## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Cambrian Holding Company, Inc., *et al.*,[1] | ) | Case No.  19-51200 (    ) |
| | ) | |
| | ) | (Joint Administration Proposed) |
| | ) | |
| Debtors. | ) | |
| | ) | Honorable _____ |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS:
(I) AUTHORIZING POST-PETITION SECURED FINANCING PURSUANT TO
SECTIONS 105, 361, 362, 363, 364 AND 503(b) OF THE BANKRUPTCY CODE; (II)
AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL PURSUANT TO
SECTION 363 OF THE BANKRUPTCY CODE; (III) PROVIDING ADEQUATE
PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT TO
SECTIONS 361, 362, AND 363 OF THE BANKRUPTCY CODE; (IV) MODIFYING THE
AUTOMATIC STAY PURSUANT TO SECTION 362(d) OF THE
BANKRUPTCY CODE; (V) SCHEDULING A FINAL HEARING; AND (VI)
PROVIDING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by

and through their proposed counsel, FROST BROWN TODD LLC, pursuant to sections 105, 361, 362,

363(c), 363(e), 364(c), 364(d) and 503(b) of Title 11 of the United States Code (the "**Bankruptcy**

**Code**"), Rules 2002, 4001(b), 4001(c), 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of the United States

Bankruptcy Court for the Eastern District of Kentucky (the "**Local Rules**"), by and through their

proposed counsel, FROST BROWN TODD LLC, hereby move this Court (this "**Motion**") for entry of

an interim order in substantially the form attached hereto as **Exhibit C** and, subject to final

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Cambrian Holding Company, Inc. (8203), Cambrian Coal LLC (3394), Apex Energy, Inc. (3455), C.W. Augering, Inc. (2875), Marshall Resources, Inc. (9735), PLM Holding Company LLC (7427), Bear Branch Coal LLC (0674), Clintwood Elkhorn Mining LLC (6910), Gatliff Coal LLC (5768), Perry County Coal LLC (4382), Ray Coal LLC (0981), Whitaker Coal LLC (8270), Pike-Letcher Land LLC (8952), Premier Elkhorn Coal LLC (8951), Raven Rock Development LLC (1351), Rich Mountain Coal LLC (1974), S.T. & T. Leasing, Inc. (0340), T.C. Leasing, Inc. (7705), and Shelby Resources, LLC (5085).

approval, a final order in a form to be filed with this Court (the "**Interim Order**" and, subject to

any order of this Court approving the DIP Facility (defined below) on a final basis, the "**Final**

**Order,**" and together with the Interim Order, the "**DIP Orders**"): (i) authorizing the Debtors to

obtain post-petition secured financing up to an aggregate principal amount not to exceed $15

million at any time outstanding (the "**DIP Facility**") and enter into a Debtor-in-Possession Term

Sheet substantially in the form annexed to the Motion as **Exhibit A** (as amended or modified, the

"**DIP Term Sheet**",[2] together with all DIP Loan Documents as defined therein, the "**DIP Credit**

**Documents**") by and among the Borrowers, Richmond Hill Capital Partners, LP and Essex Equity

Joint Investment Vehicle, LLC, and any other lenders from time to time party to the DIP Loan

Agreement (collectively, the "**DIP Lenders**"), Richmond Hill Capital Partners, LP as

administrative agent (in such capacity, the "**DIP Agent**"), all in respect of the obligations under

the DIP Credit Documents and herein (the "**DIP Obligations**"); (ii) granting the DIP Lenders first

priority liens and security interests in all of the Debtors' currently owned and after acquired

property, subject to the priorities existing as of the Petition Date, but including a senior priming

perfected lien in all assets that were subject to the DIP Lenders' pre-petition first priority lien, to

secure the DIP Obligations under the DIP Facility as further set forth herein; (iii) granting the DIP

Lenders superpriority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy

Code in respect of all DIP Obligations under the DIP Facility with priority in payment with respect

to such obligations over any and all administrative expenses of the kinds specified in Bankruptcy

Code sections 503(b) and 507(b), other than as described below; (iv) pursuant to the terms of the

DIP Orders and the terms of the DIP Credit Documents and as set forth in the budget attached

hereto as **Exhibit B** (and as subsequently modified and approved by the DIP Lenders, the "**DIP**

---

[2] Capitalized terms used herein but undefined shall have the meanings ascribed to them in the DIP Term Sheet.

**Budget**"), authorizing the Debtors to use cash collateral within the meaning of Bankruptcy Code

section 363(a) (the "**Cash Collateral**"), pursuant to Bankruptcy Code section 363(c); (v) providing

adequate protection pursuant to Bankruptcy Code sections 361, 363(e) and 364(d); (vi) modifying

the automatic stay pursuant to section 362 of the Bankruptcy Code; (vii) to the extent provided

herein, authorizing the funding of post-petition allowed fees and expenses of professionals; (viii)

pending the hearing to obtain final approval of the Motion (the "**Final Hearing**"), authorizing the

Debtors to obtain an emergency post-petition loan under the DIP Term Sheet (the "**Interim DIP**

**Facility**"), (ix) in accordance with Bankruptcy Rule 4001(c)(2), scheduling the Final Hearing and

approving notice with respect thereto; and (x) granting related relief. The Debtors state that the

granting of the Motion and entry of the DIP Orders are necessary to ensure continued going

concern operations and sale efforts and to protect and preserve the value of the Debtors' assets for

the benefit of their creditors and all constituencies. In support of this Motion, the Debtors state as

follows:

### Rule 4001(b) Statement – Cash Use

(a)     Name of Each Entity That May Claim an Interest in Cash Collateral (collectively, the "**Cash Collateral Creditors**"): See Prepetition Capital Structure section below.

(b)     Purposes for Use of Cash Collateral: As set forth in the DIP Budget, the Debtors propose to use Cash Collateral to meet their post-petition obligations and to pay their expenses, general and administrative operating expenses, and other necessary costs and expenses, including maintenance, insurance and other expenses incurred during the pendency of the Chapter 11 Cases, as well as to make payments to the DIP Lenders and the Term Lenders as described below.

(c)     Terms and Duration: The Debtors seek authority to use Cash Collateral for the initial period through the Final Hearing date, pursuant to the DIP Budget and, then subject to the entry of the Final Order and the terms of the DIP Budget, for the periods subject to the DIP Budget.

