## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Cambrian Holding Company, Inc., *et al.*,[1] | ) | Case No.  19-51200 (GRS) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | Honorable Gregory R. Schaaf |

### INTERIM ORDER (I) AUTHORIZING
### (A) SECURED POST-PETITION FINANCING ON A SUPER PRIORITY BASIS
### PURSUANT TO 11 U.S.C. § 364, (B) USE OF CASH COLLATERAL
### PURSUANT TO 11 U.S.C. § 363 AND (C) GRANT OF
### ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 363 AND 364 AND
### (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)

Upon the motion (the *"Motion"*) dated June 16, 2019 of Cambrian Coal LLC and Shelby Resources, LLC (collectively, the *"Borrowers"*), and those entities (collectively, the *"DIP Guarantors"*) listed on *"Exhibit A"* to the DIP Term Sheet attached hereto as <u>Exhibit A</u> (the *"DIP Term Sheet"*), with the Borrowers and DIP Guarantors as debtors and debtors in possession (collectively referenced to herein as the *"Debtors"*) in the above-captioned cases (the *"Cases"*) (a) seeking this Court's authorization pursuant to Section**s** 105, 361, 363(c), 363(e), 364(c) and 364(d) of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the *"Bankruptcy Code"*) and Rules 2002, 4001(c), 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*), and the Local Rules of the United States Bankruptcy Court for the Eastern District of Kentucky (the *"Local Rules"*) for the Debtors, *inter alia,* (i) to obtain post-petition financing (the *"Post-Petition Financing"*), up to an aggregate principal amount not

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Cambrian Holding Company, Inc. (8203), Cambrian Coal LLC (3394), Apex Energy, Inc. (3455), C.W. Augering, Inc. (2875), Marshall Resources, Inc. (9735), PLM Holding Company LLC (7427), Bear Branch Coal LLC (0674), Clintwood Elkhorn Mining LLC (6910), Gatliff Coal LLC (5768), Perry County Coal LLC (4382), Ray Coal LLC (0981), Whitaker Coal LLC (8270), Pike-Letcher Land LLC (8952), Premier Elkhorn Coal LLC (8951), Raven Rock Development LLC (1351), Rich Mountain Coal LLC (1974), S.T. & T. Leasing, Inc. (0340), T.C. Leasing, Inc. (7705), and Shelby Resources, LLC (5085).

to exceed $15 million at any time outstanding (the *"Commitment"*) plus accrued interest on the

aggregate principal amount from Richmond Hill Capital Partners, LP, individually as lender and

as administrative agent, and Essex Equity Joint Investment Vehicle, LLC, as lender, (collectively,

the *"DIP Lender"*) which would be extended to the Borrowers and guaranteed by the DIP

Guarantors; (ii) to grant the DIP Lender first priority liens and security interests in all of the

Debtors' currently owned and after acquired property, subject to the priorities existing as of the

Petition Date, but including a senior priming perfected lien in all assets that were subject to the

DIP Lender's pre-petition first priority lien, to secure the Debtors' obligations under the Post-

Petition Financing as further set forth herein and (iii) to grant the DIP Lender superpriority

administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all

obligations under the Post-Petition Financing with priority in payment with respect to such

obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code

§§ 503(b) and 507(b), other than as described below; (b) seeking this Court's authorization to use

cash collateral within the meaning of Bankruptcy Code § 363(a) (the *"Cash Collateral"*), pursuant

to Bankruptcy Code § 363(c), and to provide adequate protection pursuant to Bankruptcy Code

§§ 361, 363(e) and 364(d) to the DIP Lender, the Pre-Petition ABL Agent (as defined below) and

the Pre-Petition Term Loan Secured Parties (as defined below); and (c) seeking a preliminary

hearing (the *"Preliminary Hearing"*) on the Motion to consider entry of an interim order pursuant

to Bankruptcy Rule 4001 (this *"Interim Order"*) authorizing the Borrowers to borrow from the

DIP Lender, and the DIP Guarantors to guarantee such borrowings, under the Post-Petition

Financing up to an aggregate of $12 million at any time outstanding on an interim basis upon entry

of the Interim Order, plus accrued interest on the aggregate principal amount, upon the terms and

conditions set forth in this Interim Order, pending the Final Hearing referred to below; and (c) after

an interim hearing on the Post-Petition Financing held on June 17, 2019, requesting that a final

hearing (the *"Final Hearing"*) be scheduled by this Court to consider entry of a final order (the *"Final Order"*) authorizing upon entry of the Final Order on a final basis the Post-Petition Financing in the total aggregate amount of $15 million at any time outstanding, inclusive of the $12 million available upon entry of the Interim Order, together with all other rights and remedies requested in the Motion.

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the *"Notice"*) was served by the Debtors in accordance with Bankruptcy Rule 4001(c) and the Local Rules on (i) the DIP Lender and its counsel, (ii) the Pre-Petition ABL Agent (as defined below) and its counsel, (iii) the Pre-Petition Term Agent (as defined below) and its counsel, (iv) counsel to the Pre-Petition Term Lenders (as defined below) (v) all other parties with liens of record on assets of the Debtors as of the Petition Date, (vi) the Office of the United States Trustee of the Eastern District of Kentucky (the *"U.S. Trustee"*), (vii) the Debtors' cash management banks, and (viii) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the *"Noticed Parties"*).

This Court having reviewed the Motion and any responses and objections thereto, the *Declaration of J. Mark Campbell in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the *"First Day Declaration"*), the other filings and pleadings made by the Debtors, the evidence and testimony presented at the Interim Hearing, and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

A.    On June 16, 2019 (the *"Petition Date"*), the Debtors filed voluntary petitions for relief with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in

possession of their property, and operating and managing their businesses, as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.     This Court has jurisdiction over the Cases and the Motion pursuant to 28 U.S.C. § 1334. Consideration of the Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (D), (K), (M) and (O), and the Debtors confirm their consent to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

C.     Subject only to the rights of parties in interest that are specifically set forth in paragraph 25 below, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows:

(i)     The DIP Lender is a lender under that certain ABL Credit and Guaranty Agreement dated as of July 10, 2013 (as amended as of September 4, 2014, October 31, 2014 and May 28, 2015) and as further amended and restated in full by Amendment No. 4 to ABL Credit and Guaranty Agreement and Amendment No. 1 to pledge and Security Agreement, dated as of September 21, 2015, (as amended, modified and supplemented) (the *"Pre-Petition ABL Credit Agreement"*) among Cambrian Coal Corporation (now known as Cambrian Coal LLC), Beech Fork Processing, Inc. (now known as Beech Fork Processing, LLC), Eagle Coal Company, Inc. (now known as Eagle Coal Company, LLC) and Shelby Resources, LLC as Borrowers (the "*Pre-Petition Borrowers*"), certain subsidiaries of each Pre-Petition Borrower, as guarantors (the "*Pre-Petition Guarantors*"), certain lenders party thereto from time to time, Deutsche Bank Securities, Inc., as sole lead Arranger, and Deutsche Bank AG New York Branch (*"DBNY"*), as Administration Agent, Collateral Agent, Lender and Issuing Bank (collectively, the *"Pre-Petition ABL Agent"*) and all collateral and ancillary documents executed in connection therewith (the

*"Pre-Petition ABL Loan Documents"*).  A true and correct copy of the Pre-Petition ABL Credit Agreement is attached as <u>Exhibit B</u> hereto and incorporated herein by reference.  Unless otherwise specified, all capitalized terms used but not defined herein shall have the meanings given in the Pre-Petition ABL Credit Agreement or the Pre-Petition Term Loan Credit Agreement (as defined below), as applicable.

(ii)    The DIP Lender, as Lenders under the Pre-Petition ABL Credit Agreement, loaned the Pre-Petition Borrowers $37,500,000.00 in principal amount, which was secured by a security interest in all assets of the Debtors, other than the Excluded Collateral (as defined in the Pre-Petition ABL Credit Agreement).  The DIP Lender has a first priority security interest in the ABL Loan Priority Collateral (as defined in the Intercreditor Agreement) of the Debtors, which includes all the assets of Debtor PLM Holding Company LLC and all of its subsidiaries (other than the Excluded Collateral) (such assets of Debtor PLM Holding Company LLC and all of its subsidiaries, other than the Excluded Collateral, being referred to herein as the *"Pre-Petition TECO Collateral"*), and a second priority security interest in the Term Loan Priority Collateral (as defined in the Intercreditor Agreement) of the Debtors.

(iii)    DBNY, as Lender under the Pre-Petition ABL Credit Agreement, made loans to the Pre-Petition Borrowers under a $10,000,000 revolving line of credit, which was secured by a first priority security interest in the ABL Loan Priority Collateral (other than the Pre-Petition TECO Collateral) of the Debtors, a second priority security interest in the Term Loan Priority Collateral of the Debtors, and a third priority security interest in the Pre-Petition TECO Collateral of the Debtors.

(iv)    Pursuant to the Pre-Petition ABL Credit Agreement, the Pre-Petition Guarantors (including all DIP Guarantors here, with exception to Cambrian Holding Company, Inc.), guaranteed (the *"Guaranty"*) all obligations of the Pre-Petition Borrowers due the DIP Lender and

the Pre-Petition ABL Agent, under the Pre-Petition ABL Loan Documents, such that the Pre-Petition Guarantors have unconditionally guaranteed all of the Pre-Petition Borrowers' Pre-Petition ABL Obligations (as defined below) to the DIP Lender and the Pre-Petition ABL Agent. The Pre-Petition Guarantors who are DIP Guarantors (1) acknowledge and confirm that the Guaranty continues in full force and effect notwithstanding any financing and financial accommodations extended by the DIP Lender and the Pre-Petition ABL Agent to the Borrowers pursuant to the terms of this Interim Order and (2) extend the Guaranty to all financing and financial accommodations extended by the DIP Lender and the Pre-Petition ABL Agent to the Borrowers pursuant to the terms of this Interim Order.

(v)    In accordance with the terms of the Pre-Petition ABL Loan Documents, (a) the Borrowers are truly and justly indebted to the DIP Lender under the Pre-Petition ABL Credit Agreement, without defense, counterclaim or offset of any kind, and that as of the Petition Date the outstanding "Obligations" as defined in the Pre-Petition ABL Credit Agreement to the DIP Lender totaled no less than $45,698,362.87 (the *"Pre-Petition RH Obligations"*), and (b) are truly and justly indebted to the Pre-Petition Agent under the Pre-Petition ABL Credit Agreement, without defense, counterclaim or offset of any kind, and that as of the Petition Date the outstanding Obligations as defined in the Pre-Petition ABL Credit Agreement to the Pre-Petition Agent totaled no less than the principal amount of $3,081,439.56 plus accrued and unpaid interest through June 16, 2019 of $267,831.97 with a per diem interest accrual of $780.91 (collectively with the outstanding principal amount, the *"Pre-Petition ABL Agent Obligations"* and together with the Pre-Petition RH Obligations, the *"Pre-Petition ABL Obligations"*), each of (a) and (b) exclusive of all accrued and unpaid costs, expenses, and fees owed to the DIP Lender and the Pre-Petition Agent pre-petition.  For purposes hereof, the principal balance of loans and advances of the DIP Lender under the Pre-Petition ABL Credit Agreement shall be referred to herein as the *"Pre-*

*Petition RH ABL Loans"* and the principal balance of loans and advances of the Pre-Petition Agent under the Pre-Petition ABL Credit Agreement shall be referred to herein as the *"Pre-Petition Agent ABL Loans"*.  The Debtors further acknowledge, agree and stipulate that (a) the Pre-Petition ABL Liens (as defined below) (1) are valid, binding, enforceable and perfected liens in the Pre-Petition Collateral (as defined below), (2) were granted to the DIP Lender and Pre-Petition Agent pre-petition for fair consideration and reasonably equivalent value, (3) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (4) are subject and subordinate only to valid, perfected and unavoidable liens permitted under the applicable Pre-Petition ABL Loan Documents, but only to the extent that (x) such liens are permitted by the applicable Pre-Petition ABL Loan Documents to be senior to the applicable Pre-Petition ABL Liens (as defined below) and (y) such liens are actually senior to the applicable Pre-Petition ABL Liens (as defined below) under applicable law, and (b)(1) all of the Pre-Petition ABL Obligations constitute legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Pre-Petition ABL Loan Documents, **(2) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Pre-Petition ABL Obligations exist, and (3) no portion of the Pre-Petition ABL Obligations or any payments made to or for the benefit of the DIP Lender and Pre-Petition Agent pre-petition are subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.**[2]

(vi)   By reason of the Pre-Petition ABL Loan Documents, the Pre-Petition RH Obligations and Pre-Petition ABL Agent Obligations are secured by enforceable liens and security interests (the *"Pre-Petition ABL Liens"*) granted by the Debtors to the DIP Lender or the Pre-Petition ABL

---

[2] The provisions highlighted and in **bold** vary from the requirements of Local Rule 4001-2(d).

Agent, upon and in substantially all tangible and intangible assets and property of the Debtors, now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents, and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, securities (whether or not marketable), properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, bank accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds (provided, however, that to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event a lien only on the economic value of, proceeds of sale or other disposition of, and any other proceeds and products of such leasehold interests), real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, permits, franchise rights, capital stock and other equity interests of subsidiaries, tax and other refunds and proceeds of all tax credits, insurance or other proceeds, commercial tort claims, causes of action, and all other property or "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, wherever located, other than the Excluded Collateral (the *"Pre-Petition Collateral"*).

(vii)  The Pre-Petition Term Loan Secured Parties (as defined below) assert that, pursuant to that certain Term Credit and Guaranty Agreement dated as of July 10, 2013 (as amended, restated, supplemented or otherwise modified from time to time, including, without limitation, by that certain Waiver and Amendment dated as of September 3, 2014, that certain Amendment Agreement No. 1 dated as of October 31, 2014, that certain Amendment Agreement No. 2 dated

as of November 12, 2014, that certain Amendment Agreement No. 3 dated as of December 19, 2014, that certain Amendment Agreement No. 4 dated as of March 18, 2015, that certain Amendment Agreement No. 5 dated as of May 22, 2015, that certain Amendment Agreement No. 6 to Term Credit and Guaranty Agreement and Amendment No. 1 to Pledge and Security Agreement dated as of September 21, 2015, that certain Amended and Restated Forbearance Agreement dated as of September 29, 2016, and that certain Second Amended and Restated Forbearance Agreement dated as of November 6, 2017, the "*Pre-Petition Term Loan Credit Agreement*" and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments, and amendments executed and delivered in connection therewith, the "*Pre-Petition Term Loan Documents*"), by and among the Pre-Petition Borrowers, as Borrowers, the Pre-Petition Guarantors, as Guarantors, the lenders party thereto from time to time (the "*Pre-Petition Term Lenders*"), and Deutsche Bank Trust Company Americas ("*DBTCA*"), as Administration Agent and Collateral Agent (in such capacities, the *"Pre-Petition Term Agent"* and, together with the Pre-Petition Term Lenders, the "*Pre-Petition Term Loan Secured Parties*" and the Pre-Petition Term Loan Secured Parties, the Pre-Petition ABL Agent and the Lenders under the Pre-Petition ABL Credit Agreement, collectively, the "*Pre-Petition Secured Parties*") and the other parties from time to time party thereto, the Pre-Petition Term Lenders provided term loans to the Pre-Petition Borrowers (the "*Pre-Petition Term Loan Facility*"), which Pre-Petition Term Loan Facility has been unconditionally guaranteed on a joint and several basis by each Pre-Petition Guarantor.  A true and correct copy of the Pre-Petition Term Loan Credit Agreement is attached as Exhibit C hereto and incorporated herein by reference.[3]

(viii) The Pre-Petition Term Loan Secured Parties assert that, as of the Petition Date, the Pre-Petition Borrowers and the Pre-Petition Guarantors were justly and lawfully indebted and

---

[3] The Debtors are not stipulating, admitting or acknowledging the provisions in subclauses (vii), (viii) and (ix) of this Recital C as to the Pre-Petition Term Loan Secured Parties as of this time.

liable to the Pre-Petition Term Loan Secured Parties, without defense, counterclaim, or offset of any kind, in respect of loans in the aggregate principal amount (excluding accrued payment-in-kind interest) of not less than $51,745,025.93, pursuant to and in accordance with the terms of the Pre-Petition Term Loan Documents (collectively, such indebtedness together with accrued and unpaid interest thereon, including payment-in-kind interest, and fees, expenses, charges, indemnities, and other obligations incurred in connection therewith as provided therein, the "*Pre-Petition Term Loan Obligations*").

