# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Cambrian Holding Company, Inc., *et al.*,[1] | ) | Case No.  19-51200 (GRS) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | Honorable Gregory R. Schaaf |

**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) ESTABLISHING BIDDING AND SALE PROCEDURES WITH RESPECT TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE ENTRY INTO ONE OR MORE STALKING HORSE AGREEMENTS AND THE PROVISION OF STALKING HORSE PROTECTIONS, (C) SCHEDULING AN AUCTION AND SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (D) GRANTING RELATED RELIEF; AND (II) AN ORDER <u>APPROVING THE SALE OF SUCH ASSETS AND GRANTING RELATED RELIEF</u>**

The above-captioned debtors and debtors in possession (collectively, the "**<u>Debtors</u>**"), by and through their proposed counsel, FROST BROWN TODD LLC, hereby move this Court (the "**<u>Motion</u>**"), pursuant to sections 105, 363, 365 and 503(b) of title 11 of the United States Code (the "**<u>Bankruptcy Code</u>**") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**<u>Bankruptcy Rules</u>**"), for the entry of the following orders:

      (a)    an order (the "**<u>Bidding Procedures Order</u>**"), substantially in the form attached hereto as **<u>Exhibit A</u>**:

          (i)    approving proposed bidding and sale procedures attached as **<u>Annex 1</u>** to the Bidding Procedures Order (the "**<u>Bidding Procedures</u>**") and related Bid Deadline (as defined below) in connection with the sale

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Cambrian Holding Company, Inc. (8203), Cambrian Coal LLC (3394), Apex Energy, Inc. (3455), C.W. Augering, Inc. (2875), Marshall Resources, Inc. (9735), PLM Holding Company LLC (7427), Bear Branch Coal LLC (0674), Clintwood Elkhorn Mining LLC (6910), Gatliff Coal LLC (5768), Perry County Coal LLC (4382), Ray Coal LLC (0981), Whitaker Coal LLC (8270), Pike-Letcher Land LLC (8952), Premier Elkhorn Coal LLC (8951), Raven Rock Development LLC (1351), Rich Mountain Coal LLC (1974), S.T. & T. Leasing, Inc. (0340), T.C. Leasing, Inc. (7705), and Shelby Resources, LLC (5085).

or sales (collectively, the "**Sale Transaction**") of substantially all assets of the Debtors (collectively, the "**Assets**");

 (ii) authorizing the Debtors to enter into one or more asset purchase agreements (each such agreement, an "**Asset Purchase Agreement**") with a potential bidder, including an Asset Purchase Agreement with one or more "stalking horse" bidders (such Asset Purchase Agreement, collectively, a "**Stalking Horse Agreement**" and, such bidder, collectively, a "**Stalking Horse Bidder**"), and to provide such Stalking Horse Bidder, in Debtors' discretion, with: (a) a break-up fee (the "**Break-Up Fee**") up to 3% of the purchase price included in any Stalking Horse Agreement, and (b) reimbursement of reasonable and documented out-of-pocket fees and expenses in an amount up to $500,000 (the "**Expense Reimbursement Amount**" and collectively with the Break-Up Fee, the "**Stalking Horse Protections**");

 (iii) approving the date, and form and manner of notice, of an auction of the Assets (the "**Auction**") and related Sale Hearing (as defined herein), including the form and manner of notice attached hereto as **Exhibit B** (the "**Auction and Hearing Notice**");

 (iv) establishing procedures for the assumption and assignment of executory contracts and unexpired leases ("**Executory Contracts**") in connection with the Sale Transaction, including notice of proposed cure amounts (the "**Assignment Procedures**"), and approving the form and manner of notice of the proposed assumption and assignment of Executory Contracts in the form attached hereto as **Exhibit C** (the "**Assumption/Assignment Notice**"); and

 (v) granting certain related relief as described herein;

(b) an order (the "**Sale Order**"), substantially in the form attached hereto as **Exhibit D**:

 (i) authorizing the Sale Transaction, free and clear of all liens, claims and encumbrances, except for certain assumed liabilities;

 (ii) authorizing the Debtors' assumption and assignment to the successful and/or assignment of certain Executory Contracts (if any) in connection with such Sale Transaction; and

 (iii) granting such other relief as is necessary or advisable related to the foregoing.

In support of this Motion, the Debtors respectfully represent as follows:

## BACKGROUND

### I.    The Debtors' Businesses and the Filing of These Cases

1.    The Debtors commenced the jointly administered chapter 11 cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on June 16, 2019 (the "**Petition Date**"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their affairs as debtors-in-possession. A creditors' committee was appointed on June 26, 2019 in the Chapter 11 Cases (Docket No. 142).

2.    The Debtors' core business is producing and processing metallurgical (or "met") coal and thermal (or "steam") coal for use by utility providers and industrial companies located primarily in the eastern United States and Canada. The Debtors began in 1991 and, over time, acquired various mines and mining-related assets from major coal corporations. By and/or through these operations, the Debtors supply different qualities of coal to their customers.

3.    Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the Chapter 11 Cases are contained in the *Declaration of J. Mark Campbell in Support of First Day Motions of Debtors and Debtors-in-Possession* (Docket No. 39) (the "**First Day Declaration**").

### II.    The Sale Process and Related Items

#### A.    The Proposed Sale Transaction and Marketing Process

4.    Due to the challenging regulatory and economic conditions facing coal companies, the Debtors' businesses have faced a marked downturn over the past several years.

5.    Prior to the Petition Date, the Debtors engaged professionals to assist in the exploration and analysis of strategic alternatives, including Jefferies LLC ("**Jefferies**") as the Debtors' investment banker. With their assistance, the Debtors developed a sale timeline for the

Assets. Pursuant to this process, prior to the Petition Date, Jefferies began reaching out to potentially interested parties, consisting primarily of strategic coal mining companies, as well as other buyers who expressed interest in considering the purchase of all or a substantial portion of the Assets. As part of this process, certain parties contacted entered into non-disclosure agreements and were provided with access to an online data room containing substantial due diligence information. Since the filing of these Chapter 11 Cases, Jefferies has continued to engage with potential bidders.

