UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Cambrian Holding Company, Inc., *et al.*,[1] | ) | Case No. 19-51200 (GRS) |
| | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Hon. Gregory R. Schaaf |
| | ) | |

**OBJECTIONS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS:
(I) AUTHORIZING POST-PETITION SECURED FINANCING PURSUANT TO
SECTIONS 105, 361, 362, 363, 364 AND 503(b) OF THE BANKRUPTCY CODE;
(II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL PURSUANT TO
SECTION 363 OF THE BANKRUPTCY CODE; (III) PROVIDING
ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES
PURSUANT TO SECTIONS 361, 362, AND 363 OF THE BANKRUPTCY CODE;
(IV) MODIFYING THE AUTOMATIC STAY PURSUANT TO SECTION 362(d)
OF THE BANKRUPTCY CODE; (V) SCHEDULING A FINAL HEARING;
AND (VI) PROVIDING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Cambrian Holding

Company, Inc. and its related debtors and debtors in possession in the above-captioned chapter 11

cases (collectively, the "<u>Debtors</u>"), hereby submits this objection (the "<u>Objection</u>") to the *Debtors'*

*Motion for Entry of Interim and Final Orders: (I) Authorizing Post-Petition Secured Financing*

*Pursuant to Sections 105, 361, 362, 363, 364 and 503(b) of the Bankruptcy Code; (II) Authorizing*

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Cambrian Holding Company, Inc. (8203), Cambrian Coal LLC (3394), Apex Energy, Inc. (3455), C.W. Augering, Inc. (2875), Marshall Resources, Inc. (9735), PLM Holding Company LLC (7427), Bear Branch Coal LLC (0674), Clintwood Elkhorn Mining LLC (6910), Gatliff Coal LLC (5768), Perry County Coal LLC (4382), Ray Coal LLC (0981), Whitaker Coal LLC (8270), Pike-Letcher Land LLC (8952), Premier Elkhorn Coal LLC (8951), Raven Rock Development LLC (1351), Rich Mountain Coal LLC (1974), S.T. & T. Leasing, Inc. (0340), T.C. Leasing, Inc. (7705), and Shelby Resources, LLC (5085).

*the Debtors to Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; (III)*

*Providing Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362,*

*and 363 of the Bankruptcy Code; (IV) Modifying the Automatic Stay Pursuant to Section 362(d)*

*of the Bankruptcy Code; and (V) Scheduling a Final Hearing;* [Dkt No. 26] (the "DIP Motion").[2]

In support of the Objection the Committee respectfully states as follows[3]:

## **BACKGROUND**

1.      On June 16, 2019 (the "Petition Date"), the Debtors commenced chapter 11 cases

(the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the

Bankruptcy Code.  The Debtors have a complicated ownership structure, which is described in

detail in the *Declaration of J. Mark Campbell in Support of First Day Motions of Debtors and*

*Debtors-In-Possession* [Dkt No. 39] (the "First Day Declaration"), ¶ 12.  Notably, the Debtors

have significant relations with numerous non-Debtor entities including, but not limited to,

Southeastern Land, LLC ("Southeastern"), Beech Fork Processing, LLC ("Beech"), Eagle Coal

Company, LLC ("Eagle") and Pevler Coal Sales Company, Inc. ("Pevler"), all of which, on

information and belief, are owned and/or controlled by James Booth ("Booth").  Booth and Ted

McGinnis held ownership interests in Debtors Cambrian Holding and Shelby Resources until they

purportedly relinquished such interests shortly prior to the Petition Date.

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the DIP Motion.

[3] The Committee has been in negotiations with the DIP Lenders and the Debtors regarding the subjects in this Objection, which the Committee anticipates will continue in advance of the final hearing.  The Committee is filing this Objection to preserve its rights as discussions continue.

4849-7660-5523.2

### The Pre-Petition Lenders and Debtors' Guarantees

2.      The Debtors have represented that they are parties to two primary secured debt facilities.[4]  *First*, the Debtors utilize an asset-based revolving credit facility pursuant to that *ABL Credit and Guaranty Agreement*, amended and restated in full by *Amendment No. 4 to ABL Credit and Guaranty Agreement and Amendment No. 1 to Pledge and Security Agreement*, dated as of September 21, 2015 (the "ABL Revolver").  Deutsche Bank AG New York Branch ("DBNY") serves as the administrative agent and collateral agent (the "ABL Revolver Agent") for the ABL Revolver; the lenders under the ABL Revolver are DBNY and Richmond Hill (the "ABL Lenders").  (*See* RH 4001-2(b) Disclosure, Exs. A-1, B).

3.      As set forth in the DIP Motion, the ABL Revolver originated pursuant to a July 10, 2013 loan by the ABL Lenders to non-debtors Beech, Eagle and Pevler.  (*See* DIP Motion at ¶ 6).  The Debtors only became borrowers or guarantors of the ABL Revolver – which increased to $47.5 million – when they amended and restated the loan as of September 21, 2015 as part of Debtor Cambrian Coal, LLC's acquisition of TECO Coal Corporation (the "TECO Acquisition"). (*Id.*)  The Committee is investigating what value, if any, various Debtor entities received in exchange for becoming liable for the entire ABL Revolver.

4.      As of the Petition Date, the Debtors allege that approximately $48 million in principal is outstanding under the ABL Revolver.  (*See* First Day Declaration at ¶ 13).  The ABL Lenders allege that the ABL Revolver is secured by a lien on substantially all of the Debtors' assets.  (*See* Interim DIP Order, ¶ (C)(ii)).

