## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Cambrian Holding Company, Inc., *et al.*,[1] | ) | Case No.  19-51200 (GRS) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | Honorable Gregory R. Schaaf |

### FINAL ORDER AUTHORIZING
### (A) SECURED POST-PETITION FINANCING ON A SUPER PRIORITY BASIS
### PURSUANT TO 11 U.S.C. § 364, (B) USE OF CASH COLLATERAL
### PURSUANT TO 11 U.S.C. § 363 AND (C) GRANT OF
### ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 363 AND 364

Upon the motion (the *"Motion"*) dated June 16, 2019 of Cambrian Coal LLC and Shelby

Resources, LLC (collectively, the *"Borrowers"*), and those entities (collectively, the *"DIP*

*Guarantors"*) listed on *"Exhibit A"* to the DIP Term Sheet attached hereto as <u>Exhibit A</u> (the *"DIP*

*Term Sheet"*), with the Borrowers and DIP Guarantors as debtors and debtors in possession

(collectively referenced to herein as the *"Debtors"*) in the above-captioned cases (the *"Cases"*)

(a) seeking this Court's authorization pursuant to Sections 105, 361, 363(c), 363(e), 364(c) and

364(d) of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the

*"Bankruptcy Code"*) and Rules 2002, 4001(c), 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the *"Bankruptcy Rules"*), and the Local Rules of the United States Bankruptcy Court

for the Eastern District of Kentucky (the *"Local Rules"*) for the Debtors, *inter alia,* (i) to obtain

post-petition financing (the *"Post-Petition Financing"*), up to an aggregate principal amount not

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Cambrian Holding Company, Inc. (8203), Cambrian Coal LLC (3394), Apex Energy, Inc. (3455), C.W. Augering, Inc. (2875), Marshall Resources, Inc. (9735), PLM Holding Company LLC (7427), Bear Branch Coal LLC (0674), Clintwood Elkhorn Mining LLC (6910), Gatliff Coal LLC (5768), Perry County Coal LLC (4382), Ray Coal LLC (0981), Whitaker Coal LLC (8270), Pike-Letcher Land LLC (8952), Premier Elkhorn Coal LLC (8951), Raven Rock Development LLC (1351), Rich Mountain Coal LLC (1974), S.T. & T. Leasing, Inc. (0340), T.C. Leasing, Inc. (7705), and Shelby Resources, LLC (5085).

to exceed $15 million at any time outstanding (the *"Commitment"*) plus accrued interest on the

aggregate principal amount from Richmond Hill Capital Partners, LP, individually as lender and

as administrative agent, and Essex Equity Joint Investment Vehicle, LLC, as lender, (collectively,

and additionally as lenders under that certain Pre-Petition ABL Credit Agreement (as defined

below), the *"DIP Lender"*), which would be extended to the Borrowers and guaranteed by the DIP

Guarantors; (ii) to grant the DIP Lender first priority liens and security interests in all of the

Debtors' currently owned and after acquired property, subject to the priorities existing as of the

Petition Date, but including a senior priming perfected lien in all assets that were subject to the

DIP Lender's pre-petition first priority lien and a partial senior priming perfected lien in all

Debtors' assets that were subject to the pre-petition first priority lien granted to the Pre-Petition

Term Loan Secured Parties (as defined herein), to secure the Debtors' obligations under the Post-

Petition Financing as further set forth herein, and (iii) to grant the DIP Lender superpriority

administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all

obligations under the Post-Petition Financing with priority in payment with respect to such

obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code

§§ 503(b) and 507(b), other than as described below; (b) seeking this Court's authorization to use

cash collateral within the meaning of Bankruptcy Code § 363(a) (the *"Cash Collateral"*), pursuant

to Bankruptcy Code § 363(c), and to provide adequate protection pursuant to Bankruptcy Code

§§ 361, 363(e) and 364(d) to the DIP Lender, the Pre-Petition ABL Agent (as defined below) and

the Pre-Petition Term Loan Secured Parties (as defined below); and (c) seeking a preliminary

hearing on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001 (the

*"Interim Order"*), which Interim Order was entered on June 19, 2019, authorizing the Borrowers

to borrow from the DIP Lender and the DIP Guarantors to guarantee such borrowings, under the

Post-Petition Financing up to an aggregate of $12 million at any time outstanding on an interim

basis upon entry of the Interim Order, plus accrued interest on the aggregate principal amount, upon the terms and conditions set forth in the Interim Order, and (c) after the Final Hearing held on July 23, 2019, authorizing upon entry of this Final Order on a final basis the Post-Petition Financing in the total aggregate amount of $15 million at any time outstanding, inclusive of the $12 million available upon entry of the Interim Order, together with all other rights and remedies requested in the Motion.

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Final Hearing (the *"Notice"*) was served by the Debtors in accordance with Bankruptcy Rule 4001(c) and the Local Rules on (i) the DIP Lender and its counsel, (ii) the Pre-Petition ABL Agent (as defined below) and its counsel, (iii) the Pre-Petition Term Agent (as defined below) and its counsel, (iv) counsel to the Pre-Petition Term Lenders (as defined below), (v) all other parties with liens of record on assets of the Debtors as of the Petition Date, (vi) the Office of the United States Trustee of the Eastern District of Kentucky (the *"U.S. Trustee"*), (vii) the Debtors' cash management banks, and (viii) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the *"Noticed Parties"*).

This Court having reviewed the Motion and any responses and objections thereto, the *Declaration of J. Mark Campbell in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the *"First Day Declaration"*), the other filings and pleadings made by the Debtors, the evidence and testimony presented at the Interim Hearing and the Final Hearing, and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

A.    On June 16, 2019 (the *"Petition Date"*), the Debtors filed voluntary petitions for relief with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in

possession of their property, and operating and managing their businesses, as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B. This Court has jurisdiction over the Cases and the Motion pursuant to 28 U.S.C. § 1334. Consideration of the Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (D), (K), (M) and (O), and the Debtors confirm their consent to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

C. Subject only to the rights of parties in interest that are specifically set forth in paragraph 25 below, which shall constitute findings of fact or orders of this Court with respect to the Debtors, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows:

(i) The DIP Lender is a lender under that certain ABL Credit and Guaranty Agreement dated as of July 10, 2013 (as amended as of September 4, 2014, October 31, 2014 and May 28, 2015) and as further amended and restated in full by Amendment No. 4 to ABL Credit and Guaranty Agreement and Amendment No. 1 to Pledge and Security Agreement, dated as of September 21, 2015, (as amended, modified and supplemented) (the *"Pre-Petition ABL Credit Agreement"*) among Cambrian Coal Corporation (now known as Cambrian Coal LLC), Beech Fork Processing, Inc. (now known as Beech Fork Processing, LLC), Eagle Coal Company, Inc. (now known as Eagle Coal Company, LLC) and Shelby Resources, LLC as Borrowers (the *"Pre-Petition Borrowers"*), certain subsidiaries of each Pre-Petition Borrower, as guarantors (the *"Pre-Petition Guarantors"*), certain lenders party thereto from time to time, Deutsche Bank Securities, Inc., as sole lead Arranger, and Deutsche Bank AG New York Branch (*"DBNY"*), as Administration Agent, Collateral Agent, Lender and Issuing Bank (collectively, the *"Pre-Petition*

*ABL Agent")* and all collateral and ancillary documents executed in connection therewith, including that certain ABL Pledge and Security Agreement dated as of July 10, 2014 (as amended and restated in full as of September 21, 2015) (the *"Pre-Petition ABL Pledge and Security Agreement"*) (collectively, the *"Pre-Petition ABL Loan Documents"*).  A true and correct copy of the Pre-Petition ABL Credit Agreement is attached as <u>Exhibit B</u> hereto and incorporated herein by reference.  Unless otherwise specified, all capitalized terms used but not defined herein shall have the meanings given in the Pre-Petition ABL Credit Agreement or the Pre-Petition Term Loan Credit Agreement (as defined below), as applicable.

(ii)   The DIP Lender, as Lenders under the Pre-Petition ABL Credit Agreement, loaned the Pre-Petition Borrowers $37,500,000.00 in principal amount, which was secured by a security interest in all assets of the Debtors, other than the Excluded Collateral (as defined in the Pre-Petition ABL Credit Agreement).  The DIP Lender has a first priority security interest in the ABL Loan Priority Collateral (as defined in the Intercreditor Agreement described in clause (ix) below) of the Debtors, which includes all the assets of Debtor PLM Holding Company LLC and all of its subsidiaries (other than the Excluded Collateral) (such assets of Debtor PLM Holding Company LLC and all of its subsidiaries, other than the Excluded Collateral, being referred to herein as the *"Pre-Petition TECO Collateral"*), and a second priority security interest in the Term Loan Priority Collateral (as defined in the Intercreditor Agreement) of the Debtors.

(iii)   DBNY, as Lender under the Pre-Petition ABL Credit Agreement, made loans to the Pre-Petition Borrowers under a $10,000,000 revolving line of credit, which was secured by a first priority security interest in the ABL Loan Priority Collateral (other than the Pre-Petition TECO Collateral) of the Debtors, a second priority security interest in the Term Loan Priority Collateral of the Debtors, and a third priority security interest in the Pre-Petition TECO Collateral of the Debtors.

4844-3317-0332.1
4833-9284-9565.1

(iv)  Pursuant to the Pre-Petition ABL Credit Agreement, the DIP Guarantors (with exception to Cambrian Holding Company, Inc.) among others, guaranteed (the *"Guaranty"*) all obligations of the Pre-Petition Borrowers due the DIP Lender and the Pre-Petition ABL Agent, under the Pre-Petition ABL Loan Documents, such that the Pre-Petition Guarantors have unconditionally guaranteed all of the Pre-Petition Borrowers' Pre-Petition ABL Obligations (as defined below) to the DIP Lender and the Pre-Petition ABL Agent.  The Pre-Petition Guarantors who are DIP Guarantors (1) acknowledge and confirm that the Guaranty continues in full force and effect notwithstanding any financing and financial accommodations extended by the DIP Lender and the Pre-Petition ABL Agent to the Borrowers pursuant to the terms of this Final Order and (2) extend the Guaranty to all financing and financial accommodations extended by the DIP Lender and the Pre-Petition ABL Agent to the Borrowers pursuant to the terms of the Interim Order and this Final Order.

(v)   In accordance with the terms of the Pre-Petition ABL Loan Documents, (a) the Borrowers are truly and justly indebted to the DIP Lender under the Pre-Petition ABL Credit Agreement, without defense, counterclaim or offset of any kind, and that as of the Petition Date the outstanding "Obligations" as defined in the Pre-Petition ABL Credit Agreement to the DIP Lender totaled no less than $45,698,362.87, plus pre-petition fees and expenses (the *"Pre-Petition RH Obligations"*), and (b) are truly and justly indebted to the Pre-Petition ABL Agent under the Pre-Petition ABL Credit Agreement, without defense, counterclaim or offset of any kind, and that as of the Petition Date the outstanding "Obligations" as defined in the Pre-Petition ABL Credit Agreement to the Pre-Petition ABL Agent totaled no less than the principal amount of $3,081,439.56 plus accrued and unpaid interest through June 16, 2019 of $267,831.97 with a per diem interest accrual of $780.91 (collectively with the outstanding principal amount, the *"Pre-Petition ABL Agent Obligations"* and together with the Pre-Petition RH Obligations, the *"Pre-*

*Petition ABL Obligations*"), each of (a) and (b) (unless otherwise noted) exclusive of all accrued and unpaid costs, expenses, and fees owed to the DIP Lender and the Pre-Petition ABL Agent pre-petition.  For purposes hereof, the principal balance of loans and advances of the DIP Lender under the Pre-Petition ABL Credit Agreement shall be referred to herein as the "*Pre-Petition RH ABL Loans*" and the principal balance of loans and advances of the Pre-Petition ABL Agent under the Pre-Petition ABL Credit Agreement shall be referred to herein as the "*Pre-Petition ABL Agent ABL Loans*" and, together, the "*Pre-Petition ABL Loans*").  The Debtors further acknowledge, agree and stipulate that (a) the Pre-Petition ABL Liens (as defined below) (1) are valid, binding, enforceable and perfected liens in the Pre-Petition Collateral (as defined below), (2) were granted to the DIP Lender and Pre-Petition ABL Agent pre-petition for fair consideration and reasonably equivalent value, (3) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (4) are subject and subordinate only to valid, perfected and unavoidable liens permitted under the applicable Pre-Petition ABL Loan Documents, but only to the extent that (x) such liens are permitted by the applicable Pre-Petition ABL Loan Documents to be senior to the applicable Pre-Petition ABL Liens (as defined below) and (y) such liens are actually senior to the applicable Pre-Petition ABL Liens (as defined below) under applicable law, and, further, (b)(1) all of the Pre-Petition ABL Obligations constitute legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Pre-Petition ABL Loan Documents, **(2) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Pre-Petition ABL Obligations exist, and (3) no portion of the Pre-Petition ABL Obligations or any payments made to or for the benefit of the DIP Lender and Pre-Petition ABL Agent pre-petition are subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim"**

- 7 -

**(as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.[2]**

(vi)    By reason of the Pre-Petition ABL Loan Documents, the Pre-Petition RH Obligations and Pre-Petition ABL Agent Obligations are secured by enforceable liens and security interests (the *"Pre-Petition ABL Liens"*) granted by the Debtors to the DIP Lender or the Pre-Petition ABL Agent, upon and in substantially all tangible and intangible assets and property of the Debtors, now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents, and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, securities (whether or not marketable), properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, bank accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds (provided, however, that to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event a lien only on the economic value of, proceeds of sale or other disposition of, and any other proceeds and products of such leasehold interests), real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, permits, franchise rights, capital stock and other equity interests of subsidiaries, tax and other refunds and proceeds of all tax credits, insurance or other proceeds, commercial tort claims that were set forth in Section 5.2 of the Pre-Petition ABL Pledge and Security Agreement as may have been supplemented from time to time, causes of action, and all other property of any kind or nature, real or personal, or mixed, and all proceeds, products, accessions, rents, products, substitutions, accessions, profits, replacements, and cash and non-cash

---

[2] The provisions highlighted and in **bold** vary from the requirements of Local Rule 4001-2(d).

proceeds of all of the foregoing, wherever located, other than the Excluded Collateral (the *"Pre-Petition Collateral"*).

(vii) Pursuant to that certain Term Credit and Guaranty Agreement dated as of July 10, 2013 (as amended, restated, supplemented or otherwise modified from time to time, including, without limitation, by that certain Waiver and Amendment dated as of September 3, 2014, that certain Amendment Agreement No. 1 dated as of October 31, 2014, that certain Amendment Agreement No. 2 dated as of November 12, 2014, that certain Amendment Agreement No. 3 dated as of December 19, 2014, that certain Amendment Agreement No. 4 dated as of March 18, 2015, that certain Amendment Agreement No. 5 dated as of May 22, 2015, that certain Amendment Agreement No. 6 to Term Credit and Guaranty Agreement and Amendment No. 1 to Pledge and Security Agreement dated as of September 21, 2015, that certain Amended and Restated Forbearance Agreement dated as of September 29, 2016, and that certain Second Amended and Restated Forbearance Agreement dated as of November 6, 2017, the "*Pre-Petition Term Loan Credit Agreement*" and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments, and amendments executed and delivered in connection therewith, the "*Pre-Petition Term Loan Documents*"), by and among the Pre-Petition Borrowers, as Borrowers, the Pre-Petition Guarantors, as Guarantors, the lenders party thereto from time to time (the "*Pre-Petition Term Lenders*"), and Deutsche Bank Trust Company Americas ("*DBTCA*"), as Administrative Agent and Collateral Agent (in such capacities, the *"Pre-Petition Term Agent"* and, together with the Pre-Petition Term Lenders, the "*Pre-Petition Term Loan Secured Parties*" and the Pre-Petition Term Loan Secured Parties, the Pre-Petition ABL Agent and the Lenders under the Pre-Petition ABL Credit Agreement, collectively, the "*Pre-Petition Secured Parties*") and the other parties from time to time party thereto, the Pre-Petition Term Lenders provided term loans to the Pre-Petition Borrowers (the "*Pre-Petition Term Loan Facility*"), which

- 9 -

Pre-Petition Term Loan Facility has been unconditionally guaranteed on a joint and several basis by each DIP Guarantor, with exception to Cambrian Holding Company, Inc.  A true and correct copy of the Pre-Petition Term Loan Credit Agreement is attached as Exhibit C hereto and incorporated herein by reference.

(viii) As of the Petition Date, the Pre-Petition Borrowers and the Pre-Petition Guarantors were justly and lawfully indebted and liable to the Pre-Petition Term Loan Secured Parties, without defense, counterclaim, or offset of any kind, in respect of loans pursuant to and in accordance with the terms of the Pre-Petition Term Loan Documents in the amount of not less than $77,881,491.61, consisting of $51,745,025.93 in principal and $26,136,465.68 in accrued and unpaid interest (including payment-in-kind interest) (such indebtedness together with fees, expenses, charges, indemnities, and other obligations incurred in connection therewith as provided therein constitutes the "*Pre-Petition Term Loan Obligations,*" and together with the Pre-Petition ABL Agent Obligations and the Pre-Petition RH Obligations, the "*Pre-Petition Obligations*").

(ix)  By reason of the Pre-Petition Term Loan Documents, the Pre-Petition Term Loan Obligations are secured by enforceable liens and security interests granted by the Debtors to the Pre-Petition Term Loan Secured Parties, upon and in the Pre-Petition Collateral.[3]

(x)  Effective July 23, 2019 (the *"Assignment Date"*), Alliance Prime Associates, Inc. (*"Alliance"*) took assignment of the Pre-Petition Term Loan Obligations and all rights of the Pre-Petition Term Lenders under the Pre-Petition Term Loan Documents.  On and after the Assignment Date, the use of the term "Pre-Petition Secured Lenders" herein shall refer to Alliance.

(xi)  As of the Petition Date, the Debtors, the Pre-Petition ABL Agent and DBTCA, in its capacity as Collateral Agent under the Pre-Petition Term Loan Documents (in such capacity,

---

[3] The Pre-Petition Term Loan Secured Parties assert that, the Pre-Petition Term Loan Obligations are also secured by security interests and liens on certain assets of certain non-Debtor entities.

the "*Term Loan Agent*") were party to that certain Amended and Restated Intercreditor Agreement dated as of September 21, 2015, by and between the Term Loan Agent and the Pre-Petition ABL Agent (as amended, restated, amended and restated, waived, supplemented, or otherwise modified prior to the date hereof, the *"Intercreditor Agreement"* and, together with the Pre-Petition ABL Loan Documents and the Pre-Petition Term Loan Documents, the "*Pre-Petition Loan Documents*"). The Intercreditor Agreement governs the respective rights, interests, obligations, priority and positions of the Term Loan Agent and the Pre-Petition ABL Agent with respect to the Pre-Petition Collateral. The Debtors have acknowledged and agreed to, and are bound by, the Intercreditor Agreement.

(xii) Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Pre-Petition Collateral (as defined above) existing on the Petition Date, and the proceeds of any of the foregoing, is the Pre-Petition ABL Agent's collateral, held on behalf of all Secured Parties under the Pre-Petition Loan Documents, and is cash collateral within the meaning of Bankruptcy Code section 363(a) (the *"Cash Collateral"*).

(xiii) The acknowledgment by Debtors of the Pre-Petition Obligations and the rights, priorities and protections granted to the DIP Lender and the Pre-Petition Secured Parties pursuant to the Pre-Petition Loan Documents shall be deemed a timely filed proof of claim on behalf of the DIP Lender and the applicable Pre-Petition Secured Party in these Cases and the DIP Lender and the Pre-Petition Secured Parties shall not be required to file any additional proofs of claim with respect to the Pre-Petition Obligations; provided, however, that the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Agent shall provide, upon reasonable request, an accounting and reconciliation of the applicable Pre-Petition Obligations.

4844-3317-0332.1
4833-9284-9565.1

D.      As set forth in the First Day Declaration, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the Post-Petition Financing and the use of the Cash Collateral.  The Debtors urgently require financing and access to the Cash Collateral for (a) general working capital purposes for the Borrowers and their wholly owned subsidiaries consistent with the Approved Budget (as defined below); (b) paying fees, costs and expenses of the Debtors' and the Committee's (as defined below) professionals; and (c) paying the fees, costs and expenses of the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Loan Secured Parties to the extent required under this Final Order. In addition, the Debtors' critical need for financing is immediate.  The Debtors require access to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations to preserve and maintain the going concern values of the Debtors.  The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Cases without the Post-Petition Financing and authorized use of Cash Collateral.  In the absence of the Post-Petition Financing and such use of the Cash Collateral, the pursuit of the restructuring of the Debtors' operations would not be possible and serious and irreparable harm to the Debtors and their estates would occur.

E.      As set forth in the First Day Declaration, given the Debtors' current financial condition and capital structure, the Debtors are unable to obtain sufficient unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense.  Financing on a post-petition basis is not otherwise available without the Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below, and securing such indebtedness and obligations with the security interests in and the first liens upon the property

- 12 -

described below upon the consent of the DIP Lender and the Pre-Petition ABL Agent to the priming of their prepetition liens and security interests pursuant to Bankruptcy Code § 364(d) and the terms of this Final Order.

F.    Based on the record presented to this Court by the Debtors, it appears (and the Debtors, the DIP Lender and the Pre-Petition ABL Agent have stipulated) that the Post-Petition Financing and use of Cash Collateral have been negotiated in good faith and at arm's-length between the parties, and any credit extended and loans made to the Borrowers and guaranteed by the DIP Guarantors (and Cash Collateral used by the same) pursuant to the Interim Order and this Final Order shall be deemed to have been extended, issued or made or used, as the case may be, in good faith as required by, and within the meaning of, Bankruptcy Code § 364(e).

G.    Based on the record before this Court, it appears (and the Debtors, the DIP Lender and the Pre-Petition ABL Agent have stipulated) that the terms of the Interim Order and this Final Order, including, without limitation, the terms of the Post-Petition Financing and use of Cash Collateral, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

H.    The Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(B).  The permission granted herein to use Cash Collateral and enter into the Post-Petition Financing and obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Final Order is in the best interests of the Debtors' respective estates and creditors as its immediate entry will, among other things, permit the Debtors to continue to operate as a going concern and effectuate a successful sale process of the Debtors' assets.

4844-3317-0332.1
4833-9284-9565.1

I.    The Lenders under the Pre-Petition ABL Credit Agreement have instructed and directed the Pre-Petition ABL Agent to consent to (or otherwise not object to) the use of Cash Collateral as provided in this Final Order.

J.    On June 26, 2019, the U.S. Trustee appointed an Official Committee of Unsecured Creditors in the Cases (the "*Committee*").

Based upon the foregoing findings, stipulations, and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.    *Motion Granted and Notice.*  The Motion is granted on a final basis consistent with the terms of this Final Order.  Any objections to the Motion with respect to entry of this Final Order that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled.  Proper, timely, adequate and sufficient notice of the Motion and the proposed Final Order and the Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

2.    *Authorization.*  The Debtors are expressly authorized and empowered to (i) borrow money (in the case of the Borrowers) and guarantee such borrowings (in the case of the DIP Guarantors), use Cash Collateral, and perform their obligations pursuant to the provisions of this Final Order and (ii) enter into such agreements, instruments and documents to obtain the Post-Petition Financing (collectively, the *"DIP Loan Documents"*), which are attached hereto as Exhibit D hereto, and as may be necessary or required to evidence their obligations to the DIP Lender, to consummate the terms and provisions of the Motion and this Final Order and to evidence perfection of the liens and security interests to be given to the DIP Lender pursuant hereto and thereto; *provided* that such DIP Loan Documents are consistent with this Final Order.  All post-petition loans and all other indebtedness and obligations incurred on or after the Petition Date

- 14 -

by the Debtors to the DIP Lender pursuant to the Interim Order and this Final Order, and the DIP Loan Documents (including principal, accrued and unpaid interest, and costs and expenses) are subsequently referred to herein as the *"DIP Obligations,"* and, together with the Pre-Petition Obligations, as the *"Obligations."*

3.     *Borrowings; Use of Cash Collateral.*  Subject to the terms and conditions of this Final Order and the DIP Loan Documents, (a) the DIP Lender (including in their capacities as Lenders under the Pre-Petition ABL Credit Agreement) and Pre-Petition ABL Agent and the Pre-Petition Term Lenders hereby consent to the Debtors' limited use of the Cash Collateral in accordance with the terms hereof and (b) the DIP Lender will make post-petition loans to the Borrowers (which post-petition loans are to be guaranteed by the DIP Guarantors), in each case in an aggregate weekly amount not to exceed the weekly amount specified in the Approved Budget (as defined below) for the applicable weekly period, and not to exceed in the aggregate with all DIP Obligations the Commitment (with availability thereunder limited to $12 million under the Interim Order, and an additional $3 million upon entry of this Final Order).  The Cash Collateral and the proceeds of any such post-petition loans shall be used to fund the budgeted expenditures set forth in the Approved Budget in accordance with the provisions of paragraph 15 hereof.

4.     *Existing Events of Default.*  Nothing herein or in any of the DIP Loan Documents shall constitute or be deemed to constitute a waiver by the DIP Lender (including in their capacities as Lenders under the Pre-Petition ABL Credit Agreement), the Pre-Petition ABL Agent or the Pre-Petition Term Loan Secured Parties of any future Events of Default (as defined in the Pre-Petition ABL Credit Agreement or the Pre-Petition Term Loan Credit Agreement, as applicable) (including, without limitation, the Events of Default arising from the commencement of these Cases).  Without prejudice to, or waiver of, the DIP Lender's and Pre-Petition ABL Agent's rights and remedies against any Debtor in respect of any Events of Default other than the Existing

4844-3317-0332.1
4833-9284-9565.1

Defaults (as defined below), the DIP Lender (including in their capacities as Lenders under the Pre-Petition ABL Credit Agreement) and the Pre-Petition ABL Agent also agree to forbear from foreclosing their liens on any DIP Collateral (as defined below) or otherwise taking enforcement action against any Debtor based solely on any Event of Default (as defined herein or in the Pre-Petition ABL Credit Agreement, as applicable) which occurred prior to the date hereof (including any defaults under the Interim Order or the filing of the Chapter 11 petitions and other defaults existing at the time of the filing or arising as a result of such filing that are stayed pursuant thereto) (collectively, the *"Existing Defaults"*); *provided that*, (a) subject to the provisions of paragraph 11 hereof, such forbearance shall terminate upon the earlier of (i) the occurrence of any Post-Petition Default (as defined below) after the date hereof or (ii) the Post-Petition Termination Date (as such term is defined in the DIP Loan Documents), and (b) except as otherwise expressly set forth herein, the automatic stay shall continue to apply with respect to all assets of the Debtors' estates.

5.    *Interest, Fees, Costs and Expenses.*  All post-petition loans shall bear interest at the rate per annum equal to 12% per annum (half of which shall be payable-in-kind and half of which shall be payable in cash), applied to the outstanding amount of the Post-Petition Financing and measured on a 360 day year, *provided* that, immediately upon the occurrence and during the continuation of any Event of Default (as defined in the DIP Loan Agreement), at the election of the DIP Lender, such interest shall be increased by an additional 2% (*"Default Interest"*).  For the avoidance of doubt, Default Interest shall begin accruing upon the occurrence of an Event of Default, regardless of whether or not the DIP Lender has provided any other party with notice of such Event of Default.  Interest shall be payable monthly in arrears on the last day of each month. On a monthly basis, the DIP Lender shall be entitled to recover or be reimbursed for (a) all reasonable and documented out-of-pocket costs and expenses of the DIP Lender (including, but not limited to, the documented fees and expenses of Chapman and Cutler LLP and Stites &

- 16 -

Harbison PLLC) associated with the preparation, execution, delivery and administration of the DIP

Loan Documents and any amendments or waivers with respect thereto, (b) all reasonable and

documented out-of-pocket costs and expenses of the DIP Lender (including the documented fees

and expenses of appropriate counsel to the DIP Lender, including, but not limited to, Chapman

and Cutler LLP and Stites & Harbison PLLC) in connection with the enforcement of the DIP Loan

Documents, (c) all out-of-pocket transaction expenses incurred in connection with the Post-

Petition Financing and (d) all reasonable and documented fees and expenses, including but not

limited to attorney and professional fees and expenses, in connection with the Cases.  On a monthly

basis, the Pre-Petition ABL Agent shall be entitled to recover or be reimbursed for all reasonable

and documented out-of-pocket costs and expenses of the Pre-Petition ABL Agent (including, but

not limited to Latham and Watkins LLP and Stites & Harbison, PLLC), including audit expenses,

plus any additional documented out-of-pocket costs and expenses, and including reasonable

consultants', attorneys' and paralegals' fees, costs and expenses incurred in connection with the

"Obligations" (as defined in the Pre-Petition ABL Credit Agreement), the DIP Loan Documents

and the Cases to the extent provided in the Pre-Petition ABL Credit Agreement; *provided*,

*however*, that such payments to the Pre-Petition ABL Agent related to the Pre-Petition Obligations

(and not to the enforcement of its rights for the use of its cash collateral as set forth herein) are

subject to (i) the rights of a party-in-interest under paragraph 25 hereof, and (ii) without waiver of

any party-in-interest's ability to seek to recharacterize as a payment of the prinicipal amount of the

Pre-Petition ABL Loans if such loans are determined to be undersecured under § 506(a) of the

Bankruptcy Code as of the Petition Date, subject to all defenses, which are hereby reserved.  The

Debtors shall pay the DIP Lender's and the Pre-Petition ABL Agent's above-referenced

professional fees and expenses (including, but not limited to Chapman and Cutler LLP, Latham

and Watkins LLP, and Stites & Harbison PLLC) within seven (7) calendar days (if no written

objection is received within such seven (7) calendar day period) after  the DIP Lender and the Pre-Petition ABL Agent have delivered, as applicable, a reasonably detailed invoice to the Debtors describing such fees and expenses; *provided, however*, that any such invoice may be redacted to protect privileged, confidential or proprietary information, with a copy of such invoice being simultaneously sent to the U.S. Trustee and the Committee.  Written objections to payment of such fees and expenses must contain a specific basis for the objection and quantification of the undisputed amount of the fees and expenses invoiced; failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice.  None of  the DIP Lender's or Pre-Petition ABL Agent's fees and expenses shall be subject to Court approval (absent a timely submitted objection to such fees and expenses) --  or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court.  In consideration for providing the Post-Petition Financing, the DIP Lender will be entitled to receive, collectively, an upfront commitment fee in the amount of 2.5% of the DIP Lender's total commitment (one-half of which shall accrue and be paid upon exit), and an exit fee upon the repayment or termination of the Post-Petition Financing (including on the Maturity Date, as defined in the DIP Loan Documents) in the amount of 0.75% of the total amount loaned by the DIP Lender.  The Debtors shall additionally pay the DIP Lender an agency fee of $45,000.00, which shall be fully earned and payable on the date on which the first loan is made under the Post-Petition Financing.