(d)     Adequate Protection: As part of the adequate protection for any diminution in the value of the Cash Collateral Creditor's interests in their pre-petition collateral, pursuant to sections 361 and 363 of the Bankruptcy Code, effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, (i) a valid, perfected replacement security interest in and lien on the collateral to which they hold priority liens existing as of the Petition

Date or thereafter acquired and any proceeds thereof and (ii) a valid, perfected security interest in and lien on all of the DIP Collateral (collectively, the "**Adequate Protection Liens**"), subject and subordinate only to (x) the Carve-Out and (y) the liens securing the DIP Facility; (iii) a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (collectively, the "**Adequate Protection Claims**"), subject and subordinate only to (x) the Carve-Out and (y) the Superpriority Claims held by the DIP Lenders under the DIP Facility.

## Rule 4001(c) Statement – DIP Loan

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| Borrowers | Cambrian Coal LLC and Shelby Resources, LLC, as debtors and debtors-in-possession (collectively, the "**Borrower**"). | DIP Term Sheet: Section "Borrower" on p.1; See also Interim DIP Order: Defined term "Borrowers" on p.1 |
| Guarantors | On a joint and several basis, by APEX ENERGY, INC., BEAR BRANCH COAL LLC, CAMBRIAN HOLDING COMPANY, INC., CLINTWOOD ELKHORN MINING LLC, C.W. AUGERING, INC., GATLIFF COAL LLC, MARSHALL RESOURCES, INC., PERRY COUNTY COAL LLC, PIKE-LETCHER LAND LLC, PLM HOLDING COMPANY LLC, PREMIER ELKHORN COAL LLC, RAVEN ROCK DEVELOPMENT LLC, RAY COAL LLC, RICH MOUNTAIN COAL LLC, SHELBY RESOURCES, LLC, S.T.&T. LEASING, INC., T.C. LEASING, INC., WHITAKER COAL LLC. | DIP Term Sheet: Section "Guarantors" (p.1) and Exhibit A; See also Interim DIP Order: Defined term "Guarantors" on p.1 |
| Agent/Lenders | Richmond Hill Capital Partners, LP and Essex Equity Joint Investment Vehicle, LLC, and any other lenders from time to time party to the DIP Loan Agreement (collectively, in such capacities, the "**DIP Lenders**").  Richmond Hill Capital Partners, LP shall serve as administrative agent for the DIP Lenders (the "**DIP Agent**"). | DIP Term Sheet: Section "DIP Lenders" on p.1; See also Interim DIP Order: Defined term "DIP Lender" on p.1 |
| Borrowing Limit | Up to the amount of $15,000,000.00 (the "**Maximum Amount**") of which approximately $12,000,000.00 million shall be available prior to the entry of the Final Order (the "**Initial Amount**"). | DIP Term Sheet Section: "Availability" on p.2; Interim DIP Order p.2 |
| Events of Default | (a) failure to pay any principal or interest on the DIP Loans or any fee or other amount due;<br><br>(b) any representation or warranty made in connection with the DIP Facility or any Loan Document shall be false in any material respect on the date as of which made;<br><br>(c) any breach or violation of any term, covenant or agreement contained in the DIP Facility or any financing order;<br><br>(d) the dismissal or conversion of any Case to one under Chapter 7 of the Bankruptcy Code; | DIP Term Sheet Section: "Events of Default" on pp.10-11; See also Interim DIP Order: "Termination of Post-Petition Credit" section, pp. 14-19 |

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| | (e) a trustee or an examiner is appointed in any of the Cases without the prior written consent of the DIP Lenders; | |
| | (f) the Interim Order or Final Order is stayed, reversed, vacated, amended or otherwise modified; | |
| | (g) the Court or any other court enters an order or judgment in any of the Cases modifying, limiting, subordinating or avoiding the priority of any prepetition obligations or the perfection, priority or validity of any prepetition liens or postpetition; | |
| | (h) any application for approval or allowance of, or any order is entered approving or allowing, any administrative expense claim in any of the Cases, having any priority over, or being *pari passu* with, the superpriority claims of the DIP Lenders; | |
| | (i) any motion or application is filed in any of the Cases seeking the entry of an order, or an order is entered in any of the Cases, approving any subsequent debtor-in-possession facility for borrowed money or other extensions of credit unless such subsequent facility and such order expressly provide for the indefeasible payment and complete satisfaction in full in cash to the DIP Lenders; | |
| | (j) the Final Order is not entered by the Bankruptcy Court within 45 days after entry of the Interim Order; | |
| | (k) failure to timely achieve any of the milestones set forth in the Interim Order or the Final Order; | |
| | (l) a plan of reorganization or liquidation is proposed which does not provide for termination of the commitment and payment in full of the DIP Facility in cash on the effective date of such plan, if such termination and payment in full has not already occurred; | |
| | (m) any other superpriority administrative expense claim or lien senior to or pari passu with the DIP Loan Agreement obligations, or the liens granted to secure the DIP Loan Agreement obligations, shall be granted, approved, imposed, or otherwise created; | |
| | (n) any of the DIP Credit Parties seeks to obtain additional financing under section 364(c) or 364(d) of the Bankruptcy Code or to grant any lien other than liens permitted under the DIP Facility and financing orders without the prior written consent of the DIP Lenders; | |
| | (o) any DIP Credit Party files any action challenging the validity, perfection, priority, extent, or enforceability of the loan documents for the DIP Facility or the liens and claims granted thereunder or with respect to the Prepetition ABL Credit Agreement; | |
| | (p) any action to avoid, modify, dispute, challenge, or subordinate any of the prepetition obligations or any prepetition liens in favor of the Prepetition ABL Collateral Agent or the DIP Lenders, or entry of an order in any action by any other party granting such relief; | |
| | (q) the entry of an order dismissing any of the Cases that does not provide for the termination of the DIP commitment and payment in full of the DIP Loans and all related obligations in cash prior to | |