(ix)   The Pre-Petition Term Loan Secured Parties assert that, by reason of the Pre-Petition Term Loan Documents, the Pre-Petition Term Loan Obligations are secured by enforceable liens and security interests granted by the Debtors to the Pre-Petition Term Loan Secured Parties, upon and in the Pre-Petition Collateral.[4]

(x)      As of the Petition Date, the Debtors, the Pre-Petition ABL Agent and DBTCA, in its capacity as Collateral Agent under the Pre-Petition Term Loan Documents (in such capacity, the "*Term Loan Agent*") were party to that certain Amended and Restated Intercreditor Agreement dated as of September 21, 2015, by and between the Term Loan Agent and the Pre-Petition ABL Agent (as amended, restated, amended and restated, waived, supplemented, or otherwise modified prior to the date of this Interim Order, the "*Intercreditor Agreement*" and, together with the Pre-Petition ABL Loan Documents and the Pre-Petition Term Loan Documents, the "*Pre-Petition Loan Documents*").   The Intercreditor Agreement governs the respective rights, interests, obligations, priority and positions of the Term Loan Agent and the Pre-Petition ABL Agent with respect to the Pre-Petition Collateral.   The Debtors have acknowledged and agreed to, and are bound by, the Intercreditor Agreement.

---

[4] The Pre-Petition Term Loan Secured Parties assert that, the Pre-Petition Term Loan Obligations are also secured by security interests and liens on certain assets of certain non-Debtor entities.

(xi)  Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Pre-Petition Collateral (as defined above) existing on the Petition Date, and the proceeds of any of the foregoing is the Pre-Petition ABL Agent's, collateral, held on behalf of all Secured Parties under the Pre-Petition ABL Loan Documents, and is cash collateral within the meaning of Bankruptcy Code section 363(a) (the *"Cash Collateral"*). The Pre-Petition Term Loan Secured Parties assert that the Cash Collateral also is being held by the Pre-Petition ABL Agent on their behalf.

(xii)  The acknowledgment by Debtors of the Pre-Petition ABL Obligations and the rights, priorities and protections granted to the DIP Lender and the Pre-Petition ABL Agent pursuant to the Pre-Petition ABL Loan Documents shall be deemed a timely filed proof of claim on behalf of the DIP Lender and the Pre-Petition ABL Agent in these Cases and the DIP Lender and the Pre-Petition ABL Agent shall not be required to file any additional proofs of claim with respect to the Pre-Petition ABL Obligations; provided, however, that the DIP Lender and the Pre-Petition ABL Agent shall provide, upon reasonable request, an accounting and reconciliation of the applicable Pre-Petition ABL Obligations.

D.      As set forth in the First Day Declaration, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the Post-Petition Financing and the use of the Cash Collateral.  The Debtors urgently require financing and access to the Cash Collateral for (a) general working capital purposes for the Borrowers and their wholly owned subsidiaries consistent with the Approved Budget (as defined below); (b) paying fees, costs and expenses of the Debtors' professionals; and (c) paying the fees, costs and expenses of the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Loan Secured Parties to the extent required under this Interim Order.  In addition, the Debtors' critical need for

financing is immediate.  The Debtors require access to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations to preserve and maintain the going concern values of the Debtors.  The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Cases without the Post-Petition Financing and authorized use of Cash Collateral.  In the absence of the Post-Petition Financing and such use of the Cash Collateral, the pursuit of the restructuring of the Debtors' operations would not be possible and serious and irreparable harm to the Debtors and their estates would occur.

E.    As set forth in the Campbell Declaration, given the Debtors' current financial condition and capital structure, the Debtors are unable to obtain sufficient unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense.  Financing on a post-petition basis is not otherwise available without the Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below, and securing such indebtedness and obligations with the security interests in and the first liens upon the property described below upon the consent of DIP Lender and the Pre-Petition ABL Agent to the priming of their prepetition liens and security interests pursuant to Bankruptcy Code § 364(d) and the terms of this Interim Order.

F.    Based on the record presented to this Court by the Debtors, it appears (and the Debtors, the DIP Lender and the Pre-Petition ABL Agent have stipulated) that the Post-Petition Financing and use of Cash Collateral have been negotiated in good faith and at arm's-length between the parties, and any credit extended and loans made to the Borrowers and guaranteed by the DIP Guarantors (and Cash Collateral used by the same) pursuant to this Interim Order shall be

deemed to have been extended, issued or made or used, as the case may be, in good faith as required by, and within the meaning of, Bankruptcy Code § 364(e).

G.    Based on the record before this Court, it appears (and the Debtors, the DIP Lender and the Pre-Petition ABL Agent have stipulated) that the terms of this Interim Order, including, without limitation, the terms of the Post-Petition Financing and use of Cash Collateral, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

H.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(B).  The permission granted herein to use Cash Collateral and enter into the Post-Petition Financing and obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its immediate entry will, among other things, permit the Debtors to continue to operate as a going concern and effectuate a successful sale process of the Debtors' assets.

I.    The Lenders under the Pre-Petition ABL Credit Agreement have instructed and directed the Pre-Petition ABL Agent to consent to (or otherwise not object to) the use of Cash Collateral as provided in this Interim Order.

Based upon the foregoing findings, stipulations, and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.    *Motion Granted.*  The Motion is granted on an interim basis consistent with the terms of this Interim Order.  Any objections to the DIP Motion with respect to entry of this Interim Order that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.    *Authorization.*   The Debtors are expressly authorized and empowered to (i) borrow money (in the case of the Borrowers) and guarantee such borrowings (in the case of the DIP Guarantors), use Cash Collateral, and perform their obligations pursuant to the provisions of this Interim Order and (ii) enter into such agreements, instruments and documents to obtain the Post-Petition Financing (collectively, the *"DIP Loan Documents"*), which are listed on <u>Exhibit D</u> hereto within fourteen (14) days following the entry of this Order, and as may be necessary or required to evidence their obligations to the DIP Lender, to consummate the terms and provisions of the Motion and this Interim Order and to evidence perfection of the liens and security interests to be given to the DIP Lender pursuant hereto and thereto; *provided* that such DIP Loan Documents are consistent with this Interim Order.   All post-petition loans and all other indebtedness and obligations incurred on or after the Petition Date by the Debtors to the DIP Lender pursuant to this Interim Order, and the DIP Loan Documents (including principal, accrued and unpaid interest, and costs and expenses) are subsequently referred to herein as the *"DIP Obligations,"* and, together with the Pre-Petition ABL Obligations, as the *"Obligations."*

3.    *Borrowings; Use of Cash Collateral.*   Subject to the terms and conditions of this Interim Order, the DIP Term Sheet and the DIP Loan Documents, (a) the DIP Lender (including in their capacities as Lenders under the Pre-Petition ABL Credit Agreement) and Pre-Petition ABL Agent and the Pre-Petition Term Lenders hereby consent to the Debtors' limited use of the Cash Collateral in accordance with the terms hereof and (b) the DIP Lender will make post-petition loans to the Borrowers (which post-petition loans are to be guaranteed by the DIP Guarantors), in each case in an aggregate weekly amount not to exceed the weekly amount specified in the Approved Budget (as defined below) for the applicable weekly period, and not to exceed in the aggregate with all DIP Obligations the Commitment (with availability thereunder limited to $12 million under the Interim Order, and an additional $3 million upon entry of the Final Order, which

shall be available to the Debtors at the sole discretion of the DIP Lender). The Cash Collateral and the proceeds of any such post-petition loans shall be used to fund the budgeted expenditures set forth in the Approved Budget in accordance with the provisions of paragraph 15 hereof.

4. *Existing Events of Default.* Nothing herein or in any of the DIP Loan Documents shall constitute or be deemed to constitute a waiver by the DIP Lender (including in their capacities as Lenders under the Pre-Petition ABL Credit Agreement), the Pre-Petition ABL Agent or the Pre-Petition Term Loan Secured Parties of any existing or future Events of Default (as defined in the Pre-Petition ABL Credit Agreement or the Pre-Petition Term Loan Credit Agreement, as applicable) (including, without limitation, the Events of Default arising from the commencement of these Cases). Without prejudice to, or waiver of, the DIP Lender's and Pre-Petition ABL Agent's rights and remedies against any Debtor in respect of any Events of Default other than the Existing Defaults (as defined below), the DIP Lender (including in their capacities as Lenders under the Pre-Petition ABL Credit Agreement) and the Pre-Petition ABL Agent agree to forbear from foreclosing their liens on any DIP Collateral (as defined below) or otherwise taking enforcement action against any Debtor based solely on any Event of Default (as defined in the Pre-Petition ABL Credit Agreement) which occurred prior to the Petition Date (including the filing of the Chapter 11 petitions and other defaults existing at the time of the filing or arising as a result of such filing that are stayed pursuant thereto) (collectively, the *"Existing Defaults"*); *provided that*, (a) subject to the provisions of paragraph 11 hereof, such forbearance shall terminate upon the earlier of (i) the occurrence of any Post-Petition Default (as defined below) or (ii) the Post-Petition Termination Date (as such term is defined in the DIP Loan Documents), and (b) except as otherwise expressly set forth herein, the automatic stay shall continue to apply with respect to all assets of the Debtors' estates.

5.   *Interest, Fees, Costs and Expenses.*  All post-petition loans shall bear interest at the rate per annum equal to 12% per annum (half of which shall be payable-in-kind and half of which shall be payable in cash), applied to the outstanding amount of the Post-Petition Financing and measured on a 360 day year, *provided* that, immediately upon the occurrence and during the continuation of any Event of Default (as defined in the DIP Loan Agreement), at the election of the DIP Lender, such interest shall be increased by an additional 2%.  Interest shall be payable monthly in arrears on the last day of each month.  On a monthly basis, the DIP Lender shall be entitled to recover or be reimbursed for (a) all reasonable and documented out-of-pocket costs and expenses of the DIP Lender (including, but not limited to Chapman and Cutler LLP and Stites & Harbison, PLLC) associated with the preparation, execution, delivery and administration of the DIP Loan Documents and any amendments or waivers with respect thereto, (b) all reasonable and documented out-of-pocket costs and expenses of the DIP Lender (including the documented fees and expenses of appropriate counsel to the DIP Lender, including, but not limited to Chapman and Cutler LLP and Stites & Harbison, PLLC) in connection with the enforcement of the DIP Loan Documents, (c) all out-of-pocket transaction expenses incurred in connection with the Post-Petition Financing and (d) all reasonable and documented fees and expenses, including but not limited to attorney and professional fees and expenses, in connection with the Cases.  On a monthly basis, the Pre-Petition ABL Agent shall be entitled to recover or be reimbursed for all reasonable and documented out-of-pocket costs and expenses of the Pre-Petition ABL Agent (including, but not limited to Latham and Watkins LLP and Stites & Harbison, PLLC), including audit expenses, plus any additional documented out-of-pocket costs and expenses, and including reasonable consultants', attorneys' and paralegals' fees, costs and expenses incurred in connection with the Obligations (as defined in the Pre-Petition ABL Credit Agreement), the DIP Loan Documents and the Cases to the extent provided in the Pre-Petition ABL Credit Agreement.  The Debtors shall pay

the DIP Lender's and the Pre-Petition ABL Agent's above-referenced professional fees and expenses (including, but not limited to Chapman and Cutler LLP, Latham and Watkins LLP, and Stites & Harbison PLLC) within seven (7) calendar days (if no written objection is received within such seven (7) calendar day period) after the DIP Lender and the Pre-Petition ABL Agent have delivered, as applicable, a reasonably detailed invoice to the Debtors describing such fees and expenses; *provided, however*, that any such invoice may be redacted to protect privileged, confidential or proprietary information, with a copy of such invoice being simultaneously sent to the U.S. Trustee and the Official Committee of Unsecured Creditors (the *"Committee"*) (if appointed).  Written objections to payment of such fees and expenses must contain a specific basis for the objection and quantification of the undisputed amount of the fees and expenses invoiced; failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice.  None of the DIP Lender's or Pre-Petition ABL Agent's fees and expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court.  In consideration for providing the Post-Petition Financing, the DIP Lender will be entitled to receive an upfront commitment fee in the amount of 2.5% of the DIP Lender's total commitment (one-half of which shall accrue and be paid upon exit), and an exit fee upon the repayment or termination of the Post-Petition Financing (including on the Maturity Date, as defined in the DIP Loan Documents) in the amount of 0.75% of the total amount loaned by the DIP Lender.  The Debtors shall additionally pay the DIP Lender an agency fee of $45,000.00, which shall be fully earned and payable on the date on which the first loan is made under the Post-Petition Financing.

6.  *Termination of Post-Petition Credit.*  The DIP Lender's willingness to make loans hereunder and the Pre-Petition ABL Agent's consent to the Debtors' use of Cash Collateral shall

immediately and automatically terminate (except as the DIP Lender with respect to the Post-Petition Financing and the Pre-Petition ABL Agent with respect to the Cash Collateral may otherwise agree in writing in its sole discretion), and all DIP Obligations shall be immediately due and payable in cash (except as the DIP Lender may otherwise agree in writing in its sole discretion) upon the earliest to occur of the Post-Petition Termination Date or any of the following:

    i.    the date of final indefeasible payment and satisfaction in full in cash of the Obligations;

    ii.    the effective date of any confirmed plan of reorganization or liquidation in any or all of the Cases;

    iii.    the consummation of the sale or other disposition of all or substantially all of the assets of the Debtors;

    iv.    any Borrower fails to pay any principal or interest on the DIP Obligations or any fee or other amount due with respect to the Post-Petition Financing as and when the same becomes due, and such failure shall not have been remedied within two (2) business days after such due date;

    v.    any representation or warranty made by any Debtors with respect to the Post-Petition Financing or in any statement or certificate given by any Debtors in writing pursuant to the Post-Petition Financing or in connection with any DIP Loan Document shall be false in any material respect on the date as of which made;

    vi.    any Debtor shall breach or violate any term, covenant or agreement contained in the DIP Loan Documents or this Interim Order (including, but not limited to, the Debtors' failure to adhere to the Approved Budget as set forth in paragraph 15 of this Interim Order or violation of the covenants set forth in paragraph 16 of this