6.    As a part of, and throughout, this marketing process, the Debtors and Jefferies have responded (and will continue to respond) to interested parties' diligence requests, including numerous conversations with potential buyers regarding the potential sale of the Assets. Such conversations included discussions with parties interested in a going-concern transaction as well as parties interested in a select subset of the Assets. The Debtors have determined, in consultation with their professionals, that implementing the Bidding Procedures and providing a definite deadline for potential bids and an Auction is the best method to obtain bids for the Assets that will maximize the value of the Debtors' estates.

### B.    The Need for an Expedited Notice and Sale Process

7.    The Debtors have filed this Motion (even without a definitive stalking horse agreement) on an expedited basis to ensure the Debtors are able to complete the sale of the Assets in a timely manner. Among other items, the Debtors' consensual use of cash collateral and access to post-Petition Date financing is contingent upon the Debtors meeting certain sale "milestones" as noted in the *Interim Order (I) Authorizing (A) Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. § 364, (B) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364 and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(C)* (Docket No. 77) (the "**Interim**

- 4 -

**DIP Order**"). These milestones, which have been updated with the consent of the DIP Lenders, include the Debtors: (a) submitting an acceptable proposed form of bidding procedures sale order prior to making a draw in week 3; (b) requiring potential bidders on the Assets to submit a bid by August 28, 2019; (c) holding an auction, if necessary, to sell the Assets by September 4, 2019; (d) obtaining entry of an order approving the sale of the Assets by September 6, 2019; and (e) closing the sale of the Assets by October 4, 2019.

> **C.     The Deadlines Contained in the Bidding Procedures Are Reasonable and Will Provide an Adequate Opportunity for Interested Parties to Formulate and Submit Bids**

8.      In formulating the procedures and time periods, the Debtors had two principal objectives: (a) providing adequate and appropriate notice to parties in interest and to potential purchasers; and (b) efficiently selling the Assets. The Debtors believe the Bidding Procedures achieve both objectives under the facts and circumstances of these Chapter 11 Cases. Prior to the Petition Date, the Debtors had already made information regarding the Assets available to a number of potential purchasers. Based upon these marketing efforts, and those that are currently being undertaken by the Debtors, the Debtors believe that parties who may have an interest in bidding at the Auction are aware of the Debtors' intention to sell the Assets. Furthermore, potential bidders will have access to financial and related information, including financial projections, prepared by the Debtors and their advisors through an extensive data room. Thus, the timeline in the Bidding Procedures will prevent no party interested and capable of purchasing the Assets from conducting due diligence and submitting a bid.

9.      The key dates the Debtors will utilize in connection with the Sale Transaction are as follows:

| EVENT | DATE |
|---|---|
| Deadline to Submit Non-Binding Indication of Interest | August 7, 2019 |
| Deadline to file Cure Schedule | 14 days after entry of Bidding Procedures Order |
| Stalking Horse Deadline | July 31, 2019 |
| Bid Deadline | August 28, 2019 at 4:00 p.m. (prevailing Eastern Time) |
| Auction Date | September 4, 2019 at 9:00 a.m. (prevailing Eastern Time) |
| Assignment and Cure Objection Deadline | 10 days prior to Sale Hearing Date |
| Objection Deadline | 7 days prior to Sale Hearing Date |
| Sale Hearing | September 5, 2019 (subject to Court availability) |

**D.    The Bidding Procedures are Reasonable and will Allow the Debtors to Identify the Highest and Best Bid for the Assets**

10.    The Debtors, in consultation with their advisors, designed the Bidding Procedures to maximize value for the Debtors' estates. The Debtors believe the Bidding Procedures will enable the Debtors to review, analyze and compare all bids received to determine which bid is in the best interests of the Debtors' estates and creditors. The Bidding Procedures describe, among other things, the procedures for parties to access due diligence, the manner in which bidders and bids become "Qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidder, and the deadlines with respect to the foregoing Bidding Procedures. The Debtors submit that the Bidding Procedures afford the Debtors a sufficient opportunity to pursue a sale process that will maximize the value of their estates.

11.     As described further below, the Bidding Procedures will permit the Debtors, as they deem necessary and appropriate in the prudent exercise of their business judgment (and in consultation with the Consultation Parties (as defined below)), to enter into one or more typical agreements with, and to grant certain typical Stalking Horse Protections to, a Stalking Horse Bidder.

12.     The Debtors have structured the Bidding Procedures, and the expedited relief this Motion seeks, in a manner that complies with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. Further, the Bidding Procedures are designed to allow the Debtors to efficiently consummate a Sale Transaction that maximizes value and provides an opportunity to preserve jobs and other commercial relationships. These Bidding Procedures provide this framework and will enable the Debtors to review, compare and determine which bids are in the best interests of their estates and their creditors. The Debtors respectfully submit that the Bidding Procedures are necessary to, and will assist them in and promote, their efforts to complete a sale of the Assets.

13.     The following is a summary of the major components of the Debtors' proposed Bidding Procedures:[2]

---

[2] The summaries of the material terms of the Bidding Procedures set forth below are qualified in their entirety by the specific terms and conditions of the Bidding Procedures. To the extent there exists any inconsistency between these summaries and the Bidding Procedures, the Bidding Procedures shall govern.

Capitalized terms used but not defined herein are either defined later in this table or have the meanings given to them in the Bidding Procedures.

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Participation Requirements** | The Bidding Procedures detail certain requirements to participate in the bidding process, including, among other things, the execution of a confidentiality agreement. Each party meeting these requirements, set forth in full in the Bidding Procedures, has been or will be deemed a "**Potential Bidder**." The Debtors have provided or will provide all such Potential Bidders access to the Data Room (as defined below) as well as an electronic copy of any Stalking Horse Agreement. |
| **Due Diligence** | The Debtors have established a confidential electronic data room (the "Data Room") containing due diligence materials relating to the Assets. Until the Bid Deadline, in addition to access to the Data Room, the Debtors will provide any Potential Bidder such due diligence access or additional information as the Debtors determine to be reasonable and appropriate in the circumstances. A Potential Bidder's access to additional due diligence will cease if (a) the Potential Bidder does not become a Qualified Bidder by the Bid Deadline; or (b) after consultation with the Consultation Parties, the bidding process is terminated. The "**Consultation Parties**" consist of the following: (i) counsel and financial advisors to the Creditors' Committee and (ii) counsel and financial advisors to the Pre-Petition Term Lenders (as defined in the Interim DIP Order) and (iii) counsel and financial advisors to the ABL Lenders  (as defined in the Interim DIP Order). |