5.      *Second*, the Debtors are also borrowers or guarantors under that *Term Credit and Guaranty Agreement*, dated July 10, 2013, as restated in full by *Amendment Agreement No. 6 to*

---

[4] The Committee is relying on information provided by the Debtors in the First Day Declaration for much of this background.  The Committee is not by this Objection adopting such representations and reserves all of its rights.

*Term Credit and Guaranty Agreement and Amendment No. 1 to Pledge and Security Agreement*, dated September 21, 2015 (collectively, the "Term Loan").  Deutsche Bank Trust Company Americas serves as administrative and collateral agent for various lenders under the Term Loan (the "Term Lenders and, together with the ABL Lenders and the DIP Lenders, the "Lenders").[5]

6.      Just like the ABL Revolver, the Term Loan originated as a loan to non-debtors Beech, Eagle and Pevler, in the amount of $43.5 million.  The Debtors became parties to the Term Loan on September 21, 2015 in connection with the TECO Acquisition.  At that time, the size of the loan increased to $52 million.  At this juncture, it is unclear what value each of the Debtors received in exchange for becoming liable for the full amount of the Term Loan.

7.      The Term Loan is allegedly secured by a lien on substantially the same assets that secure the ABL Revolver.  (*See* First Day Declaration, ¶ 16).  As of the Petition Date, approximately $78 million is outstanding under the Term Loan.  (*Id.*)

**The DIP Motion And Interim DIP Order**

8.      On June 17, 2019, the Debtors filed the DIP Motion seeking the authority to, among other things, obtain post-petition secured financing up to an aggregate principal amount not to exceed $15 million (the "DIP Facility") from Richmond Hill (the "DIP Lenders" and, collectively with the ABL Lenders and the Term Lenders, the "Lenders").  Richmond Hill is serving as the administrative agent for the DIP Facility (the "DIP Agent").  On June 19, 2019, this Court entered an order approving the DIP Motion on an interim basis [Dkt No. 116] (the "Interim DIP Order").

---

[5] The Term Lenders announced at the first-day hearing in this case that they are assigning the Term Loan to an entity affiliated in some manner with the Debtors' surety, Continental Heritage.  While the Committee understands that this assignment has not yet closed, it is expected to close prior to a final hearing on the DIP Motion.

4849-7660-5523.2

## **OBJECTION**

9.      Before the Court can approve debtor-in-possession financing, the Debtors must

establish the following elements:   "(1) They are unable to obtain unsecured credit per 11 U.S.C. §

364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); (2)

The credit transaction is necessary to preserve the assets of the estate; and (3) The terms of the

transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and

the proposed lender."   *In re Aqua Associates*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).   A

proposed financing arrangement "will not be approved where it is apparent that the purpose of the

financing is to benefit a creditor rather than the estate."   *In re Ames Dep't Stores, Inc.*, 115 B.R.

34, 39 (Bankr. S.D.N.Y. 1990).

10.     Here, as described in more detail below, the DIP Facility benefits the ABL Lenders

and the DIP Lenders without a commensurate benefit to the Debtors' estates.   Absent elimination

or modification of the objectionable aspects of the DIP Facility discussed below, the DIP Facility

should not be approved.   Accordingly, the Committee objects to the DIP Motion for the following

reasons, as described in more detail below:

- The unencumbered assets of the estates – including avoidance actions – must be protected from the liens and superpriority claims of the Lenders;

- The Sale Milestones in the DIP Facility provide the DIP Lenders with undue leverage and should be extended;

- The limitations on the Committee's ability to investigate and pursue claims against the Lenders should not be approved;

- The Debtors' waiver of the power to surcharge the Lenders' collateral under section 506(c) of the Bankruptcy Code should not apply to amounts in the Budget;

- The proposed section 552(b) "equities of the case" and marshaling waivers should not be approved;

- The Committee should receive a reasonable professional fee carve-out; and

5

- Other provisions providing the DIP Lenders with excessive control over the case should not be approved.

## I.  The Unencumbered Assets Of The Estates Must Be Protected From Liens And Superpriority Claims

11.    Given the amount of alleged secured debt in this case, it is imperative for unsecured creditors that the Debtors' unencumbered assets are not encumbered, either directly or indirectly, through the DIP Facility.    There are two buckets of unencumbered assets that the Committee seeks to protect from liens and claims under the DIP Facility:  (a) avoidance actions (and the proceeds thereof) under chapter 5 of the Bankruptcy Code including, without limitation, claims under §§ 544, 547, 548, 550 and 551 of the Bankruptcy Code (the "Avoidance Actions"), and (b) other assets of the Debtors' estates that are unencumbered as of the Petition Date (the "Other Unencumbered Assets").

### A.    The DIP Lenders Should Not Be Able To Encumber Avoidance Actions Through The DIP Lenders' "Superpriority Claims"

12.    The Interim DIP Order provides that the DIP Lenders' *liens* do not extend to Avoidance Actions.  (Interim DIP Order at ¶ 7(a)(ii)).  The Interim DIP Order, however, provides that the DIP Lenders are attempting to encumber the Avoidance Actions through their *superpriority claims* under § 364(c)(1) of the Bankruptcy Code.    Paragraph 7(a)(i) of the Interim DIP Order provides that the DIP Lenders shall receive:

> pursuant to Bankruptcy Code 364(c)(1) . . . joint and several claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code . . . (the "*Superpriority Claims*"), which Superpriority Claims shall be payable from and have recourse to all prepetition and post-petition property of the Debtors and all proceeds thereof including, without limitation, subject to the entry of the Final Order, *all proceeds or other amounts received in respect of the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code or the proceeds or other amounts received in respect thereof* (such claims and causes of action, collectively, the "*Avoidance Actions*"). . . .