6.      *Termination of Post-Petition Credit.*    The DIP Lender's willingness to make loans hereunder and the Pre-Petition ABL Agent's consent to the Debtors' use of Cash Collateral shall immediately and automatically terminate (except as the DIP Lender with respect to the Post-Petition Financing and the Pre-Petition ABL Agent with respect to the Cash Collateral may

otherwise agree in writing in its sole discretion), and all DIP Obligations shall be immediately due and payable in cash (except as the DIP Lender may otherwise agree in writing in its sole discretion) upon the earliest to occur of the Post-Petition Termination Date or any of the following:

    i.    the date of final indefeasible payment and satisfaction in full in cash of the Obligations;

    ii.    the effective date of any confirmed plan of reorganization or liquidation in any or all of the Cases;

    iii.    the consummation of the sale or other disposition of all or substantially all of the assets of the Debtors;

    iv.    any Borrower fails to pay any principal or interest on the DIP Obligations or any fee or other amount due with respect to the Post-Petition Financing as and when the same becomes due, and such failure shall not have been remedied within two (2) business days after such due date;

    v.    any representation or warranty made by any Debtors with respect to the Post-Petition Financing or in any statement or certificate given by any Debtors in writing pursuant to the Post-Petition Financing or in connection with any DIP Loan Document shall be false in any material respect on the date as of which made;

    vi.    any Debtor shall breach or violate any term, covenant or agreement contained in the DIP Loan Documents or this Final Order (including, but not limited to, the Debtors' failure to adhere to the Approved Budget as set forth in paragraph 15 of this Final Order or violation of the covenants set forth in paragraph 16 of this Final Order);

    vii.    the dismissal of any Debtor's Case or the conversion of the case of any Debtor that is an operating business to a case under Chapter 7 of the Bankruptcy Code;

4844-3317-0332.1
4833-9284-9565.1

viii.    a trustee or an examiner with enlarged powers (beyond those set forth in § 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor is appointed in any of the Cases without the prior written consent of the DIP Lender (which consent may be withheld in its sole discretion), or any Debtor applies for, consents to, or acquiesces in, any such appointment without the prior written consent of the DIP Lender (which consent may be withheld in its sole discretion);

ix.    this Final Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the DIP Lender and the Pre-Petition ABL Agent (which consent may be withheld in its sole discretion);

x.    the Court or any other court enters an order or judgment in any of the Cases modifying, limiting, subordinating or avoiding the priority of any prepetition obligations or the perfection, priority or validity of the Pre-Petition ABL Agent's prepetition liens or the DIP Lender's postpetition liens on any collateral or imposing, surcharging or assessing against the Pre-Petition ABL Agent, the DIP Lender or their claims or collateral any costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise, other than as provided in this Final Order;

xi.    except as otherwise provided herein, any Debtor, or any entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Cases, files any application for approval or allowance of, or any order is entered approving or allowing, any administrative expense claim in any of the Cases, having any priority over, or being pari passu with, the superpriority claims of the DIP Lender;

4844-3317-0332.1
4833-9284-9565.1

xii.   any motion or application is filed by or on behalf of any Debtor in any of the Cases seeking the entry of an order, or an order is entered in any of the Cases, approving any subsequent debtor-in-possession facility for borrowed money or other extensions of credit unless such subsequent facility and such order expressly provide for the indefeasible payment and complete satisfaction in full in cash to the DIP Lender of all obligations prior to, or concurrently with, any initial borrowings or other extensions of credit under such subsequent facility or has been consented to, in writing, by the DIP Lender;

xiii.   the Debtors fail to timely achieve any of the milestones set forth in this Final Order, including with respect to a sale under Section 363 of the Bankruptcy Code, unless consented to in writing by the DIP Lenders in their sole discretion and, for the avoidance of doubt, entry of a sale order approving a sale under Section 363 of the Bankruptcy Code must occur on or before September 19, 2019, unless a later date is consented to in writing by the DIP Lender in its sole discretion;

xiv.   a plan of reorganization or liquidation is proposed which does not provide for termination of the Commitment and payment in full of the DIP Obligations in cash on the effective date of such plan, if such termination and payment in full has not already occurred;

xv.   except as otherwise provided herein, any other superpriority administrative expense claim or lien senior to or *pari passu* with the DIP Loan Agreement obligations, or the liens granted to secure the DIP Loan Agreement obligations, shall be granted, approved, imposed, or otherwise created;

xvi.   any of the Debtors seeks to obtain additional financing under section 364(c) or 364(d) of the Bankruptcy Code or to grant any lien other than liens permitted under

- 21 -

the Post-Petition Financing and financing orders without the prior written consent of the DIP Lender and Pre-Petition ABL Agent;

xvii. other than pursuant to paragraph 25 below, any Debtor or any representative of any Debtor's estate files any action challenging the validity, perfection, priority, extent, or enforceability of the loan documents for the Post-Petition Financing or the liens and claims granted thereunder or with respect to the Pre-Petition ABL Credit Agreement;

xviii. other than pursuant to paragraph 25 below, any Debtor, or any entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Cases, commences any action against the Pre-Petition ABL Agent or any lender with respect to the Pre-Petition ABL Loan Documents, including, without limitation, any action to avoid, modify, dispute, challenge, or subordinate any of the prepetition obligations or any prepetition liens in favor of the Pre-Petition ABL Agent or DIP Lender, or entry of an order in any action by any other party granting such relief;

xix. the entry of an order dismissing any of the Cases that does not provide for the termination of the Commitment and payment in full of the DIP Obligations and all related obligations in cash prior to dismissal;

xx. any Pre-Petition Collateral or DIP Collateral becoming subject to surcharge or marshaling;

xxi. the entry of an order of the Court granting relief from the automatic stay with respect to any Pre-Petition Collateral or DIP Collateral or any other assets of any Debtor (other than at the request of the DIP Lender) that have an aggregate value

- 22 -

equal to or exceeding $50,000, provided that the value of the assets subject to all such orders, in the aggregate, may not exceed $150,000;

xxii.   any material contract or unexpired leases of a Debtor is rejected or otherwise terminated (other than in accordance with its terms) or any property of the Debtors having an aggregate value equal to or exceeding $50,000 is sold outside the ordinary course of business, in each instance, without the express written consent of the DIP Lender, provided that all such rejected material leases, unexpired leases, or such property, in the aggregate, do not exceed an aggregate value of $150,000; or

xxiii.   any other Event of Default, as defined in the DIP Loan Documents;

(individually, a *"Post-Petition Default"* and collectively, the *"Post-Petition Defaults"*).  The DIP Lender shall use commercially reasonable efforts to promptly provide notice to the Debtors and the Committee should it assert that a Post-Petition Default has occurred.  For the avoidance of doubt, the DIP Lender specifically reserves its rights and does not waive any Post-Petition Default that may occur regardless of if and/or when the DIP Lender provides notice of such Post-Petition Default.

   7.   *Security for Indebtedness.*

   (a)   Subject to the Carve-Out (defined below), all DIP Obligations to the DIP Lender, including, without limitation, all principal, accrued interest, costs, fees and expenses, shall:

   (i)   pursuant to Bankruptcy Code section 364(c)(1), be joint and several claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 (the *"Superpriority Claims"*) which, subject to paragraph 29 hereof,

- 23 -

Superpriority Claims shall be payable from and have recourse to all prepetition and post-petition property of the Debtors and all proceeds thereof except for any claim or cause of action of the Debtors' estates under sections 502(d), 544, 545, 547, 548, 550 and 551 of the Bankruptcy Code or any proceeds thereof including, without limitation, any property against which a lien is avoided under section 544(a) of the Bankruptcy Code (such claims and causes of action and proceeds thereof, collectively, the "*Avoidance Actions*"); the Superpriority Claims shall, for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under Section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors, subject to the limitations provided herein;

(ii)     pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first priority lien on all now owned or hereafter acquired assets and property of the Debtors and proceeds thereof (including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and equipment of the Debtors) that are not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, but specifically excluding the Avoidance Actions (collectively, the "*First Lien Collateral*");

- 24 -

(iii)    pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected first priority lien on all property of the Debtors classified as (a) "Term Loan Priority Collateral" (as defined in the Intercreditor Agreement) and (b) "ABL Loan Priority Collateral" (as defined in the Intercreditor Agreement) that is not "TECO PP&E Collateral" (as defined in the Intercreditor Agreement), but specifically excluding in each case the Avoidance Actions or any proceeds thereof, junior only to (y) with respect to the "Term Loan Priority Collateral" (as defined in the Intercreditor Agreement), the liens of the Term Loan Agent and/or the other Pre-Petition Term Loan Secured Parties securing the "Term Loan Debt" as defined in the Intercreditor Agreement and (z) with respect to the ABL Loan Priority Collateral that is not TECO PP&E Collateral, the liens of the Pre-Petition ABL Agent securing the Pre-Petition ABL Agent Obligations (each of (a) and (b) that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code), other than as set forth below (collectively, the "*Second Lien Collateral*"));

(iv)    pursuant to Bankruptcy Code section 364(d)(1), be secured by a first-priority, senior priming perfected lien on, and security interest in, all assets (other than Avoidance Actions or proceeds thereof) that (a) are subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement, and (b) in each case, constitute either (i) TECO PP&E Collateral, or (ii) a percentage of the ABL Loan Priority Collateral that is not TECO PP&E Collateral equal to the Pre-Petition RH ABL Loans existing on the Petition Date divided by the amount

- 25 -

equal to the sum of the Pre-Petition RH ABL Loans and Pre-Petition ABL Agent ABL Loans existing on the Petition Date (the "*Primed Collateral*"); the DIP Lender has consented to the priming of its Pre-Petition ABL Liens on the TECO PP&E Collateral in accordance with the terms of this Final Order.

(b)      Subject to the Carve-Out (defined below), and notwithstanding any agreement otherwise in the Intercreditor Agreement, and in addition to those liens granted herein including with respect to those liens granted in Section 7(a) herein, any amounts loaned by the DIP Lender authorized hereunder and exceeding $12,000,000.00 shall be additionally secured pursuant to Bankruptcy Code section 364(d)(1), by a first-priority, senior priming perfected lien on, and security interest in, all property of the Debtors classified as (a) "Term Loan Priority Collateral" (as defined in the Intercreditor Agreement) (the *"Term Loan Priority Primed Collateral,"* and together with the First Lien Collateral, the Second Lien Collateral, and the Primed Collateral, the "*DIP Collateral*").  The Term Loan Agent and the Term Loan Secured Parties have consented to the priming of its "Term Loan Priority Collateral" (as defined in the Intercreditor Agreement) in accordance with the terms of this Final Order.  For the avoidance of doubt, any proceeds of the "Term Loan Priority Collateral" (as defined in the Intercreditor Agreement) shall first be used to pay any amounts loaned by the DIP Lender authorized by this Final Order that exceed $12,000,000.00, and interest and fees thereon, before such proceeds are distributed to any other party or utilized by the Debtors.

(c)      Notwithstanding any statement or language in this Final Order or the DIP Loan Documents to the contrary, nothing in this Final Order shall constitute a finding or conclusion that the DIP Lender is being granted (or is requesting) a lien, claim or security interest in any of the Debtors' currently owned or after acquired property that takes priority over any prior validly perfected liens, claims, encumbrances and security interests held by any individual or entity other

- 26 -

than the DIP Lender, with exception to the priming lien on the Term Loan Priority Primed Collateral, as set forth in Section 7(b) herein.  Additionally, the First Lien Collateral shall not include liens on any lease, leasehold estate, license, contract or agreement or other property right or interest, to which any Debtor is a party, or any of such relevant Debtor's rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in: (x) the abandonment, invalidation, unenforceability or other impairment of any right, title or interest of any Debtor therein, or (y) a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract or agreement or other property right pursuant to any provision thereof, unless, in the case of clauses (x) and (y), the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code (such leases, licenses, contracts or agreements or other property rights, collectively, the "*Specified Contracts*"); provided that, the foregoing shall not preclude any counterparty to a Specified Contract from an opportunity to be heard in this Court on notice with respect to whether applicable non-bankruptcy law or the Bankruptcy Code renders such provision ineffective or the enforceability of such provision. Notwithstanding the foregoing, in all events the First Lien Collateral shall include and the DIP Obligations shall be payable from, all proceeds, products, offspring or profits from all sales, transfers, dispositions or monetization of any and all Specified Contracts.

(d)      Debtors shall take all actions to establish and maintain the DIP Lender as a lender's loss payee and an additional named insured or similar status on all current or subsequently procured insurance coverages issued in favor of any Debtor within twenty (20) calendar days (or such longer period as may be agreed by the DIP Lender) of entry of the Interim Order, which shall be in form, scope and substance satisfactory to the DIP Lender.

(e)      The DIP Lender and Pre-Petition ABL Agent, at its respective option may release at any time from its liens and security interests any assets determined by the DIP Lender or Pre-

Petition ABL Agent to have a risk of environmental liabilities which the DIP Lender and Pre-Petition ABL Agent in its respective sole discretion deems unacceptable.

(f)      All Cash Collateral subject to the liens granted by the Debtors shall be deemed to be collateral for the Pre-Petition Obligations of the Debtors, as well as obligations and indebtedness of the Debtors hereunder.

8.      *Adequate Protection.*

(a)      Subject to the right of a party in interest under paragraph 25 hereof, as adequate protection under §§ 361, 363(e) and 364(d) of the Bankruptcy Code for the use of the Pre-Petition Collateral, including the Pre-Petition TECO Collateral and the Cash Collateral, the DIP Lender and Pre-Petition ABL Agent shall be granted the following as adequate protection of their interest in the Pre-Petition Collateral, including the Pre-Petition TECO Collateral and Cash Collateral, in an amount equal to the aggregate actual diminution in the value of their interests in such collateral after the Petition Date:

(i)      effective and perfected as of the date of entry of the Interim Order, and as reaffirmed effective and perfected pursuant to this Final Order, and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, (A) a valid, perfected replacement security interest in and lien on the collateral to which they hold priority valid, perfected and unavoidable liens existing as of the Petition Date or thereafter acquired and any proceeds thereof, and (B) a valid, perfected security interest in and lien on all of the DIP Collateral and the proceeds thereof, which shall for the avoidance of doubt exclude the Avoidance Actions (collectively, the "*ABL Adequate Protection Liens*"), subject and subordinate only to (x) the Carve-Out, (y) the liens securing the Post-Petition Financing and (z) paragraph 7(b) of the Interim Order and this Final Order;

- 28 -

(ii)    a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (collectively, the "*ABL Adequate Protection Claims*"), subject and subordinate only to (x) the Carve-Out and (y) the Superpriority Claims held by the DIP Lender under the Post-Petition Financing and *pari passu* with the Term Loan Adequate Protection Claims (as defined below).  Except for the Superpriority Claims held by the DIP Lender and the Pre-Petition Term Loan Secured Parties, no claims shall be permitted with priority *pari passu* with, or senior to, the ABL Adequate Protection Claims; provided, however, that the ABL Adequate Protection Claims may not be satisfied from the Avoidance Actions;

(iii)    current cash payments of all reasonable and documented fees and expenses payable to the DIP Lender, including, but not limited to attorney and professional fees and expenses, promptly following the 7th calendar day after the DIP Lender has provided statements of such expenses and other reasonable documented fees and expenses to the U.S. Trustee, lead counsel to the Debtors and lead counsel to the Committee, provided no objection has been submitted thereto;

(iv)    payment of fees and expenses of a financial advisor to the DIP Lender, subject to standard terms that such advisor shall have access to the books and records of the Debtors;

(v)    current cash payments of interest due on the Pre-Petition RH ABL Loans and Pre-Petition ABL Agent ABL Loans on a bi-weekly basis, without waiver of any party-in-interest's ability to seek to recharacterize such payments as payments of the prinicipal amount of the Pre-Petition ABL Loans if such loans are determined to be undersecured under § 506(a) of the Bankruptcy Code, subject to all defenses, which are hereby reserved; and

4844-3317-0332.1
4833-9284-9565.1

(vi)      current cash payments of all reasonable and documented fees and expenses payable to the Pre-Petition ABL Agent (whether incurred or accrued prior to or after the Petition Date), including, but not limited to attorney and professional fees and expenses, promptly following the 7th calendar day after the Pre-Petition ABL Agent has provided statements of such expenses and other reasonable documented fees and expenses to the U.S. Trustee, lead counsel to the Borrowers and lead counsel to the Committee, provided no objection has been filed thereto, without waiver of any party-in-interest's ability to seek to recharacterize such payments as payments of the prinicipal amount of the Pre-Petition ABL Loans if such loans are determined to be undersecured under § 506(a) of the Bankruptcy Code, subject to all defenses, which are hereby reserved.

(b)      Subject to the right of a party in interest to challenge the validity, extent or priority of the Pre-Petition Term Loan Obligations, as adequate protection under §§ 361, 363(e) and 364(d) of the Bankruptcy Code for the use of the Pre-Petition Collateral, including the Term Loan Priority Collateral, the Pre-Petition TECO Collateral and the Cash Collateral, the Pre-Petition Term Loan Secured Parties shall be granted the following as adequate protection of their interest in such Pre-Petition Collateral, in an amount equal to the aggregate actual diminution in the value of their interests in such collateral after the Petition Date:

(i)      effective and perfected as of the date of entry of the Interim Order, and as reaffirmed effective and perfected in this Final Order, and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, (A) a valid, perfected replacement security interest in and lien on the collateral to which they hold priority valid, perfected and unavoidable liens existing as of the Petition Date or thereafter acquired and any proceeds thereof and (B) a valid, perfected security interest in and lien on all of the DIP Collateral, which shall for the avoidance of

- 30 -

doubt exclude the Avoidance Actions (collectively, the "*Term Loan Adequate Protection Liens*" and, together with the ABL Adequate Protection Liens, the "*Adequate Protection Liens*"), in the case of this clause (B) subject and subordinate only to (w) the Carve-Out, (x) the liens securing the Post-Petition Financing, (y) the ABL Adequate Protection Liens in the Interim Order and this Final Order and (z) paragraph 7(b) of this Final Order;

(ii) a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (collectively, the "*Term Adequate Protection Claims*" and, together with the ABL Adequate Protection Claims, the "*Adequate Protection Claims*"), subject and subordinate only to (x) the Carve-Out, (y) the Superpriority Claims held by the DIP Lender under the Post-Petition Financing and (z) paragraph 7(b) of the Interim Order and this Final Order and *pari passu* with the ABL Adequate Protection Claims. Except for the Superpriority Claims held by the DIP Lender and the ABL Adequate Protection Claims held by the DIP Lender and Pre-Petition ABL Agent, no claims shall be permitted with priority *pari passu* with, or senior to, the Term Adequate Protection Claims; provided, however, that the Term Adequate Protection Claims may not be satisfied from the proceeds of the Avoidance Actions;

(iii) the Debtors shall promptly provide the Pre-Petition Term Agent, its counsel and counsel to the Pre-Petition Term Lenders with financial and other reporting required to be provided to the DIP Lender or the Pre-Petition ABL Agent, including without limitation any reporting in connection with the Approved Budget, substantially in compliance with the reports and notices provided for in the DIP Loan Documents, this Final Order, in each case when and as required under DIP Loan Documents, as applicable;

(iv) the Pre-Petition Term Loan Secured Parties shall have full and prompt access to any information provided to the DIP Lender, the Pre-Petition ABL Agent or any

4844-3317-0332.1
4833-9284-9565.1

other party regarding any sale process conducted by the Debtors and consultation rights with respect to any such sale process, *provided* that the Pre-Petition Term Loan Secured Parties are not active participants as potential buyers in any such sale process, and shall, notwithstanding anything to the contrary herein, have consultation rights regarding any modifications to the Approved Budget and any milestones contained in this Final Order or the DIP Loan Documents; provided further that nothing herein shall prevent the Pre-Petition Term Loan Secured Parties from participating as a bidder in any sale process, including as a credit bidder with respect to its collateral pursuant to 11 U.S.C. § 363(k), subject to any objections to such credit bid;

(v)     payment of all reasonable and documented fees and expenses, including but not limited to an annual agency fee to the Pre-Petition Term Agent, and attorney and professional fees of the Pre-Petition Secured Parties incurred on or after the Petition Date in an amount not to exceed $100,000.00 per month, payable in accordance with the procedures set forth in paragraph 5 of this Final Order, without waiver of any party-in-interest's ability to seek to recharacterize such payments as payments of the principal amount of the Pre-Petition Term Loan Obligations if such loans are determined to be undersecured under § 506(a) of the Bankruptcy Code as of the Petition Date, subject to all defenses, which are hereby reserved; and

(vi)     cash adequate protection payments of $220,000.00 per month with respect to the Term Loan Priority Collateral.

Any payments to be made under this Subsection (b), shall be made to the Pre-Petition Term Agent for the benefit of the Pre-Petition Term Loan Secured Parties.

(c)     In addition to the foregoing, each of the DIP Lender and the Pre-Petition Secured Parties shall also be entitled to all of the rights accorded to it pursuant to § 507(b) of the Bankruptcy

- 32 -

Code, subject and subordinate only to (w) the Carve-Out, (x) the liens securing the Post-Petition Financing, (y) paragraph 8(a) and (b) of the Interim Order and this Final Order, and (z) paragraph 7(b) of the Interim Order and this Final Order.

9.    *Perfection of New Liens.*  All liens and security interests on or in the DIP Collateral granted to the DIP Lender, the Pre-Petition ABL Agent or, to the extent that valid and perfected liens in favor of the Pre-Petition Term Loan Secured Parties existed as of the Petition Date and are not subject to avoidance, the Pre-Petition Term Loan Secured Parties by the Interim Order, this Final Order and the DIP Loan Documents shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; *provided, however,* that notwithstanding the provisions of § 362 of the Bankruptcy Code, (i) the DIP Lender and/or the Pre-Petition ABL Agent may, at its sole option, file or record or request that the Debtors seek to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the expense of the Debtors, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as the DIP Lender and/or the Pre-Petition ABL Agent may reasonably request, provided however, that the failure of the Debtors to obtain a landlord or warehouse lien after attempting in good faith shall not be an event of default hereunder, and (ii) the DIP Lender and/or the Pre-Petition ABL Agent may require the Debtors to deliver to the DIP Lender and/or the Pre-Petition ABL Agent any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the Debtors are directed to cooperate and comply therewith.  If the DIP Lender and/or the Pre-Petition ABL Agent, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices,

4844-3317-0332.1
4833-9284-9565.1

financing statements, mortgages or other documents with respect to such security interests and liens, or if the DIP Lender, in accordance with the DIP Loan Documents, shall elect to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents, or taking possession, shall be deemed to have been filed or recorded, or taken, in these Cases, as of the entry of the Interim Order, and reaffirmed pursuant to this Final Order, but with the priorities as set forth herein.  The DIP Lender, the Pre-Petition ABL Agent and/or the Pre-Petition Term Agent may (in its discretion) but shall not be required to, file a certified copy of this Final Order in any filing or recording office in any county or other jurisdiction in which any Debtor has any real or personal property and such filing or recording shall constitute further evidence of perfection of such party's interests in the DIP Collateral.

10.    *Waiver.*  Subject to the rights of a party in interest other than the Debtors under paragraph 25 hereof, the Debtors and their estates hereby irrevocably waive, and are barred from asserting or exercising any right, (a) without  the DIP Lender's prior written consent (which may be withheld in its sole discretion), or (b) without prior indefeasible payment and satisfaction in full in cash of the DIP Obligations in this Final Order and the Obligations: (i) to grant or impose, or request that the Court grant or impose, under § 364 of the Bankruptcy Code or otherwise, liens on or security interests in any DIP Collateral, which are *pari passu* with or superior to  the DIP Lender's liens on and security interests in such DIP Collateral; (ii) to return goods pursuant to § 546(c) of the Bankruptcy Code to any creditor of any Debtor or to consent to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to § 553(b)(1) of the Bankruptcy Code or otherwise in an amount exceeding $25,000; or (iii) to modify or affect any of the rights of the DIP Lender under this Final Order or any DIP Loan Documents by any order entered in any of the Cases or any subsequent or superseding cases,

- 34 -

including, without limitation, any conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto (collectively, a *"Successor Case"*).

11.    *Modification of Automatic Stay; Other Remedies.*    (a) Except as set forth in subparagraph (b) of this paragraph, which governs any action by the DIP Lender under the Post-Petition Financing to foreclose on its liens on any DIP Collateral or to exercise any other default-related remedies (other than those specifically referenced in the next sentence), the automatic stay pursuant to § 362 of the Bankruptcy Code is hereby vacated as to the DIP Lender to permit it to perform in accordance with, and exercise, enjoy and enforce its rights, benefits, privileges and remedies pursuant to this Final Order and the other DIP Loan Documents without further application or motion to, or order from, the Court.  Except as set forth in subparagraph (b) of this paragraph, the DIP Lender and the Pre-Petition ABL Agent are hereby granted leave, among other things and as applicable, to (i) receive and apply payments  provided under this Final Order and of the DIP Obligations and collections on and proceeds of the DIP Collateral to the DIP Obligations in the manner specified in this Final Order and the DIP Loan Documents, (ii) file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral, (iii)  charge and collect any interest, fees, costs, and expenses and other amounts accruing at any time under the DIP Loan Documents or this Final Order as provided therein, (iv) to give any Debtor any notice provided for in any of the DIP Loan Documents or this Final Order, and (v) cease making loans or other extensions of credit and/or suspend or terminate any obligation of the DIP Lender to make loans or other extensions of credit in accordance with the terms of the DIP Loan Documents or this Final Order.

(b)     Upon the occurrence and during the continuation of any Post-Petition Default beyond the applicable cure period (if any), the DIP Lender shall have the remedies set forth in the DIP

Financing Documents, including, without limitation, the right to seek relief from the automatic stay under the Bankruptcy Code within four (4) business days on an expedited basis pursuant to a motion seeking such relief.  At such hearing, the Debtors and the Committee shall be limited to contesting whether the relevant Post-Petition Default has occurred and is continuing.  The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies hereunder with respect to the Debtors under this Final Order and with respect to the DIP Collateral.  The Debtors shall immediately provide notice to the DIP Lender (with a copy to counsel to the Committee) of the occurrence of any Post-Petition Default or any Post-Petition Termination Event.

(c)    Immediately upon the occurrence of any Post-Petition Termination Event (as described in the DIP Loan Documents), the Debtors' ability to use Cash Collateral and proceeds of the Post-Petition Financing shall terminate without further notice, and the DIP Lender shall have the right to seek relief from the automatic stay on an expedited basis as provided in paragraph 11(b) above; provided that the DIP Lender shall use commercially reasonable efforts to provide prompt notice to the Debtors and the Committee should it assert that a Post-Petition Termination Event has occurred.

12.    *Priority Claims.*  Subject to the Carve-Out described in paragraph 13 below, the DIP Obligations shall have the highest administrative priority under § 364(c)(l) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in any of the Cases or any Successor Case), and shall at all times be senior to the rights of any Debtor, any successor trustee or estate representative in any of the Cases or any Successor Cases.  Nothing in  this Final Order or the Approved Budget or any other budget

- 36 -

shall constitute the consent by the DIP Lender, the Pre-Petition ABL Agent or any other Pre-Petition Secured Party to the imposition of any costs or expense of administration or other charge, lien, assessment or claim (including, without limitation, any amounts set forth in the Approved Budget or any other budget) against the DIP Lender, the Pre-Petition ABL Agent, any other Pre-Petition Secured Party, any of their respective claims or their respective collateral under § 506(c) of the Bankruptcy Code or otherwise.  Effective upon entry of the Final Order, (i) no expenses of administration of the Cases or any Successor Case shall be charged against or recovered from the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of Section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Agent, and no consent shall be implied from any action, inaction or acquiescence by the DIP Lender, the Pre-Petition ABL Agent or the Pre-Petition Term Agent; and (ii) in no event shall the DIP Lender, the Pre-Petition ABL Agent or the Pre-Petition Term Loan Secured Parties be subject to the (a) "equities of the case" exception contained in Section 552(b) of the Bankruptcy Code or (b) other than as reserved under paragraph 29 hereof, the equitable doctrine of "marshaling," or any other similar doctrine with respect to their respective collateral; *provided*, *however*, that any waiver under section 506(c) of the Bankruptcy Code by the Debtors shall not apply to claims arising prior to the Post-Petition Termination Date from the furnishing of goods or services for which payment is provided for in accordance with the Approved Budgets.

13.   *Carve-Out.*  (a) The DIP Lender's and/or the Pre-Petition ABL Agent's liens on and security interests in all assets of the Debtors including, without limitation, the DIP Collateral and the Pre-Petition Collateral, and its administrative expense claims under Sections 364(c)(1) or 507(b) of the Bankruptcy Code, and any Adequate Protection Liens and Section 507(b) claims

- 37 -

granted pursuant to the Interim Order or this Final Order shall be subject only to: (i) statutory fees

payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); (ii) fees payable to the Clerk of

this Court; (iii) to the extent allowed at any time, whether by interim order, procedural order, or

otherwise, all unpaid fees and disbursements approved and allowed by this Court pursuant to

Sections 326, 328, 330, or 331 of the Bankruptcy Code incurred by persons or firms retained by

the Debtors under Sections 327, 328 or 363 of the Bankruptcy Code (collectively, the *"Debtor*

*Professionals"*), less the sum of all unused pre-petition retainers as of the Petition Date that are

not permitted by Order of the Bankruptcy Court to be retained by the Debtor Professionals after

the Petition Date; (iv) to the extent allowed at any time, whether by interim order, procedural order,

or otherwise, all unpaid fees and disbursements approved and allowed by this Court pursuant to

Sections 326, 328, 330, or 331 of the Bankruptcy Code incurred by the Committee or its

professionals pursuant to Sections 328 or 1103 of the Bankruptcy Code (the *"Committee*

*Professionals"* and, together with the Debtor Professionals, the *"Professional Persons"*), in the

amounts set forth in the Approved Budget; (v) from and after the occurrence of a Post-Petition

Termination Event, allowed fees and costs of Professional Persons in an aggregate amount not to

exceed $400,000 to the extent allowed at any time, whether by interim order, procedural order, or

otherwise; and (vi) all reasonable and documented fees and expenses incurred by a trustee, if any,

appointed under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed

$75,000; and (vii) $1.3 million payable to Alliance or its designee from the Pre-Petition Collateral,

which amount shall be reduced on a dollar-for-dollar basis by payments from (x) the Debtors, or

(y) any other source, to Applachian Power Co. and Kentucky Power Co. on account of their pre-

petition claims (in an amount not to exceed $1.3 million) against the Debtors (the amounts set forth

in clauses (a)(i) through (a)(vii) collectively constituting the *"Carve-Out"*).

(b)    Notwithstanding anything to the contrary in this Final Order or the DIP Loan Documents, no proceeds of the Carve Out, the Obligations, Cash Collateral (including any pre-petition retainer funded by the DIP Lender pursuant to the Pre-Petition ABL Loan Documents), Pre-Petition Collateral or DIP Collateral may be used to pay any claims for services rendered by any of the Debtor Professionals, the Committee Professionals or any other person in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the liens and security interests of the DIP Lender and/or the Pre-Petition ABL Agent in the Pre-Petition Collateral or the DIP Collateral; or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the DIP Lender and/or the Pre-Petition ABL Agent of any of its rights and remedies under the Pre-Petition ABL Credit Agreement, the Pre-Petition ABL Loan Documents, this Final Order and/or the DIP Loan Documents or the DIP Lender's and/or the Pre-Petition ABL Agent's enforcement or realization upon any of the liens on or security interests in any Pre-Petition Collateral or DIP Collateral; *provided*, *however*, that the Committee Professionals may expend up to $75,000 for fees and expenses incurred in connection with the investigation of, but not litigation, objection or any challenge to, the stipulations and admissions of the Debtors with respect to each of the DIP Lender and the Pre-Petition ABL Agent contained in this Final Order.  Each of the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Loan Secured Parties shall retain its rights as a party in interest to object to any claims of any of the Debtor Professionals and the Committee Professionals.

14.    *Cash Collection Procedures.*  From and after the date of the entry of the Interim Order, and as reaffirmed pursuant to this Final Order, all collections and proceeds of any DIP

Collateral or services provided by any Debtor and all other cash or cash equivalents which shall at any time come into the possession or control of any Debtor, or to which any Debtor shall become entitled at any time, shall be deposited in the same bank accounts into which the collections and proceeds of the Pre-Petition Collateral were deposited under the Pre-Petition ABL Credit Agreement (or in such other accounts as are designated or, in the case of the Carve-Out, consented to by the DIP Lender from time to time), and such collections and proceeds upon such deposit shall be applied as provided in this Final Order and the Intercreditor Agreement.  Except as otherwise set forth herein, and subject to the rights of any party in interest under paragraph 25 hereof, all cash and cash equivalents of any Debtor currently in any account of any Debtor or otherwise in the possession or control of any Debtor constitutes proceeds of the Pre-Petition Collateral and shall only be utilized in conformance with an Approved Budget (as defined below). All financial institutions in which any lockboxes, blocked accounts or other accounts of any Debtor are located are hereby authorized and directed to comply with any request of the DIP Lender to turnover to the DIP Lender all funds therein without offset or deduction of any kind.

15.    *Budget; Use of Loan and Collateral Proceeds.*

(a)    Attached as <u>Exhibit E</u> hereto and incorporated herein by reference is a budget (which has been approved by the DIP Lender setting forth by line item all projected cash receipts and cash disbursements for the time period from the Petition Date through the week ending October 18, 2019 (*"Initial Approved Budget"*).    The Initial Approved Budget may be modified or supplemented from time to time by the Debtors, in consultation with the Committee, by additional budgets (covering any time period covered by a prior budget or covering additional time periods) (each such additional budget, a *"Supplemental Approved Budget"*) approved by the DIP Lender (i) in its reasonable discretion with respect to additional time periods and (ii) in its sole discretion with respect to any prior time periods covered by a prior budget.    The aggregate of all items

- 40 -

approved by the DIP Lender in the Initial Approved Budget and any and all Supplemental Approved Budgets shall constitute an *"Approved Budget."* As of the end of each calendar week starting with the week of the entry of this Order, (i) the unfavorable variance (if any) between (A) the Debtors' cash receipts for the 4-consecutive calendar week period then ended and (B) the forecasted cash receipts for the same 4-consecutive calendar week period then ended as set forth in the Initial Approved Budget for such period (herein, the *"Cash Receipts Variance"*), shall not exceed 15.0%, *provided* such Cash Receipts Variance shall be tested on a 1-week basis as of the end of the first week following the date of entry of this order and such variance shall not exceed 25%, and on a 2-week basis as of the end of the second week following the date of entry of this order, and such variance shall not exceed 20%, and shall be tested on a 3-week basis as of the end of the third week following the date of entry of this order and such variance shall not exceed 17.5%; and (ii) the unfavorable variance (if any) between (A) the aggregate amount of the Debtors' actual disbursements, on a cumulative basis, for "Total Operating Cash Disbursements" as defined in the Initial Approved Budget, for the most-recent 4-consecutive calendar week period then ended and (B) the aggregate amount of the DIP Credit Parties' forecasted disbursements, on a cumulative basis, for "Total Operating Cash Disbursements" in the Initial Approved Budget, for the same 4-consecutive calendar week period then ended shall not exceed 15.0% (the *"Disbursements Variance"*); *provided* such Disbursements Variance shall be tested on a 1-week basis as of the end of the first week following the date of entry of this order and such variance shall not exceed 25%, and on a 2-week basis as of the end of the second week following the date of entry of this order, and such variance shall not exceed 20%, and shall be tested on a 3-week basis as of the end of the third week following the date of entry of this order and such variance shall not exceed 17.5%.  The Debtors shall provide the DIP Lender and the Pre-Petition ABL Agent with variance reports (in substantially the same format as the Approved Budget) showing actual cash receipts,

4844-3317-0332.1
4833-9284-9565.1

disbursements and net cash flow for the immediately preceding week, noting therein all variances from values set forth for such period(s) in the Approved Budget (and updates thereto), which variance reports will be provided on a weekly basis after the end of the fourth full calendar week following the filing of the Cases (by no later than the fourth business day of each week).