| Term | Summary | Provision in Relevant Document(s) |
|------|---------|-----------------------------------|
| | dismissal; | |
| | (r) any collateral becoming subject to surcharge or marshaling; | |
| | (s) the entry of an order of the Court granting relief from the automatic stay with respect to any prepetition collateral or Collateral or any other assets; | |
| | (t) any material contract or unexpired leases of the Borrower or any Guarantor is rejected or otherwise terminated (other than in accordance with its terms) or any property of the Borrower or the Guarantors having an aggregate value equal to or exceeding $50,000 is sold outside the ordinary course of business, in each instance, without the express written consent of the DIP Lenders, provided that all such rejected material leases, in the aggregate, do not exceed an aggregate value of $150,000. | |
| Use of Cash Collateral | Permitted, subject to the terms of the approved budget. | Interim DIP Order: Section 15 |
| Maturity Date/ Termination Date | Earliest to occur of (i) the effective date of a confirmed Plan, (ii) six (6) months after the Petition Date, (iii) the date on which the obligations under the DIP Facility are accelerated following the occurrence of an Event of Default, (iv) the date of the closing of a sale of all or substantially all of the Borrower's assets pursuant to §363 of the Bankruptcy Code, and (v) the date on which the Bankruptcy Court approves the extension of any other credit facilities to the Borrower or Guarantors, or to any entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Cases, over the objection of the DIP Lenders. | DIP Term Sheet: Section "Maturity Date" on p.4 |
| Interest Rate | The interest rate shall be 12.00% per annum. Default interest rate shall be at a rate of 3.00% above the otherwise applicable rate. Interest shall be 50% payable in kind (PIK) and 50% cash. | DIP Term Sheet: Section: "Interest Rate" on p.8; See also Interim DIP Order: Section 5 |
| Liens/Security | Subject to the Carve-Out:<br><br>• per section 364(c)(1), liens with priority over all administrative expenses (the "**Superpriority Claims**"), payable from all property of the DIP Credit Parties including, *subject to the entry of the Final Order*, proceeds from chapter 5 actions (the "**Avoidance Actions**");<br><br>• per section 364(c)(2), perfected first priority lien on all now owned or hereafter acquired assets and property of the DIP Credit Parties and proceeds thereof not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, but *specifically excluding* the Avoidance Actions or any proceeds thereof (collectively, the "**First Lien Collateral**"); | DIP Term Sheet: Section "Priority and Liens: Collateral" on p.4; See also Interim DIP Order: Section 7 |

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| | • per section 364(c)(3), first priority lien on all non-Avoidance Action property of the DIP Credit Parties, junior only to liens of the Term Loan Collateral Agent securing the Term Loan Debt, and with respect to the ABL Loan Priority Collateral, the liens of the Prepetition ABL Collateral Agent securing the ABL Loan Debt that is not RH Loan Debt (collectively, the "**Second Lien Collateral**"); <br><br> • per section 364(d)(1), first-priority, senior priming perfected lien on, *other than* Avoidance Actions or proceeds thereof, (i) TECO PP&E Collateral, as defined in the Intercreditor Agreement, or (ii) a percentage of the ABL Loan Priority Collateral (as defined in the Intercreditor Agreement) equal to the RH Loan Debt existing on the Petition Date divided by the ABL Loan Debt existing on the Petition Date (each term as defined in the Intercreditor Agreement) (the "**Primed Collateral**" and together with the First Lien Collateral and the Second Lien Collateral, the "**DIP Collateral**"). | |
| Adequate Protection | The DIP Lenders shall be granted the following as adequate protection of their interest in an amount equal to the aggregate diminution in the value of their interests: <br><br> • replacement liens; <br><br> • a superpriority administrative expense claim; <br><br> • certain cash payments; <br><br> • payment of fees and expenses of counsel and financial advisor(s) to the DIP Lenders. | DIP Term Sheet: Section "Adequate Protection" on pp.7-8; See also Interim DIP Order: Section 8 |
| Fees | (i)   2.5% of the DIP Lenders' total commitment (50% of which shall be payable at exit) <br><br> (ii)   1.5% exit fee <br><br> (iii)   $75,000 agency fee <br><br> (iv)   Payment of fees and expenses of a financial advisor to the DIP Lenders <br><br> (v)   Indemnification provision <br><br> (vi)   Legal fee reimbursement | DIP Term Sheet: Sections "Commitment Fee," (p.9) "Agency Fee," (p.9)"Adequate Protection," (pp.7-8) "Indemnity," (p.16) and "Expenses" (p.16); See also Interim DIP Order: Section 5 |
| Covenants | Disbursements Unfavorable Variance not to exceed 15%. <br><br> Cash Receipts Unfavorable Variance not to exceed 25% | DIP Term Sheet: Section "Covenants" (pp.9-10); See also Interim DIP Order: Section 15 |

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| Carve-Out | $400,000 Post-Carve Out Trigger Notice Cap (with $75,000 cap for any chapter 7 trustee)<br><br>$25,000 cap for Committee to investigate claims against the DIP Lenders, the Prepetition ABL Administrative Agent or the Prepetition ABL Collateral Agent. | DIP Term Sheet: Section "Carve-Out" (pp.6-7) |
| 506(c) and 552(b) Waiver | The Final Order shall prohibit any surcharge on the collateral subject to the Prepetition ABL Collateral Agent's Liens and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise. | DIP Term Sheet: Section "Financing Orders"(pp.15-16); See also Interim DIP Order: Sections 6(x) and 12 |
| Waiver or modification of applicable non-bankruptcy law relating to the perfection/ enforcement of the lien | The liens and security interests granted to the DIP Agent, DIP Lenders, Prepetition ABL Collateral Agent, the Prepetition ABL Administrative Agent and Lenders pursuant to the Interim Order shall be valid, enforceable and perfected upon entry of the Interim Order, without the need for the execution or filing of any further document or instrument otherwise required to be executed or filed under applicable non-bankruptcy law. | DIP Term Sheet: Section "Financing Orders" (pp.15-16); Interim DIP Order: Section 23 |
| Release, waiver, or limitation on claims or other causes of action belonging to the estate or the trustee | Releases by DIP Credit Parties only of DIP Lender and Pre-Petition Agent.<br><br>Stipulations by DIP Credit Parties only regarding validity, enforceability, perfection and amount of the Pre-Petition Liens.<br><br>Releases and stipulations are subject to right of Committee and any other party in interest, including a subsequently appointed chapter 7 trustee, to object pursuant to Paragraph 25 of the Interim Order. | Interim DIP Order: Section 23, and Recital C; See also DIP Term Sheet: Section "Financing Orders" (pp.15-16) |
| Conditions Precedent | The right for the Prepetition ABL Collateral Agent (on behalf of the DIP Lenders) and/or the DIP Lenders to credit bid under Section 363(k) of the Bankruptcy Code.<br><br>Provisions for seventy (70) days (or such longer period as the DIP Lenders may agree) after the entry of the Interim Order of reasonable access to management and a well maintained electronic data room by potential bidders at auction (the "Due Diligence Period") and the bidding deadline.<br><br>A public auction to be held 75 days after entry of the Interim Order, at a time and place acceptable to the DIP Lenders.<br><br>A proposed form of sale order acceptable to the DIP Lenders approving the sale shall be entered seventy-seven (77) days (or such longer period as the DIP Lenders may agree) after the entry of the Interim Order. | DIP Term Sheet: Section "Conditions Precedent" (pp.13-15) |