Interim Order) or the Final Order, or any Event of Default (as defined in the Pre-Petition ABL Credit Agreement) shall occur, other than the Existing Defaults;

vii. the dismissal of any Debtor's Case or the conversion of the case of any Debtor that is an operating business to a case under Chapter 7 of the Bankruptcy Code;

viii. a trustee or an examiner with enlarged powers (beyond those set forth in § 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor is appointed in any of the Cases without the prior written consent of the DIP Lender (which consent may be withheld in its sole discretion), or any Debtor applies for, consents to, or acquiesces in, any such appointment without the prior written consent of the DIP Lender (which consent may be withheld in its sole discretion);

ix. this Interim Order or the Final Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the DIP Lender or Pre-Petition ABL Agent (which consent may be withheld in its sole discretion);

x. the Court or any other court enters an order or judgment in any of the Cases modifying, limiting, subordinating or avoiding the priority of any prepetition obligations or the perfection, priority or validity of the Pre-Petition ABL Agent's prepetition liens or the DIP Lender's postpetition liens on any collateral or imposing, surcharging or assessing against the Pre-Petition or the DIP Lender or their claims or collateral any costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise, other than as provided in the Interim Order and Final Order;

xi.   except as otherwise provided herein, any Debtor, or any entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Cases, files any application for approval or allowance of, or any order is entered approving or allowing, any administrative expense claim in any of the Cases, having any priority over, or being pari passu with, the superpriority claims of the DIP Lender;

xii.   any motion or application is filed by or on behalf of any Debtor in any of the Cases seeking the entry of an order, or an order is entered in any of the Cases, approving any subsequent debtor-in-possession facility for borrowed money or other extensions of credit unless such subsequent facility and such order expressly provide for the indefeasible payment and complete satisfaction in full in cash to the DIP Lender of all obligations prior to, or concurrently with, any initial borrowings or other extensions of credit under such subsequent facility or has been consented to, in writing, by the DIP Lender;

xiii.   the Final Order is not entered by the Bankruptcy Court within 45 days after entry of this Interim Order;

xiv.   the Debtors fail to timely achieve any of the milestones set forth in this Interim Order or the Final Order, including with respect to a sale under Section 363 of the Bankruptcy Code, unless consented to in writing by the DIP Lenders in their sole discretion and, for the avoidance of doubt, entry of a sale order approving a sale under Section 363 of the Bankruptcy Code must occur within 77 days following entry of this Interim Order;

xv.   a plan of reorganization or liquidation is proposed which does not provide for termination of the Commitment and payment in full of the DIP Obligations in cash

on the effective date of such plan, if such termination and payment in full has not already occurred;

xvi.    except as otherwise provided herein, any other superpriority administrative expense claim or lien senior to or *pari passu* with the DIP Loan Agreement obligations, or the liens granted to secure the DIP Loan Agreement obligations, shall be granted, approved, imposed, or otherwise created;

xvii.    any of the Debtors seeks to obtain additional financing under section 364(c) or 364(d) of the Bankruptcy Code or to grant any lien other than liens permitted under the Post-Petition Financing and financing orders without the prior written consent of the DIP Lender and Pre-Petition ABL Agent;

xviii.    subject to paragraph 25 below, any Debtor or any representative of any Debtor's estate files any action challenging the validity, perfection, priority, extent, or enforceability of the loan documents for the Post-Petition Financing or the liens and claims granted thereunder or with respect to the Pre-Petition ABL Credit Agreement;

xix.    any Debtor, or any entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Cases, commences any action against the Pre-Petition ABL Agent or any lender with respect to the Pre-Petition ABL Loan Documents, including, without limitation, any action to avoid, modify, dispute, challenge, or subordinate any of the prepetition obligations or any prepetition liens in favor of the Pre-Petition ABL Agent or DIP Lender, or entry of an order in any action by any other party granting such relief;

xx.    the entry of an order dismissing any of the Cases that does not provide for the termination of the Commitment and payment in full of the DIP Obligations and all related obligations in cash prior to dismissal;

xxi.    any prepetition collateral or Collateral becoming subject to surcharge or marshaling;

xxii.    the entry of an order of the Court granting relief from the automatic stay with respect to any prepetition collateral or Collateral or any other assets of any Debtor (other than at the request of the DIP Lenders) that have an aggregate value equal to or exceeding $50,000, provided that the value of the assets subject to all such orders, in the aggregate, does not exceed $150,000;

xxiii.    any material contract or unexpired leases of a Debtor is rejected or otherwise terminated (other than in accordance with its terms) or any property of the Debtors having an aggregate value equal to or exceeding $50,000 is sold outside the ordinary course of business, in each instance, without the express written consent of the DIP Lenders, provided that all such rejected material leases or unexpired leases, in the aggregate, do not exceed an aggregate value of $150,000; or

xxiv.    any other Event of Default, as defined in the DIP Loan Documents;

(individually, a *"Post-Petition Default"* and collectively, the *"Post-Petition Defaults"*).

7.    *Security for Indebtedness.*

(a)    Subject to the Carve-Out (defined below), all DIP Obligations to the DIP Lender, including, without limitation, all principal, accrued interest, costs, fees and expenses, shall:

(i)    pursuant to Bankruptcy Code section 364(c)(1), be joint and several claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation,

Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 (the "*Superpriority Claims*"), which Superpriority Claims shall be payable from and have recourse to all prepetition and post-petition property of the Debtors and all proceeds thereof, including, without limitation, subject to the entry of the Final Order, all proceeds or other amounts received in respect of the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code or the proceeds or other amounts received in respect thereof (such claims and causes of action, collectively the "*Avoidance Actions*"); the Superpriority Claims shall, for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under Section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors, subject to the limitations provided herein;

(ii)      pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first priority lien on all now owned or hereafter acquired assets and property of the Debtors and proceeds thereof (including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and equipment of the Debtors) that are not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, but specifically excluding the Avoidance Actions or any proceeds thereof (collectively, the "*First Lien Collateral*");

(iii)     pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected first priority lien on all property of the Debtors classified as (a) "Term Loan Priority Collateral" (as defined in the Intercreditor Agreement) and (b) "ABL Loan Priority Collateral" (as defined in the Intercreditor Agreement) that is not "TECO PP&E Collateral" (as defined in the Intercreditor Agreement), but specifically excluding in each case the Avoidance Actions or any proceeds thereof, junior only to (y) with respect to the Term Loan Priority Collateral, the liens of the Term Loan Agent and/or the other Pre-Petition Term Loan Secured Parties securing the "Term Loan Debt" as defined in the Intercreditor Agreement and (z) with respect to the ABL Loan Priority Collateral that is not TECO PP&E Collateral, the liens of the Pre-Petition ABL Agent securing the Pre-Petition ABL Agent Obligations (each of (a) and (b) that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code), other than as set forth below (collectively, the "*Second Lien Collateral*")); and

(iv)     pursuant to Bankruptcy Code section 364(d)(1), be secured by a first-priority, senior priming perfected lien on, and security interest in, all assets (other than Avoidance Actions or proceeds thereof) that (a) are subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement, and (b) in each case, constitute either (i) TECO PP&E Collateral, or (ii) a percentage of the ABL Loan Priority Collateral that is not TECO PP&E Collateral equal to the Pre-Petition RH ABL Loans existing on the Petition Date divided by the amount equal to the sum of the Pre-Petition RH ABL Loans and Pre-Petition ABL Agent ABL

Loans existing on the Petition Date (the "*Primed Collateral*" and together with the First Lien Collateral and the Second Lien Collateral, the "*DIP Collateral*"); the DIP Lender has consented to the priming of its Pre-Petition ABL Liens on the TECO PP&E Collateral in accordance with the terms of this Interim Order.

(b)     Notwithstanding any statement in this Interim Order or the DIP Term Sheet to the contrary, nothing in this Interim Order shall constitute a finding or conclusion that the DIP Lender is being granted (or is requesting) a lien, claim or security interest in any of the Debtors' currently owned or after acquired property that takes priority over any prior validly perfected liens, claims, encumbrances and security interests held by any individual or entity other than the DIP Lender.

(c)     Debtors shall take all actions to establish and maintain the DIP Lender as a lender's loss payee and an additional named insured or similar status on all current or subsequently procured insurance coverages issued in favor of any Debtor within twenty (20) calendar days (or such longer period as may be agreed by the DIP Lender), which shall be in form, scope and substance satisfactory to the DIP Lender.

(d)     The DIP Lender and Pre-Petition ABL Agent, at its respective option may release at any time from its liens and security interests any assets determined by the DIP Lender or Pre-Petition ABL Agent to have a risk of environmental liabilities which the DIP Lender and Pre-Petition ABL Agent in its respective sole discretion deems unacceptable.

(e)     Any security interest or lien upon the DIP Collateral which is avoided or otherwise preserved for the benefit of any Debtor's estate under § 551 or any other provision of the Bankruptcy Code shall be subordinate to the security interests in and liens of the DIP Lender upon the DIP Collateral.

(f)     All Cash Collateral subject to the liens granted by the Debtors shall be deemed to be collateral for the Pre-Petition ABL Obligations of the Debtors, as well as obligations and indebtedness of the Debtors hereunder.

8.     *Adequate Protection*.

(a)     As adequate protection under §§ 361, 363(e) and 364(d) of the Bankruptcy Code for the use of the Pre-Petition Collateral, including the Pre-Petition TECO Collateral and the Cash Collateral, DIP Lender and Pre-Petition ABL Agent shall be granted the following as adequate protection of their interest in the Pre-Petition Collateral, including the Pre-Petition TECO Collateral and Cash Collateral, in an amount equal to the aggregate actual diminution in the value of their interests therein:

(i)     effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, (A) a valid, perfected replacement security interest in and lien on the collateral to which they hold priority liens existing as of the Petition Date or thereafter acquired and any proceeds thereof, and (B) a valid, perfected security interest in and lien on all of the DIP Collateral, which shall for the avoidance of doubt exclude the Avoidance Actions and the proceeds thereof (collectively, the "*ABL Adequate Protection Liens*"), subject and subordinate only to (x) the Carve-Out, (y) the liens securing the Post-Petition Financing and (z) paragraph 7(b) of this Interim Order;

(ii)     a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (collectively, the "*ABL Adequate Protection Claims*"), subject and subordinate only to (x) the Carve-Out and (y) the Superpriority Claims held by the DIP Lender under the Post-Petition Financing and *pari passu* with the Term Loan Adequate Protection Claims (as defined below).  Except for the Superpriority Claims held

by the DIP Lender and the Pre-Petition Term Loan Secured Parties, no claims shall be permitted with priority *pari passu* with, or senior to, the ABL Adequate Protection Claims; provided, however, that the ABL Adequate Protection Claims may not be satisfied from the proceeds of the Avoidance Actions;

(iii)    current cash payments of all reasonable and documented fees and expenses payable to the DIP Lender, including, but not limited to attorney and professional fees and expenses, promptly following the 7th calendar day after the DIP Lender has provided statements of such expenses and other reasonable documented fees and expenses to the U.S. Trustee, lead counsel to the Debtors and lead counsel to the Committee, provided no objection has been filed thereto;

(iv)    payment of fees and expenses of a financial advisor to the DIP Lender, subject to standard terms that such advisor shall have access to the books and records of the Debtors;

(v)    current cash payments of interest due on the Pre-Petition RH ABL Loans and Pre-Petition ABL Agent ABL Loans on a bi-weekly basis; and

(vi)    current cash payments of all reasonable and documented fees and expenses payable to the Pre-Petition ABL Agent (whether incurred or accrued prior to or after the Petition Date), including, but not limited to attorney and professional fees and expenses, promptly following the 7th calendar day after the Pre-Petition ABL Agent has provided statements of such expenses and other reasonable documented fees and expenses to the U.S. Trustee, lead counsel to the Borrowers and lead counsel to the Committee, provided no objection has been filed thereto.

(b)    As adequate protection under §§ 361, 363(e) and 364(d) of the Bankruptcy Code for the use of the Pre-Petition Collateral, including the Term Loan Priority Collateral, the Pre-

Petition TECO Collateral and the Cash Collateral, the Pre-Petition Term Loan Secured Parties shall be granted the following as adequate protection of their interest in such Pre-Petition Collateral, in an amount equal to the aggregate actual diminution in the value of their interests therein:

(i)    effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, (A) a valid, perfected replacement security interest in and lien on the collateral to which they hold priority liens existing as of the Petition Date or thereafter acquired and any proceeds thereof and (B) a valid, perfected security interest in and lien on all of the DIP Collateral, which shall for the avoidance of doubt exclude the Avoidance Actions and the proceeds thereof (collectively, the "*Term Loan Adequate Protection Liens*" and, together with the ABL Adequate Protection Liens, the "*Adequate Protection Liens*"), in the case of this clause (B) subject and subordinate only to (w) the Carve-Out, (x) the liens securing the Post-Petition Financing, (y) the ABL Adequate Protection Liens in this Interim Order and (z) paragraph 7(b) of this Interim Order;

(ii)    a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (collectively, the "*Term Adequate Protection Claims*" and, together with the ABL Adequate Protection Claims, the "*Adequate Protection Claims*"), subject and subordinate only to (x) the Carve-Out, (y) the Superpriority Claims held by the DIP Lender under the Post-Petition Financing and (z) paragraph 7(b) of this Interim Order and *pari passu* with the ABL Adequate Protection Claims.  Except for the Superpriority Claims held by the DIP Lender and the ABL Adequate Protection Claims held by the DIP Lender and Pre-Petition ABL Agent, no claims shall be permitted with priority *pari passu*

with, or senior to, the Term Adequate Protection Claims; provided, however, that the Term Adequate Protection Claims may not be satisfied from the proceeds of the Avoidance Actions;

(iii)    the Debtors shall promptly provide the Pre-Petition Term Agent, its counsel and counsel to the Pre-Petition Term Lenders with financial and other reporting required to be provided to the DIP Lender or the Pre-Petition ABL Agent, including without limitation any reporting in connection with the Approved Budget, substantially in compliance with the reports and notices provided for in the DIP Term Sheet, this Interim DIP Order or the DIP Loan Documents, in each case when and as required under the DIP Term Sheet, this Interim DIP Order or the DIP Loan Documents, as applicable;

(iv)    the Pre-Petition Term Loan Secured Parties shall have full and prompt access to any information provided to the DIP Lender, the Pre-Petition ABL Agent or any other party regarding any sale process conducted by the Debtors and consultation rights with respect to any such sale process, *provided* that the Pre-Petition Term Loan Secured Parties are not active participants as potential buyers in any such sale process, and shall, notwithstanding anything to the contrary herein, have consultation rights regarding any modifications to the Approved Budget and any milestones contained in the DIP Term Sheet, this Interim Order or the DIP Loan Documents; provided further that nothing herein shall prevent the Pre-Petition Term Loan Secured Parties from participating as a bidder in any sale process, including as a credit bidder with respect to its collateral pursuant to 11 U.S.C. § 363(k);

(v)    payment of all reasonable and documented fees and expenses, including but not limited to attorney and professional fees and expenses, of the Pre-Petition Term Loan

Secured Parties[5] incurred on or after the Petition Date in an amount not to exceed $200,000 per month, payable in accordance with the procedures set forth in paragraph 5 of this Interim Order for so long as the Pre-Petition Term Loan Secured Parties as of the date hereof are the legal and beneficial owners of the Pre-Petition Term Loan Obligations; and

(vi)    cash payments of $220,000 per month, which amount reflects a fair market rent for the Term Loan Priority Collateral based on the current value of such equipment and is fair and reasonable.

Any payments to be made under this Subsection (b), shall be made to the Pre-Petition Term Agent for the benefit of the Pre-Petition Term Loan Secured Parties.

(c)    In addition to the foregoing, each of the DIP Lender and the Pre-Petition Secured Parties shall also be entitled to all of the rights accorded to it pursuant to § 507(b) of the Bankruptcy Code, subject and subordinate only to (w) the Carve-Out, (x) the liens securing the Post-Petition Financing, (y) paragraph 8(a) and (b) of this Interim Order, and (z) paragraph 7(b) of this Interim Order.

9.    *Perfection of New Liens.*  All liens and security interests on or in the DIP Collateral granted to the DIP Lender, the Pre-Petition ABL Agent or, to the extent that valid and perfected liens in favor of the Pre-Petition Term Loan Secured Parties existed as of the Petition Date and are not subject to avoidance, the Pre-Petition Term Loan Secured Parties by this Interim Order and the DIP Loan Documents shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; *provided, however,* that

---

[5] Upon assignment of the Pre-Petition Term Loan Facility and/or the Pre-Petition Term Loan Obligations to an assignee (the "Assignee"), the Assignee shall have all of the rights of the Pre-Petition Term Lenders and Pre-Petition Secured Parties as set forth in the relevant assignment document and under applicable law.

notwithstanding the provisions of § 362 of the Bankruptcy Code, (i) the DIP Lender and/or the Pre-Petition ABL Agent may, at its sole option, file or record or request that the Debtors seek to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the expense of the Debtors, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as the DIP Lender and/or the Pre-Petition ABL Agent may reasonably request, provided however, that the failure of the Debtors to obtain a landlord or warehouse lien after attempting in good faith shall not be an event of default hereunder, and (ii) the DIP Lender and/or the Pre-Petition ABL Agent may require the Debtors to deliver to the DIP Lender and/or the Pre-Petition ABL Agent any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the Debtors are directed to cooperate and comply therewith.  If the DIP Lender and/or the Pre-Petition ABL Agent, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if the DIP Lender, in accordance with the DIP Loan Documents, shall elect to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents, or taking possession, shall be deemed to have been filed or recorded, or taken, in these Cases, as of the entry of this Interim Order but with the priorities as set forth herein.  The DIP Lender, the Pre-Petition ABL Agent and/or the Pre-Petition Term Agent may (in its discretion) but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which any Debtor has any real or personal property and such filing or recording shall constitute further evidence of perfection of such party's interests in the DIP Collateral.