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Stalking Horse Designation and Stalking Horse Deadline** | The Debtors shall have until July 31, 2019 (the "Stalking Horse Deadline") to designate any Potential Bidders as a Stalking Horse Bidder and enter into a Stalking Horse Agreement. Promptly after entering into any Stalking Horse Agreement, the Debtors shall file such Stalking Horse Agreement with the Bankruptcy Court and serve a copy by overnight mail on the Master Service List established by this Court's *Order Granting Motion to Establish Notice Procedures and Master Service List* (Docket No. 83). Upon and after the designation of a Stalking Horse Bidder, the Debtors will continue soliciting interest from and assisting Potential Bidders in all regards related to the Sale Transaction. For the avoidance of doubt, even if the Debtors do not designate a Stalking Horse Bidder prior to the Stalking Horse Deadline, potential bidders will be able to submit Qualified Bids (as defined below) prior to the Bid Deadline (as defined below). |
| **Stalking Horse Protections** | In the Debtors' discretion, a Stalking Horse Agreement may include Stalking Horse Protections, including (a) the Break-Up Fee, and (b) the Expense Reimbursement. |
| **Bid Deadline** | August 28, 2019 at 4:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**"). |

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Bid Requirements** | To be a "**Qualified Bid**" (and such Potential Bidder submitting such bid, a "**Qualified Bidder**") a bid must meet the requirements enumerated in the Bidding Procedures, including, among other things, the following: (a) identifying the Executory Contracts to be purchased and providing evidence satisfactory to the Debtors of the Potential Bidder's ability to provide adequate assurance of future performance of such agreements; (b) written evidence of available cash, commitment for financing, or such other evidence of ability to consummate the transaction contemplated by the Potential Bidder; (c) providing a mark-up of the form of asset purchase agreement and proposed sale order against the Stalking Horse Agreement (if any) and Sale Order, attached hereto; (d) for the purchase of any coal mining properties, contemplating the transfer of the relevant permits or obtaining overlapping permits and the replacement of the Debtors' financial assurance/reclamation surety bonds that are associated with such permits; (e) providing evidence of sufficient financial resources to consummate a Sale Transaction, including with respect to any financial assurance/reclamation surety bonds, and Debtors' obligations under the Black Lung Act[3] and obligations to the Kentucky Department of Workers' Claims as self-insured entities; and (f) providing for consideration that is higher or better than the consideration provided for by a Stalking Horse Agreement, if any, taking into account the Break-Up Fee and Expense Reimbursement Amount (if any). In addition, a Qualified Bid may be for some or all of the Assets, and there may be multiple Qualified Bids for some or all of the Assets. Any bid made pursuant to a Stalking Horse Agreement (a "**Stalking Horse Bid**") is deemed a Qualified Bid for the Assets and such Stalking Horse Bidder, a Qualified Bidder. |

---

[3] "Black Lung Act" means, collectively, the Federal Coal Mine Safety and Health Act of 1969, the Black Lung Benefits Act of 1972, the MSHA, the Black Lung Benefits Reform Act of 1977, and the Black Lung Benefits Amendments of 1981, in each case as amended.

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Bid Deposit** | Each Qualified Bidder is required to deposit with the Debtors a cash deposit equal to the higher of 10% of the cash consideration of the purchase price or $100,000 (any such deposit, a "**Good Faith Deposit**") provided, however, the Good Faith Deposit of the DIP Lenders, ABL Lenders and the Pre-Petition Term Lenders may consist of a credit bid of the applicable loans. |
| **Determination of Qualified Bids** | The Debtors, in their discretion and after consultation with the Consultation Parties, will determine whether a bid received from a Potential Bidder for the Assets constitutes a Qualified Bid and whether a Potential Bidder that submits such a bid will be considered a Qualified Bidder. |
| **Considerations in Comparing and Valuing Bids** | The Bidding Procedures detail certain bid information to be considered in comparing the value of proposed bids. These considerations, fully detailed in the Bidding Procedures, will aid the Debtors in determining whether the terms of a particular bid for the Assets are materially more burdensome or conditional than the terms of another bid. These considerations are aimed at uncovering the bid that is highest and/or best based on the Debtors' unique circumstances. |
| **Auction** | If the Debtors receive at least two Qualified Bids (including any Stalking Horse Bid) for the Assets, the Debtors will conduct an Auction. |
| **Time, Place and Conduct of an Auction** | If necessary, an Auction will take place at the offices of counsel to the Debtors, Frost Brown Todd LLC, 250 West Main Street, Suite 2800, Lexington, Kentucky 40507-1749 or such other place as may be designated by the Debtors, at 9:00 a.m. (prevailing Eastern Time) on the auction date (*i.e.*, September 4, 2019), or such other time and place as the Debtors, after consultation with the Consultation Parties, may determine. If only one Qualified Bid (including any Stalking Horse Bid) for the Assets is received, the Auction for the Assets will be cancelled and the Qualified Bid received will be designated the Successful Bid (as defined below) for the Assets. |

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Baseline Bids** | If more than one Qualified Bid (including any Stalking Horse Bid) is received and thus an Auction is necessary, the Debtors, after consultation with the Consultation Parties, will select what they determine to be the highest and/or best Qualified Bid (the "**Baseline Bid**") for the Assets to serve as the starting point at the Auction. At least one business day prior to the Auction, the Debtors will provide copies of the Baseline Bid to all Qualified Bidders. |
| **Rules of the Auction** | After consultation with the Consultation Parties, the Debtors may at any time adopt rules for the Auction that the Debtors reasonably determine to be appropriate to promote the goals of the bidding process, including one or more adjournments of the Auction. The rules of the Auction will be announced on the record at the outset of the Auction. |
| **Bidding at an Auction** | At the Auction, participants will be permitted to increase their initial Qualified Bids and improve their terms; *provided*, *however*, any such increased or improved bid must be a Qualified Bid (except that the Bid Deadline will not apply). The Debtors will announce the bidding increments for bids (the "**Minimum Overbid**") and other auction rules at the outset of the Auction with respect to the Assets. For the purpose of evaluating the value of the consideration provided by additional bids, the Debtors will take into account any Stalking Horse Protections that may be payable to a Stalking Horse Bidder under a Stalking Horse Agreement, if necessary.<br><br>The Debtors will conduct the Auction on an open basis and shall not require any Qualified Bidders to submit their last and final bids on a "blind" basis. |