(*Id.* at ¶ 7(a)(i)).

6

13.    By granting the DIP Lenders "back door" access to Avoidance Action proceeds via superpriority claims, the Debtors propose to shift unencumbered value to the DIP Lenders in a manner that is fundamentally at odds with the unique purpose served by Avoidance Actions. Avoidance Actions are distinct creatures of bankruptcy law designed to benefit, and ensure equality of distribution among, unsecured creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.*), 226 F.3d 237, 244 (3d Cir. 2000), *rev'd en banc*, 330 F.3d 548 (3d Cir. 2003) (identifying underlying intent of avoidance powers to recover valuable assets for estate's benefit); *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully part of the bankruptcy estate, even if they have been transferred away.") (citations omitted).

14.    As an important source of recovery for unsecured creditors, avoidance actions and their proceeds should remain free of any encumbrances and should be available for distribution to all unsecured creditors. *See, e.*g., *In re Tek-Aids Indus., Inc.*, 145 B.R. 253, 256 (Bankr. N.D. Ill. 1992) (holding that granting a lien on preference actions to secured creditors "would not only defy logic, but would undermine the policy behind the avoidance powers as well"). *In re Excel Maritime Carriers, Ltd.*, No. 13-23060 (RDD) (Bankr. S.D.N.Y. Aug. 6, 2013) [Dkt No. 133] (granting the use of cash collateral and adequate protection but excluding avoidance actions and proceeds thereof from property that could be used to pay superpriority claims under section 507(b) and from the scope of adequate protection liens).

15.    The Debtors have not provided any justification for the extraordinary grant of superpriority claims against the proceeds of Avoidance Actions. Particularly in light of the backdrop of this case – where the proceeds of a potential § 363 sale may not pay all alleged secured

7

debt in full – granting superpriority claims against Avoidance Actions would result in unsecured creditors being worse off than had there been no DIP Facility at all.  Shifting the cost of administering these Chapter 11 Cases to the unsecured creditors for the sole benefit of the DIP Lenders is inappropriate and should not be countenanced.  This Court should not approve the DIP Facility unless the DIP Lenders' superpriority claims cannot be satisfied from the Avoidance Actions (including any proceeds thereof).

**B.    The Estates' Section 551 Waiver Should Be Deleted**

16.    Section 551 of the Bankruptcy Code provides that if a trustee (or estate) avoids a lien under the avoidance powers, the estate succeeds to the priority of the avoided lienholder.  *See* 11 U.S.C. § 551; *LPP Mortgage, Ltd. v. Brinley*, 547 F.3d 643, 648 (6th Cir. 2008) ("When an avoided lien is preserved for the benefit of the estate under 11 U.S.C. § 551, the estate succeeds to the priority that the avoided and preserved lien had with respect to competing interests."); *In re Ritchie*, 416 B.R. 638, 646 (6th Cir. B.A.P. 2009) (affirming bankruptcy court decision that unperfected lien of secured creditor may be avoided and that estate ascends to secured creditor's priority and subordinates the secured creditor).

17.    Under the Interim DIP Order, the DIP Lenders do not "prime" any party except for the pre-petition liens held by the DIP Lender.  (Interim DIP Order at ¶ 7(b)).  The Interim DIP Order, however, provides that "[a]ny security interest or lien upon the DIP Collateral which is avoided or otherwise preserved for the benefit of any Debtor's estate under § 551 or any other provision of the Bankruptcy Code shall be subordinate to the security interests in and lien of the DIP Lender upon the DIP Collateral."  (*Id.* at ¶ 7(e)).

18.    The DIP Lenders thus are essentially bootstrapping themselves into the estates' § 551 position through this provision.  For example, the DIP Lenders admit that their liens are

subordinate to the alleged liens of the Term Lenders in certain assets. (*See, e.g.*, Interim DIP Order at ¶ 7(a)(iii)). The § 551 waiver provision, however, would mean that if the Debtors' estates avoided the liens of the Term Lenders in that collateral, the DIP Lenders would succeed to the Term Lenders' priority, *senior* to the estates and in a better position than the DIP Lenders admittedly are in as of the entry of the Interim DIP Order. This Court should not approve the DIP Lenders' attempt to improve their "junior" positions in collateral – and sidestep the avoidance rights of the Debtors' estates – through a § 551 waiver.

## C.    The Prepetition Lenders' "Adequate Protection Liens" Should Be Modified

19.    Paragraph 8 of the Interim DIP Order provides that the ABL and Term Lenders receive "adequate protection liens" and superpriority claims in all "DIP Collateral," which definition includes all unencumbered assets of the Debtors' estates other than Avoidance Actions. (*See* Interim DIP Order at ¶¶ 8(a)(i), 8(b)(i); *see also id.* at ¶ 7(a)(iv) (definition of "DIP Collateral"). The ABL and Term Lenders also receive financial and operational reporting information, payment of fees and expenses of counsel and financial advisor(s), and cash payments (i.e., interest payments to the ABL Lenders and $220,000 per month to the Term Lenders). (*Id.* at ¶¶ 8(a)-(b)).