(b)     Except as otherwise provided in paragraph 17 hereof, the proceeds of any loans or other extensions of credit made by the DIP Lender to Debtors pursuant to the Interim Order, this Final Order, and the DIP Loan Documents, all proceeds of DIP Collateral, and all Cash Collateral, shall be used only as follows: (a) prior to the full repayment of all obligations due under the DIP Loan Documents, for the payment of the expenses set forth in any Approved Budget or within any variance from the Approved Budget that does not create an Event of Default (as defined in the DIP Loan Documents) (subject to the limitations and exceptions set forth in this ordering paragraph), including for the payment of wages of employees of Debtors (including payroll taxes on a post-petition basis), and any portion of the Obligations, and (b) on or after the Maturity Date, *first* for the payment of any administrative expenses of the Debtors' estates that were accrued but were not paid prior to the Maturity Date in amounts not to exceed the line items for such administrative expenses in the Approved Budget through the Maturity Date; and *second* for indefeasible payment in full in cash of the Obligations (in such order as determined by the DIP Lender in its sole discretion); provided that application of such payments to the Pre-Petition ABL Obligations shall be done in accordance with the Pre-Petition ABL Credit Agreement.  The DIP Lender and the Pre-Petition ABL Agent shall have no obligation with respect to the Debtors' use of the proceeds of the Post-Petition Financing, the DIP Collateral or Cash Collateral, and shall not be obligated to ensure or monitor the Debtors' compliance with any Approved Budget or to pay (directly or indirectly from its DIP Collateral) any expenses incurred or authorized to be incurred pursuant to the Approved Budget.  In addition, the DIP Lender and the Pre-Petition ABL Agent shall not be

- 42 -

obligated or be liable for the payment of any prepetition payroll taxes that may were due and owing as of the Petition Date to any governmental authority.  Funds borrowed under the Interim Order and this Final Order and Cash Collateral used under the Interim Order and this Final Order shall be used by the Debtors in accordance with this Final Order.  The DIP Lender's and/or the Pre-Petition ABL Agent consent to any Approved Budget shall not be construed as a consent to the use of any Cash Collateral or a commitment to continue to provide Post-Petition Financing after the occurrence of a Post-Petition Default or beyond the date of a Post-Petition Termination Event, regardless of whether the aggregate funds shown on the Approved Budget have been expended. To induce the Pre-Petition ABL Agent to permit the Debtors to use Cash Collateral and borrow additional funds, the Debtors have agreed, and this Court hereby orders, that as long as any of the Obligations are outstanding, the Debtors shall not seek, assert, argue for, encourage or support the use of Cash Collateral by the Debtors except as expressly permitted and consented to by the Pre-Petition ABL Agent pursuant to the terms of this Final Order.

16.    *Covenants.*  The Debtors shall timely comply with all of the covenants set forth in this Final Order and the DIP Loan Documents.

17.    *Application of Collateral Proceeds.*

(a)    The Debtors shall not have the right to direct the manner of application of any payments to the DIP Lender or the Pre-Petition Secured Parties or any other receipts by the DIP Lender or the Pre-Petition Secured Parties of proceeds of any of the Pre-Petition Collateral or DIP Collateral other than in the manner set forth in this paragraph and the Intercreditor Agreement.

(b)    Notwithstanding anything to the contrary herein, the proceeds from the sale of the TECO PP&E Collateral shall be applied (other than proceeds received in the ordinary course of business of the Debtors), or deemed applied, first to the repayment and satisfaction of the prepetition "RH Fifth Amendment Loan" (as defined in the Pre-Petition ABL Credit Agreement),

- 43 -

thereafter applied to repayment of the DIP Obligations, and finally applied to the Pre-Petition Obligations. Any outstanding prepetition RH Fifth Amendment Loans shall be deemed to be DIP Obligations arising under the Post-Petition Financing and shall be included in the $15 million Commitment under the Post-Petition Financing.

(c)     Notwithstanding anything in this Final Order to the contrary, the Pre-Petition ABL Credit Agreement, the Pre-Petition ABL Loan Documents and the Intercreditor Agreement shall continue to govern the manner and priority in which any payments made in respect of the Pre-Petition ABL Obligations are distributed or characterized as between or among the Pre-Petition ABL Agent and the lenders under the Pre-Petition ABL Credit Agreement, and nothing in this Order amends, alters or otherwise modifies the foregoing, including as provided by Section 9.2 of the Pledge and Security Agreement (as defined in the Pre-Petition ABL Credit Agreement) and Section 4 of the Intercreditor Agreement.

18.     *Non-Ordinary Course Dispositions.* Except as permitted by the DIP Loan Documents, no sale, lease or other disposition of Pre-Petition Collateral or DIP Collateral outside the ordinary course of business (including any auction or other similar sales) may be done without the prior written consent of the DIP Lender, the Pre-Petition ABL Agent, and the Pre-Petition Term Agent; provided, however, the Pre-Petition Secured Parties retain any rights they may have under the Intercreditor Agreement and other Pre-Petition Term Loan Documents to approve any sale, lease or other disposition of Pre-Petition Collateral or DIP Collateral outside the ordinary course of business, to the extent enforceable under the Bankruptcy Code.

19.     *Books and Records.* With prior notice to the Debtors, the Debtors shall permit the DIP Lender, Pre-Petition ABL Agent, the Pre-Petition Term Loan Secured Parties and any authorized representatives designated by the DIP Lender, the Pre-Petition ABL Agent or the Pre-Petition Term Loan Secured Parties (including, without limitation, its auditors, appraisers and

- 44 -

financial advisors) to visit and inspect any of the properties of any Debtor, including the Debtors'

respective financial and accounting records, and to make copies and take extracts therefrom, and

to discuss any Debtor's affairs, finances and business with such Debtor's officers and independent

public accountants, at such reasonable times during normal business hours and as often as may be

reasonably requested.  Without limiting the generality of the foregoing, the Debtors shall promptly

provide to the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Loan Secured

Parties, and each of their respective designated representatives, any information or data reasonably

requested to monitor the Debtors' compliance with the covenants in the Pre-Petition ABL Credit

Agreement or Pre-Petition Term Loan Credit Agreement, as applicable, and the provisions of the

DIP Loan Documents and this Final Order, status and progress of these Cases and to perform

appraisals or other valuation analyses of any property of any Debtor.

20.    *Reservation of Rights; No Waiver.*  The DIP Lender, the Pre-Petition ABL Agent and

the Pre-Petition Term Agent each do not waive, and expressly reserve, any and all claims, defenses,

rights and remedies each may have pursuant to any or all of the Pre-Petition Loan Documents, the

DIP Loan Documents, the Bankruptcy Code and/or other applicable law against any Debtor and

any officer, director, employee, agent or other representative of any Debtor.  In addition, the rights

and obligations of the Debtors and the rights, claims, liens, security interests and priorities of the

DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Loan Secured Parties arising

under the Interim Order and this Final Order are in addition to, and are not intended as a waiver or

substitution for, the rights, obligations, claims, liens, security interests and priorities granted by

the Debtors, in their pre-petition capacity, under the Pre-Petition Loan Documents.  Without

limiting the generality of the foregoing, the DIP Lender, the Pre-Petition ABL Agent and/or the

Pre-Petition Term Loan Secured Parties, as the case may be, may petition this Court for any such

additional protection it may reasonably require with respect to the Pre-Petition ABL Obligations,

the DIP Obligations, Pre-Petition Term Loan Obligations or otherwise, and nothing in this Final

Order constitutes a finding with respect to the adequacy of the protection of the DIP Lender's and

the Pre-Petition Secured Parties' interests in the Pre-Petition Collateral.

21.    *Order Binding on Successors.*  The provisions of the Interim Order and this Final

Order shall be binding upon and inure to the benefit of the DIP Lender, the Pre-Petition ABL

Agent, the Pre-Petition Term Loan Secured Parties, the Debtors, and their respective successors

and assigns (including any trustee or other estate representative appointed as a representative of

any Debtor's estate or of any estate in any Successor Case).  Except as otherwise explicitly set

forth in this Final Order, no third parties are intended to be or shall be deemed to be third party

beneficiaries of this Final Order or the DIP Loan Documents.

22.    *Effect of Dismissal, Conversion or Substantive Consolidation.*  If any of the Cases are

dismissed, converted, otherwise superseded or substantively consolidated, the DIP Lender's, the

Pre-Petition ABL Agent's and the Pre-Petition Term Loan Secured Parties' rights and remedies

under this Final Order and the DIP Loan Documents shall be and remain in full force and effect as

if such Case had not been dismissed, converted, superseded or substantively consolidated.

Furthermore, notwithstanding any such dismissal, conversion, supercission or substantive

consolidation, all of the terms and conditions of this Final Order, including, without limitation, the

liens and the priorities granted hereunder, shall remain in full force and effect.

23.    *Releases and Validation of Pre-Petition Obligations and Liens; Allowance of Secured*

*Claims.*  The releases, discharges, waivers and agreements set forth in Recital C and in this

paragraph will be subject to the right of the Committee and any other party in interest to object on

the terms and conditions set forth in paragraph 25 below.  Each of the Debtors and their estates,

hereby: (a) releases and discharges the DIP Lender, the Pre-Petition ABL Agent, Alliance and the

Pre-Petition Term Agent, together with, except for Alliance, each of their affiliates, agents,

attorneys, officers, directors and employees from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the Pre-Petition Loan Documents, any aspect of the pre-petition relationship between the DIP Lender, the Pre-Petition ABL Agent and any Debtor, or any other acts or omissions by the DIP Lender, the Pre-Petition ABL Agent or the Pre-Petition Term Agent in connection with any of the Pre-Petition Loan Documents or its pre-petition relationship with any Debtor; (b) waives any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability (under §§ 510, 544, 545, 547, 548, 550, 551, 552 or 553 of the Bankruptcy Code or otherwise) of the Pre-Petition Obligations and the security interests in and liens on the Pre-Petition Collateral in favor of the DIP Lender, the Pre-Petition ABL Agent, Alliance and the Pre-Petition Term Agent; and (c) agrees, without further Court order and without the need for the filing of any proof of claim, to the allowance of the pre-petition claims of the DIP Lender, the Pre-Petition ABL Agent, Alliance and the Pre-Petition Term Agent pursuant to §§ 502 and 506 of the Bankruptcy Code on account of the Pre-Petition Obligations as fully secured claims according to the the DIP Lender's, the Pre-Petition ABL Agent's and/or the Pre-Petition Term Agent's books and records, the principal amount of which is not less than approximately $45,698,362.87, $3,349,271.53, and $51,745,025.93, respectively, as of the Petition Date, plus accrued pre-petition and post-petition interest, fees, expenses and other amounts chargeable under the Pre-Petition ABL Loan Documents (in the case of the DIP Lender and the Pre-Petition ABL Agent) or Pre-Petition Term Loan Documents (in the case of the Pre-Petition Term Agent).

24.    *Relationship with Debtors.*  In making decisions to advance any Loans or other extensions of credit to any Debtor, in administering any Loans or other extensions of credit, or in taking any other actions reasonably related to this Final Order or the Obligations or the DIP Loan Documents (including, without limitation, the exercise of its approval rights with respect to any

4844-3317-0332.1
4833-9284-9565.1

budget), the DIP Lender and the Pre-Petition ABL Agent shall have no liability to any third party

and shall not be deemed to be in control of the operations of any Debtor or to be acting as a

"controlling person," "responsible person" or "owner or operator" with respect to the operation or

management of any Debtor (as such term, or any similar terms, are used in the Internal Revenue

Code, the United States Comprehensive Environmental Response, Compensation and Liability Act

as amended, or any similar Federal or state statute), and the DIP Lender's and the Pre-Petition

ABL Agent's relationship with any Debtor shall not constitute or be deemed to constitute a joint

venture or partnership of any kind between the DIP Lender, the Pre-Petition ABL Agent and any

Debtor.

      25.    *Objections by Parties in Interest.*

      (a) The stipulations, admissions and releases contained in this Final Order shall be

binding on the Debtors and all parties in interest, including, without limitation, any Committee,

unless such Committee, other committee or any other party in interest (other than the Debtors)

(i) obtains the authority to commence and commences, or, if any of the Cases are converted to

cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter

7 trustee in such Successor Cases commences, on or before the date that is the later of (a)

September 6, 2019, (b) in the case of a chapter 7 trustee, 60 days after the appointment of such

chapter 7 trustee, and (c) such later date as has been agreed to, in writing, by the DIP Lender, the

Pre-Petition ABL Agent, and the Pre-Petition Term Agent (such time period shall be referred to

as the *"Challenge Period,"* and the date that is the next calendar day after the termination of the

Challenge Period, in the event that no objection or challenge is raised during the Challenge Period,

shall be referred to as the *"Challenge Period Termination Date"*), either (x) a contested matter or

adversary proceeding challenging or otherwise objecting to the admissions, stipulations, or

releases included in this Final Order, or (y) a contested matter or adversary proceeding against the

- 48 -

DIP Lender, the Pre-Petition ABL Agent, and/or Alliance and the Pre-Petition Term Agent in connection with or related to the Pre-Petition Obligations, the Pre-Petition Loan Documents, the validity, enforceability, priority or extent of the DIP Lender's, the Pre-Petition ABL Agent's and/or Alliance and the Pre-Petition Term Agent's liens on the Pre-Petition Collateral, or the actions or inactions of any of the DIP Lender, the Pre-Petition ABL Agent and/or Alliance or the Pre-Petition Term Agent arising out of or related to the Pre-Petition Obligations, or otherwise, including, without limitation, any claim against the DIP Lender, the Pre-Petition ABL Agent and/or Alliance or the Pre-Petition Term Agent in the nature of a "lender liability" claim, or any other causes of action, setoff, counterclaim or defense to the Pre-Petition Obligations (including but not limited to those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code) (the objections, challenges, actions and claims referenced in clauses (x) and (y), collectively, the *"Claims and Defenses"*), and (ii) obtains a judgment from this Court in any such timely and properly commenced contested matter or adversary proceeding.

(b) If no Claims and Defenses have been timely asserted in any such adversary proceeding or contested matter, then the admissions, stipulations, findings and releases included in this Final Order, including the release provisions herein, shall be binding on all parties in interest, including any Committee, and (i) the Pre-Petition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, subordination, recharacterization, defense or avoidance, for all purposes in these Cases and any Successor Case, (ii) the DIP Lender's, the Pre-Petition ABL Agent's and/or Alliance and the Pre-Petition Term Agent's liens on the Pre-Petition Collateral shall be deemed legal, valid, binding, enforceable and properly perfected, not subject to recharacterization, subordination, avoidance or reduction and (iii) the Pre-Petition Obligations, the liens on the Pre-Petition Collateral, the conduct of the DIP Lender, the Pre-Petition ABL Agent and/or Alliance and the Pre-Petition Term Agent, and the DIP Lender, the Pre-Petition

- 49 -

ABL Agent, and the Pre-Petition Term Agent, themselves, shall not be subject to any other or further challenge by any party in interest, and any such party shall be enjoined and forever barred from seeking to exercise the rights of the Debtors' estates regarding any such challenge, including, without limitation, any successor thereto, or from asserting any Claims and Defenses against each of the DIP Lender, the Pre-Petition ABL Agent, Alliance, the Pre-Petition Term Agent or, other than with respect to Alliance, its respective agents, affiliates, subsidiaries, directors, officers, employees, representatives, attorneys or advisors (solely in their capacities as such).  If any such adversary proceeding or contested matter is timely filed prior to the Challenge Period Termination Date, the stipulations and admissions and provisions contained in this Final Order shall nonetheless remain binding and preclusive on the Committee, the Debtors and the Debtors' estates and on any other person or entity, except to the extent that such findings and admissions were expressly challenged in such adversary proceeding or contested matter by such party.  The Challenge Period in respect of the Pre-Petition Obligations may be extended for the benefit of any one or more parties by written agreement of the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Agent in their sole discretion without further order of the Court.  Standing is hereby vested in the Committee, on behalf of the Debtors' estates, to pursue any Claims and Defenses against the DIP Lender, the Pre-Petition ABL Agent, the Pre-Petition Term Agent and Alliance; provided that nothing in this Final Order vests or confers on any person or entity, other than the Committee, with standing or authority to pursue any cause of action belonging to any or all of the Debtors or their estates, including, without limitation, any Claim and Defense or other claim against the DIP Lender, the Pre-Petition ABL Agent, the Pre-Petition Term Agent and/or Alliance.  If a chapter 7 trustee is appointed prior to the expiration of the Challenge Period, such trustee shall have until the later of (a) the termination of the Challenge Period or (b) sixty (60) days following such

- 50 -

trustee's appointment to commence a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, or releases included in this Final Order.

26. *Effect of Modification of Order.* The Debtors shall not, without the DIP Lender's and the Pre-Petition ABL Agent's prior written consent, seek to modify, vacate or amend this Final Order or any DIP Loan Documents. If any of the provisions of the Final Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such stay, modification or vacatur shall not affect the validity of any Indebtedness outstanding immediately prior to the effective time of such stay, modification or vacatur, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such Obligations. Notwithstanding any such stay, modification or vacatur, any Obligations outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Final Order, and the DIP Lender and/or the Pre-Petition ABL Agent shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such Obligations.

27. *Safe Harbor.* The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on the terms and conditions upon which the Debtors, the DIP Lender and the Pre-Petition ABL Agent have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under § 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in § 364(e) of the Bankruptcy Code.

28. *Entry of Final Order.* The Debtors shall promptly serve a notice of entry of this Final Order by regular mail upon (i) the Noticed Parties, and (ii) any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon Debtors' counsel.

- 51 -

29.    *No Marshalling*.    The DIP Lender, the Pre-Petition ABL Agent and/or the Pre-Petition Term Loan Secured Parties shall not be under any obligation to marshal any assets in favor of any Debtor or any other party or against or in payment of any or all of the Pre-Petition Obligations, provided that (a) the Debtors and their estates (including the Committee) reserve their rights to request this Court order the DIP Lender and/or the Pre-Petition ABL Agent to marshal against any assets that are not First Lien Collateral before asserting any lien or claims granted under this Final Order including, without limitation, a Superpriority Claim or ABL Adequate Protection Claim, against First Lien Collateral (a "*Marshaling Request*"), and (b) the DIP Agent, the DIP Lender and the Pre-Petition ABL Agent reserve all of their rights and defenses to such a Marshaling Request, but provided that the Debtors and their estates (including the Committee) agree that such request shall not delay the payment of proceeds of any DIP Collateral to the DIP Lender or the Adequate Protection Claim of the Pre-Petition ABL Agent.    The Debtors and their estates including the Committee, reserve any rights that they may have to indemnification, contribution or any other claim against any non-Debtor entity that was a co-obligor or guarantor of the Pre-Petitition Obligations.

30.    *Credit Bidding*.    Subject to the right of a party in interest under paragraph 25 hereof and subject to the terms of the DIP Loan Documents, the DIP Lender shall have the right to credit bid some or all of the amount of the DIP Obligations in any sale of the DIP Collateral (or any part thereof) and shall have the right to credit bid some or all of the Pre-Petition RH Obligations in any sale of the Pre-Petition RH ABL Collateral as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or section 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code or otherwise.

31.    *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Loan Documents, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Loan Documents, the DIP Lender, the Pre-Petition ABL Agent and the Pre-Petition Term Loan Secured Parties shall not (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; (iii) be deemed a "third party" to which 26 U.S.C. § 3505 applies; or (iv) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

32.    *Objections Overruled or Withdrawn*.  All objections to the entry of this Final Order have been resolved, withdrawn or overruled.

33.    *Controlling Effect of Order*.  To the extent any provisions in this Final Order conflict with any provisions of the Motion, the Interim Order, any Pre-Petition ABL Loan Documents or any DIP Loan Documents, the provisions of this Final Order shall control.

34.    *Reporting to the Committee*.  The Debtors shall provide to the Committee all reports that they provide to the DIP Lender pursuant to this Final Order concurrently with providing such reports to the DIP Lender.

35.    *Dismissal of Pre-Petition Term Loan Secured Parties' Lawsuit*.  As soon as is reasonably practicable after entry of this Final Order but in no event, no later than 24 hours following the entry of this Final Order, the Pre-Petition Term Loan Secured Parties shall send a stipulation to all applicable defendants causing (a) the without-prejudice dismissal of (i) *Deutsche Bank Trust Company Americas v. R&J Development Company, LLC*, Case No. 19-CI-0004

- 53 -

(Lawrence Cir. Ct) and (ii) *Deutsche Bank Trust Company Americas v. R&J Development Company, LLC*, Adv. No. 19-05013 (Bankr. E.D. Ky.) (together, the *"Equipment Lawsuits"*), and (b) the dissolution of all injunctions, restraining orders and writs against all defendants and their property entered in the Equipment Lawsuits.

36.    *Order Effective.*  This Final Order shall be effective as of the date of signature by the Court.  Notwithstanding anything contained herein to the contrary, this Order shall be deemed interim and shall not become final until three business days after the Debtors file their Schedules and Statements of Financial Affairs ("*Schedules*"), absent objection as set forth in this paragraph. Any party-in-interest, other than the DIP Lender, Pre-Petition Secured Parties and the Committee, may file an objection to the terms of this Order, solely based upon issues arising from the Schedules, no later than three business days after the Debtors file their Schedules (the "*Objection Period*").  If no party-in-interest files such an objection to the terms of this Order within the Objection Period, this Order will automatically be deemed a final order.

4844-3317-0332.1
4833-9284-9565.1

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Gregory R. Schaaf*
**Bankruptcy Judge**
**Dated: Thursday, July 25, 2019**
**(tnw)**

**EXHIBIT A**

**DIP TERM SHEET**

**[Previously Filed in the Record]**

**EXHIBIT B**

**PRE-PETITION ABL CREDIT AGREEMENT**

**[Previously Filed in the Record]**

#92157804v4
4844-3317-0332.1
4833-9284-9565.1

**Exhibit C**

**Pre-Petition Term Loan Credit Agreement**

**[Previously Filed in the Record]**

EXHIBIT D

DIP LOAN DOCUMENTS

#92157804v4
4844-3317-0332.1
4833-9284-9565.1

EXECUTION VERSION

DEBTOR-IN-POSSESSION SECURED CREDIT AGREEMENT

among

CAMBRIAN COAL LLC, AND
SHELBY RESOURCES, LLC
collectively, as the Borrower

THE GUARANTORS PARTY HERETO

THE LENDERS PARTY HERETO

and

RICHMOND HILL CAPITAL PARTNERS, LP
as Agent

Dated as of July 24, 2019

0110825.0722105   4823-0803-0875v14
4840-3075-9310
7008568

# TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|

ARTICLE I          DEFINED TERMS...................................................................................2
    Section 1.1.        Definitions.................................................................................2
    Section 1.2.        Accounting Terms .....................................................................21

ARTICLE II         TERM LOAN ........................................................................................22
    Section 2.1.        Term Loan ...............................................................................22
    Section 2.2.        Pro Rata Shares .......................................................................23
    Section 2.3.        Use of Proceeds........................................................................23
    Section 2.4.        Evidence of Debt; Register; Notes............................................23
    Section 2.5.        Interest......................................................................................24
    Section 2.6.        Fees ..........................................................................................24
    Section 2.7.        Repayment................................................................................25
    Section 2.8.        Voluntary Prepayments............................................................25
    Section 2.9.        Mandatory Prepayments ..........................................................25
    Section 2.10.       Application of Prepayments......................................................25
    Section 2.11.       General Provisions Regarding Payments Prepayments ....................26
    Section 2.12.       Ratable Sharing........................................................................26
    Section 2.13.       Termination of Commitments...................................................27

ARTICLE III        CONDITIONS PRECEDENT .....................................................................27
    Section 3.1.        Conditions Precedent to Closing Date .....................................27
    Section 3.2.        Conditions to the Subsequent Term Loan..........................................29

ARTICLE IV         REPRESENTATIONS AND WARRANTIES .......................................................30
    Section 4.1.        Representations and Warranties................................................30

ARTICLE V          AFFIRMATIVE COVENANTS .................................................................34
    Section 5.1.        Basic Reporting Requirements .................................................34
    Section 5.2.        Accounting and Cost Control Systems .....................................35
    Section 5.3.        Access; Visitation; Verification................................................35
    Section 5.4.        Maintenance of Existence ........................................................35
    Section 5.5.        Preservation of Assets; Principal Place of Business............................35
    Section 5.6.        Notice of Material Events.........................................................36
    Section 5.7.        Use of Proceeds........................................................................36
    Section 5.8.        Further Assurances...................................................................36
    Section 5.9.        Insurance ..................................................................................36
    Section 5.10.       Information Regarding Collateral .............................................36
    Section 5.11.       Maintenance of Approvals........................................................37
    Section 5.12.       Taxes, Payment of Obligations.................................................37
    Section 5.13.       Compliance with Laws .............................................................37

Section 5.14.    Stay, Extension and Usury Laws ...........................................37
Section 5.15.    Compliance with ERISA.......................................................37
Section 5.16.    Information .........................................................................37
Section 5.17.    Milestones ..........................................................................38
Section 5.18.    Post-Closing Deliverables ...................................................38

ARTICLE VI    NEGATIVE COVENANTS ...................................................38

Section 6.1.    Indebtedness.........................................................................39
Section 6.2.    Liens....................................................................................40
Section 6.3.    Sales and Lease-Backs .........................................................40
Section 6.4.    Transactions with Affiliates .................................................40
Section 6.5.    Negative Pledge...................................................................40
Section 6.6.    Merger, Amalgamation, Consolidation or Sale of Assets....40
Section 6.7.    Fiscal Year; Fiscal Quarter ..................................................40
Section 6.8.    Restricted Payments.............................................................41
Section 6.9.     Investments ........................................................................41
Section 6.10.    Subsidiaries.........................................................................41
Section 6.11.    Dividend and Other Payment Restrictions Affecting
                 Subsidiaries.........................................................................41
Section 6.12.    Business ..............................................................................42
Section 6.13.    Amendments to Organizational Documents ..........................42
Section 6.14.    Amendment of Certain Other Indebtedness Documents ......42
Section 6.15.    Bankruptcy Matters.............................................................42
Section 6.16.    OFAC..................................................................................43
Section 6.17.    Cancellation of Indebtedness ...............................................43
Section 6.18.    Cash Flow Budget................................................................43
Section 6.19.    Inter-Debtor Flow of Cash ..................................................44

ARTICLE VII    INCREASED COSTS; TAXES; INDEMNIFICATION; SET OFF; ETC ..................44

Section 7.1.    Increased Costs; Capital Adequacy ......................................44
Section 7.2.    Taxes; Withholding, etc .......................................................45
Section 7.3.    Indemnification ...................................................................48
Section 7.4.    Right of Set Off...................................................................48

ARTICLE VIII    EVENTS OF DEFAULT ......................................................49

Section 8.1.     Events of Default ................................................................49
Section 8.2.    Remedies..............................................................................52
Section 8.3.    Application of Funds.............................................................54

ARTICLE IX    LOAN GUARANTEES ........................................................54

Section 9.1.    Guarantee ............................................................................54
Section 9.2.    Limitation on Guarantor Liability.........................................55
Section 9.3.    No Discharge or Diminishment of Guaranty .........................55
Section 9.4.    Reinstatement; Stay of Acceleration.....................................56

Section 9.5            Releases........................................................................................57

ARTICLE X            COLLATERAL AND SECURITY ...................................................57

Section 10.1.          Priority of Liens ...............................................................57
Section 10.2          Covenants, Representations and Warranties.....................57
Section 10.3          Additional Covenants, Representations and Warranties....58
Section 10.4.          Carve-Out.........................................................................58
Section 10.5.          Security Interest ...............................................................59

ARTICLE XI            AGENT ........................................................................................60

Section 11.1.          Appointment of Agent ......................................................60
Section 11.2.          Powers and Duties.............................................................60
Section 11.3.          Delegation of Duties ........................................................61
Section 11.4.          General Immunity .............................................................61
Section 11.5.          Agent Entitled to Act with the Borrower........................62
Section 11.6.          Lenders' Representations, Warranties and
                       Acknowledgment ..............................................................63
Section 11.7.          Right to Indemnity ...........................................................63
Section 11.8.          Successor Agent................................................................63
Section 11.9.          Collateral Documents........................................................64
Section 11.10.         Notice of Default...............................................................65
Section 11.11.         Delivery of Documents, Notices, Etc. ..............................65

ARTICLE XII           MISCELLANEOUS .....................................................................65

Section 12.1.          Amendments and Waivers ................................................65
Section 12.2.          Notices ..............................................................................66
Section 12.3.          Expenses ...........................................................................67
Section 12.4.          Enforceability; Successors and Assigns............................68
Section 12.5.          Lenders' Obligations Several; Independent Nature of
                       Lenders' Rights; Qualified Purchasers .............................69
Section 12.6.          Integration ........................................................................69
Section 12.7.          No Waiver; Remedies .......................................................69
Section 12.8.          Submission to Jurisdiction ...............................................70
Section 12.9.          Execution in Counterparts.................................................70
Section 12.10.         Governing Law .................................................................70
Section 12.11.         Waiver of Jury..................................................................70
Section 12.12.         Severability ......................................................................70
Section 12.13.         Survival .............................................................................70
Section 12.14.         Maximum Lawful Interest ................................................71
Section 12.15.         Interpretation....................................................................71
Section 12.16.         Ambiguities; Conflicts .....................................................71
Section 12.17.         Confidentiality ..................................................................71

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | – | Form of Borrowing Certificate |
| Exhibit B | – | Form of Term Note |
| Exhibit C | – | Initial Cash Flow Budget |
| Exhibit D | – | Form of Closing Date Certificate |
| Exhibit E | – | Form of Assignment Agreement |


SCHEDULES

| | | |
|---|---|---|
| Schedule 2.1 | – | Term Loan Commitments |
| Schedule 3.1(d) | – | Organizational and Capital Structure |
| Schedule 4.1(c) | – | Real Property |
| Schedule 4.1(f) | – | Litigation |
| Schedule 4.1(i) | – | Partnerships |
| Schedule 4.1(k) | – | Officers |
| Schedule 4.1(l) | – | Beneficial Owners of Capital Stock |
| Schedule 4.1(o) | – | Employee Benefit Plans |
| Schedule 4.1(q) | – | Notices from Insurers |
| Schedule 4.1(v) | – | Taxes |
| Schedule 6.1 | – | Existing Indebtedness |
| Schedule 6.2 | – | Existing Liens |
| Schedule 6.4(b) | – | Affiliate Transactions |
| Schedule 6.8 | – | Existing Investments |

DEBTOR-IN-POSSESSION SECURED CREDIT AGREEMENT, dated as of July 24, 2019 among CAMBRIAN COAL LLC (*"Cambrian"*), a Kentucky limited liability company and a debtor and a debtor-in-possession under Chapter 11 of Title 11 of the Bankruptcy Code, SHELBY RESOURCES, LLC (*"Shelby"* and referred to herein collectively with Cambrian as the *"Borrower"*), a Kentucky limited liability company and a debtor and a debtor-in-possession under Chapter 11 of Title 11 of the Bankruptcy Code, the guarantors signatory hereto, each a debtor and debtor-in-possession under Chapter 11 of Title 11 of the Bankruptcy Code (together with any other guarantors from time to time party hereto, each a *"Guarantor"* and collectively, the *"Guarantors"* and together with the Borrower, each a *"Debtor"* and collectively, the *"Debtors"*), the lenders signatory hereto (together with any other financial institutions or investors from time to time as lenders hereunder, the *"Lenders"*), and RICHMOND HILL CAPITAL PARTNERS, LP, as agent (*"Richmond Hill"* and, in such capacity, the *"Agent"*).

## RECITALS

WHEREAS, on June 16, 2019 (the *"Petition Date"*), each Debtor filed a voluntary petition with the Bankruptcy Court for relief under Chapter 11 of the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to Bankruptcy Code Sections 1107 and 1108, and such reorganization cases are being jointly administered under Case Number 19-51200 (GRS) (each a *"Chapter 11 Case"* and collectively, the *"Chapter 11 Cases"*);

WHEREAS, an immediate and on-going need exists for the Debtors to obtain additional funds in order to continue the operation of their businesses as debtors-in-possession under Chapter 11 of the Bankruptcy Code and, accordingly, the Debtors have requested that the Lenders extend post-petition financing to Borrower;

WHEREAS, the Lenders are willing to make the Term Loans to the Borrower upon the terms and conditions set forth herein;

WHEREAS, all of Borrower's obligations under the Term Loans will be guaranteed by the Guarantors;

WHEREAS, the Borrower and the Guarantors have agreed to secure all of their Obligations under this Agreement and the other Loan Documents by granting to Agent, for the benefit of Agent and the Lenders, a security interest in and Lien upon all of the Collateral with the order of priority set forth in Article X;

WHEREAS, the Borrower and the Guarantors have agreed that Agent, for the benefit of Agent and the Lenders, shall be entitled to a Superpriority Claim, with the order of priority set forth in Article X, to provide for the repayment of the Obligations;

WHEREAS, on June 11, 2019, the Borrower, the Guarantors, the Existing Credit Agreement Agent and the Lenders entered into the fifth amendment to the Existing Credit Agreement, pursuant to which the Lenders made RH Fifth Amendment Loans (as defined in the Existing Credit Agreement) to the Borrower, which as of the Petition Date is in an aggregate principal amount of $500,000;

WHEREAS, upon the entry of the Final Order, the parties hereto intend that any unpaid portion of the RH Fifth Amendment Loans shall be deemed Obligations outstanding for all purposes under this Agreement; and

NOW THEREFORE, in consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

# ARTICLE I

## DEFINED TERMS

*Section 1.1.    Definitions*.  As used in this Agreement, including, without limitation, the preamble, recitals, exhibits and schedules hereto, the following terms have the meanings stated:

*"Action"* against a Person means an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination or other proceeding pending against such Person or its property, whether civil, criminal, administrative, investigative or appellate, in law or equity before any arbitrator or Governmental Body.

*"Affiliate"* means, of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person will be deemed to be control.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

*"Affiliate Transaction"* has the meaning set forth in Section 6.4.

*"Agency Fee"* has the meaning set forth in Section 2.6(c).

*"Agent"* has the meaning assigned to that term in the preamble hereto and shall include any successor agent appointed pursuant to Section 11.8.

*"Aggregate Amounts Due"* has the meaning set forth in Section 2.12.

*"Agreement"* means this Debtor-in-Possession Secured Credit Agreement, as it may be amended, amended and restated, supplemented or otherwise modified from time to time.

*"Approved Fund"* means any Fund that is administered or managed by a Lender, an Affiliate of a Lender, or an entity or an Affiliate of an entity that administers or manages a Lender.

*"Asset Sale"* means:

(1)    the sale, lease, conveyance or other disposition of any assets or rights (whether voluntarily or in an involuntary transaction that generates Net Proceeds); and

(2)    the issuance of Equity Interests in any of the Borrower's Subsidiaries or the sale of Equity Interests in any of its Subsidiaries.