| Term | Summary | Provision in Relevant Document(s) |
|------|---------|-----------------------------------|
| | The closing of such sale one hundred seven (107) days (or such longer period as the DIP Lenders may agree) after entry of the Interim Order. | |
| Roll-Up | The proceeds of any TECO PP&E Collateral (as defined in the Intercreditor Agreement), and all other payments received by the Debtors prior to the entry of the Final Order (other than proceeds received in the ordinary course of business of the Debtors) shall be applied, or deemed applied, first to the repayment and satisfaction of the prepetition RH Fifth Amendment Loan (as defined in the Pre-Petition ABL Credit Agreement), and thereafter applied to repayment of the DIP Facility. Upon entry of the Final Order, any outstanding prepetition RH Fifth Amendment Loan shall be deemed to be Obligations arising under the DIP Facility (the "Roll-Up"). The RH Fifth Amendment Loan as of the Petition Date in the principal amount of $500,000.00. | DIP Term Sheet: Section "Roll-Up of Prepetition Lenders" (p. 3) |

## JURISDICTION AND VENUE

1.        This Court has jurisdiction over these Chapter 11 Cases, as defined herein, under 28 U.S.C. §§ 157 and 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.        The statutory bases for the relief requested herein are Sections 105, 361, 362, 363, 364 and 503(b) of the Bankruptcy Code.

## BACKGROUND

3.        The Debtors commenced chapter 11 cases under which they are seeking joint administration (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on June 16, 2019 (the "**Petition Date**"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their affairs as debtors-in-possession. As of the date hereof, no creditors' committee, trustee or examiner has been appointed in the Chapter 11 Cases.

4.      The Debtors' core business is producing and processing metallurgical (or "**met**")

coal and thermal (or "**steam**") coal for use by utility providers and industrial companies located

primarily in the eastern United States and Canada.  The Debtors began operations in 1991 and,

over time, acquired various mines and mining-related assets from major coal corporations. By

and/or through these operations, the Debtors supply different qualities of coal to their customers.

5.      Additional information regarding the Debtors' businesses, capital structure, and the

circumstances leading to the chapter 11 cases are contained in the *Declaration of J. Mark Campbell*

*in Support of the First Day Motions of Debtors and Debtors-in-Possession* (the "**First Day**

**Declaration**").

## PREPETITION CAPITAL STRUCTURE

6.      Non-Debtors Beech Fork Processing, LLC, Eagle Coal Company, LLC and Pevler

Coal Sales Company, Inc., as borrowers, and their subsidiaries, as guarantors, entered into that

certain ABL Credit and Guaranty Agreement, dated as of July 10, 2013, for a $10 million asset-

based revolving loan used for working capital and general corporate purposes (as amended from

time to time, including the amendments described herein, the "**ABL Revolver**").  In connection

with the acquisition of TECO Coal Corporation and its coal operations (the "**TECO Acquisition**")

by Cambrian Coal LLC ("**Cambrian Coal**"), the ABL Revolver was amended and restated as of

September 21, 2015 to, among other things, remove Pevler Coal Sales Company, Inc. as a

borrower, include Debtors Cambrian Coal and Shelby Resources, LLC ("**Shelby Resources**") as

borrowers, include the subsidiaries of Debtor Cambrian Coal as guarantors, and increase the size

of the ABL Revolver to up to $47.5 million.

7.      The additional ABL Revolver proceeds made available on September 21, 2015

were used to cash collateralize certain bonding obligations arising in connection with the TECO

Acquisition and for working capital and general corporate purposes.  Deutsche Bank AG New

York Branch serves as administrative agent and collateral agent (the "**ABL Revolver Agent**") for the ABL Revolver and the ABL Revolver lenders are the ABL Revolver Agent, in its capacity as a lender, and Richmond Hill Investment Co., L.P. (collectively, the "**ABL Revolver Lenders**").

8.      The ABL Revolver is secured by a lien on substantially all the assets of non-Debtors Beech Fork Processing LLC and Eagle Coal Company, LLC, and Debtors Cambrian Coal and Shelby Resources, along with their respective subsidiaries, other than certain excluded assets, such as collateral accounts, real property not considered material, agreements that prohibit the granting of liens without consent of the counterparty, and other customarily excluded assets. Subsequently, the borrowers, the guarantors, the ABL Revolver Agent and the ABL Revolver Lenders entered into various forbearance and related agreements in response to defaults arising from challenging coal market conditions (collectively, the "**ABL Forbearance Agreements**"). As part of those ABL Forbearance Agreements, non-Debtors Southeastern Land, LLC and Miller Creek Holdings, LLC granted the ABL Revolver Agent, for the benefit of the ABL Revolver Lenders, liens on certain mining equipment, a note receivable and the equity interests in Miller Creek Holdings, LLC to secure the ABL Revolver. Currently, all forbearance periods have expired under the ABL Forbearance Agreements. As of the Petition Date, approximately $45,698,362.87 million is outstanding on the ABL Revolver.

9.      In addition, non-Debtors Beech Fork Processing, LLC, Eagle Coal Company, LLC and Pevler Coal Sales Company, Inc., as borrowers, and their subsidiaries, as guarantors, entered into a Credit and Guaranty Agreement, dated as of July 10, 2013, for a $43.5 million term loan used for working capital and general corporate purposes (as amended from time to time, including the amendments described herein, the "**Term Loan**").

10.     In connection with the TECO Acquisition, the Term Loan was amended and restated as of September 21, 2015 to, among other things, remove non-Debtor Pevler Coal Sales Company, Inc. as a borrower, include Debtors Cambrian Coal and Shelby Resources as borrowers, include the subsidiaries of Debtor Cambrian Coal as guarantors, and increase the size of the Term Loan to approximately $52 million.