10.    *Waiver.*  The Debtors and their estates (and any party in interest acting on behalf of any Debtor) hereby irrevocably waive, and are barred from asserting or exercising any right, (a) without the DIP Lender's prior written consent (which may be withheld in its sole discretion), or (b) without prior indefeasible payment and satisfaction in full in cash of the DIP Obligations in this Interim Order and, subject to the entry of a Final Order, the Obligations: (i) to grant or impose, or request that the Court grant or impose, under § 364 of the Bankruptcy Code or otherwise, liens on or security interests in any DIP Collateral, which are *pari passu* with or superior to the DIP Lender's liens on and security interests in such DIP Collateral; (ii) to return goods pursuant to § 546(c) of the Bankruptcy Code to any creditor of any Debtor or to consent to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to § 553(b)(1) of the Bankruptcy Code or otherwise in an amount exceeding $25,000; or (iii) to modify or affect any of the rights of the DIP Lender under this Interim Order or any DIP Loan Documents by any order entered in any of the Cases or any subsequent or superseding cases, including, without limitation, any conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto (collectively, a *"Successor Case"*).

11.    *Modification of Automatic Stay; Other Remedies.*    (a) Except as set forth in subparagraph (b) of this paragraph, which governs any action by the DIP Lender under the Post-Petition Financing to foreclose on its liens on any DIP Collateral or to exercise any other default-related remedies (other than those specifically referenced in the next sentence), the automatic stay pursuant to § 362 of the Bankruptcy Code is hereby vacated as to the DIP Lender to permit it to perform in accordance with, and exercise, enjoy and enforce its rights, benefits, privileges and remedies pursuant to this Interim Order and the other DIP Loan Documents without further application or motion to, or order from, the Court.  Except as set forth in subparagraph (b) of this

paragraph, the DIP Lender and the Pre-Petition ABL Agent are hereby granted leave, among other things and as applicable, to (i) receive and apply payments provided under this Interim Order and of the DIP Obligations and collections on and proceeds of the DIP Collateral to the DIP Obligations in the manner specified in this Interim Order and the DIP Loan Documents, (ii) file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral, (iii) charge and collect any interest, fees, costs, and expenses and other amounts accruing at any time under the DIP Loan Documents or this Interim Order as provided therein, (iv) to give any Debtor any notice provided for in any of the DIP Loan Documents or this Interim Order, and (v) cease making loans or other extensions of credit and/or suspend or terminate any obligation of the DIP Lender to make loans or other extensions of credit under the DIP Loan Documents or this Interim Order.

(b)     Upon the occurrence and during the continuation of any Post-Petition Default beyond the applicable cure period (if any), the DIP Lender shall have the remedies set forth in the DIP Term Sheet, including, without limitation, the right to seek relief from the automatic stay under the Bankruptcy Code within three (3) business days on an expedited basis pursuant to a motion seeking such relief.  At such hearing, the Debtors shall be limited to contesting whether the relevant Post-Petition Default has occurred and is continuing.  The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies hereunder with respect to the Debtors, under this Interim Order and the Final Order, and with respect to the DIP Collateral.  The Debtors shall immediately provide notice to the DIP Lender (with a copy to counsel to the Committee) of the occurrence of any Post-Petition Default or any Post-Petition Termination Event.

(c)     Immediately upon the occurrence of any Post-Petition Termination Event (as described in the DIP Loan Documents), the Debtors' ability to use Cash Collateral and proceeds

of the Post-Petition Financing shall terminate without further notice, and the DIP Lender shall have the right to seek relief from the automatic stay on an expedited basis as provided in paragraph 11(b) above.

12.  *Priority Claims.*  Subject to the Carve-Out described in paragraph 13 below, the DIP Obligations shall have the highest administrative priority under § 364(c)(l) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in any of the Cases or any Successor Case), and shall at all times be senior to the rights of any Debtor, any successor trustee or estate representative in any of the Cases or any Successor Cases.  Nothing in this Interim Order or the Approved Budget or any other budget shall constitute the consent by the DIP Lender, the Pre-Petition ABL Agent or any other Pre-Petition Secured Party to the imposition of any costs or expense of administration or other charge, lien, assessment or claim (including, without limitation, any amounts set forth in the Approved Budget or any other budget) against the DIP Lender, the Pre-Petition ABL Agent, any other Pre-Petition Secured Party, any of their respective claims or their respective collateral under § 506(c) of the Bankruptcy Code or otherwise. Effective upon entry of the Final Order, (i) no expenses of administration of the Cases or any Successor Case shall be charged against or recovered from the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of Section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Agent, and no consent shall be implied from any action, inaction or acquiescence by the DIP Lender, the Pre-Petition ABL Agent or the Pre-Petition Term Agent; and (ii) in no event shall the DIP Lender, the Pre-Petition ABL Agent or

the Pre-Petition Term Loan Secured Parties be subject to the (a) "equities of the case" exception contained in Section 552(b) of the Bankruptcy Code or (b) equitable doctrine of "marshaling," or any other similar doctrine with respect to their respective collateral.

13.    *Carve-Out.*  (a) The DIP Lender's and/or the Pre-Petition ABL Agent's liens on and security interests in the DIP Collateral or the Pre-Petition Collateral and its administrative expense claims under Sections 364(c)(1) or 507(b) of the Bankruptcy Code, and any Adequate Protection Liens and Section 507(b) claims granted pursuant to this Interim Order or the Final Order shall be subject only to: (i) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); (ii) fees payable to the Clerk of this Court; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and disbursements approved and allowed by this Court pursuant to Sections 326, 328, 330, or 331 of the Bankruptcy Code incurred by persons or firms retained by the Debtors under Sections 327, 328 or 363 of the Bankruptcy Code (collectively, the *"Debtor Professionals"*), less the sum of all unused pre-petition retainers as of the Petition Date that are not permitted by Order of the Bankruptcy Court to be retained by the Debtor Professionals after the Petition Date; (iv) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and disbursements approved and allowed by this Court pursuant to Sections 326, 328, 330, or 331 of the Bankruptcy Code incurred by the Committee or its professionals pursuant to Sections 328 or 1103 of the Bankruptcy Code (the *"Committee Professionals"* and, together with the Debtor Professionals, the *"Professional Persons"*), in the amounts set forth in the Approved Budget; (v) from and after the occurrence of a Post-Petition Termination Event, allowed fees and costs of Professional Persons and any trustee that may be appointed under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $400,000 to the extent allowed at any time, whether by interim order, procedural order, or otherwise; and (vi) all reasonable and documented fees and expenses incurred by a trustee, if

any, appointed under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $75,000 (the amounts set forth in clauses (a)(i) through (a)(vi) collectively constituting the *"Carve-Out"*).

(b)     Notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, no proceeds of the Carve Out, the Obligations, Cash Collateral (including any pre-petition retainer funded by the DIP Lender pursuant to the Pre-Petition ABL Loan Documents), Pre-Petition Collateral or DIP Collateral may be used to pay any claims for services rendered by any of the Debtor Professionals, the Committee Professionals or any other person in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the liens and security interests of the DIP Lender and/or the Pre-Petition ABL Agent in the Pre-Petition Collateral or the DIP Collateral; or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the DIP Lender and/or the Pre-Petition ABL Agent of any of its rights and remedies under the Pre-Petition ABL Credit Agreement, the Pre-Petition ABL Loan Documents, this Interim Order and/or the DIP Loan Documents or the DIP Lender's, and/or the Pre-Petition ABL Agent's enforcement or realization upon any of the liens on or security interests in any Pre-Petition Collateral or DIP Collateral; *provided*, *however*, that the Committee Professionals may expend up to $25,000 for fees and expenses incurred in connection with the investigation of, but not litigation, objection or any challenge to, the stipulations and admissions of the Debtors contained in this Interim Order.  Each of the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Loan Secured Parties shall retain its rights as a party in interest to object to any claims of any of the Debtor Professionals and the Committee Professionals.

14.    *Cash Collection Procedures.*   From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral or services provided by any Debtor and all other cash or cash equivalents which shall at any time come into the possession or control of any Debtor, or to which any Debtor shall become entitled at any time, shall be deposited in the same bank accounts into which the collections and proceeds of the Pre-Petition Collateral were deposited under the Pre-Petition ABL Credit Agreement (or in such other accounts as are designated or, in the case of the Carve-Out, consented to by the DIP Lender from time to time), and such collections and proceeds upon such deposit shall be applied as provided in this Interim Order and the Intercreditor Agreement.   Except as otherwise set forth herein, all cash and cash equivalents of any Debtor currently in any account of any Debtor or otherwise in the possession or control of any Debtor constitutes proceeds of the Pre-Petition Collateral and shall only be utilized in conformance with an Approved Budget (as defined below).   All financial institutions in which any lockboxes, blocked accounts or other accounts of any Debtor are located are hereby authorized and directed to comply with any request of the DIP Lender to turnover to the DIP Lender all funds therein without offset or deduction of any kind.

15.    *Budget; Use of Loan and Collateral Proceeds.*

(a)    Attached as <u>Exhibit E</u> hereto and incorporated herein by reference is a budget (which has been approved by the DIP Lender) setting forth by line item all projected cash receipts and cash disbursements for the time period from the Petition Date through the week ending September 14, 2019 (*"Initial Approved Budget"*).   The Initial Approved Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) (each such additional budget, a *"Supplemental Approved Budget"*) approved by the DIP Lender (i) in its reasonable discretion with respect to additional time periods and (ii) in its sole discretion with respect to any prior time periods covered

by a prior budget.  The aggregate of all items approved by the DIP Lender in the Initial Approved Budget and any and all Supplemental Approved Budgets shall constitute an *"Approved Budget."* As of the end of each calendar week starting with the fourth full calendar week following the filing of the Cases, (i) the unfavorable variance (if any) between (A) the sum of (1) the Debtors' cash receipts for the 4-consecutive calendar week period then ended, plus (2) and Operating Receipts Carryforward (as defined in the DIP Term Sheet) and (B) the forecasted cash receipts for the same 4-consecutive calendar week period then ended as set forth in the Approved Budget for such period (herein, the *"Cash Receipts Variance"*), shall not exceed 25.0%, and (ii) the unfavorable variance (if any) between (A) the aggregate amount of the Debtors' actual disbursements, on a cumulative basis, for "Total Operating Cash Disbursements" in the Approved Budget, for the most-recent 4-consecutive calendar week period then ended and (B) the sum of (1) the aggregate amount of the DIP Credit Parties' forecasted disbursements, on a cumulative basis, for "Total Operating Cash Disbursements"  in the Approved Budget, for the same 4-consecutive calendar week period then ended, plus (2) any Operating Disbursement Carryforward (as defined in the DIP Term Sheet) (herein, the *"Disbursements Variance"*), shall not exceed 15.0%.  The Debtors shall provide the DIP Lender and the Pre-Petition ABL Agent with variance reports (in substantially the same format as the Approved Budget) showing actual cash receipts, disbursements and net cash flow for the immediately preceding week, noting therein all variances from values set forth for such period(s) in the Approved Budget (and updates thereto), which variance reports will be provided on a weekly basis after the end of the fourth full calendar week following the filing of the Cases (by no later than the fourth business day of each week).

(b)     Except as otherwise provided in paragraph 17 hereof, the proceeds of any loans or other extensions of credit made by the DIP Lender to Debtors pursuant to this Interim Order and the DIP Loan Documents, all proceeds of DIP Collateral and all Cash Collateral shall be used only

as follows: (a) prior to the full repayment of all obligations due under the DIP Loan Documents, for the payment of the expenses set forth in any Approved Budget or within any variance from the Approved Budget that does not create an Event of Default (as defined in the DIP Loan Documents) (subject to the limitations and exceptions set forth in this ordering paragraph), including for the payment of wages of employees of Debtors (including payroll taxes on a post-petition basis), and any portion of the Obligations, and (b) on or after the Maturity Date, *first* for the payment of any administrative expenses of the Debtors' estates that were accrued but were not paid prior to the Maturity Date in amounts not to exceed the line items for such administrative expenses in the Approved Budget through the Maturity Date; and *second* for indefeasible payment in full in cash of the Obligations (in such order as determined by the DIP Lender in its sole discretion); provided that application of such payments to the Pre-Petition ABL Obligations shall be done in accordance with the Pre-Petition ABL Credit Agreement. The DIP Lender and the Pre-Petition ABL Agent shall have no obligation with respect to the Debtors' use of the proceeds of the Post-Petition Financing, the DIP Collateral or Cash Collateral, and shall not be obligated to ensure or monitor the Debtors' compliance with any Approved Budget or to pay (directly or indirectly from its DIP Collateral) any expenses incurred or authorized to be incurred pursuant to the Approved Budget. In addition, the DIP Lender and the Pre-Petition ABL Agent shall not be obligated or be liable for the payment of any prepetition payroll taxes that may were due and owing as of the Petition Date to any governmental authority. Funds borrowed under this Interim Order and Cash Collateral used under this Interim Order shall be used by the Debtors in accordance with this Interim Order. The DIP Lender's and/or the Pre-Petition ABL Agent consent to any Approved Budget shall not be construed as a consent to the use of any Cash Collateral or a commitment to continue to provide Post-Petition Financing after the occurrence of a Post-Petition Default or beyond the date of a Post-Petition Termination Event, regardless of whether the aggregate funds shown on the Approved

Budget have been expended.  To induce the Pre-Petition ABL Agent to permit the Debtors to use

Cash Collateral and borrow additional funds, the Debtors have agreed, and this Court hereby

orders, that as long as any of the Obligations are outstanding, the Debtors shall not seek, assert,

argue for, encourage or support the use of Cash Collateral by the Debtors except as expressly

permitted and consented to by the Pre-Petition ABL Agent pursuant to the terms of this Interim

Order.

16.    *Covenants.*  The Debtors shall timely comply with all of the covenants set forth in

this Interim Order and the DIP Loan Documents.

17.    *Application of Collateral Proceeds.*

(a)    In the event that there is ambiguity as to whether particular collateral is Pre-Petition

Collateral or DIP Collateral, or whether proceeds are proceeds of Pre-Petition Collateral or DIP

Collateral, such collateral shall be deemed to be Pre-Petition Collateral and such proceeds shall be

deemed to be proceeds of Pre-Petition Collateral and applied accordingly in accordance with the

provisions of this paragraph.  The Debtors shall not have the right to direct the manner of

application of any payments to the DIP Lender or the Pre-Petition Secured Parties or any other

receipts by the DIP Lender or the Pre-Petition Secured Parties of proceeds of any of the

Pre-Petition Collateral or DIP Collateral other than in the manner set forth in this paragraph and

the Intercreditor Agreement.

(b)    Notwithstanding anything to the contrary herein, the proceeds from the sale of the

TECO PP&E Collateral shall be applied (other than proceeds received in the ordinary course of

business of the Debtors), or deemed applied, first to the repayment and satisfaction of the

prepetition "RH Fifth Amendment Loan" (as defined in the Pre-Petition ABL Credit Agreement),

and thereafter applied to repayment of the DIP Obligations.  Upon entry of the Final Order, any

outstanding prepetition RH Fifth Amendment Loans shall be deemed to be DIP Obligations arising

under the Post-Petition Financing and shall be included in the $15 million Commitment under the Post-Petition Financing.

(c)     Notwithstanding anything in this Interim Order to the contrary, the Pre-Petition ABL Credit Agreement, the Pre-Petition ABL Loan Documents and the Intercreditor Agreement shall continue to govern the manner and priority in which any payments made in respect of the Pre-Petition ABL Obligations are distributed or characterized as between or among the Pre-Petition ABL Agent and the lenders under the Pre-Petition ABL Credit Agreement, and nothing in this Order amends, alters or otherwise modifies the foregoing, including as provided by Section 9.2 of the Pledge and Security Agreement (as defined in the Pre-Petition ABL Credit Agreement) and Section 4 of the Intercreditor Agreement.