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Designation of Successful Bid and Alternate Bid(s)** | After determining which Qualified Bids represent the best bids for the Assets in consultation with the Consultation Parties, the Debtors will designate such as the "**Successful Bid**" and the bidder as the "**Successful Bidder**." As described in the Bidding Procedures, the Debtors may also determine, in their reasonable business judgment, after consultation with the Consultation Parties, which Qualified Bid is the next best bid for the Assets (the "**Alternate Bid**"). For the avoidance of doubt, a Successful Bid or Alternate Bid may be for some or all of the Assets, and there may be multiple Successful Bids/Alternate Bids for some or all of the Assets. |
| **Acceptance of Successful Bids** | The Debtors will be deemed to have accepted a Successful Bid only when an asset purchase agreement has been executed and such bid has been approved by entry of the applicable Sale Order. If a Successful Bidder does not close the applicable Sale Transaction contemplated by the applicable Successful Bid by the date agreed to by the Debtors and such Successful Bidder, then the Debtors will be authorized, but not required, to close with the party that submitted the Alternate Bid, pursuant to the applicable Sale Order. |
| **Successful Bid Notice** | Following the designation of a Successful Bid, the Debtors will file a notice of the Successful Bid, along with copies of the proposed asset purchase agreement and Sale Order, marked to show changes from the Stalking Horse Agreement and Sale Order (a "**Successful Bid Notice**"). |

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Sale Hearing and Objections** | Parties must file any objections to the approval of the Sale Transaction no later than 7 days prior to Sale Hearing.<br><br>At the hearing to approve the Sale Transaction (the "**Sale Hearing**"), the Debtors will seek the entry of the Sale Order approving, among other items, the sale of the Assets to the Successful Bidder pursuant to the terms and conditions set forth in the Successful Bid. For the avoidance of doubt, there may be one or more Sale Orders approving the sale of the Assets depending on whether the Assets are sold in whole or in parts.<br><br>The Sale Hearing may be adjourned or rescheduled by the Debtors in their discretion (after consultation with the Consultation Parties) without notice or with limited and shortened notice to parties. |
| **Return of Good Faith Deposit** | The Good Faith Deposits will be held in escrow by the Debtors and while held in escrow will not become property of the Debtors' bankruptcy estates unless released from escrow pursuant to further order of the Court or upon a breach by a Successful Bidder of the Successful Bid agreement. The Debtors will retain the Good Faith Deposit of the Successful Bidder until the closing of the Sale Transaction unless otherwise ordered by the Court. The Good Faith Deposits of the other Qualified Bidders, with the exception of the Good Faith Deposits of any Alternate Bidders, will be returned on the fifth business day following the entry of the Sale Order. At the closing of the Sale Transaction, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit (including any Good Faith Deposit consisting of a credit bid) against the cash purchase price. The Good Faith Deposits of any Alternate Bidders will be returned on the fifth business day following the closing of the Sale Transaction. |

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Right to Credit Bid of ABL Lenders and Pre-Petition Term Lenders** | The ABL Lenders and the Term Lenders shall be entitled to credit bid, subject to section 363(k) of the Bankruptcy Code, on a dollar-for-dollar basis (a) up to the full amount of their outstanding secured obligations (as specifically set forth in the Interim DIP Order), and (b) any unpaid amounts due and owing to the ABL Lenders and the Term Lenders under the Interim DIP Order. Any credit bid shall constitute a Qualified Bid (and, thus, the DIP Lenders, ABL Lenders and the Term Lenders shall be considered Qualified Bidders) and shall be treated as the equivalent of a cash bid. Provided, however, that a Lender Bidder may only submit a credit bid on the Assets of the Debtors that are subject to a first priority, valid, perfected lien of the Lender Bidder that is not otherwise subject to avoidance.<br><br>For the avoidance of doubt, any bid by the ABL Lenders and/or the Pre-Petition Term Lenders shall provide sufficient cash to indefeasibly pay in full all fees associated with the transaction, including fees that may be earned by Jefferies in connection with the transaction, and payments required to be made under section 365 of the Bankruptcy Code. Additionally, any bid by the ABL Lenders and/or the Pre-Petition Term Lenders on assets not subject to the liens of the ABL Lenders and/or the Pre-Petition Term Lenders, as applicable, shall be required to be a cash bid.<br><br>The ABL Lenders and the Pre-Petition Term Lenders may participate in the Auction and increase any credit bid in the same manner as the other Qualified Bidders in compliance with the Bidding Procedures. |
| **Modification of Bidding Procedures** | The Debtors may amend the Bidding Procedures or the bidding process at any time, and from time to time, in any manner that they determine in good faith will best promote the goals thereof, including extending or modifying any of the dates described therein or the information and material required from Qualified Bidders. |

## Jurisdiction

14.     The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Basis for Relief Requested

**A. The Sale and the Bidding Procedures are a Proper Exercise of the Debtors' Business Judgment and will Maximize the Value of the Purchased Assets for the Benefit of the Debtors' Estates and Creditors.**

15.     Entry of the Sale Order approving the final Sale of the Assets at the conclusion of the Sale Hearing is authorized and appropriate under the Bankruptcy Code. Section 363(b) of the Bankruptcy Code provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 1107(a) of the Bankruptcy Code grants a debtor-in-possession the powers of a trustee in respect to various matters including sales under section 363(b) of the Bankruptcy Code.

16.     Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction. *See, e.g., In re Eagle Picher Holdings, Inc.*, 2005 WL 4030132 (Bankr. S.D. Ohio 2005); *In re Martin*, 91 F.3d 389, 395 (3rd Cir. 1996); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3rd Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983).

17.     The key consideration is this Court's finding that a good business reason exists for the sale. *Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *see also, Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999).

> Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in Lionel, the bankruptcy judge should consider all salient factors pertaining to the proceeding and,

accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the assets of the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*In re Walter*, 83 B.R. 14, 19-20 (9th Cir. Bankr. 1988), citing *In re Lionel Corporation*, 722 F.2d 1063, 1070-71 (2nd Cir. 1983).

18.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bonier. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").