20.    This Court should limit the requested "adequate protection liens" and claims in three ways. *First*, the purpose of adequate protection is not to allow a secured lender to *enhance* its collateral. Rather, the purpose is to ensure that prepetition lenders receive the security they bargained for prior to the petition date, or to preserve the secured creditor's position following the commencement of a bankruptcy case. *See, e.g.*, *In re Townley*, 256 B.R. 697, 700 (Bankr. D.N.J. 2000) ("The right of a secured creditor to the value of its collateral is a property right protected by the Fifth Amendment. Before the plan is confirmed, that property right is protected by the requirement of [Bankruptcy] Code section 361 for adequate protection.").

21.     Moreover, when lienholders prime their own liens, courts have widely held that such creditor cannot assert a dollar-for-dollar diminution claim (*i.e.*, that each dollar spent or dollar of priming lien results in a dollar of diminution claim).  *See, e.g., Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 497 B.R. 403, 422 (Bankr. S.D.N.Y. 2013).  Instead, a creditor is required to show, at the appropriate time, that the value of its cash and non-cash collateral, when considered in the aggregate, has diminished as a result of the bankruptcy case.  *See* 11 U.S.C. § 363(p)(2) (providing that any entity asserting an interest under section 363 "has the burden of proof on the issue of the validity, priority, or extent of such interest").  Accordingly, as is customary, the ABL and Term Lenders should only receive adequate protection liens or claims to the extent of any actual diminution in value of their collateral *after* the Petition Date.

22.     *Second*, to the extent that any unencumbered assets are pledged as an "adequate protection" lien or claim, the applicable Lender asserting such a lien or claim should be required to marshal against any assets that are encumbered as of the Petition Date before asserting such lien or claim against Other Unencumbered Collateral.  As such, accessing Other Unencumbered Collateral only occurs as a "last resort" under very limited circumstances, protecting the interests held by unsecured creditors as of the Petition Date.

23.     *Third*, any Final DIP Order should clarify that all "adequate protection" payments of interest and professional fees should be subject to both (a) re-characterization as payments of principal, or (b) disgorgement, as applicable, in the event that the Prepetition Secured Lenders are determined to be undersecured or unsecured, whether under § 506(a) of the Bankruptcy Code or pursuant to the Committee's challenge rights under paragraph 25 of the Interim DIP Order.

## II.    **The Sale Milestones Are Unreasonable And Should Not Be Approved**

24.    The DIP Facility sets forth overly aggressive "milestones" (the "Sale Milestones")

to consummate a sale of the Debtors' assets and provides that an Event of Default will occur if any

milestone is not met.  (*See* DIP Term Sheet, p. 15-16).  The key Sale Milestones are as follows:

| **MILESTONE** | **DEADLINE** |
|---|---|
| Bid deadline for buyers | August 28, 2019 (70 days after entry of the Interim DIP Order) |
| Auction deadline | September 2, 2019 (75 days after entry of the Interim DIP Order) |
| Entry of Sale Order | September 4, 2019 (77 days after entry of the Interim DIP Order) |
| Closing of Sale | October 4, 2019 (107 days after entry of the Interim DIP Order) |

25.    At the first-day hearing in this case, the Debtors indicated that they intended to file

a § 363 sale motion in the near term.  The Debtors, however, did not file such motion until July

12, 2019 [Dkt. No. 196] (the "Sale Motion").  The Sale Motion does *not* identify a stalking horse

buyer for the Debtors' assets.  Rather, the Debtors request *authority* to enter into a stalking horse

agreement should they identify one prior to the hearing on July 31, 2019.  The proposed dates in

the Sale Motion are very similar to the "Sale Milestones" set forth in the Interim DIP Order.[6]  The

Sale Motion does not attach a proposed asset purchase agreement or other definitive sale

documentation for a prospective buyer.

26.    The Sale Milestones – including the short, 28-day period from the proposed

approval of the bidding procedures to an auction – would be onerous in almost every case.  But

they are particularly inappropriate in this case.  *First*, the Debtors did not conduct any pre-petition

---

[6] The only differences are that, presumably due to Labor Day weekend, the auction is proposed to be held on September 4 and the sale hearing on September 5 (rather than the dates of September 2 and 3, respectively).

4849-7660-5523.2

sales process.  While the Debtors may have had some limited, informal discussions with certain

prospective parties, there was no formal pre-petition process undertaken.

27.    *Second*, the Debtors did not have a data room available for prospective acquirers to

access any financial or operational information until July 10, 2019 (21 days after the Petition Date).

28.    *Third*, the Debtors still do not have a Management Presentation or comprehensive

marketing documents necessary for prospective parties to review.  The business plan available to

prospective parties is dated February 4, 2019, over five months ago, and is likely no longer relevant

or applicable given certain operational challenges and capital expenditure requirements the

Debtors have encountered since development of that plan.  Moreover, the executive management

team changed immediately prior to the Petition Date.

29.    While the Committee has no desire to have the Debtors languishing in chapter 11

indefinitely, the Sale Milestones do not reflect a realistic appraisal of (a) where the sale process

stands today, or (b) the timeline for having a reasoned process that generates value for the Debtors'

constituents.  In light of the undue control that the DIP Lenders would obtain through missing a

Sale Milestone (i.e., an Event of Default and right to terminate the DIP Facility), the Sale

Milestones should not be approved.  At a minimum, this Court should wait until the bid procedures

hearing on July 31 to set appropriate Sale Milestone dates.