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(1)    an issuance of Equity Interests by a Subsidiary of the Borrower to the Borrower or to any Guarantor;

(2)    the sale or lease of products, inventory or other assets in the ordinary course of business;

(3)    the sale or lease of equipment or other assets in the ordinary course of business that has been damaged, worn out or rendered obsolete;

(4)      the sale or other disposition of cash or Cash Equivalents;

(5)      leases, subleases, licenses or sublicenses of real or personal property and interests therein in the ordinary course of business that do not adversely affect the operations of the Debtors;

(6)      the creation of a Lien permitted under this Agreement;

(7)      a transfer of assets that constitutes an Event of Loss;

(8)      the settlement, release or surrender of contract, tort or other claims;

(9)      the making of a Permitted Investment;

(10)     sales of coal pursuant to Coal Supply Contracts entered into in accordance with the terms hereof (excluding any such sales, leases or licenses out by operations or divisions discontinued or to be discontinued); and

(13)     other sales or dispositions of assets having an aggregate value of less than $50,000.

"*Assignee*" has the meaning set forth in Section 12.4(b).

"*Assignment*" has the meaning set forth in Section 12.4(b).

"*Assignment Agreement*" has the meaning set forth in Section 12.4(b).

"*Attributable Debt*" in respect of a sale and leaseback transaction means, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction including any period for which such lease has been extended or may, at the option of the lessor, be extended.  Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP; *provided*, *however*, that if such sale and leaseback transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation".

"*Authorized Officer*" means, with respect to the Borrower or any Guarantor, (i) the Chief Executive Officer, the President, any Vice President or the Chief Financial Officer and (ii) the Treasurer or any Assistant Treasurer or the Secretary or any Assistant Secretary.

"*Available Amount*" means, for the four consecutive one-week periods commencing with the Petition Date, the amount of Term Loans available to be borrowed during each such week as set forth in the table in Section 2.1(a)(i).

"*Avoidance Actions*" means claims and causes of action under Sections 502(d), 544, 545, 547, 548, 550 and 551 of the Bankruptcy Code and any proceeds thereof, including, without limitation, any property against which a lien is avoided under Section 544(a) of the Bankruptcy Code.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Kentucky.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"*Black Lung Act*" means the Black Lung Benefits Act of 1972, 30 U.S.C. §§ 901, et seq., the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801, et seq., the Black Lung Benefits Revenue Act of 1977, Pub. L. No. 95-227, 92 Stat. 11 (1978), the Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-239, 92 Stat. 95 (1978), and the Black Lung Benefits Revenue Act of 1981 and the Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, 95 Stat. 1643 (1981), in each case as amended.

"*Black Lung Liabilities*" means any liability or benefit obligations related to black lung claims and benefits under the Black Lung Act, and occupational pneumoconiosis, silicosis or other lung disease liabilities and benefits arising under Mining Law.

"*Board of Directors*" means:

(1)    with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)    with respect to a partnership, the board of directors of the general partner of the partnership;

(3)    with respect to a limited liability company, the board of governors, the managing member or members or any controlling committee of managing members thereof; and

(4)    with respect to any other Person, the board or committee of such Person serving a similar function.

"*Borrower*" has the meaning assigned to that term in the preamble hereto.

"*Borrowing*" means the making of the Term Loan.

"*Borrowing Certificate*" means a Borrowing Certificate substantially in the form of Exhibit A.

"*Business Day*" means a day other than a Saturday, a Sunday or a day on which banking institutions in New York, New York, or at a place of payment are authorized by law, regulation or executive order to remain closed.  If a payment date is not a Business Day at a place of payment, payment may be made at that place on the next succeeding day that is a Business Day, and no interest shall accrue on such payment for the intervening period.

"*Capital Lease*" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"*Capital Lease Obligation*" means, at the time any determination is to be made, the amount of the liability in respect of a Capital Lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"*Capital Stock*" means:

(1)    in the case of a corporation, corporate shares or stock;

4

(2)    in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated);

(3)    in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)    any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"*Carve-Out*" has the meaning set forth in Section 10.4.

"*Carve-Out Trigger Notice*" has the meaning set forth in Section 10.4(a).

"*Cash*" means cash, money, currency or a credit balance in any Deposit Account.

"*Cash Equivalents*" means, as at any date of determination, any of the following: (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances issued or accepted by any Lender or by any commercial bank organized under the laws of the United States or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $5,000,000,000, and (c) has the highest rating obtainable from either S&P or Moody's; provided, however, that Cash Equivalents shall not include any accounts or letters of credit which serve as collateral for any reclamation performance bond for any Debtor.

"*Cash Flow Budget*" has the meaning set forth in Section 5.1(c)(i).

"*Change in Law*" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Body or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Body; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

*"Chapter 11 Case"* and *"Chapter 11 Cases"* have the meanings set forth in the Preamble.

*"Change of Control"* means the Sponsors shall fail to own, collectively, directly or indirectly, 100% on a fully diluted basis of the voting and economic interest in the Equity Interests (excluding any Equity Interests issued pursuant to any warrants granted to any of the Lenders) of the Borrower or any Guarantor.

*"Closing Date"* means the date on which all of the conditions set forth in Section 3.1 are satisfied or otherwise waived by the Lenders and Agent.

*"Closing Date Certificate"* means a Closing Date Certificate substantially in the form of Exhibit D.

*"Coal Supply Contracts"* means the coal supply contracts in full force and effect as of the Closing Date and each other additional agreement in respect of sales of coal supply entered into after the Closing Date by any Debtor.

*"Collateral"* has the meaning set forth in Section 10.2(d).

*"Collateral Documents"* means this Agreement, the Orders and any security agreement or other similar documents executed by a Debtor on or after the Closing Date in connection with the transactions contemplated hereby.

*"Committee"* has the meaning set forth in Section 10.4(a).

*"Connection Income Taxes"* means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

*"Consents"* means any approval, consent, authorization or order of, notice to or registration or filing with, or any other action by, any Governmental Body or other Person.

*"Debtor Relief Laws"* means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

*"Default"* means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

*"Deposit Account"* means any deposit account (as such term is defined in the UCC as adopted and in effect in the State of New York), including without limitation, a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

*"Disqualified Stock"* means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the date on which the Term Loan mature.

*"Dollars"* and the sign *"$"* mean the lawful money of the United States of America.

6

"*Domestic Subsidiary*" means each Subsidiary of the Borrower that is a Subsidiary incorporated or organized under the laws of the United States, any state of the United States or the District of Columbia.

"*Eligible Assignee*" means (a) any Lender or any Affiliate or Approved Fund of any Lender, (b) any commercial bank, insurance company, investment or mutual fund or other entity that extends credit or buys loans as one of its businesses, and/or (c) any other Person approved by the Agent.

"*Employee Benefit Plan*" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is sponsored, maintained or contributed to by, or required to be contributed by, the Borrower, any Subsidiary of the Borrower or any of their respective ERISA Affiliates and any "employee benefit plan" as defined in Section 3(3) of ERISA which was sponsored, maintained or contributed to by, or required to be contributed to by, the Borrower, any Subsidiary of the Borrower or any of their respective ERISA Affiliates with respect to which the Borrower or any Subsidiary could incur liability.

"*Environmental Claim*" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Body or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law or Mining Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment or (iv) in connection with the Reclamation, or alleged need for Reclamation, of any future, current, former or abandoned mines for which any Debtors are responsible under any Environmental Law or Mining Law.

"*Environmental Laws*" means all federal, state, provincial, municipal, local and foreign laws (including without limitation common law), statutes, regulations and rules whether now or hereinafter in effect relating in any way to the protection of the environment, natural resources, the management, release or threatened release of any Hazardous Material, human health or safety matters, including, without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act and the Toxic Substances Control Act, in each case as amended, and all rules, regulations, judgments, decrees, orders, requirements and licenses arising under all such laws.

"*Environmental or Mining Permit*" means any Permit required for coal mining or Reclamation or otherwise required under Environmental Law or Mining Law.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"*ERISA Affiliate*" means, as applied to any Person, (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member, (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member, and (c) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member. Any former ERISA Affiliate of any Debtor shall continue to be considered an ERISA Affiliate of such Debtor within the meaning of this definition with respect to the period such entity was an ERISA Affiliate

of such Debtor and with respect to liabilities with respect to such entity arising after such period for which such Debtor could be liable under the Internal Revenue Code or ERISA.

"*Event of Default*" means each of the conditions or events set forth in Section 8.1.

"*Event of Loss*" means, with respect to any property or asset (tangible or intangible, real or personal), any of the following:  (a) any loss, destruction or damage of such property or asset; (b) any actual condemnation, seizure or taking by exercise of the power of eminent domain or otherwise of such property or asset, or confiscation of such property or asset or the requisition of the use of such property or asset; or (c) any settlement in lieu of clause (b).

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net or overall gross income (however denominated), franchise, capital and net worth Taxes, and branch profits Taxes, in each case, imposed as a result of such a Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) Other Connection Taxes, (c) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Term Loan or Term Loan Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Term Loan or Term Loan Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 7.2, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (d) Taxes attributable to such Recipient's failure to comply with Section 7.2(f) and (e) any U.S. federal withholding Taxes imposed under FATCA.

"*Existing Credit Agreement*" means that certain ABL Credit and Guaranty Agreement dated as of July 10, 2013, as amended as of September 4, 2014, October 31, 2014, and May 28, 2015, as further amended and restated in full by Amendment No. 4 to ABL Credit and Guaranty Agreement and Amendment no. 1 to Pledge and Security Agreement, dated as of September 21, 2015, and as further amended by Amendment No. 5 to ABL Credit and Guaranty Agreement and Third Amendment to Intercreditor Agreement, dated as of June 11, 2019, by and among the Borrower, the Guarantors, certain affiliates of the Borrower, the Existing Credit Agreement Lenders and the Existing Credit Agreement Agent.

"*Existing Credit Agreement Agent*" means Deutsche Bank AG New York Branch as administrative and collateral agent under the Existing Credit Agreement.

"*Existing Credit Agreement Lenders*" means the lenders party to the Existing Credit Agreement from time to time.

"*Existing Investments*" means the Investments listed on Schedule 6.8.

"*Existing Liens*" means the Liens listed on Schedule 6.2.

"*Exit Fee*" has the meaning set forth in Section 2.6(b).

"*FATCA*" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any intergovernmental agreements (and any rules, laws, treaties or other official guidance) implementing the foregoing.

*"Final Order"* means the order of the Bankruptcy Court entered in the Chapter 11 Cases of the Debtors after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Agent and Required Lenders in their discretion, and which contains the provisions present in the Interim Order (including without limitation, the granting of the superpriority status and Liens referred to herein, the automatic perfection of all Liens referred to herein, the payment of all fees referred to herein and the first priority Lien referred to herein) and additional provisions allowing for the Borrowing of the full amount of Term Loans hereunder and prohibiting any claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code (except as provided in the Carve-Out and agreed to by Required Lenders).

*"Financial Officer Certification"* means, with respect to the financial statements for which such certification is required, the certification of the chief financial officers of the Debtors that such financial statements fairly present, in all material respects, the financial condition of the Debtors and their Subsidiaries on a consolidated basis as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

*"Fiscal Quarter"* means a fiscal quarter of any Fiscal Year.

*"Fiscal Year"* means the fiscal year of the Borrower and each Subsidiary of the Borrower ending on December 31 of each calendar year.

*"Foreign Lender"* means any Lender that is a resident or organized under the laws of a jurisdiction other than the United States.

*"Fund"* means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

*"Funding Date"* means each date the Lenders make Term Loans to the Borrower pursuant to Section 2.1

*"GAAP"* means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.  All ratios and calculations based on GAAP contained in this Agreement shall be computed in accordance with GAAP.

*"Governmental Body"* means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

*"Guarantee"* means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

*"Guaranteed Obligations"* has the meaning set forth in Section 9.1(a).

*"Guarantors"* has the meaning assigned to that term in the preamble hereto.

*"Hazardous Materials"* means any chemical, pollutant, contaminant, material, substance or waste, which is prohibited, limited or regulated by any Governmental Body or which may or could reasonably be expected to pose a hazard to health and safety or to the indoor or outdoor environment, including any polychlorinated biphenyls, asbestos or any asbestos-containing materials, radon or any other radioactive materials, petroleum, crude oil or any fraction thereof, coal ash, coal combustion by-products or waste, boiler slag, scrubber residue or flue desulphurization material.

*"Hazardous Materials Activity"* means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

*"Hedge Agreement"* means any swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies entered into for the purposes of hedging the Borrower's exposure to interest or exchange rates, loan credit exchanges, freight costs or charges, security or currency valuations or commodity prices not for speculative purposes, in each case entered into with a Lender counterparty.

*"Hedging Obligation"* means any Obligation of such Person pursuant to any Hedge Agreement.

*"Indebtedness"* means, with respect to any specified Person, without duplication, any indebtedness of such Person (excluding accrued expenses, trade payables, and operating leases), whether or not contingent:

> (1)    in respect of borrowed money;

> (2)    evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

> (3)    representing Capital Lease Obligations or Attributable Debt in respect of sale and leaseback transactions;

> (4)    representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed; or

> (5)    representing the net obligations under any Hedging Obligations in the event of an early termination, if and to the extent any of the preceding items (other than letters of credit, Attributable Debt and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP.  In addition, the term "Indebtedness" includes (a) all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person); *provided, however*, that the amount of such Indebtedness shall be the lesser of (x) the fair market value of such asset at the date of determination and (y) the amount of such Indebtedness of such other Person; and (b) to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person.

10

*"Indemnified Liabilities"* means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of up to two firms of counsel for different Indemnified Persons and, if a potential or actual conflict of interest exists, one additional counsel to each affected Indemnified Person and, if necessary, of up to two firms of special counsel and two firms of local counsel in any relevant jurisdiction for different Indemnified Persons, in each case, in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnified Person shall be designated as a party or a potential party thereto, whether such proceeding was commenced by or against an Indemnified Person, and any fees or expenses incurred by Indemnified Persons in enforcing this indemnity), whether direct, indirect, special or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws and/or Mining Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnified Person, in any manner relating to or arising out of (i) this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Term Loans, the credit facilities provided for herein or the use or intended use of the proceeds thereof, any amendments, waivers or consents with respect to any provision of this Agreement or any of the other Loan Documents, or any enforcement of any of the Loan Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Loan Guarantee)); or (ii) any Environmental Claim or any Hazardous Materials Activity, Reclamation or Black Lung Liabilities relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of the Debtors or any of their respective Subsidiaries.

*"Indemnified Person"* has the meaning set forth in Section 7.3.

*"Indemnified Taxes"* means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Debtor under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

*"Initial Cash Flow Budget"* has the meaning set forth in Section 5.1(c)(i).

*"Initial Funding Date"* means the date the Lenders shall have made the initial installment of Term Loans available to Borrower.

*"Initial Maximum Amount"* means $12,000,000.

*"Intellectual Property"* means, collectively, all copyrights, all patents and all trademarks, together with:  (a) all inventions, processes, production methods, proprietary information, know-how and trade secrets; (b) all licenses or user or other agreements granted to any Debtor with respect to any of the foregoing, in each case whether now or hereafter owned or used including the licenses or other agreements with respect to any Collateral; (c) all customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs; (d) all field repair data, sales data and other information relating to sales or service of products now or hereafter manufactured; (e) all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and (f) all

11

causes of action, claims and warranties, in each case, now or hereafter owned or acquired by any Debtor in respect of any of the items listed above.

*"Intercreditor Agreement"* means that certain Amended and Restated Intercreditor Agreement dated as of September 21, 2015, by and between the Pre-Petition Agents.

*"Interest Payment Date"* means the last day of each calendar month, and the Maturity Date.

*"Interim Order"* means that certain Interim Order (I) Authorizing (A) Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. § 364, (B) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) Grant of Adequate Protection Pursuant to 11 U.S.C. § 363 and 364 and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c), entered by the Bankruptcy Court on June 19, 2019, as docket number 116 in the Chapter 11 Cases, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to counsel to the Agent and counsel to the Required Lenders in their discretion.

*"Interim Order Entry Date"* shall mean June 19, 2019.

*"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

*"Investment"* means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees, but excluding advances to customers or suppliers and trade credit each in the ordinary course of business to the extent they are recorded as accounts receivable, prepaid expenses or deposits on the balance sheet of the Borrower and endorsements for collection or deposit arising in the ordinary course of business or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities. For the avoidance of doubt, this definition shall not include prepayments on defined benefit obligations. Except as otherwise provided in this Agreement, the amount of an Investment will be determined at the time the Investment is made without giving effect to subsequent changes in value.

*"Knowledge"* means, with respect to any Debtor as the context requires, the knowledge of any of such Debtor's Authorized Officers after notice and reasonable inquiry by such Authorized Officers.

*"Lenders"* has the meaning set forth in the Preamble to this Agreement, together with any of their successors and permitted assigns, which shall include, following the entry of the Final Order, the RH Lenders and the Term Loan Lenders.

*"Lender Group"* means, collectively, the Agent and the Lenders.

*"Lender Group Expenses"* has the meaning set forth in Section 12.3.

*"Lien"* means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the UCC (or equivalent statutes) of any jurisdiction.

*"Loan"* means, (a) prior to the entry of the Final Order, the Term Loans and (b) following the entry of the Final Order, all Term Loans and RH Fifth Amendment Loans.

*"Loan Document"* means any of this Agreement, the Notes (if any), the Collateral Documents, the Orders and all other documents, instruments or agreements executed and delivered by a Debtor for the benefit of the Agent or any Lender in connection herewith.

*"Loan Exposure"* means with respect to any Lender, as of any date of determination, the outstanding principal amount of Loans of such Lender; *provided,* at any time prior to the making of a Term Loan, the Loan Exposure of any Lender shall include such Lender's Term Loan Commitment.

*"Loan Guarantee"* means the Guarantee by the Guarantors of the Borrower's obligations under this Agreement and the Loan Documents.

*"Margin Stock"* as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

*"Material Adverse Effect"* means a material adverse effect on the assets, business or condition (financial or otherwise) of the Borrower and its Subsidiaries, taken as a whole, since the Petition Date or upon the ability of any Debtor to make payment when due of any amounts owing on the Term Loan or to comply in all material respects with the terms of any of the Loan Documents to which such Person is a party.

*"Material Contract"* means (i) each Coal Supply Contract, (ii) each mining lease, and (iii) any other contract or other arrangement to which Borrower or any of its Subsidiaries is a party (other than the Loan Documents), in each case, for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

*"Maturity Date"* means the earliest to occur of the following: (a) December 16, 2019, *provided* that such date may, at the request of the Borrower and subject to the prior written consent of the Lenders, be extended four times, by one (1) month per extension, subject to the payment of a fee to Lenders for each such extension occurring after the first such extension in an amount equal to 0.25% of the Maximum Amount, (b) the effective date of a confirmed, final and non-appealable Reorganization Plan, (c) the date on which all Term Loans shall become due and payable in full hereunder following the occurrence of an Event of Default, (d) the date of the closing of a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code; and (e) the date on which the Bankruptcy Court approves the extension of any other credit facility to the Borrowers or Guarantors, or to any other entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Chapter 11 Cases, over the objection of the Lenders.

*"Maximum Amount"* means $15,000,000.

*"Mining Financial Assurances"* means any and all surety bonds or escrow agreements and any payment or prepayments made with respect to, or certificates of deposit or other sums or assets required to be posted by Debtors under, Mining Law for Reclamation or otherwise.

*"Mining Laws"* means any and all current or future foreign or domestic, federal, state or local (or any other subdivision) statutes, ordinances, orders, rules, regulations, judgments, Permits, or any other requirements of Governmental Bodies relating to surface or subsurface mining operations and activities. Mining Laws shall include, but not be limited to: (i) the Federal Coal Leasing Amendments Act; (ii) the Surface Mining Control and Reclamation Act; (iii) all other applicable land reclamation and use statutes and regulations; (iv) the Federal Mine Safety Act of 1977; (v) the Black Lung Act; and (vi) the Coal Industry Retiree Health Benefits Act of 1992, in each case as amended, and any comparable state and local laws or regulations.

*"Moody's"* means Moody's Investors Service, Inc., and any successor to its ratings agency business.

*"Multiemployer Plan"* means any Employee Benefit Plan which is a "multi-employer plan" as defined in Section 3(37) of ERISA.

*"Narrative Report"* means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of the Borrower and its Subsidiaries in the form prepared for presentation to senior management thereof for the applicable Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate with comparison to and variances from the immediately preceding period and budget.

*"Net Loss Proceeds"* means the aggregate cash proceeds received by any Debtor in respect of any Event of Loss, including, without limitation, insurance proceeds from condemnation awards or damages awarded by any judgment in connection with any Event of Loss and any Cash received upon the sale or other disposition of any non-cash consideration received in any Event of Loss, net of the direct costs relating to such Event of Loss, including, without limitation, legal, accounting and investment banking fees, and sales commissions, any relocation expenses incurred as a result of the Event of Loss, and taxes paid or payable as a result of the Event of Loss (including income taxes payable as a result of any gain recognized in connection therewith), in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP.

*"Net Proceeds"* means the aggregate Cash proceeds received by any Debtor in respect of any Asset Sale (including, without limitation, any Cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of the direct costs relating to such Asset Sale, including, without limitation, (a) legal, accounting and investment banking fees, and sales commissions, and any relocation expenses incurred as a result of the Asset Sale, (b) taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, (c) any reserve for adjustment in respect of the sale price of such asset or assets, and (d) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and which is senior in priority to the Liens created hereunder.

*"Notes"* means the Term Notes.

*"Obligations"* means all Indebtedness, obligations and liabilities of each Debtor from time to time owed to Agent, the Lenders or any of them or their respective Affiliates (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise) arising or incurred under this Agreement or any other Loan Document or in respect of the Term Loans, any Note or any other instruments at any time evidencing any obligation under this Agreement or any other Loan Document, whether for principal, prepayment premium, interest (including PIK Interest and including, without limitation, interest, as provided in this Agreement accruing after the filing of a petition initiating any insolvency proceedings, whether or not such interest accrues or is recoverable against the Debtors after the filing of such petition for purposes of the Bankruptcy Code or is an allowed claim in such proceeding), fees, expenses, indemnification or otherwise. Without duplication of any of the foregoing, upon entry of the Final Order, "Obligations" shall be deemed to include the then outstanding principal amount and accrued interest of the RH Fifth Amendment Loans.

*"Orders"* means the Interim Order and the Final Order.

14

*"Other Connection Taxes"* means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

*"Other Taxes"* means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes.

*"Payment Default"* has the meaning set forth in Section 8.1(e).

*"Pension Plan"* means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

*"Permit"* means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any federal, state, provincial, local or foreign Regulation.

*"Permitted Debt"* means the Indebtedness permitted pursuant to Section 6.1.

*"Permitted Investments"* means:

(1)    equity Investments owned as of the Closing Date in any Subsidiary and Investments made after the Closing Date in the Borrower and any wholly owned Domestic Subsidiary of the Borrower that is a Debtor;

(2)    any Investment in Cash or Cash Equivalents;

(3)    any Investments received in compromise or resolution of (A) obligations of trade creditors, customers or suppliers that were incurred in the ordinary course of business of the Borrower or other Debtor including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes with Persons who are not Affiliates;

(4)    Investments in negotiable instruments held for collection and lease, utility and workers' compensation, performance, surety and other similar deposits in an aggregate amount not to exceed $500,000 at any time outstanding;

(5)    any guarantee of Indebtedness permitted to be incurred by Section 6.1 hereof other than a guarantee of Indebtedness of an Affiliate of the Borrower that is not a Subsidiary of the Borrower;

(6)    Existing Investments and any Investment consisting of an extension, modification or renewal of any Existing Investment existing on the Closing Date;

(7)    deposits, prepayments, advances and other credits to vendors, suppliers and trade creditors made in the ordinary course of business consistent with the past practices of the Debtors or made pursuant to an order of the Bankruptcy Court or permitted by the Loan Documents;

15

(8)    loans and advances to employees of any Debtor or any Subsidiary thereof made in the ordinary course of business on a post-petition basis in an aggregate principal amount not to exceed $10,000;

(9)    Investments resulting from any Permitted Lien; and

(10)    Hedge Agreements to the extent permitted by Section 6.1(k).

*"Permitted Liens"* means:

(1)    Liens securing the Pre-Petition Facilities;

(2)    Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature incurred in the ordinary course of business and permitted to be incurred pursuant to Section 6.1;

(3)    Liens to secure Indebtedness (including Capital Lease Obligations) permitted by Section 6.1(b) hereof covering only the assets acquired with or financed by such Indebtedness;

(4)    Existing Liens other than liens to secure the Pre-Petition Facilities and, in each case, outstanding on the Closing Date;

(5)    Liens for taxes, assessments or governmental charges or claims (a) that are not yet delinquent, (b) that are being contested in good faith by appropriate proceedings, *provided* that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor, (c) to secure amounts that are not material to the value of the properties to which such Liens attach, or (d) the nonpayment of which is permitted by applicable bankruptcy law;

(6)    Liens imposed by law, such as carriers', warehousemen's, landlord's and mechanics' Liens, in each case, incurred in the ordinary course of business or to secure amounts that are not material to the value of the properties to which such Liens attach; *provided*, that the amount of any such Lien that have been recorded or filed with the Office of the County Recorder or the Office of the County Registrar of Titles shall not, at the time outstanding, exceed an aggregate amount of $50,000, which liens are outstanding for more than fifteen (15) days;

(7)    (a) minor survey exceptions, easements or reservations of, or rights of others for, licenses, rights-of-way, leases, sewers, electric lines, gas lines, telegraph and telephone lines and other similar purposes; (b) zoning or other restrictions as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person; and (c) zoning or similar laws or rights reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(8)    security given in the ordinary course of business (and not in connection with the borrowing of money or obtaining of credit) to a public utility or any municipality or governmental or other public authority when required by such utility or municipality or governmental or other authority in connection with the operations of the Debtors;

(9)    Liens arising out of judgments, attachments or awards not constituting an Event of Default under Section 8.1;

16

(10)    Liens incurred or pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security and employee health and disability benefits;

(11)    Liens to secure the performance of tenders, statutory obligations, Mining Financial Assurances, surety or appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds, or other obligations of a like nature incurred in the ordinary course of business, in each case permitted to be incurred pursuant to Section 6.1;

(12)    Liens arising out of conditional sale, title retention consignment or similar arrangements for the sale of goods entered into by the Borrower or any Subsidiary in the ordinary course of business in accordance with the past practice of the Borrower or such Guarantor;

(13)    contractual Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, partnership agreements, leases, area of mutual interest agreements, royalty agreements, marketing agreements, processing agreements, development agreements, and other agreements which are usual and customary in the mining business, including Liens in respect of royalty, production payment and other obligations under coal leases arising in the ordinary course of business;

(14)    contract mining agreements, leases, licenses, subleases and sublicenses of assets (including real property and intellectual property rights) that do not materially interfere with the ordinary course of business of the Debtors;

(15)    any interest or title of a lessor under any operating lease, any purported Liens evidenced by the filing of precautionary UCC financing statements with respect thereto, and any interest or title of a lessor or sublessor under any lease of real property permitted hereunder;

(16)    mortgages, liens, security interests, restrictions, encumbrances or any other matters of record that have been placed by any government, statutory or regulatory authority, developer, landlord or other third party on property over which the Borrower or any Subsidiary has easement rights or on any leased property and subordination or similar arrangements relating thereto;

(17)    Liens on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets;

(18)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to Cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(19)    title defects or irregularities which are of a minor nature and in the aggregate will not materially impair the use of the property for the purposes for which it is held or used by the Debtors or materially adversely affect the security hereunder;

(20)    Liens placed upon equipment or machinery acquired after the date hereof and used in the ordinary course of business of any Debtor or any of its Subsidiaries and placed at the time of

17

the acquisition thereof by such Debtor or such Subsidiary to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 6.1(b) and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any other asset of such Debtor or such Subsidiary;

(21)    Liens (a) incurred in the ordinary course of business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (b) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(22)    Liens on insurance policies and the proceeds thereof pursuant to premium financing arrangements in the ordinary course of business and consistent with past practice, so long as (a) such lien encumbers only the policy on which such premiums are owed and (b) the aggregate Indebtedness secured thereby is permitted by Section 6.1(j); and

(23)    Liens pursuant to indemnity and guaranty agreements that existed as of the Petition Date by which any Debtor indemnifies or guarantees the obligations of any Affiliate thereof under any bond or other obligation of a like nature, so long as such Liens are subordinate to the obligations of the Pre-Petition Facilities and the Liens established in this Agreement.

*"Person"* means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, other legal entities and Governmental Bodies.

*"Petition Date"* has the meaning set forth in the Recitals.

*"PIK Interest"* means payment-in-kind of interest in respect of the Term Loans by increasing the outstanding principal amount thereof by an amount equal to such portion of interest, rather than paying such portion of interest in cash.

*"Post-Carve Out Trigger Notice Cap"* has the meaning set forth in Section 10.4(b).

*"Pre-Petition Agents"* means (a) the Existing Credit Agreement Agent, and (b) Pre-Petition Term Credit Agreement Agent.

*"Pre-Petition Facilities"* means the Existing Credit Agreement and the Pre-Petition Term Credit Agreement, together with all other agreements and documents entered into in connection therewith.

*"Pre-Petition Lenders"* means, collectively, the Existing Credit Agreement Lenders and the Pre-Petition Term Credit Agreement Lenders.

*"Pre-Petition Term Credit Agreement"* means the Credit and Guaranty Agreement, dated as of July 10, 2013, by and among the Borrower and certain Affiliates thereof, as borrowers, certain Subsidiaries thereof, as guarantors, Deutsche Bank Securities Inc., as sole lead arranger, and the Pre-Petition Term Credit Agreement Agent, as amended to date and as it may be amended, restated, supplemented or otherwise modified from time to time, as permitted by the terms thereof, by the Existing Credit Agreement and by the Intercreditor Agreement.

18

" *Pre-Petition Term Credit Agreement Agent*" means Deutsche Bank Trust Company Americas as administrative and collateral agent under the Pre-Petition Term Credit Agreement.

" *Pre-Petition Term Credit Agreement Lenders*" means the "Lenders" as such term is defined in the Pre-Petition Term Credit Agreement.

"*Principal Office*" means, for the Agent, its office located at 375 Hudson Street, 12th Floor, New York, New York 10014, or such other office as Agent may from time to time designate in writing to the Borrower and each Lender.

"*Professionals*" has the meaning set forth in Section 10.4(a).

"*Pro Rata Share*" means with respect to any Lender, the percentage obtained by dividing (a) the Loan Exposure of such Lender then in effect by (b) the aggregate Loan Exposure of all Lenders then in effect.

"*Recipient*" means the Agent and any Lender, as applicable.

"*Reclamation*" means the reclamation and restoration of land, water and any future, current or former mines, and any other environment affected by such mines, as required pursuant to any Mining Law.

"*Register*" has the meaning set forth in Section 2.4(b).

"*Regulation*" means each applicable law, rule, regulation, or order by any Governmental Body, central bank or comparable agency and any request or directive having the force of law of any of those Persons and each judgment, injunction, order, writ, decree or award of any Governmental Body, arbitrator or other Person.

"*Related Parties*" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"*Release*" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"*Relevant Property*" means, for the Borrower or any other Debtor, all sites, facilities, locations, real property and leaseholds presently owned, leased, used or operated, or owned, leased, used or operated by any Debtor (whether or not such properties are currently owned, leased, used or operated by any Debtor).

"*Reorganization Plan*" means a plan of reorganization or liquidation filed by the Debtors in the Chapter 11 Cases.

"*Required Lenders*" means, at any time, one or more Lenders whose Pro Rata Share exceeds 50%.

"*Restricted Payment*" has the meaning set forth in Section 6.8.

"*RH Fifth Amendment Loan*" has the meaning assigned thereto in the Existing Credit Agreement.

*"RH Lender"* means any lender who has made an RH Fifth Amendment Loan, together with any such lender's successors and assigns.

*"RH Pro Rata Share"* the percentage obtained by dividing (i) the aggregate outstanding principal amount of such RH Lender's RH Fifth Amendment Loans by (ii) the aggregate outstanding principal amount of all RH Fifth Amendment Loans.

*"S&P"* means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc., and any successor to its rating agency business.

*"Securities"* means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

*"Sponsors"* means J. Mark Campbell, direct lineal descendants, heirs, estates and beneficiaries of any of them, any charitable foundation created by any of them and trusts for the benefit of any of the foregoing.

*"Sub-Agent"* has the meaning set forth in Section 11.3.

*"Subsidiary"* means, with respect to any specified Person:

(1) any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2) any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof).

*"Superpriority Claim"* means an administrative expense claim having priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code.

*"Surety"* means OneBeacon Insurance Group.

*"Surety Bond Controlled Account"* means that certain Collateral Trust Agreement effective September 11, 2015, between Atlantic Specialty Insurance Company, Cambrian, and Wells Fargo Bank, National Association, securing that certain Surety Bond Program effective August 26, 2015 with respect to the Surety.

*"Taxes"* means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Body, including any interest, additions to tax or penalties applicable thereto.

"*Term Loan*" means, collectively, each Term Loan made by a Lender pursuant to Section 2.1 and in an aggregate principal amount not to exceed the Maximum Amount, together with any PIK Interest added to the outstanding principal amount of the Term Loans pursuant to Section 2.5(a).

"*Term Loan Commitment*" means the commitment of each Lender to make its Pro Rata Share of the Term Loans to Borrower in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.1 attached hereto.

"*Term Loan Lender*" means any lender who has made a Term Loan, together with any such lender's successors and assigns.

"*Term Loan Pro Rata Share*" means (a) prior to the Term Loan Commitments being terminated or reduced to zero, the percentage obtained by dividing (i) the sum of (x) such Lender's Term Loan Commitment plus (y) the aggregate outstanding principal amount of such Lender's Term Loans, by (ii) the sum of (x) the aggregate Term Loan Commitments of all Lenders plus (y) the aggregate outstanding principal amount of all Term Loans, and (b) from and after the time that the Term Loan Commitments have been terminated or reduced to zero, the percentage obtained by dividing (i) the aggregate outstanding principal amount of such Lender's Term Loans by (ii) the aggregate outstanding principal amount of all Term Loans.

"*Term Note*" has the meaning set forth in Section 2.4(c).

"*UCC*" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided, however*, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other that the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"*U.S. Person*" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"*U.S. Trustee*" means the United States Trustee for the Eastern District of Kentucky.

"*Upfront Fee*" has the meaning set forth in Section 2.6(a).