11.     The additional Term Loan proceeds made available on September 21, 2015 were used to repay certain indebtedness, to pay certain fees, costs and expenses incurred in connection with the TECO Acquisition, and for working capital and general corporate purposes.  Deutsche Bank Trust Company Americas serves as administrative agent and collateral agent (the "**Term Loan Agent**") for the Term Loan and the Term Loan lenders are Deutsche Bank AG, London Branch, Tennenbaum Opportunities Partners V, LP and Tennenbaum Opportunities Fund VI, LLC (collectively, the "**Term Loan Lenders**").  The Term Lenders will assert that the Term Loan is secured by a lien on substantially the same assets of non-Debtors Beech Fork Processing, LLC and Eagle Coal Company, LLC, Debtors Cambrian Coal and Shelby Resources, and their respective subsidiaries as secure the ABL Revolver.  Subsequently, the borrowers, the guarantors, the Term Loan Agent and the Term Loan Lenders entered into various forbearance and related agreements in response to defaults arising from challenging coal market conditions (collectively, the "**Term Loan Forbearance Agreements**").  The Term Lenders will also assert that as part of the Term Loan Forbearance Agreements, non-Debtors Triple A Resources, Inc., R & J Development Company, LLC, Southeastern Land, LLC and its subsidiary, Miller Creek Holdings, LLC, granted the Term Loan Agent, for the benefit of the Term Loan Lenders, liens on certain commercial development property, mining equipment, a note receivable and the equity interests in Miller Creek Holdings, LLC to secure the Term Loan.  Currently, all forbearance periods under the Term Loan

Forbearance Agreements have expired.  As of the Petition Date, the Debtors believe that the Term

Lenders will assert that approximately $78 million is outstanding on the Term Loan.

12.      The ABL Revolver Agent and the Term Loan Agent are parties to an Amended and

Restated Intercreditor Agreement dated as of September 21, 2015 (as amended, restated or

otherwise modified from time to time, the "**Intercreditor Agreement**"), which was acknowledged

by the obligors under the ABL Revolver and the Term Loan, including the Debtors.   The

Intercreditor Agreement sets forth the relative lien priority and payment rights as between the ABL

Revolver and the Term Loan.   The Intercreditor Agreement also provides that (a) if the agent

holding the senior lien on any shared collateral releases its lien in connection with a disposition of

that shared collateral, the agent holding the junior lien is deemed to consent to, and will release its

lien with respect to, the disposition of that shared collateral, provided that disposition meets certain

criteria set out in the Intercreditor Agreement, and (b) the agent holding the junior lien on any

shared collateral will be deemed to have consented to the use of such shared collateral that

constitutes cash collateral or any debtor-in-possession financing and will subordinate its liens on

such shared collateral to the debtor-in-possession financing liens on such shared collateral, any

adequate protection made available to the agent holding the senior lien on such shared collateral,

and any professional fee and U.S. trustee fee carveout consented to in writing by the agent holding

the senior lien, provided that the agent with the senior lien on such shared collateral does not

oppose or object to such use or financing and such use or financing meets certain criteria set out

in the Intercreditor Agreement.

13.      In connection with the ABL Forbearance Agreements and the Term Loan

Forbearance Agreements referenced above, the Intercreditor Agreement was amended to set out

the lien priority rights with respect to the additional collateral provided to the ABL Revolver Agent

and the Term Loan Agent by non-Debtors Triple A Resources, Inc., R & J Development Company,

LLC, Southeastern Land, LLC and its subsidiary, Miller Creek Holdings, LLC.

### **RELIEF REQUESTED**

14.    Pursuant to this Motion, the Debtors seek entry of the Interim Order, and ultimately,

a Final Order:

i.    Authorizing the Debtors to obtain and enter into the DIP Facility pursuant to sections 105, 362, 363 and 364 of the Bankruptcy Code in accordance with the Interim Order and the Final Order, from the DIP Lenders, pursuant to the terms and conditions set forth herein, in the DIP Term Sheet and in the DIP Loan Documents;

ii.    Granting grant the DIP Lender first priority liens and security interests in all of the Debtors' currently owned and after acquired property, subject to the priorities existing as of the Petition Date, but including a senior priming perfected lien in all assets that were subject to the DIP Lender's pre-petition first priority;

iii.    Granting the DIP Lender superpriority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all obligations under the DIP Facility with priority in payment with respect to such obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b);

iv.    Authorizing the Debtors to use Cash Collateral, pursuant to sections 361 and 363 of the Bankruptcy Code, grant security interests, mortgages and/or other liens and superpriority claims in order to provide adequate protection to the Prepetition ABL Collateral Agent and the Prepetition ABL Administrative Agent for use of Cash Collateral;

v.    Modifying the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to implement and enforce the terms and provisions of the DIP Credit Agreement and the Interim Order;

vi.    To the extent provided in the DIP Orders, authorizing the funding of post-petition allowed fees and expenses of retained professionals;

vi.    Scheduling the Final Hearing for entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing pursuant to Rules 2002, 4001 and 9014 of the Bankruptcy Rules; and

vii.    Granting such further and related relief as the Court deems just and equitable.

## NEED FOR USE OF CASH COLLATERAL

15.     The Debtors request authorization to use the Cash Collateral to pay actual, necessary ordinary course operating expenses, as set forth in the DIP Budget, which includes the costs and expenses associated with the continuation of the Debtors' businesses and to maximize the value of the Debtors' assets for a proposed sale process.  Upon information and belief, the Debtors believe that the proposed DIP Budget, prepared with the Debtors financial advisors, is sufficient to pay expenses incurred in the Debtors' business operations as contemplated after the Petition Date.

16.     Absent the use of the Cash Collateral, the Debtors will be unable to operate their businesses as contemplated after the Petition Date and to meet all of their ongoing obligations in the ordinary course of business. Approval of interim use of the Cash Collateral is crucial and necessary under the facts and circumstances, and without such use, the Debtors' operations, its creditors and other parties in interest will suffer immediate and irreparable harm and its assets will markedly diminish in value going forward.

17.     Accordingly, the Debtors respectfully submit good exists for the entry of the DIP Orders authorizing the immediate use by the Debtors of Cash Collateral in accordance with the DIP Budget. Among other things, entry of the DIP Orders will allow the Debtors to maintain their operations, preserve their assets and allow the Debtors to conduct a process for the sale of substantially all of their assets and business operations.

18.     Section § 363(c)(2) of the Bankruptcy Code provides that a debtor "may not use, sell or lease cash collateral . . . unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section."  Pursuant to the terms of the DIP Term Sheet and Interim Order, the ABL Revolver Agent and the ABL Revolver Lenders have consented to the use

of Cash Collateral.  Nonetheless, obtaining the use of Cash Collateral is imperative to the Debtors, their estates, their creditors, and their ability to reorganize through the sale of substantially all of their assets and business operations as a going concern.  The Debtors therefore ask this Court to enter the Interim Order authorizing the Debtors to use Cash Collateral pursuant to the DIP Budget.