18.     *Non-Ordinary Course Dispositions.*  Except as permitted by the DIP Term Sheet or the DIP Loan Documents, no sale, lease or other disposition of Pre-Petition Collateral or DIP Collateral outside the ordinary course of business (including any auction or other similar sales) may be done without the prior written consent of the DIP Lender and the Pre-Petition ABL Agent; provided, however, the Pre-Petition Secured Parties retain any rights they may have under the Intercreditor Agreement and other Pre-Petition Term Loan Documents to approve any sale, lease or other disposition of Pre-Petition Collateral or DIP Collateral outside the ordinary course of business, to the extent enforceable under the Bankruptcy Code.

19.     *Books and Records.*  With prior notice to the Debtors, the Debtors shall permit the DIP Lender, Pre-Petition ABL Agent, the Pre-Petition Term Loan Secured Parties and any authorized representatives designated by the DIP Lender, the Pre-Petition ABL Agent or the Pre-Petition Term Loan Secured Parties (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of any Debtor, including the Debtors' respective financial and accounting records, and to make copies and take extracts therefrom, and

to discuss any Debtor's affairs, finances and business with such Debtor's officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested.  Without limiting the generality of the foregoing, the Debtors shall promptly provide to the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Loan Secured Parties, and each of their respective designated representatives, any information or data reasonably requested to monitor the Debtors' compliance with the covenants in the Pre-Petition ABL Credit Agreement or Pre-Petition Term Loan Credit Agreement, as applicable, and the provisions of the DIP Loan Documents and this Interim Order, status and progress of these Cases and to perform appraisals or other valuation analyses of any property of any Debtor.

20.    *Reservation of Rights; No Waiver.*  The DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Agent each do not waive, and expressly reserve, any and all claims, defenses, rights and remedies each may have pursuant to any or all of the Pre-Petition Loan Documents, the DIP Loan Documents, the Bankruptcy Code and/or other applicable law against any Debtor and any officer, director, employee, agent or other representative of any Debtor.  In addition, the rights and obligations of the Debtors and the rights, claims, liens, security interests and priorities of the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Loan Secured Parties arising under this Interim Order are in addition to, and are not intended as a waiver or substitution for, the rights, obligations, claims, liens, security interests and priorities granted by the Debtors, in their pre-petition capacity, under the Pre-Petition Loan Documents.  Without limiting the generality of the foregoing, the DIP Lender, the Pre-Petition ABL Agent and/or the Pre-Petition Term Loan Secured Parties, as the case may be, may petition this Court for any such additional protection it may reasonably require with respect to the Pre-Petition ABL Obligations, the DIP Obligations, Pre-Petition Term Loan Obligations or otherwise, and nothing in this Interim Order constitutes a

finding with respect to the adequacy of the protection of the DIP Lender's and the Pre-Petition Secured Parties' interests in the Pre-Petition Collateral.

21.    *Order Binding on Successors.*  The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, the Pre-Petition ABL Agent, the Pre-Petition Term Loan Secured Parties, the Debtors, and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of any Debtor's estate or of any estate in any Successor Case).  Except as otherwise explicitly set forth in this Interim Order, no third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

22.    *Effect of Dismissal, Conversion or Substantive Consolidation.*  If any of the Cases are dismissed, converted, otherwise superseded or substantively consolidated, the DIP Lender's, the Pre-Petition ABL Agent's and the Pre-Petition Term Loan Secured Parties' rights and remedies under this Interim Order and the DIP Loan Documents shall be and remain in full force and effect as if such Case had not been dismissed, converted, superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, supercission or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

23.    *Releases and Validation of Pre-Petition ABL Obligations and Liens; Allowance of Secured Claim.*  The releases, discharges, waivers and agreements set forth in Recital C and in this paragraph will be subject to the right of the Committee and any other party in interest to object on the terms and conditions set forth in paragraph 25 below.  Each of the Debtors and their estates, hereby: (a) releases and discharges the DIP Lender and the Pre-Petition ABL Agent, together with each of their affiliates, agents, attorneys, officers, directors and employees from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the Pre-

Petition ABL Loan Documents, any aspect of the pre-petition relationship between the DIP Lender, the Pre-Petition ABL Agent and any Debtor, or any other acts or omissions by the DIP Lender or the Pre-Petition ABL Agent in connection with any of the Pre-Petition ABL Loan Documents or its pre-petition relationship with any Debtor; (b) waives any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability (under §§ 510, 544, 545, 547, 548, 550, 551, 552 or 553 of the Bankruptcy Code or otherwise) of the Pre-Petition ABL Obligations and the security interests in and liens on the Pre-Petition Collateral in favor of the DIP Lender and the Pre-Petition ABL Agent; and (c) agrees, without further Court order and without the need for the filing of any proof of claim, to the allowance of the pre-petition claims of the DIP Lender and the Pre-Petition ABL Agent pursuant to §§ 502 and 506 of the Bankruptcy Code on account of the Pre-Petition ABL Obligations as fully secured claims according to the DIP Lender's and/or the Pre-Petition ABL Agent's books and records, the principal amount of which is not less than approximately \$45,698,362.87 and  \$3,349,271.53, respectively, as of the Petition Date, plus accrued pre-petition and post-petition interest, fees, expenses and other amounts chargeable under the Pre-Petition ABL Loan  Documents.

24.    *Relationship with Debtors.*   In making decisions to advance any Loans or other extensions of credit to any Debtor, in administering any Loans or other extensions of credit, or in taking any other actions reasonably related to this Interim Order or the Obligations or the DIP Loan Documents (including, without limitation, the exercise of its approval rights with respect to any budget), the DIP Lender and the Pre-Petition ABL Agent shall have no liability to any third party and shall not be deemed to be in control of the operations of any Debtor or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation or management of any Debtor (as such term, or any similar terms, are used in the Internal Revenue

Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), and the DIP Lender's and the Pre-Petition ABL Agent's relationship with any Debtor shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the DIP Lender, the Pre-Petition ABL Agent and any Debtor.

25.   *Objections by Parties in Interest.*

(a) The stipulations, admissions and releases contained in this Interim Order shall be binding on the Debtors and all parties in interest, including, without limitation, any Committee, unless such Committee, other committee or any other party in interest (other than the Debtors) (i) obtains the authority to commence and commences, or, if any of the Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Cases commences, on or before the date that is the later of (a) 75 days after the entry of this Interim Order, (b) in the case of a chapter 7 trustee, 60 days after the appointment of such chapter 7 trustee, (c) in the case of such an action by the Committee, 60 days after the appointment of the Committee, and (d) such later date as has been agreed to, in writing, by the DIP Lender and the Pre-Petition ABL Agent (such time period shall be referred to as the *"Challenge Period,"* and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the *"Challenge Period Termination Date"*), either (x) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, or releases included in this Interim Order, or (y) a contested matter or adversary proceeding against the DIP Lender and/or the Pre-Petition ABL Agent in connection with or related to the Pre-Petition ABL Obligations, the Pre-Petition ABL Loan Documents, the validity, enforceability, priority or extent of the DIP Lender's and/or the Pre-Petition ABL Agent's liens on the Pre-Petition

Collateral, or the actions or inactions of any of the DIP Lender and/or the Pre-Petition ABL Agent arising out of or related to the Pre-Petition ABL Obligations, or otherwise, including, without limitation, any claim against the DIP Lender and/or the Pre-Petition ABL Agent in the nature of a "lender liability" claim, or any other causes of action, setoff, counterclaim or defense to the Pre-Petition ABL Obligations (including but not limited to those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code) (the objections, challenges, actions and claims referenced in clauses (x) and (y), collectively, the *"Claims and Defenses"*), and (ii) obtains a judgment from this Court in any such timely and properly commenced contested matter or adversary proceeding.

(b) If no Claims and Defenses have been timely asserted in any such adversary proceeding or contested matter, then the admissions, stipulations, findings and releases included in this Interim Order, including the release provisions herein, shall be binding on all parties in interest, including any Committee, and (i) the Pre-Petition ABL Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, subordination, recharacterization, defense or avoidance, for all purposes in these Cases and any Successor Case, (ii) the DIP Lender's and/or the Pre-Petition ABL Agent's liens on the Pre-Petition Collateral shall be deemed legal, valid, binding, enforceable and properly perfected, not subject to recharacterization, subordination, avoidance or reduction and (iii) the Pre-Petition ABL Obligations, the liens on the Pre-Petition Collateral, the conduct of the DIP Lender and/or the Pre-Petition ABL Agent, and the DIP Lender itself and the Pre-Petition ABL Agent itself shall not be subject to any other or further challenge by any party in interest, and any such party shall be enjoined and forever barred from seeking to exercise the rights of the Debtors' estates regarding any such challenge, including, without limitation, any successor thereto, or from asserting any Claims and Defenses against each of the DIP Lender and the Pre-Petition ABL Agent or its respective agents, affiliates, subsidiaries,

directors, officers, employees, representatives, attorneys or advisors (solely in their capacities as such).  If any such adversary proceeding or contested matter is timely filed prior to the Challenge Period Termination Date, the stipulations and admissions and provisions contained in this Interim Order shall nonetheless remain binding and preclusive on the Committee, the Debtors and the Debtors' estates and on any other person or entity, except to the extent that such findings and admissions were expressly challenged in such adversary proceeding or contested matter by such party.  The Challenge Period in respect of the Pre-Petition ABL Obligations may be extended for the benefit of any one or more parties by written agreement of the DIP Lender and the Pre-Petition ABL Agent in their sole discretion without further order of the Court.  Nothing in this Interim Order vests or confers on any person or entity, including any Committee, standing or authority to pursue any cause of action belonging to any or all of the Debtors or their estates, including, without limitation, any Claim and Defense or other claim against the DIP Lender and/or the Pre-Petition ABL Agent.  If a chapter 7 trustee is appointed prior to the expiration of the Challenge Period, such trustee shall have until the later of (a) the termination of the Challenge Period or (b) sixty (60) days following such trustee's appointment to commence a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, or releases included in this Interim Order.

26.    *Effect of Modification of Order.*  The Debtors shall not, without the DIP Lender's and the Pre-Petition ABL Agent's prior written consent, seek to modify, vacate or amend this Interim Order or any DIP Loan Documents.  If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such stay, modification or vacatur shall not affect the validity of any Indebtedness outstanding immediately prior to the effective time of such stay, modification or vacatur, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such Obligations.

Notwithstanding any such stay, modification or vacatur, any Obligations outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender and/or the Pre-Petition ABL Agent shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such Obligations.

27.     *Safe Harbor.*  The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on the terms and conditions upon which the Debtors, the DIP Lender and the Pre-Petition ABL Agent have agreed.  Thus, each of such terms and conditions constitutes a part of the authorization under § 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in § 364(e) of the Bankruptcy Code.

28.     *Subsequent Hearing; Procedure for Objections and Entry of Final Order.*  The Motion is set for a Final Hearing before this Court at 9:00 a.m. on July 23, 2019 (such date or such later date to which the Final Hearing is adjourned or continued with the DIP Lender's and the Pre-Petition ABL Agent's consent, the *"Final Hearing Date"*), at which time any party in interest may present any timely filed objections to the entry of a Final Order, in form and substance acceptable to the DIP Lender and the Pre-Petition ABL Agent in their sole discretion.  The Debtors shall promptly serve a notice of entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order, by regular mail upon (i) the Noticed Parties, and (ii) any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon Debtors' counsel.  The notice of the entry of this Interim Order and the Final Hearing shall state that objections to the entry of a Final Order on the Motion shall be in writing and shall be filed with the United States Bankruptcy Clerk for the Eastern District of Kentucky no later than July 16, 2019, which objections shall be served so that the same are received on or before 4:00 p.m.

(prevailing Eastern time) of such date by the Noticed Parties and the U.S. Trustee.  Any objections by creditors or other parties in interest to any of the provisions of this Interim Order shall be deemed waived unless filed and served in accordance with this paragraph.

29.    *No Marshalling*.  Subject to entry of the Final Order, the DIP Lender, the Pre-Petition ABL Agent and/or the Pre-Petition Term Loan Secured Parties shall not be under any obligation to marshal any assets in favor of any Debtor or any other party or against or in payment of any or all of the Obligations or Pre-Petition Term Loan Obligations.

30.    *Credit Bidding*.  Subject to the terms of the DIP Loan Documents, the DIP Lender shall have the right to credit bid some or all of the amount of the DIP Obligations in any sale of the DIP Collateral (or any part thereof) as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or section 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code or otherwise, but subject to the rights of the chapter 7 trustee set forth in paragraph 25.

31.    *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Loan Documents, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Loan Secured Parties shall not (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; (v) be deemed a "third party" to which 26 U.S.C. § 3505 applies; or (iv) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

32.     *Objections Overruled or Withdrawn.*  All objections to the entry of this Interim Order have been withdrawn or overruled.

33.     *Controlling Effect of Order.*  To the extent any provisions in this Interim Order conflict with any provisions of the Motion, any Pre-Petition ABL Loan Documents or any DIP Loan Documents, the provisions of this Interim Order shall control.

34.     *Order Effective.*  This Interim Order shall be effective as of the date of signature by the Court.

- 50 -

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Gregory R. Schaaf*
**Bankruptcy Judge**
**Dated: Wednesday, June 19, 2019**
**(grs)**

**EXHIBIT A**

**DIP TERM SHEET**

#92157804v4

**Cambrian Coal LLC and Shelby Resources, LLC
Outline of Terms and Conditions for
Debtor-In-Possession Credit Facility**

| | |
|---|---|
| **Borrower:** | Cambrian Coal LLC and Shelby Resources, LLC (collectively, the "Borrower") will be a debtor and debtor-in-possession in a case (the "Borrower's Case") commenced voluntarily under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Kentucky (the "Bankruptcy Court"). |
| **Guarantors:** | The obligations of the Borrower shall be unconditionally guaranteed, on a joint and several basis, by those entities identified on Exhibit A attached hereto (the "Guarantors"), which include Cambrian Holding Company, Inc., the direct parent company of Borrower Cambrian Coal LLC, and the subsidiaries of Cambrian Coal LLC that were among the parties guarantying the obligations of Cambrian Coal LLC and Shelby Resources, LLC (the "Prepetition Borrowers") under that certain pre-petition ABL Credit and Guaranty Agreement dated as of July 10, 2013 (as amended as of September 4, 2014, October 31, 2014 and May 28, 2015) and as further amended and restated in full by Amendment No. 4 to ABL Credit and Guaranty Agreement and Amendment No. 1 to Pledge and Security Agreement, dated as of September 21, 2015 (as amended, the "Prepetition ABL Credit Agreement"). The Guarantors and the Borrower shall be referred to herein collectively as the "DIP Credit Parties". Each Guarantor will be a debtor and debtor-in-possession in a case (such cases, collectively, the "Guarantors' Cases"; the Guarantors' Cases and the Borrower's Case are collectively referred to herein as the "Cases") commenced voluntarily under chapter 11 of the Bankruptcy Code. Deutsche Bank AG New York Branch is the pre-petition Collateral Agent, as more fully set forth in the Prepetition ABL Credit Agreement (the  "Prepetition ABL Collateral Agent") and the administrative agent under the Prepetition ABL Credit Agreement (the "Prepetition ABL Administrative Agent"). |
| **Intercreditor Agreement:** | That certain Amended and Restated Intercreditor Agreement, dated as of September 21, 2015 (as amended, the "Intercreditor Agreement"), between Deutsche Bank AG New York Branch, in its capacity as ABL Loan Agent, and Deutsche Bank Trust Company Americas, in its capacity as Term Loan Agent, as each is defined in the Prepetition ABL Credit Agreement. |
| **DIP Lenders:** | Richmond Hill Capital Partners, LP and Essex Equity Joint Investment Vehicle, LLC, and any other lenders from time to time party to the DIP Loan Agreement (collectively, in such capacities, the "DIP Lenders"). Richmond Hill Capital Partners, LP shall serve as administrative agent for the DIP Lenders (the "DIP Agent"). |
| **Petition Date:** | The date of the commencement of the Cases, which date shall be no later than June 16, 2019 (the "Petition Date"). |

2

**Closing Date:** The closing date in respect of the DIP Facility (defined below) (the "Closing Date"), which shall be no later than fourteen (14) business days following the entry of the Interim Order (defined below).