19.     In light of circumstances that precipitated the commencement of these Chapter 11 Cases and in view of the milestones established in the Interim DIP Order, the Debtors, in their business judgment, believe that a prompt sale of the Assets, pursuant to section 363(b) of the Bankruptcy Code, will maximize the value of the Assets for the benefit of the Debtors' creditors and bankruptcy estates. Several sound business reasons support the Debtors' position.

20.     Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a Sale as a going concern in accordance with the process set forth in the Bidding Procedures may be the best

method to maximize recoveries and ensure that the value of the Debtors' assets is maintained for the benefit of creditors and their estates. Maximization of asset value is a sound business purpose, warranting authorization of the Sale.

21.    The Debtors have proposed a fair and open process for achieving the objective of obtaining the highest or best offer for the Assets. The Bidding Procedures provide potential bidders an opportunity to perform due diligence. Competing bidders will have the opportunity to bid at the Auction (if they become Qualified Bidders, as defined in the Bidding Procedures), thus ensuring that the sale of the Assets will be effected through an arm's-length transaction. Accordingly, the proposed auction procedure will allow the highest and best bidder to purchase the Assets, thereby maximizing the return to the Debtors' estates.

22.    The Debtors believe that the Bidding Procedures for the Auction are commercially reasonable and are in the best interest of the Debtors, their estates and creditors and will maximize the value obtained from the sale of the Assets. The Sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. An auction is sufficient to establish that one has paid "value" for assets of a bankruptcy estate, where the auction sale has itself been conducted in good faith. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir. 1986). Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

23.    In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth herein. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties

most interested in these chapter 11 cases, those parties potentially interested in bidding on the Assets, and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtors and their creditors.

24.    Finally, the timing of the Sale is critical. Pursuant to the Interim DIP Order, the Debtors will be in default of the Interim DIP Order and the DIP Facility described in the Interim DIP Order if the Debtors fail to consummate the Sale on or before October 4, 2019. The Debtors have insufficient liquidity to continue the Debtors' operations without funding under the DIP Facility. Without financing to continue operations, the only alternative to a going concern sale is to immediately liquidate the Debtors' Assets. The Debtors believe that the proposed Sale will provide a greater return to the Debtors' estates and their creditors than the liquidation of the Debtors' Assets. For each of the foregoing reasons, the Debtors, in their business judgment, believe that a prompt sale of the Assets, pursuant to section 363(b) of the Bankruptcy Code, is in the best interest of the Debtors, their estates, creditors and other parties in interest.

### B. Ability to Select One or More Stalking Horse Bidders

25.    To incentivize potential bidders and thereby maximize the potential value of the Assets for the benefit of the Debtors' estates, the Debtors request that they be authorized, but not directed, to execute a Stalking Horse Agreement with any Stalking Horse Bidder in connection with the proposed sale of the Assets, on or before the Stalking Horse Deadline. The flexibility to execute a Stalking Horse Agreement and designate a stalking horse bid or stalking horse bids (collectively, a "**Stalking Horse Bid**") will provide the Debtors with an additional tool to ensure the sale process results in the best possible outcome for the Debtors and their estates. Any such Stalking Horse Agreement will be a Qualified Bid and the Debtors will provide notice of such Stalking Horse Bidder, Stalking Horse Agreement and Stalking Horse Bid as outlined in the Bidding Procedures.

**C. The Stalking Horse Protections Have a Sound Business Purpose and Should Be Approved**

26.     To the extent the Debtors enter into a Stalking Horse Agreement, it is appropriate to provide the Stalking Horse Bidder with the proposed Stalking Horse Protections. The anticipated Stalking Horse Protections, if deemed necessary in the Debtors' discretion, would provide for a Break-Up Fee not to exceed 3% of the contemplated Purchase Price under the Stalking Horse Agreement and Expense Reimbursement not to exceed $500,000. A Stalking Horse Bidder would receive payment of the Stalking Horse Protections upon the consummation of a transaction other than with the Stalking Horse Bidder. Based on market standards and communications with potential bidders regarding the Assets, the Debtors believe the Stalking Horse Protections may be necessary to induce any potential bidder to execute a Stalking Horse Agreement. A Stalking Horse Agreement will benefit the estate by ensuring the Debtors will receive a minimum amount of consideration for the Assets, while, at the same, giving the Debtors an opportunity to increase the consideration that their estates will receive for those assets. In addition, the Debtors believe that a Stalking Horse Agreement will benefit the estate by establishing a baseline value for the Assets and potentially attract other potential buyers.

27.     As noted above, the Debtors intend to negotiate any Stalking Horse Agreement at arm's length and in good faith and will enter into a Stalking Horse Agreement with a Stalking Horse Bidder only if the Debtors believe it will maximize the value of the Assets. Thus, the authorization for the Debtors to offer the Stalking Horse Protections to the Stalking Horse Bidder is justified.

28.     Approval of the Stalking Horse Protections to the Stalking Horse Bidder is governed by standards for determining the appropriateness of Stalking Horse Protections in the bankruptcy context. Courts have identified at least two instances in which Stalking Horse

Protections may benefit the estate. First, a break-up fee may be necessary to preserve the value of

the estates if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid

that otherwise would not have been made and without which bidding would have been limited."

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527,

533 (3d Cir. 1999) (hereinafter, "O'Brien"). Second, if the availability of a break-up fee were to

induce a bidder to research the value of the debtor and convert the value to a dollar figure on which

other bidders can rely, the bidder may have provided a benefit to the estate by increasing the

likelihood that the price at which the debtor is sold will reflect its true worth. *Id*.

29.    In *O'Brien*, the court reviewed the nine factors set forth by the lower court as

relevant in deciding whether to award a break-up fee. Such factors are as follows:

(a)    the presence of self-dealing or manipulation in negotiating the break-up fee;

(b)    whether the fee harms, rather than encourages, bidding;

(c)    the reasonableness of the break-up fee relative to the purchase price;

(d)    whether the unsuccessful bidder placed the estate property in a "sales configuration, mode" to attract other bidders to the auction;

(e)    the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

(f)    the correlation of the fee to a maximum of value of the debtor's estate;

(g)    the support of the principal secured creditors and creditors' committees of the break-up fee;

(h)    the benefits of the safeguards to the debtor's estate; and

(i)    the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See O'Brien*, 181 F.3d at 536.