III.    **The Limitations On The Committee's Ability To Investigate And Pursue Lender Claims Should Not Be Approved**

A.    **The Committee Has Been Provided Insufficient Time To Investigate, Obtain Standing, And Commence An Adversary Proceeding Against The Prepetition ABL Lenders**

30.    The Interim DIP Order provides that the Debtors stipulate to the validity and

priority of the claims of the ABL Lenders and waive any affirmative claims against such lenders.

(Interim DIP Order at ¶ C).  The Debtors also seek to impose substantial and inappropriate

12

constraints on the ability of the Committee to assert a challenge to the liens and claims of the ABL

Lenders.  Specifically, the Interim DIP Order limits the time during which the Committee may

obtain standing, investigate and initiate adversary proceedings asserting claims against the ABL

Lenders to only 60 days after the appointment of the Committee (the "Challenge Period"), unless

such period is extended by written consent of the DIP Lenders and the ABL Revolver Agent in its

sole discretion.  (*See id.* at ¶ 25(a)).

31.    These limitations are designed to make it nearly impossible for the Committee to

investigate and mount a reasonable challenge to the liens and claims of the ABL Lenders.  The

Committee has commenced its lien review; however, the Debtors are still producing information

to the Committee that is relevant to this analysis.  The Committee will also need to review matters

such as the TECO Acquisition and the Debtors' financial situation as of that time in order to

determine whether it has a viable challenge to any liens or claims.    As such, the Committee

anticipates that 60 days is far from enough to analyze all of the information necessary to either

challenge (or decide not to challenge) the stipulations in the Interim DIP Order.

32.    The Committee thus, the Committee requests that this Court modify the Final DIP

Order to provide that (i) the Challenge Period expires 120 days after the appointment of the

Committee, without prejudice to the Committee's right to obtain further extensions of the

Challenge Period by agreement of the parties; and (ii) in the absence of an agreement by the parties,

the Challenge Period may be further extended by order of the Court upon a showing of cause.

These periods are consistent with similar coal cases in this District.  *In re Licking River Mining,*

*LLC*, No. 14-10201 (Bankr. E.D. Ky. Sept. 5, 2014) [Dkt No. 447] (approving a challenge deadline

of the earlier of (a) 270 days after the petition date and (b) the date an order confirming the debtors

4849-7660-5523.2

chapter 11 plan was entered); *In re Trinity Coal Corporation*, No. 13-50364 (Bankr. E.D. Ky. Apr. 8, 2013) [Dkt No. 267] (approving challenge deadline of 90 days after entry of the *final* DIP order).

33. Moreover, as the Court is aware, the time required to brief and argue a standing motion is significant. In the interest of avoiding unnecessary delays and promoting the full investigation of liens and potential claims in the face of broad stipulations by the debtors, this Court and other courts have also approved DIP orders providing creditors' committees with automatic standing to commence an adversary proceeding without the need to file a motion seeking standing to bring such an action. *In re Licking River Mining, LLC*, No. 14-10201 (Bankr. E.D. Ky. Sept. 5, 2014) [Docket No. 447] (vesting the creditors' committee with automatic standing to commence an adversary proceeding); *In re Phoenix Payment Sys., Inc.*, No. 14-11848 (MFW) (Bankr. D. Del. Sept. 3, 2014) [Docket No. 149] (same).

34. In cases where automatic standing is not granted, courts alternatively have provided for the tolling of the period within which an adversary proceeding must be commenced upon the filing of a standing motion. *See, e.g., In re Swift Energy Co.*, No. 15-12670 (MFW) (Bankr. D. Del. Feb. 2, 2016) [Dkt No. 224] (providing that the challenge period was tolled as to the Committee from the date the Committee seeks standing until ten business days after entry of order by the court); *In re RS Legacy Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Mar. 12, 2015) [Dkt No. 947] (providing challenge period tolled as to moving party until earlier of (a) withdrawal of standing motion or (b) entry of dispositive order by the court with respect to such motion).

35. Given the broad stipulations by the Debtors and the tight investigation period in this case, the Committee submits that it is appropriate to grant the Committee automatic standing to commence an adversary proceeding challenging the validity of the DIP Lenders and Pre-Petition ABL Agent's pre-petition liens.

14

### B.    The Budget Allocated To The Investigation Of Prepetition Liens And Claims Is Inadequate

36.    The DIP Facility caps the amount of funds available to the Committee for the investigation of liens and claims at a mere $25,000 (the "Committee Investigation Budget").  (*See* Interim DIP Order, ¶ 13(b)).    Further, the Committee may only use this Budget for "the investigation of, *but not litigation, objection or challenge to*, the stipulations and admissions of the Debtors contained in this Interim Order."  (*Id.* (emphasis added)).

37.    These restrictions improperly seek to shield the Lenders from potential claims.  In *In re Tenney Village Co.*, 104 B.R. 562 (Bankr. D.N.H. 1989), the court refused to approve a proposed financing arrangement with similar restrictions against challenging liens and bringing claims against secured lenders.  The court stated that:

> [T]he Bank would close the purse strings to payment of Debtor's counsel for services devoted to any claim or defense against the Bank, except for the $25,000 retainer. . . . It is said that a Chapter 11 lender should not be required to finance the prosecution of claims and defenses against it.  That is true.  If the lender believes that this will occur, it can elect not to make the loan.  It cannot expect, however, to change the rules of a Chapter 11 case.  We have here much more than the common provision giving counsel to a creditors' committee a limited period to object to a lender's liens.