"*Voting Stock*" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

Section 1.2.    *Accounting Terms.*  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by the Borrower to Lenders pursuant to Section 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(c)(iii), if applicable).   Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Financial Statements.

**ARTICLE II**

**TERM LOAN**

Section 2.1.    *Term Loans.*

(a)    Subject to and upon the terms and conditions hereof and relying on the representations and warranties set forth herein,

(i)    prior to the entry of the Final Order, each Lender agrees (severally, not jointly or jointly and severally) to make Term Loans to Borrower on each Funding Date in an aggregate amount not to exceed such Lender's Term Loan Commitment as set forth on Schedule 2.1 and not to exceed the Initial Maximum Amount, and for any week, in an aggregate amount not to exceed the Available Amount for such week set forth in the table below:

| Week | Available Amount |
|------|------------------|
| 1 | Up to $5,000,000 |
| 2 | Up to $3,000,000 |
| 3 | Up to $2,000,000 |
| 4 | Up to $2,000,000 |

Week 1 means the seven-day period commencing with the Petition Date.  Weeks 2 through 4 mean the consecutive seven-day periods immediately following Week 1.  For the avoidance of doubt, the Available Amount is cumulative and any Available Amount not used in any week may be carried over and added to the next subsequent week's Available Amount.

(ii)    subject to the receipt of a Borrowing Certificate pursuant to Section 3.2, upon entry of the Final Order, the Lenders agree (severally, not jointly or jointly and severally) to promptly make Term Loans to the Borrower in an aggregate amount, together with any Term Loans then outstanding, not to exceed the Maximum Amount, based upon the following schedule:

| Week | Available Amount |
|------|------------------|
| Week Beginning July 22, 2019 | Up to $2,000,000 |
| Week Beginning July 29, 2019 | Up to $2,000,000, plus the amount of any undrawn amounts from the prior week |
| Week of August 5, 2019 | $500,000, plus the amount of any undrawn amounts from the prior 2 weeks |

(b)    No Lender shall have any obligation to make a Term Loan in excess of such Lender's Term Loan Commitment.  Subject to Section 2.8 and Section 2.9, all amounts owed hereunder with respect

to the Term Loan shall be paid in full no later than the Maturity Date. Any principal amounts of the Term Loan subsequently repaid or prepaid may not be re-borrowed. Each Lender's Term Loan Commitment shall immediately and permanently and without further action be decreased on each Funding Date by the amount of Term Loans made by such Lender on such Funding Date.

(c)    Whenever the Borrower desires that the Lenders make a Term Loan hereunder, the Borrower shall deliver a Borrowing Certificate to the Agent no later than 10:00 a.m. (New York City time) at least one (1) Business Day in advance of the proposed Funding Date. Such Borrowing Certificate shall provide the amount requested by the Borrower, which shall be in increments of no less than $1,000,000 per draw. Each such Borrowing Certificate shall be accompanied by an updated Cash Flow Budget.

Section 2.2.    *Pro Rata Shares*. The Term Loans shall be made by Lenders simultaneously and proportionately to their respective Pro Rata Share, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Term Loan hereunder.

Section 2.3.    *Use of Proceeds*. The proceeds of the Term Loans shall be used by the Borrower solely to (a) fund post-petition operating expenses and other working capital and financing requirements of the Borrower and its wholly owned Subsidiaries as set forth in the Cash Flow Budgets, (b) pay all Lender Group Expenses and those reasonable and documented fees and expenses payable to the Lender Group, (c) pay fees, costs and expenses specifically related to the Chapter 11 Cases to the extent such fees, costs and expenses are consistent with the Cash Flow Budgets, are approved by the Bankruptcy Court, and relate solely to fees, costs and expenses of the Debtors' professionals or professionals retained by the Lender Group, (d) make certain payments on account of prepetition obligations (including "critical vendor payments") of the Borrower and its wholly owned Subsidiaries, to be mutually agreed with the Lenders, and as approved by the Bankruptcy Court, and (e) pay any other amounts included in the Cash Flow Budgets, including without limitation adequate protection payments, which other amounts shall not exceed the amounts so budgeted. The Lenders acknowledge that the Interim Order and the Initial Cash Flow Budget were acceptable to the Lenders as of the date they were filed and approved by the Bankruptcy Court. Notwithstanding the foregoing but subject to Section 10.4(d), no portion of the Term Loans shall be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the Existing Credit Agreement Agent, or the Existing Credit Agreement Lenders, the Agent or the Lenders.

Section 2.4.    *Evidence of Debt; Register; Notes*.

(a)    *Lenders' Evidence of Debt*. Each Lender shall maintain on its internal records an account or accounts evidencing the Indebtedness of the Borrower to such Lender, including the amounts of the Term Loan owed to it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Borrower and Guarantors, absent manifest error; *provided* that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Term Loan or the Borrower's or the Guarantors' Obligations in respect of the Term Loan; and *provided further* that in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    *Register*. Agent shall maintain, as agent for the Lenders, at Agent's Principal Office, a register for the recordation of the names and addresses of each Lender and the portion of the Term Loan owed to each Lender *(the "Register")*. The Register shall be available for inspection by the Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice. Agent shall record in the Register the fees, interest and the outstanding balance of the Term Loan, and each repayment or prepayment in respect of the principal amount of and interest, fees and other amounts with respect to the Term Loan, and any such recordation shall be conclusive and binding on the Borrower and each Lender, absent manifest error; *provided* that the failure to make any such recordation, or any error in such

23

recordation, shall not affect the principal outstanding amount of the Term Loan, or the Borrower's Obligations in respect thereto. No transfer of a Term Loan and/or any interests therein shall be effective until such transfer is recorded in the Register. The Borrower hereby designates the entity serving as Agent to serve as the Borrower's agent solely for purposes of maintaining the Register as provided in this Section 2.4, and the Borrower hereby agrees that, to the extent such entity serves in such capacity, the entity serving as Agent and its officers, directors, employees, agents and affiliates shall constitute "Indemnified Persons" pursuant to Section 7.3.

(c)    *Notes*. If so requested by any Lender by written notice to the Borrower (with a copy to Agent) prior to the Closing Date, or at any time thereafter, the Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 12.4) on the Closing Date (or, if such request is delivered after the Closing Date, promptly after the Borrower's receipt of such request) a promissory note, in the form of Exhibit B (each, a *"Term Note"*), to evidence such Lender's Term Loans.

Section 2.5.    *Interest*.

(a)    *Applicable Rates*. Except as otherwise set forth herein, all Obligations (including outstanding Term Loans) shall bear interest on the unpaid principal amount thereof from the Interim Order Entry Date made through repayment (whether by acceleration or otherwise) at a rate per annum equal to 12.00%. All interest payments on the Term Loans made pursuant to this Section 2.5 (including interest payable at the default rate set forth in Section 2.5(c) herein) shall accrue and be payable in arrears on each Interest Payment Date and at such other times as may be specified herein. So long as no Default or Event of Default has occurred and is continuing interest due on each Interest Payment Date shall be payable 50% in cash, and 50% as PIK Interest. Such PIK Interest shall be capitalized and added to the outstanding principal amount of the Term Loans on the applicable Interest Payment Date. For purposes of this Agreement and the other Loan Documents, the amounts so capitalized pursuant to the foregoing sentence will constitute a portion of the outstanding principal amount of the Term Loans and will bear interest in accordance with this Section 2.5. In the event that any Default or Event of Default has occurred and is continuing on any Interest Payment Date, all interest must be paid in cash.

(b)    *Accrual/Computation of Interest*. Interest on the Term Loan will accrue initially from the Interim Order Entry Date until the first Interest Payment Date, and thereafter, from the date of the most recent Interest Payment Date. Interest payable pursuant to Section 2.5(a) shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.

(c)    *Default Interest*. Upon the occurrence and during the continuance of an Event of Default, the principal amount of the Term Loans and, to the extent permitted by applicable law, any past due interest payments on the Term Loans or any fees or other amounts owed hereunder, in each case whether at stated maturity, by notice of prepayment, by acceleration or otherwise, shall thereafter bear interest (including, without limitation, interest, as provided in this Agreement, accruing after the filing of a petition initiating any insolvency proceedings, whether or not such interest accrues or is recoverable against the Borrower after the filing of such petition for purposes of the Bankruptcy Code or is an allowed claim in such proceeding) payable on demand at a rate that is 2.00% per annum in excess of the interest rate otherwise payable hereunder with respect to the Term Loans (which shall accrue both before as well as after judgment). Payment or acceptance of the increased rates of interest provided for in this Section 2.5(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Agent or any Lender.

Section 2.6.    *Fees*.

(a)    *Upfront Fee.*  The Borrower shall pay to the Agent for the benefit of each Term Loan Lender in accordance with their Pro Rata Share an upfront fee (the *"Upfront Fee"*) in respect of the aggregate Term Loan Commitments of each Lender on the Interim Order Entry Date equal to 2.50% of the Term Loan Commitments (as calculated immediately prior to the making of the Term Loans on the Interim Order Entry Date).  The Upfront Fee shall be fully earned on the Interim Order Entry Date.  Fifty percent (50%) of the Upfront Fee shall be payable on the Initial Funding Date, and fifty percent (50%) of the Upfront Fee shall be payable on the Maturity Date.

(b)    *Exit Fee*.  The Borrower shall pay to the Agent for the benefit of each Term Loan Lender in accordance with their Pro Rata Share an exit fee (the *"Exit Fee"*) equal to 0.75% of the aggregate amount of Term Loans made by the Lenders pursuant to Section 2.1.  The Exit Fee shall be fully earned with respect to the Term Loans made on each Funding Date, and payable on the Maturity Date.

(c)    *Agency Fee*.  The Borrower shall pay to the Agent for its own benefit an agency fee (the *"Agency Fee"*) in the amount of $45,000.  The Agency Fee shall be fully earned and payable upon the Initial Funding Date.

Section 2.7.    *Repayment*.  Subject to Section 2.8, the Term Loan shall be due and payable, and the Borrower shall be required to repay all of the Obligations (including, without limitation, all accrued and unpaid principal and interest on the principal amounts of the Term Loan) on the Maturity Date.

Section 2.8.    *Voluntary Prepayments*.

(a)    *Voluntary Prepayments*.  At any time and from time to time the Borrower may prepay the Term Loan, in whole or in part, in an aggregate minimum amount of $1,000,000 and in multiples of $500,000 above such amount (or such lesser amount as shall constitute the entire amount of the Term Loan then outstanding or as otherwise permitted hereby).  The Term Loan shall be prepaid according to each Lender's Pro Rata Share.

(b)    *Notice of Voluntary Prepayment*.  All such prepayments shall be made on a Business Day and upon not less than one Business Day's prior written notice given to Agent by 12:00 p.m. (New York City time) on the date required (and Agent will promptly transmit such original notice of prepayment by facsimile, or electronic mail to each Lender).  Upon the giving of any such notice, the principal amount of the Term Loan specified in such notice shall become due and payable on the date specified therein.

Section 2.9.    *Mandatory Prepayments*.

(a)    *Event of Loss.*  Notwithstanding any party other than the Agent being named as "additional insured" or "loss payee" (or in any similar capacity), no later than the first Business Day following the date of receipt by any Debtor of any Net Loss Proceeds, the Borrower shall prepay the Term Loans as set forth in Section 2.10.

(b)    *Asset Sales*.  No later than the first Business Day following the date of receipt by any Debtor of any Net Proceeds, the Borrower shall prepay the Term Loans as set forth in Section 2.10.

Section 2.10.    *Application of Prepayments.*  (a) All prepayments shall be applied (i) prior to the date of the Final Order, *first,* to the outstanding RH Fifth Amendment Loans, together with all accrued interest with respect thereto on a pro rata basis in accordance with the RH Pro Rata Share of each RH Lender and *second,* to the remaining Obligations on a pro rata basis in accordance with the Term Loan Pro Rata Share of each Term Loan Lender and (ii) following the entry of the Final Order, to the Obligations on a pro rata basis in accordance with the Pro Rata Share of each Lender.

(b)    For the avoidance of doubt, all references to and the use of the terms "prepay", "prepaid", or "prepayment" shall mean payment of the Term Loans prior to the original Maturity Date.

Section 2.11.    *General Provisions Regarding Payments.*

(a)    *Payments.*  All payments by the Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to Agent not later than 2:00 p.m. (New York City time) on the date due at Agent's Principal Office for the account of Lenders.  All funds received by Agent after that time on such due date shall be deemed to have been paid by the Borrower on the next succeeding Business Day.

(b)    *Non-Conforming Payments.*  Agent shall deem any payment by or on behalf of the Borrower that is not made in same day funds prior to 2:00 p.m. (New York City time) on the date when due to be a non-conforming payment.  Any such payment shall not be deemed to have been received by Agent until the later of (i) the time such funds become available funds and (ii) the applicable next Business Day.  Agent shall give prompt telephonic notice (confirmed in writing) to the Borrower and each applicable Lender if any payment is non-conforming.  To the extent any non-conforming payment may be deemed to have been received on a date after the date such payment was due hereunder pursuant to the provisions of the prior sentence, such failure of such payment to have been made when due will constitute or become a Default or Event of Default to the extent so provided under the terms of Section 8.1.  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate otherwise applicable hereunder (including, if applicable, pursuant to Section 2.5(c)) from the date such amount was due and payable until the date such amount is paid in full.

(c)    *Payments to Include Accrued Interest.*  All payments in respect of the principal amount of the Term Loan shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of the Term Loan on a date when interest is due and payable with respect to the Term Loan) shall be applied to the payment of interest before application to principal.

(d)    *Distributions by Agent.*  Agent shall promptly distribute to each Lender such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable with respect thereto, to the extent received by Agent.

(e)    *Business Days.*  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

Section 2.12.    *Ratable Sharing.*  Lenders hereby agree among themselves that if any of them shall, whether by mandatory or voluntary prepayment (other than a voluntary prepayment of the Term Loan made and applied in accordance with the terms hereof), through the exercise of any right of setoff or banker's lien, by counterclaim or cross-action or by the enforcement of any right under the Loan Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Loan Documents (collectively, the *"Aggregate Amounts Due"* to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify the Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase (for Cash at face value) participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by

26

such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; *provided* that if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of the Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest and, *provided, further* that the provisions of this Section 2.12 shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement, or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in its Term Loan to any assignee or participant, including, but not limited to, an Affiliate of the Debtors.  Each Debtor expressly consents to the foregoing arrangement and agrees, to the extent it may effectively do so under applicable law, that any holder of a participation so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all monies owing by any of the Debtors to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

Section 2.13.    *Termination of Commitments.*  The Term Loan Commitment of each Lender shall be automatically and permanently reduced (a) by the principal amount of each Term Loan made by such Lender pursuant to Section 2.1, and (b) in full, upon (i) acceleration of the Term Loans pursuant to Section 8.2(a) or (ii) the election of the Lenders upon the occurrence and during the continuance of an Event of Default.

ARTICLE III

CONDITIONS PRECEDENT

Section 3.1.    *Conditions Precedent to Closing Date* .  The obligation of any Lender to make a Term Loan and to make the other financial accommodations described herein on or after the Closing Date is subject to the satisfaction, or waiver in accordance with Section 12.1, of the following conditions on or before the Closing Date:

(a)    *Chapter 11 Case*.  The Debtors shall have commenced the Chapter 11 Cases.

(b)    *DIP Credit Agreement*.  The Agent and the Lenders shall have received (i) duly executed copies of this Agreement and (ii) duly executed original copies of any Notes (to the extent requested by any Lender at least one (1) day prior to the Closing Date), in each case, in form and substance reasonably acceptable to the Agent and the Lenders.

(c)    *Secretary's Certificate.*  The Lenders shall have received a certificate of an Authorized Officer of each Debtor with respect to (i) the certificate of incorporation, the articles of incorporation, the certificate of formation or other organizational documents, as the case may be, of such Debtor, as applicable, each as amended or amended and restated to date, (ii) the regulations, bylaws, operating agreement or limited partnership agreement, as the case may be, of such Debtor, as applicable, each as amended or amended and restated to date, (iii) the resolutions of the board of directors, manager or general partner, as the case may be, of such Debtor, as applicable, approving each Loan Document to which such party is a party, the other documents to be delivered by such party under the Loan Documents and the performance of the obligations of such party thereunder, and (iv) the names and true signatures of the officers of such Debtor, as applicable, or such other persons authorized to sign each Loan Document to which such party is a party and the other documents to be delivered by it under the Loan Documents.

(d)    *Organizational and Capital Structure.*  On the Closing Date, the organizational structure and capital structure of the Borrower and its Subsidiaries shall be as set forth on Schedule 3.1(d).

27

(e)    *Good Standing Certificates.*  The Agent shall have received a good standing certificate from the applicable Governmental Body of each Debtor's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated as of a recent date prior to the Closing Date and in form and substance satisfactory to Lenders.

(f)    *Closing Date Certificate.*  The Agent shall have received a copy of an executed Closing Date Certificate from the Borrower, together with any attachments thereto.

(g)    *Payment of Fees and Expenses*.  The Agent and the Lenders shall have received all of the legal fees and other fees, costs and other Lender Group Expenses incurred by the Agent or any Lender that are reimbursable by Borrower pursuant to Section 12.3 or otherwise pursuant to the Loan Documents as of the Closing Date.

(h)    *Initial Cash Flow Budget*.  The Agent shall have received the Initial Cash Flow Budget, which Initial Cash Flow Budget shall be in form and substance satisfactory to the Agent and the Required Lenders.

(i)    *Interim Order*.

(i)    The Bankruptcy Court shall have entered the Interim Order, which among other things, shall approve the transactions contemplated hereby and grant a perfected security interest in the Collateral with the priority described in Article X and find that the Lenders are extending credit to the Borrower in good faith within the meaning of Section 364(e) of the Bankruptcy Code.

(ii)    The Interim Order shall (a) approve the Debtors' waiver of any and all claims and causes of action against the Existing Credit Agreement Lenders, including, but not limited to, claims for preference, fraudulent conveyance or other claims arising under Title 11 of the United States Code, and claims regarding the validity, priority, perfection or avoidability of the secured claims of the Existing Credit Agreement Lenders, subject to any official committee's rights to pursue such claims, (b) establish a deadline of the later of (x) seventy-five (75) days from the entry of the Interim Order, (y) sixty (60) days from the appointment of any Committee or any trustee, or (z) sixty (60) days from the appointment of a Chapter 7 trustee if a Chapter 7 trustee is appointed, to bring any causes of action against the Existing Credit Agreement Lenders based on the Existing Credit Agreement or any acts or omissions of the Existing Credit Agreement Lenders that occurred prior to the filing of the Chapter 11 Cases, (c) preclude any priming of any Lien of the Lenders, other than pursuant to this Agreement and the other Loan Documents, (d) provide the right for the Existing Credit Agreement Agent (on behalf of the Lenders) and/or the Lenders to credit bid under Section 363(k) of the Bankruptcy Code, and (e) include Milestones for a Section 363 sales process as set forth in Section 5.17.

(iii)    The Interim Order (a) shall be in form and substance satisfactory to the Agent and the Required Lenders in their sole discretion, (b) shall have been entered upon an application of the Debtors reasonably satisfactory in form and substance to the Required Lenders, (c) shall be in full force and effect and (d) shall not have been reversed, modified, amended or stayed (without the Required Lenders' prior written consent, which consent shall be in their sole discretion) and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of such Term Loans nor the performance by the Debtors of any of their respective Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(j)    *Motions and Other Pleadings*.  Prior to filing or submission to the Bankruptcy Court, counsel to the Lenders shall have received the motions and other pleadings or related documents to be filed or submitted to the Bankruptcy Court in connection with this Agreement and the other Loan Documents and the approval thereof, and such motions, orders, pleadings and related documents shall be reasonably satisfactory in all respects to such counsel.

(k)      *First Day Orders*.  Prior to filing or submission to the Bankruptcy Court, counsel to the Lenders shall have received all first day and related orders to be filed with the Bankruptcy Court in the Chapter 11 Cases, including without limitation any and all cash collateral orders and related orders, and such orders shall be reasonably satisfactory in all respects to such counsel.  The Existing Credit Agreement Agent shall have consented to the use of its cash collateral in connection with such orders.

(l)      *Priority of Claims*.  Upon the entry of the Interim Order, the Superpriority Claim status and Liens of the Lenders and the Agent shall be as set forth in Article X.

(m)      *Representations and Warranties*.  Each of the representations and warranties set forth in this Agreement and in each other Loan Document shall be true and correct in all material respects on the Closing Date, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct in all material respects as of such earlier date.

(n)      *No Default*.  No Default or Event of Default shall have occurred and be continuing on the Closing Date, and no event or condition shall have occurred or be existing which would reasonably be expected to result in a Default or an Event of Default after giving effect to any Term Loan made on the Closing Date.

(o)      *Sales Procedure*.  The Debtors shall have submitted a proposed form of bidding procedures sales order (or agreed to motion filed requesting such order) acceptable to the Lenders.

(p)      *Chief Restructuring Advisor*.  The Debtors shall have filed an application to retain FTI Consulting, Inc. as the chief restricting advisor for the Debtors.

Section 3.2.      *Conditions to each Funding Date*.  The obligation of the Lenders to make Term Loans hereunder, or to take, fulfill or perform any other action hereunder, is subject to the satisfaction or waiver, in a manner satisfactory to the Agent and Required Lenders, of the following conditions:

(a)      *Representations and Warranties*.  Each of the representations and warranties set forth in this Agreement and in each other Loan Document shall be true and correct in all material respects on the applicable date of the Borrowing, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct in all material respects as of such earlier date.

(b)      *No Default*.  No Default or Event of Default shall have occurred and be continuing on the applicable date of the Borrowing, and no event or condition shall have occurred or be existing which would

reasonably be expected to result in a Default or an Event of Default after giving effect to the subsequent Term Loan made on the applicable date of the Borrowing.

(c)     *Borrowing Certificate*.  The Agent shall have received a duly executed Borrowing Certificate from Borrower.

(d)     *Cash Flow Budget*.  The Agent shall have received the most recent Cash Flow Budget required to be delivered pursuant to Section 5.1(c).

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES**

*Section 4.1.     Representations and Warranties*.  To induce the Agent and the Lenders to provide the financing arrangements contemplated by this Agreement and to undertake their respective obligations hereunder and under the other Loan Documents, each Debtor makes the following representations and warranties to Agent and the Lenders, subject to entry by the Bankruptcy Court of the Orders, where applicable, and each and all of which representations and warranties shall survive the execution and delivery of this Agreement:

(a)     *Corporate Status; Corporate Authorization*.  Each Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and is duly qualified and in good standing in every other jurisdiction where it is doing business except where the failure to so qualify does not have a Material Adverse Effect on it, and the execution, delivery and performance by each Debtor of the Loan Documents (i) are within its respective authority, (ii) have been duly authorized and (iii) do not conflict with or contravene its respective corporate governance documents.  The execution, delivery, performance of their respective obligations and exercise of their respective rights under the Loan Documents by each Debtor thereto, including, without limitation, the making of the Loans under this Agreement, (i) do not require any Consents that have not been obtained (other than any Consents for which the failure to obtain would not have a Material Adverse Effect) and (ii) are not and will not be in conflict with or prohibited or prevented by (A) any Regulation or (B) any corporate governance document, corporate minute or resolution or (C) any instrument, agreement or provision thereof, in each case binding on any of them or affecting any of their property.

(b)     *Execution and Binding Effect*.  Upon execution and delivery thereof, each Loan Document shall constitute the legal, valid and binding obligation of each Debtor which is a party thereto, enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

(c)     *Properties*.  (i) Each Debtor has good and marketable title to all material real property owned or purported to be owned by it, in each case free of all Liens other than Permitted Liens;

(ii)     each Debtor is in lawful possession of a valid and subsisting leasehold estate in and to its leasehold properties which it purports to lease free and clear of all Liens other than Permitted Liens;

(iii)     each Debtor enjoys peaceful and undisturbed possession of, or a license to use, all property (subject only to the Permitted Liens) that is necessary for their respective businesses; and

30

(iv)        set forth on Schedule 4.1(c) is a list, as of the date hereof, of all or substantially all real property held by any Debtor, indicating in each case whether the respective property is owned or leased, the identity of the owner or lessee, and the location of the respective property.

(d)        *Initial Cash Flow Budget.*  The Borrower has delivered to the Agent and each of the Lenders the Initial Cash Flow Budget.  The Initial Cash Flow Budget has been prepared in good faith based upon assumptions which the Borrower believes to be reasonable.

(e)        *Absence of Material Adverse Effect.*  There has been no act, condition or event which has had or is reasonably likely to have a Material Adverse Effect since the Petition Date.

(f)        *Litigation.*  Schedule 4.1(f) sets forth (i) all actions, suits, investigations, litigations or proceedings, pending in any court or before any arbitrator or Governmental Body as of the Closing Date relating to the Debtors, which would, alone or together, be reasonably expected to have a Material Adverse Effect and (ii) all legal proceedings pending as of the Closing Date with any supplier owed in excess of $100,000 as of the Closing Date.

(g)        *Governmental Approvals and Filings.*  No approval, order, consent, authorization, certificate, license, permit or validation of, or exemption or other action by, or filing, recording or registration with, or notice to, any Governmental Body which has not been obtained is or will be necessary in connection with the execution and delivery of this Agreement or any other Loan Document, consummation by the Debtors of the transactions herein or therein contemplated, or performance of or compliance with the terms and conditions hereof or thereof, other than the filings and recordations contemplated by the Collateral Documents (if any).  No Debtor is subject to regulation under the Federal Power Act, the Interstate Commerce Act or the Investment Company Act of 1940 or to any federal, state or provincial statute or regulation limiting the ability of the Borrower to incur Indebtedness for money borrowed.  No Debtor is required to register as an "investment company" or is "controlled" by an entity that is required to register as an "investment company," all within the meaning of the Investment Company Act of 1940, as amended.

(h)        *Absence of Conflicts.*  The execution and delivery by each Debtor of this Agreement and each other Loan Document to which it is a party and performance by it hereunder and thereunder will not violate any law (including, without limitation, Regulations T, U and X of the Federal Reserve Board) and will not conflict with or result in a breach of any order, writ, injunction, resolution, decree or other similar document or instrument of any court or Governmental Body or its certificate of incorporation or by-laws or similar constituent documents or, except under the Collateral Documents, result in the imposition of any Lien (other than Permitted Liens) of any nature whatsoever upon any of the properties or assets owned by or used in connection with the business of the Borrower and its Subsidiaries.

(i)        *Partnerships, Etc.*  Except as set forth on Schedule 4.1(i), as of the Closing Date no Debtor is a partner (general or limited) of any partnership, is a party to any joint venture or owns (beneficially or of record) any equity or similar interest in any similar Person (including, without limitation, any interest pursuant to which any Debtor has or may in any circumstance have an obligation to make capital contributions to, or be generally liable for or on account of the liabilities, acts or omissions of such other Person).

(j)        *Fiscal Year.*  Each Fiscal Year of each of the Debtors ends on December 31 of each calendar year.

(k)        *Officers.*  As of the Closing Date, each of the officers of the Debtors is as set forth on Schedule 4.1(k).

(l)    *Capitalization.*  (i) Except for warrants issued to Lenders under the Pre-Petition Facilities, as of the Closing Date, each Debtor is the record and beneficial owner of all of the issued and outstanding shares of Capital Stock of each of the Subsidiaries listed on Schedule 4.1(l) as being owned by such Debtor and there are no proxies, irrevocable or otherwise, with respect to such shares and no equity securities of any of the Subsidiaries are or may become required to be issued by reason of any options, warrants, rights to subscribe to, calls or commitments of any kind or nature and there are no contracts, commitments, understandings or arrangements by which any Subsidiary is or may become bound to issue additional shares of its Capital Stock or securities convertible into or exchangeable for such shares.

(ii)    As of the Closing Date, the issued and outstanding shares of Capital Stock of each Debtor are directly and beneficially owned and held by the persons indicated on Schedule 4.1(l), and in each case all of such shares have been duly authorized and are fully paid and non-assessable.

(m)    *Material Misstatements and Omissions.*  After giving effect to the Petition Date, no factual information (taken as a whole) furnished by the Debtors or any of their Affiliates in writing to the Agent or any Lender for purposes of, or in connection with, this Agreement, or the other Loan Documents (as modified by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this Section 4.1(m), such factual information shall not include any projections, estimates (including financial estimates, forecasts and other forward-looking information), any pro forma financial information, or information of a general economic or general industry nature.

(n)    *Labor Practices.*  No Debtor is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is no (i) unfair labor practice complaint pending against any Debtor or threatened against any Debtor before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against any Debtor or threatened against any Debtor, (ii) strike or work stoppage in existence or threatened involving any Debtor, and (iii) union representation question existing with respect to the employees of any Debtor, as the case may be, and no union organization activity that is taking place, except (with respect to any matter specified in clause (i), (ii) or (iii) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

(o)    *Employee Benefits.*   None of the Employee Benefit Plans is a Pension Plan or a Multiemployer Plan.  Each Debtor and each of their ERISA Affiliates are in substantial compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all of their obligations under each Employee Benefit Plan, except where such noncompliance and/or failure to perform such obligations could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code is so qualified.  Except as set forth on Schedule 4.1(o) or to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Debtor or any of their respective ERISA Affiliates.  Borrower, its Subsidiaries and their respective ERISA Affiliates have no actual or contingent liability under the Coal Industry Retiree Health Benefit Act of 1992, as amended.

(p)    *Environmental Matters.*  (a) Neither Borrower nor any of its Subsidiaries nor any of their respective Relevant Properties or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity and (b) there are no pending or, to Borrower's and its Subsidiaries'

knowledge, threatened, Environmental Claims related to Borrower or any of its Subsidiaries, and there are and, to Borrower's and its Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of such an Environmental Claim, in each case in this subclause (b), that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  Except as could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, (a) Borrower and each of its Subsidiaries is in compliance with, and has no liability under, Environmental Law or Mining Law; and (b) Borrower and each of its Subsidiaries has obtained, and is in compliance with, all Environmental or Mining Permits required for the conduct of their businesses and operations, and all such Environmental or Mining Permits are valid and in good standing.  Except for Black Lung Liabilities that are being paid in the ordinary course of business, there are no material Black Lung Liabilities pending or to Borrower's and its Subsidiaries' knowledge, threatened, against Borrower or any of its Subsidiaries.  All Mining Financial Assurances have been obtained by Borrower and each of its Subsidiaries.  Neither Borrower nor any of its Subsidiaries has been barred for a period of sixty (60) or more consecutive days from receiving surface or underground Permits pursuant to the permit blockage provisions of the Surface Mining Control and Reclamation Act, 30 U.S.C. §§1201 et seq., and the regulations promulgated thereunder, or any corresponding state laws or regulations.

(q)    *Insurance.*  As of the date hereof, the policies and binders for fire, liability, product liability, workmen's compensation, vehicular and other insurance currently held by or on behalf of each Debtor insure their respective material properties and business activities against such losses and risks as are adequate to protect its properties in accordance with customary industry practices when entered into or renewed.  As of the date hereof, all such policies, binders and self-insurance programs are in full force and effect.  As of the date hereof, except as set forth on Schedule 4.1(q), no Debtor has received notice from any insurer or agent of such insurer that substantial capital improvements or other expenditures are required. As of the date hereof, no Debtor has received notice of cancellation of any material insurance policy or binder.  Prior to the Closing Date, the Debtors have provided the Agent and the Lenders with true, correct and complete copies of all the insurance policies held by the Debtors.  For the avoidance of doubt, the Agent and the Lenders recognize that the Debtors do not hold an insurance policy with respect to director and officer liability and that the failure of the Debtors to have such a policy shall not be a default hereunder.

(r)    *Intellectual Property.*  Each Debtor owns, or is licensed or otherwise has the right to use the Intellectual Property necessary to own and operate its properties and to carry on its business as presently conducted and presently planned to be conducted without conflict with the rights of others, except for such instances of non-compliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  As of the date hereof, the Debtors do not have any Intellectual Property registered, or subject to pending applications, in the United States Patent and Trademark Office or any similar office or agency in the United States, any State thereof, any political subdivision thereof or in any other country.

(s)    *Compliance with Laws.*  Each Debtor has complied and is in compliance in all respects with all Laws (including Environmental Laws and Mining Laws), except for such instances of non-compliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(t)    *Brokerage Fees.*  Except for fees payable to Jefferies LLC in accordance with the terms of its engagement letter with Debtors and the order of the Bankruptcy Court authorizing the retention and employment of Jefferies LLC, no broker's or finder's fee or commission will be payable with respect to the execution and delivery of this Agreement and the other Loan Documents, and no other similar fees or commissions will be payable by the Debtors for any other services rendered to the Debtors ancillary to the credit transactions contemplated herein.

(u)    *Margin Regulations.*  No part of the proceeds of the Term Loan borrowed hereunder will be used for the purpose of buying or carrying any Margin Stock or to extend credit to others for the purpose of buying or carrying any Margin Stock, in either case in a manner which would violate or conflict with Regulations T, U or X of the Board of Governors of the Federal Reserve System.  No Debtor is engaged in the business of extending credit to others for the purpose of buying or carrying Margin Stock.  Neither the making of the Term Loan nor any use of proceeds of any such loan will violate or conflict with the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System, as amended from time to time.

(v)    *Taxes.*  Except as set forth on Schedule 4.1(v), each Debtor has filed all federal and other material Tax returns required to be filed by it and has not failed to pay any material taxes, or interest and penalties relating thereto, on or before the due dates thereof except for Taxes not yet due and except for those the amount or validity of which is currently being contested in good faith by appropriate proceedings. Except as may be previously disclosed to the Agent and to the extent that reserves are reflected in the Financial Statements, (i) there are no material federal, state or local tax liabilities of any Debtor due or to become due for any tax year ended on or prior to the date hereof relating to any Debtor, which are not reflected in the Financial Statements and (ii) there are no material claims pending, proposed or threatened against any Debtor for past federal, state or local taxes, except those, if any, as to which proper reserves in accordance with GAAP are reflected in such Financial Statements.

(w)    *USA Patriot Act; Etc.*  Each Debtor is in compliance in all material respects with the USA Patriot Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001)).  No part of the proceeds of the extensions of credit hereunder will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the federal Foreign Corrupt Practices Act of 1977 (as amended from time to time).