19.     The Debtors respectfully submit that the use of the Cash Collateral on the terms set forth in the attached proposed Interim Order maximizes the value of the Debtors' assets for the benefit of all stakeholders.  Further, section 363(e) of the Bankruptcy Code provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e); *see also Federal Nat. Mortg. Ass'n v. Dacon Bolingbrook Associates Ltd. Partnership*, 153 B.R. 204, 210-11 (N.D. Ill. 1993); *Matter of Johnson*, 47 B.R. 204, 208 (Bankr. W.D. Wis. 1985). Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include the providing of an additional or replacement lien to the extent that the use of the property by a debtor will cause a decrease in the value of an entity's interest in the property. 11 U.S.C. § 361.

20.     In consideration for the post-petition use of the prepetition collateral, to the extent that any Cash Collateral Creditors assert rights to adequate protection, the Debtors propose to protect the interests of those Cash Collateral Creditors with replacement liens and periodic cash payments in the amounts and at the times set forth in the DIP Budget   The Debtors respectfully submit that such replacement liens and cash payments, as more fully described in the Interim Order and in the DIP Budget, adequately protect those interests and meet all requirements of 11 U.S.C. § 361.

## THE DIP TERM SHEET AND INTERIM DIP ORDER

21.      The Debtors have determined, in exercising their business judgment, that, under the current circumstances, the post-petition financing proposal made by the DIP Lenders satisfies the Debtors' urgent financing needs.

22.      The Debtors and the DIP Lender engaged in lengthy negotiations over the terms of the DIP Term Sheet and the DIP Order.  Those negotiations were extensive, comprehensive, at arm's length and in good faith.  The Debtors used their best efforts to negotiate the elimination or narrowing of those provisions implicating issues that are the subject of Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(l)(B).  Nevertheless, there remain certain provisions in the DIP Orders and the DIP Term Sheet that the Debtors are required to highlighted by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule E.D. KY. LBR 4001-2(d) (the "**Highlighted Provisions**").  The DIP Lender has requested Court approval of the Highlighted Provisions as a condition for providing the financing to the Debtors. In particular, the DIP Lender has requested:

   a.  **Provisions that acknowledge the validity, amount, perfection, priority, extent or enforceability of a secured claim, if binding on any party except the debtors.**
   There are no such provisions, although a challenge period for any third party, including but not limited any chapter 7 trustee appointed, to question these issues is hereby requested. (Recital C of the Interim DIP Order).  The relevant provision in the Interim Order is paragraph 25.

   b.  **Provisions that release liability for creditor's prepetition torts or breaches of contract, waiver of avoidance actions or waiver of defenses by the debtor or estate representative.**
   A release of the DIP Lender and the Pre-Petition Agent by the Debtors and Debtors-in-Possession only (Paragraph 23 of the Interim DIP Order).  However, the Interim

Order provides for an investigation and challenge period by third parties, including but not limited to any chapter 7 trustee appointed; and

**c.  Provisions that grant a postpetition lien which secures a claim for replacement or extension of prepetition credit, or for diminution in value that occurred prior to the Petition Date.**

The DIP Term Sheet provides for the provision of adequate protection payments to be provided to the DIP Lender and the Pre-Petition Agent, including amounts for the Roll-up (as defined above) as well as replacement liens and superpriority claims.

**d.  Provisions that grant a security interest in any avoidance powers available to a trustee.**

Subject to entry of the Final Order, the DIP Collateral shall not include, and the security interests created by the DIP Term Sheet and the other DIP Credit Documents shall not extend to claims and causes of action under Chapter 5 of the Bankruptcy Code (defined in the DIP Term Sheet and the Interim Order as the "Avoidance Actions").

**e.  Provisions that grant relief from the automatic stay without further order or hearing upon the breach of a cash collateral, adequate protection of DIP financing order or agreement.**

The DIP Term Sheet does not provide for automatic relief from the stay if the Debtors do not cure an Event of Default; the DIP Term Sheet provides for an expedited hearing on 3 days' notice.

(Paragraph 11 of the Interim DIP Order).

23.     Based upon the totality of the circumstances, the Debtors submit that such protections are appropriate, in the best interest of the creditors of these estates and should be approved by this Court. Moreover, the Highlighted Provisions are not uncommon to debtor-in-possession financing of the nature that is currently before this Court.

24.     The Debtors submit that the Highlighted Provisions are appropriate because of the Debtors' inability to obtain post-petition financing on equal or better terms.  In conjunction with the prepetition liens, many of the Debtor's assets are encumbered by liens in favor of the Pre-Petition Lenders and various equipment lessors and financial parties.  Further, the Debtors' discussions with other potential lenders did not yield terms more favorable than those offered to the Debtor in the DIP Order.  The DIP Lenders offered the Debtors the only terms available upon which to obtain post-petition financing and continue their business operations. Without such financing, the Debtors will be unable to operate after the Petition Date and will face substantially more obstacles and uncertainty going forward as the Debtors seek to commence a process to sell substantially all of their assets and business operations.  The Debtors therefore believe that the terms of the DIP Term Sheet and the DIP Order are fair and justified under the circumstances and should be approved by this Court.

## DEBTORS' ATTEMPTS TO OBTAIN CREDIT

25.     Prior to the Filing Date, the Debtors, through their financial advisors, Jefferies LLC, attempted to obtain post-petition financing proposals from other lenders and financial entities, but were unable to obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code and/or unsecured credit allowable under section 364(a) or (b) of the Bankruptcy Code.  In addition, due to their urgent financial constraints, the Debtors are presently unable to obtain, in the ordinary course of business or otherwise, credit allowable under sections 364(c) or 364(d) of the Bankruptcy Code, except

from the DIP Lender on the terms and conditions contained in the Interim Order and the Final

Order.

26.    Before deciding to obtain post-petition financing from the DIP Lender, the Debtors

and the DIP Lenders engaged in arm's length, good faith negotiations, each with separate and

independent counsel.  The Debtors were unable to obtain proposals for post-petition financing on

terms and conditions more favorable to the Debtors' estates than those set forth in the DIP Term

Sheet or the DIP Orders.  As such, any credit extended by the DIP Lender on or after the Petition

Date pursuant to the terms of the DIP Term Sheet and the DIP Orders should be accorded the

benefits of Section 364(e) of the Bankruptcy Code.