**DIP Facility:** A senior secured debtor-in-possession credit facility (the "DIP Facility" and the extensions of credit under the DIP Facility, the "DIP Loans") providing for extensions of credit not to exceed $15,000,000.00 (the "Maximum Amount"), pursuant to the terms of DIP Loan Agreement in form and substance acceptable to the DIP Lenders (the "DIP Loan Agreement"). As set forth in this Outline of Terms and Conditions (this "Term Sheet"), the DIP Facility will be provided on a "super-priority" basis and secured by liens on all of the assets of the DIP Credit Parties as described below under the heading "Priority and Liens; Collateral."

**Availability:** Subject to all of the terms and conditions hereof, upon the entry of an order by the Bankruptcy Court in form and substance satisfactory to the DIP Lenders (the "Interim Order"), availability under the DIP Facility shall (a) prior to the entry of the Final Order (defined below), be available in an amount not to exceed $12,000,000.00 (the "Initial Amount"), the extension of which shall be made in multiple draws pursuant to the schedule contained herein upon the provision by the Borrowers of an updated Budget (as defined below) for which the Borrower shall provide the DIP Lenders with at least one (1) business day notice, provided that (ii) the filing of the Borrower's Case shall be deemed to be notice to the DIP Lender of Borrower's request for a draw in the amount of $5,000,000.00, which draw may not occur until those "Conditions Precedent" as set forth herein have been met, and (b) upon entry of the Final Order, the remaining portion of the DIP Loans shall be available under the DIP Facility in the absolute and sole discretion of the Lenders, which, subject to the absolute and sole discretion of the Lenders, such DIP Loans may be in multiple draws in an amount not to exceed the remaining portion of the Maximum Amount. Subject to the foregoing limits, the DIP Loans shall be available under the DIP Facility in increments of no less than $1,000,000.00 per draw. Amounts repaid with respect to DIP Loans may not be re-borrowed. Amounts released to the Borrower pursuant to the foregoing shall continue to constitute DIP Loans for all purposes under the DIP Facility, and shall be subject to the provisions and limitations applicable thereto (including, without limitation, interest and use of proceeds).

Draw Schedule:

Week 1("First Draw"): Up to $5,000,000.00

Week 2 ("Second Draw"): Up to $3,000,000.00, plus the amount of any undrawn amounts from the prior week

Week 3 ("Third Draw"): Up to $2,000,000.00, plus the amount of any undrawn amounts from the prior 2 weeks

Week 4 ("Fourth Draw"): Up to $2,000,000.00, plus the amount of any undrawn amounts from the prior 3 weeks

**Purpose/Use of Proceeds:** Proceeds of loans under the DIP Facility (and any letters of credit issued thereunder) may be used by the Borrower in the Case solely for: (i) general working capital purposes for the Borrower and its wholly owned subsidiaries consistent with the Budget and to be mutually agreed with the DIP Lenders; (ii) to pay all DIP Transaction Expenses (as defined herein) and those reasonable and documented fees and expenses payable to the DIP Lenders; (iii) paying fees, costs and expenses specifically related to the Cases to the extent such fees, costs and expenses are consistent with the Budget, are approved by the Bankruptcy Court, and relate solely to fees, costs and expenses of the Borrower's professionals (allowance of such fees shall be subject to final approval of the Bankruptcy Court) or professionals retained by the DIP Lender; (iv) to make certain payments on account of prepetition obligations (including "critical vendor payments") of the Borrower and its wholly owned subsidiaries, to be mutually agreed with the DIP Lenders, and as approved by the Bankruptcy Court; and (v) to pay any other amounts included in the Budget, including without limitation adequate protection payments, which other amounts shall not exceed the amounts so budgeted.  In no event shall any proceeds of the extensions of credit under the DIP Facility be used to challenge or contest any of the Liens or claims of the DIP Lenders, the Prepetition ABL Collateral Agent or the Prepetition ABL Administrative Agent.

**Roll-Up of Prepetition DIP Lenders** The proceeds of any TECO PP&E Collateral (as defined in the Intercreditor Agreement), and all other payments received by the Debtors prior to the entry of the Final Order (as defined below)  (other than proceeds received in the ordinary course of business of the Debtors) shall be applied, or deemed applied, first to the repayment and satisfaction of the prepetition RH Fifth Amendment Loan (as defined in the Pre-Petition ABL Credit Agreement), and thereafter applied to repayment of the DIP Facility.  Upon entry of the Final Order, any outstanding prepetition RH Fifth Amendment Loan shall be deemed to be Obligations arising under the DIP Facility.   The outstanding principal balance of the RH Fifth Amendment Loan as of the Petition Date is $500,000.00.

**Budget:** The Borrower will provide the DIP Lenders and the Prepetition ABL Administrative Agent with a detailed weekly budget covering the succeeding 13-calendar week period (as amended or modified from time to time, the "Budget"), substantially in the form attached as Exhibit B hereto, that shall set forth in reasonable detail receipts and disbursements of the Borrower on a weekly basis for the 13-calendar week period following the Petition Date, which Budget shall be subject to approval by the DIP Lenders in their reasonable discretion, and the Borrower will provide the DIP Lenders and the Prepetition ABL Administrative Agent with an update to the Budget every week (by no later than 12:00 noon (Eastern Time) of the third business day of such week), commencing for the first full calendar week following the Petition Date, for each rolling 13-calendar week period that begins with the first full calendar week following the date each such updated budget is delivered, which Budget updates shall also be subject to approval by the DIP Lenders (i) in their

4

reasonable discretion with respect to the new 13th week being added to the Budget, and (ii) in their sole discretion with respect to any of the other weeks in such updated Budget.  Unless otherwise approved by the DIP Lenders, each updated Budget shall be identical to the previously approved Budget except with respect to the week not covered by such prior Budget.  The Borrower shall provide the DIP Lenders and the Prepetition ABL Administrative Agent with variance reports (in substantially the same format as the Budget) showing actual cash receipts, disbursements and net cash flow for the immediately preceding calendar week, noting therein all variances from values set forth for such calendar week in the Budget (and updates thereto), which variance reports will be provided on a weekly basis (by no later than 12:00 noon (Eastern Time) of the third business day of each week).  For the avoidance of doubt, the Budget shall be the weekly budget solely for the Borrower and its wholly owned subsidiaries.

**Maturity Date:**

The DIP Facility shall mature, be repayable in full, and the DIP Facility shall terminate on such date (the "Maturity Date") that is the earliest to occur of (i) the effective date (the "Effective Date") of a confirmed Plan (defined below), (ii) six (6) months after the Petition Date (which date may, at the request of the Borrower and subject to the prior written consent of the DIP Lenders, be extended four times by one (1) month per extension, subject to the payment of a fee on each occurrence after the first occurrence to the DIP Lenders in an amount equal to 0.25% of the Maximum Amount), (iii) the date on which the obligations under the DIP Facility are accelerated following the occurrence of an Event of Default (defined below), (iv) the date of the closing of a sale of all or substantially all of the Borrower's assets pursuant to §363 of the Bankruptcy Code, and (v) the date on which the Bankruptcy Court approves the extension of any other credit facilities to the Borrower or Guarantors, or to any entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Cases, over the objection of the DIP Lenders.

**Commitment Termination Date:**

The commitment of the DIP Lenders to provide the DIP Facility shall terminate on the earlier of (i) the Maturity Date, (ii) the date the Borrower terminates the commitments of the DIP Lenders to make further DIP Loans under the DIP Facility, and (iii) the date the DIP Lenders terminate their commitments to make the DIP Loans upon the occurrence of an Event of Default.

**Priority and Liens: Collateral:**

Subject to the Carve-Out (defined below), all obligations to the DIP Lenders, including, without limitation, all principal, accrued interest, costs, fees and expenses, shall:

- pursuant to Bankruptcy Code section 364(c)(1), be joint and several claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and

1114 (the "<u>Superpriority Claims</u>"), which Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Credit Parties and all proceeds thereof, including, without limitation, subject to the entry of the Final Order (defined below), all proceeds or other amounts received in respect of the DIP Credit Parties' claims and causes of action arising under chapter 5 of the Bankruptcy Code or the proceeds or other amounts received in respect thereof (such claims and causes of action, collectively the "<u>Avoidance Actions</u>");

- pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first priority lien on all now owned or hereafter acquired assets and property of the DIP Credit Parties and proceeds thereof (including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and equipment of the DIP Credit Parties) that are not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, but specifically excluding the Avoidance Actions or any proceeds thereof (collectively, the "<u>First Lien Collateral</u>");

- pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected first priority lien on all property of the DIP Credit Parties classified as (a) "Term Loan Priority Collateral" as defined in the Intercreditor Agreement and (b) "ABL Loan Priority Collateral" that is not "TECO PP&E Collateral" each as defined in the Intercreditor Agreement, but specifically excluding in each case the Avoidance Actions or any proceeds thereof, junior only to (y) with respect to the Term Loan Priority Collateral, the liens of the Term Loan Collateral Agent (as defined in the Prepetition ABL Credit Agreement) securing the Term Loan Debt and (z) with respect to the ABL Loan Priority Collateral, the liens of the Prepetition ABL Collateral Agent securing the ABL Loan Debt that is not RH Loan Debt (as each such term is defined in the Intercreditor Agreement) (each of (a) and (b) including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and equipment of the DIP Credit Parties constituting Term Loan Priority Collateral or

6

ABL Loan Priority Collateral (in each case, that is not also TECO PP&E Collateral) that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code), other than as set forth below (collectively, the "Second Lien Collateral");

- pursuant to Bankruptcy Code section 364(d)(1), be secured by a first-priority, senior priming perfected lien on, and security interest in, all assets, other than Avoidance Actions or proceeds thereof, that (a) are subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement, and (b) in each case, constitute either (i) TECO PP&E Collateral, as defined in the Intercreditor Agreement, or (ii) a percentage of the ABL Loan Priority Collateral (as defined in the Intercreditor Agreement) that is not TECO PP&E Collateral equal to the RH Loan Debt existing on the Petition Date divided by the ABL Loan Debt existing on the Petition Date (each term as defined in the Intercreditor Agreement) (the "Primed Collateral" and together with the First Lien Collateral and the Second Lien Collateral, the "DIP Collateral").

**Carve-Out:**  The aforementioned Superpriority Claims and liens on the DIP Collateral and the Adequate Protection Claims and Adequate Protection Liens (each defined below) and any pre-Petition Date liens and claims shall be subject only to (1) (x) after delivery by the DIP Lenders, of the Carve Out Trigger Notice (defined below), to the extent allowed on an interim basis or final basis by the Bankruptcy Court at any time, all unpaid fees, disbursements, costs and expenses incurred by Professionals[1] from and after the date following the date of delivery of the Carve Out Trigger Notice, in an aggregate amount not to exceed $400,000 (such amount, the "Post-Carve Out Trigger Notice Cap") *plus* (y) the amount of all accrued and/or unpaid fees, disbursements, costs and expenses incurred by Professionals on and before the date of delivery of the Carve Out Trigger Notice, to the extent allowed on an interim basis or final basis by the Bankruptcy Court at any time (including after the date of delivery of the Carve Out Trigger Notice); provided, however, that nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any Professionals or any other Person or entity; (2) the payment of fees required pursuant to 28 U.S.C. § 1930; and (3) all reasonable and documented fees and expenses incurred by a trustee appointed under section 726(b) of the

---

[1]  Solely for purposes of this Carve-Out section, the term "Professionals" shall mean the professionals retained by the DIP Credit Parties and a statutory committee of unsecured creditors to the extent one is appointed in the Cases and approved by the Bankruptcy Court (the "Committee").

Bankruptcy Code in an aggregate amount not to exceed $75,000 ((1), (2) and (3), together, the "Carve-Out").

"Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Lenders to the Borrower and its lead counsel, the United States Trustee for the Eastern District of Kentucky (the "U.S. Trustee"), lead counsel to the Committee of Unsecured Creditors, if any, lead counsel for the Term Loan Agent, and filed with the Court, which notice may be delivered only following the occurrence and during the continuance of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

- Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, the DIP Credit Parties shall be permitted to pay compensation and reimbursement of fees and expenses of Professionals allowed and payable under Bankruptcy Code sections 328, 330 and 331, as the same may be due and payable, and the same shall not reduce the Carve-Out. No portion of the Carve-Out or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of any liens or claims of the DIP Lenders or the Prepetition ABL Collateral Agent, or the initiation or prosecution of any claim or action against any of the foregoing or their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof. The DIP Credit Parties' stipulations, acknowledgements and covenants concerning the extent, validity, priority, perfection, enforceability and non-avoidance of the obligations under the Prepetition ABL Credit Agreement and the liens securing the obligations under the Prepetition ABL Credit Agreement shall be binding on the DIP Credit Parties, their estates, and any successor in interest in these or any successor cases, and subject to any applicable investigation period required by local rule or otherwise agreed to by the DIP Lenders in their sole discretion; provided, that no more than $25,000 in the aggregate of the DIP Loans and Carve-Out may be used by a Committee solely to investigate claims or causes of action against the DIP Lenders, the Prepetition ABL Administrative Agent or the Prepetition ABL Collateral Agent.

**Adequate Protection:**  The DIP Lenders shall be granted the following as adequate protection of their interest in the ABL Collateral, including the TECO Collateral (as defined in the Prepetition ABL Credit Agreement) in an amount equal to the aggregate actual diminution in the value of their interests therein:

- effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, (i) a valid, perfected replacement security interest in and lien on the collateral to which they hold priority liens existing as of the Petition Date or thereafter acquired and any proceeds thereof and (ii) a valid, perfected security interest

8

in and lien on all of the DIP Collateral, which shall for the avoidance of doubt exclude the Avoidance Actions and the proceeds thereof (collectively, the "<u>Adequate Protection Liens</u>"), subject and subordinate only to (x) the Carve-Out and (y) the liens securing the DIP Facility;

- a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (collectively, the "<u>Adequate Protection Claims</u>"), subject and subordinate only to (x) the Carve-Out and (y) the Superpriority Claims held by the DIP Lenders under the DIP Facility.  Except for the Superpriority Claims held by the DIP Lenders, no claims shall be permitted with priority *pari passu* with, or senior to, the Adequate Protection Claims; provided, however that the Adequate Protection Claims may not be satisfied from the proceeds of the Avoidance Actions;

- current cash payments of all reasonable and documented fees and expenses payable to the DIP Lenders, including but not limited to attorney and professional fees and expenses, promptly following the 7th calendar day after the DIP Lenders have provided statements of such fees and expenses to the U.S. Trustee, lead counsel to the Borrower and lead counsel to the Committee, provided no objection has been filed thereto;

- payment of fees and expenses of a financial advisor to the DIP Lenders, subject to standard terms that such advisor shall have access to the books and records of the DIP Credit Parties;

- current cash payments of interest due on the RH Loan and the Revolving Loan (each as defined in the Prepetition ABL Credit Agreement) on a bi-weekly basis; and

- current cash payments of all reasonable and documented fees and expenses payable to the Prepetition ABL Administrative Agent and Prepetition ABL Collateral Agent (whether incurred or accrued prior to or after the Petition Date), including but not limited to attorney and professional fees and expenses, promptly following the 7th calendar day after the Prepetition ABL Administrative Agent and Prepetition ABL Collateral Agent have provided statements of such expenses and other reasonable documented fees and expenses to the U.S. Trustee, lead counsel to the Borrower and lead counsel to the Committee, provided no objection has been filed thereto.