30.     The Stalking Horse Protections would fall squarely within the *O'Brien* factors. For example, such protections would assist the Debtors in securing an adequate floor for the Assets and, thus, require that competing bids be higher or otherwise better than the Stalking Horse Bid and attract other potential buyers to bid for the Assets subject to the Stalking Horse Agreement— a clear benefit to the Debtors' estates. Without the ability to offer the Stalking Horse Protections, the Debtors may lose the opportunity to obtain the highest or best offer for the Assets and the associated downside protection that the existence of the Stalking Horse Bidder affords.

31.     In sum, the proposed Stalking Horse Protections are reasonable and appropriate in light of the size and nature of the proposed Sale Transaction and the efforts that will be expended by any potential Stalking Horse Bidder. The Debtors' ability to offer the Stalking Horse Protections, and potentially inducing the involvement of a Stalking Horse Bidder, enables them to ensure the sale of the Assets at a price they believe to be fair, while, at the same time, providing them with the potential of even greater benefit to the estates.

### D. This Court Should Approve the Sale Free and Clear of all Liens, Claims, and Encumbrances Pursuant to Section 363(f) of the Bankruptcy Code.

32.     The Debtors also request that the Sale Order provide that the Sale of the Assets is free and clear of any interest held by any third party in any of the assets to be sold. Specifically, it is contemplated that upon the closing, the Stalking Horse Bidder (or such other Successful Bidder(s) as may be selected in accordance with the Bidding Procedures) will take title to and possession of the Assets, free and clear of all liens, claims, interests, and encumbrances, except as otherwise provided in the Stalking Horse Agreement or such other Asset Purchase Agreement.

33.     Section 363(f) of the Bankruptcy Code authorizes the sale of property under section 363(b) of the Bankruptcy Code to be free and clear of interests in such property held by an entity if:

a.  Applicable non-bankruptcy law permits a sale of such property free and clear of such interests;

b.  Such entity consents;

c.  Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.  Such interest is in bona fide dispute; or

e.  Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

34.  The ABL Lenders and the Pre-Petition Term Lenders hold liens upon substantially all of the Assets, not otherwise subject to a validly perfected unavoidable lien of third parties; and the DIP Lenders have super-priority liens and claims under section 364(c)(1) of the Bankruptcy Code. These liens will attach to the sales proceeds with the same validity and priority as exist under state law pursuant to section 363(e) of the Bankruptcy Code.

35.  The Sale of the Assets pursuant to the Bidding Procedures will satisfy section 363(f) of the Bankruptcy Code because any entities holding liens, claims, interests, or encumbrances against the Assets will have received notice of the Sale. All parties in interest will be given sufficient opportunity to object to the relief requested herein and any such entity that does not object to the Sale of the Purchased Assets should be deemed to have consented. See *Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive

- 23 -

if everyone who might have an interest in the bankrupt's assets had to execute a formal consent

before they could be sold.") (internal citations omitted); *Hargrave v. Township of Pemberton (In*

*re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear

of liens, claims, and encumbrances satisfies section 363(f)(2)); *Citicorp Homeowners Serv., Inc.*

*v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *see also In re Enron Corp.*, 2003

WL 21755006, at *2 (Bankr. S.D.N.Y. 2003) (order deeming all parties who did not object to

proposed sale to have consented under section 363(f)(2)). As such, the Sale of the Assets may be

free and clear of all liens, claims, interests, and encumbrances except any liabilities expressly

assumed by the Stalking Horse Bidder (or other Successful Bidders), thus satisfying section

363(f)(2) of the Bankruptcy Code.

      36.     Moreover, a sale of the Assets free and clear may proceed pursuant to section 363(f)

of the Bankruptcy Code because creditors with an interest in the sale assets can be compelled to

accept money satisfaction of their claims pursuant to section 363(f)(5) of the Bankruptcy Code.

*See Scherer v. Fed. Nat'l Mortgage Assoc. (In re Terrace Chalet Apartments, Ltd.)*, 159 B.R. 821,

829 (N.D. Ill. 1993) (holding that pursuant to section 363(f)(5) of the Bankruptcy Code courts may

authorize sales free and clear of a secured creditor's lien if such creditor's interest could be

crammed down pursuant to section 1129(b)(2) of the Bankruptcy Code); *In re Healthco Int'l, Inc.*,

174 B.R. 174, 176 (Bankr. D. Mass. 1994) (same). Therefore, this Court may authorize the Sale

pursuant to section 363(f)(5) of the Bankruptcy Code.

      37.     The Debtors also believe that other provisions of section 363(f) of the Bankruptcy

Code may be applicable to and would permit the sale of the Assets. Thus, the sale of the Assets is

appropriately free and clear of all liens, claims, interests, or encumbrances pursuant to section

363(f) of the Bankruptcy Code.

**E. The Stalking Horse Bidder (or such other Successful Bidder(s)) Should be Entitled to the Protections of 363(m) of the Bankruptcy Code.**

38.     The Debtors seek the protections afforded under section 363(m) of the Bankruptcy

Code, which provide, in pertinent part:

> (m)  The reversal or modification on appeal of an authorization under section (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. 363(m).

39.     The Debtors submit that the Sale of the Assets to the Stalking Horse Bidder, if any,

(or such Successful Bidder(s) as may be selected in accordance with the Bidding Procedures)

warrants a finding that the Assets were acquired in good faith within the meaning of section 363(m)

of the Bankruptcy Code. The Debtors have and will continue to aggressively market the Assets.

Any parties who have expressed any meaningful interest in the acquiring the business and assets

of the Debtors will be given notice of the Sale. No subjectivity in evaluating bids will be at issue.

The highest and best bidder will purchase the Assets, subject to the terms of the Bidding

Procedures

40.     Accordingly, the Sale Order will include a provision that the Stalking Horse Bidder

(or such Successful Bidder(s) for the Assets) is a "good faith" purchaser within the meaning of

section 363(m) of the Bankruptcy Code. The Debtors believe that providing such protection

will ensure that the maximum price will be received by the Debtors for the Assets and closing of

the Sale will occur promptly.