*Tenney*, 104 B.R. at 568-69.  Here, the Lenders should not be permitted to disarm the Committee by preventing its professionals from being paid for challenging their liens and claims.

38.    Some courts place no cap on the amount a creditors' committee may expend to investigate potential claims against lenders.[7]  Other courts, including courts in this jurisdiction, routinely approve caps well in excess of $25,000 for the investigation of claims against prepetition lenders.  *See*, *e.g.*, *In re Licking River Mining, LLC*, No. 14-10201 (Bankr. E.D. Ky. Sept. 5, 2014)

---

[7] *See In re TOUSA, Inc.* (Bankr. S.D. Fla. Jan. 9, 2009) [Dkt No. 2355] (placing no cap on the use of cash collateral to investigate claims); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008) [Dkt. No. 219] (same); *In re Delta Air Lines, Inc.*, No. 05-17923 (Bankr. S.D.N.Y. Oct. 6, 2005) (same).

[Dkt No. 447] ($150,000 cap); *In re Trinity Coal Corporation*, No. 13-50364 (Bankr. E.D. Ky. Apr. 8, 2013) [Dkt No. 267] ($100,000 cap); *In re Swift Energy Co.*, No. 15-12670 (MFW) (Bankr. D. Del. Feb. 2, 2016) [Dkt No. 224] ($200,000 cap).

39.     The integrity of the bankruptcy process mandates that the Committee's professionals be permitted to advocate on behalf of unsecured creditors without being subject to unduly restrictive caps imposed by third parties whose interests are adverse to those of the Debtors' estates.  In the alternative, the Committee requests that an additional $75,000 be made available to the Committee for the investigation of the liens of and claims against the DIP Lenders and ABL Lenders, for a total budget of $100,000.

**IV.     The Debtors' Waiver Of The Power To Surcharge The DIP Lenders' Collateral Under Section 506(c) Of The Bankruptcy Code Should Not Apply To Amounts In The Budget**

40.     Section 506(c) of the Bankruptcy Code provides that "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c).  The DIP Facility provides for a waiver of all § 506(c) claims.  (Interim DIP Order, ¶ 6(xxi)).  Some courts have refused to approve § 506(c) waivers as part of cash collateral orders, characterizing such waivers as unenforceable "in light of the congressional mandate that a trustee have the authority to use a portion of secured collateral for its preservation or proper disposal." *In re Brown Brothers, Inc.,* 136 B.R. 470, 474 (W.D. Mich. 1991); *see also*, *e.g.*, *In re Ridgeline Structures, Inc.*, 154 B.R. 831, 832 (Bankr. D.N.H. 1993) (characterizing a proposed section 506(c) waiver as "against public policy and unenforceable per se").

41.     The Committee submits that a blanket waiver of claims under § 506(c) is not reasonable.  The DIP Lenders have agreed to fund the Debtors' expenses in accordance with the Budget.  Accordingly, the Debtors should be authorized to surcharge the DIP Lenders' collateral

16

on behalf of administrative creditors that advance credit or provide services during the Chapter 11

Cases – pursuant to the Budget – that help preserve the value of the DIP Lenders' collateral.  The

Final DIP Order therefore should provide that § 506(c) claims for services provided according to

the Budget before termination of the DIP Facility (a) are expressly preserved, and (b) if allowed,

do not result in any event of default under the DIP Facility.

42.     This Court has approved similar "limited" § 506(c) waivers in chapter 11 coal

cases.  *See In re Licking River Mining,* No. 14-10201 (Bankr. E.D. Ky. Sept. 5, 2014) [Dkt  No.

447] (including this language as a limitation on the section 506(c) waiver); *In re Black Diamond*

*Mining Company,* No. 08-70066 (Bankr. E.D. Ky. Apr. 10, 2008) [Dkt No. 354].

## VI.     The Proposed  Section 552(b) Waiver Should Not Be Approved

43.     The Interim DIP Order also waives the "equities of the case" exception under §

552(b) of the Bankruptcy Code, which would otherwise allow the Debtors, the Committee, or other

parties-in-interest to argue that equitable considerations warrant the exclusion of post-petition

proceeds from the collateral securing the Debtors' secured debt.  (*See* Interim DIP Order, ¶ 12).

"The purpose of the equity exception is to prevent a secured creditor from reaping benefits from

collateral that has appreciated in value as a result of the trustees/debtor-in-possessions use of other

assets of the estate (which normally would go to general creditors) to cause the appreciated value."

*In re Muma Servs.*, 322 B.R. 541, 558-559 (Bankr. D. Del. 2005) (citations omitted).

44.     As recoveries for unsecured creditors are uncertain, a prospective a waiver of the

"equities of the case" exception contained in section 552(b) is wholly inappropriate and should be

stricken.  *See, e.g., In re Metaldyne Corp.*, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23,

2009) (holding, in the context of a proposed 552(b) waiver, that is "an equitable rule is not a finding

of fact…and the Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make").

## VII.   The Proposed Waiver Of The Marshaling Doctrine Should Not Be Approved

45.    The Debtors also should not be permitted to waive any rights with respect to the marshaling doctrine in the Final DIP Order.  (*See* Interim DIP Order, ¶¶ 6(xxi), 12, 29).  Such rights should be preserved for the Committee.  Marshaling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 237 (1963).