## ARTICLE V

### AFFIRMATIVE COVENANTS

Each Debtor covenants and agrees that so long as the Term Loan or any other Obligation shall remain unpaid or unsatisfied, each Debtor shall perform, and shall cause each of its Subsidiaries to perform, all the covenants in this Article V:

Section 5.1.    *Basic Reporting Requirements.*  The Borrower shall furnish to the Agent and the Lenders:

(a)    *Annual Financial Statements.* As soon as available, and in any event within one hundred and twenty (120) days after the end of each Fiscal Year, the consolidated balance sheets of the Borrower and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Year, together with a Financial Officer Certification and a Narrative Report with respect thereto.

(b)    *Quarterly Financial Statements.*  As soon as available, and in any event within sixty (60) days after the end of each of the first three Fiscal Quarters of each Fiscal Year, the consolidated balance sheets of the Borrower and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, together with a Financial Officer Certification and a Narrative Report with respect thereto.

(c)    *Cash Flow Budgets.*

(i)       On or before the Initial Funding Date, Debtors shall deliver to the Agent and Lenders a pro forma rolling thirteen calendar week cash flow budget for the Debtors, which budget shall (x) be reasonably satisfactory in all respects to the Required Lenders and (y) be substantially in the form of Exhibit C (the first such budget delivered, the *"Initial Cash Flow Budget"*, and each such budget, a *"Cash Flow Budget"*).

(ii)      Commencing for the first full calendar week following the Petition Date (by no later than 12:00 Noon Eastern time on the third Business Day of such calendar week), Debtors shall deliver to the Agent and Lenders an updated Cash Flow Budget covering the rolling thirteen calendar week period commencing with the first full calendar week following the date each such updated Cash Flow Budget is delivered, which updates shall be subject to the approval of the Required Lenders (i) in their reasonable discretion with respect to the new 13th calendar week being added to the updated Cash Flow Budget, and (ii) in their sole discretion with respect to any of the other calendar weeks in such updated Cash Flow Budget.  Unless otherwise approved by the Required Lenders, each updated Cash Flow Budget shall be identical to the previously approved Cash Flow Budget except with respect to the calendar week not covered by such prior Cash Flow Budget.

(iii)     Each Cash Flow Budget (except the Initial Cash Flow Budget) shall be accompanied by a reconciliation of the actual results for the immediately preceding calendar week period to the Cash Flow Budget for such immediately preceding calendar week period and a detailed explanation of all material variances from the Cash Flow Budget.

Section 5.2.      *Accounting and Cost Control Systems.*  Each Debtor shall keep true and accurate books of account in accordance with GAAP.

Section 5.3.      *Access; Visitation; Verification.*  The Debtors will keep proper books of record and account sufficient to permit the preparation of financial statements in accordance with GAAP.  The Debtors will permit any representatives designated by the Agent and the Lenders to visit and inspect any properties of the Debtors at the reasonable expense of the Borrower at any time with reasonable advance notice and during normal business hours.  The Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent accountants and financial advisors.

Section 5.4.      *Maintenance of Existence.*  The Debtors shall do all things necessary to maintain: (a) their corporate, partnership, limited liability company or other existence in accordance with the respective organizational documents (as the same may be amended from time to time upon prior written notice to the Agent) and (b) their rights (charter and statutory), licenses and franchises; *provided* the Debtors shall not be required to preserve any such right, license or franchise, or the corporate, partnership, limited liability company or other existence (other than that of the Borrowers), if (i) the Debtors in good faith shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Debtors and (ii) any such action would not, and would not reasonably be expected to, result in a Material Adverse Effect.

Section 5.5.      *Preservation of Assets; Principal Place of Business.*  Each Debtor shall maintain its assets in good operating conditions and repair and shall make such repairs and replacements as are required in accordance with generally accepted prudent Central Appalachian mining industry practice (subject to ordinary wear and tear, the occurrence of casualty events and all provisions of this Agreement permitting sales of certain assets of the Debtors), keep its business and assets adequately insured, maintain its chief executive office and originals or copies of the principal books and records in the United States, continue to engage in the same or substantially similar lines of business, and comply in all material respects with all Regulations, including, without limitation, ERISA and Environmental Laws, except, in each case, to the extent that failure to so act, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

*Section 5.6.    Notice of Material Events.*  Each Debtor shall notify the Agent and the Lenders promptly in writing (i) of the occurrence of any Default or Event of Default, (ii) of any noncompliance with ERISA or any Environmental Law, Environmental or Mining Permit or proceeding in respect thereof which has had, or would be reasonably expected to have, a Material Adverse Effect on such Person, (iii) of any threatened or pending litigation or other proceeding or claim affecting the Borrower, any of its Subsidiaries or any other Debtor involving claims which in the reasonable judgment of such Person could result in liability (including Environmental Liability) in excess of $100,000 in the aggregate or any material change in any such litigation or proceeding previously reported, (iv) of any claims which in the reasonable judgment of the Borrower could result in liability in excess of $100,000 in the aggregate against any assets or properties of any Debtor encumbered in favor of the Agent and/or the Lenders, (v) any lost time accidents that (x) are Immediately Reportable Accidents (as such term is defined by the Mine Safety and Health Administration) and (y) cause an interruption of mining for three or more days, (vi) geological events that cause an interruption of mining for three or more days, and (vii) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

*Section 5.7.    Use of Proceeds.*  The Borrower, each of its Subsidiaries and each of the other Debtors shall use the proceeds of the Term Loans only as permitted by Section 2.3 hereof.

*Section 5.8.    Further Assurances.*  (a) Each Debtor shall cooperate with the Agent, take such action, execute such documents, and provide such information as the Agent may from time to time reasonably request in order to further effect the transactions contemplated by and the purposes of the Loan Documents.

(b)    Each Debtor shall promptly, upon request by any Lender, correct, and cause each of the other Debtors to any Loan Document to promptly correct, any defect or error that may be discovered in any Loan Document or in the execution, acknowledgment or recordation of any Loan Document.  Promptly upon request by the Agent or the Required Lenders, the Debtors shall execute, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, documents, security agreements, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments as the Agent or the Required Lenders may reasonably require from time to time in order to carry out more effectively the purposes of each Loan Document.  Without limiting the foregoing, each Debtor shall (A) authorize the Agent to file UCC-1 financing statements in all jurisdictions deemed necessary or desirable by Agent, and (B) take such action from time to time (including, without limitation, filing, executing and delivering such assignments, security agreement and other instruments) as shall be reasonably requested by the Agent to create, in favor of the Lenders to the maximum extent permitted under applicable law, a first-priority perfected Lien in all of the Collateral (subject to Permitted Liens).

*Section 5.9.    Insurance*.  The Borrower and its Subsidiaries shall:  (i) keep their properties adequately insured at all times by financially sound and reputable insurers; (ii) maintain such other insurance, to such extent and against such risks (and with such deductibles, retentions and exclusions), including all property and general liability coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations; and (iii) maintain such other insurance as may be required by law.

*Section 5.10.    Information Regarding Collateral.*  The Borrower will furnish to the Agent and the Lenders prompt written notice of any change in (i) any Debtor's corporate name or any trade name used to identify it in the conduct of its business or any Debtor's chief executive office, its principal place of business or its jurisdiction of organization, (ii) any Debtor's identity or corporate structure or (iii) any Debtor's federal Taxpayer Identification Number.  The Borrower will not effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC and all other actions have been

taken that are required so that such change will not at any time adversely affect the validity, perfection or priority of any Lien established under any Loan Document on the Collateral.

Section 5.11.    *Maintenance of Approvals.*    Each Debtor shall maintain, and to the extent not obtained on or prior to the Closing Date, obtain on or before the date on which they are required to be obtained, or cause to be so maintained or obtained, all Permits in good standing, in full force and effect, in its name, not subject to appeal and free from conditions or requirements, except to the extent that a failure to do so either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect.    Each Debtor shall comply with and observe all Permits, complying with all applicable terms and conditions, pay all fees when due and take all actions to prevent cancellation, termination or suspension of any Permit, except to the extent that a failure to do so either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect.    In addition, each Debtor will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its other rights, licenses, permits (including, without limitation, Environmental or Mining Permits) privileges, franchises, patent, copyrights, trademarks and trade names material to the conduct of its business, except to the extent that failure to so act, which either individually or in the aggregate, could not reasonably expected to have a Material Adverse Effect.

Section 5.12.    *Taxes.*    Each Debtor will pay its Tax liabilities accruing after the Petition Date before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and such Debtor has set aside on its books adequate reserves with respect thereto in accordance with GAAP or (b) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

Section 5.13.    *Compliance with Laws.*    Each Debtor shall comply, and use its reasonable best efforts to cause its contractors to comply, with all applicable laws, rules, regulations and orders of Governmental Bodies (including without limitation Environmental Laws, Environmental or Mining Permits, health and safety, and mining laws), except where such failure to comply could not reasonably be expected to have a Material Adverse Effect.

Section 5.14.    *Stay, Extension and Usury Laws.*    Each Debtor covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement; and each Debtor (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Agent, but will suffer and permit the execution of every such power as though no such law has been enacted.

Section 5.15.    *Compliance with ERISA.*    Each Debtor shall, and shall cause each of its ERISA Affiliates to:  (i) maintain each Employee Benefit Plan in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other Federal and State law; (ii) cause each Employee Benefit Plan which is qualified under Section 401(a) of the Internal Revenue Code to maintain such qualification; (iii) not allow or suffer to exist any prohibited transaction involving any Employee Benefit Plan or any trust created thereunder which would subject such Debtor or such ERISA Affiliate to a material tax or other material liability on prohibited transactions imposed under Section 4975 of the Internal Revenue Code or ERISA; and (iv) make all required contributions to any Employee Benefit Plan which it is obligated to pay under ERISA, the Internal Revenue Code or the terms of such Employee Benefit Plan.

Section 5.16.    *Information.*

(a)      The Debtors shall (i) cooperate with the Required Lenders and/or their respective legal and financial advisors to provide, as soon as reasonably practicable following any request and, unless agreed otherwise by the Agent and the Lenders, within two (2) Business Days of such request or within five (5) Business Days of such request if the information requested does not exist and cannot reasonably be compiled within two (2) Business Days, all information reasonably requested by the Required Lenders and/or their respective legal and financial advisors with respect to the Debtors, including without limitation, (A) the operations, business affairs or financial condition of the Debtors, (B) the compliance with the terms of any Material Contract (including, but not limited to, this Agreement and the Pre-Petition Facilities) and (C) information and updates regarding the achievement or progress towards the Milestones (as requested through the Agent) and (ii) meet in person or telephonically (at the option of the Borrower) with any available Lenders and/or their financial advisors on a weekly basis.

(b)      The Borrower shall provide notice to the respective financial advisors and legal counsel to the Lenders within two (2) Business Days of any of the following:  (i) changes to any Coal Supply Agreement outside of the ordinary course of business; (ii) significant change to any labor agreement; (iii) change in senior management; and (iv) any event that has or could reasonably be expected to result in a Material Adverse Effect.

Section 5.17.    *Milestones*.  The Debtors shall comply with the following and produce and deliver the following documents (with a level of completeness, clarity and detail that is satisfactory to Required Lenders) or achieve the following actions, as applicable, on or prior to the date indicated for each such material action or document below (each a *"Milestone"* and collectively, the *"Milestones"*):

(a)      On or prior to the third (3rd) day after the Petition Date, the Bankruptcy Court shall have entered the Interim Order in form and substance acceptable to counsel to the Lenders.

(b)      On or prior to the forty-fifth (45th) day after the Petition Date, the Bankruptcy Court shall have entered the Final Order in form and substance acceptable to counsel to the Lenders.

(c)      The bid deadline shall be September 11, 2019 (or such later date as may be agreed by the Required Lenders).

(d)      On or by September 18, 2019, a public auction of the assets of the Debtors shall be held at a time and place acceptable to the Required Lenders.

(e)      On or by September 19, 2019 (or such longer period as may be agreed by the Required Lenders), the Bankruptcy Court shall enter an order acceptable to the Required Lenders approving the sale of substantially all of the assets of the Debtors.

(f)      On or by October 9, 2019 (or such longer period as may be agreed by the Required Lenders), the closing of the sale of substantially all of the assets of the Debtors shall have occurred.

Section 5.18.    *Post-Closing Deliverables* .  Within 20 days after entry of the Interim Order (or such longer period as may be agreed by the Required Lenders), the Borrower shall provide to the Agent evidence of all insurance coverage required hereby, in form, scope and substance satisfactory to the Agent.

## ARTICLE VI

## NEGATIVE COVENANTS

Each Debtor covenants and agrees that so long as the Term Loans or any other Obligation (other than contingent obligations, including, without limitation, any indemnities described in Article VII or

38

elsewhere and reimbursement obligations under Section 12.3, which are not then due and payable) shall remain unpaid or unsatisfied, each Debtor shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Article VI:

Section 6.1.    *Indebtedness.*  No Debtor shall incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, Disqualified Stock, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, except (collectively, *"Permitted Debt"*):

(a)    the Obligations;

(b)    the incurrence in the ordinary course by the Debtors of Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purchase price, lease or cost of design, construction, installation, repair or improvement of property (real or personal), plant or equipment used in the business of the Debtors, in an aggregate principal amount not to exceed $100,000 at any time outstanding;

(c)    the incurrence by the Debtors of Indebtedness in respect of workers' compensation claims, health, disability or other employee benefits, property, casualty, liability or self-insurance obligations, bankers' acceptances, guaranties, performance, bid, completion, remediation, reclamation, surety, appeal, black lung, workers' compensation and similar bonds, in the ordinary course of business and reimbursement obligations on any letters of credit issued with respect thereto;

(d)    Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(e)    Indebtedness of the Debtors with respect to letters of credit (and reimbursement obligations in respect thereof) or similar instruments, in each case issued in the ordinary course of business of such Debtor not constituting an obligation for money borrowed in an aggregate amount not to exceed $100,000 at any time outstanding;

(f)    the Pre-Petition Facilities;

(g)    guaranties in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of any Debtor and its Subsidiaries;

(h)    guaranties by a Borrower of Indebtedness of a Guarantor or guaranties by a Guarantor of Indebtedness of a Borrower or another Guarantor with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.1; *provided*, that if the Indebtedness that is being guarantied is unsecured and/or subordinated to the Obligations and the obligations of the Pre-Petition Facilities, the guaranty shall also be unsecured and/or subordinated to the Obligations;

(i)    Indebtedness relating to insurance premium financing in an aggregate amount not to exceed $4,000,000 at any time;

(j)    Indebtedness of and Debtor under Hedge Agreements entered into with respect to other Indebtedness permitted under this Section 6.1 or in the ordinary course of business;

(k)    indemnification obligations not incurred in connection with borrowed money;

39

(l)    indemnity and guaranty agreements that existed as of the Petition Date by which any Debtor indemnifies or guarantees the obligations of any Affiliate thereof under any bond or other obligation of a like nature, so long as any security interest securing such indemnity and guaranty agreements is subordinate to the secured Obligations and the secured obligations under the Pre-Petition Facilities; and

(n)    other Indebtedness outstanding on the Closing Date and set forth on Schedule 6.1.

Section 6.2.    *Liens.*  No Debtor shall directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind, on or with respect to any asset or property of such Debtor now owned or hereafter acquired except Permitted Liens.

Section 6.3.    *Sales and Lease-Backs.*  No Debtor shall enter into any sale and leaseback transaction.

Section 6.4.    *Transactions with Affiliates.*  (a) No Debtor shall make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of a Debtor that is not also a Debtor, and in the case of an Affiliate of a Debtor that is a Debtor, such transaction shall be permitted only if occurring in the ordinary course of business (each, an *"Affiliate Transaction"*).

(b)    The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of Section 6.4(a) hereof: (i) any employment agreement, director compensation, employee benefit plan, officer or director indemnification agreement or any similar arrangement entered into by the Debtors in the ordinary course of business and payments pursuant thereto, including the arrangement listed on Schedule 6.4(b) (so long as such arrangements are paid only on a post-petition basis); (ii) any Permitted Investments; and (iii) transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business, including without limitation purchases or acquisitions of ore, steel slabs and engineering or informational technology services, and otherwise in compliance with the terms of this Agreement that are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party in an arm's length transaction.

Section 6.5.    *Negative Pledge.*  Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale, (b) restrictions on the transfer of any assets subject to a Permitted Lien, (c) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and other agreements entered into in the ordinary course of business (*provided* that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or other agreements or the assignment of such lease, license or other agreement, as the case may be), (d) restrictions contained in the Loan Documents, and (e) restrictions contained in the Pre-Petition Facilities, no Debtor shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

Section 6.6.    *Merger, Amalgamation, Consolidation or Sale of Assets.*  Without the consent of the Required Lenders, which may be withheld in the Required Lenders' sole discretion, the Debtors shall not, directly or indirectly:  (a) amalgamate, consolidate or merge with or into another Person (whether or not a Debtor is the surviving corporation); or (b) unless the proceeds of such Asset Sale are sufficient to pay the Obligations and the "Obligations" (as defined in the Existing Credit Agreement), in each case, other than contingent obligations, in full, engage in any Asset Sale.

Section 6.7.    *Fiscal Year; Fiscal Quarter.*  No Debtor shall change its Fiscal Year or Fiscal Quarter without the prior written consent of the Required Lenders.

*Section 6.8.        Restricted Payments.*  The Debtors shall not directly or indirectly:

(i)        declare or pay any dividend or make any other payment or distribution on account of such Debtor's Equity Interests (including, without limitation, any payment in connection with any merger, amalgamation, arrangement or consolidation involving a Debtor) or to the direct or indirect holders of a Debtor's Equity Interests in their capacity as such;

(ii)        purchase, redeem or otherwise acquire or retire for value (including without limitation, in connection with any merger, amalgamation, arrangement or consolidation involving the Debtors) any Equity Interests of the Debtors or any direct or indirect parent of the Debtors; or

(iii)        except as otherwise permitted in this Agreement or any other Loan Document, make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness (all such payments and other actions set forth in these clauses (i) through (iii) above being collectively referred to as *"Restricted Payments"*).

*Section 6.9.        Investments.*  The Debtors shall not directly or indirectly make any Investments other than Permitted Investments.

*Section 6.10        Subsidiaries.*  Without the consent of the Required Lenders, in their sole discretion, no Debtor shall form, or cause to be formed, any other Subsidiary.

*Section 6.11.        Dividend and Other Payment Restrictions Affecting Subsidiaries.*  (a) The Borrower will not, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Subsidiary to:  (i) pay dividends or make any other distributions on its Capital Stock to the Borrower or any of its Subsidiaries or with respect to any other interest or participation in, or measured by, its profits, or pay any indebtedness owed to the Borrower or any of its Subsidiaries; (ii) make loans or advances to the Borrower or any of its Subsidiaries; or (iii) sell, lease or transfer any of its properties or assets to the Borrower or any of its Subsidiaries.

(b)        However, the restrictions in Section 6.11(a) hereof will not apply to encumbrances or restrictions of the type described in Section 6.5 or existing under or by reason of:

(i)        agreements governing Indebtedness of the Debtors in existence on the Closing Date (including, for the avoidance of doubt, the Pre-Petition Facilities), and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; *provided* that the amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in those agreements on the Closing Date;

(ii)        this Agreement and the other Loan Documents;

(iii)        applicable law, rule, regulation, order, or government license, permit or concession;

(iv)        customary non-assignment provisions in contracts and licenses entered into in the ordinary course of business;

(v)        purchase money obligations for property acquired in the ordinary course of business and Capital Lease Obligations that impose customary restrictions on the property purchased or leased;

(vi)    Liens permitted to be incurred under the provisions of Section 6.2 hereof that limit the right of the debtor to dispose of the assets subject to such Liens;

(vii)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business; and

(viii)    any encumbrance or restriction contained in the terms of any Indebtedness incurred in accordance with Section 6.1 hereof if (A) the Borrower determines in good faith at the time any such Indebtedness is incurred that any such encumbrance or restriction will not materially affect the Borrower's ability to make principal or interest payments on the Term Loan and (B) the encumbrance or restriction is not materially more disadvantageous to the Lenders than is customary in comparable financings or agreements (as determined by the Borrower in good faith).

Section 6.12.    *Business.*  No Debtor shall, nor shall it permit any of its Subsidiaries to, engage in any business other than (i) the businesses engaged in by such Debtor on the Closing Date and similar or related businesses and (ii) such other lines of business as may be consented to by the Required Lenders.

Section 6.13.    *Amendments to Organizational Documents.*  None of the Debtors shall amend or permit any amendments to any Debtor's articles of incorporation, certificate of formation, bylaws, operating agreement or limited partnership agreement or any similar organizational document.

Section 6.14.    *Amendment of Certain Other Indebtedness Documents.*  The Debtors shall not, except with the written consent of the Required Lenders (in their sole discretion) or pursuant to an order of the Bankruptcy Court after notice and hearing, directly or indirectly, amend, waive, supplement or otherwise modify (including by means of a refinancing or replacement facility with substantially the same syndicate or group of lenders) documents governing any Indebtedness.

Section 6.15.    *Bankruptcy Matters.*

(a)    The Debtors shall not incur, create, assume suffer to exist or permit any other Superpriority Claim or Lien on any Collateral which is *pari passu* with, or senior to, the priority claims of the Agent and the Lenders in respect of the Obligations, except as provided in Article X and as set forth in the Orders.

(b)    The Debtors shall not at any time, seek, consent to, or suffer to exist, any reversal, modification, amendment, stay, vacation or appeal of any of the Orders, except for modifications and amendments agreed to by the Agent and the Lenders.

(c)    Prior to the date on which the Obligations have been paid in full, the Debtors shall not pay or voluntarily incur (other than as may arise under Section 503(b)(9) of the Bankruptcy Code) any administrative expense claims except (i) as set forth in Article X and the Orders, (ii) the Obligations and (iii) other administrative expense claims incurred in the ordinary course of business of the Debtors or the Chapter 11 Cases, in each case that is a disbursement made pursuant to the Cash Flow Budget.

(d)    Except with the consent of the Required Lenders, the Debtors shall not (i) make any payment or transfer any property on account of claims asserted by any vendors of the Debtors for reclamation in accordance with Section 2-702 of the UCC and Section 546(c) of the Bankruptcy Code or (ii) enter into agreements or file any motion seeking a Bankruptcy Court order for the return of property of the Debtors to any vendor under Section 546(c) of the Bankruptcy Code in the aggregate for clauses (i) and (ii) in excess $25,000.

*Section 6.16.    OFAC.*  No Debtor (a) shall become a Person whose property or interests in property are blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079) (2001) (as amended, restated, supplemented or superseded), (b) shall engage in any dealings or transactions prohibited by Section 2 of such executive order, or be otherwise associated with any such Person in any manner violative of Section 2, or (c) shall otherwise become a Person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other OFAC regulation or executive orders.

*Section 6.17.    Cancellation of Indebtedness.*  The Debtors shall not, without the express prior written consent of Required Lenders or pursuant to an order of the Bankruptcy Court after notice and hearing, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the filing of the Chapter 11 Cases that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise, except as specifically permitted hereunder or under any other Loan Document.

*Section 6.18.    Cash Flow Budget.*

(a)    For the period prior to the week of the entry of the Final Order, as of the end of each calendar week starting with the fourth full calendar week following the Petition Date, the Debtors shall not permit:

(i)    the unfavorable variance (if any) between (A) the sum of (x) the Debtors' cash receipts for the 4-consecutive calendar week period then ended, plus (y) the Operating Receipts Carry Forward and (B) the forecasted cash receipts for the same 4-consecutive calendar week period as set forth in the Initial Cash Flow Budget, to exceed 25.0%; "Operating Receipts Carry Forward" means the amount of any cash receipts of the Debtors in any prior period in excess of forecasted receipts for such period in the Initial Cash Flow Budget, which shall carry forward into future periods.

(ii)    the unfavorable variance (if any) between (A) the aggregate amount of the Debtors' actual disbursements, on a cumulative basis, for "Total Operating Cash Disbursements" as set forth in the Cash Flow Budget, for the 4-consecutive calendar week period then ended, and (B) the sum of (x) the aggregate amount of the Debtors' forecasted disbursements, on a cumulative basis for "Total Operating Cash Disbursements" as set forth in the Initial Cash Flow Budget for the same 4-consecutive calendar week period then ended, plus (y) any Operating Disbursement Carry Forward, to exceed 15.0%; "Operating Disbursement Carryforward" means the amount of any forecasted "Total Operating Cash Disbursements" in a Cash Flow Budget not expended by the Debtors in a prior period, which shall carry forward into future periods.

(b)    For the period starting with the week of the entry of the Final Order, as of the end of each calendar week starting with the full calendar week of the entry of the Final Order, the Debtors shall not permit:

(i)    the unfavorable variance (if any) between (A) the Debtors' cash receipts for the 4-consecutive calendar week period then ended and (B) the forecasted cash receipts for the same 4-consecutive calendar week period then ended as set forth in the Initial Cash Flow Budget for such period, to exceed 15.0%; provided that such variance shall be tested on a 1-week basis as of the end of the first week following the date of entry of the Final Order and such variance shall not exceed 25.0%, and on a 2-week basis as of the end of the second week following the date of entry of the Final Order, and such variance shall not exceed 20.0%, and shall be tested on a 3-week basis as of the end of the third week following the date of entry of the Final Order and such variance shall not exceed 17.5%.

43

(ii)    the unfavorable variance (if any) between (A) the aggregate amount of the Debtors' actual disbursements, on a cumulative basis, for "Total Operating Cash Disbursements" as set forth in the Initial Cash Flow Budget, for the 4-consecutive calendar week period then ended, and (B) the aggregate amount of the Debtors' forecasted disbursements, on a cumulative basis for "Total Operating Cash Disbursements" as set forth in the Initial Cash Flow Budget for the same 4-consecutive calendar week period then ended, to exceed 15.0%; provided such variance shall be tested on a 1-week basis as of the end of the first week following the date of entry of the Final Order and such variance shall not exceed 25.0%, and on a 2-week basis as of the end of the second week following the date of entry of the Final Order, and such variance shall not exceed 20.0%, and shall be tested on a 3-week basis as of the end of the third week following the date of entry of the Final Order and such variance shall not exceed 17.5%.

Section 6.19.    *Inter-Debtor Flow of Cash.*    Notwithstanding any provision of this Agreement to the contrary (including Section 6.8), the Agent and the Lenders acknowledge and agree that Cash received by any Debtor in the ordinary course of business are moved among the Debtors as necessary to satisfy the obligations of the Debtors' business operations and that no such movement of Cash, regardless of how recorded, reported, characterized or treated for accounting, tax, regulatory or other purposes, shall be or constitute, or be deemed to be or constitute, a breach, violation, Default or Event of Default under this Agreement or any of the other Loan Documents. This Section 6.19 applies only to the inter-Debtor transfer of Cash and, for the avoidance of debt, unless otherwise permitted pursuant to this Agreement, the Debtors shall not transfer any other asset.

## ARTICLE VII

### INCREASED COSTS; TAXES; INDEMNIFICATION; SET OFF; ETC.

Section 7.1.    *Increased Costs; Capital Adequacy.*

(a)    *Increased Costs.*  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (a) through (c) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or the Term Loan made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, continuing or maintaining the Term Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or other Recipient, the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)    *Capital Requirements.*  If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's

capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Term Loan Commitments of such Lender or the Term Loan made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    *Certificates for Reimbursement.*    In determining the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section, each Lender will act reasonably and in good faith and will use averaging and attribution methods that are reasonable, and a certificate of such Lender as to such additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the applicable Borrower by the Lender shall, absent manifest error, be final and conclusive and binding on all the parties hereto.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    *Delay in Requests.*    Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 7.2.    *Taxes; Withholding, etc.*

(a)    *Payments Free of Taxes.*    Any and all payments by or on account of any obligation of any Debtor under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law requires the deduction or withholding of any Tax from any such payment, then the applicable Debtor shall make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Body in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Debtor shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 7.2) the Agent or the applicable Lender receives an amount equal to the sum it would have received had no such deduction or withholding for Indemnified Tax been made.

(b)    *Payment of Other Taxes.*    The Debtors shall timely pay to the relevant Governmental Body in accordance with applicable law, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(c)    *Indemnification by the Debtors*.    The Debtors shall jointly and severally indemnify the Agent and each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 7.2) payable or paid by such Agent or Lender or required to be withheld or deducted from a payment to such Agent or Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Body.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

45

(d)   *Indemnification by the Lenders.*  Each Lender shall severally indemnify the Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Debtor has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Debtors to do so), and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Body.  A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this paragraph (d).

(e)   *Evidence of Payments.*  As soon as practicable after any payment of Taxes by any Debtor to a Governmental Body pursuant to this Section 7.2, such Debtor shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(f)   *Status of Lenders.*  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Agent, at the time or times reasonably requested by the Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section (ii) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)   Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

(A)   any Lender that is a U.S. Person shall deliver to the Borrower and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)   any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), whichever of the following is applicable:

(1)   in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS

46

Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed originals of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate in form and substance acceptable to the Agent to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a *"U.S. Tax Compliance Certificate"*) and (y) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate in form and substance reasonably acceptable to the Agent on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Agent in writing of its legal inability to do so.

(g)    *Treatment of Certain Refunds.*  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 7.2 (including by the payment of additional amounts pursuant to this Section 7.2), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 7.2 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Body with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Body) in the event that such indemnified party is required to repay such refund to such Governmental Body.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    *Survival.*  Each party's obligations under this Section 7.2 shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Term Loan Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 7.3.    *Indemnification.*

(a)    *Indemnification by the Borrower.*  The Borrower and its Subsidiaries shall indemnify the Agent (and any Sub-Agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an *"Indemnified Person"*) against, and hold each Indemnified Person harmless from, any and all losses, claims, damages, liabilities and related expenses (collectively *"Losses"*) that are Indemnified Liabilities; *provided* that such indemnity shall not, as to any Indemnified Person, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person.

(b)    *Contribution.*  If the indemnification provided for in Section 7.3(a) is prohibited under applicable Regulations to an Indemnified Person, then the Borrower, in lieu of indemnifying the Indemnified Person, will contribute to the amount paid or payable by the Indemnified Person as a result of the Losses in such proportion as is appropriate to reflect the relative fault of the Borrower, on the one hand, and of the Indemnified Person, on the other, in connection with the events or circumstances which resulted in the Losses as well as any other relevant equitable considerations.