27.    The Debtors have determined, in the exercise of their best and reasonable business

judgment, that the financing to be provided by the DIP Lender is the most favorable funding

available under the circumstances and addresses the Debtors' immediate necessary financing needs

during these Chapter 11 Cases.  The financing available under the DIP Term Sheet and the DIP

Orders will enable the Debtors, among other things, to avoid the cessation of its operations,

maintain the continuity of its operations, and maximize the value of its business.

## APPROVAL OF THE DIP TERM SHEET AND DIP FACILITY IS WARRANTED UNDER THE CIRCUMSTANCES AND APPLICABLE LAW

28.    Pursuant to Section 364(c) of the Bankruptcy Code, a debtor may, in the exercise

of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured

credit and the borrowing is in the best interests of the estate.  *In re Simasko Production*, 47 B.R.

444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where debtors' best business

judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept.

Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit

debtors-in-possession to exercise their basic business judgment consistent with their fiduciary

duties"); *see also* Collier on Bankruptcy, ¶ 364.05 (15th ed. rev.).    Section 364(c) of the

Bankruptcy Code provides in pertinent part:

> (c)    If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
>> (1)    with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>>
>> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>>
>> (3)    secured by a junior lien on property of the estate that is subject to a lien.

29.    In satisfying the standards of section 364(c) of the Bankruptcy Code, a debtor need

not seek credit from every available source but should make a reasonable effort to seek other

sources of credit available of the type set forth in Sections 364(a) and (b) of the Bankruptcy Code.

*See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (11th Cir. 1986) (trustee demonstrated by good faith

effort that credit was not available without senior lien by unsuccessfully contacting other financial

institutions in immediate geographic area; "the statute imposes no duty to seek credit from every

possible lender before concluding that such credit is unavailable"); *see also Ames*, 115 B.R. at 40

(debtors demonstrated the unavailability of unsecured financing where debtors approached several

lending institutions); *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897,900 (Bankr. N.D. Ohio 1992)

(same); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where there are few

lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be

unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing"),

*aff'd sub nom.*, *Anchor Say. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

30.    Courts have articulated a three-part test to determine whether a debtor in possession

is entitled to financing under section 364(c) of the Bankruptcy Code: (i) whether the debtor is

unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing

a lender only an administrative claim; (ii) whether the credit transaction is necessary to preserve

the assets of the estate; and (iii) whether the terms of the transaction are fair, reasonable and

adequate, given the circumstances of the debtor-borrower and the proposed lender. *See*, *e.g.*, *In re*

*Farmland Indus., Inc.*, 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003); *In re Aqua Assocs.*, 123 B.R.

192, 195-96 (Bankr. E.D. Pa, 1991); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr.

S.D.N.Y. 1990); *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).

31.     Furthermore, section 364(d) of the Bankruptcy Code does not require that a debtor

seek alternative financing from every possible lender; rather, the debtor simply must demonstrate

sufficient efforts to obtain financing without the need to grant a senior lien. *Bray v. Shenandoah*

*Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee

demonstrated that credit was unavailable absent the senior lien by establishment of unsuccessful

contact with other financial institutions in the geographic area and court observed that "[t]he statute

imposes no duty to seek credit from every possible lender before concluding that such credit is

unavailable"); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 442 n.44 (Bankr. S.D.N.Y. 2010)

("Generally, courts require only a showing of reasonable effort; debtors are not required to seek

an alternative financing from every possible lender."); *In re 495 Cent. Park Ave. Corp.*, 136 B.R.

626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing

from various sources, explaining that "most banks lend money only in return for a senior secured

position").

## NO MORE FAVORABLE ALTERNATIVE FINANCING IS AVAILABLE IN LIGHT OF THE DEBTORS' CURRENT FINANCIAL STATUS

32.     As noted above, the Debtors are unable to obtain credit that is not both secured and

entitled to superpriority administrative claim status from any other financing source and, in fact,

have been unable to obtain credit on even a secured and superpriority administrative basis from any other source because the Debtors' prepetition obligations are secured by substantially all of their assets. Under these circumstances, and given the Debtors' current financial status, after the Debtors were unable to locate any third-party lender to provide financing on better terms than the DIP Term Sheet, the Debtors had no choice but to move forward with the DIP Lender, their only financing option. Thus, the Debtors can show "by a good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code. *Snowshoe*, 789 F.2d at 1088.

## NEED FOR FINANCING

33.    Unless the Debtors are authorized to obtain the financing requested herein, the Debtors will not have sufficient available sources of working capital to maintain their businesses for a going concern sale after the Petition Date, which will maximize value for their estates.

## THE FINANCING IS FAIR AND REASONABLE

34.    The Debtors believe that the terms of the DIP Orders are fair, just, and reasonable under the circumstances. The DIP Orders are ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Term Sheet and the DIP Orders have been negotiated in good faith and at arms' length by and among the Debtors and the DIP Lenders, with all parties represented by counsel. Accordingly, the Debtors believe that any credit extended under the terms of the DIP Orders is extended in good faith by the DIP Lenders as that term is used in Section 364(e) of the Bankruptcy Code.

35.    Given the Debtors' current financial condition, the Debtors are unable to obtain credit that is unsecured and not secured by a lien. Accordingly, after appropriate investigation and analysis, the Debtors have concluded that the post-petition financing set forth herein is the best

alternative available under the circumstances.  Bankruptcy Courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money and/or obtain credit.  *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not this Court"); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("More exacting scrutiny would slow the administration of the Debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estates, and threaten the court's ability to control a case impartially."); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

36.     Additionally, unless the decision is arbitrary and capricious, a bankruptcy court should defer to a debtor's business judgment regarding the need for, and the proposed use of, the requested funds.  *In re Curlew Valley Assoc.*, 14 B.R. 507, 511-13 (Bankr. D. Utah 1981). Bankruptcy Courts will generally not second guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Id.* at 513-14 (footnotes omitted).

37.     In the instant case, the Debtors have exercised sound business judgment by seeking advice from its legal advisors and financial in making the determination that the DIP Term Sheet are fair and reasonable and in the best interest of the Debtors' estates. Accordingly, the Debtors should be granted authority under section 364(c) of the Bankruptcy Code to enter into the DIP Term Sheetand the DIP Orders, and to borrow funds from the DIP Lender on a secured basis and as described herein.