**363 Sales:**          Other than the sale or other disposition of assets having an aggregate value of less than $50,000, no sale of assets of the Borrower or any Guarantor under section 363 of the Bankruptcy Code, outside the ordinary course of business, will be authorized without the DIP Lenders' consent, unless the proceeds of such sale or other disposition will be sufficient to pay the DIP Loans under the DIP Facility and the RH Loan Debt and the other ABL Loan Debt (as such terms are defined in the Intercreditor Agreement) in full.

| | |
|---|---|
| **Interest Rate:** | The interest rate shall be 12.00% per annum, applied to the outstanding amount of the DIP Facility and measured on a 360 day year.  Upon the occurrence and during the continuance of an Event of Default, at the election of the DIP Lenders, all obligations under the DIP Facility shall bear interest at a rate of 3.00% above the otherwise applicable rate. Interest shall be payable 50% payable in kind (PIK) and 50% cash |
| **Commitment Fee:** | (i) An upfront fee upon funding in the amount of 2.5% of the DIP Lenders' total commitment, one-half of which shall accrue and be paid upon exit, and (ii) an exit fee upon the repayment or termination of the DIP Facility (including on the Maturity Date) in the amount of 1.5% of the total amount loaned by the DIP Lenders. |
| **Agency Fee:** | The Borrower shall pay to the DIP Lenders $75,000 upon the initial draw on the DIP Facility. |
| **Representations and Warranties:** | The documentation evidencing the DIP Facility (the "<u>DIP Loan Documents</u>") shall include representations and warranties that are reasonable and customary for post-petition financings of this type, including, without limitation, continued effectiveness of orders of the Bankruptcy Court, including the Interim Order and the Final Order, as applicable, and full disclosure and good faith accuracy of the Budget. |
| **Covenants:** | The DIP Loan Documents shall include affirmative and negative covenants that are reasonable and customary for post-petition financings of this type, and shall be acceptable in all respects to the DIP Lenders, and with such changes as may be required to reflect the pendency of the Cases.  The DIP Credit Parties shall comply with the following: |

- *Disbursements.*  As of the end of each calendar week starting with the fourth full calendar week following the filing of the Cases, the unfavorable variance (if any) between (i) the aggregate amount of the DIP Credit Parties' actual disbursements, on a cumulative basis, for "Total Operating Cash Disbursements" in the Budget, for the most recent 4-consecutive calendar week period then ended and (ii) the sum of (A) the aggregate amount of the DIP Credit Parties' forecasted disbursements, on a cumulative basis, for "Total Operating Cash Disbursements" in the Budget, for the same 4-consecutive calendar week period then ended, plus (B) any Operating Disbursement Carryforward (herein, the "<u>Disbursements Unfavorable Variance</u>"), shall not exceed 15.0%.  "Operating Disbursement Carryforward" means the amount of any forecasted Total Operating Cash Disbursements not expended in a prior period, which shall carry forward into future periods.

- *Receipts*. As of the end of each calendar week starting with the fourth full calendar week following the filing of the Cases, the unfavorable variance (if any) between (i) the sum of (A) the DIP Credit Parties' cash receipts for the 4-consecutive calendar week

period then ended, plus (B) any Operating Receipts Carryforward and (ii) the forecasted cash receipts for the same 4-consecutive calendar week period then ended as set forth in the Budget for such period (herein, the "Cash Receipts Unfavorable Variance"), shall not exceed 25.0%. "Operating Receipts Carryforward" means the amount of any cash receipts in any prior period in excess of forecasted receipts for such period, which shall carry forward into future periods.

**Events of Default:**    The DIP Loan Documents will include events of default that are reasonable and customary for post-petition financings of this type, with such changes as may be required to reflect the pendency of the Cases and/or to reflect institutional requirements of the DIP Lenders (subject to grace, notice and cure periods to be agreed) (each, an "Event of Default"), including, without limitation:

(a)    any DIP Credit Party fails to pay any principal or interest on the DIP Loans or any fee or other amount due with respect to the DIP Facility as and when the same becomes due, and such failure shall not have been remedied within two business (2) days after such due date;

(b)    any representation or warranty made by any DIP Credit Party with respect to the DIP Facility or in any statement or certificate given by any DIP Credit Party in writing pursuant to the DIP Facility or in connection with any Loan Document shall be false in any material respect on the date as of which made;

(c)    any DIP Credit Party shall breach or violate any term, covenant or agreement contained in the DIP Facility or any financing order or any Event of Default (as defined in the Prepetition ABL Credit Agreement) shall occur, other than existing defaults as of the Petition Date (including the filing of the Chapter 11 petitions and other defaults existing at the time of the filing or arising as a result of such filing that are stayed pursuant thereto);

(d)    the dismissal of any DIP Credit Party's Case or the conversion of the case of any DIP Credit Party that is not an operating business to a case under Chapter 7 of the Bankruptcy Code;

(e)    a trustee or an examiner with enlarged powers (beyond those set forth in § 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any DIP Credit Party is appointed in any of the Cases without the prior written consent of the DIP Lenders (which consent may be withheld in its sole discretion), or any DIP Credit Party applies for, consents to, or acquiesces in, any such appointment without the prior written consent of the DIP Lenders (which consent may be withheld in its sole discretion);

(f)    the Interim Order or Final Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the DIP Lenders and the Prepetition ABL Collateral Agent (which consent may be withheld in its sole discretion);

(g)    the Court or any other court enters an order or judgment in any of the Cases modifying, limiting, subordinating or avoiding the priority

11

of any prepetition obligations or the perfection, priority or validity of the Prepetition ABL Collateral Agent's prepetition liens or the DIP Lenders' postpetition liens on any collateral or imposing, surcharging or assessing against the Prepetition ABL Collateral Agent or the DIP Lenders or their claims or collateral any costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise, other than as provided in the Interim Order and Final Order;

(h)     except as otherwise provided herein, any DIP Credit Party, or any entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Cases, files any application for approval or allowance of, or any order is entered approving or allowing, any administrative expense claim in any of the Cases, having any priority over, or being pari passu with, the superpriority claims of the DIP Lenders;

(i)     any motion or application is filed by or on behalf of any DIP Credit Party in any of the Cases seeking the entry of an order, or an order is entered in any of the Cases, approving any subsequent debtor-in-possession facility for borrowed money or other extensions of credit unless such subsequent facility and such order expressly provide for the indefeasible payment and complete satisfaction in full in cash to the DIP Lenders of all obligations prior to, or concurrently with, any initial borrowings or other extensions of credit under such subsequent facility or has been consented to, in writing, by the DIP Lenders;

(j)     the Final Order is not entered by the Bankruptcy Court within 45 days after entry of the Interim Order;

(k)     the DIP Credit Parties fail to timely achieve any of the milestones set forth in the Interim Order or the Final Order, including with respect to a sale under Section 363 of the Bankruptcy Code, unless consented to in writing by the DIP Lenders in their sole discretion and, for the avoidance of doubt, entry of a sale order approving a sale under Section 363 of the Bankruptcy Code must occur within 77 days following entry of the Interim Order;

(l)     a plan of reorganization or liquidation is proposed which does not provide for termination of the commitment and payment in full of the DIP Facility in cash on the effective date of such plan, if such termination and payment in full has not already occurred;

(m)     except as otherwise provided herein, any other superpriority administrative expense claim or lien senior to or pari passu with the DIP Loan Agreement obligations, or the liens granted to secure the DIP Loan Agreement obligations, shall be granted, approved, imposed, or otherwise created;

(n)     any of the DIP Credit Parties seeks to obtain additional financing under section 364(c) or 364(d) of the Bankruptcy Code or to grant any lien other than liens permitted under the DIP Facility and financing orders without the prior written consent of the DIP Lenders and the Prepetition ABL Collateral Agent;

(o)     any DIP Credit Party files, or any representative of any DIP

Credit Party's estate files, any action challenging the validity, perfection, priority, extent, or enforceability of the loan documents for the DIP Facility or the liens and claims granted thereunder or with respect to the Prepetition ABL Credit Agreement;

(p)    any DIP Credit Party, or any entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Cases, commences any action against the Prepetition ABL Administrative Agent, the Prepetition ABL Collateral Agent or any lender with respect to the Prepetition ABL Credit Agreement, including, without limitation, any action to avoid, modify, dispute, challenge, or subordinate any of the prepetition obligations or any prepetition liens in favor of the Prepetition ABL Collateral Agent or the DIP Lenders, or entry of an order in any action by any other party granting such relief;

(q)    the entry of an order dismissing any of the Cases that does not provide for the termination of the DIP commitment and payment in full of the DIP Loans and all related obligations in cash prior to dismissal;

(r)    any collateral becoming subject to surcharge or marshaling;

(s)    the entry of an order of the Court granting relief from the automatic stay with respect to any prepetition collateral or Collateral or any other assets of any DIP Credit Party (other than at the request of the DIP Lenders) that have an aggregate value equal to or exceeding $50,000, provided that the value of the assets subject to all such orders, in the aggregate, does not exceed $150,000;

(t)    any material contract or unexpired leases of the Borrower or any Guarantor is rejected or otherwise terminated (other than in accordance with its terms) or any property of the Borrower or the Guarantors having an aggregate value equal to or exceeding $50,000 is sold outside the ordinary course of business, in each instance, without the express written consent of the DIP Lenders, provided that all such rejected material leases or unexpired leases, in the aggregate, do not exceed an aggregate value of $150,000;

(u)    the DIP Credit Parties agree to a rental payment with respect to equipment constituting Term Loan Priority Collateral that exceeds $220,000.00 per month; or

(v)    an order of the court or other action restricts the DIP Credit Parties ability to use all of the equipment constituting Term Loan Priority Collateral, without the consent of the DIP Lenders, in their sole discretion.

**Remedies:**    Customary remedies, including, without limitation, the right of the DIP Lenders, upon the occurrence of an Event of Default, to seek relief from the automatic stay under the Bankruptcy Code, and the Borrower's consent to an expedited hearing within three (3) Business Days on a motion seeking such relief.  The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies hereunder with respect to the DIP Credit Parties, under the Interim Order and the Final Order, and with respect to the DIP Collateral.

| | |
|---|---|
| **Assignments and Participations:** | The DIP Facility will contain customary provisions for facilities of this kind, including, without limitation, each DIP Lenders' right to (i) assign its DIP Loans to other DIP Lenders or affiliates thereof without the consent of the DIP Credit Parties, (ii) participate its DIP Loans without notice to, or consent of, the DIP Credit Parties and (iii) pledge its DIP Loans. |
| **Chapter 11 Plan:** | The DIP Credit Parties' plan of reorganization (the "<u>Plan</u>") shall, among other things, provide for (i) payment in full, on the Effective Date thereof, of all DIP Loans under the DIP Facility, or (ii) such other treatment as may be acceptable in all respects to the DIP Lenders. |
| **Conditions Precedent:** | (a)      The First Draw of up to $5,000,000.00 shall be subject to those conditions precedent set forth in subsections (1), (5), (7), (11) and (14) below.  The Second Draw shall be subject to those conditions precedent set forth in subsections (1), (3), (5), (7), (11), (12) and (14) below.  The Third Draw and Fourth Draw shall be subject to those conditions precedent set forth in subsections (1), (2), (3), (5), (6), (7), (11), (12), (13) and (14) below.  Any subsequent draws shall be subject to all subsections contained herein, and pursuant to conditions precedent that are customary and appropriate for financings of this type and acceptable to the DIP Lenders, including, without limitation: |

1.  The DIP Lenders' review of and satisfaction with the Budget;

2.  Execution and delivery by the DIP Credit Parties of definitive DIP Loan Documents, in form and substance consistent with this Term Sheet, and otherwise satisfactory in all respects to the DIP Lenders;

3.  The absence of any Default or Event of Default under any of the DIP Loan Documents or this Term Sheet;

4.  The DIP Lenders receipt of favorable legal opinions of Borrower's and Guarantors' counsel as to such matters as may be required by the DIP Lenders (including, without limitation, enforceability of the DIP Loan Documents and perfection of all Liens granted to the DIP Lenders under the DIP Loan Documents);

5.  The Bankruptcy Court's entry of the Interim Order, as described below;

6.  The retention and approval by the Bankruptcy Court of FTI Consulting, Inc, as chief restructuring advisor for the DIP Credit Parties;

7.  The DIP Lenders' review of and reasonable satisfaction with all "first day orders" (other than the Interim Order, which shall be satisfactory in all respects to the DIP Lenders);

8.  Borrower shall have paid to the DIP Lenders all fees and expenses required to be paid to the DIP Lenders on the Closing Date pursuant to any of the DIP Loan Documents and the

transactions contemplated thereby;

9. All proceedings taken in connection with the execution of the DIP Loan Documents and approval thereof by the Bankruptcy Court (including, without limitation, the nature, scope and extent of notices to interested parties with respect to all hearings related to the DIP Facility) shall be satisfactory in all respects to the DIP Lenders;

10. All representations and warranties made by the DIP Credit Parties under the DIP Loan Documents shall be true and correct in all material respects on and as of the date of each extension of credit under the DIP Facility, except to the extent such representations or warranties relate solely to an earlier date (in which case, they shall be true and correct in all material respects as of such earlier date);

11. The Prepetition ABL Collateral Agent shall have consented to the use of its cash collateral, and an order with respect to such use shall be entered concurrently with the Interim Order or Final Order (subject to the satisfaction in all respects of the DIP Lenders), as the case may be;

12. Receipt of a notice of borrowing from the Borrower.  The request for and acceptance of each DIP Loan by the Borrowers shall constitute a representation and warranty that the conditions to each extension of credit shall have been satisfied;

13. The submission of an acceptable proposed form of bidding procedures sales order (or agreed to motion filed requesting such order) which shall designate the DIP Lenders as the stalking horse bidder for substantially all of the assets of the DIP Credit Parties; and

14. The DIP Credit Parties are not restricted in the use of the equipment that constitutes Term Loan Priority Collateral.

(b)     The Interim Order shall include, among other terms and conditions to be agreed by the DIP Lenders:

1. The right for the Prepetition ABL Collateral Agent (on behalf of the DIP Lenders) and/or the DIP Lenders to credit bid under Section 363(k) of the Bankruptcy Code.

2. Provisions for seventy (70) days (or such longer period as the DIP Lenders may agree) after the entry of the Interim Order of reasonable access to management and a well maintained electronic data room by potential bidders at auction (the "Due Diligence Period").

3. A bid deadline to be set for seventy (70) days (or such longer period as the DIP Lenders may agree) after the entry of the Interim Order.

4. A public auction to be held 75 days after entry of the Interim Order, at a time and place acceptable to the DIP Lenders.

5. A proposed form of sale order acceptable to the DIP Lenders approving the sale shall be entered seventy-seven (77) days (or such longer period as the DIP Lenders may agree) after the entry of the Interim Order.

6. The closing of such sale one hundred seven (107) days (or such longer period as the DIP Lenders may agree) after entry of the Interim Order.

(c) Within twenty (20) calendar days (or such longer period as may be agreed by the DIP Lenders) after entry of the Interim Order, the DIP Lenders shall have received evidence, in form, scope and substance, satisfactory to the DIP Lenders, of all insurance coverage set forth on Exhibit C attached hereto.

**Financing Orders:**    Interim Order.  A condition precedent to the DIP Lenders' DIP Loans under the DIP Facility will be the entry of an interim order, in form and substance satisfactory in all respects to the DIP Lenders (the "Interim Order"), by the Bankruptcy Court, which must occur no later than three (3) business days after the Petition Date, following proper notice and hearing thereon, which, among other things, approves the form and substance of the definitive DIP Loan Documents evidencing the DIP Facility; approves Borrower's stipulation of the validity, extent, amount, perfection, priority, enforceability, and non-avoidability of the Prepetition ABL Collateral Agent's claims and Liens; grants adequate protection (as hereinabove provided) for the benefit of the Prepetition ABL Collateral Agent, the Prepetition ABL Administrative Agent and Lenders; authorizes the DIP Agent to enforce its Liens and the DIP Loan Documents upon the occurrence and during the continuance of Events of Default; contains a Carve-Out for Professional fees and expenses on terms and conditions described herein; confers section 364(c)(1) priority status on all DIP Loans under the DIP Facility and provides for the securing of all such DIP Loans by a Lien on all DIP Collateral having the priority provided herein; finds that the DIP Agent and the DIP Lenders have acted in good faith in connection with the proposed financing and are entitled to the benefits of section 364(e) of the Bankruptcy Code; provides that the Liens granted to the DIP Lenders under the DIP Loan Documents and pursuant to the Interim Order are deemed perfected without the necessity of the filing for record of any documents, notices, or other filings (but the DIP Credit Parties agree to execute and deliver to the DIP Lenders, and to authorize the DIP Lenders to file, any such documents at the DIP Lenders' sole discretion); and contains such other terms and conditions as the DIP Lenders shall request or find acceptable.  For the avoidance of doubt, the Interim Order shall include milestones for a Section 363 sale process as set forth herein.  The Interim Order shall additionally permit the Debtor's use of cash collateral, subject to the terms and conditions therein.

<u>Final Order</u>. The final financing order (the "<u>Final Order</u>") shall be entered, in form and substance satisfactory in all respects to the DIP Lenders, not later than forty-five (45) calendar days after the Petition Date, (i) shall contain provisions substantially the same as those in the Interim Order and (ii) shall provide that all prepetition Liens of the Prepetition ABL Collateral Agent shall be deemed finally allowed and approved as legal, valid, binding and enforceable Liens that are not subject to any equitable subordination, defense, or avoidance and the prepetition claims of the Prepetition ABL Collateral Agent shall be deemed allowed as claims that are not subject to offset, equitable subordination, reduction, counterclaim, or defense, in each case if the same are not challenged by the commencement of appropriate proceedings by an interested party having standing to do so on the sooner to occur of thirty (30) calendar days after the entry of the Final Order or confirmation of a plan of reorganization or liquidation in any of the Cases. The Final Order shall also prohibit any surcharge on the collateral subject to the Prepetition ABL Collateral Agent's Liens and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise.

| | |
|---|---|
| **Governing Law:** | New York, except as governed by the Bankruptcy Code. |
| **Indemnity:** | The DIP Credit Parties shall indemnify, pay and hold harmless the DIP Lenders (and their respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith or willful misconduct of the indemnified party, and except to the extent resulting from claims between or among any DIP Lenders in their capacity as such) (including the reasonable and documented fees and expenses of counsel to the DIP Lenders). |
| **Expenses:** | The Borrower shall pay (a) all reasonable and documented out-of-pocket costs and expenses of the DIP Lenders (including, but not limited to Chapman and Cutler LLP and Stites & Harbison, PLLC) associated with the preparation, execution, delivery and administration of the DIP Loan Documents and any amendments or waivers with respect thereto, (b) all reasonable and documented out-of-pocket costs and expenses of the DIP Lenders (including the documented fees and expenses of appropriate counsel to the DIP Lenders, including but not limited to Chapman and Cutler LLP and Stites & Harbison, PLLC) in connection with the enforcement of the DIP Loan Documents, (c) all out-of-pocket transaction expenses incurred in connection with the DIP Facility (items in clauses (a), (b) and (c) collectively, the "<u>DIP Transaction Expenses</u>"), and (d) all reasonable and documented fees and expenses payable to the DIP Lenders, including but not limited to attorney and professional fees and expenses, in connection with the Cases and as provided in the Interim Order and the Final Order. The Borrowers shall additionally pay (a) all reasonable and documented out-of-pocket costs and expenses of the Prepetition ABL Collateral Agent and the Prepetition ABL Administrative Agent (including but not limited to Latham and Watkins |

17

|  | LLP and Stites & Harbison, PLLC) associated with the preparation, execution, delivery and administration of the DIP Loan Documents and any amendments or waivers with respect thereto, and (b) all reasonable and documented fees and expenses payable to the Prepetition ABL Collateral Agent and the Prepetition ABL Administrative Agent, including but not limited to attorney and professional fees and expenses, in connection with the Cases and as provided in the Interim Order and the Final Order. |
|---|---|
| **Amendments, Modifications and Waivers:** | Except as otherwise specified herein, this Term Sheet may only be modified, amended or supplemented by an agreement in writing signed by the Borrower and the DIP Lenders. |
| **Counsel to DIP Lenders:** | Chapman and Cutler LLP and Stites & Harbison, PLLC, as local counsel |
| **Counsel to DIP Credit Parties:** | Frost Brown Todd LLC |
| **Counsel to ABL Prepetition Agent** | Latham and Watkins LLP |

**Exhibit A to the DIP Term Sheet**

**Guarantors**

APEX ENERGY, INC.
BEAR BRANCH COAL LLC
CAMBRIAN HOLDING COMPANY, INC.
CLINTWOOD ELKHORN MINING LLC
C.W. AUGERING, INC.
GATLIFF COAL LLC
MARSHALL RESOURCES, INC.
PERRY COUNTY COAL LLC
PIKE-LETCHER LAND LLC
PLM HOLDING COMPANY LLC
PREMIER ELKHORN COAL LLC
RAVEN ROCK DEVELOPMENT LLC
RAY COAL LLC
RICH MOUNTAIN COAL LLC
SHELBY RESOURCES, LLC
S.T.&T. LEASING, INC.
T.C. LEASING, INC.
WHITAKER COAL LLC

**<u>Exhibit B to the DIP Term Sheet</u>**

**Budget**

**<u>Exhibit C to the DIP Term Sheet</u>**

**Required Insurance**

0110825.0637106   4830-5215-8360v12

**EXHIBIT B**

**PRE-PETITION ABL CREDIT AGREEMENT**

**Exhibit C**

**Pre-Petition Term Loan Credit Agreement**

**EXHIBIT D**

**DIP LOAN DOCUMENTS**

#92157804v4

**EXHIBIT E**

**BUDGET**

0110825.0637106   4838-3461-3658v16

**Cambrian Holding Company, Inc.,** *et al.*

**13 Week Cash Flow Forecast**

*($ in 000s)*

| | Forecast Week 1 21-Jun-19 | Forecast Week 2 28-Jun-19 | Forecast Week 3 5-Jul-19 | Forecast Week 4 12-Jul-19 | Forecast Week 5 19-Jul-19 | Forecast Week 6 26-Jul-19 | Forecast Week 7 2-Aug-19 | Forecast Week 8 9-Aug-19 | Forecast Week 9 16-Aug-19 | Forecast Week 10 23-Aug-19 | Forecast Week 11 30-Aug-19 | Forecast Week 12 6-Sep-19 | Forecast Week 13 13-Sep-19 | Forecast Cumulative 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | |
| Customer Receipts | $ 2,913 | $ 3,095 | $ 3,151 | $ 3,792 | $ 5,677 | $ 6,804 | $ 5,461 | $ 4,264 | $ 5,499 | $ 5,634 | $ 5,800 | $ 4,815 | $ 4,629 | $ 61,536 |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash Receipts** | **2,913** | **3,095** | **3,151** | **3,792** | **5,677** | **6,804** | **5,461** | **4,264** | **5,499** | **5,634** | **5,800** | **4,815** | **4,629** | **61,536** |
| | | | | | | | | | | | | | | |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | |
| Payroll, Health & Welfare & Related | (2,243) | (1,749) | (1,316) | (1,874) | (1,016) | (1,749) | (1,016) | (1,749) | (1,141) | (1,749) | (1,141) | (1,749) | (1,141) | (19,633) |
| Contract Miners | - | - | (675) | (1,350) | (675) | (1,550) | - | - | (1,550) | - | (1,550) | - | (1,550) | (8,900) |
| Contract Freight | - | (385) | - | (385) | - | (385) | - | - | (385) | - | (385) | - | (385) | (2,310) |
| Utilities | - | - | - | (350) | (350) | (210) | (210) | (350) | (350) | (210) | (350) | (350) | (210) | (2,940) |
| Maintenance / Supplies / Repairs / General Mining | (885) | (950) | (950) | (950) | (950) | (950) | (1,050) | (1,050) | (1,050) | (1,050) | (1,050) | (1,050) | (1,050) | (12,985) |
| Fuel and Lube | (300) | (400) | (400) | (400) | (400) | (400) | (450) | (450) | (450) | (450) | (450) | (450) | (450) | (5,450) |
| Explosives | (100) | (50) | (300) | (50) | (100) | (50) | (300) | (50) | (100) | (50) | (300) | (50) | (300) | (1,800) |
| Insurance (WC Only) | - | - | - | - | (146) | - | (850) | - | - | (146) | - | (850) | - | (1,992) |
| Insurance Premium Financing Repayment | - | (240) | - | - | - | (240) | - | - | - | - | (240) | - | - | (720) |
| Equipment Rentals | (8) | - | - | (4) | (12) | - | - | (4) | (4) | (8) | - | - | (4) | (44) |
| Equipment Operating Leases | - | - | (110) | - | - | - | (91) | (55) | - | - | (36) | (110) | - | (402) |
| Equipment Notes Payable | - | - | - | - | - | (19) | (114) | - | - | (19) | (114) | - | - | (266) |
| Production & Other Taxes | (766) | (25) | - | (25) | (125) | (740) | (168) | - | (170) | (840) | (45) | - | (160) | (3,064) |
| Surety Bond Payment | - | - | - | - | (1,400) | - | (750) | - | - | - | - | - | - | (2,150) |
| Royalties | (50) | (50) | (50) | (50) | (50) | (371) | (50) | (50) | (50) | (50) | (992) | (50) | (50) | (1,913) |
| **Total Operating Cash Disbursements** | **(4,352)** | **(3,849)** | **(3,801)** | **(5,438)** | **(5,224)** | **(6,664)** | **(5,049)** | **(3,758)** | **(5,396)** | **(4,426)** | **(7,503)** | **(3,809)** | **(5,300)** | **(64,569)** |
| | | | | | | | | | | | | | | |
| **Operating Cash Flow** | **(1,439)** | **(754)** | **(650)** | **(1,646)** | **453** | **140** | **412** | **506** | **103** | **1,208** | **(1,703)** | **1,006** | **(671)** | **(3,033)** |
| | | | | | | | | | | | | | | |
| **Non-Operating Cash Disbursements** | | | | | | | | | | | | | | |
| Adequate Assurance Deposits | - | (50) | - | - | - | - | - | - | - | - | - | - | - | (50) |
| Critical Vendors (Prepetition) [1] | (3,000) | - | - | - | - | - | - | - | - | - | - | - | (3,000) | (6,000) |
| ABL Facility Interest | - | - | (125) | - | - | - | (250) | - | - | - | - | (250) | - | (625) |
| Term Lender Adequate Protection Payments | - | (220) | - | - | - | - | (220) | - | - | - | - | (220) | - | (660) |
| Restructuring Professional Fees | - | - | (150) | (450) | - | - | - | (450) | (772) | - | - | - | (1,282) | (3,104) |
| US Trustee Fees | - | - | (200) | - | - | - | - | - | - | - | - | - | - | (200) |
| DIP Facility Interest & Fees [2] | (263) | - | (21) | - | - | - | (63) | - | - | - | - | (63) | - | (409) |
| **Total Non-Operating Cash Disbursements** | **(3,263)** | **(270)** | **(496)** | **(450)** | **-** | **-** | **(533)** | **(450)** | **(772)** | **-** | **-** | **(533)** | **(4,282)** | **(11,048)** |
| | | | | | | | | | | | | | | |
| **Net Cash Flow** | **(4,701)** | **(1,024)** | **(1,146)** | **(2,096)** | **453** | **140** | **(120)** | **56** | **(669)** | **1,208** | **(1,703)** | **473** | **(4,953)** | **(14,081)** |
| | | | | | | | | | | | | | | |
| **Cash Balance** | | | | | | | | | | | | | | |
| Beginning Cash Balance | 500 | 799 | 2,775 | 3,629 | 3,533 | 3,986 | 4,126 | 4,006 | 4,062 | 3,393 | 4,601 | 2,898 | 3,372 | - |
| Net Cash Flow | (4,701) | (1,024) | (1,146) | (2,096) | 453 | 140 | (120) | 56 | (669) | 1,208 | (1,703) | 473 | (4,953) | (14,081) |
| DIP Borrowings | 5,000 | 3,000 | 2,000 | 2,000 | - | - | - | - | - | - | - | - | 2,500 | 15,000 |
| **Ending Cash Balance** | **$ 799** | **$ 2,775** | **$ 3,629** | **$ 3,533** | **$ 3,986** | **$ 4,126** | **$ 4,006** | **$ 4,062** | **$ 3,393** | **$ 4,601** | **$ 2,898** | **$ 3,372** | **$ 919** | **$ 919** |
| | | | | | | | | | | | | | | |
| **DIP Facility Balance** | | | | | | | | | | | | | | |
| Beginning Balance | $ 500 | $ 5,500 | $ 8,500 | $ 10,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ - |
| (+) Borrowings | 5,000 | 3,000 | 2,000 | 2,000 | - | - | - | - | - | - | - | - | 2,500 | 15,000 |
| (-) Paydown | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Balance** | **5,500** | **8,500** | **10,500** | **12,500** | **12,500** | **12,500** | **12,500** | **12,500** | **12,500** | **12,500** | **12,500** | **12,500** | **15,000** | **15,000** |
| | | | | | | | | | | | | | | |
| **Memo: Undrawn DIP Facility** | **9,500** | **6,500** | **4,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **-** | **-** | |

**Notes:**

(1) The timing of critical vendor payments is illustrative and subject to change based on discussions with vendors.  Critical vendor amounts will be used as necessary throughout the pendency of the case.

(2) The amount shown for the week ended 6/21/19 reflects payment of half of the total upfront DIP fee of 2.5%.  The remaining balance of the upfront DIP fee is due upon exit.  Additionally, a $75,000 agency fee has been included in the week ended 6/21/1
In subsequent weeks, the amounts reflects the payment of 6.0% cash interest on the outstanding DIP facility.  Separately, PIK interest on the DIP facility is expected to accrue at a 6.0% rate throughout the pendency of the case

6/18/2019 - 4:57 PM

| Cambrian Holding Company, Inc., *et al.* | | | | 2019 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Professional Fees Monthly Summary (Incurred Basis)** | | *Post-Petition* | | | | | | | | |
| *($ in 000s)* | | Jun | | Jul | | Aug | | Sep | Oct | Nov |
| **Monthly Fee Forecast** | | | | | | | | | | |
| **Debtor** | | | | | | | | | | |
| FTI Consulting (FA) | $ | 200 | $ | 200 | $ | 200 | $ | 200 | $ 200 | $ 400 |
| Frost Brown Todd (Lead Counsel) | | 300 | | 300 | | 300 | | 300 | 300 | 300 |
| Whiteford Taylor (Conflict / Local Counsel) | | 65 | | 65 | | 65 | | 65 | 65 | 65 |
| Jefferies (Investment Banker) | | 75 | | 225 | | 75 | | 75 | 75 | 1,425 |
| Epiq (Claims Agent) | | 50 | | 50 | | 50 | | 50 | 50 | 50 |
| **Subtotal Debtor Professional Fees** | | **690** | | **840** | | **690** | | **690** | **690** | **2,240** |
| **ABL** | | | | | | | | | | |
| Legal Counsel | | 150 | | 150 | | 150 | | 150 | 150 | 150 |
| Financial Advisor | | - | | - | | - | | - | - | - |
| **Subtotal ABL Professional Fees** | | **150** | | **150** | | **150** | | **150** | **150** | **150** |
| **Term Loan** | | | | | | | | | | |
| Legal Counsel | | 150 | | 150 | | 150 | | 150 | 150 | 150 |
| Financial Advisor | | 50 | | 50 | | 50 | | 50 | 50 | 50 |
| **Subtotal Term Loan Professional Fees** | | **200** | | **200** | | **200** | | **200** | **200** | **200** |
| **Creditors' Committee** | | | | | | | | | | |
| Legal Counsel | | 50 | | 50 | | 50 | | 50 | 50 | 50 |
| Local Counsel | | - | | - | | - | | - | - | - |
| Financial Advisor | | 50 | | 50 | | 5 | | 5 | 5 | 5 |
| **Subtotal Creditors' Committee Professional Fees** | | **100** | | **100** | | **55** | | **55** | **55** | **55** |
| **Other** | | | | | | | | | | |
| Data Site Hosting | | 50 | | 50 | | 50 | | 50 | 50 | 50 |
| Other Professional Fees | | 50 | | 50 | | 50 | | 50 | 50 | 50 |
| **Subtotal Other Professional Fees** | | **100** | | **100** | | **100** | | **100** | **100** | **100** |
| **Total Professional Fees** | $ | **1,240** | $ | **1,390** | $ | **1,195** | $ | **1,195** | $ **1,195** | $ **2,745** |
| **Monthly Expense Forecast** | | | | | | | | | | |
| All Restructuring Professionals | | **50** | | **50** | | **50** | | **50** | **50** | **50** |
| **Total Expenses** | $ | **50** | $ | **50** | $ | **50** | $ | **50** | $ **50** | $ **50** |
| **Total Professional Fees and Expenses (Incurred Basis)** | $ | **1,290** | $ | **1,440** | $ | **1,245** | $ | **1,245** | $ **1,245** | $ **2,795** |