**F. Assumption and Assignment of the Assumed Contracts is Warranted Under Section 365 of the Bankruptcy Code**

41.     The Debtors also seek authority to assume and assign Executory Contracts in

accordance with the Assignment procedures (any such assumed and assigned Executory Contracts,

the "**Assigned Contracts**") as part of a Sale Transaction. No later than 14 days after entry of Bidding Procedures Order, the Debtors will file a schedule of cure obligations (the "**Cure Schedule**") for the Executory Contracts that the Debtors have identified as potential Assigned Contracts. The Cure Schedule will include the amount, if any, the Debtors believe necessary to cure defaults under such agreements pursuant to sections 365(b)(1) and 365(f)(2)(A) of the Bankruptcy Code (the "**Cure Costs**"). An Executory Contract's inclusion on the Cure Schedule means only that a successful bidder may include the contract as an Assigned Contract in an asset purchase agreement. In addition, inclusion of any document in the Cure Schedule does not constitute, and is not be deemed to be, a determination or admission by the Debtors or any Successful Bidder that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and all rights with respect thereto are expressly reserved. The Debtors may amend or supplement the Cure Schedule as necessary.

42.     The Debtors will serve a copy of the Cure Schedule, together with the Assumption/Assignment Notice, on each of the non-debtor counterparties to the agreements listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Bankruptcy Court. If the Debtors amend the Cure Schedule, the Debtors will serve a copy of the amended Cure Schedule, together with the Assumption/Assignment Notice, on each of the non-debtor counterparties to the agreements listed on the amended Cure Schedule by first class mail. The Debtors propose that any objections to the Cure Costs set forth on the Cure Schedule, or the assumption and assignment of the Executory Contracts identified therein, must be in writing, filed with the Court, and be actually received by the Objection Notice Parties (as defined below) on or before 10 days before the Sale Hearing (the "**Assignment and Cure Objection Deadline**").

43.    If the Debtors receive no timely objections to the Cure Costs, then the Cure Costs set forth in the Cure Schedule will be binding upon the non-debtor counterparties to any Executory Contract ultimately identified as an Assigned Contract for all purposes in these Chapter 11 Cases and will constitute a final determination of the total Cure Costs the Debtors or a Successful Bidder must pay in connection with the assumption and assignment of any Assigned Contracts (unless a portion of such costs are paid or satisfied in any manner, in which case the Cure Costs will be reduced). In addition, all non-debtor counterparties to the potential Assigned Contracts will be forever (a) barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to the Assigned Contracts (and the Debtors and the Successful Bidder shall be entitled to rely solely upon the Cure Costs set forth in the Cure Schedule); and (b) barred, estopped and permanently enjoined from asserting or claiming against the Debtors, any Successful Bidder or their respective property that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assigned Contract or that there is any objection or defense to the assumption and assignment of such Assigned Contract.

44.    If a non-debtor counterparty to an Assigned Contract files an objection asserting a cure amount higher than the proposed Cure Costs (a "**Disputed Cure Amount**"), the following procedures will govern the resolution of such Disputed Cure Amount: (a) to the extent that the parties (including, if applicable, a Successful Bidder) are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, the Debtors will promptly notify the Consultation Parties and the Bankruptcy Court; or (b) to the extent that the parties are unable to consensually resolve the dispute prior to the Sale Hearing or any of the Consultation Parties raises an objection, the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing or on such other date as may be fixed by the Court.

All other objections to the proposed assumption and assignment of an Assigned Contract will be heard at the Sale Hearing. The Debtors intend to cooperate with counterparties to Assigned Contracts to attempt to reconcile any differences with respect to a particular cure amount.

45.    Section 365(a) of the Bankruptcy Code provides as follows:

Except as provided in section 765 and 766 of this title and in subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

46.    Section 365 of the Bankruptcy Code authorizes the assumption or rejection of any executory contract or unexpired lease of a debtor except for open contracts of commodity brokers that are covered by Bankruptcy Code sections 765 and 766.

47.    The Bankruptcy Code provides little guidance as to the standards to be applied by a court in approving an assumption or rejection. Drawing on pre-Code law, the predominant test is described as the "business judgment" rule or business judgment test. *In re Kong*, 162 B.R. 86, 94 (Bankr. E.D.N.Y. 1993*); In re Minges*, 602 F.2d 38 (2nd Cir. 1979); *In re Child World*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *In re Stable Mews Assocs.*, 41 B.R. 594 (Bankr. S.D.N.Y. 1984). The business judgment test is the same test applied to judicial review of corporate decisions outside bankruptcy. *Johnson v. Fairco Corp.*, 61 B.R. 317 (N.D. Ill. 1986). This test analyzes the impact that continued performance under the executory contract or unexpired lease will have on the estate. Assumption or rejection of the contract or lease will be approved upon a mere showing that the action will benefit the estate. *In re Chestnut Ridge Plaza Assocs., L.P.*, 156 B.R. 477 (Bankr. W.D. Pa. 1993) (test is best interest of the estate); *Bezanson v. Metropolitan Ins. & Annuity Co.*, 952 F.2d 1 (1st Cir. 1991).

48.    In addition to the business judgment test, section 365(b)(1) of the Bankruptcy Code further provides that the debtor may not assume an executory contract or unexpired lease unless, at the time of assumption, the debtor: (a) cures defaults; (b) compensates the non-debtor party to the lease or contract for any actual pecuniary loss resulting from defaults; and (c) provides adequate assurance of future performance. *See* 11 U.S.C § 365(b)(1).

49.    In the present case, the Debtors may seek to assume the Assigned Contracts and assign the Assigned Contracts to the Stalking Horse Bidder (or such other Successful Bidder(s) as may be selected in accordance with the Bidding Procedures). Section 365(f) of the Bankruptcy Code addresses assumption and assignment of executory contracts and unexpired leases and provides, in pertinent part:

> (1) Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .
> (2) The trustee may assign an executory contract or unexpired lease of the debtor only if—
>> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(1)-(2).

50.    Section 365(f) of the Bankruptcy Code provides that the assignment of a properly assumed contract or lease is to be permitted by the Court only if the debtor has assumed the contract or lease in compliance with all of the terms of section 365 of the Bankruptcy Code and if the debtor provides the other party to the contract or lease with adequate assurance of future performance by the assignee of the contract or lease. 11 U.S.C. § 365(f)(2). The words "adequate assurance of

future performance" must be given a "practical, pragmatic construction" in light "of the proposed assumption." *In re Fleming Cos.*, 499 F.3d 300 (3d Cir. 2007) (quoting *Cinicola v. Scharffenberger*, 248 F.3d 110, 120, n.10 (3d Cir. 2001). *See also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (same); *In re Nalco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

51.      As part of this Motion, the Debtors seek authority to assume and assign the identified Assigned Contracts to the Stalking Horse Bidder, if any (or such other Successful Bidder(s) as may be selected in accordance with the Bidding Procedures). Any assumption and assignment of the Assigned Contracts will be subject to any applicable provisions of the Bankruptcy Code. The proposed terms and conditions set forth herein and in the Bidding Procedures are designed to ensure that the assignees, if any, are financially able and prepared to undertake all of the obligations of the Assumed Contracts. In addition, the availability of the Sale Hearing gives this Court and other parties in interest an appropriate opportunity to evaluate any assignment issues.

52.      The Debtors assert that under the circumstances, the Assigned Contracts can be properly assumed in compliance with section 365 of the Bankruptcy Code. First, the assumption of the Assigned Contracts by the Debtors complies with the requirements of section 365 because assumption clearly satisfies the "business judgment test". The Debtors' satisfaction of the business judgment test is demonstrated by the benefit to the Debtors' estates which will accrue as a result

of the Debtors' ability to close the Sale and from the savings realized as a result of: (a) the assumption of the Debtors' obligations under the Assigned Contracts; and (b) the avoidance of a potential rejection damages claims and possible administrative expense claims.

53.     Second, all monetary defaults under the Assigned Contracts will be cured by payment of the Cure Costs at the time of assumption.

54.     Third, it is contemplated that the Stalking Horse Bidder, if any (or such other Successful Bidder(s) as may be selected in accordance with the Bidding Procedures) will be capable of satisfying the adequate assurance conditions of sections 365(b)(i)(c) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts. Adequate assurance of future performance is to be determined on a case by case basis to ensure that the other party to the contact or lease obtains the benefit of the bargain for what was contracted. *Chera v. 991 Blvd. Realty Corp. (In re National Shoes, Inc.)*, 20 B.R. 55, 59 (Bankr. S.D.N.Y. 1982); *See also In re Bygaph*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) ("Congress intended that the words 'adequate assurance' be given a practical, pragmatic construction, and is to be determined under the facts of each particular case"). The Debtors submit, and will demonstrate at the Sale Hearing, that there are adequate business justifications for the assumption and assignment of the Assumed Contracts and that all requirements to assumption and assignment, including adequate assurance of future performance by the Stalking Horse Bidder or any Successful Bidder(s), have been met.

**G.  The Proposed Notice of the Sale Hearing is Adequate and Appropriate.**

55.     Under Bankruptcy Rule 2002(c), notice of the Sale Hearing must include the date, time, and place of the potential Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested in this Motion. As noted above, the Debtors propose the following deadlines for objecting to the approval of the proposed Sale Transaction: no later than seven (7)

days prior to the Sale Hearing (the "<u>Objection Deadline</u>") for all objections to the potential Sale Transaction, the terms contained in this Motion and the proposed Sale Order.

56.     Within five (5) business days after entry of the Bidding Procedures Order, the Debtors will serve the proposed Auction and Hearing Notice by overnight mail to those parties on the Master Service List maintained by the Debtors' claims and noticing agent at https://dm.epiq11.com/case/CDC/info.

57.     As Bankruptcy Rule 2002(c) requires, the Auction and Hearing Notice will include (among other things) the following: (a) the proposed date, time, and place of the Auction and the Sale Hearing; (b) information about the Assets and the sale process; and (c) the Objection Deadline for filing any objections to the relief requested in this Motion. The methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Assets.

**F.     Waiver of Bankruptcy Rules 6004(h) and 6006(d)**

58.     The Debtors request that, upon entry of a Sale Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d). The waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) will allow any Sale Transaction to close as soon as possible and prevent further delay in the administration of these cases. In addition, because many of the Assets impose holding costs on the Debtors during their period of ownership and control, any delay in closing may diminish the Debtors' estates to the detriment of creditors. Thus, the Debtors respectfully submit that a waiver of the 14-day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d) is appropriate under the circumstances.

**<u>NOTICE OF OPPORTUNITY TO OBJECT AND REQUEST FOR HEARING</u>**

**59.     Pursuant to Local Rule 2002-1, parties in interest shall have 14 days from the date of this Motion to object or the Court may enter an order approving this Motion without**

**further notice and opportunity to object. If a party in interest timely and properly files an objection, the Debtors intend to present this Motion for hearing on July 31, 2019 at 9:00 a.m. (prevailing Eastern Time) before the United States Bankruptcy Court for the Eastern District of Kentucky, 100 East Vine Street, Suite 200, Second Floor Courtroom, Lexington, Kentucky 40507.**

**<u>NO PRIOR REQUEST</u>**

60.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these Chapter 11 Cases.

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order substantially in the form attached hereto as **<u>Exhibit A</u>**; (ii) after a Sale Hearing, enter the Sale Order approving the sale of the Assets to the Successful Bidder; and (iii) grant such other and further relief to the Debtors as the Court may deem proper.

[*Signature page follows*.]

Dated: July 12, 2019                    Respectfully submitted,


                                        /s/ Patricia K. Burgess
                                        Patricia K. Burgess
                                        **FROST BROWN TODD LLC**
                                        250 West Main Street, Suite 2800
                                        Lexington, Kentucky 40507
                                        Tel:  (859) 231-0000
                                        Fax: (859) 231-0011
                                        E-mail: pburgess@fbtlaw.com

                                        -and-

                                        Ronald E. Gold (admitted *pro hac vice*)
                                        Douglas L. Lutz (admitted *pro hac vice*)
                                        A.J. Webb (admitted *pro hac vice*)
                                        **FROST BROWN TODD LLC**
                                        3300 Great American Tower
                                        301 East Fourth Street
                                        Cincinnati, Ohio 45202
                                        Tel:  (513) 651-6800
                                        Fax:  (513) 651-6981
                                        E-mail:  rgold@fbtlaw.com
                                                 dlutz@fbtlaw.com
                                                 awebb@fbtlaw.com


                                        **PROPOSED ATTORNEYS FOR DEBTORS AND
                                        DEBTORS-IN-POSSESSION**