46.    There is no justification for the broad scope of the marshaling waiver.  If this Court grants the Debtors' request to encumber certain unencumbered assets to secure the DIP Facility and provide "adequate protection" to the Lenders, the Lenders should be required to exhaust all other collateral before seeking satisfaction from the Debtors' unencumbered assets, the value of which would otherwise be available for the benefit of unsecured creditors.

47.    Moreover, given that the Lenders have claims against various non-debtor affiliate obligors under their loans to the Debtors, a "no marshaling" clause is particularly inappropriate. Otherwise, those non-debtors, controlled by Booth, could receive a windfall in that the Lenders could satisfy all (or most) of their claims against the Debtors, giving such non-debtors a free ride. As such, any marshaling restriction in the Final DIP Order has to be narrowly tailored to exempt non-debtor affiliate obligors as well.

## VIII.  The Committee Should Receive A Reasonable Professional Fee Carve-Out

48.    Reasonable carve-outs for professional fees under debtor-in-possession financing arrangements are "designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system.  Absent such

4849-7660-5523.2

protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced." *Ames*, 115 B.R. at 38.

49.      Here, there is a significant disparity between the fees budgeted for the Debtors' professionals and those budgeted for the Committee's professionals. Debtors' counsel is budgeted a total of $365,000/month for the life of the case, while Committee counsel is budgeted only $50,000/month. Indeed, Committee counsel is budgeted less than the $65,000/month budgeted for *conflicts counsel* for the Debtors.

50.      The disparity is even more stark with respect to financial advisors. FTI Consulting, the Debtors' advisor, is budgeted $200,000/month, plus a success fee, and Jefferies, the Debtors' investment banker, is also budgeted at least $75,000/month, plus a success fee. By contrast, the Committee's financial advisor is budgeted $50,000 for July and only $5,000/month thereafter.

51.      This disparity in treatment is neither reasonable nor appropriate. The Committee is a fiduciary for unsecured creditors and has significant work to do in a short period of time in this case. While the Committee is, and will be, mindful to keep fees in check, the current budgeted amounts are far from sufficient. The Committee requests that its professionals receive budgets of at least 50% of those of the Debtors. As such, Committee counsel would receive $182,500/month beginning in July and its advisors would receive $125,000/month for July and August and $100,000/month thereafter.

## IX.   Other Objections To The Terms Of The DIP Facility

### A.   The Post-Carve Out Trigger Notice Cap Should Be Amended

52.      The DIP Facility does not provide nearly enough protection for the Debtors, the Committee, or their professionals in the event that the DIP Lenders decide to declare a default. The DIP Facility provides for payment of an aggregate $400,000 "Post-Carve Out Trigger Notice Cap" to estate professionals for fees and expenses incurred following the DIP Lenders' delivery

of a "Carve Out Trigger Notice." (*See* Interim DIP Order, ¶ 13(a)). The DIP Lenders may send a Carve Out Trigger Notice upon a continuing event of default under the DIP Facility, even if the default does not result in termination of the DIP Facility. (*See* DIP Term Sheet at 7).

53.     The trigger provision should not be approved. The trigger for any carve-out should be the *termination* of the DIP Facility rather than merely a default that does not result in termination. Otherwise, the DIP Lenders could hang the Debtors, the Committee and their professionals out to dry while the Chapter 11 Cases remain pending merely by calling a default that they do not plan to enforce. The ability of the estates' professionals to rely on the carve-out should not be subject to the potential strategic actions of the DIP Lenders.

## B.     Covenants And Events of Default

54.     The DIP Facility contains numerous covenants that will be difficult, if not impossible, for the Debtors to comply with over the course of these Chapter 11 Cases and which, if violated, could result in one or more events of default under the DIP Facility. For example and as discussed above, the Sale Milestones are unduly tight for any sale, much less a proposed sale that involved a scant prepetition marketing process.

55.     Further, the Interim DIP Order references "Events of Default" that will be defined in the DIP Loan Documents. (Interim DIP Order, *passim*). The DIP Loan Documents have not yet been filed by the Debtors and it is unclear what exactly will be considered an "Event of Default." The Debtors have provided the DIP Term Sheet, which lists Events of Default, but still refers to the DIP Loan Documents as the source for the ultimately list of what constitutes an Event of Default. (*See* DIP Term Sheet, p. 11, "Events of Default"). Upon review of the DIP Term Sheet, the Events of Default listed need to be removed or tempered.

56.     The enumerated list provides that an Event of Default occurs on the breach of "any term, covenant, or agreement" contained in the DIP Facility or any financing order. (DIP Term

4849-7660-5523.2

Sheet, p. 11, "Events of Default," (c)). Such language would permit the DIP Lenders to call an Event of Default for even breaches of immaterial provisions of the Interim DIP Order. Although a breach of an immaterial provision of the Interim DIP Order would be a technical breach of the Interim DIP Order, there must be a materiality requirement for the DIP Lenders to exercise remedies against the Debtors. Without such a materiality requirement, the Debtors may be focused on curing immaterial breaches instead of pursuing a value-maximizing transaction for the benefit of all creditors.

57.    In addition, an Event of Default occurs upon "any representative of any DIP Credit Party's estate" filing an action challenging the validity, perfection, extent, or enforceability of the loan documents for the DIP Facility or the liens and claims granted with respect to the Prepetition ABL Credit Agreement. (DIP Term Sheet, p. 12-13, "Events of Default," (o)). This vague language implies that the Committee filing an action to challenge the ABL Lenders' liens or claims will be an Event of Default. This language handcuffs the Committee's ability to represent its constituency and maximize recoveries for unsecured creditors. Thus, this Event of Default should be removed from the Final DIP Order or revised to specifically exclude any actions from the Committee as an Event of Default.

58.    The DIP Term Sheet also includes an event of default upon any collateral becoming subject to surcharge or marshaling. (DIP Term Sheet, p. 13 at (r)). As stated above, this provision is inappropriate and has the same effect as the Debtors waiving their rights to surcharge or marshal. This language should be removed from the Final DIP Order. In addition, the DIP Term Sheet has an Event of Default occurring upon the entry of an order granting relief from the automatic stay for any collateral "or *any other assets* of any DIP Credit Party" exceeding $50,000 in aggregate value for such order and $150,000 in the aggregate for all orders. (DIP Term Sheet, p. 13, "Events

21

of Default," (s) (emphasis added)).  This condition – with a very low dollar threshold – is not

necessary to protect the DIP Lenders' interests in their collateral.  Instead, it merely serves to cede

control over the Debtors' cases to the DIP Lenders and should not be approved.

### C.    The Lenders' Credit Bid Rights Should Not Be Determined By The Final DIP Order

59.    The Interim DIP Order granted the DIP Lenders the ability to credit bid the DIP

Obligations without the need for further order from the Court.  (*See* Interim DIP Order, ¶ 30).  The

DIP Term Sheet also suggests that the DIP Lenders may be able to credit bid pre-petition claims,

although the language is somewhat ambiguous.  (*See* DIP Term Sheet at 15).  Any right to credit

bid pre-petition obligations must be subject to the right of the Committee to object to such a bid,

asserting its rights under ¶ 25 of the Interim DIP Order.  Moreover, given that the ABL Lenders

and Term Lenders may assert first-priority liens over different assets included in a sale, any credit

bid must be subject to further order of Court and a reasoned procedure that does not lead to either

(a) chaos at an auction, or (b) an end-run on the rights of unsecured creditors.

### D.    The Provisions Governing Termination Of The Automatic Stay Are Unreasonable

60.    The DIP Facility provides that the automatic stay should be modified under section

362 of the Bankruptcy Code to allow the DIP Lenders, without further order of Court, to exercise

any rights and remedies that they may have upon an event of default under the DIP Facility.  (*See*

Interim DIP Order at ¶ 11(a)).  The DIP Lenders may seek expedited relief in front of the Court

within three business days.  (*Id.* at ¶ 11(b)).

61.    Three business days' notice to seek a Court order is an unreasonably short period

of time to prevent the termination of the DIP Facility and corresponding loss of value to unsecured

creditors and other stakeholders.  To protect the rights of unsecured creditors, the Committee

should have a full and fair opportunity to contest any attempt by the DIP Lenders to obtain relief

from the automatic stay and terminate the DIP Facility. The DIP Lenders should be required to provide at least six (6) business days' notice prior to obtaining relief from the automatic stay.

**RESERVATION OF RIGHTS**

62.     As of the date of the filing of this Objection, the Committee and its professionals are still performing diligence relevant to the proposed DIP Facility and discovery related to this Preliminary Objection. The Budget continues to be updated as well. Accordingly, this Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights, claims, defenses, and remedies, including the right to amend, modify, or supplement this Objection, to raise additional objections and to introduce evidence at any hearing relating to this Objection, and without in any way limiting any other rights of the Committee to further object to the DIP Motion, on any grounds, as may be appropriate.

63.     The Interim DIP Order references the DIP Loan Documents, which are to be executed between the Debtors and the DIP Lenders within fourteen days of entry of the Interim DIP Order. Such timeline has passed and the DIP Loan Documents have not been filed with the Court. The Committee therefore reserves all of its rights to object to the DIP Loan Documents after it has had a chance to review them in detail. In addition, the proposed Final DIP Order has not been filed with the Court, although the Committee has reviewed a draft. The Committee reserves all of its rights to object to the form filed with the Court.

**WHEREFORE**, the Committee requests that the Court (i) deny the DIP Motion absent the Committee's requested modifications and (ii) provide the Committee such other and further relief as the Court may deem just, proper and equitable.

**NOTICE**

Notice is hereby given that the foregoing shall be brought on for hearing before the United States Bankruptcy Court for the Eastern District of Kentucky, 100 East Vine Street, Second Floor,

4849-7660-5523.2

Lexington, Kentucky, on Thursday, July 23, 2019, at the hour of 9:00 a.m. Eastern Time (ET), or as soon thereafter as counsel may be heard.

Respectfully Submitted,


/s/ T. Kent Barber
**BARBER LAW PLLC**
KY Bar No. 092456
2200 Burrus Drive
Lexington, KY 40513
(859) 296-4372
kbarber@barberlawky.com


-and-

Geoffrey S. Goodman (*pro hac vice* pending)
**FOLEY & LARDNER LLP**
IL Bar No. 6272297
321 N. Clark Street, Suite 2800
Chicago, Illinois 60654
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
ggoodman@foley.com

PROPOSED COUNSEL FOR
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS
(APPLICATION TO BE FILED)

## CERTIFICATE OF SERVICE


This document has been electronically filed and served via the Court's ECF System on July 16, 2019

/s/ T. Kent Barber, Esq.
PROPOSED LOCAL COUNSEL FOR THE
OFFICIAL           COMMITTEE          OF
UNSECURED CREDITORS
(APPLICATION TO BE FILED)

4849-7660-5523.2

25