Section 7.4.    *Right of Set Off.*  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuation of any Event of Default, each Lender, the Agent and each of their respective Affiliates are hereby authorized by each Debtor at any time or from time to time, to the fullest extent permitted by applicable law, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other

48

Indebtedness at any time held or owing by such Lender, the Agent or any such Affiliate, to or for the credit or the account of any Debtor against and on account of the Obligations of any Debtor to such Lender, the Agent or their respective Affiliates irrespective of whether or not (a) such Lender, Agent or Affiliate shall have made any demand hereunder or under any other Loan Document, (b) the principal of or the interest on the Loans or any other amounts due hereunder or the other Loan Documents shall have become due and payable and although such obligations and liabilities, or any of them, may be contingent or unmatured or (c) such Obligations are owed to a branch, office or Affiliate of such Lender or Agent different from the branch, office or Affiliate holding such deposit or obligated on such Obligations.  Each Lender agrees to notify the Borrower and the Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

## ARTICLE VIII

### EVENTS OF DEFAULT

*Section 8.1.     Events of Default.*  Any one or more of the following events which shall occur and be continuing shall constitute an *"Event of Default"*:

(a)     any Debtor fails to pay as and when due any of the Obligations, including failure by any Debtor to pay when due any payment of principal of, premium on, or interest on the Term Loans, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise, or any fee or any other amount due hereunder or under any other Loan Document, and such failure shall not have been remedied within two (2) Business Days after the due date therefor;

(b)     failure by the Debtors to comply with the provisions and covenants of (i) Section 5.1(a) and (b) and such failure shall not have been remedied within five (5) Business Days after the date on which written notice thereof is given to the Borrower by the Agent or any Lender, or (ii) Sections 2.3, 2.9, 5.1(c) 5.4, and Article VI hereof;

(c)     any representation, warranty, certification or other statement made or deemed made by any Debtor in any Loan Document or in any statement or certificate at any time given by any Debtor in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made;

(d)     failure by the Debtors to perform or comply with any of the other agreements, terms or covenants in this Agreement or in any other Loan Document other than those listed in the preceding clauses (a)-(c), and such failure shall not have been remedied or waived within thirty (30) days after the earlier of (i) an officer of such Debtor becoming aware of an event which results in a default and that a default has occurred under any of the Loan Documents; or (ii) receipt by the Borrower of written notice from the Agent or any Lender of such failure;

(e)     except for any defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from the failure to comply with agreements, covenants or other obligations with respect to which the Bankruptcy Code, this Agreement or any other Loan Document prohibits the Debtors from complying or permits the Debtors to not comply, any default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Borrower (or the payment of which is guaranteed by the Borrower), whether such Indebtedness or Guarantee now exists, or is created after the Closing Date, if that default:  (i) is caused by a failure to pay principal of, or interest or premium, if any, on, such Indebtedness prior to the expiration of the grace period provided in such Indebtedness on the date of such default (a "*Payment Default*"); or (ii) results in the acceleration of such Indebtedness prior to its express maturity, and, in each case, the principal amount of

any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates $100,000 or more;

(f)     failure by any Debtor to pay any final non-appealable judgments entered by a court or courts of competent jurisdiction, or any writ or warrant of attachment or similar process, involving in the aggregate at any time an amount in excess of $100,000, which judgments are not paid, discharged or stayed for a period of sixty (60) days;

(g)     the occurrence of any of the following:  (i) this Agreement or any Collateral Document is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect; or (ii) except as permitted herein, any Lien purported to be granted under any Collateral Document on Collateral having a value in excess of $50,000 ceases to be enforceable; or (iii) the Debtors or any Person acting on behalf of any of them, denies or disaffirms, in writing, any obligation of the Debtors set forth in or arising under this Agreement or any other Loan Document;

(h)     except as permitted by this Agreement, any Loan Guarantee is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect, or a Guarantor, or any Person acting on behalf of a Guarantor, denies or disaffirms its obligations under its Loan Guarantee;

(i)     if any Debtor is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of such Debtor;

(j)     a Change of Control shall occur;

(k)     the Surety Bond Controlled Account (or any agreements and documents relating to such account) shall fail to be in full force and effect or funds are removed from the Surety Bond Controlled Account in violation of its terms or the Bankruptcy Code, and such failure shall not have been remedied within fifteen (15) days after the date of occurrence of such failure or within such longer period as is necessary to remedy such failure so long as the Debtors commence efforts to remedy such failure during such 15-day period and diligently pursue such efforts thereafter; for the avoidance of doubt, a withdrawal from the Surety Bond Controlled Account pursuant to its terms shall not constitute an Event of Default hereunder unless such withdrawal results in the termination of the Surety Bond Controlled Account; or

(m)     the occurrence of any of the following in the Chapter 11 Cases:

(i)     the failure to satisfy any Milestone set forth in Section 5.17 or any milestone set forth in the Interim Order or the Final Order by the deadline or within the time period set forth therein, unless consented to in writing by the Lenders in their sole discretion;

(ii)     the entry of an order regarding the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case of any Debtor that is an operating business from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(iii)     the entry of an order by the Bankruptcy Court appointing an interim or permanent trustee in any Chapter 11 Case or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business or reorganization of any of the Debtors (powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, in each case, without the prior written consent of the Required Lenders (which consent may be withheld in their sole discretion);

(iv)    the entry of an order of competent jurisdiction granting relief from or modifying the automatic stay applicable under Section 362 of the Bankruptcy Code to permit one or more creditors to execute upon, enforce or foreclose on any Collateral with a value in excess of (x) $50,000 with respect to any single such order or (y) $150,000 in the aggregate with respect to all such orders;

(v)    (x) the entry of an order of competent jurisdiction (1) reversing, staying, vacating or rescinding either the Interim Order or the Final Order, or either of such Interim Order or Final Order otherwise ceases to be in full force and effect (except in the case of the replacement of the Interim Order with the entry of the Final Order) or (2) amending, supplementing or otherwise modifying the Interim Order or the Final Order, in each case, without the prior written consent of the Required Lenders (which consent may be withheld in their sole discretion); or (y) the filing of a motion for reconsideration (1) in respect of the Term Loans and Term Loan Commitments, without the Agent's and the Required Lenders' consent, or (2) in respect of the grant of adequate protection pursuant to the Orders, without the consent of the Pre-Petition Lenders and the Pre-Petition Agents;

(vi)    (x) a Reorganization Plan is proposed which does not provide for payment in full in cash of the Obligations and termination of all outstanding Term Loan Commitments on the effective date of such plan or, over the objection of the Pre-Petition Lenders, the Debtors' obligations under the Pre-Petition Facilities, on or before the effective date of such Reorganization Plan or (y) the entry of an order which dismisses any of the Chapter 11 Cases and which order does not provide for payment in full in cash of the Obligations and termination of all outstanding Term Loan Commitments on the effective date of such dismissal or, over the objection of the Lenders, the Debtors' obligations under the Pre-Petition Facilities, or (z) any of the Debtors seek, support or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

(vii)    except as otherwise permitted by the Orders, the entry of an order of competent jurisdiction in the Chapter 11 Cases granting any other super priority administrative expense claim or Lien on any Collateral which Lien is *pari passu* or senior to that granted to the Agent, on behalf of itself and the Lenders (except provided in Article X and as set forth in the Orders);

(viii)    an application for any of the orders or items described in clauses (ii) through (vii) above shall be made by a Debtor without the prior written consent of the Required Lenders (which consent may be withheld in their sole discretion);

(ix)    an application for any of the orders or items described in clauses (ii) through (vii) above shall be made by a Person other than the Debtors and such application is not contested by the Debtors in good faith without the prior written consent of the Required Lenders (which consent may be withheld in their sole discretion) and the relief requested is granted in an order that is not stayed pending appeal;

(x)    the payment of, or application for authority to pay, any post-petition judgments without the prior written consent of the Required Lenders or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement;

(xi)    the payment of, or application for authority to pay, any pre-petition claim without the prior written consent of the Required Lenders or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement;

(xii)    except as otherwise permitted by the Orders, submission by the Debtors (a) of any motion or other pleading attacking the validity or enforceability of the Loan Documents or any other documents executed in connection with this Agreement or the Orders, or (b) of any order granting the Pre-Petition Lenders adequate protection of their security interests;

51

(xiii)    any Debtor shall attempt to invalidate, reduce or otherwise impair (A) the Liens or security interests of the Agent and the Lenders or (B) the claims or rights of the Agent and the Lenders against the Debtors;

(xiv)    any Debtor shall attempt to invalidate, reduce or otherwise impair, or to challenge the amount, priority or perfection of, the claims and obligations, or the Liens or security interests, securing the claims and obligations under the Existing Credit Agreement or to pursue any causes of action of any kind against the Existing Credit Agreement Agent or the Existing Credit Agreement Lenders solely in their respective capacities as Existing Credit Agreement Agent or Existing Credit Lenders;

(xv)    the filing of a motion, pleading or proceeding by any Debtor that could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party that results in a material impairment;

(xvi)    (a) any Debtor shall assert any claims against the Lenders pursuant to section 506(c) of the Bankruptcy Code or any other action is commenced by any Debtor that is adverse to the Lenders or the Lenders' respective rights and remedies under this Agreement or any Bankruptcy Court order, or (b) any person shall prevail in the assertion of any claim against the Lenders pursuant to section 506(c) of the Bankruptcy Code;

(xvii)    any Debtor shall fail to comply with the terms of any Order;

(xviii)    any motion or application is filed by or on behalf of any Debtor in any of the Chapter 11 Cases seeking the entry of an order, or an order is entered in any of the Chapter 11 Cases, approving any subsequent debtor-in-possession facility for borrowed money or other extensions of credit unless such subsequent facility and such order expressly provide for the indefeasible payment and complete satisfaction in full in cash to the Agent and Lenders of all Obligations prior to, or concurrently with, any initial borrowings or other extensions of credit under such subsequent facility or has been consented to, in writing, by the Lenders;

(xix)    any Debtor seeks to obtain additional financing under section 364(c) or 364(d) of the Bankruptcy Code or to grant any Lien other than Permitted Liens and Liens permitted pursuant to the Orders without the prior written consent of the Lenders;

(xx)    any Collateral becomes subject to surcharge or marshaling;

(xxi)    (a) any Material Contract or unexpired leases of any Debtor is rejected or otherwise terminated (other than in accordance with its terms) or any property of the Debtors having an aggregate value equal to or exceeding $50,000 is sold outside the ordinary course of business, in each instance, without the express written consent of the Lenders, or (b) the aggregate amount of all such rejected or otherwise terminated Material Contracts and unexpired leases and sales of property outside the ordinary course of business has a value exceeding $150,000; or

(xxii)    any other event set forth in paragraph 6 of the Final Order authorizing post-petition financing that is entered by the Bankruptcy Court.

Section 8.2.    *Remedies*.

(a)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the Orders, if any Event of Default occurs and is continuing, the Agent may and, at the request of the Required

Lenders, shall take any or all of the following actions without further order of, or application to, the Bankruptcy Court:

(i)    declare the Term Loan Commitment of each Lender to be terminated;

(ii)    declare the unpaid principal amount of all outstanding Term Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(iii)    set-off against any outstanding Obligations amounts held for the account of the Debtors as cash collateral or in the accounts of any Debtor maintained by or with the Agent, any Lender or their respective Affiliates; and

(iv)    take any action or exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law.

(b)    Upon the occurrence and during the continuance of an Event of Default, the Lenders shall have the right to seek relief from the automatic stay under the Bankruptcy Code within three (3) business days on an expedited basis pursuant to a motion seeking such relief to exercise of all of their rights and remedies based on the occurrence of an Event of Default, including, without limitation, all of their rights and remedies with respect to the Collateral and the Guarantors.  At such hearing, the Debtors shall be limited to contesting whether the relevant Event of Default has occurred and is continuing.  The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies hereunder with respect to the Debtors, under the Orders, and with respect to the Collateral.  The Debtors shall immediately provide notice to the Lenders (with a copy to counsel to the Committee) of the occurrence of any Event of Default.

(c)    If an Event of Default has occurred and is continuing: (i) the Agent shall have for the benefit of the Lender Group, in addition to all other rights of the Agent and the Lenders, the rights and remedies of a secured party under the UCC; (ii) the Agent may, at any time, take possession of the Collateral and keep it on any Debtor's premises, at no cost (including any charge pursuant to Section 506(c) of the Bankruptcy Code) to the Agent or any Lender, or remove any part of it to such other place or places as the Agent may desire, or the Borrower shall, upon the Agent's demand, at the Borrower's cost, assemble the Collateral and make it available to the Agent at a place or places reasonably convenient to the Agent; and (iii) the Agent may sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Agent deems advisable, in its reasonable discretion, and may, if the Agent deems it reasonable, postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale without giving a new notice of sale.  Without in any way requiring notice to be given in the following manner, the Debtors agree that any notice by the Agent of a sale, disposition or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to the Debtors if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt to the Borrower, at least ten (10) Business Days prior to such action to the Borrower's address specified herein. If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Obligations until the Agent or the Lenders receive payment, and if the buyer defaults in payment, the Agent may resell the Collateral without further notice to the Debtors.  In the event the Agent seeks to take possession of all or any portion of the Collateral by judicial process, the Debtors irrevocably waive: (A) the posting of any bond, surety or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Agent retain possession and not dispose of any Collateral until after trial or final judgment.  The Debtors agree that the Agent has no obligation to preserve rights to the Collateral

53

or marshal any Collateral for the benefit of any Person. The Agent is hereby granted a license or other right to use, without charge, the Debtors' Intellectual Property and advertising matter, or any similar property, in completing production of, advertising or selling any Collateral, and the applicable Debtor's rights under all licenses and all franchise agreements shall inure to the Agent's benefit for such purpose.

(d)    In addition to the above, following the occurrence and during the continuance of an Event of Default, the Agent may deliver the Carve-Out Trigger Notice to the Debtors and their lead counsel, the U.S. Trustee, lead counsel to the Committee (if any), lead counsel to the Pre-Petition Term Credit Agreement Agent, and the Bankruptcy Court invoking the Post-Carve Out Trigger Notice Cap.

Section 8.3.    *Application of Funds*.

If the Agent collects any money or property pursuant to this Article VIII, it shall pay out the money or property in the following order (after giving effect to any payments required pursuant to the Orders, including in respect of the Carve-Out):

*First*: to the Agent, its agents and attorneys for amounts due under Section 12.3 hereof, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Agent and the costs and expenses of collection;

*Second*: prior to the date of the Final Order, to the outstanding RH Fifth Amendment Loans, together with all accrued interest with respect thereto on a pro rata basis in accordance with the RH Pro Rata Share of each RH Lender;

*Third*: to the Term Loan Lenders for amounts due and unpaid pursuant to this Agreement with respect to accrued and unpaid interest (including default interest accruing pursuant to Section 2.5(c)), the Upfront Fee and the Exit Fee;

*Fourth*: to the Lenders for amounts due and payable on the outstanding principal amount of the Loans; and

*Fifth*: to any remaining outstanding Obligations.

After the Obligations have been indefeasibly paid in full in cash and the Term Loan Commitments terminated, the Agent will apply any excess proceeds of the Collateral in accordance with an order of the Bankruptcy Court. The Debtors shall remain liable for any deficiency. The Agent may fix a record date and payment date for any payment to the Lenders pursuant to this Section 8.3.

## ARTICLE IX

## LOAN GUARANTEES

Section 9.1.    *Guarantee.* (a) Subject to this Article IX, each Guarantor hereby absolutely and unconditionally guarantees to each Lender, the Agent and to their successors and assigns, irrespective of the validity and enforceability of this Agreement, the other Loan Documents or the Obligations of the Borrower hereunder or thereunder, that: (i) the principal of, premium and interest on, the Term Loan and any other Obligations due hereunder or under any Loan Document will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Term Loan, if any, if lawful, and all other obligations of the Borrower to the Lenders and the Agent hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and (ii) in case of any extension of time of payment or renewal of any Term Loan or any of such other obligations, that same will be promptly paid in full when due or performed in

54

accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise (the "*Guaranteed Obligations*").  Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

(b)     Each Guarantor hereby agrees that its obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Term Loan, this Agreement or any other Loan Document, the absence of any action to enforce the same, any waiver or consent by any Lender with respect to any provisions hereof or thereof, the recovery of any judgment against the Borrower, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.  Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Borrower, any right to require a proceeding first against the Borrower, protest, notice and all demands whatsoever and covenant that this Loan Guarantee will not be discharged except by complete performance of the obligations contained in this Agreement and the other Loan Documents.

(c)     If any Lender or the Agent is required by any court or otherwise to return to the Borrower, any Guarantor or any custodian, trustee, liquidator or other similar official acting in relation to either the Borrower or any Guarantor, any amount paid either to the Agent or such Lender, this Loan Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

(d)     Each Guarantor agrees that it will not be entitled to any right of subrogation in relation to the Lenders in respect of any obligations guaranteed hereby until payment in full of all Guaranteed Obligations.  Each Guarantor further agrees that, as between such Guarantor, on the one hand, and the Lenders and the Agent, on the other hand, (i) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article VIII hereof for the purposes of this Loan Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such obligations as provided in Article VIII hereof, such obligations (whether or not due and payable) will forthwith become due and payable by such Guarantor for the purpose of this Loan Guarantee.  Each Guarantor will have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Lenders under the Loan Guarantee.

Section 9.2.     *Limitation on Guarantor Liability*.  Each Guarantor hereby confirms that it is the intention of all such parties that the Loan Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Loan Guarantee.  To effectuate the foregoing intention, the Agent, the Lenders and each Guarantor hereby irrevocably agree that the obligations of each such Guarantor will be limited to the maximum amount that will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article IX, result in the obligations of such Guarantor under its Loan Guarantee not constituting a fraudulent transfer or conveyance.

Section 9.3.     *No Discharge or Diminishment of Guaranty*.  (a) Except as otherwise provided for herein and to the extent provided for herein, the obligations of each Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in Cash of the Guaranteed Obligations), including:

(i)     any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise;

(ii)    any change in the corporate existence, structure or ownership of the Borrower or any other Guarantor of or other Person liable for any of the Guaranteed Obligations;

(iii)    any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower, any Guarantor, or any other guarantor of or other person liable for any of the Guaranteed Obligations, or their assets or any resulting release or discharge of any obligation of the Borrower, any Guarantor, or any other guarantor of or other Person liable for any of the Guaranteed Obligations; or

(iv)    the existence of any claim, setoff or other rights which any Guarantor may have at any time against the Borrower, any other Guarantor, any other guarantor of the Guaranteed Obligations, the Agent, any Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b)    The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by the Borrower, any Guarantor or any other guarantor of or other person liable for any of the Guaranteed Obligations, of the Guaranteed Obligations or any part thereof.

(c)    Further, the obligations of each Guarantor hereunder are not discharged or impaired or otherwise affected by:

(i)    the failure of the Agent or any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations;

(ii)    any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations;

(iii)    any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other Person liable for any of the Guaranteed Obligations;

(iv)    any action or failure to act by the Agent or any Lender with respect to any Collateral securing any part of the Guaranteed Obligations;

(v)    any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of such Guarantor as a matter of law or equity (other than the indefeasible payment in full in Cash of the Guaranteed Obligations).

Section 9.4.    *Reinstatement; Stay of Acceleration.*    If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of the Borrower or otherwise, each Guarantor's obligations under this Loan Guarantee with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Agent, and the Lenders are in possession of this Loan Guarantee.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by each Guarantor forthwith on demand by the Required Lenders.

*Section 9.5.    Releases.*    (a) The Loan Guarantee of a Subsidiary will automatically and unconditionally be released:

(i)    in connection with any sale or other disposition of all or substantially all of the assets of that Subsidiary (including by way of merger, amalgamation or consolidation) to a Person that is not (either before or after giving effect to such transaction) the Borrower or a Subsidiary of the Borrower, if the sale or other disposition is effected in compliance with the provisions hereof;

(ii)    in connection with any sale or other disposition of the Capital Stock of that Subsidiary such that it is (after giving effect to such transaction) no longer a Subsidiary of the Borrower, if the sale or other disposition is effected in compliance with the provisions hereof;

(iii)    upon full payment to the Agent for the benefit of the Lenders in Cash of all the Obligations hereunder and under the other Loan Documents; or

(iv)    in connection with the merger or consolidation of a Subsidiary with the Borrower or any other Subsidiary.

(b)    Each Guarantor not released from its obligations under its Loan Guarantee as provided in this Section 9.5 will remain liable for the full amount of the Obligations, including, but not limited to, principal of and interest on the Term Loan and for the other obligations of such Guarantor under this Agreement as provided in this Article IX.

ARTICLE X

SUPERPRIORITY NATURE OF OBLIGATIONS AND LENDERS' LIENS

*Section 10.1.    Priority of Liens.*  The priority of the Agent's Liens on the Collateral shall be as set forth in the Orders.

*Section 10.2.    Covenants, Representations and Warranties.*   Each Debtor hereby covenants, represents and warrants that, upon entry of the Interim Order (and the Final Order, as applicable), all Obligations will:

(a)    pursuant to Bankruptcy Code section 364(c)(1), be entitled to a Superpriority Claim, junior only to the Carve-Out, which Superpriority Claim shall be payable from and have recourse to all prepetition and post-petition property of the Debtors and all proceeds thereof, including, without limitation, subject to the entry of a Final Order, all proceeds or other amounts received in respect of Avoidance Actions or other amounts received in respect thereof; the Superpriority Claim shall, for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under Section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors, subject to the limitations provided in the Orders;

(b)    pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first priority lien on all now owned or hereafter acquired assets and property of the Debtors and proceeds thereof (including, without limitation, all Cash, Cash Equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and equipment of the Debtors) that are not subject to valid, perfected and non-avoidable liens as of the commencement of the Chapter 11 Cases or perfected after

57

the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, but specifically excluding the Avoidance Actions or any proceeds thereof (collectively, the "*First Lien Collateral*");

(c)    pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected first priority lien on all property of the Debtors classified as (i) "Term Loan Priority Collateral" (as defined in the Intercreditor Agreement) and (ii) "ABL Loan Priority Collateral" (as defined in the Intercreditor Agreement) that is not "TECO PP&E Collateral" (as defined in the Intercreditor Agreement), but specifically excluding in each case the Avoidance Actions or any proceeds thereof, junior only to (y) with respect to the Term Loan Priority Collateral, the liens of the Pre-Petition Term Credit Agreement Agent and/or the other secured parties under the Pre-Petition Term Credit Agreement, and (z) with respect to the ABL Loan Priority Collateral that is not TECO PP&E Collateral, the liens of the Existing Credit Agreement Agent securing the pre-petition obligations under the Existing Credit Agreement (each of (i) and (ii) that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code), other than as set forth below (collectively, the "*Second Lien Collateral*"); and

(d)    pursuant to Bankruptcy Code section 364(d)(1), be secured by a first-priority, senior priming perfected lien on, and security interest in, all assets (other than Avoidance Actions or proceeds thereof) that (i) are subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement, and (ii) in each case, constitute either (i) TECO PP&E Collateral, or (ii) a percentage of the ABL Loan Priority Collateral that is not TECO PP&E Collateral equal to the RH Loan Debt (as defined in the Intercreditor Agreement) existing on the Petition Date divided by the amount equal to the sum of the RH Loan Debt and the ABL Loan Debt (as defined in the Intercreditor Agreement) held by the Existing Credit Agreement Agent existing on the Petition Date (the "*Primed Collateral*" and together with the First Lien Collateral and the Second Lien Collateral, the "*Collateral*").

*Section 10.3.    Additional Covenants, Representations and Warranties.*  Each Debtor hereby covenants, represents and warrants that, upon entry of the Final Order, and in addition to the Liens described in Section 10.2 herein, any amounts loaned by the Lenders authorized hereunder and exceeding $12,000,000.00 shall be additionally secured pursuant to Bankruptcy Code section 364(d)(1), by a first-priority, senior priming perfected lien on, and security interest in, all property of the Debtors classified as "Term Loan Priority Collateral" (as defined in the Intercreditor Agreement).  For the avoidance of doubt, each Debtor agrees that any proceeds of the "Term Loan Priority Collateral" (as defined in the Intercreditor Agreement) shall first be used to pay any amounts loaned by the Lenders hereunder that exceed $12,000,000.00, and interest and fees thereon, before such proceeds are distributed to any other party or utilized by the Debtors.

*Section 10.4.    Carve-Out.*  The Agent's and the Lenders' Liens on the Collateral owned by the Debtors and their administrative claim under Sections 364(c)(1) of the Bankruptcy Code afforded the Obligations shall be subject and subordinate only to a carve-out for the following (herein after referred to as the "*Carve-Out*"):

(a)    prior to occurrence of an Event of Default and delivery of a notice of such Event of Default to the Debtors, up to the amounts as set forth in the Cash Flow Budget that are necessary to pay (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable and documented fees and expenses incurred by a trustee, if any, appointed under Section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $75,000, (iii) fees and expenses incurred by the Debtors in respect of compensation for services rendered or reimbursement of expenses allowed by the Bankruptcy Court to the Debtors'

professionals (whether or not allowed prior to the occurrence of an Event of Default) and (iv) fees and expenses incurred by any statutory committee appointed in the Chapter 11 Cases (each, a *"Committee"*), in respect of compensation for services rendered or reimbursement of expenses allowed by the Bankruptcy Court to the Debtors' or any Committee's professionals (the *"Professionals"*) or to the members of any Committee for reasonable expenses incurred in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members), in each case incurred (whether or not paid or allowed by the Bankruptcy Court) prior to the delivery of the notice of the occurrence of an Event of Default (the *"Carve-Out Trigger Notice"*);

(b)    (i) after the delivery of a Carve-Out Trigger Notice, an amount not exceeding $400,000 (the *"Post-Carve Out Trigger Notice Cap"*), to pay the fees or expenses incurred following the delivery of such Carve-Out Trigger Notice by the Professionals, in respect of compensation for services rendered or reimbursement of expenses allowed by the Bankruptcy Court; provided, however, that the dollar amount in this clause (b) shall not be reduced by payments made pursuant to clause (a) above, and (ii) the sum of the $1.3 million payable to Alliance Prime Associates, Inc., which amount shall be reduced on a dollar-for-dollar basis by payments from (x) the Debtors, or (y) any other source, to Appalachian Power Co. and Kentucky Power Co. on account of their pre-petition claims against the Debtors (in an amount not to exceed $1.3 million).

(c)    No proceeds from the Term Loans or cash collateral (as that term is defined in 11 U.S.C. 363(a)) is to be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the Lenders, the Agent, the Existing Credit Agreement Lenders or the Existing Credit Agreement Agent, and/or challenging or raising any defenses to the Obligations, the pre-petition obligations under the Existing Credit Agreement, or the Liens of the Agent, the Lenders, the Existing Credit Agreement Agent or the Existing Credit Agreement Lenders.

(d)    Notwithstanding anything herein to the contrary, the Committee, to the extent appointed in the Chapter 11 Cases, shall be permitted to use up to $75,000 of the proceeds of the Term Loans to investigate the validity, perfection, priority, extent, or enforceability of the Existing Credit Agreement, or the Liens or security interests securing the Existing Credit Agreement but no such amounts shall be used to challenge any such Liens or security interests.

(e)    In the event of a conversion of a Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, the Required Lenders consent to the charging against the Collateral of any amounts of the Carve-Out that have accrued through the date of any such conversion; *provided*, *however*, that in no event shall any of the Carve-Out include any fees or expenses incurred after the conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code (other than as permitted under clauses (a) and (b) above).

(f)    Except as set forth herein or in the Orders, no other claim having a priority superior to or *pari passu* with that granted to the Agent and the Lenders by the Orders shall be granted or approved while any Obligations under this Agreement remain outstanding.

*Section 10.5    Security Interest*. Subject to the priorities set forth in Section 10.1 above and to the Carve-Out, as to all Collateral, including, without limitation, all real property the title to which is held by the Debtors, or the possession of which is held by any Debtor pursuant to a leasehold interest, each Debtor hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Agent, on behalf of the Lenders, all of the right, title and interest of the Debtors in all of such Collateral, including without limitation, all owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of the Debtors in and to all

59

buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof. For the avoidance of doubt and as further set forth in the Final Order, the foregoing shall not include liens on any lease, leasehold estate, license, contract or agreement or other property right or interest, to which any Debtor is a party, or any of such relevant Debtor's rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in: (x) the abandonment, invalidation, unenforceability or other impairment of any right, title or interest of any Debtor therein, or (y) a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract or agreement or other property right pursuant to any provision thereof, unless, in the case of clauses (x) and (y), the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code (such leases, licenses, contracts or agreements or other property rights, collectively, the "*Specified Contracts*"), but the Collateral shall include all proceeds, products, offspring or profits from all sales, transfers, dispositions or monetization of any and all Specified Contracts. Each Debtor acknowledges that, pursuant to the Orders, the Liens granted in favor of the Agent (on behalf of the Lenders) in all of the Collateral shall be perfected without the recordation of any Uniform Commercial Code financing statements, notices of Lien or other instruments of mortgage or assignment. Notwithstanding the foregoing, or any failure on the part of any Debtor and the Agent to take any further act to perfect, maintain, protect or enforce the Liens and security interests in the Collateral granted hereunder, the Orders (when entered) shall automatically, and without further action by any Person, perfect such Liens and security interests against the Collateral. Each Debtor further agrees that (i) the Agent shall have rights and remedies set forth in Section 8.2 in respect of the Collateral and (ii) if requested by the Agent, the Debtors shall enter into separate security agreements, control agreements, pledge agreements and fee and leasehold mortgages with respect to such Collateral on terms reasonably satisfactory to counsel to the Agent.

## ARTICLE XI

### AGENT

Section 11.1.    *Appointment of Agent*.  Richmond Hill is hereby appointed Agent hereunder and each Lender hereby authorizes the Agent to act as its agent in accordance with the terms hereof and the other Loan Documents. The Agent hereby agrees to act upon the express conditions contained herein and the other Loan Documents, as applicable. The provisions of this Article XI are solely for the benefit of the Agent and the Lenders and no Debtor shall have any rights as a third-party beneficiary of any of the provisions thereof. In performing its functions and duties hereunder, the Agent shall act solely as an agent of the Lenders and does not assume, and shall not be deemed to have assumed, any obligation towards or relationship of agency or trust with or for the Debtors. The Agent, without consent of or notice to any party hereto, may assign any and all of its rights or obligations hereunder to any of its Affiliates.

Section 11.2.    *Powers and Duties*.  (a) Each Lender irrevocably authorizes the Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Loan Documents as are specifically delegated or granted to the Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. The Agent shall have only those duties and responsibilities that are expressly specified herein and the other Loan Documents. The Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact or may assign such duties to its wholly owned nominee without the consent of the Lenders, and shall be entitled to rely on advice of counsel concerning all matters pertaining to such duties. The Agent shall not have, by reason hereof or any of the other Loan Documents, a fiduciary relationship in respect of any Lender and nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein.

(b)      The duties of the Agent shall be administrative in nature.  Without limiting the generality of the foregoing, the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(c)      The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent, and the term *"Lender"* or *"Lenders"* shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.

*Section 11.3.      Delegation of Duties*.  The Agent may execute any of its duties under this Agreement or any other Loan Document by or through third parties, agents, employees or attorneys-in-fact (any such entity, a *"Sub-Agent"*) or may assign such duties to its wholly owned nominee without the consent of the Lenders, and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Agent shall not be responsible for the negligence or misconduct of any Sub-Agent that it selects as long as such selection was made with reasonable care.  The Borrower and each Lender hereby agree that any Sub-Agent appointed hereunder shall be entitled to the benefit of the provisions of Sections 7.3, 11.2, 11.4, 11.5, 11.6, 11.7, 11.10 and 11.11 of this Agreement as if such Sub-Agent is a party to this Agreement.

*Section 11.4.      General Immunity*.

(a)      *No Responsibility for Certain Matters*.  The Agent shall not be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Loan Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by the Agent to any Lender or by or on behalf of any Debtor to the Agent or any Lender in connection with the Loan Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Debtor or any other Person liable for the payment of any Obligations, nor shall the Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Loan Documents or as to the use of the proceeds of the Term Loan or as to the existence or possible existence of any Event of Default or Default.  Anything contained herein to the contrary notwithstanding, Agent shall not have any liability arising from confirmations of the amount of the outstanding Term Loan.

(b)      *Exculpatory Provisions*.

(i)      The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Any permissive grant of power to Agent hereunder shall not be construed to be a duty to act.  Without limiting the generality of the foregoing, the Agent:

(A)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(B)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that the

61

Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law; and

(C)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

(ii)    Neither the Agent nor any of its officers, trustees, partners, members, directors, employees, attorneys or agents shall be liable to the Lenders for any action taken or omitted by the Agent under or in connection with any of the Loan Documents, except to the extent caused by the Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. The Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Loan Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until the Agent shall have received instructions in respect thereof from the Required Lenders (or such other Lenders as may be required to give such instructions under Section 12.1) and, upon receipt of such instructions from the Required Lenders (or such other Lenders, as the case may be), the Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions.

(iii)    Without prejudice to the generality of the foregoing contained in this Section 11.4(b), (i) the Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for the Borrower and its Subsidiaries), accountants, experts and other professional advisors selected by it, (ii) the Agent shall be entitled to rely, and shall be fully protected in relying, upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person or Persons, and (iii) no Lender shall have any right of action whatsoever against the Agent as a result of Agent acting or refraining from acting hereunder or any of the other Loan Documents in accordance with the instructions of the Required Lenders (or such other Lenders as may be required to give such instructions under Section 12.1). The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document which involves discretionary decision making absent express written instructions from the Required Lenders with respect thereto. The Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Agent in writing by any Debtor or a Lender.

(iv)    In determining compliance with any condition hereunder to the making of the Term Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received notice to the contrary from such Lender prior to the making of such loan.

Section 11.5.    *Agent Entitled to Act with the Borrower*. The Agent and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of banking, trust, financial advisory or other business with the Borrower or any of its Affiliates as if it were not performing the duties specified herein, and may accept

fees and other consideration from the Borrower for services in connection herewith and otherwise without having to account for the same to Lenders.

Section 11.6.    *Lenders' Representations, Warranties and Acknowledgment.*  (a) Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of the Debtors in connection with the Borrowing hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of the Debtors.  The Agent shall not have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Term Loan or at any time or times thereafter, and the Agent shall not have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)    Each Lender, by delivering its signature page to this Agreement and funding or holding any of its Term Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by the Agent or Lenders, as applicable on the Closing Date.

Section 11.7.    *Right to Indemnity*.  Each Lender, in proportion to its Pro Rata Share, severally (and not jointly) agrees to indemnify the Agent and its stockholders, directors, officers, employees, agents, attorneys and Affiliates (each an *"Indemnified Agent Person"*), to the extent that Agent shall not have been reimbursed by any Debtor, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including legal fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnified Agent Person in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as Agent in any way relating to or arising out hereof or in connection with the Loan Documents; *provided* that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final nonappealable decision of a court of competent jurisdiction to have resulted from such Indemnified Agent Person's gross negligence or willful misconduct.  If any indemnity furnished to the Agent for any purpose shall, in the opinion of the Agent, be insufficient or become impaired, the Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; *provided further* that in no event shall this sentence require any Lender to indemnify the Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof, and *provided further* that this sentence shall not be deemed to require any Lender to indemnify the Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.  The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder and the earlier removal or resignation of the Agent hereunder.

Nothing herein or in any Loan Document or related documents shall obligate the Agent to advance, expend or risk its own funds, or to take any action which in its reasonable judgment may cause it to incur any expense or financial or other liability for which it is not adequately indemnified.

Section 11.8.    *Successor Agent*.  (a) The Agent may resign at any time by giving not less than thirty (30) Business Days' prior written notice thereof to the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall have the right to appoint a successor Agent, which shall be (i) one of the Lenders or an Affiliate of one of the Lenders or (ii) a Person who would be an eligible successor agent if appointed by the resigning Agent under Section 11.8(b).

(b)    If no successor Agent shall have been so appointed by the Lenders within ten (10) Business Days after the resigning Agent's giving of notice of resignation, then the resigning Agent may appoint, on behalf of the Borrower and the Lenders, a successor Agent, which shall be a commercial bank organized under the laws of the United States of America or of any state thereof and having a combined capital and surplus of at least $250,000,000 in the event that the Agent is unable to appoint a replacement successor within ten (10) Business Days after it is entitled to do so after using reasonable efforts, the Agent may nonetheless resign by delivering a written resignation to the Lenders and the Borrower, *provided* that in such circumstances, and unless and until a successor Agent is appointed, the Agent shall remain Agent solely for the purpose of serving as secured party of record with respect to the Collateral, its sole duty in that capacity shall be to take such ministerial actions as it shall be directed to take by the Lenders (including, without limitation, the execution and delivery of documents or instruments relating to the Collateral), and the Agent shall be entitled to reimbursement from the Borrower for its out-of-pocket costs and expenses and reasonable compensation from the Borrower for its services.  If the Agent has resigned and no successor Agent has been appointed, subject to the preceding sentence, the Lenders shall perform the duties of the Agent hereunder, and the Borrower shall make all payments in respect of the Obligations to the applicable Lenders and shall deal directly with the Lenders.

(c)    No successor Agent shall be deemed to be appointed hereunder until such successor Agent has accepted the appointment in writing.  Upon the acceptance of any appointment as Agent hereunder by a successor Agent and upon the execution and filing of such financing statements, or amendments thereto, and such other instruments and notices, as may be necessary or desirable or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted under the Collateral Documents, such successor Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the resigning Agent, and the resignation or termination of Agent shall then be effective without any further action by any Person for all purposes.  Upon the effectiveness of the resignation or termination of Agent, the resigning or terminated Agent shall be discharged from all of its duties and obligations under the Loan Documents.  After the effectiveness of the resignation or termination of an Agent, the provisions of Section 7.3, Section 12.3 and this Article XI shall continue to inure to the former Agent's benefit as to any actions taken or omitted to be taken by it while it was acting as Agent under this Agreement.

Section 11.9.    *Collateral Documents*.

(a)    *Agent as Agent under Collateral Documents.*  Each Lender hereby further authorizes the Agent, on behalf of and for the benefit of the Lenders, to be the agent for and representative of the Lenders with respect to the Collateral and the Collateral Documents.  Subject to Section 12.1, without further written consent or authorization from the Lenders, the Agent may execute any documents or instruments necessary to release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which the Lenders have otherwise consented in the manner provided herein. The Agent shall not be responsible for the preparation or filing of any UCC financing statements or the correctness of any financing statements filed in connection with any Loan Document or the validity or perfection of any lien or security interest created pursuant to any Loan Document.

(b)    *Agent's Right to Realize on Collateral.*  Anything contained in any of the Loan Documents to the contrary notwithstanding the Borrower, the Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Agent, on behalf of Lenders in accordance with the terms hereof, and (ii) in the event of a foreclosure by the Agent on any of the Collateral pursuant to a public or private sale, the Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Agent, as agent for and representative of Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in

64

writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Agent at such sale.

Section 11.10.    *Notice of Default*.  The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Agent receives such a notice, the Agent shall promptly give notice thereof to the Lenders.  The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed in writing by the Required Lenders; *provided* that unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 11.11.    *Delivery of Documents, Notices, Etc.*  In addition to, and in furtherance of any requirement placed upon the Agent herein to deliver, provide, distribute, notify or otherwise convey items received from the Borrower to the Lenders, the Agent shall promptly notify Lenders of any notices, documents, requests, demands or other items the Agent received from the Borrower and promptly deliver or convey, to the extent they are in written form, such notices, documents, requests, demands or items to the Lenders.

## ARTICLE XII

### MISCELLANEOUS

Section 12.1.    *Amendments and Waivers*.

(a)    *General*.  Subject to Section 12.1(b) and Section 12.1(c) below, no amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by any Debtor therefrom, shall be effective without the written consent of the Required Lenders.

(b)    *Other Consent*.  Notwithstanding the provisions of Section 12.1(a) above, no amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by any Debtor therefrom, shall amend, modify, terminate or waive any provision of Article XI as the same applies to the Agent, or any other provision hereof as the same applies to the rights or obligations of the Agent, in each case without the consent of the Agent;

(c)    *Prior Unanimous Written Consent*.  Without the prior unanimous written consent of the affected Lenders:

(i)    no amendment, consent or waiver shall (A) affect the amount or extend the time of the obligation of any Lender to make the Term Loans or (B) alter the time or times of payment of principal or interest on the Term Loans or of any fees payable for the account of the Lenders or (C) alter the amount of the principal of the Term Loans or the rate of interest thereon or (D) alter the amount of any fee payable hereunder to the account of the Lenders or (E) permit any subordination of the principal of or interest on the Term Loans or (F) permit the subordination of the Lien created by the Collateral Documents in any of the Collateral or (G) consent to the assignment or transfer by any Debtor of any of its rights and obligations under any Loan Document or (H) affect the definition of *"Required Lenders"* or *"Pro Rata Share"*;

(ii)    no Collateral, other than as specifically permitted in this Agreement or the Collateral Documents, shall be released from the Lien of this Agreement or the Collateral Documents;

(iii)    none of the provisions of Section 2.12 shall be amended, modified or waived; and

(iv)    none of the provisions of Section 12.1(b) or this Section 12.1(c) shall be amended.

(d)    *Effect of Notices, Waivers or Consents.*  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Debtor in any case shall entitle any Debtor to any other or further notice (except as otherwise specifically required hereunder or under any other Loan Document) or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 12.1 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Debtor, on such Debtor.

Section 12.2.    *Notices*.  All notices, requests, demands and other communications to any party or given under any Loan Document (collectively, the *"Notices"*) will be in writing and delivered personally, by overnight courier or by registered mail to the parties at the following address:

(a)    If to the Borrower or any Guarantor, at:

c/o Cambrian Coal LLC
P.O. Box 2100
Pikeville, KY 41502
Telephone:    (606) 200-7211
Attention:    President
Email:    mark.campbell@cambriancoal.com

With a copy to:

Frost Brown Todd LLC
250 West Main Street, Suite 2800
Lexington, KY 40507
Telephone:    (859) 244-3256
Attention:    Jeff Hallos
    Bryan Mattingly
Email:    jhallos@fbtlaw.com
    bmattingly@fbtlaw.com

(b)    If to Agent, at:

Richmond Hill Capital Partners, LP
375 Hudson Street, 12th Floor
New York, NY 10014
Telephone:  (646) 216-9242
Attention:   Ryan Taylor
    Jordan Jones
Email:    rtaylor@rhiclp.com
    jjones@medorapartners.com

66

With a copy to:

Chapman and Cutler LLP
1270 Avenue of the Americas
New York, NY 10020
Telephone:      (212) 655-2517
Attention:      Larry G. Halperin
Email:          halperin@chapman.com

(c)    If to the Lenders, to the address for such Lender set forth on the signature pages hereof and in the Assignment Agreement delivered by such Lender.

All Notices will be deemed delivered when actually received.  Each of the parties will hereafter notify the other parties in accordance with this Section 12.2 of any change of address or telecopy number to which notice is required to be mailed.

Section 12.3.    *Expenses.*    Whether or not the transactions contemplated hereby shall be consummated or any Term Loan shall be made, the Borrower agrees, subject to any payment procedures in the Orders, to pay promptly (the *"Lender Group Expenses"*):

(a)    all the actual and reasonable costs and expenses of preparation of the Loan Documents and any consents, amendments, waivers or other modifications thereto and incurred in connection with the Chapter 11 Cases; the reasonable fees, expenses and disbursements of counsel to the Agent, Lenders and the Existing Credit Agreement Agent in connection with the negotiation, preparation, execution and administration of the Loan Documents and any consents, amendments, supplements, waivers or other modifications thereto and any other documents or matters requested by the Borrower, including all matters related to the Chapter 11 Cases;

(b)    all the actual costs and reasonable expenses of creating and perfecting Liens in favor of the Agent, for the benefit of the Lenders, pursuant hereto, including, without limitation, filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to the Agent;

(c)    all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers;

(d)    all the actual costs and reasonable expenses (including, without limitation, the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Agent and its counsel) in connection with the inspection, verification, custody or preservation of any of the Collateral, to the extent required or permitted hereunder;

(e)    after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees (including, without limitation, allocated costs of internal counsel) and costs of settlement, incurred by any the Agent and/or Lenders in enforcing any Obligations of or in collecting any payments due from any Debtor hereunder or under the other Loan Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of any guaranty) or in connection with any negotiations, reviews, refinancing or restructuring of the credit arrangements provided hereunder, including, without limitation, in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings; and

67

(f)    the foregoing shall be in addition to, and shall not be construed to limit, any other provisions of the Loan Documents regarding costs and expenses to be paid by the Borrower.

Section 12.4.    *Enforceability; Successors and Assigns.*

(a)    *Enforceability; Successors and Assigns.*  This Agreement will be binding upon and inure to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto. This Agreement may not be assigned by the Borrower hereto without the prior written consent of the Agent and each Lender.  Any assignment or attempted assignment in contravention of this Section 12.4 will be *void ab initio* and will not relieve the assigning party of any obligation under this Agreement.

(b)    *Assignments.*  Each Lender may assign (each, an *"Assignment"*) to one or more Eligible Assignees (each, an *"Assignee"*) all or a portion of its rights and obligations under this Agreement (including all or a portion of such Lender's Term Loan, as the case may be).  Assignment shall be subject to the following:

(i)    Assignments shall be made with the prior written consent (not to be unreasonably withheld or delayed) of the Agent, *provided* that no consent of the Agent shall be required for an assignment to an assignee that is a Lender or an Affiliate of a Lender or an Approved Fund;

(ii)    except in the case of an assignment to a Lender or an Affiliate of a Lender or to an Approved Fund, the amount of the Term Loan of the assigning Lender subject to each such assignment (determined as of the date the Assignment Agreement with respect to such assignment is delivered to the Agent) shall not be less than $1,000,000 or an assignment of the entire remaining amount of the assigning Lender's Term Loan (if less than $1,000,000) unless the Agent otherwise consents;

(iii)    the parties to each assignment shall execute and deliver to the Agent an Assignment Agreement, in the form of Exhibit E (each, an *"Assignment Agreement"*) and any questionnaires and other documents reasonably requested by the Agent; and

(iv)    upon its receipt of a duly executed and completed Assignment Agreement, the Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to the Borrower and shall maintain a copy of such Assignment Agreement in its Principal Office.  From and after the effective date of an Assignment, the Assignee shall be a party hereto and, to the extent of the interest assigned pursuant to the Assignment, have the rights and obligations of a "Lender" under this Agreement, and the assigning Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement, but shall continue to be entitled to the benefits of Sections 7.3 and 12.3 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.  The Borrower hereby consents to the disclosure of any information obtained by Lender in connection with this Agreement to any Person to which such Lender sells, or proposes to sell, its Term Loan.

(c)    *Participations.*  Each Lender may sell participations to one or more Persons in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of such Lender's Term Loan); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the Borrower for the performance of such obligations, and (iii) the Borrower and the Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to

68

which such Lender sells a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the participant, agree to any amendment, modification or waiver to (A) extend the final scheduled maturity of the Term Loan, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect, or (B) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Loan Guarantee (in each case, except as expressly provided in the Loan Documents) supporting the Term Loan.  The Borrower agrees that each participant also shall be entitled to the benefits of Section 7.1 and 7.2 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section; *provided* that (i) a participant shall not be entitled to receive any greater payment under Section 7.1 or 7.2 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with the Borrower's prior written consent and (ii) a participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 7.2 unless the Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of the Borrower, to comply with Section 7.2 as though it were a Lender.  To the extent permitted by law, each participant shall be entitled to the benefits of Section 7.4 as though it were a Lender, *provided* that such participant agrees to be subject to Section 2.13 as though it were a Lender.  The Borrower hereby consents to the disclosure of any information obtained by a Lender in connection with this Agreement and/or any other Loan Document to any Person to which such Lender participates, or proposes to participate, its Term Loan.

(d)    Notwithstanding anything else to the contrary contained herein, any Lender may any time pledge its Term Loan and such Lender's rights under this Agreement and the other Loan Documents to a Federal Reserve Bank and, in the case of any Lender that is a fund, to its trustee for the benefit of its investors; *provided* that no such pledge to a Federal Reserve Bank (or in the case of any Lender that is a fund, to its trustee for the benefit of its investors) shall release such Lender from such Lender's obligations hereunder or under any other Loan Document.

Section 12.5.    *Lenders' Obligations Several; Independent Nature of Lenders' Rights; Qualified Purchasers*.  The obligation of each Lender hereunder is several and not joint and neither the Agent nor any Lender shall be responsible for the obligation of any other Lender hereunder.  Nothing contained in any Loan Document and no action taken by the Agent or any Lender pursuant hereto or thereto shall be deemed to constitute Lenders to be a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and, *provided* the Agent fails or refuses to exercise any independent debt, and, *provided* the Agent fails or refuses to exercise any remedies against the Borrower after receiving the direction of the Lenders, each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

Section 12.6.    *Integration*.  This Agreement and the other Loan Documents contain and constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto.

Section 12.7.    *No Waiver; Remedies*.  No failure or delay by any party in exercising any right, power or privilege under this Agreement or any of the other Loan Documents will operate as a waiver of such right, power or privilege.  A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power or

privilege. The rights and remedies provided in the Loan Documents will be cumulative and not exclusive of any rights or remedies provided by law.

Section 12.8.    *Submission to Jurisdiction*. Each Debtor, the Agent and the Lenders hereby (a) agrees that any Action with respect to any Loan Document may be brought only in the Bankruptcy Court, (b) accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of such court, (c) irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any Action in those jurisdictions, and (d) irrevocably consents to the service of process of such court in any Action by the mailing of copies of the process to the parties hereto as provided in Section 12.2. Service effected as provided in this manner will become effective ten (10) calendar days after the mailing of the process.

Section 12.9.    *Execution in Counterparts*. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement or any other Loan Documents by facsimile or a scanned copy by electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement or the other relevant Loan Documents.

Section 12.10.    *Governing Law*. This Agreement and the other Loan Documents, and all claims, disputes and matters arising hereunder or thereunder or related hereto or thereto, will be governed by, and construed in accordance with, the laws of the state of New York applicable to contracts executed in and to be performed entirely within that state, without reference to conflicts of laws provisions.

Section 12.11.    *Waiver of Jury*. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.12.    *Severability*. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 12.13.    *Survival*. All representations, warranties, covenants, agreements, and conditions contained in or made pursuant to this Agreement or the other Loan Documents shall survive (a) the making of the Term Loan and the payment of the Obligations and (b) the performance, observance and compliance with the covenants, terms and conditions, express or implied, of all Loan Documents, until the due and punctual (i) indefeasible payment of the Obligations and (ii) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other Loan Documents; *provided, however,* that the provisions of Section 7.1, Section 7.2, Section 7.3, Section 11.4,

70

Section 11.6, Section 11.7 and Section 12.3 shall survive (i) indefeasible payment of the Obligations, and (ii) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other Loan Documents.

Section 12.14.     *Maximum Lawful Interest*.  Notwithstanding anything to the contrary contained herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement or any other Loan Document exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  The Borrower and the Lenders, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and other charges for the use of money and manner of payment stated within it; *provided, however,* that, anything contained herein to the contrary notwithstanding, if the amount of such interest and other charges for the use of money or manner of payment exceeds the maximum amount allowable under applicable law, then, *ipso facto* as of the Closing Date, the Borrower is and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Term Loan to the extent of such excess.

Section 12.15.     *Interpretation*.  As used in this Agreement, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate.  Unless otherwise expressly provided in this Agreement (a) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement and (b) article, section, subsection, schedule and exhibit references are references with respect to this Agreement unless otherwise specified.  Unless the context otherwise requires, the term "including" will mean "including, without limitation."  The headings in this Agreement and in the Schedules are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.  The term "will" shall be interpreted to express a command.

Section 12.16.     *Ambiguities; Conflicts*.  This Agreement and the other Loan Documents were negotiated between legal counsel for the parties and any ambiguity in this Agreement or the other Loan Documents shall not be construed against the party who drafted this Agreement or such other Loan Documents.  If any provision in this Agreement conflicts with any provision in the Orders, the provision contained in the Final Order shall govern and control.

Section 12.17.     *Confidentiality*.  The Agent and each Lender agrees to hold any non-public information that it may receive from the Borrower or any other Debtor pursuant to this Agreement (or pursuant to any other Loan Document) in confidence and consistent with their respective policies for handling material non-public information, except for disclosure:  (a) to the other Lenders; (b) to legal counsel, accountants and other representatives for the Borrower, any other Debtor, the Agent or any Lender; (c) to the other professional advisors to the Borrower, any other Debtor, the Agent or any Lender, *provided* that the recipient is advised of and agrees to comply with the provisions of this Section 12.17; (d) to regulatory officials having jurisdiction over the Agent or the applicable Lender; (e) to any Governmental Body having regulatory jurisdiction over the Borrower or any other Debtor, *provided* that each of the Agent and the Lenders agrees to endeavor to notify the Borrower of any such disclosure; (f) as required by law, rule or legal process or in connection with any legal proceeding, *provided* that such disclosing Agent or Lender uses reasonable efforts, if legally permitted, to notify the Borrower prior to any such disclosure; (g) to any rating agency when required by it, *provided* that prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to the Debtors received by it from Agent or any Lender; and (h) to another financial institution or investor in connection with a disposition or proposed disposition to that financial institution or investor of all or part of that Lender's Term Loan or Term Loan Commitments hereunder, whether by assignment or participation,

*provided* that the recipient is advised of and agrees to be bound by the provisions of this Section 12.17.  For purposes of the foregoing, "non-public information" shall mean any information respecting the Borrower or any other Debtor reasonably considered by the Borrower to be material and not available to the public and which has been identified as such by the applicable Debtor, other than (i) information previously filed with any governmental agency and available to the public, (ii) information which is available to the general public at the time of use or disclosure, (iii) information which becomes available to the general public, other than by manner of unauthorized disclosure or use or (iv) information previously published in any public medium from a source other than, directly or indirectly, the Agent or any Lender.  Nothing in this Section shall be construed to create or give rise to any fiduciary duty on the part of the Agent or the Lenders to the Borrower or any other Debtor.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURES ON FOLLOWING PAGES.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

BORROWER:

**CAMBRIAN COAL LLC**

By: _____
   Name:_____
   Title:_____

**SHELBY RESOURCES, LLC**

By: _____
   Name:_____
   Title:_____

GUARANTORS:

**CAMBRIAN HOLDING COMPANY, INC.,**
**PLM HOLDING COMPANY LLC,**
**APEX ENERGY, INC.,**
**BEAR BRANCH COAL LLC,**
**C. W. AUGERING, INC.,**
**CLINTWOOD ELKHORN MINING LLC,**
**GATLIFF COAL LLC**
**MARSHALL RESOURCES, INC.,**
**PERRY COUNTY COAL LLC,**
**PIKE-LETCHER LAND LLC,**
**PREMIER ELKHORN COAL LLC,**
**RAVEN ROCK DEVELOPMENT LLC,**
**RAY COAL LLC,**
**RICH MOUNTAIN COAL LLC,**
**S. T. & T. LEASING, INC.,**
**T.C. LEASING, INC.,**
**WHITAKER COAL LLC**

By: _____
   Name:_____
   Title:_____

[Signature Page to the Debtor-In-Possession Secured Credit Agreement]

AGENT:

**RICHMOND HILL CAPITAL PARTNERS, LP**


By: _____
  Name:_____
  Title:_____

LENDERS:

**RICHMOND HILL CAPITAL PARTNERS, LP**


By: _____
   Name:_____
   Title:_____

LENDERS:

**ESSEX EQUITY JOINT INVESTMENT VEHICLE, LLC**


By: _____
   Name:_____
   Title:

## EXHIBIT E

## BUDGET

Privileged and Confidential
DRAFT - Subject to Material Change

**Cambrian Holding Company, Inc.,** *et al.*
**13 Week Cash Flow Forecast - Reforecast Through the Week Ended 10/18/19** [1]
*($ in 000s)*

| | Actual Week 1 21-Jun-19 | Actual Week 2 28-Jun-19 | Actual Week 3 5-Jul-19 | Actual Week 4 12-Jul-19 | Actual Week 5 19-Jul-19 | Forecast Week 6 26-Jul-19 | Forecast Week 7 2-Aug-19 | Forecast Week 8 9-Aug-19 | Forecast Week 9 16-Aug-19 | Forecast Week 10 23-Aug-19 | Forecast Week 11 30-Aug-19 | Forecast Week 12 6-Sep-19 | Forecast Week 13 13-Sep-19 | Forecast Week 14 20-Sep-19 | Forecast Week 15 27-Sep-19 | Forecast Week 16 4-Oct-19 | Forecast Week 17 11-Oct-19 | Forecast Week 18 18-Oct-19 | Forecast Cumulative 18 Weeks | Forecast Standalone 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | | | | | | | |
| Customer Receipts | 911 | 3,114 | 1,838 | 4,129 | 2,331 | 3,569 | 4,659 | 4,710 | 3,454 | 4,985 | 5,690 | 5,752 | 6,063 | 5,994 | 6,074 | 5,488 | 5,943 | 4,628 | 79,332 | 67,009 |
| Other Receipts | 113 | 136 | 157 | 25 | 66 | - | - | - | - | - | - | - | - | - | - | - | - | - | 498 | - |
| **Total Cash Receipts** | 1,025 | 3,250 | 1,995 | 4,154 | 2,397 | 3,569 | 4,659 | 4,710 | 3,454 | 4,985 | 5,690 | 5,752 | 6,063 | 5,994 | 6,074 | 5,488 | 5,943 | 4,628 | 79,830 | 67,009 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | | | | | | | |
| Payroll, Health & Welfare & Related | (1,682) | (2,108) | (604) | (1,512) | (922) | (1,704) | (972) | (1,836) | (927) | (1,704) | (927) | (1,749) | (1,059) | (1,704) | (927) | (1,749) | (1,059) | (1,704) | (24,849) | (18,021) |
| Contract Miners | - | - | - | (1,299) | (6) | (864) | - | (1,350) | - | - | (1,450) | - | (1,550) | - | (1,550) | - | (1,550) | - | (9,618) | (8,314) |
| Contract Freight | - | (31) | - | (280) | - | (238) | - | (385) | - | - | (385) | - | (385) | - | (385) | - | (385) | - | (2,475) | (2,163) |
| Utilities | - | - | (35) | (83) | (25) | (200) | (400) | (400) | (275) | (275) | (275) | (275) | (275) | (275) | (275) | (220) | (220) | (220) | (3,728) | (3,585) |
| Maintenance / Supplies / Repairs / General Mining | (359) | (976) | (762) | (1,056) | (867) | (925) | (925) | (900) | (900) | (900) | (900) | (900) | (900) | (900) | (900) | (900) | (900) | (900) | (15,769) | (11,750) |
| Fuel and Lube | (169) | (364) | (250) | (200) | (345) | (300) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (5,828) | (4,500) |
| Explosives | - | (80) | (96) | (89) | (77) | (150) | (200) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (2,067) | (1,725) |
| Insurance (WC Only) | - | (850) | - | (146) | - | (146) | (850) | - | - | - | (996) | - | - | - | (146) | (850) | - | - | (3,984) | (2,988) |
| Insurance Premium Financing Repayment | - | - | (252) | - | - | (240) | - | - | - | - | - | - | - | - | - | - | - | - | (1,167) | (915) |
| Equipment Rentals | - | - | - | - | - | (16) | - | - | (8) | (8) | - | - | (8) | (8) | - | - | (4) | (12) | (63) | (63) |
| Equipment Operating Leases | - | - | - | (28) | - | (40) | (92) | - | - | (19) | (92) | - | - | - | (19) | (92) | - | - | (383) | (355) |
| Equipment Notes Payable | - | - | - | - | - | (37) | (114) | (56) | - | - | (114) | (55) | (1) | - | - | (114) | (56) | - | (596) | (544) |
| Production & Other Taxes | (639) | (20) | (33) | (8) | (142) | (486) | (173) | (40) | (175) | (745) | (50) | (5) | (175) | (845) | (50) | (5) | (5) | (175) | (3,772) | (2,929) |
| Surety Bond Payment | (249) | - | - | - | - | - | (386) | (619) | - | - | - | (562) | - | (1,086) | - | - | (450) | - | (3,352) | (3,103) |
| Royalties | - | - | (152) | - | (12) | (177) | (50) | (50) | (50) | (50) | (50) | (992) | (50) | (50) | (50) | (992) | (50) | (50) | (2,825) | (2,661) |
| **Total Operating Cash Disbursements** | (3,098) | (4,428) | (2,184) | (4,753) | (2,396) | (5,524) | (4,511) | (6,111) | (2,810) | (4,176) | (6,655) | (4,071) | (4,877) | (5,343) | (6,394) | (4,454) | (5,154) | (3,536) | (80,477) | (63,617) |
| **Operating Cash Flow** | (2,074) | (1,178) | (189) | (599) | 1 | (1,954) | 148 | (1,401) | 644 | 808 | (966) | 1,682 | 1,186 | 651 | (320) | 1,034 | 790 | 1,092 | (647) | 3,392 |
| **Non-Operating Cash Disbursements** | | | | | | | | | | | | | | | | | | | | |
| Adequate Assurance Deposits | - | (50) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (50) | - |
| Critical Vendors (Prepetition) [1] | (1,265) | (839) | (764) | (268) | (197) | (178) | (198) | (137) | (102) | (146) | (146) | (203) | (178) | (178) | (178) | (36) | - | - | (5,190) | (1,857) |
| Possessory Lien Claimants (Prepetition) | - | - | - | - | (113) | (118) | (28) | (28) | (28) | - | - | - | - | - | - | - | - | - | (200) | (200) |
| ABL Facility Interest | - | - | (100) | - | - | - | (121) | - | (115) | - | (123) | - | - | (116) | - | (117) | - | (118) | (923) | (710) |
| Term Lender Adequate Protection Payments | - | (220) | - | - | - | - | (220) | - | - | - | (220) | - | - | - | (220) | - | - | - | (880) | (660) |
| Restructuring Professional Fees | - | (200) | - | (117) | - | (150) | (425) | - | - | - | - | (1,272) | - | - | (802) | (350) | - | - | (3,316) | (2,999) |
| US Trustee Fees [2] | - | - | - | - | (102) | - | - | - | - | - | - | - | - | - | - | - | (690) | - | (792) | (690) |
| DIP Facility Interest & Fees [2] | - | - | - | - | - | - | (100) | - | - | - | (77) | - | - | - | - | (75) | - | - | (252) | (252) |
| Utility Payment Plan [3] | - | - | - | - | - | (325) | (325) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (1,200) | (1,200) |
| **Total Non-Operating Cash Disbursements** | (1,265) | (1,309) | (864) | (384) | (412) | (770) | (1,418) | (214) | (294) | (196) | (616) | (1,525) | (228) | (344) | (1,030) | (990) | (776) | (168) | (12,803) | (8,569) |
| **Net Cash Flow** | (3,338) | (2,487) | (1,053) | (984) | (411) | (2,725) | (1,270) | (1,615) | 350 | 613 | (1,581) | 157 | 957 | 306 | (1,350) | 43 | 14 | 924 | (13,449) | (5,177) |
| **Cash Balance** [4] | | | | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance (Book) | 333 | 1,995 | 2,508 | 3,455 | 2,471 | 1,939 | 1,214 | 1,944 | 829 | 1,179 | 1,792 | 211 | 367 | 1,325 | 1,631 | 281 | 324 | 338 | - | 13,376 |
| Net Cash Flow (Book) | (3,338) | (2,487) | (1,053) | (984) | (411) | (2,725) | (1,270) | (1,615) | 350 | 613 | (1,581) | 157 | 957 | 306 | (1,350) | 43 | 14 | 924 | (13,616) | (5,177) |
| DIP Borrowings | 5,000 | 3,000 | 2,000 | - | - | 2,000 | 2,000 | 500 | - | - | - | - | - | - | - | - | - | - | 15,000 | 4,500 |
| Other Adjustments [5] | - | - | - | - | (121) | - | - | - | - | - | - | - | - | - | - | - | - | - | (121) | |
| **Ending Cash Balance (Book)** | 1,995 | 2,508 | 3,455 | 2,471 | 1,939 | 1,214 | 1,944 | 829 | 1,179 | 1,792 | 211 | 367 | 1,325 | 1,631 | 281 | 324 | 338 | 1,263 | 1,263 | 12,700 |
| **Memo: Ending Cash Balance (Bank)** | 4,769 | 4,332 | 5,394 | 4,439 | 3,883 | | | | | | | | | | | | | | | |
| **DIP Facility Balance** | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | 500 | 5,500 | 8,500 | 10,500 | 10,500 | 10,500 | 12,500 | 14,500 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | - | 10,500 |
| (+) Borrowings [6] | 5,000 | 3,000 | 2,000 | - | - | 2,000 | 2,000 | 500 | - | - | - | - | - | - | - | - | - | - | 15,000 | 4,500 |
| (-) Paydown | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Balance** | 5,500 | 8,500 | 10,500 | 10,500 | 10,500 | 12,500 | 14,500 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| **Memo: Undrawn DIP Facility** | 9,500 | 6,500 | 4,500 | 4,500 | 4,500 | 2,500 | 500 | - | - | - | - | - | - | - | - | - | - | - | | |

**Notes:**

(1) The standalone 13 weeks reflects the forecast period from the week ended 7/26/19 through the week ended 10/18/19.
(2) The timing of critical vendor payments in the forecast period is illustrative and subject to change based on discussions with vendors. Critical vendor amounts will be used as necessary throughout the pendency of the case.
(3) An agency for $45,000 has been included in the week ended 8/2/19. Amounts related to the payment of the DIP fee will be reflected within the restructuring professional fees category.
The DIP facility bears a 6.0% cash interest rate on the outstanding balance, in addition to a 6.0% PIK interest rate. An exit fee of 0.75% of the outstanding DIP facility is due upon the repayment or termination of the facility.
(4) Debtor's proposed utility payment plan.
(5) The cash balances included within the cash flow forecast exclude any balances related to payroll, surety bond collateral or royalty escrow accounts.

Privileged and Confidential
DRAFT - Subject to Material Change

**Cambrian Holding Company, Inc.,** *et al.*
**Post-Petition Case Professional Payments Detail (Accrual Basis)**
*($ in 000s)*

| Week Number ---> / Week Ending ---> | Week 1 21-Jun-19 | Week 2 28-Jun-19 | Week 3 5-Jul-19 | Week 4 12-Jul-19 | Week 5 19-Jul-19 | Week 6 26-Jul-19 | Week 7 2-Aug-19 | Week 8 9-Aug-19 | Week 9 16-Aug-19 | Week 10 23-Aug-19 | Week 11 30-Aug-19 | Week 12 6-Sep-19 | Week 13 13-Sep-19 | Week 14 20-Sep-19 | Week 15 27-Sep-19 | Week 16 4-Oct-19 | Week 17 11-Oct-19 | Week 18 18-Oct-19 | Cumulative 18 Weeks | Standalone 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ACCRUAL** | | | | | | | | | | | | | | | | | | | | |
| **Debtor's Professionals** | | | | | | | | | | | | | | | | | | | | |
| Frost Brown Todd (Legal Counsel) | $ 150 | $ 150 | $ 60 | $ 60 | $ 60 | $ 60 | $ 60 | $ 75 | $ 75 | $ 75 | $ 75 | $ 75 | $ 75 | $ 75 | $ 75 | $ 60 | $ 60 | 60 | 1,380 | 900 |
| Whiteford Taylor & Preston (Conflict / Local Counsel) | 33 | 33 | 13 | 13 | 13 | 13 | 13 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 13 | 13 | 13 | 299 | 195 |
| Jefferies (Investment Banker) | 188 | 38 | 15 | 15 | 15 | 15 | 15 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 15 | 15 | 15 | 495 | 225 |
| FTI Consulting (FA) | 100 | 100 | 40 | 40 | 40 | 40 | 40 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 40 | 40 | 40 | 920 | 600 |
| Epiq (Claims Management) | 25 | 25 | 10 | 10 | 10 | 10 | 10 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 10 | 10 | 10 | 230 | 150 |
| **Subtotal** | 495 | 345 | 138 | 138 | 138 | 138 | 138 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 138 | 138 | 138 | 3,324 | 2,070 |
| | | | | | | | | | | | | | | | | | | | | |
| **ABL / DIP Professionals** | | | | | | | | | | | | | | | | | | | | |
| Chapman and Cutler (DIP / ABL Legal Counsel) | 75 | 75 | 30 | 30 | 30 | 30 | 30 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 30 | 30 | 30 | 690 | 450 |
| Latham & Watkins (Prepetition ABL Legal Counsel) | - | - | - | 117 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 117 | - |
| Financial Advisor | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal** | 75 | 75 | 30 | 147 | 30 | 30 | 30 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 30 | 30 | 30 | 807 | 450 |
| | | | | | | | | | | | | | | | | | | | | |
| **Term Loan Professionals** | | | | | | | | | | | | | | | | | | | | |
| Legal Counsel | 100 | 100 | 35 | 35 | 35 | 35 | 35 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 20 | 20 | 20 | 635 | 330 |
| Financial Advisor | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Subtotal** | 100 | 100 | 35 | 35 | 35 | 35 | 35 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 20 | 20 | 20 | 635 | 330 |
| | | | | | | | | | | | | | | | | | | | | |
| **UCC Professionals** | | | | | | | | | | | | | | | | | | | | |
| Foley & Lardner (Legal Counsel) | 75 | 75 | 30 | 30 | 30 | 30 | 30 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 30 | 30 | 30 | 690 | 450 |
| B. Riley FBR (Financial Advisor) | 50 | 50 | 20 | 20 | 20 | 20 | 20 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 20 | 20 | 20 | 460 | 300 |
| **Subtotal** | 125 | 125 | 50 | 50 | 50 | 50 | 50 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 50 | 50 | 50 | 1,150 | 750 |
| | | | | | | | | | | | | | | | | | | | | |
| **Other Professionals** | | | | | | | | | | | | | | | | | | | | |
| Data Site Hosting | 25 | 25 | 10 | 10 | 10 | 10 | 10 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 10 | 10 | 10 | 230 | 150 |
| Other Professional Fees | 25 | 25 | 10 | 10 | 10 | 10 | 10 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 10 | 10 | 10 | 230 | 150 |
| **Subtotal** | 50 | 50 | 20 | 20 | 20 | 20 | 20 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 20 | 20 | 20 | 460 | 300 |
| | | | | | | | | | | | | | | | | | | | | |
| **Total Restructuring Professional Fees** [1] | 845 | 695 | 273 | 390 | 273 | 273 | 273 | 323 | 323 | 323 | 323 | 323 | 323 | 323 | 323 | 258 | 258 | 258 | 6,376 | 3,900 |
| | | | | | | | | | | | | | | | | | | | | |
| All Restructuring Professional Expenses | 25 | 25 | 10 | 10 | 10 | 10 | 10 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 10 | 10 | 10 | 230 | 150 |
| | | | | | | | | | | | | | | | | | | | | |
| **Total Restructuring Professional Expenses** | 25 | 25 | 10 | 10 | 10 | 10 | 10 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 10 | 10 | 10 | 230 | 150 |
| | | | | | | | | | | | | | | | | | | | | |
| **Total Restructuring Professional Fees and Expenses** | $ 870 | $ 720 | $ 283 | $ 400 | $ 283 | $ 283 | $ 283 | $ 335 | $ 335 | $ 335 | $ 335 | $ 335 | $ 335 | $ 335 | $ 335 | $ 268 | $ 268 | 268 | $ 6,606 | $ 4,050 |

**Notes:**
(1) Does not include Jefferies or FTIs transaction fees, nor does it include exit-related DIP facility fees.
(2) Professional fee accrual will be adjusted subject to closing date.

7/24/2019 - 5:40 PM