38.     Furthermore, substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent the proposed superpriority claims

and liens. It is noteworthy that the proposed priming only impacts the ABL Lenders and the priming is with the consent of the ABL Lenders. The proposed priming does not impact the valid liens and security interests of any third party. Because the ABL Lenders have consented to the priming, the priming liens are appropriate under section 364(d) of the Bankruptcy Code. *See In re Xerium Techs., Inc.*, 2010 WL 6982125 (Bankr. D. Del. March 30, 2010) ("The DIP Liens…are appropriate under section 364(d) of the Bankruptcy Code because, among other things…the holders of such valid, perfected, prepetition security interests and Liens have consented to the security interests and priming Liens.").

39.    Finally, in accordance with the terms of the Intercreditor Agreement, during the week prior to the Petition Date, the ABL Lenders advanced funds to the Debtors in the amount of $500,000. In accordance with the terms of the Intercreditor Agreement amendment, the parties agreed that the amount advanced to the Debtors under the Intercreditor Agreement amendment would, subject to entry of the Final Order, be rolled up into the DIP Facility. Roll-ups, as well as similar refinancings of prepetition claims with postpetition credit, may be authorized under section 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010) ("Post-petition refinancing of uneconomical *secured* debt through a DIP loan may be authorized by section 363(b) of the Bankruptcy Code as a use of estate property outside the ordinary course of business . . . similarly, prepetition secured claims can be paid off through a roll-up."); *In re Energy Future Holding Corp.*, 527 B.R. 157, 167 (D. Del. 2015). Given that the Roll-Up is relatively small, and effective only upon entry of the Final Order, the Debtors respectfully submit that the Roll-Up is a sound exercise of the Debtor's business judgment.

40.    Ultimately, the requested relief is vital. Without the DIP Facility, the Debtors will be unable to maximize the value of their assets through a going concern sale that will be proposed to the Court prior to entry of a Final Order.

## NOTICE

41.    Notice of this Motion has been given to (i) the Office of the United States Trustee for the Eastern District of Kentucky; (ii) the Debtors' 40 largest unsecured creditors on a consolidated basis; (iii) Richmond Hill Capital Partners, LP and Essex Equity Joint Investment Vehicle, LLC; (iv) counsel to Richmond Hill Capital Partners, LP and Essex Equity Joint Investment Vehicle, LLC, Chapman and Cutler LLP, 1270 Avenue of the Americas, 30th Floor, New York, New York 10020 (Attn: Mr. Larry G. Halperin, Esq. and Ms. Laura E. Appleby, Esq.) and Stites & Harbison PLLC, 250 West Main Street, Suite 2300, Lexington, Kentucky 40507 (Attn: Ms. Elizabeth L. Thompson, Esq.); (v) counsel to Deutsche Bank AG, London Branch, Tennenbaum Opportunities Partners V, LP and Tennenbaum Opportunities Fund VI, LLC, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Brian M. Resnick, Esq. and Christopher S. Robertson, Esq.) and Bingham Greenbaum Doll LLP, 101 South Fifth Street, Louisville, Kentucky 40202 (Attn: April A. Wimberg, Esq.); (vi) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (vii) all parties to equipment leases with the Debtors to the extent reasonably known to the Debtors; (viii) all parties asserting a surety bond interest in the assets of the Debtors to the extent reasonably known to the Debtors, i.e., Commonwealth of Kentucky, Energy and Environment Cabinet, Department of Natural Resources, Commonwealth of Kentucky, Commonwealth of Virginia, Virginia Department of Mine Minerals and Energy, Division of Mined Land Reclamation, Energy and Environment Cabinet, Division of Mine Reclamation and Enforcement, Kentucky Utilities, United States of America, Department of the Interior, Bureau of Land Management; (ix) all parties

asserting a taxing interest in the assets of the Debtors to the extent reasonably known to the Debtors, i.e. Kentucky Department of Revenue, US Department of Treasury, and US Department of Interior-Office of Surface Mining; (x) counsel to any party in pending litigation with the Debtors; and (xi) those entities specifically affected by a specific motion.  Because of the exigencies of the circumstances and the irreparable harm to the Debtors that will ensue if the relief requested herein is not granted, the Debtors submit that no other notice need be given.  **Please take notice that the Debtors have filed a Motion for an Expedited Hearing to consider First Day Motions, including the foregoing.**

### <u>NO PRIOR REQUEST</u>

42.     No prior motion for the relief requested herein has been made to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request that this Court enter an interim order, substantially in the form attached hereto as **<u>Exhibit C</u>**, and a final order in a form to be presented prior to a final hearing on this Motion: (i) authorizing the Debtors to obtain post-petition financing and enter into DIP Term Sheet substantially in the form annexed to the Motion as **<u>Exhibit A</u>**, by and among the Borrowers, the DIP Lenders, and the DIP Agent, all in respect of the DIP Obligations, and the DIP Budget; (ii) granting mortgages, security interests, liens and superpriority claims for the benefit of the DIP Agent and DIP Lenders; (iii) permitting the use of Cash Collateral, subject to the terms of the DIP Orders and the DIP Term Sheet; (iv) providing Adequate Protection; (v) modify the automatic stay pursuant to section 362 of the Bankruptcy Code; (vi) allowing the funding of post-petition allowed fees and expenses of professionals to the extent provided in the DIP Orders; (vii) authorizing the Debtors to obtain the Interim DIP Facility, pending a Final

Hearing; (viii) scheduling the Final Hearing and approving notice with respect thereto; and (ix) granting any and all other such relief to which the Debtors may be justly entitled.

Dated: June 16, 2019           /s/ Patricia K. Burgess
                                   Patricia K. Burgess
                                   **FROST BROWN TODD LLC**
                                   250 West Main Street, Suite 2800
                                   Lexington, Kentucky 40507
                                   Tel:  (859) 231-0000
                                   Fax: (859) 231-0011
                                   E-mail: pburgess@fbtlaw.com

                                   -and-

                                   Ronald E. Gold (*pro hac vice* application forthcoming)
                                   Douglas L. Lutz (*pro hac vice* application forthcoming)
                                   A.J. Webb (*pro hac vice* application forthcoming)
                                   Bennett M. Parker (*pro hac vice* application forthcoming)
                                   **FROST BROWN TODD LLC**
                                   3300 Great American Tower
                                   301 East Fourth Street
                                   Cincinnati, Ohio 45202
                                   Tel:  (513) 651-6800
                                   Fax:  (513) 651-6981
                                   E-mail:  rgold@fbtlaw.com
                                             dlutz@fbtlaw.com
                                             awebb@fbtlaw.com
                                             bmparker@fbtlaw.com

                                   **PROPOSED ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION**