## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Cambrian Holding Company, Inc., *et al.*,[1] | ) | Case No.  19-51200 (GRS) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | Honorable Gregory R. Schaaf |

## ORDER (I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS RELATED THERETO FREE AND CLEAR OF ALL NON-ASSUMED LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (III) GRANTING RELATED RELIEF

Upon the *Debtors' Motion for Entry of (I) An Order (A) Establishing Bidding and Sale Procedures with Respect to the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Entry Into One or More Stalking Horse Agreements and the Provision of Stalking Horse Protections, (C) Scheduling an Auction and Sale Hearing and Approving the Form and Manner of Notice Thereof and (D) Granting Related Relief; and (II) An Order Approving the Sale of Such Assets and Granting Related Relief* (the "**Sale Motion**")[2] (Docket No. 196) dated July 12, 2019, of the above-captioned debtors and debtors-in-possession, pursuant to sections 105(a), 363 and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**")

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Cambrian Holding Company, Inc. (8203), Cambrian Coal LLC (3394), Apex Energy, Inc. (3455), C.W. Augering, Inc. (2875), Marshall Resources, Inc. (9735), PLM Holding Company LLC (7427), Bear Branch Coal LLC (0674), Clintwood Elkhorn Mining LLC (6910), Gatliff Coal LLC (5768), Perry County Coal LLC (4382), Ray Coal LLC (0981), Whitaker Coal LLC (8270), Pike-Letcher Land LLC (8952), Premier Elkhorn Coal LLC (8951), Raven Rock Development LLC (1351), Rich Mountain Coal LLC (1974), S.T. & T. Leasing, Inc. (0340), T.C. Leasing, Inc. (7705), and Shelby Resources, LLC (5085).

[2] Capitalized terms used, but not defined, herein have the meaning ascribed to them in the Sale Motion or the Bidding Procedures Order, as applicable.

for, among other things, (i) approval of each of the sales transactions (collectively, the "**Sale Transaction**"), aggregating to substantially all assets of the Debtors (the "**Assets**") free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature; (ii) approval of the assumption and assignment of the "**Assigned Contracts**" which, for purposes of this Order, shall mean those unexpired leases and executory contracts of the Debtors designated by each applicable Buyer (as defined in this Order) by delivering a written schedule to the Debtors on or before September 26, 2019 at 6:00 p.m. (prevailing Eastern Time) (the "**Designation Deadline**") and (x) for each counterparty to the unexpired leases and executory contracts of the Debtors who has timely and properly filed an objection to the Bidding Procedures Order, the entry of this Order, or the Cure Notice, such counterparty has consented to adequate assurance of future performance of the applicable Buyer and has consented to the applicable cure amount under section 365 of the Bankruptcy Code in both time and amount, or (y) for all other counterparties, upon expiration of the Designation Deadline and payment of any cure amount set forth on the Cure Notice, and (iii) approval of related relief; and the Court having previously entered its *Order (A) Establishing Bidding and Sale Procedures with Respect to the Sale of Substantially All Assets, (B) Authorizing the Entry Into a Stalking Horse Agreement and the Provision of Stalking Horse Protections, (C) Scheduling an Auction and Sale Hearing and Approving the Form and Manner of Notice Thereof, and (D) Granting Related Relief* (Docket No. 339) (the "**Bidding Procedures Order**"); and the Bankruptcy Court having conducted a hearing on the Sale Motion on September 24, 2019 (the "**Sale Hearing**") and all parties in interest having been heard, or having had the opportunity to be heard, regarding the Sale Motion; and the Bankruptcy Court having reviewed and considered the Sale Motion, and the arguments of counsel made, and the evidence adduced, at the hearing to

approve the Bidding Procedures (the "**Bidding Procedures Hearing**") and the Sale Hearing; and upon the record of the Bidding Procedures Hearing and the Sale Hearing, and these chapter 11 cases and proceedings, and after due deliberation thereon, and good cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    **Jurisdiction and Venue**. The Bankruptcy Court has jurisdiction over the Sale Motion and the Sale Transaction pursuant to 28 U.S.C. §§ 157 and 1334 and may enter a final order on the Motion consistent with Article III of the United States Constitution. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates**. The statutory predicates for the relief requested in the Sale Motion are sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014 and Rule 5 of Exhibit C to the Complex Case Procedures.

C.    **Notice**. Proper, timely, adequate and sufficient notice of the Sale Motion, including, without limitation, the Sale Transaction, the assumption and assignment of the Assigned Contracts, the Auction, the Sale Hearing and the Bidding Procedures (as defined in the Bidding Procedures Order) have been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9006 and 9007. Such notice was good and sufficient and appropriate under the circumstances. No other or further notice of the Sale Motion, including, without limitation, the Sale Transaction, the Debtors' assumption and assignment of the Assigned Contracts, the Auction or the Sale Hearing, is necessary or shall be required.

D.    A Cure Notice has been provided to each of the non-Debtor counterparties to the Assigned Contracts identified on the list(s) the Debtors have filed with the Court at Docket Nos. 381 and 449, all in accordance with the Bidding Procedures provided in the Sale Motion. The service of the Cure Notice was sufficient under the circumstances, and no further notice need be

given in respect of the Debtors' assumption and assignment of the Assigned Contracts or the establishment of associated Cure Costs (as defined in this Order). Non-Debtor parties to the Assigned Contracts have had an adequate opportunity to object to the Debtors' assumption and assignment of the Assigned Contracts and the associated Cure Costs.

      E.    **Opportunity to Object**. A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities.

      A.    **Business Justification**. The Debtors have demonstrated an adequate business justification supporting their entry into the Sale Transaction, and the Debtors' assumption and assignment of the Assigned Contracts and the sale of the Assets. Such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors. The reasons underlying the Debtors' sound exercise of their business judgment reasons include, but are not limited to, the facts that (i) the Assets have been aggressively marketed and each form of asset purchase agreement (each an "**APA**" and, collectively, the "**APAs**") by and between: certain Debtors and Richmond Hill Capital Partners, LP, Essex Equity Joint Investment Vehicle, LLC and Alliance Prime Associates, Inc. (the "**JV Buyers**"), attached hereto as **Exhibit A**; (ii) certain Debtors and Pristine Clean Energy LLC, attached hereto as **Exhibit B**; and (iii) certain Debtors and American Resources Corporation, attached hereto as **Exhibit C** (the JV Buyers, Pristine Clean Energy LLC, and American Resources Corporation are collectively referred to as the "**Buyers**" and each a "**Buyer**") constitutes the highest or otherwise best offer for the Assets; (ii) the continued operation of the Assets and corresponding costs will continue to deplete the Debtors' assets, so there is a "need for speed" to consummate the Sale Transaction; (iii) the Sale Transaction will present the best opportunity to realize the value of the Assets on a going concern basis and to avoid decline and devaluation of the related business; (iv) the Bidding

Procedures utilized were designed to yield the highest or otherwise best bids for the Assets; and (v) the Debtors and each of the Buyers engaged in good faith, arm's-length negotiations with the Buyers in order to achieve the Sale Transaction contemplated in each of the APAs. Entry of this Order and all provisions hereof is a necessary condition precedent to the Buyers consummating the Sale Transaction.

B.      **Opportunity to Bid**. The Debtors and their professionals robustly marketed the Assets and conducted the marketing and sale process as set forth in the Sale Motion and in accordance with the Bidding Procedures included in the Sale Motion. The Auction process included in the Bidding Procedures afforded a full and fair opportunity for any entity to make an offer to purchase the Assets. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Assets.

C.      **Auction**. An Auction was conducted in accordance with the Bidding Procedures and after conclusion of the Auction, each of the Buyers was declared to have made the highest or otherwise best offer. The Auction was conducted at arm's length, without collusion and in good faith.

D.      **Highest or Otherwise Best Offer**. The total consideration provided by each of the Buyers for the Assets in the aggregate is the highest or otherwise best offer received by the Debtors. The Buyers are the successful bidders for the Assets in accordance with the Bidding Procedures.

E.      **Good Faith Purchaser**. The Sale Transaction has been negotiated by the Debtors and each Buyer (and their respective affiliates and representatives) in good faith, at arm's length and without collusion or fraud. The terms and conditions of each Sale Transaction, including the

total consideration to be realized by the Debtors pursuant to each APA are fair and reasonable, and the Sale Transaction is in the best interest of the Debtors, their creditors and their estates.

F.     Each Buyer is a "good faith purchaser" entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code with respect to the sale and assignment of the Assets and the Sale Transaction.

G.     None of the APAs were controlled by an agreement between potential or actual bidders within the meaning of section 363(n) of the Bankruptcy Code. The Debtors and the Buyers have not engaged in any conduct that would cause or permit any of the APAs or the consummation of the Sale Transaction to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. The Buyers is entitled to all the protections and immunities of section 363(n) of the Bankruptcy Code.

H.     Cause has been shown as to why this Order should not be stayed pursuant to Bankruptcy Rules 6004(h) and 6006(d). None of the Buyers are "insiders" as that term is defined in section 101(31) of the Bankruptcy Code.

I.     **Transfer of Assets and Assumed Liabilities**. The transfer of the Assets and Assumed Liabilities (as such term is defined in each of the respective APAs) in accordance with the terms of this Order is integral to each of the APAs and is in the best interests of the Debtors, their estates and their creditors, and the Debtors have an adequate business justification therefor.

J.     **Assumption and Assignment in Best Interests**. The Debtors' assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the Sale Transaction and is in the best interests of the Debtors, their estates and their creditors, and represents the Debtors' exercise of reasonable business judgment. Pursuant to section 365(f) of the Bankruptcy Code, the Assigned Contracts shall be assigned and transferred to, and remain in full

force and effect for the benefit of, the Buyers assuming such Assigned Contract notwithstanding any provision of the Assigned Contracts or other restriction prohibiting their assignment or transfer.

K.    **Cure/Adequate Assurance**. The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts, or such requirements have been waived by the applicable counterparties. The Buyers have provided adequate assurance (within the meaning of section 365(b)(1) of the Bankruptcy Code) of cure of any default existing prior to the Closing Date under any of the Assigned Contracts. The Buyers have provided adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code (including to the extent, if any, modified by section 365(b)(3) of the Bankruptcy Code).

L.    **Free and Clear**. The sale and assignment of the Assets to each Buyer will be, as of the Closing Date, a legal, valid and effective transfer of such assets, and each such transfer and assignment shall, upon the Closing Date, vest the Buyers with all right, title and interest of the Debtors to the Assets identified in their respective APA free and clear of all Liens and Excluded Liabilities (as such terms are defined in the respective APA), with any such Liens or Excluded Liabilities to attach to the net proceeds to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any, as were in existence on the Closing Date. The Buyers would not enter into the Sale Transaction if the sale of the Assets were not free and clear of all Liens and Excluded Liabilities, or if the Buyers would, or in the future could, be liable for any such Liens or Excluded Liabilities.

M.    **Satisfaction of 363(f) Standards**. The Debtors may sell and assign the Assets free and clear of all liens or other interests in the Assets, because, with respect to each creditor asserting

a Lien, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens who did not object or who withdrew their objections to the Sale Transaction or any Cure Notice are deemed to have consented to the Sale Motion and the sale and assignment of the Assets to the Buyers under section 363(f)(2) of the Bankruptcy Code. Those holders of liens or other interests in the Assets who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their liens or other interests (if any) attach to the net proceeds of the Sale Transaction ultimately attributable to the Assets in which such holders allege a lien or other interest, in the same order of priority, with the same validity, force and effect that such holder had prior to the Sale Transaction, and subject to any claims and defenses the Debtors and their estates may possess with respect thereto.    Alternatively, the collateral securing certain objecting creditors' claims has been identified as Excluded Assets, including those secured creditors who made credit bids at the auction.

N.    **No Successor Liability**. The Buyers and their affiliates and their respective predecessors, successors, assigns, members, partners, principals, directors, officers and shareholders (or equivalent) shall have no obligations with respect to any liabilities of the Debtors other than the Assumed Liabilities, but with respect to the Committee or chapter 7 trustee, solely by reason of entering into the Sale Transaction.

O.    **Authority to Enter into the APAs**.  The Debtors have full authority and power (a) to execute and deliver each of the APAs and related agreements and all other documents contemplated by each of the APAs and (b) to perform its obligations under each of the APAs and to consummate the Sale.  No additional consents or approvals, other than those provided in each

of the APAs, are necessary or required for the Debtors to enter into each of the APAs, perform their obligations therein and consummate the transactions contemplated thereby.

P.     **Buyer Consummation.**  Each Buyer would not have entered into its respective APAs and would not have consummated the transactions thereby, thus adversely affecting the Debtor, its estate and creditors, if the Assets were not sold to it free and clear of all claims and liabilities, except those expressly assumed in each APA by the respective Buyer, or if each Buyer would, or in the future could, be liable for any such claims and liabilities, including based upon successor or vicarious liability or otherwise.  A sale of Assets other than one free and clear of all such claims and liabilities (except those expressly assumed by each Buyer in its respective APA) would adversely affect the Debtors' estate and creditors, and would yield substantially less value to the Debtors' estates.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.     **Relief Granted**. The relief requested in the Sale Motion is granted as set forth herein.  The Debtors entry into each APA and the sale of the Assets contemplated by each APA is hereby approved in all respects.  The terms and conditions of each APA are hereby approved in all respects.

2.     **Objections Overruled**. All objections, reservations of rights, and responses to the Sale Motion, this Order or the relief granted herein that have not been overruled, withdrawn, waived, settled or otherwise resolved, are hereby overruled and denied on their respective merits with prejudice.

3.     **Notice**. Notice of the Sale Motion, including without limitation, the transactions set forth in each of the APAs and the assumption and assignment of the Assigned Contracts, the Auction, the Sale Hearing and the Sale Transaction, was fair and reasonable under the

circumstances and complied in all respects with sections 102(1), 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, 9006 and 9007.

4.      **Approval of the APAs**. Each of the APAs and the Sale Transaction are hereby approved and authorized in all respects, and the Debtors are hereby authorized and empowered to enter into, and to perform their obligations under, each of the APAs and to execute and perform such agreements or documents, and take such other actions as are necessary or desirable to effectuate the terms of each of the APAs.

5.      **Good Faith Buyers**. Each Buyer is a good faith purchaser of the Assets and is hereby granted and is entitled to all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code. Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified or vacated by a subsequent order of the Bankruptcy Court or any other court, such reversal, modification or vacatur shall not affect the validity and enforceability of any sale, transfer or assignment under the APAs or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing Date) and, notwithstanding any reversal, modification or vacatur, any sale, transfer or assignment, shall be governed in all respects by the original provisions of this Order or the APAs, as the case may be.

6.      **Section 363(n) of the Bankruptcy Code**. The sale approved by this Order is not subject to avoidance or any recovery or damages pursuant to section 363(n) of the Bankruptcy Code.

7.      **Authorization of Performance by the Debtors**. The Debtors are authorized to fully perform under, consummate, and implement the terms of the APAs together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement

and effectuate the terms of the APAs, this Order and the Sale Transaction, including, without limitation, deeds, assignments, stock powers, transfers of membership interests, and other instruments of transfer and to take all further actions as may reasonably be requested by the Buyers for the purpose of assigning, transferring, granting, conveying and conferring to the Buyers, or reducing to possession any or all of the Assets, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the APAs, without any further corporate action or orders of the Bankruptcy Court.

8.      The Debtors are authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units, any and all certificates, agreements or amendments necessary or appropriate to effectuate the transactions contemplated by the APAs, any related agreements and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.

9.      **Valid Transfer**. Effective as of the Closing, the sale and assignment of the Assets and the Assigned Contracts by the Debtors to the Buyers shall constitute a legal, valid and effective transfer of the Assets and the Assigned Contracts notwithstanding any requirement for approval or consent by any person, and will vest the Buyers with all right, title and interest of the Debtors in and to the Assets, free and clear of all liens and other interests (other than those liens or interests assumed under the APAs), pursuant to section 363(f) of the Bankruptcy Code.

10.      **The Debtors Shall Not Retain Liability for Assigned Contracts and Assumed Liabilities**. Effective on the Closing, (a) the assumption of the Assigned Contracts and the

Assumed Liabilities by the Buyers constitutes a legal, valid, effective, complete and absolute sale, conveyance and transfer from the Seller to the Buyers of any and all Liabilities relating to, in connection with or arising under the Assigned Contracts and Assumed Liabilities and (b) the Debtors shall have no liability to Buyers, any governmental agency, surety or any other person for any Liabilities with respect to the Assigned Contracts and such Assumed Liabilities (which shall, for the avoidance of doubt, include, among other things, all Liabilities arising under or relating to (x) any Environmental Laws and (y) the Transferred Permits/Licenses, including such liabilities thereunder arising out of or relating to all Reclamation and post-mining Liabilities of the Business and Assets).

11.     Further, it is the Parties' express intention that the Sale Transaction be, and be treated for all purposes, as an absolute sale, conveyance and transfer of all Liabilities relating to, in connection with or arising under the Assigned Contracts and Assumed Liabilities.

12.     **Free and Clear**. Except to the extent specifically provided in the APAs, upon the Closing, the Debtors shall be, and hereby are, authorized, empowered and directed, pursuant to sections 105, 363(b) and 363(f) of the Bankruptcy Code, to sell the Assets and assign the Assigned Contracts to the Buyers as set forth in their respective APAs. The sale and assignment of the Assets and the assignment of the Assigned Contracts to each of the Buyers as set forth in their respective APAs vests the Buyers with all right, title and interest of the Debtors to the Assets (including the Assigned Contracts) free and clear of any and all Liens, Excluded Liabilities and other liabilities or interests of any kind or nature whatsoever, whether imposed by agreement, understanding, law, equity or otherwise, with all such Liens to attach only to the net proceeds of the sale with the same priority, validity, force and effect as they now have in or against the Assets (including the Assigned Contracts). The Sale Motion shall be deemed to provide sufficient notice as to the sale and

assignment of the Assets free and clear of all Liens and Excluded Liabilities in accordance with the Bankruptcy Code and the Bankruptcy Rules. Following the Closing, no holder of any Lien on the Assets may interfere with the Buyers' use and enjoyment of the Assets based on or related to such Lien or any actions that the Debtors may take in their chapter 11 cases, and such holders are expressly enjoined from taking any action against each Buyer, its affiliates, or any agent of the foregoing to recover any claim which such person or entity has or believes it has against the Debtors or the Buyers.

13.    The provisions of this Order authorizing the sale and assignment of the Assets free and clear of Liens and the Excluded Liabilities, shall be self-executing, and neither the Debtors nor the Buyers shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

14.    **Direction to Creditors**. On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens on the Assets, if any, as such Liens may otherwise exist. If any person or entity that has filed financing statements, mortgages, mechanics liens, lis pendens or other documents, instruments, notices or agreements evidencing any Lien against or in the Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases or instruments of satisfaction that the person or entity has with respect to the Assets, then with regard to the Assets, (a) the Debtors and/or the Buyers are authorized to execute and file such termination statements, releases, instruments of satisfaction or other documents on behalf of the person or entity with respect to the Assets; and (b) the Debtors and/or Buyers are authorized to file, register or otherwise record a certified copy of

13

this Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens against the Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, local, tribal or foreign government agency, department or office.

15.   **Direction to Government Agencies**. Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official and any other persons or entities that may be required by operation of law or the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Assets, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APAs and this Order. All such entities described above in this paragraph are authorized and specifically directed to strike all recorded Liens against the Assets from their records.

16.   **Direction to Surrender Possession or Control**. All persons or entities, presently or on or after the Closing Date, in possession or control of some or all of the Assets are directed to surrender possession or control of the Assets to the Buyer of such Assets pursuant to the respective APAs on the Closing Date or at such time thereafter as the Buyers may request.

17.   **Licenses and Permits**. To the extent provided in each of the APAs and available under applicable law, the Buyers shall be authorized, as of the Closing Date, to operate under any license, permit, registration and any other governmental authorization or approval of the Debtors with respect to the Assets and the Assigned Contracts purchased or assumed by such Buyer, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the respective Buyer as of the Closing

Date. To the extent any license or permit necessary for the operation of the business is determined

not to be an executory contract assumable and assignable under section 365 of the Bankruptcy

Code, the respective Buyer shall apply for and obtain any necessary license or permit promptly

after the Closing Date, and such licenses or permits of the Debtors shall remain in place for the

respective Buyer's benefit until new licenses and permits are obtained.

18.    To the extent provided by section 525 of the Bankruptcy Code, no governmental

unit may revoke or suspend any permit or license relating to the operation of the Assets sold,

transferred or conveyed to the Buyers on account of the filing or pendency of this chapter 11 cases

or the consummation of the transactions contemplated by the APAs.

19.    **No Successor Liability**. The Buyers and their affiliates and their respective

predecessors, successors, representatives, assigns, members, partners, officers, directors,

principals and shareholders (or equivalent) are not and shall not be (a) deemed a "successor" in

any respect to the Debtors or their estates as a result of the consummation of the Sale Transaction

contemplated by each of the APAs or any other event occurring in the chapter 11 cases under any

theory of law or equity, (b) deemed to have, de facto or otherwise, merged or consolidated with or

into the Debtors or their estates, (c) deemed to have a common identity with the Debtors, (d)

deemed to have a continuity of enterprise with the Debtors, (e) deemed to be an alter ego of the

Debtors or their estates or (f) deemed to be a continuation or substantial continuation of the Debtors

or any enterprise of the Debtors. The Buyers shall not assume, nor be deemed to assume or in any

way be responsible for any liability or obligation of any of the Debtors and/or their estates

including, but not limited to, any Excluded Liabilities, any bulk sales law, successor liability,

liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or

similar liability except as otherwise expressly provided in the respective APAs, and the Sale

Motion contains sufficient notice of such limitation in accordance with applicable law. Except for the Assumed Liabilities, solely as a result of entering into the Sale Transaction, the transfer of the Assets and the Assigned Contracts to the respective Buyer under the respective APAs shall not result in (x) the respective Buyer and its affiliates and their respective predecessors, representatives, successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) or the Assets, having any liability or responsibility for any claim against the Debtors or against an insider of the Debtors (including, without limitation, Excluded Liabilities); (y) each of the Buyers and their affiliates and their respective predecessors, successors, representatives, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) or the Assets, having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Liens or Excluded Liability; or (z) the Buyers and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) or the Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the APAs.

20.     **No Bulk Sales; No Brokers**. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction. No brokers were involved in consummating the Sale Transaction, and no brokers' commissions are due to any person or entity in connection with the Sale Transaction. The Buyers is not, and will not become, obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the Sale Transaction based upon any arrangement made by, or on behalf of, the Debtors.

21.     **Assumption and Assignment of Assigned Contracts**. Under sections 105(a), 363 and 365 of the Bankruptcy Code, and strictly subject to and conditioned upon the closing of the Sale Transaction, the Debtors' assumption and assignment of the Assigned Contracts to each of the Buyers as set forth in the respective APAs free and clear of all Liens and Excluded Liabilities pursuant to the terms set forth in the respective APAs, as modified by the terms of any amendments reached directly by the respective Buyer with the respective counterparty, is hereby approved, and the requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code (including to the extent, if any, modified by section 365(b)(3) of the Bankruptcy Code) with respect thereto are hereby deemed satisfied. Each counterparty to the Assigned Contracts is hereby forever barred, estopped and permanently enjoined from raising or asserting against the Debtors or the Buyers, or the property of any of them, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown, liquidated or unliquidated senior or subordinate) arising under or out of, in connection with, or in any way related to the Assigned Contracts existing as of the Closing Date or arising by reason of the Closing.

22.     **Adequate Assurance**. The Buyers have provided adequate assurance of its future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code (including to the extent, if any, modified by section 365(b)(3) of the Bankruptcy Code). All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment to the Buyers of the Assigned Contracts have been satisfied.

23.     **Anti-Assignment Provisions Unenforceable**. No sections or provisions of the Assigned Contracts that purport to (a) prohibit, restrict or condition Debtors' assignment of the

Assigned Contracts, including, but not limited to, the conditioning of such assignment on the consent of the non-debtor party to such Assigned Contracts; (b) authorize the termination, cancellation or modification of the Assigned Contracts based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtors; or (d) provide for additional payments, penalties, conditions, renewals, extensions, charges or other financial accommodations in favor of the non-debtor third party to the Assigned Contracts, or modification of any term or condition upon the assignment of an Assigned Contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code. The entry of this Order constitutes the consent of the non-debtor parties to the Assigned Contracts to the Debtors' assumption and assignment of such agreements to the Buyers. All Assigned Contracts shall remain in full force and effect, without existing default(s), subject only to payment of the appropriate cure amount, if any, by the Buyers.

24.    **No Fees for Assumption and Assignment**. There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyers, their successors or assigns or the Debtors as a result of the assumption and assignment of the Assigned Contracts.

25.    **Cure Costs**. All defaults or other obligations shall be deemed cured by the Buyers' payment or other satisfaction of the cure amounts, if any, whether by agreement of the parties or in the amounts as set forth on the Cure Notice (the "**Cure Costs**"). Unless a non-debtor counterparty to an Assigned Contract has timely and properly filed and served an objection to the assumption and assignment of its Assigned Contract or the Cure Costs, the Cure Costs set forth in

the Cure Schedule are binding upon the non-debtor counterparties to the Assigned Contracts for all purposes in these Chapter 11 Cases and shall constitute a final determination of the total Cure Costs required to be paid by the Buyers in connection with the assumption and assignment of the Assigned Contracts (unless a portion of such costs are paid or satisfied in any manner, in which case the Cure Costs shall be reduced). Absent a timely and properly filed and served objection, all non-debtor counterparties to the Assigned Contracts are forever (a) barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to the Assigned Contracts, and the Debtors and the Buyers shall be entitled to rely solely upon the Cure Costs set forth in the Cure Schedule; and (b) barred, estopped and permanently enjoined from asserting or claiming against the Debtors, any Buyers or their respective property that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assigned Contract or that there is any objection or defense to the assumption and assignment of such Assigned Contract. For the avoidance of doubt, the Buyers shall be responsible for the payment of their respective Cure Costs for the Assigned Contracts specifically assigned and assumed to that Buyer pursuant to its respective APA.

26.    **Notice of Assumption and Assignment**. The Debtors have served all of the non-debtor counterparties to the Assigned Contracts, identified on the lists the Debtors have filed with the Bankruptcy Court, by first class mail, an Assumption/Assignment Notice that included (a) the title of the Assigned Contract, (b) the name of the counterparty to the Assigned Contract, (c) any applicable Cure Costs, (d) the deadline by which any such Assigned Contract counterparty must file an objection ("**Cure Objection**") to the proposed assumption and assignment. No other or further notice is required.

27.    **Objections to Assumption and Assignment**. Except as provided herein, all Cure Objections have been overruled, withdrawn, waived, settled or otherwise resolved. Any Cure Objections as to applicable Cure Costs that have not been resolved by the parties may be heard at a later date as set by the Bankruptcy Court. The pendency of a dispute relating to a particular Assigned Contract shall not prevent or delay the assumption and assignment of any other Assigned Contract or the closing of the Sale Transaction.

28.    Any non-debtor counterparty to the Assigned Contract designated for the Debtors' assumption and assignment to the Buyers that has not filed an Objection on or before the deadline as set forth in the relevant Assumption/Assignment Notice shall thereafter be barred from objecting or asserting monetary or non-monetary defaults with respect to any such Assigned Contract, and such Assigned Contract shall be deemed assumed by the Debtors and assigned to the Buyers on the Closing Date.

29.    **Direction to Assigned Contracts Counterparties**. All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyers, and shall not charge the Buyers for, any instruments, applications, consents or other documents that may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

30.    **Amendments**. Subject to the terms of each of the APAs, each of the Buyers' APAs and any related agreements may be waived, modified, amended or supplemented by agreement of the Debtors and the Buyer party to the respective APA, after consultation with the Committee, without further action or order of the Bankruptcy Court; provided, however, that any such waiver, modification, amendment or supplement does not have a material effect on the Debtors and their estates. The Debtors and each of the Buyers are expressly authorized, without further order of the

Bankruptcy Court, to execute an amendment to the respective APAs to provide for the Closing to occur on one or more Closing Dates. Any material modification, amendment or supplement to the respective APAs that has an adverse effect on the Debtors and their estates must be approved by order of the Bankruptcy Court following a motion on notice to all interested parties.

31.     **Failure to Specify Provisions**. The failure specifically to include any particular provisions of the APAs or any related agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court, the Debtors and the Buyers that the APAs and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

32.     **Binding Order**. This Order and the APAs shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtors and the Buyers, their respective successors and permitted assigns, shareholders, members, former employees, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case if this case is converted from chapter 11, all creditors of any Debtor (whether known or unknown), all non-debtor parties to any Assigned Contracts, filing agents, filing officers, title agents, recording agencies, governmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Assets. The APAs and Sale Transaction shall not be subject to rejection or avoidance under any circumstances. This Order and the APAs shall inure to the benefit of the Debtors, their estates, their creditors, the Buyers and its respective successors and assigns.

33.    **Allocation of Consideration**. Except as provided in the APAs, all rights of the respective Debtors' estates with respect to the allocation of consideration received from the Buyers in connection with the Sale Transaction (including, without limitation, the value of the assumption of the Assumed Liabilities) are expressly reserved for later determination by the Bankruptcy Court and, to the extent consideration is received by any Debtor that is determined to be allocable to another Debtor, the recipient Debtor shall be liable to such other Debtor for a claim with the status of an expense of administration in the case of the recipient Debtor under section 503(b) of the Bankruptcy Code.

34.    **No Stay of Order**. Notwithstanding Bankruptcy Rules 6004 and 6006, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. Time is of the essence in closing the Sale Transaction referenced herein, and the Debtors and the Buyers intend to close the Sale Transaction as soon as practicable. Any party objecting to this Order must exercise due diligence in filing an appeal, pursuing a stay and obtaining a stay prior to the Closing or risk its appeal being foreclosed as moot.

35.    **Lift of Automatic Stay**. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Bankruptcy Court, to allow the Buyers to deliver any notice provided for in the APAs and allow the Buyers to take any and all actions permitted under the APAs, including, without limitation, terminating one or more of the APAs, in each case in accordance with the terms and conditions thereof.

36.    **Retention of Jurisdiction**. The Bankruptcy Court shall retain exclusive jurisdiction to: (a) interpret, implement and enforce the terms and provisions of this Order and the APAs, including all amendments thereto and any waivers and consents thereunder and each of the

agreements executed in connection therewith, in all respects; and (b) to decide any disputes concerning this Order and the APAs, or the rights and duties of the parties hereunder or thereunder or any issues relating to the APAs and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning (i) the transfer of the assets free and clear of all Liens and (ii) the absolute conveyance of the Assumed Liabilities and Assigned Contracts.

37.    **Overriding Royalty Arrangement.**  That 2% overriding royalty arrangement as set forth in the Pristine APA is hereby approved and the parties are directed to enter into such arrangement promptly after the Closing of the Pristine APA.

38.    **Further Assurances**. From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale Transaction, including, such actions as may be necessary to vest, perfect or confirm, or record or otherwise, in the Buyers its right, title and interest in and to the Assets and the Assigned Contracts.

39.    **Committee Reservation of Rights**.  Notwithstanding anything to the contrary in this Order or in the Asset Purchase Agreement, including without limitation, any credit bid, (a) the rights and claims of the Committee and the Debtors' estates against each of the Defendants (collectively, the "**Defendants**") in those certain adversary proceedings entitled *Official Committee of Unsecured Creditors of Cambrian Holding Company, Inc. et al. v. Alliance Prime Associates, Inc., et al.* (Adv. Pro. No. 19-05021) and *Official Committee of Unsecured Creditors of Cambrian Holding Company, Inc. et al. v. Deutsche Bank AG, et al.* (Adv. Pro. No. 19-05022)

(collectively, the "**Adversary Proceedings**") are hereby reserved in all respects for prosecution after the entry of this Order, and (b) for purposes of the Adversary Proceedings, the purchase price, including credit bid and allocation of bid, identified for the Assets shall not be binding on the Committee or the Debtors' estates as to the value of the Assets or the consideration received, whether under principles of res judicata, collateral estoppel or otherwise.  Defendants in the Adversary Proceedings retain all other arguments and defenses to any claims in the Adversary Proceeding, including that the identified purchase price for the Assets is in fact the correct valuation and/or allocation.  In addition, the Committee has argued that the Debtors have sold to the Buyers assets which constitute unencumbered assets of the Debtors' estates including, without limitation, vehicles and real estate to which an asserted lien may be avoided under section 544(a) of the Bankruptcy Code (the "**Alleged Unencumbered Transferred Assets**").  Notwithstanding anything to the contrary in this Order or in the Asset Purchase Agreement including, without limitation, any credit bid, (i) the Committee's rights to argue that the Debtors' estates are entitled to be paid, in cash, on account of the fair market value of some or all of the Alleged Unencumbered Transferred Assets are preserved, and (ii) if the Court agrees that the Debtors' estates are entitled to be paid, in cash, on account of the fair market value of such Alleged Unencumbered Transferred Assets, the JV Buyers shall transfer that sum in cash to the Debtors' estates, it being understood that the JV Buyers reserve all arguments, rights and defenses, as to such claims.  However, to the extent it prevails on any claim regarding Alleged Unencumbered Transferred Assets, the Committee waives any right to seek recovery of "the property transferred" under Section 550(a) of the Bankruptcy Code from the Buyers, but reserves all other recourse, including monetary damages against the JV Buyers. The JV Buyers and any such purported lienholder reserves all

arguments, defenses and issues regarding to the foregoing claims to the Alleged Unencumbered Transferred Assets.

40.    **Governing Terms**. To the extent this Order is inconsistent with any prior order or pleading in these chapter 11 cases, the terms of this Order shall govern. To the extent there is any inconsistency with between the terms of this Order and the terms of the APAs (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

41.    Nothing in this Order or the APAs releases, nullifies, precludes, or enjoins the enforcement of any liability under police or regulatory statutes or regulations to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order; provided, however, that the foregoing shall not limit, diminish or otherwise alter the Debtors' or the Buyers' defenses, claims, causes of action, or other rights under applicable nonbankruptcy law with respect to any liability that may exist to a governmental unit at an owned or operated property. Nothing in this Order or the APAs authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

42.    To the extent the Debtors' self-funded employee welfare benefit plan that the Debtors have with Meritain Health, Inc. ("**Meritain**") and Administrative Services Agreement, effective as of June 1, 2016, as amended, are assumed and assigned to the Buyers, Meritain's rights are reserved to recover from the Buyers in the ordinary course all amounts that become due to Meritain. This reservation includes without limitation, Meritain's right to recover from the Buyers

all amounts which have been accrued but not yet submitted to or processed by Meritain, without regard to whether the dates of service for such benefits were prior to or after the cure objection deadline. To the extent such self-funded employee welfare benefit plan and Administrative Services Agreement are assumed, but not assigned, Meritain's rights under the Administrative Services Agreement are fully reserved.

43.    Notwithstanding anything in this Order or the APAs to the contrary, the purchased Assets shall not be transferred free and clear of, and shall remain subject to, any and all rights of setoff, recoupment, and/or other defenses to liability available under applicable non-bankruptcy law to any entity directly or indirectly controlled or affiliated in any way with James Booth or Ted McGinnis (the "**Non-Debtor Entities**").  Nothing in this Order shall constitute an adjudication of the validity of the claims or defenses of the Non-Debtor Entities and the Purchaser shall retain any and all rights to challenge same.

44.    To the extent that any property owned by Pinnacle Processing, Inc. and Eagle Coal Company, LLC is in the possession of one of the Debtors, title to such property is not being transferred pursuant to this Order.

45.    For the avoidance of doubt, the collateral of Community Trust Bank, Inc., Caterpillar Financial, Inc. and Komatsu Financial LP shall not be sold and transferred pursuant to this Order.

46.    Notwithstanding anything in this Order or the APAs to the contrary, the sale, transfer, and assignment of the Assets to the JV Buyers pursuant to the APA of the JV Buyers will be subject to (and not free and clear of) the claims, security interests, and liens of the Pre-Petition ABL Agent (as defined in the Final DIP Order) as to pre-petition amounts owed to DBNY (as defined in the Final DIP Order) by the Debtors, as set forth in the Final DIP Order.

TENDERED BY:

/s/ Patricia K. Burgess
Patricia K. Burgess
**FROST BROWN TODD LLC**
250 West Main Street, Suite 2800
Lexington, Kentucky 40507
Tel:  (859) 231-0000
Fax: (859) 231-0011
E-mail: pburgess@fbtlaw.com

-and-

Ronald E. Gold (admitted *pro hac vice*)
Douglas L. Lutz (admitted *pro hac vice*)
A.J. Webb (admitted *pro hac vice*)
**FROST BROWN TODD LLC**
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Tel:  (513) 651-6800
Fax:  (513) 651-6981
E-mail:  rgold@fbtlaw.com
       dlutz@fbtlaw.com
       awebb@fbtlaw.com

**PROPOSED ATTORNEYS FOR
DEBTORS AND DEBTORS-IN-POSSESSION**

0110825.0722105   4828-9708-4060v3

27

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and
electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Gregory R. Schaaf*
**Bankruptcy Judge**
**Dated: Wednesday, September 25, 2019**
  (grs)

# **<u>EXHIBIT A</u>**

**Execution Version**

ASSET PURCHASE AGREEMENT

among

CAMBRIAN COAL LLC,

SHELBY RESOURCES, LLC,

AND EACH OTHER DEBTOR SIGNATORY HERETO

and

RICHMOND HILL CAPITAL PARTNERS, LP,

ESSEX EQUITY JOINT INVESTMENT VEHICLE, LLC

AND ALLIANCE PRIME ASSOCIATES, INC.

Dated as of September 20, 2019

# TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| Section 1.1. | Certain Definitions | 1 |
| Section 1.2. | Other Definitional and Interpretive Matters | 14 |
| ARTICLE II | PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES | 15 |
| Section 2.1. | Purchase and Sale of Assets | 15 |
| Section 2.2. | Excluded Assets | 18 |
| Section 2.3. | Assumption of Liabilities | 19 |
| Section 2.4. | Excluded Liabilities | 21 |
| Section 2.5. | Non-Assignment of Assets | 21 |
| Section 2.6. | Further Conveyances and Assumptions | 22 |
| ARTICLE III. | CONSIDERATION | 22 |
| Section 3.1. | Consideration | 22 |
| Section 3.2. | Payment of Purchase Price | 23 |
| ARTICLE IV. | CLOSING AND TERMINATION | 24 |
| Section 4.1. | Closing Date | 24 |
| Section 4.2. | Deliveries by Sellers | 24 |
| Section 4.3. | Deliveries by Purchaser | 25 |
| Section 4.4. | Termination of Agreement | 26 |
| Section 4.5. | Procedure Upon Termination | 27 |
| Section 4.6. | Effect of Termination | 27 |
| ARTICLE V. | REPRESENTATIONS AND WARRANTIES OF SELLERS | 27 |
| Section 5.1. | Organization and Good Standing | 27 |
| Section 5.2. | Authorization of Agreement | 27 |
| Section 5.3. | Governmental Consents | 28 |
| Section 5.4. | Title to Purchased Assets | 28 |
| Section 5.5. | Validity of Purchased Contracts | 29 |
| Section 5.6. | Litigation | 29 |
| Section 5.7. | Financial Advisors | 29 |
| Section 5.8. | Environmental Matters | 29 |
| Section 5.9. | Sellers' Intellectual Property | 31 |
| Section 5.10. | Compliance with Applicable Laws; Permits | 31 |
| Section 5.11. | Labor Matters | 31 |
| Section 5.12. | Employee Benefits | 32 |
| Section 5.13. | Mining | 33 |
| Section 5.14. | Tax Matters | 34 |
| Section 5.15. | No Other Representations or Warranties; Schedules | 35 |

ARTICLE VI.          REPRESENTATIONS AND WARRANTIES OF PURCHASER ...............................35

Section 6.1.        Organization and Good Standing..........................................35
Section 6.2.        Authorization of Agreement ...............................................35
Section 6.3.        Conflicts; Consents of Third Parties ....................................36
Section 6.4.        Litigation.................................................................36
Section 6.5.        Financial Advisors .......................................................36
Section 6.6.        Capability ................................................................36
Section 6.7.        Condition of the Purchased Assets .......................................37
Section 6.8.        Exclusivity of Representations and Warranties ..................37

ARTICLE VII.         BANKRUPTCY COURT MATTERS ...........................................37

Section 7.1.        Bankruptcy Court Approval...............................................37
Section 7.2.        Bankruptcy Court Filings ...............................................38

ARTICLE VIII.        COVENANTS ...................................................................39

Section 8.1.        Access to Information ...................................................39
Section 8.2.        Actions Pending the Closing ...........................................39
Section 8.3.        Consents ..................................................................40
Section 8.4.        Further Assurances ......................................................40
Section 8.5.        Assignment/Assumption of Contracts ...........................41
Section 8.6.        Transferred Permit and Surety Bond Matters ..................42
Section 8.7.        Insurance Cooperation ..................................................42
Section 8.8.        Employee Matters ......................................................42
Section 8.9.        No Successor Liability ..................................................43
Section 8.10.       Publicity ..................................................................43
Section 8.11.       Confidentiality ..........................................................43
Section 8.12.       Transaction Documents ...............................................44
Section 8.13.       Sale Free and Clear ....................................................44
Section 8.14.       Fiduciary Obligations...................................................44

ARTICLE IX.          CONDITIONS TO CLOSING ................................................45

Section 9.1.        Conditions Precedent to Obligations of Purchaser .............45
Section 9.2.        Conditions Precedent to Obligations of Sellers .................46
Section 9.3.        Conditions Precedent to Obligations of Purchaser and
                    Sellers...................................................................47
Section 9.4.        Frustration of Closing Conditions..................................47

ARTICLE X.           TAXES .........................................................................47

Section 10.1.       Transfer Taxes ..........................................................47
Section 10.2.       Purchase Price Allocation ............................................47
Section 10.3.       Cooperation and Audits ...............................................48

ARTICLE XI.          MISCELLANEOUS ...........................................................48

| Section 11.1. | No Survival of Representations and Warranties | 48 |
| Section 11.2. | Expenses | 49 |
| Section 11.3. | Injunctive Relief | 49 |
| Section 11.4. | Submission to Jurisdiction; Consent to Service of Process | 49 |
| Section 11.5. | Waiver of Right to Trial by Jury | 50 |
| Section 11.6. | Entire Agreement; Amendments and Waivers | 50 |
| Section 11.7. | Governing Law | 50 |
| Section 11.8. | Notices | 50 |
| Section 11.9. | Severability | 52 |
| Section 11.10. | Assignment | 52 |
| Section 11.11. | Non-Recourse | 53 |
| Section 11.12. | Counterparts | 53 |

| Exhibit A | Interim Permit Operating Agreement |

| Schedule 1.1(a) | Knowledge of Sellers |
| Schedule 1.1(b) | Owned Real Property |
| Schedule 2.1(b)(v) | Purchased Contracts |
| Schedule 2.1(b)(xix) | Other Purchased Assets |
| Schedule 2.2(f) | Excluded Assets |
| Schedule 2.3(l) | Assumed Liabilities |
| Schedule 5.5 | Validity of Purchased Contracts |
| Schedule 5.6 | Litigation |
| Schedule 5.9 | Sellers' Intellectual Property |
| Schedule 5.10 | Compliance with Applicable Laws; Permits |
| Schedule 5.12(a) | Seller Benefit Plan |
| Schedule 5.12(d) | Seller Benefit Plan - health, life or disability insurance |
| Schedule 5.12(e) | Seller Benefit Plan - money or other property, accelerate the vesting |
| Schedule 5.13 | Mining Financial Assurances |
| Schedule 5.14 | Tax Matters |
| Schedule 8.5(a) | Assignable Contracts |

### ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this *"Agreement"*), dated as of September 20, 2019, is entered into by and among Cambrian Coal LLC, a Kentucky limited liability company (*"Cambrian"*), Shelby Resources, LLC, a Kentucky limited liability company (*"Shelby"*), and other direct and indirect subsidiaries of Cambrian party hereto, as Sellers, and Richmond Hill Capital Partners, LP, Essex Equity Joint Investment Vehicle, LLC, and Alliance Prime Associates, Inc., or such other entity or entities as have been designated pursuant to Section 11.10 herein, collectively as *"Purchaser"*. Cambrian, Shelby and each other direct or indirect subsidiary of Cambrian signatory hereto shall each be referred to herein as a *"Seller"* and collectively as the *"Sellers."*

### RECITALS:

A.    Sellers directly and indirectly mine, process, market and sell metallurgical coal and thermal coal for use by industrial companies and utility providers located primarily in the eastern United States and Canada (the *"Business"*).

B.    Sellers desire to sell to Purchaser the Purchased Assets and to assign to Purchaser the Assumed Liabilities, and Purchaser desires to purchase from Sellers the Purchased Assets and to assume from Sellers the Assumed Liabilities, in each case upon the terms and conditions set forth in this Agreement.

C.    The Parties intend to consummate the sale or sales through an auction of all or any part of the Sellers' assets in the cases filed by Sellers on June 16, 2019 (the *"Petition Date"*) under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the *"Bankruptcy Code"*), in the United States Bankruptcy Court for the Eastern District of Kentucky (the *"Bankruptcy Court"*), Case No. 19-51200 (GRS) (Jointly Administered) (such cases, the *"Bankruptcy Cases"*).

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE I

### DEFINITIONS

*Section 1.1.    Certain Definitions.*  For purposes of this Agreement, each of the following terms, when used herein with initial capital letters, has the meaning specified in this Section 1.1 or in the other Sections of this Agreement identified in Section 1.2:

*"Accrued Payroll"* means all wages and other related wage and benefit obligations to employees of the Sellers that have accrued since the end of the last payroll period immediately prior to the Closing Date.

"*Administrative Priority Claims Escrow Account*" means an escrow account established pursuant an escrow agreement in form and substance satisfactory to Sellers and Purchaser, which shall be funded at Closing by Purchaser with a portion of the Cash Amount equal to the Administrative Priority Claims Escrow Amount.

"*Administrative Priority Claims Escrow Amount*" means $2,000,000.

"*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"*Bidding Procedures Order*" means that certain Order (A) Establishing Bidding and Sale Procedures with Respect to the Sale of Substantially All Assets, (B) Authorizing the Entry into a Stalking Horse Agreement and the Provision of Stalking Horse Protections, (C) Scheduling an Auction and Sale Hearing and Approving the Form and Manner of Notice Thereof, and (D) Granting Related Relief entered by the Bankruptcy Court on August 7, 2019 (Doc No. 339).

"*Black Lung Act*" means, collectively, the Federal Coal Mine Safety and Health Act of 1969, the Black Lung Benefits Act of 1972, the MSHA, the Black Lung Benefits Reform Act of 1977, and the Black Lung Benefits Amendments of 1981, in each case as amended.

"*Business Day*" means any day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are authorized or required by Law to close.

"*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, credit, judgment, account, defense, offset, power, privilege, license, franchise, lawsuit, investigation, arbitration, formal inquiry, audit, citation, summons, subpoena, notice of violation, proceeding or litigation, whether civil, criminal, administrative, regulatory, at law, in equity or otherwise, of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow any "claim" (as defined in section 101(5) of the Bankruptcy Code) or interests; (d) any "claim" (as defined in section 101(5) of the Bankruptcy Code) pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

-2-

"*Coal Act*" means the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701, *et seq.*

"*COBRA Coverage*" means the health continuation coverage requirements under Section 4980B of the Code and Part 6 of Title I of ERISA or any similar provision under applicable state Law.

"*Code*" means the Internal Revenue Code of 1986.

"*Committee*" means the Official Committee of Unsecured Creditors (if appointed) in the Bankruptcy Cases.

"*Contract*" means any contract, agreement, commitment, understanding, arrangement, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, lease, instrument, license, lease, purchase order or other legally binding agreement) whether written or oral.

"*Contract Assignment and Assumption Agreements*" means the agreements for the assignment and assumption of the Purchased Contracts, in one or more forms to be mutually agreed among the Parties.

"*Cure Costs*" means, in connection with the assignment and assumption of the Purchased Contracts, those costs associated with the Purchaser either (i) curing all defaults under such Purchased Contracts to the extent required by section 365(b) of the Bankruptcy Code at the time of the assumption thereof; or (ii) paying cash or other acceptable consideration to, or obtain appropriate waivers from, the third party (or parties) under the applicable Purchased Contracts in order to obtain such third party's consent to the assumption and assignment.

"*DIP Lender*" has the meaning set forth in the Final DIP Order.

 "*Documents*" means all books, records, files, invoices, inventory records, product specifications, cost and pricing information, business plans and quality control records and manuals, in each case exclusively relating to any Purchased Asset, including all data and other information stored in any format or media, including on hard drives, hard copy or other media.

"*Employee*" means any employee of any Seller who is identified on a schedule of employees to be delivered by Sellers to the Purchaser immediately prior to the execution and delivery hereof, plus any additional individuals who become employees of any Seller and less any individuals that cease to be employees of any Seller, in each case, in the Ordinary Course of Business during the period from the date hereof through and including the Closing Date.  For the avoidance of doubt, "Employee" shall not include any contractor employed by a party with which any Seller has a contract, such as (but not limited to) contract miners.

"*Environmental Claim*" shall mean any Legal Proceeding brought pursuant to any Environmental Law or otherwise asserting liability or responsibility for losses arising in connection with pollution or protection of the environment or compliance with Environmental

Laws, including any Legal Proceeding relating to the occurrence or continuation of any Release (or threat thereof), the migration of or exposure to any Hazardous Material, the violation, or alleged violation, of any Environmental Law or any Environmental Permit.

*"Environmental Law"* means any applicable Law relating to (i) the pollution (including, without limitation, acid mine drainage), restoration or Reclamation of the environment or natural resources, (ii) the protection of the environment, natural resources, or human health or safety, or (iii) the presence, manufacture, distribution, use, transport, treatment, storage, disposal, Release or threatened Release of, or exposure to any Hazardous Material, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*; Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, *et seq.*; the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.*; the Toxic Substances Control Act, 15 U.S.C. §§ 2601, *et seq.*; the Emergency Planning and Community Right to Know Act, 42 U.S.C. §§ 11001, *et seq.*; the Safe Drinking Water Act, 42 U.S.C. §§ 300f, *et seq.*; the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.*; the Occupational Safety and Health Act, 29 U.S.C. §§ 651, *et seq.*, Mining and Mining Safety Law, and any applicable tribal, state or local law counterparts, as the same may be reauthorized, amended or otherwise modified from time to time.

*"Environmental Permit"* means any Permit or any other permit, license, authorization, approval, registration or entitlement required by or issued pursuant to any Environmental Law.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended.

*"ERISA Affiliate"* means all employers (whether or not incorporated) that would be treated together with any Seller or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

*"Excluded Employee Liabilities"* means the following Liabilities of Sellers: (i) any payments or entitlements owed on behalf of or to any employee who has provided services to or on behalf of any Seller, including wages, other remuneration, holiday or vacation pay, bonus, severance pay (statutory or otherwise), commissions, post-employment medical or life obligations, pension contributions, insurance premiums or employment or payroll Taxes; (ii) any Liability, payment or obligations related to any employee who has provided services to or on behalf of any Seller, including under, or with respect to, the Worker Adjustment and Retraining Notification Act (or any similar provision of any applicable federal, state, regional, foreign or local Law), COBRA Coverage, actions under any labor or similar Laws, including any such Liabilities arising under a Seller Benefit Plan, in each case, that is incurred, accrued or arising prior to the Closing; (iii) any Liability or expense of any Seller or any of their respective ERISA Affiliates which arises under or relates to any Seller Benefit Plan, including Liability to any such plan that is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 of the Code, or Liability under any other statute or regulation that imposes Liability on a "controlled group" basis with or without reference to any provision of Section 414 of the Code or Section 4001 of ERISA, including by reason of Purchaser being deemed an ERISA successor to any Seller or any of its ERISA Affiliates; (iv) any Liabilities, payments, costs and disbursements incurred in connection with the termination of the employment with Sellers of any employee who has provided services to or on behalf of any Seller, regardless

of whether or not such employee becomes a Transferred Employee, arising under any Seller Benefit Plan, employment or similar agreement of any Seller or any of its ERISA Affiliates addressed to any employee who has provided services to or on behalf of any Seller, or under any applicable Law; and (v) any Liabilities (including successor obligations) that arise under or relate to any and all collective bargaining agreements.  For purposes of this definition, "employees" shall also include temporary employees, independent contractors and any other Person who has provided services to any of the Sellers.

*"Excluded Pre-Closing Fines"* means, collectively, any monetary fines and penalties imposed by any Governmental Body for which Sellers have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date to the extent relating to periods prior to the Closing Date.

*"Final DIP Order"* means that certain Final Order Authorizing (A) Secured Post-Petition Financing on a Superpriority Basis Pursuant to 11 U.S.C. § 364, (B) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 And (C) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364 entered by the Bankruptcy Court on July 25, 2019 (Doc No. 283), and which became final on August 7, 2019 (*see* Notice of Finality of Final DIP Order, dated August 7, 2019 (Doc No. 340).

*"Final Order"* means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Purchaser) and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resolved, as a result of which such action or Order shall have become final in accordance with Bankruptcy Rule 8002; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

*"GAAP"* means generally accepted accounting principles in the United States.

*"General Assignments and Bills of Sales"* means the General Assignments and Bills of Sales for the Purchased Assets, in a form to be mutually agreed among the parties.

*"Governmental Body"* means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether

foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

*"Hazardous Material"* means any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant (including, without limitation, acid mine drainage), toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste or words of similar import under Environmental Laws, including, but not limited to, petroleum products, asbestos, asbestos-containing materials, lead, radon, radioactive materials and substances, urea formaldehyde and polychlorinated biphenyls.

*"Insurance Policies"* means the insurance policies maintained by or for the benefit of the Sellers in effect on or prior to the Closing Date with respect to the Purchased Assets, the Business, the Purchased Real Property, or the Assumed Liabilities.

*"Intellectual Property Right"* means any trademark, service mark, trade name, trade dress, logo, domain name or URL, mask work, invention, patent, trade secret or other right in any proprietary business information (including data bases and data collections, pricing and cost information, business and marketing plans, and customer and supplier lists), copyright, right of publicity, know-how (including manufacturing and production processes and techniques, and research and development information), or any other intellectual property or similar proprietary industrial right of any kind or nature anywhere in the world (including any such rights in software and computer programs), and including (i) any issuances, registrations or applications for registration of any of the foregoing, (ii) all goodwill associated with any of the foregoing, and (iii) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation of any of the foregoing.

*"Interim Permit Operating Agreement"* means the agreement to be entered into by and between the applicable Sellers and Purchaser, substantially in the form attached as Exhibit A hereto.

*"Knowledge of Sellers"* or *"Sellers' Knowledge"* means the actual knowledge, after reasonable inquiry, of those individuals identified on Schedule 1.1(a).

*"Law"* means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree or common law requirement.

*"Lease Assignment and Assumption Agreements"* means the agreements for the assignment and assumption of the Leases that are Purchased Contracts, in one or more forms to be mutually agreed among the Parties.

*"Leases"* means all Contracts pursuant to which interests in real property are let, leased or subleased by the Sellers, as tenant, subtenant, lessee or sublessee, or pursuant to which a Seller has been granted a possessory interest or right to use or occupy all or any portion of the same, including any and all mining leases, coal leases, coal mining leases, underground coal mining and gob gas

leases, coal land leases, coal degasification leases, use agreements or other occupancy agreements and all short form leases, memoranda and amendments relating to the foregoing together with, in each case to the extent let, leased, used or occupied by the Sellers in connection with the Business or the Purchased Assets, any and all underground and surface coal reserves, mineral rights, oil and gas rights and interests, mining rights, surface rights, water rights, rights of way, unrecouped minimum, advance or pre-paid production royalties, all buildings and other structures, facilities or improvements located on the real property that is the subject of such Contracts, all fixtures, systems, equipment and items of personal property of the Sellers attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing (and any present or future rights, title and interests arising from or related to the foregoing).

*"Legal Proceeding"* means claims, notices of violations, judicial, administrative or arbitral actions, orders, decrees, suits, proceedings (public or private) or any proceedings by or before a Governmental Body.

*"Liability"* means any debt, loss, liability, claim (including "claim" (as defined in section 101(5) of the Bankruptcy Code)), commitment, demand, responsibility, suit, judgment, undertaking, damage, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, determined or indeterminable, disputed or undisputed, secured or unsecured, joint or several, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, and whether in contract, tort or otherwise, and whether or not required to be accrued on the financial statements of any entity or individual.

*"Licenses"* means the licenses, qualifications, franchises, certificates, consents, authorizations, approvals, Orders, and concessions used or held for use by Sellers in connection with the operation of the Business, and all pending applications for additional licenses, renewals of existing licenses, or amendments to existing licenses which have been submitted to any Governmental Body by any Seller necessary for the operation of the Business.

*"Lien"* means any "interest" as that term is used in section 363(f) of the Bankruptcy Code, lien (statutory or otherwise), mechanics lien, covenant, encroachment, encumbrance, pledge, mortgage, deed of trust, security interest, claim (including "claim" (as defined in section 101(5) of the Bankruptcy Code)), lease, sublease, charge, option, right of first offer or first refusal, right of use or possession, restriction, easement, servitude, restrictive covenant, condition, encroachment or any other similar encumbrance, third party interest, other survey defect, charge, hypothecation, deemed trust, action, or restriction, whether imposed by Law, Contract, equity or otherwise.

*"Mining"* means the exploration, extraction, processing, storage and transportation of coal and non-coal minerals and the Reclamation of lands used for such activities.

*"Mining and Mining Safety Law"* means all Laws relating to Mining and Mining safety, including (i) SMCRA (including its implementing regulations and any state statutes or regulations implementing SMCRA); (ii) MLA; (iii) MSHA; (iv) OSHA; (v) acid and toxic mine drainage

requirements; and (vi) regulations relating to Mining operations and activities, including Reclamation.

*"MLA"* *means the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181 et seq.*

*"MSHA"* means the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801 *et seq.*

*"Order"* means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of, or entered, issued, made or rendered by, a Governmental Body.

*"Ordinary Course of Business"* means the ordinary and usual course of normal day-to-day operations of the Business as presently conducted.

*"OSHA"* means the Occupational and Safety Health Act of 1970, 29 U.S.C. §§ 652 *et seq.*

*"Owned Real Property"* means all real property owned by any Seller, including that real property that is listed on Schedule 1.1(b), together with all of the Sellers' right, title and interest in and to the following, as it relates to such owned real property and as used or held for use in the operation of the Business as currently conducted: (i) all buildings, structures and improvements located on such real property owned by any Seller, (ii) all improvements, fixtures, systems, equipment mine infrastructure, preparation plant structures and improvements, loadout structures and improvements, rail sidings, or apparatus affixed to such real property owned by any Seller, and any items of personal property of the Sellers attached or appurtenant thereto, (iii) all rights of way or easements, if any, in or upon or appurtenant to such real property owned by any Seller and all other rights and appurtenances belonging or in any way pertaining to such real property owned by any Seller (including the right, title and interest of any Seller in and to any underground and surface coal reserves, mineral rights, oil and gas rights and interests, underground and surface coal and mining rights, surface rights, unrecouped minimum, advance or pre-paid production royalty rights, support rights and waivers, subsidence rights or water rights relating or appurtenant to such real property owned by any Seller), and (iv) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining such real property owned by any Seller.

*"Party"* or *"Parties"* means Purchaser and each Seller, as the case may be.

*"Permits"* means the mining permits, drilling permits, discharge permits, Environmental Permits and other permits held by Sellers in connection with the operation of the Business and Purchased Assets, and all pending applications for additional permits, renewals of existing permits or amendments to existing permits which have been submitted to any Governmental Body by any Seller necessary for the operation of the Business and Purchased Assets.

*"Permitted Exceptions"* means all Liens specifically permitted by the Sale Order.

*"Perry County Transaction"* means the transaction for the sale of substantially all of the assets of Perry County Coal LLC contemplated by that certain General Assignment and Assumption Agreement and Bill of Sale of even date herewith.

"*Person*" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"*Premier Elkhorn Transaction*" means the transaction for the sale of substantially all of the assets of Premier Elkhorn Coal LLC and other assets contemplated by that certain General Assignment and Assumption Agreement and Bill of Sale of even date herewith.

"*Pre-Paid Expenses*" means any of Sellers' rights with respect to all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone, insurance, bonding or otherwise), advances, pre-paid expenses, prepayments, rights under warranties or guarantees, vendor rebates, refunds, credits, rebates and prepayment(s) or deposits of property and other Taxes which are in respect of the Purchased Assets or the Business, and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent), to the extent related to the Business.

"*Professional*" means any Person retained by the Sellers or the Committee in the Bankruptcy Cases pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code, or any Person retained by the Pre-Petition ABL Agent.

"*Professional Fee Claims*" means any administrative claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals in connection with the Bankruptcy Cases through and including the Closing Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

"*Professional Fees Escrow Account*" means an escrow account established pursuant an escrow agreement in form and substance satisfactory to Sellers and Purchaser, which shall be funded at Closing by Purchaser with a portion of the Cash Amount equal to the Professional Fees Escrow Amount.

"*Professional Fees Escrow Amount*" means $6,583,082.

"*Purchased Assets*" has the meaning set forth in Section 2.1(b).

"*Purchased Real Property*" means the Owned Real Property and the Purchased Leased Real Property.

"*Purchaser*" has the meaning set forth in the preamble.

"*Purchaser Material Adverse Effect*" means any event, change, effect, condition, state of facts or occurrence (regardless of whether such event, change, effect, condition, state of facts or occurrence constitutes a breach of any representation, warranty or covenant of Purchaser hereunder) which has had or would reasonably be expected to have, individually or when

-9-

considered together with any other event, change, effect, condition, state of facts or occurrence, a material and adverse effect on the ability of Purchaser to consummate the Transactions or perform its obligations under this Agreement.

*"Reclamation"* means reclamation, revegetation, recontouring, abatement, control or prevention of adverse effects of mining activities, including all reclamation required pursuant to any applicable Licenses, Leases or Permits.

*"Release"* shall mean any release, spill, emission, leaking, pumping, pouring, dumping, emptying, injection, deposit, disposal, discharge, dispersal, leaching, or migration of Hazardous Materials (including, without limitation, acid mine drainage and the abandonment or discarding of barrels, containers or other closed receptacles containing Hazardous Materials) on or into the indoor or outdoor environment or at, on, in, or from any property in violation of any Environmental Law.

*"Representative"* means, with respect to any Person, any and all directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents.

*"Required Bonding"* means (a) the applicable reclamation bonds, letters of credit or other sources of collateral or financial assurance required for each Transferred Permit or Purchased Contract sufficient to renew or replace all existing reclamation and surety bonds of the Sellers related to the Transferred Permits or Purchased Contracts, and (b) any other financial assurance provided by Sellers or on their behalf related to Sellers' obligations to the Kentucky Department of Workers' Claims to secure claims under Sellers' terminated self-insured workers' compensation program.

*"Sale Hearing"* means that hearing held by the Bankruptcy Court to consider the approval of this Agreement and the entry of the Sale Order.

*"Sale Order"* means an Order in form and substance satisfactory to Purchaser and Sellers, entered by the Bankruptcy Court or other court of competent jurisdiction, pursuant to, *inter alia,* sections 105, 363 and 365 of the Bankruptcy Code, authorizing and approving, inter alia, the sale of the Purchased Assets to Purchaser, the assumption and assignment of the Purchased Contracts to Purchaser and the assumption by Purchaser of the Assumed Liabilities, in each case, on the terms and conditions set forth herein, which order (a) is not subject to a stay pending appeal, and (b) provides, at least, the following: (i) pursuant to section 363(f) of the Bankruptcy Code and all other applicable Law, the Purchased Assets will be transferred to Purchaser free and clear of all Liens and all Liabilities of any kind or nature whatsoever, whether at law or in equity, including free and clear of any rights or claims based on theories of transferee or successor liability under any applicable Law, whether arising before or after the commencement of the Bankruptcy Cases, and that on the Closing Date and concurrently with the Closing, the Purchased Assets shall be transferred to Purchaser free and clear of all then existing successorship obligations under any collective bargaining agreement, and/or with respect to any Seller Benefit Plan, save and excepting only those Liabilities expressly assumed by Purchaser in writing under this Agreement and Permitted Exceptions, (ii) contains findings of fact and conclusions of law that Purchaser has acted

in "good faith" within the meaning of, and is entitled to the protections of, section 363(m) of the Bankruptcy Code, and that this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, and (iii) this Agreement and the Transactions may, subject to the terms set forth herein, be specifically enforced against and binding upon, and not subject to rejection or avoidance by any of Sellers or their respective estates or any chapter 7 or chapter 11 trustee of any of the Sellers or other Representative of their respective estates.

*"Secured Obligations"* means Pre-Petition RH Obligations, the DIP Obligations and the Pre-Petition Term Loan Obligations, each as defined in the Final DIP Order.

*"Seller Benefit Plan"* means each employee benefit plan, program, policy, practices, or other arrangement that is sponsored or maintained by or for the benefit of any Seller or any of its ERISA Affiliates or any employee providing services to or on behalf of any Seller, or to which any Seller or any of its ERISA Affiliates contributes or is obligated to contribute, whether or not written, including without limitation any employee welfare benefit plan within the meaning of Section 3(1) of ERISA, any employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not such plan is subject to ERISA) and any bonus, incentive, deferred compensation, vacation, stock purchase, stock option, severance, employment, change of control or fringe benefit plan, program or policy.

*"Seller Material Adverse Effect"* means, whether foreseeable or not, any event, change (including the loss of any material supplier, customer, or other contract counterparty), effect, state of facts or occurrence which has had or would reasonably be expected to have, individually or when considered together with any other events, changes, effects, conditions, states of facts or occurrences, a material adverse effect on the operations or performance of the Business, the Purchased Assets or the Assumed Liabilities, considered as a whole, other than any event, change, effect, condition, state of facts or occurrence resulting from (a) any change in the United States or foreign economies or financial markets in general, (b) any change that generally affects the mining, processing, marketing, sale or use of thermal or metallurgical coal or other carbon based sources of energy or power, (c) any change arising in connection with acts of God (including earthquakes, storms, severe weather, fires, floods and natural catastrophes), hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions (in each case including cyberterrorism), (d) any change in applicable Laws or accounting rules, (e) any actions taken or proposed to be taken by Purchaser or any of its Affiliates, (f) any effect resulting from the public announcement of this Agreement or the Bankruptcy Cases, (g) the commencement, initiation, filing, or administration of any insolvency proceedings or cases by any Seller or any of their respective Affiliates, and any effect resulting therefrom, (h) any effect resulting from the commencement of the Bankruptcy Cases or as approved by the Bankruptcy Court in the Bankruptcy Cases or any Seller's inability to pay certain obligations as a result of the commencement of the Bankruptcy Cases, and (i) any failure of the Business or any Seller to meet any projections or forecasts for any period occurring on or after the date hereof; *provided, however,* that with respect to clauses (a), (b), (c), and (d), such effects shall not be excluded from the definition of "Seller Material Adverse Effect" to the extent it has, or would reasonably be expected to have, a materially disproportionate adverse effect on the Business, taken as a whole, as compared to other similarly situated businesses.

"*SMCRA*" means the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201 *et seq.*

"*Subsidiary*" means each corporation or other Person in which a Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% of the outstanding voting stock or other equity interests.

"*Tax Authority*" means any government, or agency, instrumentality or employee thereof, charged with the administration of any Law or regulation relating to Taxes.

"*Tax Return*" means any return, declaration, report, estimate, information return or other document relating to Taxes (including any related or supporting estimate, election, schedule, statement or information and any attachment thereto or amendment thereof).

"*Taxes*" means (a) all federal, state, local, provincial, municipal, foreign or other taxes, charges or other assessments, including, without limitation, all income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, net worth, intangibles, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, intangibles, goods and services, customs duties, conveyance, mortgage, registration, documentary, recording, premium, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, unemployment insurance, severance, environmental (including taxes under Section 59A of the Code), disability, workers' compensation, health care natural resources, excise, severance, stamp, occupancy, rent, real property, personal property, estimated or other similar taxes, duties, levies or other governmental charges or assessments or deficiencies thereof, (b) any item described in clause (a) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Code, or by contract, indemnity or otherwise, and (c) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (a) or (b).

"*Trade Payables*" means, as of 12:01 a.m. Eastern time on the Closing Date, the accrued and unpaid post-petition trade payables of any Seller for goods or services received, pursuant to Contract or otherwise, prior to such time (whether billed or unbilled).

"*Transactions*" means the transactions contemplated by this Agreement.

"*Transferred Employee*" means an Employee who commences working for or on behalf of Purchaser subsequent to the Closing Date.

"*Transition Services Agreement*" means an agreement whereby certain Sellers shall perform management services for Purchaser, for consideration sufficient to cover all costs and expenses of Sellers and Sellers' estates so that Sellers and Sellers' estates are net neutral through the termination of such agreement, in a form to be mutually agreed upon among the Parties.

"*Wind-Down Escrow Account*" means an escrow account established pursuant an escrow agreement in form and substance satisfactory to Sellers and Purchaser, which shall be funded at

Closing by Purchaser with a portion of the Cash Amount equal to the Wind-Down Escrow Amount.

"*Wind-Down Escrow Amount*" means $475,000.

For purposes of this Agreement, the following terms have meanings set forth in the Sections indicated:

| TERM | SECTION |
|---|---|
| Agreement | Preamble |
| Allocation Notice of Objection | 10.2(a) |
| Applicant Violator System | 5.10 |
| Assignable Contracts | 8.5(a) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Cambrian | Preamble |
| Cash Amount | 3.1(b) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Collective Bargaining Agreement | 5.11(a) |
| Credit Amount | 3.1 |
| Designated Purchaser | 11.10 |
| DIP Credit Agreement | 8.11 |
| Equipment | 2.1(b) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| FASB 410 | 5.13 |
| Final Allocation Statement | 10.2(a) |
| Mining Financial Assurances | 5.13 |
| Necessary Consent | 2.5(a) |
| Outside Date | 4.4(a) |
| Petition Date | Recitals |

| TERM | SECTION |
|------|---------|
| Perry/Premier Transaction | 8.17 |
| Proposed Allocation Statement | 10.2(a) |
| Purchase Price | 3.1 |
| Purchased Assets | 2.1(b) |
| Purchased Contracts | 2.1(b)(v) |
| Purchased Leased Real Property | 2.1(b)(ii) |
| Purchaser | Preamble |
| Seller | Preamble |
| Transfer Taxes | 10.1(a) |
| Transferred Permits | 2.1(b)(vi) |
| Union | 5.11(a) |
| WARN Act | 5.11(c) |

*Section 1.2.    Other Definitional and Interpretive Matters.*  (a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

*Calculation of Time Period.*  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

*Contracts.*  Reference to any Contract means such Contract as amended or modified and in effect from time to time in accordance with its terms.

*Dollars.*  Any reference in this Agreement to $ will mean U.S. dollars.

*Exhibits/Schedules.*  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

*GAAP.*  Terms used herein which are defined in GAAP are, unless specifically defined herein, used herein as defined in GAAP.

*Gender and Number.*  Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

-14-

*Headings.*    The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any Article, Section, Recital, Exhibit or Schedule are to the corresponding Article, Section, Recital, Exhibit or Schedule of or to this Agreement unless otherwise specified.

*Herein.*  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

*Including.*    The word "including" or any variation thereof means "including, without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

*Law.*    Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any successor legislation thereto and any rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, replacement or re-enactment of such section or other provision.

*Parties.*    References to any "Party" shall refer to Purchaser and each Seller, and references to the "Parties" shall refer to Purchaser and Sellers collectively; *provided* that, if the context requires, references to "Party" and "Parties" may be interpreted to refer to Purchaser, on the one hand, and Sellers collectively, on the other hand.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

*Section 2.1.    Purchase and Sale of Assets*.    (a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will purchase, acquire and accept from the applicable Seller, and each applicable Seller will sell, transfer, assign, convey and deliver to Purchaser, all of such Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than those Liens created by Purchaser and Permitted Exceptions) and Excluded Liabilities.

(b)    The term "Purchased Assets" means all of the following properties, assets and rights of any Seller existing as of the Closing, other than any of such properties, assets or rights that

constitute "Purchased Assets" in the Perry County Transaction or the Premier Elkhorn Transaction:

(i)    all right, title and interest in and to the Owned Real Property;

(ii)    all right, title and interest of the Sellers in and to the real property leased by the Sellers pursuant to the Leases that are Purchased Contracts, together with, in each case to the extent let, leased, used or occupied by the Sellers pursuant to the Leases that are Purchased Contracts, any and all underground and surface coal reserves, mineral rights, oil and gas rights and interests, mining rights, surface rights, water rights, rights of way, unrecouped minimum, advance or pre-paid production royalties, all buildings and other structures, facilities or tenant or leasehold improvements located on the real property that is the subject of the Leases that are Purchased Contracts, all fixtures, systems, equipment and items of personal property of the Sellers attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing (and any present or future rights, title and interests arising from or related to the foregoing) (collectively, the *"Purchased Leased Real Property"*);

(iii)    all machinery and equipment (owned or leased) and other tangible personal property assets (including all mobile mining equipment and components thereof), in each case that are owned and used or held for use in the conduct of the Business by Sellers, whether situated on the Purchased Real Property or elsewhere, and all of Sellers' rights under warranties, indemnities, licenses and all similar rights against third parties with respect to the machinery, equipment and other tangible personal property assets referenced in this clause (iii) (to the extent such rights are assignable at no cost, expense or penalty to Sellers or their Affiliates, or at Purchaser's election if Purchaser agrees to pay for such cost, expense or penalty);

(iv)    all coal inventory located on (or, to the extent in the possession of Sellers at the Closing, mined or extracted from) the Purchased Real Property or all coal in transit;

(v)    subject to Sections 2.5(c) and 8.5, all right, title and interest of Sellers now or hereafter existing, in, to and under the Contracts listed on Schedule 2.1(b)(v) that are unexpired as of the Closing Date and that have not been rejected or terminated (and are not the subject of a notice of rejection or a pending rejection motion) by any Seller (as such schedule may be modified pursuant to Section 8.5) (collectively, the *"Purchased Contracts"*), in each case as each such Contract may have been amended or otherwise modified prior to the date of (or as permitted in accordance with the terms of) this Agreement;

(vi)    subject to any required approval by the appropriate Governmental Body, all Permits and Licenses held by any Seller that relate to the Business or the Purchased Assets (collectively, the *"Transferred Permits"*), and all cash or other escrowed property securing or any residual right to any bonds posted with respect to, or securing the reclamation or bonding obligations arising from, the Transferred Permits if and when transferred; for the avoidance of doubt, the Sellers intend to transfer and the Purchaser intends to assume the

rights and obligations of each Permit and License held by Sellers in connection with the Business;

(vii)    subject to any required approval by the appropriate Governmental Body and, with respect to the immediately following clause (B), the assumption of the Liabilities described in Section 2.3(f), all cash or other escrowed property securing or any residual right to (A) any bonds posted with respect to, or securing the reclamation or bonding obligations arising from, the Transferred Permits if and when released following transfer of the Transferred Permits, or (B) any bonds posted with respect to the Liabilities or other obligations of Sellers to the Kentucky Department of Workers' Claims to secure claims under Sellers' terminated self-insured workers' compensation program if and when released and any and all rights related to that program, including, but not limited to any reinsurance program;

(viii)    all rights of Sellers to use haul roads, utility easements and other rights of way and easements used or held for use in the operation of the Business;

(ix)    all warranties, guarantees and similar rights related to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Purchased Contracts;

(x)    all insurance proceeds, refunds, return of unearned premiums, reserves, benefits or claims of any Seller or its Subsidiaries under the Insurance Policies, to the extent relating to the Assumed Liabilities or the Purchased Assets;

(xi)    all goodwill directly associated with the Purchased Assets;

(xii)    all Documents (other than those described in Section 2.2(h));

(xiii)    all Causes of Action relating to any Purchased Asset or Assumed Liability, including any such item arising under any guarantee, warranty, indemnity, right of recovery, right of set-off or similar right in favor of such Seller in respect of any Purchased Asset or Assumed Liability and further, including any Cause of Action that the Sellers may have related to the failure of the Premier Elkhorn Transaction or the Perry County Transaction to close, but specifically excluding any Causes of Action held by a Seller (1) arising under Chapter 5 of the Bankruptcy Code, (2) against any current or former officer, director or owner of any of the Sellers including, without limitation, James Booth ("*Booth*") or Ted McGinnis ("*McGinnis*") including, without limitation, for breach of fiduciary duty, or (3) against any non-Seller entity directly or indirectly controlled or affiliated in any way with Booth or McGinnis (collectively, the "*Insider Claims*"); provided that the term Insider Claims shall not include claims to collect accounts or notes receivable;

(xiv)    all Intellectual Property Rights relating primarily to the operation of the Business (including all company names, product names, trade names, as well as telephone

and facsimile numbers related to the Business), except to the extent related to the Excluded Assets or the Excluded Liabilities;

(xv)     all Pre-Paid Expenses;

(xvi)     all refunds, credits and rebates of Taxes or prepayment of Taxes which are in respect of the Purchased Assets or Assumed Liabilities;

(xvii)     all accounts receivable (whether billed or unbilled), rebates, notes, chattel paper, and negotiable instruments of Sellers, including intercompany receivables; provided, however, that Purchaser shall not, and shall not permit, engage, hire or otherwise authorize any other Person to collect, pursue collection of or otherwise enforce (or attempt to enforce) any rights with respect to any intercompany receivables or other accounts receivable, rebates, notes, chattel paper or negotiable instruments with respect to which any Seller is an obligor;

(xviii)     all automobiles, light trucks and other vehicles owned by the Sellers; and

(xix)     all other assets set forth on Schedule 2.1(b)(xix).

Section 2.2.     *Excluded Assets.*  Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers will retain all right, title and interest to, in and under the Excluded Assets.  The term "Excluded Assets" means all assets, properties and rights of any Seller other than the Purchased Assets, including:

(a)     (i) any Contract that is not a Purchased Contract; or (ii) any Purchased Contract for which applicable Law requires the consent of a third party to be assumed and assigned hereunder as to which, by the Closing Date, such consent has not been obtained;

(b)     all rights, "claims" (as defined in Section 101(5) of the Bankruptcy Code), Causes of Action and credits not described as a Purchased Asset in Section 2.1(b)(xii), including all such rights, "claims," Causes of Action and credits to the extent relating to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of a Seller in respect of an Excluded Asset or Excluded Liability and any and all Causes of Action under Sections 544, 545, 547, 548, 549, 550, 551 and 724(a) of the Bankruptcy Code;

(c)     any shares of capital stock or other equity interest of any of Sellers or any of their Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any of Sellers or any of their Subsidiaries;

(d)     the Purchase Price and all rights, claims and causes of action of Sellers under this Agreement and the other agreements executed in connection with the transactions contemplated herein;

(e)      any claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom;

(f)      any properties or other assets set forth on Schedule 2.2(f);

(g)      all bonds (including any residual rights thereto) posted with respect to, or securing obligations arising from or under, the Black Lung Act, and all cash, deposits or other escrowed property securing any such bonds or obligations;

(h)      any Documents prepared in connection with this Agreement or the Transactions or primarily relating to the Bankruptcy Cases, any minute books, stock ledgers, corporate seals and stock certificates of Sellers, any Documents that Sellers are required by Law to retain, other books and records that Sellers determine are necessary or advisable to retain, including Tax Returns, personnel records and financial statements, and other documents, books and records that relate exclusively to the Excluded Assets; provided, however, that Sellers shall provide Purchaser with reasonable access during normal business hours to inspect and copy any of the foregoing upon reasonable notice to Sellers to the extent Purchaser requires such access for any reasonable purpose, subject in all cases to the protection of attorney-client privileged information and otherwise subject to applicable confidentiality restrictions;

(i)      all assets of Sellers on which a Person other than Purchaser or its Affiliates has a Lien that is senior to the Lien(s) of Purchaser or its Affiliates; and

(j)      all properties, rights or other assets that constitute "Purchased Assets" in the Perry County Transaction or the Premier Elkhorn Transaction.

Section 2.3.    *Assumption of Liabilities.*  On the terms and subject to the conditions set forth in this Agreement, at the Closing, pursuant to the Sale Order, Purchaser will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, only the following Liabilities, but excluding in each case all Liabilities that are "Assumed Liabilities" in the Premier Elkhorn Transaction or the Perry County Transaction (collectively, the *"Assumed Liabilities"*):

(a)      all Liabilities of any kind or character to the extent resulting from or arising out of or in connection with Purchaser's or its Affiliates' use, operation, possession or ownership of or interest in the Purchased Assets and/or the Business, in each case, only to the extent such Liability first arises following the Closing;

(b)      all Cure Costs that Purchaser is required to pay pursuant to Section 8.5(c);

(c)      subject to the obligation of Purchaser to pay all Cure Costs, all Liabilities of Sellers under the Purchased Contracts that arise on or after the Closing Date;

(d)      all Liabilities of Sellers (whether arising before, on or after the date hereof) arising out of or relating to (i) the Transferred Permits (except for and specifically excluding actual or alleged operational violations of Environmental Permits occurring prior to the Petition Date), but including such Liabilities thereunder arising out of or relating to all Reclamation and post-mining Liabilities of the Business or the Purchased Assets, (ii) any mine operation or safety compliance matters related to the condition of the Purchased Assets or the mining areas of the Business, (iii) the compliance of the Purchased Assets and the Business with Environmental Laws (except for any monetary fines or penalties imposed or incurred under Environmental Laws with respect to the Purchased Assets or the operation of the Business prior to the Petition Date), and (iv) any conditions arising from a spill, emission, Release or disposal into the environment of, or human exposure to, Hazardous Materials resulting from the operation of the Business or the Purchased Assets, in each case in this subclause (d) excluding any Excluded Pre-Closing Fines;

(e)      all Trade Payables relating to the Business;

(f)      subject to any required approval by the appropriate Governmental Bodies and the receipt of the assets described in Section 2.1(b)(vii), all Liabilities or other obligations of Sellers arising under or from, or relating to, Sellers' terminated self-insured workers' compensation program, including Sellers' obligations to the Kentucky Department of Workers' Claims to secure claims under Sellers' terminated self-insured workers' compensation program, whether arising before, on or after the date hereof, and any bonds or proceeds of, or collateral posted with respect to, bonds in place to secure Sellers' obligations to the Kentucky Department of Workers' Claims to secure claims under Sellers' terminated self-insured workers' compensation program, specifically including the right to return of any proceeds from any bonds drawn by the Commonwealth of Kentucky;

(g)      all Liabilities or other obligations with respect to the WARN Act arising, accruing or as a result of Purchaser's actions taken following the Closing Date;

(h)      all accrued but unpaid Liabilities of Sellers with respect to real property Taxes assessed with respect to the Purchased Assets for periods prior to calendar year 2019, solely to the extent necessary to transfer the Purchased Assets free and clear of any statutory senior priority lien on such Purchased Assets and all accrued but unpaid Liabilities of Sellers with respect to real property Taxes assessed with respect to the Purchased Assets for calendar year 2019;

(i)      all Transfer Taxes;

(j)      all Taxes with respect to the Purchased Assets attributable to any Tax period or portion thereof that begins after the Closing Date, but for the avoidance of doubt, such amount shall not include any taxes that accrued pre-petition;

(k)      all Accrued Payroll; and

(l)    all Liabilities listed on Schedule 2.3(l).

*Section 2.4.    Excluded Liabilities.*  (a) Notwithstanding anything to the contrary set forth herein, Purchaser will not assume and will be deemed not to have assumed, and Sellers will remain liable with respect to, the Excluded Liabilities.  "Excluded Liabilities" means any and all Liabilities of Sellers other than the Assumed Liabilities, including such Liabilities arising out of, resulting from, relating to or otherwise in respect of the following, in each case other than the Assumed Liabilities: (i) Sellers' use, operation, possession or ownership of the Purchased Assets prior to the Closing, (ii) Sellers' use, operation, possession or ownership of any assets or entities other than the Purchased Assets, including any reclamation or asset retirement obligations or Environmental Claims, (iii) all Liabilities of Sellers arising from the Transactions, (iv) Excluded Employee Liabilities, (v) Excluded Pre-Closing Fines, (vi) any Liability of any Seller for any Taxes, (vii) all Liabilities arising out of any Environmental Claim, the presence or Release of Hazardous Materials, or any actual or alleged violations of Environmental Laws or Environmental Permits, in each case occurring prior to the Petition Date, (viii) all Liabilities of Sellers with respect to any bonds or reclamation or bonding obligations relating to any Permits or Licenses that are not Transferred Permits, and (ix) all Liabilities that are "Assumed Liabilities" in the Premier Elkhorn Transaction or the Perry County Transaction.

*Section 2.5.    Non-Assignment of Assets.*

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not affect the assignment or transfer of any Purchased Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a *"Necessary Consent"* or collectively, the *"Necessary Consents"*), would constitute a breach, default or violation thereof or of any Law or Order or in any way materially adversely affect the rights of Purchaser thereunder and (ii) the Bankruptcy Court has not entered an Order approving such assignment or transfer.  In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Sellers and Purchaser will use their respective reasonable commercial efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided, however, that Sellers will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Legal Proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would be ineffective or would materially adversely affect the rights of Purchaser to such Purchased Asset following the Closing, neither the Sellers nor Purchaser shall be in breach of this Agreement as a result thereof, the Purchase Price shall not be adjusted and the Closing shall not be delayed (subject to any termination rights in Section 4.4), but, for a period of no more than four (4) months following the Closing Date, Sellers and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible, under which Purchaser will obtain the benefits and assume the obligations thereunder in accordance with this Agreement and the Sale Order, and Sellers will reasonably seek to enforce, at the reasonable request of and for the account of Purchaser and its Affiliates, any rights of Sellers and their respective Affiliates arising from any such Contract against any third Person.

(b)        Subject to Section 2.5(a), if after the Closing (i) Purchaser holds any Excluded Assets or Excluded Liabilities or (ii) any Seller holds any Purchased Assets or Assumed Liabilities, Purchaser or the applicable Seller, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

(c)        Notwithstanding anything herein to the contrary, at any time prior to the Sale Hearing, Purchaser shall be entitled, in its sole discretion, to add or delete any Contract to Schedule 2.1(b)(v) by providing written notice thereof to Sellers and any Contract so added or deleted will be a Purchased Contract for all purposes hereunder.

Section 2.6.        *Further Conveyances and Assumptions.*   From time to time following the Closing, Sellers and Purchaser will, and will cause their respective Affiliates to, use commercially reasonable efforts to execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transactions; *provided*, that nothing in this Section 2.6 will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

# ARTICLE III.

## CONSIDERATION

Section 3.1.    *Consideration.*   The aggregate consideration for the Purchased Assets (the *"Purchase Price"*) will be:

(a)        the cancellation of a portion of the Secured Obligations attributed to the DIP Obligations pursuant to Section 363(k) of the Bankruptcy Code in an amount equal to $15,000,000 (the *"Credit Amount"*).  For the avoidance of doubt, any portion of the Secured Obligations that is not included in the Credit Amount shall remain outstanding following the Transactions;

(b)        the payment of an amount equal to the sum of (i) the Administrative Priority Claims Escrow Amount, (ii) the Professional Fees Escrow Amount, (iii) the Wind-Down Escrow Amount, and (iv) $2,000,000 (such amount, the *"Cash Amount"*), which amount shall be net of all cash of the Sellers at the Closing; and

(c)        the assumption of the Assumed Liabilities (including the Cure Costs).

Section 3.2.    *Deposit.*   Purchaser has deposited into an escrow account established by Seller $2,000,000, as a good faith deposit (the *"Deposit Amount"*), which amount shall be

nonrefundable and may be used by Sellers immediately to fund operational expenses. The Deposit Amount will be deemed compensation and consideration for entering into this Agreement and will be deemed liquidated damages and, notwithstanding anything to the contrary set forth herein, such Deposit Amount will be the sole and exclusive remedy of Sellers in the event that this Agreement is (or at any time could have been) terminated by the Sellers pursuant to Section 4.4(d). At the Closing, the Deposit Amount will be credited against the Purchase Price.

Section 3.3.    *Payment of Purchase Price.* At the Closing:

(a)    Purchaser will deliver to Sellers a writing acknowledging the cancellation of the Credit Amount as consideration for the transfer of the Purchased Assets, in form and substance reasonably acceptable to the Sellers.

(b)    Purchaser will fund the Administrative Priority Claims Escrow Account in an amount equal to the Administrative Priority Claims Escrow Amount. The Administrative Priority Claims Escrow Account shall be used solely to fund (i) fees and expenses associated with the administration of the Administrative Priority Claims Escrow Account, (ii) the payment of allowed priority and administrative expense claims, and (iii) amounts described in Section 3.3(c) or 3.3(d). An amount equal to 50% of the Administrative Priority Claims Escrow Amount shall be paid into the Administrative Priority Claims Escrow Account at Closing, and 50% of such Administrative Priority Claims Escrow Amount shall be paid into the Administrative Priority Claims Escrow Account upon the earlier of (i) the 6-month period immediately following the Closing, in six (6) equal portions or (ii) the termination of the Transition Services Agreement.

(c)    Purchaser will fund the Wind-Down Escrow Account in an amount equal to the Wind-Down Escrow Amount in full in immediately available funds at the Closing. The Wind-Down Escrow Account shall be used solely to fund (i) fees and expenses associated with the administration of the Wind-Down Escrow Account, (ii) the costs to wind-down the Bankruptcy Cases, and (iii) amounts described in Section 3.3(b) or 3.3(d).

(d)    Purchaser will fund the Professional Fees Escrow Account in an amount equal to the Professional Fees Escrow Amount in full in immediately available funds at the Closing. The Professional Fees Escrow Account shall be used solely to fund (i) fees and expenses associated with the administration of the Professional Fees Escrow Account, (ii) Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to, or on behalf of, Sellers or the Committee, (iii) the fees and expenses of the United States Trustee, and (iv) amounts described in Section 3.3(b) or 3.3(c). An amount equal to 50% of the Professional Fees Escrow Amount shall be paid into the Professional Fees Escrow Account at Closing, and the remaining 50% of such Professional Fees Escrow Amount shall be paid into the Professional Fees Escrow Account on or by a date that is sixty (60) days after the Closing.

(e)    Purchaser will assume the Assumed Liabilities pursuant to instruments delivered at the Closing as provided in Section 4.3.

(f)    All payments of Purchase Price will be made free and clear of, and without any reduction in respect of, any withholding or similar Taxes.

## ARTICLE IV.

### CLOSING AND TERMINATION

*Section 4.1.    Closing Date.*

(a)    Subject to the satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II (the *"Closing"*) will take place remotely by the electronic exchange of documents and signatures in PDF format at 10:00 a.m. (Eastern time) on the date that is two Business Days following the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be first satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the Parties may designate in writing.  The date on which the Closing is held is referred to in this Agreement as the "*Closing Date.*"  For all accounting, liability assumption and similar purposes hereunder, the Closing shall be deemed to have occurred at 12:01 a.m. (Eastern time) on the Closing Date.

(b)    Purchaser shall have the right, subject to receiving all required approvals from applicable Governmental Bodies, to purchase all cash or other escrowed property securing, or any residual right to any bonds posted with respect to, the Liabilities or other obligations of Sellers to the Kentucky Department of Workers' Claims to secure claims under Sellers' terminated self-insured workers' compensation program if and when released and any and all rights related to that program, including, but not limited, to any reinsurance program, in exchange for the assumption of all Liabilities or other obligations of Sellers arising under or from, or relating to, Sellers' terminated self-insured workers' compensation program, including Sellers' obligations to the Kentucky Department of Workers' Claims to secure claims under Sellers' terminated self-insured workers' compensation program, whether arising before, on or after the date hereof, whether or not a closing of the remainder of the Purchased Assets occurs.  This Section 4.1(b) shall survive the termination of this Agreement.

*Section 4.2.    Deliveries by Sellers.*  At the Closing, Sellers will deliver to Purchaser:

(a)    the General Assignments and Bills of Sale for the Purchased Assets, each duly executed by the applicable Seller;

(b)    the Lease Assignment and Assumption Agreements for the assumed Leases and Purchased Leased Real Property, each duly executed by the applicable Seller;

(c)    the Contract Assignment and Assumption Agreements for the Purchased Contracts, each duly executed by the applicable Seller;

(d)    the Transition Services Agreement, duly executed by each applicable Seller;

-24-

(e)      the Interim Permit Operating Agreement, duly executed by each applicable Seller;

(f)      special warranty or limited warranty deeds (or similar deeds to convey title with warranties limited only to grantor's acts in a particular jurisdiction where the Owned Real Property is located) to the Owned Real Property in recordable form, duly executed by the applicable Seller;

(g)      all documents of title and instruments of conveyance (duly executed by the applicable Seller) necessary to transfer record and/or beneficial ownership to Purchaser of all automobiles, trucks and trailers owned by Sellers (and any other Purchased Assets owned by Sellers which require execution, endorsement and/or delivery of a document in order to vest record or beneficial ownership thereof in Purchaser) which are included in the Purchased Assets;

(h)      the officer's certificate required to be delivered pursuant to Sections 9.1(b) and 9.1(c); and

(i)      all other deeds, endorsements, assignments, company seals, instruments of transfer and other instruments of conveyance reasonably requested by Purchaser or required to convey and assign the Purchased Assets to Purchaser and vest title therein in Purchaser free and clear of all Liens (other than those created by Purchaser and Permitted Exceptions); *provided,* that any such instruments as cannot be timely effected shall be subject to Section 8.4.

Section 4.3.      *Deliveries by Purchaser.*  At the Closing, Purchaser will deliver to the Sellers:

(a)      the Purchase Price specified in Section 3.1 of this Agreement;

(b)      the General Assignments and Bills of Sale for the Purchased Assets, each duly executed by Purchaser;

(c)      the Lease Assignment and Assumption Agreements for the assumed Leases and Purchased Leased Real Property, each duly executed by Purchaser;

(d)      the Contract Assignment and Assumption Agreements for the Purchased Contracts, each duly executed by Purchaser;

(e)      the Transition Services Agreement, duly executed by Purchaser;

(f)      the Interim Permit Operating Agreement, duly executed by Purchaser;

(g)      special warranty or limited warranty deeds (or similar deeds to convey title with warranties limited only to grantor's acts in a particular jurisdiction where the Owned Real Property is located) to the Owned Real Property in recordable form, duly executed by Purchaser;

(h)    the officer's certificate required to be delivered pursuant to Sections 9.2(a) and 9.2(b); and

(i)    all such other documents, instruments and certificates, reasonably requested by Sellers, to evidence the assumption by Purchaser of the Assumed Liabilities.

Section 4.4.    *Termination of Agreement.*  This Agreement may be terminated prior to the Closing as follows:

(a)    by Purchaser or Sellers, if the Closing has not occurred by 5:00 p.m. Eastern time on September 27, 2019 (or such later date as has been mutually agreed in writing by the Sellers and Purchaser) (the *"Outside Date"*); *provided, however,* that if the Closing has not occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or any Seller, then (i) Purchaser may not terminate this Agreement pursuant to this Section 4.4(a) in the case of any such breach by Purchaser and (ii) Sellers may not terminate this Agreement pursuant to this Section 4.4(a) in the case of any such breach by any Seller; provided further if the Closing has not occurred by the Outside Date and the only condition to Closing that has not been satisfied is the closing of the Perry County Transaction and the Premier Elkhorn Transaction, the Sellers may terminate this Agreement if (i) Purchaser does not elect to exercise its rights in Section 8.17, or (ii) Purchaser does not close the Perry/Premier Transaction in the applicable time period set forth in Section 8.17.

(b)    by mutual written consent of Sellers and Purchaser;

(c)    by Purchaser, if any Seller breaches any representation, warranty, covenant or agreement contained in this Agreement, such breach would reasonably be expected to result in a failure of a condition set forth in Sections 9.1 or 9.3 and such breach has not been cured by the earlier of (i) 30 Business Days after the giving of written notice by Purchaser to Sellers of such breach and (ii) the Outside Date; *provided,* that Purchaser is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement;

(d)    by Sellers, if Purchaser breaches any material representation, warranty, covenant or agreement contained in this Agreement, such breach would reasonably be expected to result in a failure of a condition set forth in Sections 9.2 or 9.3 and such breach has not been cured by the earlier of (i) 30 days after the giving of written notice by Sellers to Purchaser of such breach and (ii) the Outside Date; *provided,* that no Seller is then in material breach of any representation, warranty, covenant or agreement contained in this Agreement;

(e)    by Purchaser or Sellers if there is in effect a final non-appealable Order of a Governmental Body of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and use their

respective reasonable best efforts to pursue such appeal unless and until this Agreement is terminated pursuant to this Section 4.4; or

(f)    by Purchaser or Sellers, upon a final and non-appealable denial by the applicable Governmental Body of a material regulatory approval required for consummation of the Transactions, unless such denial is the result of negligence or misconduct by the Purchaser.

Section 4.5.    *Procedure Upon Termination.*    In the event of termination pursuant to Section 4.4, the terminating Party will give written notice thereof to the other Party or Parties, and this Agreement will terminate as described in Section 4.6, and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Purchaser or any Seller.

Section 4.6.    *Effect of Termination.*    In the event that this Agreement is terminated as provided herein, then each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there will be no Liability or obligation on Purchaser, any Seller or any of their respective Representatives; *provided, however,* that the provisions of Section 3.2, this Section 4.6, Section 8.11 and Article XI (other than Section 11.3) and, to the extent necessary to effectuate the foregoing enumerated provisions, Section 1.1 hereof, will survive any such termination and will be enforceable hereunder, *provided, further,* that nothing in this Section 4.6 will be deemed to release any Party from Liability for any breach of this Agreement prior to termination.

## ARTICLE V.

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Schedules hereto, Sellers hereby jointly and severally represent and warrant to Purchaser that, as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date):

Section 5.1.    *Organization and Good Standing.*    Each Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and, subject to any limitations that may be imposed on such Seller resulting from or relating to the Bankruptcy Cases, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 5.2.    *Authorization of Agreement.*    Subject to entry of the Sale Order and such other authorization as may be required by the Bankruptcy Court, each Seller has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.    The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of each Seller.    This Agreement and each other agreement, document or

instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by the applicable Seller and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of each applicable Seller enforceable against such Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 5.3.    *Governmental Consents.*  Except to the extent rendered unnecessary through the entry of the Sale Order, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of any Seller in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which any Seller is a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by Sellers of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except for (a) the entry of the Sale Order and (b) as would not reasonably be expected to have a Seller Material Adverse Effect.

Section 5.4.    *Title to Purchased Assets.*  (a) Subject to Section 2.5, and subject to the entry of the Sale Order, Sellers own the Owned Real Property and the Purchased Assets that are tangible personal property free and clear of all Liens (other than Permitted Exceptions and Liens created by the Purchaser) and, at the Closing, Purchaser will be vested with good, marketable, and valid title to the Owned Real Property and such Purchased Assets, free and clear of all Liens (other than Permitted Exceptions and Liens created by the Purchaser) and Excluded Liabilities, to the fullest extent permissible under Law, including Sections 105, 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.  Solely for the purposes of this Section 5.4(a), "*Permitted Exceptions*" shall be defined to mean (a) Liens disclosed on Sellers' financial statements or reflected in the notes thereto; (b) Liens for Taxes and other governmental charges not yet delinquent or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established and maintained to the extent required in accordance with GAAP; (c) mechanic's, workmen's, repairmen's, materialmen's, warehousemen's, carrier's and other similar statutory Liens arising or incurred in the Ordinary Course of Business not yet due and payable or which are being contested in good faith and for which adequate reserves have been established and maintained to the extent required in accordance with GAAP; (d) deposits or pledges made in connection with, or to secure payment of, workers' compensation, unemployment insurance, or old age pension programs mandated under applicable Law or other social security programs; (e) Liens on goods in transit incurred pursuant to documentary letters of credit or otherwise securing payments under lease agreements; (f) zoning, entitlement, building and other land use regulations imposed by or on behalf of any Governmental Body having jurisdiction over any real property; (g) the rights, if any, of suppliers or other vendors which are third parties and have possession of any properties or assets; (h) restrictions on the transfer of securities arising under applicable securities Laws; (i) title defects, easements and encroachments of record and similar Liens of record which would not, individually or in the

aggregate, reasonably be expected to materially or adversely detract from the current value of, or materially interfere with any current or continued use of, any material property or material assets encumbered thereby; (j) Liens imposed by Law that relate to obligations that are not yet due and have arisen in the Ordinary Course of Business; (k) pledges or deposits to secure obligations under workers' compensation or other similar Law or to secure any public or statutory obligation; (l) licenses granted in the Ordinary Course of Business; (m) other than with respect to Owned Real Property, Liens under operating leases or original purchase price conditional sales contracts entered into in the Ordinary Course of Business; and (n) the Assumed Liabilities.

(b)      The Purchased Assets and the Excluded Assets constitute all the properties, assets, interests in properties and rights necessary to permit Purchaser to carry on the Business after the Closing as presently conducted.

Section 5.5.      *Validity of Purchased Contracts.*  As of the date of this Agreement, to the Knowledge of Sellers, each Purchased Contract is in full force and effect and is a valid and binding obligation of Seller party thereto and the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by (a) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity), (c) the obligation to pay Cure Costs (if any) under Section 8.5, or (d) any facts described on Schedule 5.5.  Except as set forth on Schedule 5.5, as of the date of this Agreement, other than the commencement of the Bankruptcy Cases, no Seller has any knowledge of the intention of any third party to terminate any Purchased Contract.  As of the date of this Agreement, no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any such Purchased Contract or would cause the acceleration of any obligation of any Seller or the creation of a Lien upon any Purchased Asset, except for such events that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

Section 5.6.      *Litigation.*  Except for Legal Proceedings that are disclosed on Schedule 5.6 or that do not have, and would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, as of the date of this Agreement, there are no Legal Proceedings or Orders pending or, to the Knowledge of Sellers, threatened against any Seller that involves or relates to the Business, any of the Transactions, or affects any of the Purchased Assets.

Section 5.7.      *Financial Advisors.*  Except with respect to Jefferies LLC and FTI Consulting, Inc., Sellers have not incurred any obligation or Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or Transactions for which Purchaser is or will become liable.

Section 5.8.      *Environmental Matters.*  Except as would not reasonably be expected to be material to the Business or the Purchased Assets:

(a)      Sellers' operation of the Business, and the Purchased Real Property, have complied during the previous five years and, as of the date of this Agreement, are in compliance with all applicable Environmental Laws;

(b)      Sellers are not subject to any Environmental Claim and have not received any written notice, report or information alleging any pending or threatened material violation, non-compliance, Liability or potential Liability under Environmental Laws with regard to any of the Purchased Real Property or the Business, or any prior business for which Sellers have retained Liability under any Contract or Environmental Law;

(c)      No Legal Proceeding is pending or, to Sellers' Knowledge, threatened under any Environmental Law against Sellers or with respect to the Purchased Real Property or the Business, nor are there any Orders outstanding or, to Sellers' Knowledge, threatened, nor, to Sellers' Knowledge, are there any investigations pending or threatened, under any Environmental Law with respect to the Purchased Real Property or the Business;

(d)      Sellers (i) hold, maintain and are, and have been during the previous five years, in compliance with all Permits required under Environmental Law (each of which is in full force and effect and is not subject to appeal, except in such instances where the requirement to hold a Permit pursuant to Environmental Laws or the terms of a Permit issued pursuant to Environmental Laws are being contested in good faith by Sellers by appropriate proceedings diligently conducted) for any of their current operations or for the current ownership, operation or use of the Purchased Real Property, including all Permits required under Environmental Law for the coal mining-related operations of Sellers or, to the extent currently required, any pending construction or expansion related thereto, (ii) have used reasonable best efforts to cause all contractors, lessees and other Persons occupying, operating or using the Purchased Real Property to comply with Environmental Law and obtain all necessary Permits required under Environmental Law, and (iii) have not received any written notice that the Permits required under Environmental Law will not be renewed or any condition thereof will be materially modified;

(e)      To Sellers' Knowledge, none of the Purchased Assets contains (i) Hazardous Materials for which any investigation or remediation is required under Environmental Law, (ii) any underground storage tanks requiring a Permit or registration under Environmental Law, (iii) above ground storage tanks requiring a Permit under Environmental Law, (iv) transformers or other equipment containing PCBs at levels above 50 parts per million, (v) underground injection wells requiring a Permit under Environmental Law, (vi) non-naturally occurring radioactive materials or (vii) septic tanks or waste disposal pits requiring a Permit or registration under Environmental Law (to the extent such tanks or pits constitute Purchased Assets), except in each case for such Hazardous Materials, tanks, transformers, other equipment, wells, or pits that would not reasonably be expected to give rise to material Liability; and

(f)      Sellers have made available copies of all material environmental assessments, audits (including compliance audits), evaluations, studies, and tests within their current possession or control, relating to the Purchased Real Property, whether generated by Sellers or others, including environmental audits and environmental site assessments.

-30-

Section 5.9.    *Sellers' Intellectual Property.*    Except as disclosed on Schedule 5.9, and except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, to Sellers' Knowledge, (i) the conduct of the Business by Sellers as currently conducted (including the products and services currently sold or provided by Sellers) does not infringe or otherwise violate any Person's intellectual property rights, and no such claims are pending or threatened in writing against Sellers, and (ii) no Person is infringing or otherwise violating any Intellectual Property Rights owned by Sellers, and no such claims are pending or threatened in writing against any Person by Sellers.

Section 5.10.    *Compliance with Applicable Laws; Permits.*    (a) The Sellers own and operate, and for each of the prior three years have at all times owned and operated, the Purchased Assets and conduct, and for each of the prior three years have at all times conducted, the Business, in each case, in compliance in all material respects with all Orders, Permits and Law applicable to the Sellers, the Purchased Assets or the Business, as applicable, except for prior instances of non-compliance that have been fully and finally resolved to the satisfaction of all Governmental Bodies with jurisdiction over such matters, and (b) no Seller nor, to the Knowledge of Sellers, any of its respective Representatives has received in the past 24 months any written notice from a Governmental Body or third party alleging that any Seller or the Business is not in compliance in any material respect with applicable Orders, Permits and Law.  The Permits set forth on Schedule 5.10 are all of the material Permits held by Sellers with respect to the current operation and conduct of the Business, the Purchased Assets or the Assumed Liabilities.  No Seller nor any officer or director of any Seller is "permit blocked" on the Applicant Violator System established pursuant to SMCRA (or any applicable state system) (the *"Applicant Violator System"*) by any Governmental Body.

Section 5.11.    *Labor Matters.*    (a) None of the Sellers or their Affiliates are party to or subject to any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements, and other similar agreements (each a *"Collective Bargaining Agreement"*), or any letter or memoranda of understanding or agreement interpreting any Collective Bargaining Agreement or modifying same, with respect to the Business, with any union, works council, or labor organization (each a *"Union"* and collectively *"Unions"*);

(b)    To Sellers' Knowledge, in the past three years, other than pursuant to procedures established in connection with the Bankruptcy Cases (including, without limitation proceedings under sections 1113 and 1114 of the Bankruptcy Code), (i) no Union or group of Employees or former Employees has organized any employees for purposes of collective bargaining, sought to bargain collectively with any of Sellers, made a demand for recognition or certification as an employee representative for purposes of collective bargaining or filed a petition for recognition with any Governmental Body; (ii) as of this date, no Collective Bargaining Agreement is being negotiated by any of Sellers, other than pursuant to procedures established in connection with the Bankruptcy Cases; and (iii) there have been no material strikes, lockouts, slowdowns, work stoppages, boycotts, handbilling, picketing, walkouts, demonstrations, leafleting, sit-ins, sick-outs, or other material forms of organized labor disruption with respect to any of Sellers, the Business or the Purchased Assets; and

(c)     Within the past three (3) years, there has been no "mass layoff" or "plant closing" (as defined in the Worker Adjustment and Retraining Notification Act of 1988, and including any similar state or local Law (the *"WARN Act"*)) with respect to any Seller, the Business and/or any of the Purchased Assets and, therefore, Sellers (and, to the Knowledge of Sellers, their Affiliates) have complied with any and all legal requirements to provide advance notice of layoffs or terminations as required by, or incurred any material Liability under, the WARN Act, or any applicable Law for Employees outside the United States regarding the termination or layoff of Employees.

(d)     Excluding any legal matter, either individually or in the aggregate, reasonably expected to be immaterial to the Business or related to the Bankruptcy Cases, (i) within the past three (3) years, to Sellers' Knowledge, Sellers (and their affiliates) have been in material compliance with all applicable Law relating to labor and employment, including all applicable Law relating to employment practices; the hiring, promotion, assignment, and termination of employees; discrimination; equal employment opportunities; disability; labor relations; wages and hours; FLSA, classification of independent contractors, hours of work; payment of wages; immigration; workers' compensation; employee benefits; background and credit checks; working conditions; occupational safety and health; family and medical leave; employee terminations; and data privacy and data protection; (ii) there are no pending, or to Sellers' Knowledge, threatened, lawsuits, grievances, unfair labor practice charges, arbitrations, charges, investigations, hearings, actions, claims, or proceedings (including any administrative investigations, charges, claims, actions, or proceedings), against Sellers or, to the Knowledge of Sellers, any of their affiliates brought by or on behalf of any applicant for employment, any current or former Employee, any person alleging to be a current or former employee, any representative, agent, consultant, independent contractor, subcontractor, or leased employee, volunteer, or "temp" of, or that has performed any work or services on behalf of or for the benefit of any of the Sellers, or any group or class of the foregoing, or any Governmental Body, alleging a material violation of any labor or employment Law, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with the employment relationship; (iii) each of the Employees has presented documentation sufficient under the Laws of the jurisdiction in which they perform employment services for or on behalf of the Sellers authorizing the Employees to lawfully work within the jurisdictions they perform employment services for or on behalf of the Sellers; and (iv) to Sellers' Knowledge, no individual has been improperly excluded from, or wrongly denied benefits under, any Seller Benefit Plan.

*Section 5.12.     Employee Benefits.*

(a)     Schedule 5.12(a) contains a list of each Seller Benefit Plan.

(b)     Each Seller Benefit Plan and related trust has been maintained, operated and administered in material compliance with its terms and the requirements of all applicable Laws (including ERISA and the Code). Each Seller Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a "*Qualified Benefit Plan*") has received a favorable determination letter from the Internal Revenue Service, or with respect to a prototype plan, can rely on an opinion letter from the Internal Revenue Service to the prototype plan sponsor, to the effect that such Qualified Benefit Plan is so qualified. No action or other claim (other than claims for benefits in

the ordinary course) is pending or, to the Knowledge of Seller, threatened with respect to any Seller Benefit Plan that would reasonably be expected to result in material liability to Purchaser.

(c)     No Seller Benefit Plan is or at any time has been: (i) subject to Title IV of ERISA or the minimum funding standards of Section 302 of ERISA or Section 412 of the Code; or (ii) a "*multi-employer plan*" (as defined in Section 3(37) of ERISA). Neither the Seller nor any ERISA Affiliate has: (A) withdrawn from any pension plan under circumstances resulting (or expected to result) in liability; or (B) engaged in any transaction which would give rise to a liability under Section 4069 or Section 4212(c) of ERISA.

(d)     Except as set forth on Schedule 5.12(d), other than as required under Section 4980B of the Code or other applicable Law, no Seller Benefit Plan that is subject to ERISA provides benefits or coverage in the nature of health, life or disability insurance following retirement or other termination of employment (other than death benefits when termination occurs upon death).

(e)     Except as set forth on Schedule 5.12(e), no Seller Benefit Plan exists that would: (i) result in the payment to any employee, director or consultant of the Seller or any ERISA Affiliate of any money or other property; or (ii) accelerate the vesting of or provide any additional rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any employee, director or consultant of the Seller, in each case, as a result of the execution of this Agreement or the consummation of the transactions contemplated hereby and thereby.

(f)     As of the Closing, there will be no contract or plan to which Seller is a party covering any current or former employee, director or independent contractor of the Seller that, individually or collectively, provides for payment or benefits that would reasonably be expected to constitute an "excess parachute payment" under Section 280G of the Code as a result of the execution of this Agreement or the consummation of the transactions contemplated hereby and thereby.

(g)     Each Seller Benefit Plan that is or contains a "deferred compensation" plan, arrangement or feature, that is subject to Code Section 409A, has been operated in compliance, in all material respects, with such Code section and applicable regulations thereunder. Seller has not agreed to pay or reimburse taxes under Code Section 409A incurred by any service provider participating in any deferred compensation arrangement.

*Section 5.13.     Mining.*   Each Seller has, in the amounts and forms required pursuant to applicable Mining and Mining Safety Laws, obtained all performance bonds and surety bonds, lease bonds or otherwise provided any financial assurance as (a) required under the applicable Permits, Leases or Mining and Mining Safety Laws for Reclamation of land, water or other natural resources at any property included in the Purchased Assets, or (b) required pursuant to any applicable Permit or Mining and Mining Safety Law (collectively, *"Mining Financial Assurances"*).   Schedule 5.13 sets forth a complete and accurate list of all Mining Financial Assurances held by Sellers with respect to the Purchased Assets, categorized by Transferred Permit or the Purchased Assets, and including the name of the provider, the amount provided, and the amounts of collateral held by the provider.   The liability for mine closing and Reclamation obligations recorded on the Sellers' most recent financial statements has been properly accrued in accordance with the requirements of Financial Accounting Standards Board Codification Topic

410, Asset Retirement and Environmental Obligations, formerly known as Financial Accounting Standard No. 143 (*"FASB 410"*), and the amount of such liability is equal to or in excess of the amount of such obligations, determined on the basis of Sellers' actual historic Reclamation and closure costs and currently planned mine life and escalated for inflation, in accordance with FASB 410 and applicable Law.

Section 5.14.     *Tax Matters.*  Except as set forth on Schedule 5.14:

(a)     Each Seller has filed (or had filed on its behalf) all material Tax Returns that it was required to file in respect to the Purchased Assets or the Business and all such Tax Returns were correct and complete in all material respects.  Other than as excused or prohibited from being paid as a result of the Bankruptcy Code or the Bankruptcy Court, with respect to the Purchased Assets and the Business, each Seller has paid (or had paid on its behalf) or will pay (or have paid) when due (i) all material Taxes that are shown to be due by such Seller on any such Tax Returns or pursuant to any assessment received by such Seller from any Tax Authority for any period preceding the Closing Date, and (ii) all other material Taxes due on or before the Closing Date (whether or not shown on a Tax Return).  Other than as excused or prohibited from being withheld, collected or paid as a result of the Bankruptcy Code or the Bankruptcy Court, all material Taxes that each Seller is or was required by Law to withhold or collect with respect to the Purchased Assets and the Business have been duly withheld or collected and, to the extent required, have been paid or will be paid to the proper Tax Authority.

(b)     There are no pending, proposed in writing or threatened in writing Legal Proceedings with respect to any Taxes payable by or asserted against any Seller related to the Purchased Assets or the Business.

(c)     There are no outstanding agreements or waivers that would extend the statutory period in which a Tax Authority may assess or collect a Tax that could result in (i) a Lien upon the Purchased Assets or the Business or (ii) liability to any Purchaser as a transferee of or a successor to the Purchased Assets or the Business.

(d)     There are no Liens with respect to Taxes (other than Permitted Exceptions) upon the Purchased Assets or the Business.

(e)     No Seller is a party to any Tax indemnity, Tax allocation or Tax sharing agreement, other than any such agreement entered into in the Ordinary Course of Business the principal purpose of which is not related to Tax, that could result in (i) a Lien upon the Purchased Assets or the Business or (ii) liability for any Purchaser as a result of its acquisition or ownership of the Purchased Assets or the Business.

(f)     There are no requests for rulings pending between any Seller and any Tax Authority in respect of any Tax that could result in (i) a Lien upon the Purchased Assets or the Business or (ii) liability to any Purchaser as a transferee of or successor to the Purchased Assets or the Business.

(g)     Sellers have collected or self-assessed and remitted to the appropriate Tax Authority all material sales and use or similar Taxes required to have been collected or self-assessed with respect to the Purchased Assets and the Business.

(h)     Sellers or their affiliates have properly and timely paid to the appropriate Tax Authorities all material payroll, unemployment and similar Taxes with respect to the Purchased Assets or the Business due on or before the Closing Date, to the extent that the failure to do so could result in any Lien on the Purchased Assets or any liability for any Purchaser as a result of its acquisition or ownership of the Purchased Assets or the Business.

Section 5.15.    *No Other Representations or Warranties; Schedules.*    Except for the representations and warranties contained in this Article V (as modified by the Schedules to this Agreement), none of Sellers nor any other Person makes any other express or implied representation or warranty with respect to Sellers, the Purchased Assets, the Assumed Liabilities or the Transactions, and each Seller disclaims any other representations or warranties, whether made by Sellers, any Affiliate of Sellers, or any of Sellers' or their Affiliates' respective Representatives.  Except for the representations and warranties contained in this Article V (as modified by the Schedules to this Agreement), each Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Sellers or any of its Affiliates).  Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the Purchased Assets or the use thereof.  The disclosure of any matter or item in any Schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Seller Material Adverse Effect.

## ARTICLE VI.

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Each Purchaser, as to itself only, hereby represents and warrants to Sellers that, as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date):

Section 6.1.    *Organization and Good Standing*.  Purchaser is an entity duly organized, validly existing and in good standing under the Laws of the state of its organization.

Section 6.2.    *Authorization of Agreement*.  Purchaser has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or

instrument contemplated hereby or thereby to which it is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of Purchaser.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other Parties) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.3.    *Conflicts; Consents of Third Parties*.  Except as set forth herein, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of Transactions, the taking by Purchaser of any other action contemplated hereby or thereby, except for (a) the entry of the Sale Order and (b) immaterial consents, waivers, approvals, Orders, authorizations, declarations, filings and notifications.

Section 6.4.    *Litigation*.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which would reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect. Purchaser is not subject to any Order except to the extent the same would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

Section 6.5.    *Financial Advisors*.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof that would or could be owed by or claimed against Sellers or any of the consideration to be paid hereunder.

Section 6.6.    *Capability*.

(a)    Purchaser has and will have at Closing sufficient funds available to it in cash to pay or cause to be paid the Cash Amount, the Cure Costs and the fees and expenses required to be paid by Purchaser in connection with the Transactions, and to effect the Transactions.  As of the date hereof and upon the consummation of the Transactions, (i) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (ii) Purchaser will not be left with unreasonably small capital, and (iii) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature.

(b)    None of Purchaser or its Affiliates, nor any of their officers or directors, (i) is "permit blocked" on the Applicant Violator System, or (ii) have been denied, or are subject to denial of, any application for any mining license, permit or other authorization of a Governmental Body due to application of the Applicant Violator System.

Section 6.7.    *Condition of the Purchased Assets*.   Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in Article V (as modified by the Schedules to this Agreement), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and "as is" basis.  Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation.

Section 6.8.    *Exclusivity of Representations and Warranties*.    Except for the representations and warranties contained in this Article VI (as modified by the Schedules to this Agreement), neither Purchaser nor any other Person makes any other express or implied representation or warranty with respect to the Purchaser or the Transactions, and Purchaser disclaims and is not relying on any other representations or warranties, whether made by Purchaser or any of its Affiliates or any of Purchaser's or its Affiliates' respective Representatives.  Except for the representations and warranties contained in Article V, Purchaser agrees and acknowledges that none of Sellers or any Person on behalf of Sellers makes any other express or implied representation or warranty with respect to Sellers, the Purchased Assets, the Assumed Liabilities or the Business or with respect to any other information provided or made available to Purchaser in connection with the Transactions, including information conveyed at management presentations, in a virtual data room or in due diligence sessions and, without limiting the foregoing, including any estimates, projections, predictions or other forward-looking information.

## ARTICLE VII.

## BANKRUPTCY COURT MATTERS

Section 7.1.    *Bankruptcy Court Approval*.

(a)    Sellers will pursue diligently the entry of the Sale Order, and Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser of the Purchased Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Sellers shall deliver to Purchaser, at least one Business Day in advance of the Sellers' filing or submission thereof, drafts of any and all pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted relating to the Transactions for Purchaser's prior review and comment, and such filings or submission shall be acceptable to the Purchaser in its reasonable discretion.  In the event

the entry of the Bidding Procedures Order or the Sale Order shall be appealed, Sellers and Purchaser shall use their reasonable best efforts to defend such appeal. Sellers shall comply with all notice requirements imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

(b)    Sellers and Purchaser acknowledge that this Agreement and the sale of the Purchased Assets, including the assumption and assignment of the Purchased Contracts, are subject to Bankruptcy Court approval. Sellers and Purchaser acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration shall include giving notice of the Transactions to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Purchaser must provide adequate assurance of future performance under the to-be-assigned Purchased Contracts.

(c)    From and after the date of this Agreement and prior to the Closing or the termination of this Agreement in accordance with Article IV, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement; *provided however* that the Sellers may act in accordance with the Bidding Procedures Order.

Section 7.2.    *Bankruptcy Court Filings*.

(a)    The auction concerning the Transaction shall commence pursuant to the Bidding Procedures Order on or before September 18, 2019.

(b)    The Bankruptcy Court shall schedule a hearing on the Transaction on or before September 24, 2019. Without the consent of the Purchaser, unless required by the Bankruptcy Court, the Sellers shall not extend the time for such hearing. In the event that the hearing is rescheduled solely by requirement of the Bankruptcy Court, Seller shall use its best efforts to obtain a hearing no later than September 26, 2019.

(c)    Seller shall use its best efforts to obtain a Sale Order, in form and substance acceptable to Purchaser and its counsel, on or before September 24, 2019, provided however that the Sellers may act in accordance with the Bidding Procedures Order.

(d)    In the event that the entry of a Sale Order is appealed or a stay pending appeal is sought, Sellers shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation).

(e)    Notwithstanding the foregoing, any resulting changes to this Agreement or any other document to be executed and delivered in connection herewith or resulting material changes to the proposed Sale Order shall be subject to the approval of Purchaser in its reasonable discretion. Sellers shall (i) provide Purchaser with drafts of any and all other pleadings and proposed orders to be filed or submitted in connection with this Agreement and the Transactions, and such

-38-

pleadings and proposed orders shall be in form and substance reasonably acceptable to Purchaser and (ii) make best efforts to consult and cooperate with Purchaser regarding any discovery taken in connection with seeking entry of the Sale Order (including any depositions).

(f)    During the Bankruptcy Cases, Sellers shall not assign, convey or abandon any Causes of Action against any of Sellers' ordinary course vendors, contract counterparties, contractors and other suppliers of services related to the Purchased Assets without the prior written consent of Purchaser or an order of the Bankruptcy Court.

ARTICLE VIII.

COVENANTS

Section 8.1.    *Access to Information*.  (a) From the date hereof through the Closing Date, Purchaser will be entitled for purposes of consummating the Transactions to make such investigation of the Purchased Assets and the Assumed Liabilities as it reasonably requests.  Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances so as not to disturb the operation of the Business and will be subject to restrictions under applicable Law.  Sellers will direct and use their reasonable best efforts to cause their respective Representatives to cooperate with Purchaser and Purchaser's Representatives in connection with such investigation and examination, and Purchaser and its Representatives will cooperate with Sellers and their Representatives.  Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require Sellers to disclose information that would cause material competitive harm to a Seller or would violate attorney-client privilege.  Sellers will promptly deliver to Purchaser all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding related to the Purchased Assets and the Transactions.

(b)    For a period until the later of (X) three years following the Closing Date or (Y) entry of a Final Order closing the Bankruptcy Cases, Purchaser shall make available and provide access to Sellers, upon reasonable notice and during normal business hours, to (i) the books and records of the Business (or copies or extracts thereof) with respect to periods or portions of periods ending on or before the Closing Date (including the Documents) as may be in the possession of Purchaser or its Affiliates, and (ii) to the management level Transferred Employees (provided, that such access to any Transferred Employee shall not unreasonably disturb the operation of the Business; and provided, further, that no Transferred Employee shall be made available to perform any wind down-related actions at the request of or on behalf of any Seller or their respective estates), in each case for purposes of complying with applicable Laws and fulfilling Sellers' obligations under this Agreement, and with respect to pursuing and resolving claims and causes of action that constitute Excluded Assets.  For the avoidance of doubt, Sellers' access to Purchaser's books and records pursuant to this Section 8.1(b) shall be limited to books and records to the extent they relate solely to the Business and the Excluded Assets.

Section 8.2.    *Actions Pending the Closing*.  Except (a) as required by applicable Law or by Order of the Bankruptcy Court, including, without limitation, the Approved Budget set forth in the Final DIP Order, as updated, (b) as otherwise expressly contemplated by this Agreement or

-39-

(c) with the prior written consent of Purchaser, during the period from the date hereof to and through the Closing Date, Sellers will: (i) use reasonable best efforts to carry on the Business in the Ordinary Course of Business of the Sellers and use reasonable best efforts to maintain, preserve and protect the Purchased Assets in their current condition, ordinary wear and tear excepted, but including replacements, modifications and maintenance in the Ordinary Course of Business of the Sellers and normal inventories of coal and operating materials and supplies in the Ordinary Course of Business of Sellers; (ii) maintain their books, accounts and records in the Ordinary Course of Business; (iii) not materially amend, modify, terminate, waive any rights under or create any Lien (other than a Lien that will not be transferred to Purchaser at the Closing) with respect to any of the Purchased Contracts, or enter into any Contract other than in the Ordinary Course of Business; (iv) use reasonable best efforts to defend and protect the Purchased Assets from infringement or deterioration; (v) comply with applicable Laws with respect to the Business or any Purchased Assets, other than with respect to the failure of such compliance as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect; (vi) comply in all material respects with all applicable Environmental Laws and Environmental Permits; (vii) not terminate, cancel or make any material changes to the structure, limits, or terms and conditions of the Insurance Policies, including allowing any of the Insurance Policies to expire without renewing such policies or obtaining comparable replacement coverage, or prejudicing rights to insurance payments or coverage; (viii) use reasonable best efforts to maintain in full force and effect all Transferred Permits and comply in all material respects with the terms of each such Transferred Permit; (ix) not waive, compromise or settle (or take any action that would have such an effect or affect a Sellers' rights, title and/or interest in) any (1) material claim or right involving the Purchased Assets or (2) any material claim or Cause of Action of any Seller that is a Purchased Asset; (x) not sell, lease, encumber, or otherwise dispose of all or any material portion of any Purchased Assets, except sales of coal and sales of damaged, obsolete or worn out equipment or other assets in the Ordinary Course of Business; (xi) not, to the extent relating to the Business or any Purchased Assets, (1) make, change or rescind any material Tax election or (2) make, change or rescind a material Tax reporting practice or policy, file any amended Tax Return, enter into any closing agreement, settle any material Tax claim or assessment, surrender any right to claim a material refund of Taxes, or take any other similar action relating to the filing of any Tax Return or the payment of any Tax that is material in nature; (xii) not propose, commit, take or fail to take any action, as the case may be, that is inconsistent with the terms of the Approved Budget set forth in the Final DIP Order, as updated; and (xiii) not enter into any agreement or commitment to take any action prohibited by this Section 8.2.

Section 8.3.    *Consents*.  Sellers and Purchaser will use their respective reasonable best efforts to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the consents and approvals referred to in Section 2.5(a)(ii) and the Necessary Consents; provided, however, that none of Sellers or Purchaser will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or proceedings to obtain any such consent or approval.

Section 8.4.    *Further Assurances*.  Subject to the other provisions of this Agreement and any relevant Order of the Bankruptcy Court, each of Purchaser and each Seller will use its reasonable best efforts to (a) take all actions necessary or appropriate to consummate the Transactions, (b) provide the other Parties with reasonable cooperation and take such actions as

such other Parties may reasonably request in connection with the consummation of the Transactions, (c) following the Closing, execute and deliver such additional documents, instruments, assignments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transactions, and (d) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.  Without limiting the foregoing, each of Purchaser and each Seller will use its reasonable best efforts to defend any Legal Proceedings which would prevent the condition to Closing described in Section 9.3(b) from being satisfied, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Body with respect thereto vacated or reversed, and will cooperate with each other in connection with the foregoing.

Section 8.5.    *Assignment/Assumption of Contracts.*    (a) Schedule 8.5(a) sets forth all Contracts of any Seller that are capable of assumption and assignment or purchase pursuant to Section 365 of the Bankruptcy Code (the *"Assignable Contracts"*), which schedule may be updated from time to time prior to the Sale Hearing to add or remove any Contracts inadvertently included or excluded from such schedule, as well as the Sellers' good faith estimate of all Cure Costs for each such Contract.  At the Sale Hearing (notice of which shall be properly and timely served on all non-Seller counterparties to Assignable Contracts by the Sellers), Sellers shall seek authority to assume and assign, or sell and transfer, as applicable, to Purchaser those Assignable Contracts that are Purchased Contracts.

(b)    At Closing, the Sellers shall assume and assign or transfer to Purchaser the Purchased Contracts; *provided*, that, notwithstanding anything herein to the contrary, Purchaser shall have the right in its sole and absolute discretion to amend Schedule 2.1(b)(v) prior to the Sale Hearing to add or remove any Contract thereto or therefrom by providing written notice thereof to Sellers whereupon (i) any Contract so added or removed shall be a Purchased Contract, and (ii) Schedule 2.1(b)(v) shall be deemed to be amended to add such Contract thereto.

(c)    At the Closing, Purchaser will (i) pay the applicable Cure Costs in connection with the assumption and assignment of the applicable Purchased Contracts for which all Necessary Consents to transfer have been obtained, including consents conditioned on receipt of the Cure Costs, and (ii) assume and agree to perform and discharge all unperformed obligations under the Purchased Contracts, in each case, following the assignment and assumption of the Purchased Contracts to the Purchaser; *provided, however*, that notwithstanding anything to the contrary set forth herein, until the Sale Hearing, Purchaser can elect (in its sole discretion) by written notice to Sellers to exclude such Contract from the list of Purchased Contracts at which point such Contract shall no longer be a Purchased Contract and Purchaser shall shall have no obligation with respect thereto and Schedule 2.1(b)(v) shall be deemed to be amended to remove such Contract therefrom.

(d)    From the date hereof until the Closing, the Sellers shall not seek Bankruptcy Court approval to reject any Assignable Contract unless agreed to in writing by Purchaser.  Additionally, Sellers shall file with the Bankruptcy Court such motions or pleadings as may be appropriate or otherwise as may be reasonably requested by Purchaser to preserve Sellers' right or ability to assume and assign any of the Assignable Contracts (including without limitation, pursuant to Section 365(d)(4) of the Bankruptcy Code) until the Closing.

Section 8.6.    *Transferred Permit and Surety Bond Matters.*

(a)    At the Closing, Sellers and Purchaser shall execute, and shall thereafter comply with the terms of, the Interim Permit Operating Agreement.

(b)    Notwithstanding any provision of this Agreement to the contrary, from and after the Closing, Purchaser shall remain liable for the Assumed Liabilities related to the Transferred Permits even if any applicable Governmental Body fails to approve the transfers of any of the Transferred Permits to Purchaser.

Section 8.7.    *Insurance Cooperation.*    Notwithstanding anything to the contrary in this Agreement, (i) from and after the Closing, Purchaser shall be entitled to any available benefits under the Insurance Policies with respect to the Purchased Assets and the Assumed Liabilities, but subject to the terms, conditions and limitations set forth therein; (ii) Sellers shall assign, to the extent assignable, to Purchaser the right, power and authority, to make directly to the insurer any request for payment under the Insurance Policies relating to any claims in respect to the Purchased Assets and the Assumed Liabilities, or in the event Purchaser is unable to make direct claim for payment, Sellers shall cooperate with Purchaser in filing any insurance claims and in the collection of insurance proceeds, including where permitted by law transferring to Purchaser the right to pursue insurance proceeds related to such claims; and (iii) Sellers shall assign, to the extent assignable, to Purchaser following the Closing the right to receive any future proceeds (including any proceeds in respect of business interruption insurance for any period after the Closing) relating to any such claim.    Any party receiving a notice with respect to any such claim shall promptly notify all other Parties hereto.

Section 8.8.    *Employee Matters.*

(a)    At such time as Sellers approve in writing, the Purchaser may communicate with any of the Employees about possible employment with the Purchaser or its Affiliates as of the Closing Date.    Following such approval, Purchaser will, or will cause its Affiliates to, offer employment to all of the Employees to be effective as of the Closing Date.    The Purchaser shall hire, or cause its Affiliates to hire, all of such Employees who accept such offers.    The Sellers will reasonably encourage each Employee to accept the offer of employment from Purchaser or its Affiliate, and shall take no action, including the offering of employment with the Sellers, designed to induce such Employees not to accept employment with the Purchaser or its Affiliate.    Those Employees that accept the offer of employment from Purchaser or its Affiliate shall be terminated by Sellers and its Affiliates, as applicable, on the Closing Date and shall become employed by the Purchaser or its Affiliate, as applicable, on the Closing Date (and shall be Transferred Employees).

(b)    Other than as expressly agreed by Purchaser, Purchaser is not and shall not be obligated to, and does not, adopt any wage rates, employee benefits, employee policies, or any other terms and conditions of employment applicable to any Employees or former employees who worked at the Purchased Real Property.    Nothing contained in this Agreement shall restrict the ability of Purchaser and its Affiliates to terminate the employment of any Transferred Employee for any reason at any time after the effective date of his or her employment with Purchaser and its Affiliates.    Purchaser shall have full responsibility for the Transferred Employees after the Closing

Date, including any responsibility under the WARN Act, COBRA Coverage and all applicable Laws.

(c)    No provision in this Section 8.8 shall (i) create any third-party beneficiary or other rights in any Employee or former Employee (including any beneficiary or dependent thereof) or any other Person other than the parties hereto and their respective successors and permitted assigns, (ii) constitute or create an employment agreement or employment other than "at-will" employment or (iii) constitute or be deemed to constitute an amendment to any Seller Benefit Plan or any employee benefit plan sponsored or maintained by the Purchaser or its Affiliates.

Section 8.9.    *No Successor Liability*.  The Parties intend that, except as included in the Assumed Liabilities, upon the Closing, Purchaser shall not assume any Excluded Employee Liabilities and shall not be deemed to: (a) be the successor of or successor employer to Sellers, including with respect to any employee benefit plans, under the Coal Act, and any common law successor liability; (b) have, de facto, or otherwise, merged with or into Sellers; (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (d) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Purchased Assets other than as set forth in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Purchaser shall not be liable for any Liens (other than Permitted Exceptions) against any Seller or any of its predecessors or Affiliates, and that Purchaser have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or whether fixed or contingent, existing or hereafter arising, with respect to the Business, the Purchased Assets or any Liabilities of any Seller arising prior to the Closing Date.

Section 8.10.    *Publicity*.  Prior to Closing, unless otherwise required by applicable Law or Bankruptcy Court requirement, Purchaser and Sellers shall consult with each other before issuing any press release or public announcement concerning this Agreement or the Transactions, and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed).  From and after the Closing, Purchaser and Sellers may make public statements with respect to this Agreement or the Transactions so long as such announcements do not disclose the specific terms or conditions of this Agreement, except where such terms and conditions have already been disclosed as required by Law or Bankruptcy Court requirement; provided, that the issuing party shall use its reasonable best efforts to consult with the other party with respect to the text thereof to the extent practicable.

Section 8.11.    *Confidentiality*.  Purchaser acknowledges that evaluation material relating to the Transaction has been, and in the future will be, provided to it in connection with this Agreement, including under Section 8.1, and is subject to the terms of the confidentiality provisions set forth in the Debtor-in-Possession Secured Credit Agreement dated as of July 24, 2019 between Cambrian and Shelby, as borrowers, and Purchaser, as lenders as amended (the *"DIP Credit Agreement"*), the Pre-Petition ABL Credit Agreement (as defined in the Final DIP Order) and the Pre-Petition Term Loan Credit Agreement (as defined in the Final DIP Order), the terms of which are incorporated herein by reference.  Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to

Purchaser, whether pursuant to this Agreement, the DIP Credit Agreement, the Pre-Petition ABL Credit Agreement, the Pre-Petition Term Loan Credit Agreement or otherwise.

Section 8.12.    *Transaction Documents*.  The Parties shall negotiate in good faith, prior to the Closing, the terms of the Contract Assignment and Assumption Agreements, the General Assignments and Bills of Sales, the Lease Assignment and Assumption Agreements, the Transition Services Agreement and each other document, agreement or instrument executed and delivered in connection herewith or therewith, and in each case such terms shall be in a form (i) customary for transactions of the type contemplated by this Agreement and (ii) reasonably satisfactory to the Sellers and Purchaser, in their respective discretion.

Section 8.13.    *Sale Free and Clear*.  On the Closing Date, the Purchased Assets shall be transferred to Purchaser free and clear of all Liens and Liabilities, other than the Liens expressly permitted by the Sale Order and the Assumed Liabilities.

Section 8.14.    *Fiduciary Obligations*.  Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective governing bodies, directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.

Section 8.15.    *Escrow Amounts.*

(a)    Seller and Purchaser shall cooperate in good faith to negotiate with any potential escrow agent on the terms of any escrow agreement contemplated by this Agreement. The fees and expenses arising out of the administration of any resulting escrow arrangement shall be borne solely by such accounts.

(b)    The Administrative Priority Claims Escrow Account, the Wind-Down Escrow Account and the Professional Fees Escrow Account and the funds therein shall be used solely to fund the items identified in Sections 3.3(b), 3.3(c) and 3.3(d), respectively.

Section 8.16.  *Claims Waiver.*  Purchaser and its Affiliates hereby waive, effective as of the Closing, any and all claims for administrative expenses or adequate protection that Purchaser or its Affiliates may be entitled under the Bankruptcy Code including, but not limited to, any and all claims that Purchaser and its Affiliates may have under section 361 of the Bankruptcy Code and/or under section 507 of the Bankruptcy Code, that have accrued but have not been paid by the Sellers; provided, however, that Purchaser and its Affiliates are not waiving (a) any replacement liens that Purchaser may be entitled to under the Final DIP Order as to property sold under this Agreement or under the Perry/Premier Transaction (as defined below), subject to any applicable defenses or (b) their full unsecured deficiency claims, which are fully preserved, subject to any applicable defenses.

Section 8.17.  *Call Option.*  Sellers hereby grant to Purchaser, in the event closing of the Perry County Transaction and the Premier Elkhorn Transaction does not occur by the Outside Date, the right to close, on substantially the same economic terms to Sellers as are set forth in each General Assignment and Assumption Agreement and Bill of Sale for the Perry County Transaction and the

Premier Elkhorn Transaction (the *"Perry/Premier Transaction"*).  Purchaser may elect to purchase the Perry/Premier Transaction in its sole and absolute discretion by sending written notice of its election to purchase the Perry/Premier Transaction (the "*Purchase Notice*") to the Sellers within three (3) Business Days of receipt of notice from the Sellers that the Perry County Transaction and the Premier Elkhorn Transaction did not close, which notice shall be irrevocable.  Purchaser must close the purchase of the Perry/Premier Transaction as soon as reasonably practicable, and within two (2) Business Days of giving the Purchase Notice to the Sellers, the Perry/Premier Transaction shall be included as a part of the Transition Services Agreement.

*Section 8.18.  Coal Shipments.*  Following the Closing, Purchaser shall deliver all coal shipments required by that certain coal supply agreement with EES Coke Battery LLC having an effective date of January 1, 2019, for which a "Provisional Payment" has been made on or before the Closing Date under that certain Prepayment Agreement entered into on the 8th day of May 2019 between Carbon Partners, Inc. and Clintwood Elkhorn Mining LLC.

## ARTICLE IX.

## CONDITIONS TO CLOSING

    *Section 9.1.    Conditions Precedent to Obligations of Purchaser.*  The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part in its sole discretion):

        (a)    The Bankruptcy Court shall have approved and authorized, other than with respect to Cure Costs, the assumption and assignment of each Purchased Contract, except as would not have a material adverse effect on the Business from and after the Closing;

        (b)    the representations and warranties of Sellers contained in this Agreement (disregarding any "materiality" or "Seller Material Adverse Effect" qualifications contained therein) shall be true and correct in all respects as of the Closing (except such representations and warranties that expressly address an earlier date, which such representations and warranties shall be true and correct as of such earlier date), except where the failure to be so true and correct has not had, and would not reasonably be expected to have, a Seller Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of the Sellers, dated the Closing Date, to the foregoing effect;

        (c)    Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to or on the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of the Sellers, dated the Closing Date, to the forgoing effect;

        (d)    no Seller Material Adverse Effect shall have occurred since the date of this Agreement;

(e)     Purchaser shall have reached an agreement with respect to an amount of $5,000,000 in the aggregate, of which no more than $2,000,000 may be due on the Closing Date, of the Cure Costs with counterparties for the Purchased Contracts; and

(f)     Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2.

Section 9.2.     *Conditions Precedent to Obligations of Sellers*.  The obligations of Sellers to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part in their sole discretion):

(a) the representations and warranties of Purchaser contained in this Agreement (disregarding any "materiality" or "Purchaser Material Adverse Effect" qualifications contained therein) shall be true and correct in all respects as of the Closing (except such representations and warranties that expressly address an earlier date, which such representations and warranties shall be true and correct as of such earlier date), except where the failure to be so true and correct has not had, and would not reasonably be expected to have, a Purchaser Material Adverse Effect, and the Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser prior to or on the Closing Date, and the Sellers shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect;

(c)     in the event Purchaser has received all required approvals from all applicable Governmental Bodies for such assumptions, Purchaser shall have delivered to the applicable Governmental Bodies all Required Bonding with respect to Purchaser's assumption of all Liabilities or other obligations of Sellers arising under or from, or relating to, Sellers' terminated self-insured workers' compensation program, including Sellers' obligations to the Kentucky Department of Workers' Claims to secure claims under Sellers' terminated self-insured workers' compensation program, whether arising before, on or after the date hereof;

(d)     Purchaser shall have provided Sellers with evidence satisfactory to Sellers, in Sellers' reasonable discretion, that Purchaser has a commitment from a reputable surety bond company to post the Required Bonding with respect to the Transferred Permits and, if applicable, any Purchased Contracts; and

(e)     Purchaser shall have delivered to Sellers all of the items set forth in Section 4.3.

Section 9.3.    *Conditions Precedent to Obligations of Purchaser and Sellers*.    The respective obligations of Purchaser and Sellers to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part in their respective sole discretion):

       (a)    there shall not be in effect any Order restraining, enjoining, staying or otherwise prohibiting the consummation of the Transactions;

       (b)    the Bankruptcy Court shall have entered the Sale Order;

       (c)    both the Perry County Transaction and the Premier Elkhorn Transaction shall have closed or shall close simultaneously with the Closing; and

       (d)    Purchaser and Sellers shall each be reasonably satisfied with the form and substance of the Schedules hereto.

Notwithstanding the foregoing provisions of this Section 9.3, the failure of the Closing to occur shall not terminate or otherwise modify Purchaser's right set forth in Section 4.1(b).

Section 9.4    *Frustration of Closing Conditions*.    No Party may rely on the failure of any condition set forth in Sections 9.1, 9.2 or 9.3, as the case may be, if such failure was caused by such Party's breach of any provision of this Agreement.

## ARTICLE X.

### TAXES

Section 10.1.    *Transfer Taxes*.    All documentary, stamp, transfer, motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the Transactions (collectively, *"Transfer Taxes"*) will be borne by Purchaser, regardless of the Party on whom Liability is imposed under the provisions of the Laws relating to such Transfer Taxes.    Sellers and Purchaser will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes and will cooperate and otherwise use their respective reasonable best efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party.

Section 10.2.    *Purchase Price Allocation*.    (a)  As promptly as practicable after the Closing Date, but no later than 120 days thereafter, Purchaser will prepare and deliver to Sellers an allocation schedule setting forth the amounts to be allocated among Sellers and among the Purchased Assets of each Seller, pursuant to (and to the extent necessary to comply with) Section 1060 of the Code and the applicable regulations promulgated thereunder (or, if applicable,

any similar provision under state, local or foreign Law or regulation) (the *"Proposed Allocation Statement"*).  Sellers will have 30 Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an *"Allocation Notice of Objection"*) of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of their objections.  If Sellers fail to deliver an Allocation Notice of Objection in accordance with this Section 10.2(a) the Proposed Allocation Statement will be conclusive and binding on all Parties and will become the *"Final Allocation Statement."* If Sellers submit an Allocation Notice of Objection, then for 20 Business Days after the date Purchaser receives the Allocation Notice of Objection, Purchaser and Sellers will use their reasonable best efforts to agree on the allocations.  If Purchaser and Sellers agree in writing on an allocation schedule during such period, such allocation schedule shall be conclusive and binding on all Parties and shall become the Final Allocation Statement. Failing such agreement within 20 Business Days of such notice, the unresolved allocations will be determined in writing by Purchaser after taking into account in good faith Sellers' objections, and such written determination shall be conclusive and binding on all Parties and shall become the Final Allocation Statement.  For the avoidance of doubt, in administering any Legal Proceeding, the Bankruptcy Court shall not be required to apply the Final Allocation Statement in determining the manner in which the Purchase Price should be allocated as between Sellers and their respective estates.

(b)     Sellers and Purchaser and their respective Affiliates will report, act, and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with the Final Allocation Statement.  Neither Sellers nor Purchaser will take any position (whether in audits, tax returns, or otherwise) that is inconsistent with the Final Allocation Statement unless required to do so by applicable Law.

Section 10.3.     *Cooperation and Audits.*  Purchaser, its Affiliates and Sellers will cooperate fully with each other regarding Tax matters (including the execution of appropriate powers of attorney) and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes; *provided, however,* that in the event that Sellers desire to destroy or dispose of any such records, Sellers shall first notify the Purchaser and offer to deliver, at Purchaser's expense, any or all of such records and documents relating to Taxes governed by this Agreement as Purchaser may request.

## ARTICLE XI.

### MISCELLANEOUS

Section 11.1.     *No Survival of Representations and Warranties.*  The Parties agree that the representations and warranties contained in this Agreement will not survive the Closing hereunder, and none of the Parties will have any Liability to each other after the Closing for any breach thereof.  The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein, and each Party will be liable to the other after the Closing for any breach thereof.

Section 11.2.    *Expenses*.    Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, each of Sellers and Purchaser will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions and all proceedings incident thereto.

Section 11.3.    *Injunctive Relief*.    (a) The Parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to enforce specifically the terms and provisions of this Agreement, including specific performance of such covenants, promises or agreements or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 11.3 will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)    The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Sellers, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or Sellers, as applicable, under this Agreement all in accordance with the terms of this Section 11.3.

Section 11.4.    *Submission to Jurisdiction; Consent to Service of Process*.    (a) Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 11.8 hereof; *provided, however,* that if any Bankruptcy Case has been closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Legal Proceeding in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereby consents to process being served by any other Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of

Section 11.8; *provided, however,* that such service will not be effective until the actual receipt thereof by the Party being served.

Section 11.5.     *Waiver of Right to Trial by Jury*.  Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

Section 11.6.     *Entire Agreement; Amendments and Waivers*.  This Agreement represents the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

Section 11.7.     *Governing Law*.  This Agreement will be governed by and construed in accordance with federal bankruptcy Law, to the extent applicable, other federal law, where applicable, and, where state Law is implicated, the Laws of the State of Delaware applicable to contracts made and performed in such State, and the Laws of the Commonwealth of Kentucky applicable to real property located in the Commonwealth of Kentucky and Licenses or Permits issued or administered by a Governmental Body under the jurisdiction of the Commonwealth of Kentucky.

Section 11.8.     *Notices*.  All notices and other communications under this Agreement will be in writing and will be deemed given (i) when delivered personally by hand, (ii) when sent by email (with written confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

     If to Sellers, to:

          Cambrian Coal LLC
          P.O. Box 2100
          Pikeville, KY 41502
          Attention:  J. Mark Campbell
          Email: mark.campbell@cambriancoal.com

With a copy (which will not constitute notice) to:

Frost Brown Todd LLC
250 West Main Street, Suite 2800
Lexington, Kentucky 40507
Attention:  Jeff Hallos
Email:      jhallos@fbtlaw.com

If to Purchaser, to:

Richmond Hill Capital Partners, LP and
Essex Equity Joint Investment Vehicle, LLC
c/o Richmond Hill Investment Co., LP
375 Hudson Street, 12th Floor
New York, NY 10014
Attention:  Ryan Taylor
            Jordan Jones
Email:      rtaylor@rhiclp.com
            jjones@medorapartners.com

-and-

Alliance Prime Associates, Inc.
200 Park Avenue, Suite 400
Orange Village, Ohio 44122
Attention:  Joseph E. LoConti
            Michael R. Cavanaugh
            Sean T. O'Brien
Email:      jloconti@yahoo.com
            Seanobrien1414@gmail.com
            michael@tower1partnership.com

With copies (which will not constitute notice) to:

Chapman and Cutler LLP
1270 Avenue of the Americas
New York, NY 10020
Attention: Larry G. Halperin
Email: halperin@chapman.com

-and-

Kaplan Johnson Abate & Bird LLP
710 West Main Street
Louisville, Kentucky 40202
Attention: Brian Meldrum
Email: bmeldrum@kaplanjohnsonlaw.com

Section 11.9.    *Severability*.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 11.10.    *Assignment*.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Except as set forth in Section 11.11, nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; *provided, however,* that Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 11.10, one or more Affiliates to (i) purchase the Purchased Assets and/or (ii) assume the Assumed Liabilities (any such Affiliate of Purchaser that shall be properly designated by Purchaser in accordance with this clause, a *"Designated Purchaser"*); it being understood and agreed, however, that any such right of Purchaser to designate a Designated Purchaser is conditioned upon (a) such Designated Purchaser executing and delivering to Sellers a counterpart to this Agreement, (b) such Designated Purchaser being able to perform the applicable covenants under this Agreement (and make the same representations and warranties as Purchaser has made in Article VI, limited, where applicable, to the relevant portion of the Purchased Assets being acquired by such Designated Purchaser), and demonstrate satisfaction of the applicable requirements of Section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the applicable Purchased Contracts, (c) any such designation not creating any Liability (including any Liability relating to Taxes) for Sellers or their Affiliates that would not have existed had Purchaser purchased the Purchased Assets and/or assumed the Assumed Liabilities, and which Liability is (i) not fully reimbursed by or on behalf of Purchaser prior to or at the Closing or (ii) a Liability for which Purchaser or the applicable Designated Purchaser agrees, at its election, to provide an indemnity reasonably acceptable to Sellers and (d) such designation not reasonably being expected to materially delay, prevent or hinder the consummation of the transactions contemplated by this Agreement.  No such designation shall relieve Purchaser of any of its obligations hereunder.  Any breach hereof by a Designated Purchaser shall be deemed a breach by Purchaser.  The above designation shall be made by Purchaser by way of a written notice to be delivered to Sellers as soon as reasonably practicable after the date hereof and in no event later than the fifth (5th) day prior to the Closing Date, which written notice shall contain appropriate information about the Designated Purchaser(s) and shall indicate which Purchased Assets and Assumed Liabilities that Purchaser intends such Designated Purchaser(s) to purchase and/or assume, as applicable, hereunder.  Upon any such permitted assignment, the references in this Agreement to Sellers or Purchaser will also apply to any such assignee unless the context otherwise requires.

Section 11.11. *Non-Recourse*. No past, present or future director, officer, employee, incorporator, member, partner, equityholder, incorporator, manager, agent, attorney, Representative or Affiliate of the parties to this Agreement or any of their Affiliates will have any Liability for any obligations or Liabilities of Sellers or Purchaser, as applicable, under this Agreement or any agreement entered into in connection herewith or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as Parties thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the Parties, no other party will have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any Party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any Legal Proceeding based on, in respect of, or by reason of, the Transactions (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another Person or otherwise. In no event will any Person be liable to another Person for any remote, speculative or punitive damages with respect to the Transactions.

Section 11.12. *Counterparts*. This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers duly authorized, as of the date hereof.

PURCHASER:

RICHMOND HILL CAPITAL PARTNERS, LP

By: _____

Name:  Ryan P. Taylor

Title:  Authorized Signatory

ESSEX EQUITY JOINT INVESTMENT
    VEHICLE, LLC

By: _____

Name:  Ryan P. Taylor

Title:  Authorized Signatory

ALLIANCE PRIME ASSOCIATES, INC.

By: _____

Name:  Joseph E. LoConti

Title:  President

Signature Page to Asset Purchase Agreement

SELLERS:

CAMBRIAN COAL LLC,
SHELBY RESOURCES, LLC,
PLM HOLDING COMPANY LLC,
APEX ENERGY, INC.,
BEAR BRANCH COAL LLC,
C. W. AUGERING, INC.,
CLINTWOOD ELKHORN MINING LLC,
GATLIFF COAL LLC
MARSHALL RESOURCES, INC.,
PERRY COUNTY COAL LLC,
PIKE-LETCHER LAND LLC,
PREMIER ELKHORN COAL LLC,
RAVEN ROCK DEVELOPMENT LLC,
RAY COAL LLC,
RICH MOUNTAIN COAL LLC,
S. T. & T. LEASING, INC.,
T.C. LEASING, INC.,
WHITAKER COAL LLC

By:_____
    Name: _____
    Title: _____

Signature Page to Asset Purchase Agreement

**Exhibit A**

**Interim Permit Operating Agreement**
**(See attached)**

## PERMIT OPERATING AGREEMENT

**THIS PERMIT OPERATING AGREEMENT** ("*Permit Agreement*") is dated as of _____, 2019, and is made and entered into by and between Cambrian Coal LLC, a Kentucky limited liability company, Shelby Resources, LLC, a Kentucky limited liability company, [OTHER ENTITIES], a Kentucky _____, and [_____], a Kentucky _____ (collectively "*Transferor*"), and [_____], a _____ ("*Transferee*").

### WITNESSETH:

**WHEREAS**, Transferor, as seller, and Richmond Hill Capital Partners, LP, Essex Equity Joint Investment Vehicle, LLC, and Alliance Prime Associates, Inc. (collectively, the "**Designating Purchasers**"), as purchaser, have entered into that certain Asset Purchase Agreement dated September 20, 2019 (the "*Purchase Agreement*") pursuant to which Transferor is to transfer to Transferee, as the Designated Purchaser under the Purchase Agreement, the Permits (as defined below); and

**WHEREAS**, Transferor is in possession of, and is designated as "*Permittee*" of, under and pursuant to, those permits set forth on *Exhibit A* issued by the Kentucky Department of Natural Resources (the "*KDNR*") and other Governmental Bodies (such permits, as amended and revised, together with all other Transferred Permits (as defined in the Purchase Agreement), collectively, the "*Permits*"); and

**WHEREAS**, pursuant to the Purchase Agreement, Transferee is obligated to become the permittee under each of the Permits and to conduct certain operations on the properties and assets being acquired by Transferee pursuant to the Purchase Agreement; and

**WHEREAS**, Transferee has filed or shall file, in accordance with the terms of this Permit Agreement, all necessary applications to transfer the Permits from Transferor to Transferee, to have Transferee designated as an "operator" under the Permits, to, if applicable, obtain "advance approvals" of both the transfer and operator status for the Permits from the KDNR and other Governmental Bodies, as applicable ("*Transfer Applications*"), and to obtain the approvals of all applicable Governmental Bodies with respect thereto ("*Transfer Approvals*") all as more particularly set forth herein; and

**WHEREAS**, the parties to the Purchase Agreement desire to close the transactions contemplated by the Purchase Agreement before the Transfer Approvals are obtained, and to have Transferor and Transferee enter into this Permit Agreement to govern the rights, obligations and liabilities of Transferor and Transferee in any way related to the Permits during the period of time beginning on the Closing Date (as defined in the Purchase Agreement) and continuing through the date of receipt of all Transfer Approvals (the "*Interim Period*").

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual covenants and representations contained herein, the reasonableness, adequacy and sufficiency of which are hereby acknowledged, the parties, each intending to be legally bound, hereby agree as follows:

1.  <u>Capitalized Terms</u>.  All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Purchase Agreement.

2.  <u>Transfer Applications</u>.

(a)  As promptly as practicable, and in no event later than 30 days after the Closing Date, Transferee (with the reasonable cooperation and assistance of Transferor, at Transferee's sole cost and expense) shall submit Transfer Applications to all applicable Governmental Bodies necessary to facilitate the Transfer Approvals for the Permits, including, if applicable, a request for advance approval of the transfer of the Permits, except for any Transfer Application which may not be filed until Transferee can demonstrate ownership and control of the Purchased Real Property, which shall be properly filed promptly after the Purchased Real Property is transferred in accordance with the Purchase Agreement.

(b)  Transferee shall be responsible (with the reasonable cooperation and assistance of Transferor, at Transferee's sole cost and expense) for preparing and assembling drafts of all Transfer Applications and other documentation to be submitted to the applicable Governmental Bodies in connection with the approval of the Transfer Applications for the Permits (the "***Permit Application Approvals***") or the Transfer Approvals, responding to data or information requests received from such Governmental Bodies in connection therewith, providing any necessary information, facilitating any required consents or approval, and otherwise securing the Permit Application Approvals and the Transfer Approvals.  Any and all costs and expenses in connection with obtaining the Permit Application Approvals and the Transfer Approvals and designating Transferee as an operator under the Permits, if required, including any and all necessary filing fees for the Transfer Applications, costs of advertising the filing of the Transfer Applications and costs and expenses payable to any Governmental Body in connection with the Transfer Applications, shall be borne by Transferee.

(c)  Following the submission of the Transfer Applications, Transferee agrees to diligently prosecute the Transfer Application process contemplated hereby to obtain the Permit Application Approvals and the Transfer Approvals, and Transferor agrees to promptly review and/or provide any documents required of Transferor to facilitate such process.  Without obtaining the prior written approval of Transferor (which consent shall not be unreasonably withheld, conditioned or delayed), Transferee agrees that it shall not seek in any of the Transfer Applications to change any condition of mining or reclamation obligation established in the Permits (other than the identity of the operator) or delete or add property to the Permits, if the effect of such request or modification thereto would delay or otherwise hinder obtaining prompt approval of the Transfer Applications or the release of any Bonds (as defined below) or other security, if any, of Transferor or its Affiliates, except, in each case, (i) for actions ordered by an applicable Governmental Body, (ii) as required to abate or resolve any notice of non-compliance, (iii) as required in connection with any mid-term review or renewal of any such Permits, (iv) as required in connection with any pending actions, or (v) as

required in connection with similar permitting developments.  Transferee and Transferor agree to sign all documents reasonably required by any Governmental Body in connection with the Permit Application Approvals or the Transfer Approvals.  In the event of the denial of any Permit Application Approval or Transfer Approval by the appropriate Governmental Body, Transferee shall, at Transferee's sole cost and expense, until such denial is reversed, use commercially reasonable efforts to diligently pursue and exhaust all administrative and judicial remedies afforded to Transferee in the event of such denial.

(d)     So long as Transferee is in compliance in all material respects with its obligations under this Permit Agreement and the Purchase Agreement, Transferor shall take commercially reasonable action (including, without limitation, filing and diligently prosecuting any permit renewals), at Transferee's sole cost and expense, to maintain each Permit in full force and effect until the Transfer Approval is obtained with respect thereto, provided that, if any such action will or may subject Transferor to any material cost, expense or liability, Transferor may refrain from taking such action until and unless it receives reasonably adequate assurance that Transferee is capable of indemnifying, reimbursing, holding harmless or otherwise making whole Transferor for any and all costs, expenses and liabilities that may result or arise from such action.

3.     <u>Transfer of Operatorship</u>.

(a)     At Closing, Transferee will submit all documentation necessary to designate Transferee, its Affiliates or designees as an "operator" on each of the Permits.  During the Interim Period, subject to first obtaining any required administrative consent or approval and complying with any other requirement of any Governmental Body  (including, if applicable, filing a request for advance approval of the transfer of the Permits), Transferor, to the extent Transferor has a legal right to do so, designates Transferee and its Affiliates as an operator under, and grants to Transferee and its Affiliates the right to immediately engage in mining operations and all other legally permissible activities on the premises permitted under, the Permits, subject to the terms and conditions of this Permit Agreement, each applicable Lease that is a Purchased Contract and the Permits.  With respect to such mining operations and other legally permissible activities conducted by Transferee during the Interim Period, Transferee shall operate solely as an independent contractor and not as an agent, employee, or servant of Transferor.  Except as otherwise provided in this Permit Agreement, (i) all of Transferee's post-Closing operations pursuant to this subsection shall be at the sole cost, risk, liability and expense of Transferee and (ii) any benefit gained from such post-Closing operations by Transferee pursuant to this subsection shall likewise be for the sole account and benefit of Transferee.

(b)     Unless completed prior to Closing or otherwise agreed upon, in writing, by the parties hereto, within the time period set forth in Section 2(a) to submit Transfer Applications for the Permits, (i) Transferee and Transferor shall execute and deliver to Transferee all necessary applications and such other forms as may be required

by applicable Governmental Bodies in connection with obtaining the Permit Application Approvals or the Transfer Approvals, (ii) to the extent required by applicable Law, Transferee and Transferor shall use commercially reasonable efforts to obtain the signatures of all contract miners used by Transferor on the properties covered by the Permits, (iii) to the extent required by applicable Law, Transferor and Transferee shall use commercially reasonable efforts to designate Transferee or its Affiliates as an "operator" under the Permits, and (iv) Transferee and Transferor shall use commercially reasonable efforts to obtain a fully executed consent from each Person that has granted a dwelling distance waiver with respect to the Permits, to the extent required by applicable Law.

4.      Operation on Permits.  Except for the Transferor's Obligations (as defined below), upon execution of this Permit Agreement, all liabilities, conditions, obligations, responsibilities and other matters pertaining to the Permits shall be the responsibility of Transferee.  It is expressly acknowledged and agreed by the parties that Transferee is desirous of immediately commencing and continuing mining and reclamation operations upon the property covered by the Permits.  In recognition thereof, it is expressly agreed by Transferor that Transferee shall have the right to commence and continue, immediately upon the execution of this Permit Agreement, mining, reclamation and related activities under the terms and conditions of the existing Permits as a designated operator for Transferor upon the property covered by the Permits, with indemnification of Transferor by Transferee during the Interim Period as set forth herein.  For purposes of this Permit Agreement, "***Transferor's Obligations***" means all liabilities and obligations of Transferor expressly set forth in this Permit Agreement or the Purchase Agreement. The Transferor's Obligations, to the extent not fully completed and satisfied, shall survive the termination of this Permit Agreement.

5.      Right of Entry.  In addition to any and all rights of access granted to Transferee under the Purchase Agreement, Transferor does hereby grant to Transferee a right of entry on, over and across the property covered by the Permits, together with the right of ingress, egress and regress to and from such property (to the extent of Transferor's authority to do so without the resulting breach of the instruments by which Transferor has rights in the property), as required by Law or necessary to maintain and comply with the terms of the applicable Leases that are Purchased Contracts and the Permits, exercise its rights and perform its obligations under the Purchase Agreement, this Permit Agreement and the other documents executed pursuant to the Purchase Agreement, and to perform reclamation obligations related to the Permits.  Transferee, to the extent necessary, grants to Transferor, its successors, assigns and contractors, right of entry to the property covered by the Permits, together with the right of ingress, egress and regress to and from such property (to the extent of Transferee's authority to do so without the resulting breach of the instruments by which Transferee has rights in the property):  (a) as may be necessary to segregate and remove the Excluded Assets; (b) as may be necessary for the transfer of the Permits and the release of the Bonds related thereto; (c) to complete any of the Transferor's Obligations; and (d) to review records relating to the Permits and for any other lawful purpose reasonably necessary to exercise its rights under the Purchase Agreement or this Permit Agreement, including correcting, as permitted pursuant to the terms of the Purchase Agreement or this Permit Agreement, any violations of any applicable Laws pertaining to the premises subject to the Permits that have not been, and are not being, timely corrected by Transferee, in each case for the foregoing clauses (a) through (d), subject to the terms, conditions, limitations and restrictions set forth in this

Permit Agreement and the Purchase Agreement.  The immediately preceding sentence shall survive the term and termination of this Permit Agreement.

6.    <u>Certain Obligations.</u>

(a)    <u>Transferee's Obligations</u>.  Upon the date hereof, except to the extent the liability, performance or other matters constitute the Transferor's Obligations or are matters for which Transferee is entitled to be indemnified by Transferor under the Purchase Agreement, Transferee shall (i) be responsible  and liable for, and shall timely perform, all liabilities and obligations of Transferee expressly set forth in this Permit Agreement or the Purchase Agreement and any and all monitoring, sampling, reporting, maintenance, reclamation and remedial obligations and liabilities under the Permits and for timely compliance with the terms and conditions of the Permits, and (ii) have the duty at its sole cost and expense to timely defend and abate any non-compliance issued on the Permits, whether arising before, on or after the date hereof, to pay all fines and assessments related thereto, to correct all such non-compliances, and to perform all abatement measures required by the applicable Governmental Bodies, except that Transferee shall not be responsible for any of the foregoing to the extent they constitute Excluded Liabilities (as defined in the Purchase Agreement) or that are not Assumed Liabilities (as defined in the Purchase Agreement) for which Transferor shall indemnify Transferee as contemplated in Section 9(b).  In the event that either Transferor or Transferee receives written notice of any non-compliance with the Permits or applicable safety or environmental Laws, including but not limited to Mine Safety and Health Administration ("*MSHA*") violations or Imminent Danger Orders issued under Section 107(a) of the Federal Mine Safety and Health Act of 1977 (the "*Mine Act*"), a written notice from MSHA that a mine covered by a Permit has a pattern of violations of mandatory health or safety standards of such nature as could have significant and substantial contribution to the cause and effect of mine health or safety hazards under Section 104(e) of the Mine Act, Office of Surface Mining ("*OSM*") citations, or a written notice of Reportable Incidents (as defined in the Mine Act), then it shall give written notice of the non-compliance to the other party promptly, and in any event within 2 Business Days (or in the case of receipt of a cessation order, immediately), of receipt of such notice.  If Transferee fails to timely defend any non-compliance that it is required to defend pursuant to this Section 6(a) or does not promptly and in good faith take any and all actions necessary to abate such non-compliance, then Transferor shall have the right (but not the obligation), itself or through its contractors, to defend and/or abate said non-compliance and to freely and without unreasonable interference from Transferee enter upon the property covered by the Permits to do all things that Transferor deems necessary to abate any such non-compliance, and Transferee shall reimburse Transferor for all costs and expenses associated with such defense and/or abatement, including the work required to abate any such non-compliance and any and all reasonable attorneys' or other professionals' fees that are incurred by Transferor relating thereto.  Transferor shall provide copies of all inspection sheets received from the KDNR or other applicable Governmental Body in respect of the

Permits or applicable safety or environmental Laws to Transferee within five (5) Business Days of receipt of such sheets.

(b)     <u>Transferor's Obligations.</u>     Transferor shall timely perform the Transferor's Obligations, and shall timely cure any non-compliance arising thereunder or associated therewith. If Transferor fails to defend any such non-compliance and does not promptly and in good faith take any and all commercially reasonable actions necessary to abate such non-compliance, then Transferee shall have the right (but not the obligation), itself or through its contractors, to defend and/or abate said non-compliance and to freely and without unreasonable interference from Transferor do all things that it deems necessary to abate such non-compliance, and Transferor shall reimburse Transferee for all reasonable costs and expenses associated with such defense and/or abatement, including the work required to abate any such non-compliance and any and all reasonable attorneys' or other professionals' fees that are incurred by Transferee relating thereto.

7.     <u>Replacement Bonds</u>. Simultaneously with the filing of the Transfer Applications in accordance with the terms of this Permit Agreement, Transferee shall, or shall cause its Affiliate to, post all bonds (or other appropriate collateral of a type satisfactory to the appropriate Governmental Bodies) necessary to obtain the applicable Transfer Approval and cause a full and complete release of the Bonds once the applicable Transfer Approval is obtained. Transferee is solely responsible for the maintenance of the bonds it posts with respect to the Permits, including the costs and expenses thereof. The obligations contemplated hereunder shall be on a Permit-by-Permit basis and in no event shall performance be delayed until all Transfer Applications are complete and/or all Permit Application Approvals have been obtained. Transferee shall take all commercially reasonable steps necessary to ensure that all Bonds and any cash bonds or letters of credit posted by Transferor or its Affiliates directly with the applicable Governmental Body in connection with a Permit shall be refunded in full and/or returned to Transferor and/or its Affiliates or Transferee, as provided in the Purchase Agreement, as soon as reasonably practicable after the Transfer Approval is obtained.

8.     <u>Bond Maintenance</u>. Transferor and its Affiliates shall leave in place the bonds of Transferor posted with respect to each of the Permits (collectively, the "***Bonds***") until such Bonds are released by the applicable Governmental Body following the applicable Transfer Approval and shall cause the security, if any, they have posted for the Bonds to remain in place during the Interim Period; *provided however,* that Transferee shall be solely responsible for all costs associated with the Bonds from and after the Closing Date and Transferee agrees to reimburse Transferor, or upon request from Transferor to pay as and when due directly on behalf of Transferor to the appropriate third party, any amounts payable related to or arising from any Bond during the period from the Closing Date until such Bond is released. For the avoidance of doubt, Transferee shall be solely responsible for the obligation to replace the applicable Bonds notwithstanding any provision of this Section 8 to the contrary.

9.     <u>Indemnifications.</u>

(a)     <u>Indemnification by Transferee.</u>     Transferee shall indemnify, defend, and save harmless, Transferor, its Affiliates and their respective members, managers,

officers, directors, stockholders, employees, agents, representatives, successors and assigns from and against any and all Liabilities in any way arising out of, resulting from Transferee's conduct after Closing in connection with (i) the Permits; (ii) the performance of the operations of Transferee on the property covered by the Permits; (iii) the use by Transferee of the property covered by the Permits; (iv) forfeiture of the Bonds after Closing; or (v) Transferee's obligations under this Permit Agreement or the Purchase Agreement, in each case, other than those Liabilities solely to the extent arising out of, resulting from or in connection with the Transferor's Obligations.

(b)    <u>Indemnification by Transferor.</u>    Transferor shall indemnify, defend, and save harmless Transferee, its Affiliates and their respective members, managers, officers, directors, stockholders, employees, agents, representatives, successors and assigns from and against any and all Liabilities in any way arising out of, resulting from or in connection with the Transferor's Obligations (other than those Liabilities solely to the extent arising out of, resulting from or in connection with the obligations of Transferee under this Permit Agreement or the Purchase Agreement).

(c)    <u>Survival.</u>    The indemnification obligations in this Permit Agreement shall survive the term and termination of this Permit Agreement.

10.    <u>Insurance</u>.    At all times during the term of this Permit Agreement, Transferee shall, at its sole cost and expense, provide and maintain insurance covering Transferee's operations and assets and any and all liabilities relating thereto of the type and in the amounts set out in *Exhibit B* attached hereto and incorporated herein by reference and shall comply with the terms and conditions set forth on such exhibit. Prior to its entry onto the Purchased Real Property, Transferee shall provide Transferor with certificates of insurance that indicate that Transferee has the required insurance. The insurance limits and coverages specified in the attached *Exhibit B* are minimum requirements and shall not be construed in any way to limit Transferee's liability. Such insurance shall be maintained with one or more reputable insurance companies that customarily insure risks in the coal industry. To the extent permitted under the applicable insurance policies, Transferee shall designate Transferor as an additional insured on all such policies and shall provide Transferor with a certificate of insurance or other proof reasonably satisfactory to Transferor as to such insurance coverage.

11.    <u>Accident Notice</u>.    Transferee shall promptly provide written notice to Transferor of any accidents or occurrences resulting in injuries to persons or property in any way arising out of or related to the operations of Transferee, its Affiliates or their respective agents, representatives or contractors hereunder.

12.    <u>Termination</u>.    Except to the extent otherwise provided herein, this Permit Agreement, and the obligations of the parties hereunder, shall terminate with respect to each Permit upon the parties obtaining all Transfer Approvals and the release of all Bonds with respect to such Permit and shall terminate in its entirety upon the parties obtaining all Transfer Approvals and the release of all Bonds with respect to all Permits.

13.     <u>Applicant Violator System</u>.    Transferee hereby represents and warrants to Transferor that neither Transferee nor any of its Affiliates is permit blocked on the Applicant Violator System by any Governmental Body.   Transferor hereby represents and warrants to Transferee that neither Transferor nor any of its Affiliates is permit blocked on the Applicant Violator System by any Governmental Body.

14.     <u>Right to Injunctive Relief</u>.   Transferee acknowledges and agrees that, in the event of a breach or threatened breach of any of Transferee's obligations regarding operations under the Permits or other obligations under this Permit Agreement, Transferor may suffer irreparable harm for which it would have no adequate remedy at Law and, accordingly, shall be entitled to an injunction or other equitable relief (including a temporary restraining order or preliminary injunction) against such breach or threatened breach. Transferee waives, to the fullest extent permitted by Law, the requirement of the posting of any bond or other security in connection with such injunctive or other equitable relief.

15.     <u>Cooperation</u>.   Transferor and Transferee agree to fully cooperate, and to cause their respective Affiliates to fully cooperate, with each other in all filings and other actions that may be necessary to obtain the Transfer Approvals, including providing any additional information and the preparation and execution of any additional documents; *provided, however*, Transferor shall not be obligated to incur any liability or pay any money to any third party in connection with such cooperation.

16.     <u>Notice</u>. Except as otherwise specified in this Permit Agreement, all notices, requests, demands and other communications under this Permit Agreement shall be in writing and shall be deemed to have been duly given on the date when personally delivered to the party to whom notice is to be given, on the date of transmission if sent by confirmed e-mail, or on the second day after mailing, if mailed to the party to whom notice is to be given, by nationally recognized overnight delivery service and properly addressed as follows:

TO TRANSFEROR:

c/o Cambrian Coal LLC
P.O. Box 2100
Pikeville, KY 41502
Attn: President
Email: mark.campbell@cambriancoal.com

With a copy (which shall not constitute notice) to:

Frost Brown Todd LLC
Lexington Financial Center
250 W. Main Street, Suite 2800
Lexington, KY  40507-1749
Attn:  Jeffrey L. Hallos
Email: jhallos@fbtlaw.com

TO TRANSFEREE:

Richmond Hill Capital Partners, LP and
Essex Equity Joint Investment Vehicle, LLC
c/o Richmond Hill Investment Co., LP
375 Hudson Street, 12th Floor
New York, NY 10014
Attention:  Ryan Taylor
              Jordan Jones
Email:     rtaylor@rhiclp.com
              jjones@medorapartners.com

-and-

Alliance Prime Associates, Inc.
200 Park Avenue, Suite 400
Orange Village, Ohio 44122
Attention:  Joseph E. LoConti
              Michael R. Cavanaugh
              Sean T. O'Brien
Email:     jloconti@yahoo.com
              Seanobrien1414@gmail.com
              michael@tower1partnership.com

With copies (which will not constitute notice) to:

Chapman and Cutler LLP
1270 Avenue of the Americas
New York, NY 10020
Attention: Larry G. Halperin
Email: halperin@chapman.com

-and-

Kaplan Johnson Abate & Bird LLP
710 West Main Street
Louisville, Kentucky 40202
Attention: Brian Meldrum
Email: bmeldrum@kaplanjohnsonlaw.com

Any party may change its contact information for the purposes of this Section by giving the other party hereto written notice of the new address in the manner set forth above.

17.    <u>Miscellaneous</u>.

(a)    <u>Succession; Assignment</u>. This Permit Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Transferee may not assign this Permit Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of Transferor, which consent may be withheld in Transferor's sole and absolute discretion.

(b)    <u>Counterparts</u>. This Permit Agreement may be executed in counterparts (including via facsimile and e-mail), each of which shall be deemed an original, but all of which together shall constitute one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto.  The executed Permit Agreement together with any attachments hereto may be photocopied and stored on computer tapes, disks and similar electronic storage media ("***Imaged Document***").  If an Imaged Document is introduced as evidence in any judicial, arbitration, mediation or administrative proceeding, neither party shall object to the admissibility of the Imaged Document on the basis that such was not originated or maintained in documentary form under either the hearsay rule, the best evidence rule, or other rule of evidence.

(c)    <u>Waiver</u>.  The failure of either party to seek redress for violation of or to insist upon a strict performance of any term or condition of this Permit Agreement shall not be considered a waiver, nor shall it deprive that party of the right thereafter to insist upon strict adherence to that or any other term of this Permit Agreement.

(d)    <u>Severability</u>.  If any provision of this Permit Agreement or its application will be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of all other applications of that provision, and of all other provisions and applications hereof, will not in any way be affected or impaired.  If any court shall determine that any provision of this Permit Agreement is in any way unenforceable, such provision shall be reduced to whatever extent is necessary to make such provision enforceable.

(e)    <u>Headings</u>.  The headings contained in this Permit Agreement are included for purposes of convenience of reference only and shall not affect the construction or interpretation of any of its provisions.

(f)    <u>Entire Agreement</u>. This Permit Agreement, together with the Purchase Agreement, constitute the entire agreement and understanding of the parties related to the subject matter hereof, and supersede all prior proposals, understandings, agreements, correspondence, arrangements and contemporaneous oral agreements relating to the subject matter of this Permit Agreement.  In the event of a conflict between the provisions of this Permit Agreement and the Purchase Agreement, the provisions of this Permit Agreement shall control.  This Permit Agreement shall

not be amended or modified, and no waiver of any provision hereof shall be effective, unless set forth in a written instrument authorized and executed by all the parties hereto.

(g)    Waiver of Right to Trial by Jury.    **EACH OF TRANSFEROR AND TRANSFEREE WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS PERMIT AGREEMENT OR ANY PROVISION HEREOF.**

(h)    Governing Law.    This Permit Agreement will be governed by and construed in accordance with federal bankruptcy Law, to the extent applicable, other federal Law, where applicable, and, where state Law is implicated, the Laws of the Commonwealth of Kentucky without regard to or application of conflict of Laws principles.

(i)    Submission to Jurisdiction; Consent to Service of Process.    Without limiting any right of Transferor or Transferee to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Permit Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Permit Agreement or any breach or default hereunder, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and Transferor and Transferee hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 16 hereof; *provided, however,* that if any Bankruptcy Case has been closed pursuant to Section 350 of the Bankruptcy Code, Transferor and Transferee agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, in the event (but only in the event) that such court does not have subject matter jurisdiction over such legal proceeding, in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any such claim or dispute.    Transferor and Transferee hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.    Each of Transferor and Transferee agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.    Each of Transferor and Transferee hereby consents to process being served by any other party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 16; provided, however, that such service will not be effective until the actual receipt thereof by the party being served.

*[**Signature Page Follows**]*

IN WITNESS WHEREOF, the undersigned have executed or caused this Permit Agreement to be executed by their respective officers thereunto duly authorized, each with the intent to be legally bound, as of the date first written above.

Transferor:

[_____]

By: _____
Name: _____
Title: _____


[_____]

By: _____
Name: _____
Title: _____


Transferee:

[_____]

By: _____
Name:
Title:


SIGNATURE PAGE TO PERMIT OPERATING AGREEMENT

**EXHIBIT A**

**PERMITS**

## EXHIBIT B

## MINIMUM INSURANCE REQUIREMENTS

| Type of Insurance Coverage | Minimum Limits of Liability | Minimum Scope of Coverage |
|---|---|---|
| Workers' Compensation Insurance | statutory amount | • as required by applicable Law<br>• coverage shall extend to primary state of employment<br>• coverage shall extend to "leased workers"/borrowed servants, to the extent any such persons are used |
| Employer's Liability Insurance | $1,000,000 for each accident | • bodily injury by accident or disease, including death, arising out of and in the course of employment<br>• coverage shall extend to "leased workers"/borrowed servants, to the extent any such persons are used |
| Commercial General Liability Insurance | $1,000,000 for each occurrence and $2,000,000 aggregate for death, bodily injury, and property damage | • premises/operations<br>• independent contractors and subcontractors<br>• personal and advertising injury<br>• products/completed operations<br>• blanket contractual liability – written and oral<br>• explosion, collapse, subsidence, and underground coverage |
| Commercial Automobile Liability Insurance | $1,000,000 for each accident for death, bodily injury, and property damage | • owned vehicles<br>• non-owned vehicles<br>• hired vehicles<br>• leased vehicles |
| Excess or Umbrella Liability | $5,000,000 for each occurrence | • the minimum scope of coverage shall be as broad as the underlying insurance policies, and, irrespective of underlying insurance coverage, shall include (a) employer's liability, (b) commercial general liability, including contractual liability, and (c) commercial automobile liability<br>• no "laser exclusions" related to activities during the Interim Period shall be included in the policy (*i.e.*, special exclusions that specifically name certain activities, products, services, or work as not being insured under the policy) |

### Terms and Conditions

1. All insurance required by this Permit Agreement is to be occurrence based.

2. All insurance required by this Permit Agreement shall include endorsements signed by the applicable insurance carrier(s) that name Transferor and its parents, subsidiaries, affiliates, successors, and assigns, and all of their current and former directors, officers, employees, shareholders, members, partners, agents, and representatives, (collectively, the "Additional Insureds," and individually, an "Additional Insured") as additional insured with respect to liability arising out of the activities performed by or on behalf of Transferee and allow an Additional Insured to be a permissible claimant thereunder; provided, however, such a

EXHIBIT TO PERMIT OPERATING AGREEMENT

requirement shall not apply to the workers' compensation insurance required by this Permit Agreement.

3. All insurance required by this Permit Agreement shall be primary and not contributory as to any other insurance and self-insurance that an Additional Insured may have in effect.

4. All insurance required by this Permit Agreement shall (a) waive any rights of subrogation against the Additional Insureds, and (b) have adequate territorial and navigation limits for each applicable state wherein Transferee's operations are located.

5. All insurance required by this Permit Agreement shall (a) be with insurers authorized to conduct insurance business in each state in which insured entities, assets, operations or liabilities are located, (b) be placed with insurers that have a current A.M. Best's rating of no less than A-VII, and (c) include endorsements so as to provide to Transferor no less than thirty (30) calendar days' notice of suspension or termination of coverage or any material change in coverage.

6. All deductibles or self-insured retentions are the sole responsibility of Transferee to pay.

7. Transferee shall not enter onto the Purchased Real Property until all insurance set forth in this Permit Agreement is in place. Transferee shall provide to Transferor certificates of insurance and endorsements signed by an authorized representative of the insurer evidencing that the minimum insurance coverage set forth in this Permit Agreement is in full force and effect, including disclosing any deductibles or self-insured retentions. If policies for which certificates have previously been furnished to Transferor expire during the course of this Permit Agreement, certificates evidencing the renewals of such policies shall immediately be provided to Transferor.

8. Failure on the part of Transferee to maintain the required insurance shall constitute a material breach of this Permit Agreement, which shall give Transferor the right to terminate this Permit Agreement immediately upon notice.

9. All insurance obligations of Transferee are in addition to Transferee's obligations of indemnity and shall not be construed as limiting Transferee's indemnity obligations to the amount of the insurance coverage.

10. The insurance coverage obligations set forth in this Exhibit are minimum coverage requirements only. To the extent Transferee maintains insurance coverage greater than these minimum requirements, such greater insurance coverage shall be applicable to any activities conducted during the Interim Period and to any liabilities and obligations of Transferee under this Permit Agreement. In addition, with respect to those forms of coverage where additional insured status is required by this Permit Agreement, the Additional Insureds shall be entitled to the benefit of the full available limits of liability maintained by Transferee, regardless of the limits of liability set forth in any certificate of insurance issued to the Additional Insureds and regardless of whether such coverage is primary, excess, contingent, or otherwise. By specifying minimum insurance requirements, Transferor does not assert or recommend this insurance as being adequate for any activities conducted during the Interim Period, and Transferee remains solely responsible to inform itself of the types and amounts of insurance coverage that may be appropriate.

11. Transferee shall ensure that all of its contractors performing activities on the property covered by the Permits shall maintain customary insurance in accordance with Transferee's standard contractor insurance requirements. Transferee's insurance will respond to any deficiency in coverage between the minimum insurance coverage set forth in this Permit Agreement and the insurance maintained by Transferee's contractors.

[Other Schedules to be Completed Prior to Closing]

# **<u>EXHIBIT B</u>**

**AMENDED AND RESTATED
GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT
AND BILL OF SALE**

This **AMENDED AND RESTATED GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT AND BILL OF SALE** (this "**Agreement**"), dated as of September 23, 2019 (the "**Effective Date**"), is made and entered into by and among Premier Elkhorn Coal LLC, Cambrian Coal LLC, Pike-Letcher Land LLC, S.T. & T. Leasing, Inc., C.W. Augering, Inc. and T.C. Leasing, Inc. (collectively, "**Sellers**"), and Pristine Clean Energy LLC ("**Buyer**").

In consideration of the mutual representations, warranties, covenants and agreements contained herein, the parties hereto agree as follows:

1.      This Agreement is subject in all respects to approval by the United States Bankruptcy Court for the Eastern District of Kentucky (the "**Bankruptcy Court**") in the chapter 11 bankruptcy cases of the Sellers, Case No. 19-51200(GRS) (Jointly Administered) (the "**Bankruptcy Cases**") by entry of an order in form and substance acceptable to Sellers and Buyer (the "**Sale Order**").

2.      Sellers do hereby sell, transfer, assign, convey and deliver to Buyer, effective as of the Closing, all of the right, title and interest of Sellers in, to and under the Purchased Assets described on Exhibit A, free and clear of all (i) liens, claims, interests and encumbrances, to the fullest extent permitted by the Bankruptcy Code and by the order of the Bankruptcy Court authorizing and approving the transactions described in this Agreement ("**Liens**") (other than those Liens created by Buyer and Liens specifically permitted by the Sale Order) and (ii) Excluded Liabilities described on Exhibit B, and Buyer hereby accepts the sale, transfer, assignment, conveyance and delivery of Sellers' right, title and interest in all such Purchased Assets. This Agreement does not sell, transfer, assign, convey or deliver to Buyer any right, title or interest in, to or under the Excluded Assets described on Exhibit C.

3.      Buyer does hereby assume from Sellers and agrees to timely pay, perform and discharge in accordance with their respective terms, the Assumed Liabilities described on Exhibit D. Nothing in this Agreement shall be construed as the assumption by Buyer of any Excluded Liabilities.

4.      Each Seller does hereby sell, transfer, assign, convey, and deliver to Buyer, effective as of the Closing, all of the right, title and interest of such Seller in, to and under the Assumed Leases described on Exhibit E to which such Seller is a party, free and clear of all Liens (other than those Liens created by Buyer and Liens specifically permitted by the Sale Order) and Excluded Liabilities, and Buyer hereby accepts such assignment, and Buyer does hereby assume and agree to pay, perform and discharge, as and when due, all of the duties and obligations of Sellers under all such Assumed Leases arising from and after the Closing Date, except to the extent such duties and obligations constitute Excluded Liabilities.

5.      At Closing, each Seller shall sell, transfer, assign, convey and deliver to Buyer all of the right, title and interest of such Seller in, to and under the Assumed Purchased Contracts described on Exhibit F to which such Seller is a party, free and clear of all Liens (other than those Liens created by Buyer and Liens specifically permitted by the Sale Order) and Excluded Liabilities, and Buyer shall accept such assignment and assume and agree to pay, perform and discharge, as and when due, subject to the payment of all applicable cure costs by the Buyer, all of the duties and obligations of Sellers under all such Assumed Purchased Contracts arising from and after the Closing Date, except to the extent such duties and obligations constitute Excluded Liabilities, and Sellers are hereby relieved of any and all obligations and liabilities under the Assumed Purchased Contracts. Notwithstanding anything herein to the contrary, Buyer shall have the right in its sole and absolute discretion to amend Exhibit F prior to the Sale Hearing to add or remove any contract thereto or therefrom by providing written notice thereof to Sellers whereupon (i) any contract so added shall be an Assumed Purchased Contract and any contract so removed shall not be an Assumed Purchased Contract, and (ii) Exhibit F shall be deemed to be amended to add or remove such contract.  For purposes of this Agreement, "**Sale Hearing**" means that hearing held by the Bankruptcy Court to consider the approval of this Agreement and the entry of the Sale Order.

6.      Sellers hereby agree to sell, transfer, assign, convey and deliver to Buyer, at the Closing, all of the right, title and interest of Sellers in and to the Owned Real Property described on Exhibit G, free and clear of all Liens (other than those Liens created by Buyer and Liens specifically permitted by the Sale Order) and Excluded Liabilities, pursuant to special warranty or limited warranty deeds in form and substance reasonably acceptable to Sellers and Buyer, and Buyer hereby agrees to accept such assignment, and Buyer does hereby assume and agree to pay, perform and discharge, as and when due, all of the duties and obligations of Sellers relating to such Owned Real Property arising from and after the Closing Date, except to the extent such duties and obligations constitute Excluded Liabilities.

7.      Each Seller does hereby sell, transfer, assign, convey, and deliver to Buyer, effective as of the Closing, all of the right, title and interest of such Seller in and to the intercompany receivables solely related to the Premier Elkhorn Operations; provided, however, that Buyer shall not, and shall not permit, engage, hire or otherwise authorize any other person to, collect, pursue collection of or otherwise enforce (or attempt to enforce) any rights with respect to any such intercompany receivables.

8.      Buyer will, or will cause its affiliates to, offer employment to as many of the employees of the Premier Elkhorn Operations that it deems necessary (the "**Employees**") to be effective as of the Closing.  Buyer shall hire, or cause its affiliates to hire, all such Employees who accept such offers.  Those Employees that accept the offer of employment from Buyer or its affiliate shall be terminated by Sellers and their affiliates, as applicable, effective upon the Closing and shall become employed by Buyer or its affiliate, as applicable, effective upon the Closing.

9.      In consideration for the Purchased Assets, Buyer will: (i) assume the Assumed Liabilities (including the payment of all cure costs described on Exhibit D or as otherwise ordered

by the Bankruptcy Court) and (ii) pay Sellers the amount of $1.00 in immediately available funds.

10. Each Seller is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of formation and, subject to any limitations that may be imposed on such Seller resulting from or relating to the Bankruptcy Cases (as defined herein), has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

11. Subject to entry of the Sale Order, Sellers own or have a valid leasehold interest in the Purchased Assets and, as of the Closing Date, Buyer will be vested with good, marketable, and valid title to the Purchased Assets, free and clear of all Liens (other than those Liens created by Buyer and Liens specifically permitted by the Sale Order) and Excluded Liabilities, to the fullest extent permissible under law, including Sections 105, 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

12. The Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transaction contemplated under this Agreement. Any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes; provided, however, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Fayette Circuit Court (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such proceeding in the United States District Court for the Eastern District of Kentucky) and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

13. In the event that, within 90 days following the Closing Date, it is discovered and demonstrated to the satisfaction of the Buyer that certain assets, properties or rights, including fractional real property interests, owned, leased or subleased were conveyed to Buyer by Sellers in error, then Buyer shall use its commercially reasonable efforts to assign, convey, lease or sublease, as applicable, such assets, properties, or rights to Sellers (or their designee), in each case upon the reasonable request of Sellers (or their designee). In the event that, within 90 days following the Closing Date, it is discovered and demonstrated to the satisfaction of the Sellers that certain assets, properties or rights, including fractional real property interests, owned, leased or subleased erroneously were not conveyed to Buyer by Sellers, then Sellers shall use their commercially reasonable efforts to assign, convey, lease or sublease, as applicable, such assets, properties, or rights

to Buyer (or its designee), in each case upon the reasonable request of Buyer (or its designee).

14.    Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

15.    This Agreement represents the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof, including that certain General Assumption and Assignment Agreement and Bill of Sale, dated September 22, 2019 among Buyer and Sellers. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. All Exhibits attached to this Agreement are hereby incorporated herein by reference.

16.    This Agreement will be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and, where state law is implicated, the laws of the Commonwealth of Kentucky applicable to contracts made and performed in such State.

17.    This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

18.    Each party hereto agrees, upon the reasonable request of any other party hereto (and at such other party's expense), to make, execute and deliver any and all documents or instruments of any kind or character, and to perform all such other actions, that may be reasonably necessary or proper to effectuate, confirm, perform or carry out the terms or provisions of this Agreement.

19.    This Agreement may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by the parties hereto and approval of the Bankruptcy Court. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

20.    The parties hereto acknowledge that, in connection with this Agreement, Buyer is entering into a 2% overriding royalty arrangement with Richmond Hill Capital Partners, LP, Essex Equity Joint Investment Vehicle, LLC, and Alliance Prime Associates, Inc. on the owned mineral interests that constitute Purchased Assets.

21.    Following the Closing, Buyer shall deliver all coal shipments required by that certain Firm Pricing Agreement and Binding Term Sheet with ArcelorMittal Dofasco G.P. having an effective date of January 1, 2019, for which a "Provisional Payment" has been made on or before the Closing Date under that certain Prepayment Agreement entered into on the 25th day of March 2019 between Carbon Partners, Inc. and Premier Elkhorn Coal LLC.  On the Closing Date, a third party will survey the coal inventory at Sellers' Premier Elkhorn operation.   If the coal inventory is insufficient to satisfy the coal shipments described above, then Sellers shall cause their affiliates to satisfy the deficit by

shipping inventory of an equivalent value from the excluded (Clintwood Elkhorn) facility to the Premier Elkhorn facility.  Any payments received under the Prepayment Agreement following the Closing Date shall be paid to Buyer.

22.     The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in this Agreement (the "**Closing**") will take place remotely by the electronic exchange of documents and signatures in PDF format at 10:00 a.m. (Eastern time) on the date that is no more than one business day following the satisfaction or waiver of the conditions set forth in this Section (other than conditions that by their nature are to be first satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the parties hereto may designate in writing.  The date on which the Closing is held is referred to in this Agreement as the "**Closing Date**."  For all accounting, liability assumption and similar purposes hereunder, the Closing shall be deemed to have occurred at 12:01 a.m. (Eastern time) on the Closing Date.  The respective obligations of Buyer and Sellers to consummate the transactions contemplated by this Agreement are subject to the Bankruptcy Court having entered the Sale Order.  The obligation of Sellers to consummate the transactions contemplated by this Agreement are subject to Sellers receiving evidence satisfactory to Sellers, in Sellers' reasonable discretion, that Buyer has a commitment from a reputable surety bond company to post all bonding required with respect to the Transferred Permits and, if applicable, any Assumed Leases or Assumed Purchased Contracts.

23.     This Agreement may be terminated prior to the Closing by Buyer or Sellers, if the Closing has not occurred by 5:00 p.m. Eastern time on September 27, 2019 (or such later date as has been mutually agreed in writing by the Sellers and Buyer).

24.     Buyer has deposited $250,000 into an escrow account established by Sellers, as a good faith deposit (the "**Deposit Amount**"), which amount will be forfeited by Buyer if this Agreement is terminated by the Sellers due to Buyer's material breach of any provision hereof.  The Deposit Amount will be deemed compensation and consideration for entering into this Agreement and will be deemed liquidated damages and, notwithstanding anything to the contrary set forth herein, such Deposit Amount will be the sole and exclusive remedy of Sellers in the event that this Agreement is (or at any time could have been) terminated by the Sellers due to Buyer's material breach of any provision hereof.  If this Agreement is terminated for any reason other than by Sellers due to Buyer's material breach of any provision hereof, the Deposit Amount will be returned to Buyer pursuant to the bidding procedures in the Bankruptcy Cases.  At the Closing, the Deposit Amount will be applied toward payment of cure costs.

25.     WITH RESPECT TO ALL MATTERS SOLD, ASSIGNED, TRANSFERRED AND CONVEYED PURSUANT HERETO, SUCH MATTERS ARE HEREBY SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO BUYER ON AN "AS IS", "WHERE IS", "WITH ALL FAULTS" BASIS, WITHOUT ANY REPRESENTATION, WARRANTY, GUARANTY, PROMISE, PROJECTION OR PREDICTION WHATSOEVER WITH RESPECT TO SUCH MATTERS, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW OR

UNDER THE UNIFORM COMMERCIAL CODE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

Sellers:

**PREMIER ELKHORN COAL LLC,**
**CAMBRIAN COAL LLC,**
**PIKE-LETCHER LAND LLC,**
**T.C. LEASING, INC.,**
**C.W. AUGERING, INC.,**
**S.T. & T. LEASING, INC.**

By:_____
Name: _____
Title: _____

BUYER:

**PRISTINE CLEAN ENERGY LLC**

By: _____

Name: _____

Title: _____

## EXHIBIT A

### Purchased Assets

For purposes of this Agreement, "Premier Elkhorn Operations" means the coal operations operated by the Sellers associated with Premier Elkhorn, the Bevins Branch surface mine and the Renaissance underground mine.

The Purchased Assets are (i) all leases, interests in real property (including all real property interests (surface and mineral) in Pike-Letcher Land LLC that are associated with the Premier Elkhorn Operations), contracts, governmental permits and/or authorizations (including the Transferred Permits listed below), improvements, equipment, parts and inventory, coal inventory, maps, records and employee information (to the extent permitted by law) which are (a) necessary and desirable for the operation of the Premier Elkhorn Operations as such operations would be operated by an experienced and prudent operator, and (b) owned or leased by Sellers with respect to the Premier Elkhorn Operations, (ii) two Superior Highwall Miners owned by C.W. Augering, Inc., (iii) six 18-wheel coal trucks owned by S.T. & T. Leasing, Inc., (iv) one EX2500 Hitachi excavator located at Pond Knob, (v) one L1150 LeTourneau end loader, and (vi) all of Sellers' right, title and interest in and to all underground equipment used in connection with the Renaissance Mine. The Purchased Assets also include any real property, improvements, leases, equipment, parts and inventory and coal inventory located within the Premier Elkhorn Operations whether or not contained within, on, or under the permits listed below.

Transferred Permits:

Premier Elkhorn Coal LLC:

| DNR PERMIT | LOCATION | MINE TYPE | STATUS | DNR EXPIR. | BOND | KPDES |
|---|---|---|---|---|---|---|
| 867-0529 | Job 40 - Shea Fork – Bucklick | Surf, Undg | A1 | 1/23/2020 | $629,500 | KYGE40077 |
| 867-0530 | Job 35 - Joes Branch | Surf, Undg | A2 | 4/23/2018 | $150,600 | KYGE40165 |
| 867-5335 | Clark Mining - Cane Branch | Surf, Undg | O2 | 1/22/2022 | $557,500 | KYGE40100 |
| 867-5336 | Job 31 – Dunham | Surf, Undg | O2 | 8/4/2020 | $251,700 | KYGE40034 |
| 898-0967 | Job 49 | Surf, Undg | A1 | 12/12/2021 | $8,059,500 | KYGE40650 |
| 898-0968 | Job 40 - Shea Fork – Bucklick | Surf, Undg | D6 | 3/31/2018 | $3,253,900 | KYGE40399 |
| 898-0969 | Job 53 - Adams Branch | Surface | A1 | 1/30/2021 | $1,387,600 | KYGE40195 |
| 898-0970 | Job 45 - Bear Fork | Surf, Undg | A1 | 11/28/2021 | $2,956,130 | KYGE41024 |
| 898-0971 | Job 45 - Petty's Fork | Surface | A1 | 8/11/2019 | $2,408,300 | KYGE40209 |
| 898-0972 | Job 51 | Surface | AP | 12/28/2022 | $3,001,500 | KYGE40017 |
| 898-0973 | Job 49 - Blackburn Branch | Surface | A1 | 5/30/2023 | $1,443,700 | KYGE40121 |
| 898-0974 | Job 57 | Surface | AP | 10/16/2018 | $2,530,037 | KYGE40104 |
| 898-0975 | Job 35 | Surf, Undg | A1 | 2/8/2019 | $464,300 | KYGE40345 |
| 898-0977 | Job 42 - Esco | Surface | P2 | 6/4/2019 | $514,600 | KYGE40133 |
| 898-0978 | Phillips Branch | Surf, Undg | AP | 2/5/2023 | $1,090,200 | KYGE40150 |
| 898-4542 | Penny Road | Underground | O2 | 6/17/2019 | $75,000 | KYGE40795 |
| 898-4543 | Cooke Branch | Underground | A1 | 6/17/2019 | $139,000 | KYGE40018 |
| 898-4544 | Tackett Fork - Pond Treatment | Underground | P1 | 5/3/1999 | $848,500 | KYGE40085 |
| 898-4545 | E3-LF - Shelby Creek | Underground | ND | 3/18/2020 | $79,600 | KYGE40123 |

| 898-4546 | Zebulon | Underground | ND | 9/17/2018 | $75,000 | KYGE40194 |
| 898-4548 | Amburgy - Marshall's Branch | Underground | ND | 3/20/2021 | $196,800 | KYGE40406 |
| 898-4549 | Glamorgan - Long Fork | Underground | A1 | 3/27/2021 | $154,700 | KYGE40135 |
| 898-4554 | Arnold Fork | Underground | P1 | 10/15/2014 | $33,300 | KYGE40016 |
| 898-4555 | Hazard 4 - Tackett Fork | Underground | ND | 10/11/2020 | $75,000 | KYGE40022 |
| 898-4556 | Newsome Branch | Underground | P1 | 10/11/2005 | $617,800 | KYGE40468 |
| 898-4557 | Arnold Fork | Underground | P1 | 1/13/2014 | $38,700 | KYGE40109 |
| 898-4561 | Osborne Branch | Surf, Undg | A1 | 9/28/2018 | $1,221,900 | KYGE40568 |
| 898-4562 | Cheyenne - Andy Wright | Surf, Undg | O2 | 7/26/2018 | $526,400 | KYGE40020 |
| 898-4563 | Wright's Fork | Surf, Undg | A2 | 7/26/2020 | $701,900 | KYGE40206 |
| 898-7111 | Burke Branch Haul Road | Road, Surf | A1 | 1/28/2023 | $260,500 | KYGE40724 |
| 898-7112 | Jenkins to Burke Haul Road | Road | A1 | 1/21/2021 | $230,000 | KYGE40724 |
| 898-8183 | Burke Branch Plant/Tipple | Prep, Surf | A1 | 3/24/2023 | $4,740,900 | KYGE40602 |
| 898-8184 | Esco Loadout | Loadout | A1 | 9/17/2022 | $126,400 | KYGE40217 |
| 898-8185 | Robinson Creek Impoundment | Prep, Surf | A1 | 9/12/2019 | $1,370,700 | KYGE40070 |
| 898-9176 | Burke Branch Impoundment | Refuse | A1 | 8/15/2019 | $4,763,400 | KYGE40724 |

**$44,974,567**

Cambrian Coal LLC:

| DNR PERMIT | LOCATION | MINE TYPE | STATUS | DNR EXPIR. | BOND | KPDES |
|---|---|---|---|---|---|---|
| 898-0618 | Daniels Creek | Surface | A2 | 4/24/2021 | $255,200 | KYGE40951 |
| 898-0619 | Daniels, Biggs | Surface | A2 | 1/22/2009 | $172,200 | KYGE40951 |
| 898-0620 | Bevins Branch - Peytons Creek | Surface | A1 | 4/27/2023 | $2,760,900 | KYGE40624 |
| 898-0670 | Bevins Branch - Wolfpen | Surface | A1 | 3/31/2020 | $445,000 | KYGE40689 |
| 898-0807 | Bevins - Wolfpen and Red Creek | Surface | A1 | 7/3/2023 | $3,870,300 | KYGE40689 |
| 898-0808 | Slones Branch | Surface | A1 | 11/17/2021 | $530,600 | KYGE40521 |
| 898-0819 | Powells Creek Deep Mine | Surf, Undg | AP | 1/5/2020 | $1,191,400 | KYGE40951 |
| 898-0834 | Dry Fork - Red Creek | Surface | A1 | 1/4/2021 | $1,365,200 | KYGE40762 |
| 898-0842 | Bishop Branch | Surface | A1 | 8/10/2020 | $93,900 | KYGE40350 |
| 898-0846 | Coleman Hollow | Surface | AP | 6/7/2022 | $603,000 | KYGE40762 |
| 898-7084 | Bevins Branch Haul Road | Road | A1 | 12/2/2019 | $110,000 | KYGE40689 |

**$11,397,700**

Status:
  AP - Actively Producing
  A1 - Active, Not Producing
  A2 - Reclamation
  D6 - Deferment
  ND - Non-Disturbed
  O2 - Temporary Cessation
  P1 - Phase 1 Bond Release
  P2 - Phase 2 Bond Release

Notes:
  *Permit administratively extended

The permit numbers listed above are permit numbers that are either currently assigned or formerly assigned permit numbers, depending upon current permit transfer status to the Sellers. The permit numbers listed are for reference to a specific mine; Buyer and Sellers agree that the actual permit number may vary due to a portion of the permits being in different phases of transfer at this time. All associated KPDES/NPDES permits and any and all air quality and other associated permits are included herein as Purchased Assets.

Sellers and Buyer agree to promptly execute, and shall thereafter comply with the terms of, the Interim Permit Operating Agreement attached hereto as <u>Exhibit A-1</u> and incorporated herein by reference.

# **EXHIBIT A-1**

## **Interim Permit Operating Agreement**

See attached.

## PERMIT OPERATING AGREEMENT

**THIS PERMIT OPERATING AGREEMENT** ("***Permit Agreement***") is dated _____, 2019, and is made and entered into by and between [_____], a Kentucky _____, and [_____], a Kentucky _____ (collectively "***Transferor***"), and Pristine Clean Energy LLC ("***Transferee***").

## WITNESSETH:

**WHEREAS**, Transferor and Transferee have entered into that certain Amended and Restated General Assignment and Assumption Agreement and Bill of Sale dated September 23, 2019 (the "***Purchase Agreement***") pursuant to which Transferor is to transfer to Transferee the Permits (as defined below); and

**WHEREAS**, Transferor is in possession of, and is designated as "***Permittee***" of, under and pursuant to, those permits set forth on *Exhibit A* issued by the Kentucky Department of Natural Resources (the "***KDNR***") and other applicable governmental bodies (such permits, as amended and revised, together with all other Transferred Permits (as defined in the Purchase Agreement), collectively, the "***Permits***"); and

**WHEREAS**, pursuant to the Purchase Agreement, Transferee is obligated to become the permittee under each of the Permits and to conduct certain operations on the properties and assets being acquired by Transferee pursuant to the Purchase Agreement; and

**WHEREAS**, Transferee has filed or shall file, in accordance with the terms of this Permit Agreement, all necessary applications to transfer the Permits from Transferor to Transferee, to have Transferee designated as an "operator" under the Permits, to, if applicable, obtain "advance approvals" of both the transfer and operator status for the Permits from the KDNR and other governmental bodies, as applicable ("***Transfer Applications***"), and to obtain the approvals of all applicable governmental bodies with respect thereto ("***Transfer Approvals***") all as more particularly set forth herein; and

**WHEREAS**, the parties to the Purchase Agreement desire to close the transactions contemplated by the Purchase Agreement before the Transfer Approvals are obtained, and to have Transferor and Transferee enter into this Permit Agreement to govern the rights, obligations and liabilities of Transferor and Transferee in any way related to the Permits during the period of time beginning on the Closing Date (as defined in the Purchase Agreement) and continuing through the date of receipt of all Transfer Approvals (the "***Interim Period***").

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual covenants and representations contained herein, the reasonableness, adequacy and sufficiency of which are hereby acknowledged, the parties, each intending to be legally bound, hereby agree as follows:

1.      <u>Capitalized Terms</u>.  All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Purchase Agreement.

2.      <u>Transfer Applications</u>.

(a)      As promptly as practicable, and in no event later than thirty (30) days after the Closing Date, Transferee shall submit Transfer Applications to all applicable governmental bodies necessary to facilitate the Transfer Approvals for the Permits, including, if applicable, a request for advance approval of the transfer of the Permits, except for any Transfer Application which may not be filed until Transferee can demonstrate ownership and control of the real property that constitutes part of the Purchased Assets (the "***Purchased Real Property***"), which shall be properly filed promptly after the Purchased Real Property is transferred in accordance with the Purchase Agreement.

(b)      Transferee shall be responsible (with the reasonable cooperation and assistance of Transferor, at Transferee's sole cost and expense) for preparing and assembling drafts of all Transfer Applications and other documentation to be submitted to the applicable governmental bodies in connection with the approval of the Transfer Applications for the Permits (the "***Permit Application Approvals***") or the Transfer Approvals, responding to data or information requests received from such governmental bodies in connection therewith, and otherwise securing the Permit Application Approvals and the Transfer Approvals.  Any and all costs and expenses in connection with obtaining the Permit Application Approvals and the Transfer Approvals and designating Transferee as an operator under the Permits, if required, including any and all necessary filing fees for the Transfer Applications, costs of advertising the filing of the Transfer Applications and costs and expenses payable to any governmental body in connection with the Transfer Applications, shall be borne by Transferee.

(c)      Following the submission of the Transfer Applications, Transferee agrees to diligently prosecute the Transfer Application process contemplated hereby to obtain the Permit Application Approvals and the Transfer Approvals, and Transferor agrees to promptly review and/or provide any documents required of Transferor to facilitate such process.  Without obtaining the prior written approval of Transferor (which consent shall not be unreasonably withheld, conditioned or delayed), Transferee agrees that it shall not seek in any of the Transfer Applications to change any condition of mining or reclamation obligation established in the Permits (other than the identity of the operator) or delete or add property to the Permits, if the effect of such request or modification thereto would delay or otherwise hinder obtaining prompt approval of the Transfer Applications or the release of any Bonds (as defined below) or other security, if any, of Transferor or its affiliates, except, in each case, (i) for actions ordered by an applicable governmental body, (ii) as required to abate or resolve any notice of non-compliance, (iii) as required in connection with any mid-term review or renewal of any such Permits, (iv) as required in connection with any pending actions, or (v) as required in connection with similar permitting developments. Transferee and Transferor agree to sign all documents reasonably required by any governmental body in connection with the Permit Application Approvals or the Transfer Approvals.  In the event of the denial of any Permit Application

Approval or Transfer Approval by the appropriate governmental body, Transferee shall, at Transferee's sole cost and expense, until such denial is reversed, use commercially reasonable efforts to diligently pursue and exhaust all administrative and judicial remedies afforded to Transferee in the event of such denial.

(d)     So long as Transferee is in compliance in all material respects with its obligations under this Permit Agreement and the Purchase Agreement, Transferor shall take commercially reasonable action (including, without limitation, filing and diligently prosecuting any permit renewals), at Transferee's sole cost and expense, to maintain each Permit in full force and effect until the Transfer Approval is obtained with respect thereto, provided that, if any such action will or may subject Transferor to any material cost, expense or liability, Transferor may refrain from taking such action until and unless it receives reasonably adequate assurance that Transferee is capable of indemnifying, reimbursing, holding harmless or otherwise making whole Transferor for any and all costs, expenses and liabilities that may result or arise from such action.

3.     <u>Transfer of Operatorship</u>.

(a)     At Closing, Transferee will submit all documentation necessary to designate Transferee, its affiliates or designees as an "operator" on each of the Permits. During the Interim Period, subject to first obtaining any required administrative consent or approval and complying with any other requirement of any governmental body  (including, if applicable, filing a request for advance approval of the transfer of the Permits), Transferor, to the extent Transferor has a legal right to do so, designates Transferee and its affiliates as an operator under, and grants to Transferee and its affiliates the right to immediately engage in mining operations and all other legally permissible activities on the premises permitted under, the Permits, subject to the terms and conditions of this Permit Agreement, each applicable Assumed Lease and the Permits.  With respect to such mining operations and other legally permissible activities conducted by Transferee during the Interim Period, Transferee shall operate solely as an independent contractor and not as an agent, employee, or servant of Transferor. Except as otherwise provided in this Permit Agreement, (i) all of Transferee's post-Closing operations pursuant to this subsection shall be at the sole cost, risk, liability and expense of Transferee and (ii) any benefit gained from such post-Closing operations by Transferee pursuant to this subsection shall likewise be for the sole account and benefit of Transferee.

(b)     Unless completed prior to Closing or otherwise agreed upon, in writing, by the parties hereto, within the time period set forth in Section 2(a) to submit Transfer Applications for the Permits, (i) Transferee and Transferor shall execute and deliver to Transferee all necessary applications and such other forms as may be required by applicable governmental bodies in connection with obtaining the Permit Application Approvals or the Transfer Approvals, (ii) to the extent required by applicable law, Transferee shall use commercially reasonable efforts

to obtain the signatures of all contract miners used by Transferor on the properties covered by the Permits, (iii) to the extent required by applicable law, Transferor and Transferee shall use commercially reasonable efforts to designate Transferee or its affiliates as an "operator" under the Permits, and (iv) Transferee shall use commercially reasonable efforts to obtain a fully executed consent from each Person that has granted a dwelling distance waiver with respect to the Permits, to the extent required by applicable law.

4.    <u>Operation on Permits</u>.    Except for the Transferor's Obligations (as defined below), upon execution of this Permit Agreement, all liabilities, conditions, obligations, responsibilities and other matters pertaining to the Permits shall be the responsibility of Transferee.  It is expressly acknowledged and agreed by the parties that Transferee is desirous of immediately commencing and continuing mining and reclamation operations upon the property covered by the Permits.  In recognition thereof, it is expressly agreed by Transferor that Transferee shall have the right to commence and continue, immediately upon the execution of this Permit Agreement, mining, reclamation and related activities under the terms and conditions of the existing Permits as a designated operator for Transferor upon the property covered by the Permits, with indemnification of Transferor by Transferee during the Interim Period as set forth herein.  Prior to commencing operations on the property covered by the Permits, Transferee shall obtain, and provide to Transferor, copies of all licenses or authorizations required for Transferee to be designated as a designated operator under the Permits until the Transfer Approvals have been obtained from the applicable governmental bodies.  For purposes of this Permit Agreement, "***Transferor's Obligations***" means all liabilities and obligations of Transferor expressly set forth in this Permit Agreement or the Purchase Agreement. The Transferor's Obligations, to the extent not fully completed and satisfied, shall survive the termination of this Permit Agreement.

5.    <u>Right of Entry.</u>  In addition to any and all rights of access granted to Transferee under the Purchase Agreement, Transferor does hereby grant to Transferee a right of entry on, over and across the property covered by the Permits, together with the right of ingress, egress and regress to and from such property (to the extent of Transferor's authority to do so without the resulting breach of the instruments by which Transferor has rights in the property), as required by law or necessary to maintain and comply with the terms of the applicable Assumed Leases and the Permits, exercise its rights and perform its obligations under the Purchase Agreement, this Permit Agreement and the other documents executed pursuant to the Purchase Agreement, and to perform reclamation obligations related to the Permits.  Transferee, to the extent necessary, grants to Transferor, its successors, assigns and contractors, right of entry to the property covered by the Permits, together with the right of ingress, egress and regress to and from such property (to the extent of Transferee's authority to do so without the resulting breach of the instruments by which Transferee has rights in the property):  (a) as may be necessary to segregate and remove the Excluded Assets; (b) as may be necessary for the transfer of the Permits and the release of the Bonds related thereto; (c) to complete any of the Transferor's Obligations; and (d) to review records relating to the Permits and for any other lawful purpose reasonably necessary to exercise its rights under the Purchase Agreement or this Permit Agreement, including correcting, as permitted pursuant to the terms of the Purchase Agreement or this Permit Agreement, any violations of any applicable laws pertaining to the premises subject to the Permits that have not been, and are not being, timely corrected by Transferee, in each case for the foregoing clauses (a) through (d), subject to the terms, conditions, limitations

and restrictions set forth in this Permit Agreement and the Purchase Agreement.    The immediately preceding sentence shall survive the term and termination of this Permit Agreement.

6.    <u>Certain Obligations.</u>

(a)    <u>Transferee's Obligations</u>.    Upon the date hereof, except to the extent the liability, performance or other matters constitute the Transferor's Obligations or are matters for which Transferee is entitled to be indemnified by Transferor under the Purchase Agreement, Transferee shall (i) be responsible  and liable for, and shall timely perform, all liabilities and obligations of Transferee expressly set forth in this Permit Agreement or the Purchase Agreement and any and all monitoring, sampling, reporting, maintenance, reclamation and remedial obligations and liabilities under the Permits and for timely compliance with the terms and conditions of the Permits, and (ii) have the duty at its sole cost and expense to timely defend and abate any non-compliance issued on the Permits, whether arising before, on or after the date hereof, to pay all fines and assessments related thereto (excluding any monetary fines and penalties imposed by any governmental body for which Transferor has received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date to the extent relating to periods prior to the Closing Date), to correct all such non-compliances, and to perform all abatement measures required by the applicable governmental bodies.    In the event that either Transferor or Transferee receives written notice of any non-compliance with the Permits or applicable safety or environmental laws, including but not limited to Mine Safety and Health Administration ("***MSHA***") violations or Imminent Danger Orders issued under Section 107(a) of the Federal Mine Safety and Health Act of 1977 (the "***Mine Act***"), a written notice from MSHA that a mine covered by a Permit has a pattern of violations of mandatory health or safety standards of such nature as could have significant and substantial contribution to the cause and effect of mine health or safety hazards under Section 104(e) of the Mine Act, Office of Surface Mining ("***OSM***") citations, or a written notice of Reportable Incidents (as defined in the Mine Act), then it shall give written notice of the non-compliance to the other party promptly, and in any event within 2 business days (or in the case of receipt of a cessation order, immediately), of receipt of such notice.  If Transferee fails to timely defend any non-compliance that it is required to defend pursuant to this Section 6(a) or does not promptly and in good faith take any and all actions necessary to abate such non-compliance, then Transferor shall have the right (but not the obligation), itself or through its contractors, to defend and/or abate said non-compliance and to freely and  without unreasonable interference from Transferee enter upon the property covered by the Permits to do all things that Transferor deems necessary to abate any such non-compliance, and Transferee shall reimburse Transferor for all costs and expenses associated with such defense and/or abatement, including the work required to abate any such non-compliance and any and all reasonable attorneys' or other professionals' fees that are incurred by Transferor relating thereto.  Transferor shall provide copies of all inspection sheets received from the KDNR or other applicable governmental

body in respect of the Permits or applicable safety or environmental laws to Transferee within five (5) business days of receipt of such sheets.

(b)    <u>Transferor's Obligations.</u>    Transferor shall timely perform the Transferor's Obligations, and shall timely cure any non-compliance arising thereunder or associated therewith.  If Transferor fails to defend any such non-compliance and does not promptly and in good faith take any and all commercially reasonable actions necessary to abate such non-compliance, then Transferee shall have the right (but not the obligation), itself or through its contractors, to defend and/or abate said non-compliance and to freely and without unreasonable interference from Transferor do all things that it deems necessary to abate such non-compliance, and Transferor shall reimburse Transferee for all reasonable costs and expenses associated with such defense and/or abatement, including the work required to abate any such non-compliance and any and all reasonable attorneys' or other professionals' fees that are incurred by Transferee relating thereto.

7.    <u>Replacement Bonds</u>.  Simultaneously with the filing of the Transfer Applications in accordance with the terms of this Permit Agreement, Transferee shall, or shall cause its affiliate to, post all bonds (or other appropriate collateral of a type satisfactory to the appropriate governmental bodies) necessary to obtain the applicable Transfer Approval and cause a full and complete release of the Bonds once the applicable Transfer Approval is obtained.  Transferee is solely responsible for the maintenance of the bonds it posts with respect to the Permits, including the costs and expenses thereof.  The obligations contemplated hereunder shall be on a Permit-by-Permit basis and in no event shall performance be delayed until all Transfer Applications are complete and/or all Permit Application Approvals have been obtained.  Transferee shall take all commercially reasonable steps necessary to ensure that all Bonds (and all deposits, letters of credit or other collateral, if any, posted as security by Transferor or any of its affiliates with respect to the Bonds) and any cash bonds or letters of credit posted by Transferor or its affiliates directly with the applicable governmental body in connection with a Permit shall be refunded in full and/or returned to Transferor and/or its affiliates or Transferee, as provided in the Purchase Agreement, as soon as reasonably practicable after the Transfer Approval is obtained.

8.    <u>Bond Maintenance</u>.  Transferor and its affiliates shall leave in place the bonds of Transferor posted with respect to each of the Permits (collectively, the "***Bonds***") until such Bonds are released by the applicable governmental body following the applicable Transfer Approval and shall cause the security, if any, they have posted for the Bonds to remain in place during the Interim Period; *provided however,* that Transferee shall be solely responsible for all costs associated with the Bonds from and after the Closing Date and Transferee agrees to reimburse Transferor, or upon request from Transferor to pay as and when due directly on behalf of Transferor to the appropriate third party, any amounts payable related to or arising from any Bond during the period from the Closing Date until such Bond is released.  For the avoidance of doubt, Transferee shall be solely responsible for the obligation to replace the applicable Bonds notwithstanding any provision of this Section 8 to the contrary.

9.    <u>Indemnifications.</u>

    (a)    <u>Indemnification by Transferee.</u>  Transferee shall indemnify, defend, and save harmless, Transferor, its affiliates and their respective members, managers, officers, directors, stockholders, employees, agents, representatives, successors and assigns from and against any and all liabilities or other obligations in any way arising out of, resulting from or in connection with (i) the Permits; (ii) the performance of the operations of Transferee on the property covered by the Permits; (iii) the use by Transferee of the property covered by the Permits; (iv) the Bonds; or (v) Transferee's obligations under this Permit Agreement or the Purchase Agreement, in each case, other than those liabilities or other obligations solely to the extent arising out of, resulting from or in connection with the Transferor's Obligations.

    (b)    <u>Indemnification by Transferor.</u>  Transferor shall indemnify, defend, and save harmless Transferee, its affiliates and their respective members, managers, officers, directors, stockholders, employees, agents, representatives, successors and assigns from and against any and all liabilities or other obligations in any way arising out of, resulting from or in connection with the Transferor's Obligations (other than those liabilities and other obligations solely to the extent arising out of, resulting from or in connection with the obligations of Transferee under this Permit Agreement or the Purchase Agreement).

    (c)    <u>Survival.</u>  The indemnification obligations in this Permit Agreement shall survive the term and termination of this Permit Agreement.

    10.    <u>Insurance.</u>  At all times during the term of this Permit Agreement, Transferee shall, at its sole cost and expense, provide and maintain insurance covering Transferee's operations and assets and any and all liabilities relating thereto of the type and in the amounts set out in *Exhibit B* attached hereto and incorporated herein by reference and shall comply with the terms and conditions set forth on such exhibit.  Prior to its entry onto the Purchased Real Property, Transferee shall provide Transferor with certificates of insurance that indicate that Transferee has the required insurance.  The insurance limits and coverages specified in the attached *Exhibit B* are minimum requirements and shall not be construed in any way to limit Transferee's liability.  Such insurance shall be maintained with one or more reputable insurance companies that customarily insure risks in the coal industry.  To the extent permitted under the applicable insurance policies, Transferee shall designate Transferor as an additional insured on all such policies and shall provide Transferor with a certificate of insurance or other proof reasonably satisfactory to Transferor as to such insurance coverage.

    11.    <u>Accident Notice.</u>  Transferee shall promptly provide written notice to Transferor of any accidents or occurrences resulting in injuries to persons or property in any way arising out of or related to the operations of Transferee, its affiliates or their respective agents, representatives or contractors hereunder.

    12.    <u>Termination.</u>  Except to the extent otherwise provided herein, this Permit Agreement, and the obligations of the parties hereunder, shall terminate with respect to each Permit upon the parties obtaining all Transfer Approvals and the release of all Bonds with

respect to such Permit and shall terminate in its entirety upon the parties obtaining all Transfer Approvals and the release of all Bonds with respect to all Permits.

13.   <u>Applicant Violator System</u>.   Transferee hereby represents and warrants to Transferor that neither Transferee nor any of its affiliates is permit blocked on the Applicant Violator System by any governmental body.   Transferor hereby represents and warrants to Transferee that neither Transferor nor any of its affiliates is permit blocked on the Applicant Violator System by any governmental body.

14.   <u>Right to Injunctive Relief</u>.   Transferee acknowledges and agrees that, in the event of a breach or threatened breach of any of Transferee's obligations regarding operations under the Permits or other obligations under this Permit Agreement, Transferor may suffer irreparable harm for which it would have no adequate remedy at law and, accordingly, shall be entitled to an injunction or other equitable relief (including a temporary restraining order or preliminary injunction) against such breach or threatened breach. Transferee waives, to the fullest extent permitted by law, the requirement of the posting of any bond or other security in connection with such injunctive or other equitable relief.   Transferee hereby agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Permit Agreement by Transferee and to specifically enforce the terms and provisions of this Permit Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Transferee under this Permit Agreement all in accordance with the terms of this Section.

15.   <u>Cooperation</u>.   Transferor and Transferee agree to fully cooperate, and to cause their respective affiliates to fully cooperate, with each other in all filings and other actions that may be necessary to obtain the Transfer Approvals, including providing any additional information and the preparation and execution of any additional documents; *provided, however*, Transferor shall not be obligated to incur any liability or pay any money to any third party in connection with such cooperation.

16.   <u>Notice</u>. Except as otherwise specified in this Permit Agreement, all notices, requests, demands and other communications under this Permit Agreement shall be in writing and shall be deemed to have been duly given on the date when personally delivered to the party to whom notice is to be given, on the date of transmission if sent by confirmed e-mail, or on the second day after mailing, if mailed to the party to whom notice is to be given, by nationally recognized overnight delivery service and properly addressed as follows:

TO TRANSFEROR:

c/o Cambrian Coal LLC
P.O. Box 2100
Pikeville, KY 41502
Attn: President
Email: mark.campbell@cambriancoal.com

With a copy (which shall not constitute notice) to:

Frost Brown Todd LLC
Lexington Financial Center
250 W. Main Street, Suite 2800
Lexington, KY  40507-1749
Attn:  Jeffrey L. Hallos
Email: jhallos@fbtlaw.com

TO TRANSFEREE:

Pristine Clean Energy, LLC
P.O. Box 1929
Logan, WV 25601
Attn:  Kem Abraham
Email: kabraham@birchriverwv.com

With a copy (which shall not constitute notice) to:

Shelton, Branham & Halbert, PLLC
2452 Sir Barton Way, Suite 101
Lexington, KY 40509
Attn:  Billy R. Shelton
Email: bshelton@sbhlegal.net

Any party may change its contact information for the purposes of this Section by giving the other party hereto written notice of the new address in the manner set forth above.

17.    Miscellaneous.

(a)    Succession; Assignment. This Permit Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Transferee may not assign this Permit Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of Transferor, which consent may be withheld in Transferor's sole and absolute discretion.

(b)    Counterparts. This Permit Agreement may be executed in counterparts (including via facsimile and e-mail), each of which shall be deemed an original, but all of which together shall constitute one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto.  The executed Permit Agreement together with any attachments hereto may be photocopied and stored on computer tapes, disks and similar electronic storage media ("***Imaged Document***").  If an Imaged Document is introduced as evidence in any judicial, arbitration, mediation or administrative proceeding, neither party shall object to the admissibility of the Imaged Document on the basis that such was not originated or maintained in documentary form under either the hearsay rule, the best evidence rule, or other rule of evidence.

(c)     <u>Waiver</u>.  The failure of either party to seek redress for violation of or to insist upon a strict performance of any term or condition of this Permit Agreement shall not be considered a waiver, nor shall it deprive that party of the right thereafter to insist upon strict adherence to that or any other term of this Permit Agreement.

(d)     <u>Severability</u>.  If any provision of this Permit Agreement or its application will be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of all other applications of that provision, and of all other provisions and applications hereof, will not in any way be affected or impaired.  If any court shall determine that any provision of this Permit Agreement is in any way unenforceable, such provision shall be reduced to whatever extent is necessary to make such provision enforceable.

(e)     <u>Headings</u>.  The headings contained in this Permit Agreement are included for purposes of convenience of reference only and shall not affect the construction or interpretation of any of its provisions.

(f)     <u>Entire Agreement</u>.  This Permit Agreement, together with the Purchase Agreement, constitute the entire agreement and understanding of the parties related to the subject matter hereof, and supersede all prior proposals, understandings, agreements, correspondence, arrangements and contemporaneous oral agreements relating to the subject matter of this Permit Agreement.  In the event of a conflict between the provisions of this Permit Agreement and the Purchase Agreement, the provisions of this Permit Agreement shall control.  This Permit Agreement shall not be amended or modified, and no waiver of any provision hereof shall be effective, unless set forth in a written instrument authorized and executed by all the parties hereto.

(g)     <u>Waiver of Right to Trial by Jury</u>.  **EACH OF TRANSFEROR AND TRANSFEREE WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS PERMIT AGREEMENT OR ANY PROVISION HEREOF.**

(h)     <u>Governing Law</u>.  This Permit Agreement will be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, other federal law, where applicable, and, where state law is implicated, the laws of the Commonwealth of Kentucky without regard to or application of conflict of laws principles.

(i)     <u>Submission to Jurisdiction; Consent to Service of Process</u>.  Without limiting any right of Transferor or Transferee to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Permit Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Permit Agreement or any breach or default hereunder, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and Transferor and Transferee hereby consent to and submit to the jurisdiction and venue of the Bankruptcy

Court for such purposes and will receive notices at such locations as indicated in Section 16 hereof; *provided, however,* that if any Bankruptcy Case has been closed pursuant to Section 350 of the Bankruptcy Code, Transferor and Transferee agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Fayette Circuit Court and any state appellate court therefrom within the Commonwealth of Kentucky (or, in the event (but only in the event) that such court does not have subject matter jurisdiction over such legal proceeding, in the United States District Court for the Eastern District of Kentucky) and any appellate court from any thereof, for the resolution of any such claim or dispute.  Transferor and Transferee hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of Transferor and Transferee agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of Transferor and Transferee hereby consents to process being served by any other party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 16; provided, however, that such service will not be effective until the actual receipt thereof by the party being served.

**[*Signature Page Follows*]**

IN WITNESS WHEREOF, the undersigned have executed or caused this Permit Agreement to be executed by their respective officers thereunto duly authorized, each with the intent to be legally bound, as of the date first written above.

Transferor:

[_____]

By: _____
Name: _____
Title: _____


[_____]

By: _____
Name: _____
Title: _____


Transferee:

PRISTINE CLEAN ENERGY LLC

By: _____
Name:
Title:

SIGNATURE PAGE TO PERMIT OPERATING AGREEMENT

**<u>EXHIBIT A</u>**

**<u>PERMITS</u>**

EXHIBIT TO PERMIT OPERATING AGREEMENT

## EXHIBIT B

## MINIMUM INSURANCE REQUIREMENTS

| Type of Insurance Coverage | Minimum Limits of Liability | Minimum Scope of Coverage |
|---|---|---|
| Workers' Compensation Insurance | statutory amount | • as required by applicable law<br>• coverage shall extend to primary state of employment<br>• coverage shall extend to "leased workers"/borrowed servants, to the extent any such persons are used |
| Employer's Liability Insurance | $1,000,000 for each accident | • bodily injury by accident or disease, including death, arising out of and in the course of employment<br>• coverage shall extend to "leased workers"/borrowed servants, to the extent any such persons are used |
| Commercial General Liability Insurance | $1,000,000 for each occurrence and $2,000,000 aggregate for death, bodily injury, and property damage | • premises/operations<br>• independent contractors and subcontractors<br>• personal and advertising injury<br>• products/completed operations<br>• blanket contractual liability – written and oral<br>• explosion, collapse, subsidence, and underground coverage |
| Commercial Automobile Liability Insurance | $1,000,000 for each accident for death, bodily injury, and property damage | • owned vehicles<br>• non-owned vehicles<br>• hired vehicles<br>• leased vehicles |
| Excess or Umbrella Liability | $5,000,000 for each occurrence | • the minimum scope of coverage shall be as broad as the underlying insurance policies, and, irrespective of underlying insurance coverage, shall include (a) employer's liability, (b) commercial general liability, including contractual liability, and (c) commercial automobile liability<br>• no "laser exclusions" related to activities during the Interim Period shall be included in the policy (*i.e.*, special exclusions that specifically name certain activities, products, services, or work as not being insured under the policy) |

### Terms and Conditions

1. All insurance required by this Permit Agreement is to be occurrence based.
2. All insurance required by this Permit Agreement shall include endorsements signed by the applicable insurance carrier(s) that name Transferor and its parents, subsidiaries, affiliates, successors, and assigns, and all of their current and former directors, officers, employees, shareholders, members, partners, agents, and representatives, (collectively, the "<u>Additional Insureds</u>," and individually, an "<u>Additional Insured</u>") as additional insured with respect to liability arising out of the activities performed by or on behalf of

EXHIBIT TO PERMIT OPERATING AGREEMENT

Transferee and allow an Additional Insured to be a permissible claimant thereunder; provided, however, such a requirement shall not apply to the workers' compensation insurance required by this Permit Agreement.

3. All insurance required by this Permit Agreement shall be primary and not contributory as to any other insurance and self-insurance that an Additional Insured may have in effect.

4. All insurance required by this Permit Agreement shall (a) waive any rights of subrogation against the Additional Insureds, and (b) have adequate territorial and navigation limits for each applicable state wherein Transferee's operations are located.

5. All insurance required by this Permit Agreement shall (a) be with insurers authorized to conduct insurance business in each state in which insured entities, assets, operations or liabilities are located, (b) be placed with insurers that have a current A.M. Best's rating of no less than A-VII, and (c) include endorsements so as to provide to Transferor no less than thirty (30) calendar days' notice of suspension or termination of coverage or any material change in coverage.

6. All deductibles or self-insured retentions are the sole responsibility of Transferee to pay.

7. Transferee shall not enter onto the Purchased Real Property until all insurance set forth in this Permit Agreement is in place.  Transferee shall provide to Transferor certificates of insurance and endorsements signed by an authorized representative of the insurer evidencing that the minimum insurance coverage set forth in this Permit Agreement is in full force and effect, including disclosing any deductibles or self-insured retentions.  If policies for which certificates have previously been furnished to Transferor expire during the course of this Permit Agreement, certificates evidencing the renewals of such policies shall immediately be provided to Transferor.

8. Failure on the part of Transferee to maintain the required insurance shall constitute a material breach of this Permit Agreement, which shall give Transferor the right to terminate this Permit Agreement immediately upon notice.

9. All insurance obligations of Transferee are in addition to Transferee's obligations of indemnity and shall not be construed as limiting Transferee's indemnity obligations to the amount of the insurance coverage.

10. The insurance coverage obligations set forth in this Exhibit are minimum coverage requirements only.  To the extent Transferee maintains insurance coverage greater than these minimum requirements, such greater insurance coverage shall be applicable to any activities conducted during the Interim Period and to any liabilities and obligations of Transferee under this Permit Agreement.  In addition, with respect to those forms of coverage where additional insured status is required by this Permit Agreement, the Additional Insureds shall be entitled to the benefit of the full available limits of liability maintained by Transferee, regardless of the limits of liability set forth in any certificate of insurance issued to the Additional Insureds and regardless of whether such coverage is primary, excess, contingent, or otherwise. By specifying minimum insurance requirements, Transferor does not assert or recommend this insurance as being adequate for any activities conducted during the Interim Period, and Transferee remains solely responsible to inform itself of the types and amounts of insurance coverage that may be appropriate.

11. Transferee shall ensure that all of its contractors performing activities on the property covered by the Permits shall maintain customary insurance in accordance with Transferee's standard contractor insurance requirements.  Transferee's insurance will respond to any deficiency in coverage between the minimum insurance coverage set forth in this Permit Agreement and the insurance maintained by Transferee's contractors.

EXHIBIT TO PERMIT OPERATING AGREEMENT

## **EXHIBIT B**

### **Excluded Liabilities**

All liabilities not identified in Exhibit D to this Agreement as Assumed Liabilities are Excluded Liabilities.

# **EXHIBIT C**

## **Excluded Assets**

Excluded Assets are (a) any and all assets (i) not identified as a Purchased Asset in <u>Exhibit A</u> to this Agreement, or (ii) on which an individual or entity other than Richmond Hill Capital Partners, LP, Essex Equity Joint Investment Vehicle, LLC, or Alliance Prime Associates, Inc. has a Lien that is senior to the Lien(s) of Richmond Hill Capital Partners, LP, Essex Equity Joint Investment Vehicle, LLC, and Alliance Prime Associates, Inc., and (b) any and all oil and gas rights owned or leased by the Sellers or otherwise associated with the Premier Elkhorn Operations.

## EXHIBIT D

### Assumed Liabilities

1. All liabilities of any kind or character to the extent resulting from or arising out of or in connection with Buyer's or its affiliates' use, operation, possession or ownership of or interest in the Purchased Assets and/or the Premier Elkhorn Operations, only to the extent such liability first arises following the Closing Date.

2. All cure costs, if any, for each Assumed Purchased Contract as reflected on the cure cost schedule filed with the Bankruptcy Court or as otherwise determined by the Bankruptcy Court, it being agreed that the Buyer will promptly pay all such cure costs on the Closing Date.

3. Subject to the obligation of Buyer to pay all such cure costs, all liabilities of Sellers under the Assumed Purchased Contracts that arise on or after the Closing Date.

4. All liabilities of Sellers (whether arising before, on or after the Closing Date) arising out of or relating to (i) the Transferred Permits, including such liabilities thereunder arising out of or relating to all reclamation and post-mining liabilities of the Premier Elkhorn Operations or the Purchased Assets, (ii) any mine operation or safety compliance matters related to the condition of the Purchased Assets or the mining areas of the Premier Elkhorn Operations, (iii) the compliance of the Purchased Assets and the Premier Elkhorn Operations with environmental laws and regulations, or (iv) any conditions arising from a spill, emission, release or disposal into the environment of, or human exposure to, hazardous materials resulting from the operation of the Premier Elkhorn Operations or the Purchased Assets, in each case in this subclause (d) excluding any monetary fines and penalties imposed by any governmental body for which Sellers have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date to the extent relating to periods prior to the Closing Date.

5. All accrued and unpaid post-petition trade payables of Sellers relating to the Premier Elkhorn Operations.

6. All liabilities or other obligations with respect to the WARN Act arising or accruing from, or as a result of, the consummation of the transactions contemplated by this Agreement, the performance or non-performance of the obligations under this Agreement, or the actions of Buyer or its affiliates taken following the Closing Date.

7. All accrued but unpaid liabilities of Sellers with respect to real property taxes assessed with respect to the Purchased Assets for periods prior to calendar year 2019, solely to the extent necessary to transfer the Purchased Assets free and clear of any statutory senior priority lien on such Purchased Assets and all accrued but unpaid liabilities of Sellers with respect to real property taxes assessed with respect to the Purchased Assets for calendar year 2019.

8. All documentary, stamp, transfer, motor vehicle registration, sales, use, value added, excise and other similar non-income taxes and all filing and recording fees (and any penalties and interest associated with such taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement.

9.  All taxes with respect to the Purchased Assets attributable to any tax period or portion thereof that begins after the Closing Date, but for the avoidance of doubt, such amount shall not include any taxes that accrued pre-petition.

10. All wages and other related wage and benefit obligations to employees of the Sellers that have accrued and not been paid prior to the entry of the Sale Order, but for the avoidance of doubt, such amount shall not include any pre-petition payroll taxes.

# **EXHIBIT E**

**Assumed Leases**

The leases listed on the schedule attached to <u>Exhibit F</u>.


[To be completed prior to closing.]

## <u>EXHIBIT F</u>

### Assumed Purchased Contracts

The contracts (other than leases) listed on the attached schedule.


[To be completed prior to closing.]

## <u>EXHIBIT G</u>

## Owned Real Property

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| 01.CC.0001 | Pike, KY | Deed - Special Warranty | Cambrian Coal LLC | COAL-MAC, Inc. | 23-Sep-2000 | |
| 01.CC.0001 [9283] | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | CHANEY, Ronald D. & Betty | 31-Aug-1981 | Levisa Fork |
| 01.CC.0001 [9301] | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | MEADE, Tommy & Ella | 12-Jan-1990 | Powell's Creek Road |
| 01.CC.0001 [9338 & 9339] | Pike, KY | Deed - Quitclaim | Cambrian Coal LLC | MOUNTAINEER LAND COMPANY | 1-May-1994 | Powells Creek |
| 01.CC.0001 [9643] | Pike, KY | Deed - Quitclaim | Cambrian Coal LLC | MOUNTAINEER LAND COMPANY | 1-Apr-1994 | Powells Creek of Russell Fork |
| 01.CC.0001 [9678] | Pike, KY | Deed - Quitclaim | Cambrian Coal LLC | HAWKINS COAL COMPANY EAST KENTUCKY FUEL TRIANGLE COAL COMPANY HAWKINS, Henderson HAWKINS, Harold D. & Mary Helen HAWKINS, Kenneth HAWKINS, Jimmy D. & Lois Ann HAWKINS, Lois | 27-Jun-1995 | East Elkorn City Lower Branch of Russell's Fork |
| 01.CC.0001 [9692] | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | FERRAN, Steven & Mary | 28-Jul-1995 | Near the mouth of Adams Branch on Elkhorn Creek |
| 01.CC.0001 [9737] | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | ADAMS, William Brice & Donna | 25-Oct-1995 | Adams Branch |
| 01.CC.0002 [9679] | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | HAWKINS COAL COMPANY EAST KENTUCKY FUEL TRIANGLE COAL COMPANY HAWKINS, Henderson HAWKINS, Harold D. & Mary Helen HAWKINS, Kenneth HAWKINS, Jimmy D. & Lois Ann HAWKINS, Lois | 27-Jun-1995 | Watersheds of Pond Creek & Jackson Branch - Russell Fork Dry Fork of Marrowbone Creek |
| 01.CC.0002 [9852] | Pike, KY | Deed - Quitclaim | Cambrian Coal LLC | EAST KENTUCKY ENERGY CORPORATION | 1-Jun-1996 | |
| 01.CC.0002 [10062] | Pike, KY | General Warranty | Cambrian Coal LLC | CLEVINGER, Bert, Jr. & Kelsie | 14-Jun-1999 | Little Branch of Elkhorn Creek |
| 01.CC.0002 [10063] | Pike, KY | General Warranty | Cambrian Coal LLC | STILTNER, Kit Carson & Betty | 14-Jun-1999 | Little Branch of Elkhorn Creek |
| 01.CC.0003 | Pike, KY | Deed - Special Warranty | Cambrian Coal LLC | ARK LAND COMPANY | 23-Sep-2000 | |
| 01.CC.0003 [10035] | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | BLACKBURN, George & Peggy | 13-Oct-1998 | Near the mouth of Slick Rock Hollow |
| 01.CC.0003 [10043] | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | JAMES, Howard & Opal | 28-Jan-1999 | Lower Pompey Branch |
| 01.CC.0003 [10059] | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | BEVINS, Carol BEVINS, George & Alberta SCHOBELOCK, Robert & Molly | 29-Apr-1999 | Wolfpit of Pompey Creek |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| 01.CC.0003 [4250] | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | ADKINS, Lincoln, Jr. & Theresa A. | 28-May-1998 | Tract No. 9 - Daniel's Creek |
| 01.CC.0003 [10008] | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | ROSE, Tommy & Marietta | 29-Jul-1998 | Frankie Fork of Harless Creek |
| 01.CC.0003 [10070] | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | STILTNER, Howard & Gloria | 26-Jul-1999 | Little Branch of Elkhorn Creek |
| 01.CC.0004 [4247-2] | Pike, KY | Deed - Special Warranty | Cambrian Coal LLC | ARK LAND COMPANY | 23-Sep-2000 | Tract W-475 described in DB 606 / PG 235 |
| 01.CC.0006 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | GRINDSTAFF, Deborah Martin & Randy COLEMAN, Michael COLEMAN, Mark REYNOLDS, Elishia | 28-Oct-2000 | Watershed of Biggs Creek on Russell Fork and North Levisa Fork |
| 01.CC.0008 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | COAL-MAC, INC. | 20-Apr-2004 | Powell's Creek |
| 01.CC.0009 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | CLEVINGER, Norman R. & Linda B. | 9-Mar-2005 | Rockford Branch |
| 01.CC.0010 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | JUSTICE, Gary K. & Karen R. JUSTICE, Richard D. & Chastity | 17-May-2005 | Slone's Branch |
| 01.CC.0011 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | THACKER, Thomas, Jr. & Ingrid JUSTICE, Richard D. & Chastity | 25-Jun-2005 | Oney Fork of Harless Creek of Russell Fork |
| 01.CC.0012 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | RILEY, Michael Paul & Catherine A. | 21-Dec-2006 | Oney Fork of Harless Creek |
| 01.CC.0013 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | POWELL, Avonell S. | 5/11/22006 | Elkhorn Creek |
| 01.CC.0013 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | SYKES, David C. | 6-Feb-2006 | Elkhorn Creek |
| 01.CC.0014 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | THACKER, Patricia | 14-Jul-2006 | Harless Creek |
| 01.CC.0015 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | GOFF, Victor E. | 9-Nov-2006 | Wolfpit Fork of Pompey Creek |
| 01.CC.0016 | Pike, KY | Deed - Special Warranty | Cambrian Coal LLC | KNOX CREEK COAL CORPORATION | 20-Dec-2006 | Left Fork of John Moore's Branch (Goose Hollow), a tributary of Russell Fork |
| 01.CC.0017 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | BLACKBURN, Elmer Timothy & Vicki Lynn | 9-Mar-2007 | Waters of Wolfpit Fork of Big Sandy |
| 01.CC.0018 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | BEVINS, George & Alberta SCHOBELOCK, Robert & Molly | 19-Apr-2007 | Pompey Creek |
| 01.CC.0019 | Pike, KY | Deed - Special Warranty | Cambrian Coal LLC | BIG SANDY COMPANY, L.P. | 15-May-2007 | Bevins Fork of Lower Pompey Creek |
| 01.CC.0020 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | BLANKENSHIP, Alex Jr. & Brenda | 4-Oct-2007 | Wolfpen Fork of Lower Pompey |
| 01.CC.0021 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | BLACKBURN, George & Peggy | 30-Oct-2007 | Lower Pompey Creek |
| 01.CC.0022 | Pike, KY | Deed - General Warranty | Cambrian Coal LLC | TAYLOR, Tonya Weddington & John Christopher | 15-Sep-2008 | Wolfpen Fork of Lower Pompey |
| 01.TL.0010 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | WRIGHT, Monette | 11-Mar-2009 | Big Branch, Johns Hollow |
| 01.TL.0011 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | MORGAN, Irene | 12-Mar-2009 | Wolfpen Fork of Pompey Creek |
| 01.TL.0012 | Pike, KY | Deed - Special Warranty | T.C. Leasing, Inc. | THACKER, Jerri Lynn & Garfield | 17-Mar-2009 | Lower Pompey |
| 01.TL.0013 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | VANOVER, Russell Jr. & Barbara Lee | 22-Jun-2009 | Right hand fork of Red Creek |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| 01.TL.0015 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | PHILLIPS, Glenn G. & Patsy | 21-Apr-2010 | Kendrick Fork of Upper Chloe |
| 01.TL.0016 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | JUSTICE, Patty S. | 27-Aug-2010 | Biggs Branch at Millard |
| 01.TL.0018 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | COLLINS, James Tunis & Tina L. | 18-May-2010 | Frozen and Chloe Creeks |
| 01.TL.0018 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | TACKETT, JoEtta & Ronald Gene | 19-May-2010 | Frozen and Chloe Creeks |
| 01.TL.0018 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | COLLINS, Estelle | 18-May-2010 | Frozen and Chloe Creeks |
| 01.TL.0018 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | BYERS, Esta Pauline Thacker & Warren Blaine | 29-Jun-2010 | Frozen and Chloe Creeks |
| 01.TL.0018 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | ADKINS, Veronica Thacker & Enoch Jr. | 29-Jun-2010 | Frozen and Chloe Creeks |
| 01.TL.0018 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | THACKER, David | 29-Jun-2010 | Frozen and Chloe Creeks |
| 01.TL.0018 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | BARTLEY, Sonna Johnson & Jimmy | 29-Jun-2010 | Frozen and Chloe Creeks |
| 01.TL.0018 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | TRIMBLE, Pamela & Anthony Todd | 9-Aug-2010 | Frozen and Chloe Creeks |
| 01.TL.0018 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | RICE, Susan Arnett & Timothy ARNETT, James Stephen & Ella Jo NICHOLS, Sheila Arnett & Lloyd ROBINSON, Deloris Arnett & Robby NEWMAN, Donna Arnett & Timothy MAY, Charles Gary & Glenna Gay GOFF, Marlene & Burton GOFF, Ocie May & George Thomas BUCKLEY, Virgie May | 11-Aug-2010 | Frozen and Chloe Creeks |
| 01.TL.0018 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | COLLINS, Ruth | 21-Sep-2010 | Frozen and Chloe Creeks |
| 01.TL.0018 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | COLLINS, Luther Jefferson & Virginia | 24-May-2011 | Frozen and Chloe Creeks |
| 01.TL.0019 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | COLLINS, Estelle Justice | 19-May-2010 | Frozen Creek |
| 01.TL.0019 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | COLLINS, James Tunis & Tina L. | 18-May-2010 | Frozen Creek |
| 01.TL.0019 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | TACKETT, JoEtta & Ronald Gene | 19-May-2010 | Frozen Creek |
| 01.TL.0020 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | SCHNELL, Peggy KEENE, Lloyd KEENE, Larry & Judy | 5-Aug-2010 | Raccoon Creek, tributation of Johns Creek |
| 01.TL.0026 | Pike, KY | Deed - Commissioner's | T.C. Leasing, Inc. | MASTER COMMISSIONER OF PIKE CIRCUIT COURT, Melanie Fields Horton | 25-Jul-2012 | Lower Pompey Creek |
| 01.TL.0027 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | PHIPPS, Larry & Ruth Ann | 6-Nov-2012 | Peytons Creek |
| 01.TL.0028 | Pike, KY | Deed - General Warranty | T.C. Leasing, Inc. | JP&P REALTY, LLC | 22-May-2013 | Right Fork of Upper Chloe Creek |
| | ? | Deed of Conveyance | | Fields-Bobby & Barbara-Conveyance(0104).pdf | 4/13/2001 | |
| | ? | Deed of Conveyance | | Fields-Bobby & Barbara-Conveyance(0106).pdf | 4/13/2001 | |
| | ? | Quitclaim Deed | | Fields-Bobby & Barbara-Quitclaim(0103).pdf | 4/23/2003 | |
| | ? | Quitclaim Deed | | Fields-Bobby & Barbara-Quitclaim(0105).pdf | 4/23/2003 | |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| | Campbell, KY | Warranty Deed | Pike-Letcher Land LLC | Gatliff Coal Company | 12/19/1996 | Big Mud Creek |
| | Floyd, KY | Deed of Conveyance | Pike-Letcher Land LLC | Terry D. & Eileen Brown | 12/19/1997 | Tackett Fork |
| | Floyd, KY | Quitclaim Deed | Pike-Letcher Land LLC | Jeanene Hamilton, et al- (Oley Hall Heirs) | 1/9/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Arthur Caudill | 6/5/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Will Steven Rusty Ray & Reba Hamilton | 6/12/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Steven & Diane Brown | 6/22/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Jeffrey & Angela Brown | 6/19/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | James Young | 9/23/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Ronnie and Charlene Brown | 9/24/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Frank and Sharon Dotson | 8/31/2009 | Big Mud Creek |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Helen Hamilton | 10/20/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Zachary Kiser | 10/21/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Russell and Martha Walker | 7/27/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Jeffrey and Angela Brown | 7/19/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Ralph and Wilma Brown | 7/19/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Steven and Diane Brown | 7/22/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Trenia and Jackie Cecil | 8/10/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Wilma Jean Cerulla | 8/8/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Will and Rusty Hamilton | 6/12/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Brown Kiser-Angela et al.pdf | 5/18/2010 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Brown-Bernice-single.pdf | 7/27/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Brown-Ronnie & Charlene.pdf | 9/24/2009 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Brown-Terry & Eileen.pdf | 7/7/2010 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Bryant-Sheila.pdf | 6/1/2012 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Citizen National Bank | 6/6/2014 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Dotson-Frank & Sharon.pdf | 8/31/2009 | Big Mud Creek |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Hall-James.pdf | 10/14/2010 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Hamilton-Ervin Jr & Syltanna.pdf | 10/25/2010 | Tackett Fork |
| | Floyd, KY | Deed of Conveyance | Pike-Letcher Land LLC | Hamilton-Freddie & Vicky.pdf | 5/17/2013 | Tinker Fork/Big Mud Creek |
| | Floyd, KY | Deed of Conveyance | Pike-Letcher Land LLC | Hamilton-Jimmy Ray Divorced.pdf | 6/7/2013 | Tinker Fork/Big Mud Creek |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Hamilton-Paul & Eileen.pdf | 12/1/2010 | Tackett Fork |
| | Floyd, KY | Deed of Conveyance | Pike-Letcher Land LLC | Hamilton-Tolvie Jr.pdf | 5/17/2013 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Hamilton-Verdie.pdf | 4/30/2012 | Tackett Fork |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Hamilton-Will & Tina & Kenneth.pdf | 10/29/2010 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Henson-Elizabeth.pdf | 4/30/2012 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Henson-Geneva et al.pdf | 8/8/2009 | Tackett Fork |
| | Floyd, KY | Corrective Warranty Deed of Conveyance | Pike-Letcher Land LLC | Pike Letcher Land-Brown & Kiser.pdf | 5/4/2011 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Rogers-Dewey & Lorene.pdf | 6/28/2012 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Vance-Eva June widow.pdf | 9/27/2013 | Big Mud Creek |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Vance-Eva.pdf | 10/19/2010 | Moore Fork |
| | Floyd, KY | Deed of Conveyance | Pike-Letcher Land LLC | Howard Land Management et al | 7/23/2014 | Tinker Fork/Big Mud Creek |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Jeffrey Brown et al (Brown Family Cemetery) | 5/11/2015 | Beech Fork / Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Mark & Elizabeth Brown | 12/15/2015 | Tackett Fork |
| | Floyd, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Terry Brown & Eileen Brown | 12/14/2015 | Tackett Fork |
| | Letcher, KY | Deed of Conveyance | | Phyllis & Leon Mullins | 7/29/1999 | |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | D. B. Kazee | 5/27/1993 | Pine Mt. |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Manning Coal Co. | 8/25/1993 | Elkhorn Creek |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Thomas Mullins | 8/26/1993 | Elkhorn Creek |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Opal S. Burke | 4/3/1996 | Beefhide Cr |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Bob Blevins | 2/21/1997 | Joe's Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Arnold and Kathy Stewart | 9/16/1997 | Beefhide Cr |
| | Letcher, KY | Deed of Conveyance | ? | Pike Letcher Coal Partners and Traveller Coal Corporation | 11/20/1991 | ? |
| | Letcher, KY | Quitclaim Deed of Conveyance | ? | CSX Transportation, Inc. | 12/17/1993 | ? |
| | Letcher, KY | Deed of Correction | ? | Pike Letcher Coal Partners and Traveller Coal Corporation | 12/15/1995 | ? |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Mary Hollon, Lisa Hollon and Tom Bastian | 9/25/1997 | Barkcamp |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Can & Bessie Potter | 12/3/1998 | Master's Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Glenn's Finer Homes, Inc. | 12/3/1998 | Grays Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Henry Dan & Betty Kincer | 12/5/1998 | Bear Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Royce Baker | 4/8/1999 | Grays Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Margie Mae Anderson, Bobby Anderson Sr.  And Rebecca Anderson | 4/26/1999 | Grays Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Scott & Barbara Stephens | 7/15/1999 | Bear Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Letcher County | 12/12/2000 | Child's Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Paul & Linda Hall and Brian Johnson | 12/29/2000 | Wright's Fork |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Thurman & Wanda Wright | 3/5/2001 | Potter's Fork |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|--------|--------|-------------|----------------|------------------|----------------|----------|
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | James H. & Emily Johnson (Lucinda Johnson Heirs) | 10/3/2001 | Wright's Fork |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ada Baker | 12/3/2001 | Wright's Fork |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Carl & Bonnie Mullins | 7/18/2002 | Wright's Fork |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Charles Ray & Diane Mullins | 7/19/2002 | Wright's Fork |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Harold Danny & Anita Mullins | 7/19/2002 | Wright's Fork |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Kenneth & Connie Mullins | 7/19/2002 | Wright's Fork |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ronald & Judith Mullins | 7/19/2002 | Wright's Fork |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Donald & Violet Mullins | 7/20/2002 | Wright's Fork |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Myrtle Johnson | 8/7/2002 | Wright's Fork |
| | Letcher, KY | Deed | Pike-Letcher Land LLC | Janice & Keith Banks | 10/9/2002 | Chopping Branch |
| | Letcher, KY | Deed | Pike-Letcher Land LLC | Jennifer Wyatt | 10/9/2002 | Chopping Branch |
| | Letcher, KY | Deed | Pike-Letcher Land LLC | Paul & Linda Hall | 10/10/2002 | Chopping Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Bobby & Barbara Fields | 4/23/2003 | White House Hollow |
| | Letcher, KY | General Warranty Deed | Pike-Letcher Land LLC | Granville Burke | 10/21/2003 | Chopping Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Harold & Linda Cantrell | 12/20/2004 | Tom Biggs |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ray & Josephine Durham | 8/31/2006 | Burdine |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Mountain Outreach, Inc. | 6/5/2007 | Bear Hollow |
| | Letcher, KY | Master Commissioners Deed | Pike-Letcher Land LLC | Southeast KY. Economic Development Corporation et al (JABO Building) | 11/8/2013 | Near Burdine |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Corbett-Kathy & Dennis W. Jr. | 11/15/2013 | Bill Moore Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Bessette-Michele and Larry | 12/31/2013 | Bill Moore Branch |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Williams-Charles | 12/31/2013 | Bill Moore Branch |
| | Letcher, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Appalachian Land Company | 2/7/2014 | Potter's Fork |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Randy & Patricia Burke | 8/6/2014 | Johns Fork of Beefhide Creek |
| | Letcher, KY | Deed of Exchange | Pike-Letcher Land LLC | Carl & Anna Hall | 9/26/2014 | ? |
| | Letcher, KY | Deed of Conveyance | Pike-Letcher Land LLC | Edith & Allen Mullins | 12/29/2015 | Bill Moore Branch |
| | Letcher, KY | Deed | Pike-Letcher Land LLC | Jeffrey Cornett | 6/13/2016 | Potter's Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rabon and Melphia Hall | 5/1/1992 | Indian Crk. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ada Seals | 6/17/1992 | Bucklick |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Deane Hopkins/Gail McCollum | 7/15/1992 | Osborne Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Dr. William M. Johnson | 7/15/1992 | Osborne Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Linda Lou Page | 7/15/1992 | Osborne Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Edith Bentley Moore, Harry Moore, Pearl Moore | 7/18/1992 | Osborne Br. |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ruby R. Scott | 7/21/1992 | Osborne Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Clayton Moore and Ruth Moore | 7/22/1992 | Osborne Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Harry and Nona Wright | 7/29/1992 | Osborne Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Noble Osborne | 11/5/1992 | Adj.to Osborne Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Donald & Rebecca Bentley | 12/11/1992 | Shelby Crk. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Betty Greer | 12/23/1992 | Shelby Crk. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Paul and Tina Tackett | 2/25/1993 | Shelby Crk. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Dr. William M. Johnson and Glenna Jo Johnson | 3/1/1993 | Below Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ellis and Ruth Osborne | 3/1/1993 | Below Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Johnny and Louise Anderson | 3/1/1993 | Below Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Danny and Martha Wright | 3/11/1993 | Below Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Lester and Zella Wright | 3/11/1993 | Below Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Randall and Pam Osborne | 3/11/1993 | Below Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Swan Fork Coal Company and C.D. Roberts | 4/15/1993 | Below Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Jeffrey & Carol Bentley | 4/19/1993 | Bucklick |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Elkhorn City Land Company | 5/5/1993 | Longfork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Lawrence Joseph Logging, Inc. | 5/6/1993 | Elkhorn Crk. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Liberty Hardwoods, Inc. | 5/6/1993 | Meeting House |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Elsie Osborne | 6/4/1993 | Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Dianne & Rusty McCall, et ux (Solomon-Mullins Heirs) | 8/13/1993 | Longfork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Lester Mullins, et ux ((Solomon-Mullins Heirs) | 8/31/1993 | Longfork |
| | Pike, KY | Deed and Construction Easement | Pike-Letcher Land LLC | Harry, Rodney, Gloria Wright | 9/30/1993 | Shelby Crk. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Charles and Jeanette Marie Bentley | 10/29/1993 | Phillips Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Jimmy Little | 12/15/1993 | Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Carson and Ruby Wright | 12/17/1993 | Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Collie and Judy Jeanine Hall | 1/27/1994 | Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Coolidge and Margie Johnson | 3/2/1994 | Bucklick |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ina Lee & Charley Hipps (Solomon-Mullins Heirs) | 4/21/1994 | Longfork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Russell and Mary Smallwood | 5/26/1994 | Phillips Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Luther & Janie Bentley | 6/9/1994 | Phillips Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ella Ritenour (Solomon-Mullins Heirs) | 8/15/1994 | Longfork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Joyce & Anthony Barnett (Solomon-Mullins Heirs) | 10/29/1994 | Longfork |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Kinship Resources Inc. | 11/7/1994 | Nats Fk / Middle Fk |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Jimmy & Marionette Little | 12/9/1994 | Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Branham & Baker Coal Company, Inc. | 1/9/1995 | Brushy Fk. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Emma Lee and Curtis Holbrook | 3/9/1995 | Burk Br. |
| | Pike, KY | Quitclaim Deed | Pike-Letcher Land LLC | Bill & Mary E. Riddle | 3/21/1995 | Sycamore Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Roger & Dorothy Hamby | 4/5/1995 | Phillips Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Charlie & Nola K. Greer | 5/10/1995 | Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Carson & Ruby Wright | 5/11/1995 | Burk Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Raymond, Gary & Betty Coleman | 5/25/1995 | Left Fork Island Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Benjamin & Shirley Bentley | 8/30/1995 | Longfork |
| | Pike, KY | Quitclaim Deed | | Lonzo Johnson and Francis Johnson | 9/26/1995 | |
| | Pike, KY | Deed of Conveyance | | Charles Raymond Burke, et al | 2/27/1996 | |
| | Pike, KY | Deed of Conveyance | | Wilburn Bentley, Ballard and Susie Bentley, Elish and Flora Bentley, Ed and Betty Bentley, Millie Bentley, Payne Bentley Jr. and Roberta Bentley, Kenneth and Joanne Bentley (Payne-Bentley Heirs) | 6/7/1996 | |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Carol Sue and Michael DeBourbon | 6/19/1996 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Johnny E. & Teresa Potter | 1/13/1997 | Beefhide Ck. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Johnny E. & Teresa Potter | 1/13/1997 | Beefhide Ck. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Johnny E. & Teresa Potter and Roger & Ernestine White | 1/13/1997 | Beefhide Ck. |
| | Pike, KY | Deed of Exchange | Pike-Letcher Land LLC | Winston & Janet Senter | 4/16/1997 | Marshalls Br. |
| | Pike, KY | Commissioner's Deed | Pike-Letcher Land LLC | Thomas Marion Elkins | 9/10/1997 | Lick Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Lonnie G. & Beulah Mullins | 11/12/1998 | Lick Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Matthew & Pauline Mullins | 11/12/1998 | Lick Fork |
| | Pike, KY | General Warranty Deed of Conveyance | Pike-Letcher Land LLC | Tonya Yvonne White | 5/24/1999 | Long Fork |
| | Pike, KY | General Warranty Deed of Conveyance | Pike-Letcher Land LLC | Jessee Todd White | 5/29/1999 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Freeman & Barbara Mullins | 7/28/1999 | Booker Br. |
| | Pike, KY | Deed of Conveyance | | Lucy Mullins Turner & Ken Turner | 8/14/1999 | |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Sanford & Irene Powell | 8/26/1999 | Big Shelby Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Patricia Mullins | 11/6/1999 | Brooker Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Casey Mullins | 11/9/1999 | Brooker Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Lois Mullins and Chester Wright | 11/9/1999 | Brooker Branch |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ralph and Rose Mullins (Robert Mullins Heirs) | 12/18/1999 | Brooker Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Eli & Esta Elswick | 12/22/2000 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Winston & Flora Johnson | 10/3/2001 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Gregory & Anita Elkins | 10/12/2001 | Lick Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Sylvia & Robert Ferguson | 10/12/2001 | Lick Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Arthur & Billie Jean Johnson | 12/11/2001 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Gwen & Bernard Hall | 12/11/2001 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Nevil Smallwood | 12/14/2001 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Bob & Irene Johnson | 12/17/2001 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Mary Ann Johnson | 12/17/2001 | Long Fork |
| | Pike, KY | Special Warranty Deed of Conveyance | Pike-Letcher Land LLC | Noarine & Clifford Bowers | 12/17/2001 | Long Fork |
| | Pike, KY | Deed of Conveyance | | Jeff and Gale Burke | 5/23/2002 | |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Daniel Melvin Wright and Bill Keene Hollow | 8/22/2002 | Jonancy |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Whetsel and Sharon Damron | 8/27/2002 | Jonancy |
| | Pike, KY | Special Warranty Deed of Conveyance | Pike-Letcher Land LLC | Alert Oil & Gas Company | 11/4/2003 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Lovenia Hamilton | 12/11/2003 | Bratten Hollow |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | John and Mary, Robert and Zama Picklesimer | 2/17/2004 | Robinson Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Delbert and Lezie Little | 7/26/2004 | Bartley Hollow |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ruby Burke | 7/26/2004 | Bartley Hollow |
| | Pike, KY | Special Warranty Deed | | AEP Kentucky Coal | 12/7/2004 | |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Evert F. Jr. & Judy Johnson | 10/17/2005 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rodney and Vicki Bentley | 12/8/2005 | Brushy Ford |
| | Pike, KY | Deed | Pike-Letcher Land LLC | Darvin Newsome Heirs | 2/27/2006 | Robinson Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Haynes-Goldie Heir - W&R Sargent(0145).pdf | 4/19/2006 | Little Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | V.Ray, G.Newman, L.Ray | 10/16/2006 | Little Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Margie Johnson | 10/25/2006 | Robinson Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Daphine Akers, Teresa Thacker and Ronnie Thacker, Dianna Brown and Ronnie Brown, Katherine Borders and Earnest Borders and Harvey Daniel Akers (David Akers Heirs) | 11/3/2006 | Little Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Vernon Johnson, et al | 11/13/2006 | Little Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Danny & Margaret Biliter | 1/31/2007 | Indian Creek |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Frank Akers (Daphine Akers) | 5/30/2007 | Little Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Aaron Jones | 12/18/2007 | Penny Road |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Milford and Michelle Little | 12/20/2007 | Bartley Hollow |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Robin & Thomas Anderson, Eric & Jennifer Anderson, Suzan Anderson-Ross | 1/19/2008 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Vesta Lou Anderson (Revocable Living Trust) | 1/19/2008 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Allard Newsome et. al. (CC Newsome Heirs) | 7/18/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Conley Newsome (CC Newsome Heirs) | 7/18/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Noble Newsom (GW Newsome Heirs) | 9/11/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Allen Eugene Newsom (GW Newsome Heirs) | 9/12/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Donald Reed Newsom (GW Newsome Heirs) | 9/12/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Maurice & Ruth Newsom (GW Newsome Heirs) | 9/12/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Dorothy & Paul Damron (GW Newsome Heirs) | 9/16/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Lawrence Rabon Newsom et. al. (GW Newsome Heirs) | 9/20/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Howard Lafnear II & Mary (GW Newsome Heirs) | 9/23/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Aileen Newsome (GW Newsome Heirs) | 9/24/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Gary Scott & Linda Newsom et. al (GW Newsome Heirs) | 9/29/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Larry Don & Daphne Newsom (GW Newsome Heirs) | 9/29/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Maureen & David Copley, Sr. (GW Newsome Heirs) | 9/29/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Bennie & Lorraine Bartley et. al. (GW Newsome Heirs) | 10/7/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Dexter Newsom (GW Newsome Heirs) | 10/7/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Mary Alice Newsom (GW Newsome Heirs) | 10/7/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Joe L. and Linda Newsom (GW Newsome Heirs) | 10/9/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Bobbie Lois Smith et al (GW Newsome Heirs) | 10/29/2008 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | | Maurice & Ruth Newsome | 11/17/2008 | |
| | Pike, KY | Quitclaim Deed of Conveyance | Pike-Letcher Land LLC | Robert & Carole Hurley | 1/8/2009 | Turkey Branch |
| | Pike, KY | Quitclaim Deed of Conveyance | Pike-Letcher Land LLC | Randy Lee Mullins | 2/11/2009 | Lick Fork |
| | Pike, KY | Quitclaim Deed | | Smith-Anna et al.pdf | 3/16/2009 | |
| | Pike, KY | Quitclaim Deed of Conveyance | Pike-Letcher Land LLC | ACIN LLC | 5/22/2009 | Robinson Creek |
| | Pike, KY | Quitclaim Deed of Conveyance | Pike-Letcher Land LLC | Hursel & Willa Fouts et al | 6/9/2009 | Left Fork of Long Fork |
| | Pike, KY | Warranty Deed of Conveyance | | Walker-Russell & Martha his wife.pdf | 8/29/2009 | |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Maurice and Ruth Newsome | 9/11/2009 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Newsome-Maurice & Ruth.pdf | 9/11/2009 | Tackett Fork |
| | Pike, KY | Warranty Deed of Conveyance | | Kiser-Zachary.pdf | 9/21/2009 | |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|--------|--------|-------------|----------------|------------------|----------------|----------|
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Anna Sue Branham, et al (GW Newsome Heirs) | 10/28/2009 | Tackett Fork |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Bentley-Dinah Mae.pdf | 5/19/2010 | Little Robinson |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Meade-Rusha.pdf | 9/1/2010 | Long Fork |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Burke-Janice & Paul.pdf | 9/14/2010 | Shelby Creek |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Cochran-Linda.pdf | 9/14/2010 | Shelby Creek |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Bartley-Ronnie & Wanda.pdf | 9/22/2010 | Shelby Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Flannery-Susan,Donnie,Julia.pdf | 1/14/2011 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Flannery-Priscilla.pdf | 1/18/2011 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Flannery-Darbin.pdf | 1/19/2011 | Tackett Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Flannery-Virgil & Anna.pdf | 2/1/2011 | Tackett Fork |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Johnson-James.pdf | 3/18/2011 | Long Fork |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Johnson-Janice.pdf | 3/18/2011 | Long Fork |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Hall-Barry K.pdf | 3/24/2011 | Long Fork |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Johnson-Carl & Phyllis.pdf | 4/21/2011 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Johnson-Marlow.pdf | 5/5/2011 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Meade-Daniel & Jeree.pdf | 8/2/2011 | Pettys Fk. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Mullins-Joseph & Donna.pdf | 10/4/2011 | Pettys Fk. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Umbenhower-Patty & Albert.pdf | 10/7/2011 | Pettys Fk. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Little-Sinega & Thomas.pdf | 11/14/2011 | Pettys Fk. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ross-Suzan.pdf | 1/17/2012 | Marshalls Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Anderson-Robin & Thomas.pdf | 1/18/2012 | Marshalls Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Anderson-Eric & Jennifer.pdf | 1/19/2012 | Marshalls Br. |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Fields-Harrison et al.pdf | 2/1/2012 | Shelby Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Newsome-Robert & Rhonda.pdf | 2/21/2012 | Shelby Creek |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Hampton-Ronnie & Dorothy.pdf | 2/24/2012 | Marshalls Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Johnson-Kenneth & Shirley.pdf | 3/23/2012 | Marshalls Br. |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Johnson-Hazel.pdf | 3/26/2012 | Marshalls Br. |
| | Pike, KY | Quitclaim Deed of Conveyance | Pike-Letcher Land LLC | White-Thomas J. et al | 4/18/2012 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Hall-Norma Sue & Billy.pdf | 5/1/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Roberts-Linda Lou & Dave.pdf | 5/1/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Tucker-Teddy & Loraine.pdf | 5/1/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Tucker- Mary et al.pdf | 5/5/2012 | Peter Branch |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Fields-Willie.pdf | 5/15/2012 | Shelby Creek |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|--------|--------|-------------|----------------|------------------|----------------|----------|
| | Pike, KY | Special Warranty Deed of Conveyance | Pike-Letcher Land LLC | Johnson-Hobart Clay.pdf | 5/21/2012 | Myra |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Bryant-Lee & Brenda.pdf | 6/7/2012 | Peter Branch |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Johnson-Bob & Ollie.pdf | 6/22/2012 | Bob's Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rogers-Jeff & Sharon.pdf | 6/25/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Murzda-Alice et al.pdf | 6/27/2012 | Pettys Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Estep-Bonnie.pdf | 7/3/2012 | Pettys Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rogers-Randy.pdf | 7/5/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rogers-Glen.pdf | 7/6/2012 | Peter Branch |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Elswick-Clifford & Molly.pdf | 7/9/2012 | Bob's Branch |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Elswick-Tavis & Lola.pdf | 7/12/2012 | Bob's Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Mair Hockman-Ruth etal.pdf | 1/2/2010 | Road Fork of Big Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Mullins-David & Wendi.pdf | 11/14/2011 | Pettys Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Fraley-James & Melissia.pdf | 7/13/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Fraley-Sammy Jr.pdf | 7/13/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Fraley-Samuel.pdf | 7/13/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Burke-Ernestine & Danny.pdf | 7/18/2012 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Gooden-Glen & Anna.pdf | 7/18/2012 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Slone-Elmer & Catherine.pdf | 7/18/2012 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Daniels-Sonja & Arnollis.pdf | 8/6/2012 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Branham-Katherine.pdf | 8/7/2012 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Hall-Linda.pdf | 8/7/2012 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Tarr-Beatrice.pdf | 8/7/2012 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Davis-Rita & Eddie.pdf | 8/11/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rogers-Lloyd & Connie.pdf | 8/13/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rogers-Tonya.pdf | 8/14/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rogers-Andrew.pdf | 8/17/2012 | Peter Branch |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Burke-Corbin.pdf | 8/20/2012 | Cow Hollow |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Vogeler-Corey Lee.pdf | 8/25/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rogers-Tandy & Dixie | 8/27/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Atkinson-Lexie.pdf | 9/5/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Clevenger-Jerry Lee.pdf | 9/5/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Kirk-Julie.pdf | 9/5/2012 | Peter Branch |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Whyde-Birdie & Norman.pdf | 9/5/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Akers-Joseph & Arlene.pdf | 9/12/2012 | Little Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Holt-Russel & Betty.pdf | 9/21/2012 | Little Robinson |
| | Pike, KY | Quitclaim Deed of Conveyance | Pike-Letcher Land LLC | White-Mark E. & Susan C. | 10/11/2012 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Little-Lorine.pdf | 11/9/2012 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Adams-Deloice.pdf | 11/12/2012 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Grisi-Frank.pdf | 12/11/2012 | Marshalls Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ramm-Annie & Frank.pdf | 12/11/2012 | Marshalls Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ramm-Douglas & Mary.pdf | 12/11/2012 | Marshalls Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Grisi-Betty and Frank.pdf | 12/12/2012 | Marshalls Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Mullins-Robert.pdf | 12/12/2012 | Marshalls Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ramm-Gregory.pdf | 12/12/2012 | Marshalls Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Mullins-Daniel.pdf | 12/13/2012 | Marshalls Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Mullins-Jeanette.pdf | 12/13/2012 | Marshalls Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Fraley-Savannah.pdf | 12/20/2012 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Akers-Darryl.pdf | 2/21/2013 | Little Robinson |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Akers-Douglas.pdf | 2/23/2013 | Little Robinson |
| | Pike, KY | Deed of Conveyance | | Akers-Joshua.pdf | 2/23/2013 | |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Hall-Zena & Richard.pdf | 3/29/2013 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Lunsford-Angeline.pdf | 4/4/2013 | Little Robinson |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Tackett-Zelma.pdf | 4/4/2013 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Williams-Keren & Everett.pdf | 4/4/2013 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Mark Calhoun | 5/29/2013 | Lick Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Troy Jackson Calhoun | 6/10/2013 | Lick Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Charlene Calhoun | 6/21/2013 | Lick Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Harold and Deborah Calhoun | 6/21/2013 | Lick Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Linda Calhoun | 6/21/2013 | Lick Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rachel Burkhart Calhoun | 7/1/2013 | Lick Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Branham-Rena & Creed.pdf | 7/8/2013 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Fields-Chalmer & Pauline.pdf | 7/11/2013 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Carol Flower and Jerry Flowers | 7/12/2013 | Lick Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Magner-Margaret.pdf | 7/15/2013 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Shelby Calhoun Busse and Larry Busse | 7/22/2013 | Lick Branch |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Magner-Ernest & Fern.pdf | 7/24/2013 | Lick Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Johnson-Newton.pdf | 7/29/2013 | Lick Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Robin Calhoun Christlieb and Gary Christlieb | 8/2/2013 | Lick Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Fields-JeffreyThomas & Frances.pdf | 8/5/2013 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Ralph Calhoun | 8/26/2013 | Lick Branch and Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Sharon Vela | 9/30/2013 | Lick Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Greg Calhoun and Tammy Calhoun | 10/3/2013 | Lick Branch and Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Linda Anderson and John Anderson | 10/5/2013 | Lick Branch and Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Calhoun-Phillip | 10/16/2013 | Turkey Branch |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Johnson-Lydon Clement, Alma & Jeanetta | 10/28/2013 | Long Fork |
| | Pike, KY | Warranty Deed of Conveyance | Pike-Letcher Land LLC | Johnson-Wayne Arthur | 10/28/2013 | Long Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Triscari-Helen Fields | 11/4/2013 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Reed Sowards and Laura Sowards | 11/5/2013 | Lick Branch and Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Akers-Robert and Mimie Jean | 12/13/2013 | Indian Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rogers-David | 4/18/2014 | Peter Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Anthony & Tommie Sue Tackett | 8/6/2014 | Pettys Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Gregory & Jennifer Tackett | 8/6/2014 | Pettys Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Kenneth & Kristie Tackett | 8/6/2014 | Pettys Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Louvilla Tackett | 8/6/2014 | Pettys Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Neil & Sabrina Tackett | 8/6/2014 | Pettys Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Steve D. Tacktett | 8/6/2014 | Pettys Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Della & Gary Tackett | 9/5/2014 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Bill Compton | 10/18/2014 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Anna & Harry Hill | 11/17/2014 | Beefhide Creek |
| | Pike, KY | Quitclaim Deed of Conveyance | Pike-Letcher Land LLC | ACIN | 12/18/2014 | Little Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Coda Mullins, Jr (Cody) & Martha Mullins | 12/23/2014 | Brushy Fork |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Bertha and Charles Estep | 2/6/2015 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Dorothy Keener | 2/9/2015 | Beefhide Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Billy & Sharon Akers | 5/1/2015 | Indian Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Michelle Richardson | 8/14/2015 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Georgia Elkins | 3/4/2016 | Beefhide Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Colonues & Christine Mullins | 3/30/2016 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Jimmy Mullins | 3/31/2016 | Turkey Branch |

| Number | County | Description | Owner / Lessee | Other Party(ies) | Effective Date | Location |
|---|---|---|---|---|---|---|
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Heather & David Howell | 4/5/2016 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Rosalind & Robert Damron | 4/5/2016 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Cindy Marie Jones | 4/6/2016 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Roger Mullins | 4/6/2016 | Turkey Branch |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | Jay Elkins | 1/26/2018 | Beefhide Creek |
| | Pike, KY | Deed of Conveyance | Pike-Letcher Land LLC | McDaniel-Della.pdf | | |

For the avoidance of doubt, the following properties were previously sold or conveyed by Sellers to third parties and are not Owned Real Property:

| ENTITY | PURCHASER | TOTAL ACRES | LOCATION | DATE OF PURCHASE | DEED BOOK | PAGE | COUNTY |
|---|---|---|---|---|---|---|---|
| PLLC | Carolyn Sue Tackett | | Tackett Fork | 6/24/2009 | 560 | 50 | Floyd |
| PLLC | Leon & Intha Burke | 4.80 ac. | Johns Fork | 7/9/1998 | 338 | 517 | Letcher |
| PLLC | City of Jenkins | 76 | Child's Branch | 1/1/1999 | | | Letcher |
| PLLC | John R. Barker | | Wrights Fork | 3/19/1999 | 360 | 702 | Letcher |
| PLLC | Coma Wright | | Wrights Fork | 7/20/1999 | 344 | 302 | Letcher |
| PLLC | Bobby Webb | 6 | Bear Br. | 8/19/2015 | 429 | 624 | Letcher |
| PLLC | Clifford & Betty Collins | 0.86 | Tom Biggs Br. | 11/13/2001 | | | Letcher |
| PLLC | Jeff & Misty Sexton | | McRoberts | 2/15/2000 | | | Letcher |
| PLLC | Jennifer Johnson | | Andy Wright | 8/2/2000 | | | Letcher |
| PLLC | Gregory Johnson | 14.71 ac. | Little Elkhorn Crk. | 3/28/2000 | | | Letcher |
| PLLC | Boonie Potter | | Wright's Fk. | 7/20/1999 | 344 | 219 | Letcher |
| PLLC | Robert & Peggy Banks | 1.22 | Wrights Fork | 8/8/2001 | 355 | 605 | Letcher |
| PLLC | East Properties, LLC | 4.35 ac. | Childs Branch Rd. | 8/13/2001 | | | Letcher |
| PLLC | James W. & Celeste Johnson | | Shea Fork | 10/3/2001 | | | Letcher |
| PLLC | Harold & Teresa Kelly | 0.55 | Camden | 1/18/2002 | | | Letcher |
| PLLC | Shelva Jean Kelly | 0.25 | Camden | 1/18/2002 | | | Letcher |
| PLLC | Mega Communications | 7.52 | Joe's Br. | 8/16/2001 | 355 | 533 | Letcher |
| PLLC | Calvin & Elaine Tackett | | Church House Hlw. | 8/13/2001 | 355 | 497 | Letcher |
| PLLC | City of Jenkins | 0.2052 | Jenkins | 6/20/2002 | 360 | 134 | Letcher |
| PLLC | McRoberts Walking Assoc. | | Chopping Br. | | | | Letcher |
| PLLC | Jenkins Athletic Field, Inc. | | Ben's Br. | 2/23/2003 | 363 | 851 | Letcher |
| PLLC | Lavon & Mary Tackett | | U.S. 23 | 3/31/2003 | 364 | 609 | Letcher |
| PLLC | City of Jenkins | | Elkhorn Ave. | 4/18/2003 | 360 | 134 | Letcher |
| PLLC | Bobby & Barbara Fields | 26.35 | Potters Fk. | 4/23/2003 | 365 | 96 | Letcher |
| PLLC | Bobby & Barbara Fields | 39.56, Tract 3 | Joes Branch, US 23 | 4/13/2001 | 355 | 331 | Letcher |
| PLLC | Bobby & Barbara Fields- Corrective Deed of Conveyance | Tract.2 Potters Gap;Tract. 3 Joes Br. | Potters Gap & Joes Branch, US 23 | 7/8/2015 | 429 | 210 | Letcher |
| PLLC | Cumberland Mountain Arts & Crafts | | Jenkins | | 367 | 275 | Letcher |
| PLLC | Cumberland Mountain Arts & Crafts | Deed of Corr. | Jenkins | | 374 | 75 | Letcher |
| PLLC | Cumberland Mountain Arts & Crafts | Deed of Release of Right of Reverter | Jenkins | 5/13/2015 | 428 | 672 | Letcher |
| PLLC | City of Jenkins | 0.55 | Pound Gap | 9/22/2004 | | | Letcher |
| PLLC | Sandra Spears | 2.41 | Jenkins | 2/21/2005 | | | Letcher |
| PLLC | Roger & Shirley Collins | 122 | Ramey Rk. | 5/13/2005 | 378 | 224 | Letcher |

| ENTITY | PURCHASER | TOTAL ACRES | LOCATION | DATE OF PURCHASE | DEED BOOK | PAGE | COUNTY |
|---|---|---|---|---|---|---|---|
| PLLC | Gregory & Sue Johnson | 0.247 | Raven Rock Estates Lot #13 | 4/5/2005 | not | completed | Letcher |
| PLLC | Gregory & Sue Johnson | 0.211 | Raven Rock Estates Lot #12 | 4/5/2005 | not | completed | Letcher |
| PLLC | Gregory & Sue Johnson | 0.222 | Raven Rock Estates Lot #14 | 4/5/2005 | not | completed | Letcher |
| PLLC | Gregory & Sue Johnson | 0.219 | Raven Rock Estates Lot #19 | 4/5/2005 | not | completed | Letcher |
| PLLC | George & Kathy Johnson | 0.316 | Raven Rock Estates Lot #8 | 4/5/2005 | not | completed | Letcher |
| PLLC | George & Kathy Johnson | 0.313 | Raven Rock Estates Lot #36 | 4/5/2005 | not | completed | Letcher |
| PLLC | Bruce & Melena Outlaw | 0.299 ac. | Raven Rock Estates Lot #30 | 7/22/2005 | | | Letcher |
| PLLC | Lisa Branham | 12.97 ac. | Jenkins | 10/19/2006 | 386 | 530 | Letcher |
| PLLC | Chester & Ernestine Flint | 1.12 ac. | Burdine | 11/9/2006 | 386 | 827 | Letcher |
| PLLC | Jeffery & Tiffany Hamilton | 0.3 ac. | Raven Rock Estates Lot #25 | 12/22/2006 | 387 | 629 | Letcher |
| PLLC | Terry & Dinah Wright | 0.211 ac. | Raven Rock Estates Lot #7 | 4/16/2007 | | | Letcher |
| PLLC | Rodney & Vicki Bentley | (Tr.1) 5.22 ac. (Tr.2) 17.98 ac. | Johns Fork | 12/8/2005 | 389 | 339 | Letcher |
| PLLC | Robert & Tracee Scheeler | 0.242 ac/ | Raven Rock Estates Lot #1 | 7/18/2007 | | | Letcher |
| PLLC | Triple Crown Homes | 0.226 | Raven Rock Estates Lot #29 | 11/30/2007 | | | Letcher |
| PLLC | City of Jenkins | 0.5 ac. | Dunham | 4/7/2008 | 395 | 234 | Letcher |
| PLLC | Roy & Joan Curry | 0.237 ac. | Raven Rock Estates Lot #15 | 5/16/2008 | | | Letcher |
| PLLC | Carl Winston Hall | 0.793 | Raven Rock Estates Lots #9,10,11 | 8/29/2008 | 398 | 54 | Letcher |
| PLLC | Tiffany Bentley | 3 tracts 0.55 ac. | Chopping Br. | 2/16/2009 | 401 | 16 | Letcher |
| PLLC | Larry & Connie Helton | 1.47 ac. | Jenkins | 5/15/2009 | 402 | 227 | Letcher |
| PLLC | Betty Williams, Jean Kelly, Billee W. Sanders | 3 tracts | Camden | 10/26/2009 | 404 | 233 | Letcher |
| PLLC | New Freedom Worship Center | 0.95 | Dunham | 1/15/2009 | 404 | 820 | Letcher |
| PLLC | Raymond & Tracy Branham | 0.41 | Shea Fork | 2/19/2010 | 405 | 200 | Letcher |
| PLLC | Duran & Dena Sparkman | 0.262 | Raven Rock Estates Lot #35 | 4/5/2010 | 405 | 688 | Letcher |
| PLLC | James Christopher Stewart | 0.226 | Raven Rock Estates Lot #27 | | | | Letcher |
| PLLC | Hobart Clay Johnson | 1.486 | Raven Rock Estates | 5/22/2012 | 416 | 651 | Letcher |
| PLLC | Hobart Clay Johnson | | Raven Rock Estates | 8/26/2013 | 421 | 704 | Letcher |
| PLLC | City of Jenkins | 0.6 | Dunham | 1/14/2013 | 418 | 818 | Letcher |
| PLLC | Mark C. & Tanya Wright | 25 | Mossy Bottom | 8/3/2012 | 418 | 793 | Letcher |
| PLLC | Mark C. & Tanya Wright to Jimmy & Kathy Mullins | | | 8/3/2012 | 418 | 790 | Letcher |
| PLLC | Beverly Wright | 1.32 | Shea Fork | 11/15/2012 | 419 | 737 | Letcher |
| PLLC | George and Kathy Johnson | 0.313 | Raven Rock Estates Lot #36 | 11/7/2013 | 423 | 88 | Letcher |
| PLLC | Gregory & Sue Johnson | 0.222 | Raven Rock Estates Lot #14 | 11/7/2013 | 423 | 65 | Letcher |
| PLLC | Gregory & Sue Johnson | 0.219 | Raven Rock Estates Lot #19 | 11/7/2013 | 423 | 70 | Letcher |
| PLLC | Gregory & Sue Johnson | 0.211 | Raven Rock Estates Lot #12 | 11/7/2013 | 423 | 75 | Letcher |
| PLLC | Gregory & Sue Johnson | 0.247 | Raven Rock Estates Lot #13 | 11/7/2013 | 423 | 80 | Letcher |

| ENTITY | PURCHASER | TOTAL ACRES | LOCATION | DATE OF PURCHASE | DEED BOOK | PAGE | COUNTY |
|--------|-----------|-------------|----------|------------------|-----------|------|--------|
| PLLC | George & Kathy Johnson | 0.316 | Raven Rock Estates Lot #8 | 11/7/2013 | 423 | 90 | Letcher |
| PLLC | Gregory & Sue Johnson | 18.01 | Little Elkhorn Creek US Rt. 23 near Jenkins | 9/5/2013 | 423 | 44 | Letcher |
| PLLC | Gregory & Sue Johnson | (Tr.1) 3.72 ac. (Tr2) 4.64 ac. | Little Elkhorn Creek US Rt. 23 near Jenkins | 9/5/2013 | 423 | 49 | Letcher |
| PLLC | Gregory, Garnie, and George Johnson | Tract 4 | Industrial Park | 9/24/2013 | 423 | 680 | Letcher |
| PLLC | Gregory, Garnie, and George Johnson | Tracts 1 & 2 | Little Elkhorn Creek | 9/24/2013 | 423 | 568 | Letcher |
| PLLC | Randy & Patricia Burke | 3.6 | Beefhide | 3/12/2014 | | | Letcher |
| PLLC | Jeffrey Cornett (JC) | | Potter Fork | 6/12/2014 | 424 | 691 | Letcher |
| PLLC | Skyview Community Recreation Area | 2 tracts | Bill Moore Branch | 6/12/2014 | 425 | 359 | Letcher |
| PLLC | Carl and Sherry Tucker | 1/3 acre | Burdine at Jenkins | 8/22/2014 | | | Letcher |
| PLLC | Commonwealth of KY DOT | Parcel No.12 | Fleming Neon | 7/16/2014 | | | Letcher |
| PLLC | Commonwealth of KY DOT | Parcel No.6 | McRoberts | 7/16/2014 | | | Letcher |
| PLLC | Appalachian Industrial Authority, Inc. | | Childs Branch | 1/9/2001 | 352 | 265 | Letcher |
| PLLC | Coda Mullins Jr (Cody) & Martha Mullins | Tract 1 & 2 | Wright Fork | 1/6/2015 | 427 | 445 | Letcher |
| PLLC | Commonwealth of KY DOT | Percel 3, Tr. A & B | Camden Rd.off KY 805 | 11/23/2015 | 431 | 523 | Letcher |
| PLLC | Jeffrey Cornett (JC) | 18.15 | Potter Fork | 6/13/2016 | 432 | 565 | Letcher |
| PLLC | City of Jenkins | Parcel B | Dairy Hollow | 3/1/1999 | | | Letcher |
| PLLC | John Phillip Walker | 3 acres | City of Jenkins | 5/15/2000 | 349 | 111 | Letcher |
| PLLC | Jonathan & Andrea Hatton | Lot Nos. 10 & 11 | Raven Rock Estates | 11/17/2016 | 434 | 836 | Letcher |
| PLLC | Ronnie Paul Newsome | Lot 26 | Raven Rock Estates | 7/29/2004 | 373 | 388 | Letcher |
| PLLC | Ronnie Paul Newsome | Lot 24 | Raven Rock Estates | 7/29/2004 | 373 | 392 | Letcher |
| PLLC | City of Jenkins (Deed of Corection) | | Water Tank Behind Clubhouse-Raven Rock Golf Course | 7/3/2017 | 437 | 79 | Letcher |
| PLLC | Raven Rock Holdings LLC | | Raven Rock Golf Course | 10/20/2017 | 438 | 270 | Letcher |
| PLLC | Ravens Nest LLC | | Raven Rock Golf Course | 10/20/2017 | 438 | 295 | Letcher |
| PLLC | Daniel Boone Johnson | | Grassy Fk. Branch | 10/5/2017 | | | Letcher |
| PLLC | Jeffrey Cornett (JC) | 37.11 | Potter Fk. of Boone Fk | 8/24/2018 | | | |
| PLLC | Gary & Denisa Wright | | Lick Fork | 8/10/2001 | | | Pike |
| PLLC | Robert L. Newsome | 0.56 | Long Fork | 5/17/2002 | | | Pike |
| PLLC | Gary & Denisa Wright | 1.28 | Lick Fork | 8/10/2001 | | | Pike |
| PLLC | Lavon & Mary Tackett | | Booker Br. | 3/31/2003 | | | Pike |
| PLLC | Keithel & Connie White | | Bear Fork | 6/27/2003 | 838 | 180 | Pike |
| PLLC | CSTL LLC (Bobby Smith) | 0.45 | Little Robinson Ck. | 4/3/2003 | 831 | 268 | Pike |
| PLLC | Evert F., Jr. & Judy Johnson | | Lick Branch | 11/10/2004 | 860 | 336 | Pike |
| PLLC | Steve Haynes | | Little Grassy Crk. | 9/22/2005 | 880 | 541 | Pike |
| PLLC | Bobby & Nell Ruth Spears | 78 | Blackburn Br. | 3/9/2007 | 902 | 510 | Pike |
| PLLC | John & Katherine Ray | 13 | Indian Creek | 3/30/2007 | | | Pike |
| PLLC | Thomas J. White | | Long Fork | 10/11/2012 | 992 | 169 | Pike |
| PLLC | Mark E. White | | Long Fork | 10/11/2012 | 992 | 166 | Pike |
| PLLC | Jimmy & Madonna Akers | 0.6 | Penny Road | 1/31/2008 | 918 | 452 | Pike |
| PLLC | Jimmy & Madonna Akers to | | Robinson Creek | 9/23/2009 | 944 | 697 | Pike |
| PLLC | Tiffany Dawn Akers | | | 12/18/2007 | | | Pike |

| ENTITY | PURCHASER | TOTAL ACRES | LOCATION | DATE OF PURCHASE | DEED BOOK | PAGE | COUNTY |
|--------|-----------|-------------|----------|------------------|-----------|------|--------|
| PLLC | Jimmy & Madonna Akers | 19.304 ac. surface only | Robinson Creek | 9/23/2009 | 946 | 117 | Pike |
| PLLC | Bradley & Kathy Johnson | | Sycamore Br. | 12/23/2011 | 985 | 154 | Pike |
| PLLC | Kentucky Power Company (AEP) | 58.91 | Faceup @ Elkhorn City | 12/19/2013 | 1009 | 106 | Pike |
| PLLC | Randy & Teresia Tackett | 0.8 | Sow Branch | 12/14/2014 | 1021 | 184 | Pike |
| PLLC | Jean Adams | | Little Fork | 1/13/2015 | 1023 | 11 | Pike |
| PLLC | Charles & Kimberley Brown | | Little Fork | 1/13/2015 | 1023 | 5 | Pike |
| PLLC | Randy & Micki J. Newsome | | Newsome Cemetery Road, Robinson Cr. | 12/1/2016 | | | Pike |
| PLLC | Charles J. Baird | Tracts 1,2,3,4,5 | Right Fk. of Long Fk. of Shelby Cr. (a/k/a/ Bob's Br.) | 2/11/2016 | 1034 | 532 | Pike |
| PLLC | LDF Properties, LLC | 3.2 | Pike County, Millard Area | 1/9/2019 | | | Pike |

# **EXHIBIT C**

## GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT
## AND BILL OF SALE

This **GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT AND BILL OF SALE** (this "**Agreement**"), dated as of September 23, 2019 (the "**Effective Date**"), is made and entered into by and among BEAR BRANCH COAL LLC, a Kentucky limited liability company, PERRY COUNTY COAL LLC, a Kentucky limited liability company, RAY COAL LLC, a Kentucky limited liability company, and WHITAKER COAL LLC, a Kentucky limited liability company (each a "**Seller**" and collectively, "**Sellers**") and American Resources Corporation, or its assignee at Closing ("**Buyer**").

In consideration of the mutual representations, warranties, covenants and agreements contained herein, the parties hereto agree as follows:

1.    This Agreement is subject in all respects to approval by the United States Bankruptcy Court for the Eastern District of Kentucky (the "**Bankruptcy Court**") in the chapter 11 bankruptcy cases of the Sellers, Case No. 19-51200(GRS) (Jointly Administered) (the "**Bankruptcy Cases**") by entry of an order in form and substance acceptable to Sellers and Buyer (the "**Sale Order**").

2.    Each Seller does hereby sell, transfer, assign, convey and deliver to Buyer, effective as of the Closing, all of the right, title and interest of such Seller in, to and under the Purchased Assets described on <u>Exhibit A</u>, free and clear of all (i) liens, claims, interests and encumbrances, to the fullest extent permitted by the Bankruptcy Code and by the order of the Bankruptcy Court authorizing and approving the transactions described in this Agreement ("**Liens**") (other than those Liens created by Buyer and Liens specifically permitted by the Sale Order) and (ii) Excluded Liabilities described on <u>Exhibit B</u>, and Buyer hereby accepts the sale, transfer, assignment, conveyance and delivery of such Seller's right, title and interest in all such Purchased Assets. This Agreement does not sell, transfer, assign, convey or deliver to Buyer any right, title or interest in, to or under the Excluded Assets described on <u>Exhibit C</u>.

3.    Buyer does hereby assume from Sellers and agrees to timely pay, perform and discharge in accordance with their respective terms, the Assumed Liabilities described on <u>Exhibit D</u>. Nothing in this Agreement shall be construed as the assumption by Buyer of any Excluded Liabilities.

4.    Each Seller does hereby sell, transfer, assign, convey, and deliver to Buyer, effective as of the Closing, all of the right, title and interest of such Seller in, to and under the Assumed Leases described on <u>Exhibit E</u> to which such Seller is a party, free and clear of all Liens (other than those Liens created by Buyer and Liens specifically permitted by the Sale Order) and Excluded Liabilities, and Buyer hereby accepts such assignment, and Buyer does hereby assume and agree to pay, perform and discharge, as and when due, all of the duties and obligations of such Seller under all such Assumed Leases arising from and after the Closing Date, except to the extent such duties and obligations constitute Excluded Liabilities.

5.  At Closing, each Seller shall sell, transfer, assign, convey and deliver to Buyer all of the right, title and interest of such Seller in, to and under the Assumed Purchased Contracts described on <u>Exhibit F</u> to which such Seller is a party, free and clear of all Liens (other than those Liens created by Buyer and Liens specifically permitted by the Sale Order) and Excluded Liabilities, and Buyer shall accept such assignment and assume and agree to pay, perform and discharge, as and when due, subject to the payment of all applicable cure costs by the Buyer, all of the duties and obligations of such Seller under all such Assumed Purchased Contracts arising from and after the Closing Date, except to the extent such duties and obligations constitute Excluded Liabilities, and Sellers are hereby relieved of any and all obligations and liabilities under the Assumed Purchased Contracts. Notwithstanding anything herein to the contrary, Buyer shall have the right in its sole and absolute discretion to amend <u>Exhibit F</u> prior to the Sale Hearing to add or remove any contract thereto or therefrom by providing written notice thereof to Sellers whereupon (i) any contract so added shall be an Assumed Purchased Contract and any contract so removed shall not be an Assumed Purchased Contract, and (ii) <u>Exhibit F</u> shall be deemed to be amended to add or remove such contract.  For purposes of this Agreement, "**Sale Hearing**" means that hearing held by the Bankruptcy Court to consider the approval of this Agreement and the entry of the Sale Order.

6.  Each Seller hereby agrees to sell, transfer, assign, convey and deliver to Buyer, at the Closing, all of the right, title and interest of such Seller in and to the Owned Real Property described on <u>Exhibit G</u>, free and clear of all Liens (other than those Liens created by Buyer and Liens specifically permitted by the Sale Order) and Excluded Liabilities, pursuant to special warranty or limited warranty deeds in form and substance reasonably acceptable to Sellers and Buyer, and Buyer hereby agrees to accept such assignment, and Buyer does hereby assume and agree to pay, perform and discharge, as and when due, all of the duties and obligations of such Seller relating to such Owned Real Property arising from and after the Closing Date, except to the extent such duties and obligations constitute Excluded Liabilities.

7.  Each Seller does hereby sell, transfer, assign, convey, and deliver to Buyer, effective as of the Closing, all of the right, title and interest of such Seller in and to the intercompany receivables solely related to the Perry County Operations; provided, however, that Buyer shall not, and shall not permit, engage, hire or otherwise authorize any other person to, collect, pursue collection of or otherwise enforce (or attempt to enforce) any rights with respect to any such intercompany receivables.

8.  Buyer will, or will cause its affiliates to, interview for employment all of the needed employees of the Perry County Operations (the "**Employees**").  Buyer shall hire, or cause its affiliates to hire, all such Employees for which it extends employment.  Those Employees that accept the offer of employment from Buyer or its affiliate shall be terminated by Sellers and their affiliates, as applicable, effective upon the Closing and shall become employed by Buyer or its affiliate, as applicable, effective upon the Closing.

9.  In consideration for the Purchased Assets, Buyer will: (i) assume the Assumed Liabilities (including the payment of all cure costs described on <u>Exhibit D</u> or as otherwise ordered

by the Bankruptcy Court) and (ii) pay Sellers the amount of $1.00 in immediately available funds.

10.     Each Seller is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of formation and, subject to any limitations that may be imposed on such Seller resulting from or relating to the Bankruptcy Cases (as defined herein), has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

11.     Subject to entry of the Sale Order, Sellers own or have a valid leasehold interest in the Purchased Assets and, as of the Closing Date, Buyer will be vested with good, marketable, and valid title to the Purchased Assets, free and clear of all Liens (other than those Liens created by Buyer and Liens specifically permitted by the Sale Order) and Excluded Liabilities, to the fullest extent permissible under law, including Sections 105, 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

12.     The Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transaction contemplated under this Agreement. Any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes; provided, however, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Fayette Circuit Court (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such proceeding in the United States District Court for the Eastern District of Kentucky) and any appellate court from any thereof, for the resolution of any such claim or dispute.   The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

13.     In the event that, within 90 days following the Closing Date, it is discovered and demonstrated to the satisfaction of the Buyer that certain assets, properties or rights, including fractional real property interests, owned, leased or subleased were conveyed to Buyer by Sellers but not previously used or held for use in connection with the Perry County Operations, then Buyer shall use its commercially reasonable efforts to assign, convey, lease or sublease, as applicable, such assets, properties, or rights to Sellers (or their designee), in each case upon the reasonable request of Sellers (or their designee).

14.     Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

15.  This Agreement represents the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. Notwithstanding any assignment, in whole or in part, of this Agreement or any rights or obligations hereunder, American Resources Corporation shall remain liable for all liabilities and obligations of Buyer hereunder.  All Exhibits attached to this Agreement are hereby incorporated herein by reference.

16.  This Agreement will be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and, where state law is implicated, the laws of the Commonwealth of Kentucky applicable to contracts made and performed in such State.

17.  This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

18.  Each party hereto agrees, upon the reasonable request of any other party hereto (and at such other party's expense), to make, execute and deliver any and all documents or instruments of any kind or character, and to perform all such other actions, that may be reasonably necessary or proper to effectuate, confirm, perform or carry out the terms or provisions of this Agreement.

19.  This Agreement may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by the parties hereto and approval of the Bankruptcy Court. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

20.  Following the Closing, Buyer shall deliver all coal shipments required by that certain Firm Pricing Agreement and Binding Term Sheet with ArcelorMittal Dofasco G.P. having an effective date of January 1, 2019, for which a "Provisional Payment" has been made on or before the Closing Date under that certain Prepayment Agreement entered into on the 23rd day of May 2019 between Carbon Partners, Inc. and Perry County Coal LLC.  On the Closing Date, a third party will survey the coal inventory at Sellers' Perry County operation.  If the inventory is insufficient to satisfy in the aggregate the coal shipments described above, then Sellers shall cause their affiliates to satisfy the deficit by shipping inventory of an equivalent value from the excluded (Clintwood Elkhorn) facility to the Perry County facility.  Any payments received under the Prepayment Agreement following the Closing Date shall be paid to Buyer.

21.  The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in this Agreement (the "**Closing**") will take place remotely by the electronic exchange of documents and signatures in PDF format at 10:00 a.m. (Eastern time) on the date that is no more than one business day following the satisfaction or waiver of the conditions set forth in this Section (other than conditions that

by their nature are to be first satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the parties hereto may designate in writing.  The date on which the Closing is held is referred to in this Agreement as the "**Closing Date**."  For all accounting, liability assumption and similar purposes hereunder, the Closing shall be deemed to have occurred at 12:01 a.m. (Eastern time) on the Closing Date.  The respective obligations of Buyer and Sellers to consummate the transactions contemplated by this Agreement are subject to the Bankruptcy Court having entered the Sale Order.  The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the following: (i) Sellers receiving evidence satisfactory to Sellers, in Sellers' reasonable discretion, that Buyer has a commitment from a reputable surety bond company to post all bonding required with respect to the Transferred Permits and, if applicable, any Assumed Leases or Assumed Purchased Contracts, and (ii) the Premier Elkhorn Transaction having closed or closing simultaneously with the Closing.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to Buyer having received from Richmond Hill Capital Partners, LP, Essex Equity Joint Investment Vehicle, LLC, Alliance Prime Associates, Inc. or their affiliates, prior to or simultaneously with Closing, $250,000 and an agreement satisfactory to Buyer to fund the first two post-Closing employee payrolls for the Perry County Operations.  For purposes of this Agreement, "**Premier Elkhorn Transaction**" means the transaction for the sale of substantially all of the assets of Premier Elkhorn Coal LLC and other assets contemplated by that certain General Assignment and Assumption Agreement and Bill of Sale dated September 22, 2019.

22.    This Agreement may be terminated prior to the Closing by Buyer or Sellers, if the Closing has not occurred by 5:00 p.m. Eastern time on September 27, 2019 (or such later date as has been mutually agreed in writing by the Sellers and Buyer).

23.    WITH RESPECT TO ALL MATTERS SOLD, ASSIGNED, TRANSFERRED AND CONVEYED PURSUANT HERETO, SUCH MATTERS ARE HEREBY SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO BUYER ON AN "AS IS", "WHERE IS", "WITH ALL FAULTS" BASIS, WITHOUT ANY REPRESENTATION, WARRANTY, GUARANTY, PROMISE, PROJECTION OR PREDICTION WHATSOEVER WITH RESPECT TO SUCH MATTERS, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW OR UNDER THE UNIFORM COMMERCIAL CODE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

Sellers:

**BEAR BRANCH COAL LLC,
PERRY COUNTY COAL LLC,
RAY COAL LLC,
WHITAKER COAL LLC**

By:_____

Name: _____

Title: _____

BUYER:

**AMERICAN RESOURCES
CORPORATION OR ITS ASSIGNEE AT
CLOSING**

By: _____

Name: _____
Thomas Sauve

Title: _____
President

## EXHIBIT A

**Purchased Assets**

For purposes of this Agreement, "Perry County Operations" means the coal operations operated by the Sellers.

The Purchased Assets are all leases, interests in real property, contracts, governmental permits and/or authorizations (including the Transferred Permits listed below), improvements, equipment, parts and inventory, coal inventory, all deposits (including, but not limited to, insurance and utility deposits), maps, electronic files, records and employee information (to the extent permitted by law) which are (a) necessary and desirable for the operation of the Perry County Operations as such operations would be operated by an experienced and prudent operator, and (b) owned or leased by Sellers with respect to the Perry County Operations. The Purchased Assets also include any real property, improvements, leases, equipment, parts and inventory and coal inventory located within the Perry County Operations whether or not contained within, on, or under the permits listed below.

Transferred Permits:

| Company | New Permit | Issued | Old Permit | |
|---|---|---|---|---|
| Bear Branch Coal LLC | 897-5153 | 01/09/18 | 897-5100 | Mine E3-1 & E4-1 |
| Bear Branch Coal LLC | 897-8063 | 12/14/16 | 897-8028 | Stockpile Area Mine E3-1 & E4-1 |
| Bear Branch Coal LLC | 897-9009 | 05/17/17 | 897-9002 | Mine E3-1 & E4-1 Coarse Fill & Mining |
| Whitaker Coal LLC | 897-0603 | 06/16/17 | 897-0424 | Messer Br Refuse |
| Whitaker Coal LLC | 897-0604 | 02/24/17 | 897-0426 | Warehouse/Roads |
| Whitaker Coal LLC | 897-0605 | 01/24/17 | 897-0427 | Messer Br Refuse Davidson Br |
| Whitaker Coal LLC | 897-0606 | 02/23/17 | 897-0428 | Jade Mine/ Eversole Refuse |
| Whitaker Coal LLC | 897-5155 | 06/23/17 | 897-5121 | Mine E4-2 |
| Whitaker Coal LLC | 897-5156 | 02/07/17 | 897-5125 | Proposed Jake Br Mine |
| Whitaker Coal LLC | 897-5157 | 05/12/17 | 897-5126 | Proposed Jake Br Mine |
| Whitaker Coal LLC | 897-5158 | 02/23/17 | 897-5127 | Wooten Br Proposed Portal E4-2 |
| Whitaker Coal LLC | 897-8064 | 02/22/17 | 897-8035 | Davidson Br Prep Plant |
| Whitaker Coal LLC | 897-9010 | 06/20/17 | 897-9005 | Foursaem Refuse |

The permit numbers listed above are permit numbers that are either currently assigned or formerly assigned permit numbers, depending upon current permit transfer status to the applicable Seller. The permit numbers listed are for reference to a specific mine; Buyer and Sellers agree that the actual permit number may vary due to a portion of the permits being in different phases of transfer at this time.  All associated KPDES/NPDES permits and any and all air quality and other associated permits are included herein as Purchased Assets.

Sellers and Buyer agree to promptly execute, and shall thereafter comply with the terms of, the Interim Permit Operating Agreement attached hereto as <u>Exhibit A-1</u> and incorporated herein by reference.

# **EXHIBIT A-1**

## **Interim Permit Operating Agreement**

See attached.

## PERMIT OPERATING AGREEMENT

**THIS PERMIT OPERATING AGREEMENT** ("*Permit Agreement*") is dated [●], 2019, and is made and entered into by and between [●], a [●], [●], a [●] (collectively "*Transferor*"), and [●], a [●] ("*Transferee*").

## WITNESSETH:

**WHEREAS**, Transferor and Transferee have entered into that certain General Assignment and Assumption Agreement and Bill of Sale dated September [●], 2019 (the "*Purchase Agreement*") pursuant to which Transferor is to transfer to Transferee the Permits (as defined below); and

**WHEREAS**, Transferor is in possession of, and is designated as "*Permittee*" of, under and pursuant to, those permits set forth on *Exhibit A* issued by the Kentucky Department of Natural Resources (the "*KDNR*") and other applicable governmental bodies (such permits, as amended and revised, together with all other Transferred Permits (as defined in the Purchase Agreement), collectively, the "*Permits*"); and

**WHEREAS**, pursuant to the Purchase Agreement, Transferee is obligated to become the permittee under each of the Permits and to conduct certain operations on the properties and assets being acquired by Transferee pursuant to the Purchase Agreement; and

**WHEREAS**, Transferee has filed or shall file, in accordance with the terms of this Permit Agreement, all necessary applications to transfer the Permits from Transferor to Transferee, to have Transferee designated as an "operator" under the Permits, to, if applicable, obtain "advance approvals" of both the transfer and operator status for the Permits from the KDNR and other governmental bodies, as applicable ("*Transfer Applications*"), and to obtain the approvals of all applicable governmental bodies with respect thereto ("*Transfer Approvals*") all as more particularly set forth herein; and

**WHEREAS**, the parties to the Purchase Agreement desire to close the transactions contemplated by the Purchase Agreement before the Transfer Approvals are obtained, and to have Transferor and Transferee enter into this Permit Agreement to govern the rights, obligations and liabilities of Transferor and Transferee in any way related to the Permits during the period of time beginning on the Closing Date (as defined in the Purchase Agreement) and continuing through the date of receipt of all Transfer Approvals (the "*Interim Period*").

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual covenants and representations contained herein, the reasonableness, adequacy and sufficiency of which are hereby acknowledged, the parties, each intending to be legally bound, hereby agree as follows:

1.    <u>Capitalized Terms</u>.  All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Purchase Agreement.

2.    <u>Transfer Applications</u>.

(a)    As promptly as practicable, and in no event later than thirty (30) days after the Closing Date, Transferee shall submit Transfer Applications to all applicable governmental bodies necessary to facilitate the Transfer Approvals for the Permits, including, if applicable, a request for advance approval of the transfer of the Permits, except for any Transfer Application which may not be filed until Transferee can demonstrate ownership and control of the real property that constitutes part of the Purchased Assets (the "***Purchased Real Property***"), which shall be properly filed promptly after the Purchased Real Property is transferred in accordance with the Purchase Agreement.

(b)    Transferee shall be responsible (with the reasonable cooperation and assistance of Transferor, at Transferee's sole cost and expense) for preparing and assembling drafts of all Transfer Applications and other documentation to be submitted to the applicable governmental bodies in connection with the approval of the Transfer Applications for the Permits (the "***Permit Application Approvals***") or the Transfer Approvals, responding to data or information requests received from such governmental bodies in connection therewith, and otherwise securing the Permit Application Approvals and the Transfer Approvals.  Any and all costs and expenses in connection with obtaining the Permit Application Approvals and the Transfer Approvals and designating Transferee as an operator under the Permits, if required, including any and all necessary filing fees for the Transfer Applications, costs of advertising the filing of the Transfer Applications and costs and expenses payable to any governmental body in connection with the Transfer Applications, shall be borne by Transferee.

(c)    Following the submission of the Transfer Applications, Transferee agrees to diligently prosecute the Transfer Application process contemplated hereby to obtain the Permit Application Approvals and the Transfer Approvals, and Transferor agrees to promptly review and/or provide any documents required of Transferor to facilitate such process.  Without obtaining the prior written approval of Transferor (which consent shall not be unreasonably withheld, conditioned or delayed), Transferee agrees that it shall not seek in any of the Transfer Applications to change any condition of mining or reclamation obligation established in the Permits (other than the identity of the operator) or delete or add property to the Permits, if the effect of such request or modification thereto would delay or otherwise hinder obtaining prompt approval of the Transfer Applications or the release of any Bonds (as defined below) or other security, if any, of Transferor or its affiliates, except, in each case, (i) for actions ordered by an applicable governmental body, (ii) as required to abate or resolve any notice of non-compliance, (iii) as required in connection with any mid-term review or renewal of any such Permits, (iv) as required in connection with any pending actions, or (v) as required in connection with similar permitting developments. Transferee and Transferor agree to sign all documents reasonably required by any governmental body in connection with the Permit Application Approvals or the Transfer Approvals.  In the event of the denial of any Permit Application

Approval or Transfer Approval by the appropriate governmental body, Transferee shall, at Transferee's sole cost and expense, until such denial is reversed, use commercially reasonable efforts to diligently pursue and exhaust all administrative and judicial remedies afforded to Transferee in the event of such denial.

(d)     So long as Transferee is in compliance in all material respects with its obligations under this Permit Agreement and the Purchase Agreement, Transferor shall take commercially reasonable action (including, without limitation, filing and diligently prosecuting any permit renewals), at Transferee's sole cost and expense, to maintain each Permit in full force and effect until the Transfer Approval is obtained with respect thereto, provided that, if any such action will or may subject Transferor to any material cost, expense or liability, Transferor may refrain from taking such action until and unless it receives reasonably adequate assurance that Transferee is capable of indemnifying, reimbursing, holding harmless or otherwise making whole Transferor for any and all costs, expenses and liabilities that may result or arise from such action.

3.      Transfer of Operatorship.

(a)     At Closing, Transferee will submit all documentation necessary to designate Transferee, its affiliates or designees as an "operator" on each of the Permits. During the Interim Period, subject to first obtaining any required administrative consent or approval and complying with any other requirement of any governmental body   (including, if applicable, filing a request for advance approval of the transfer of the Permits), Transferor, to the extent Transferor has a legal right to do so, designates Transferee and its affiliates as an operator under, and grants to Transferee and its affiliates the right to immediately engage in mining operations and all other legally permissible activities on the premises permitted under, the Permits, subject to the terms and conditions of this Permit Agreement, each applicable Assumed Lease and the Permits.  With respect to such mining operations and other legally permissible activities conducted by Transferee during the Interim Period, Transferee shall operate solely as an independent contractor and not as an agent, employee, or servant of Transferor. Except as otherwise provided in this Permit Agreement, (i) all of Transferee's post-Closing operations pursuant to this subsection shall be at the sole cost, risk, liability and expense of Transferee and (ii) any benefit gained from such post-Closing operations by Transferee pursuant to this subsection shall likewise be for the sole account and benefit of Transferee.

(b)     Unless completed prior to Closing or otherwise agreed upon, in writing, by the parties hereto, within the time period set forth in Section 2(a) to submit Transfer Applications for the Permits, (i) Transferee and Transferor shall execute and deliver to Transferee all necessary applications and such other forms as may be required by applicable governmental bodies in connection with obtaining the Permit Application Approvals or the Transfer Approvals, (ii) to the extent required by applicable law, Transferee shall use commercially reasonable efforts

to obtain the signatures of all contract miners used by Transferor on the properties covered by the Permits, (iii) to the extent required by applicable law, Transferor and Transferee shall use commercially reasonable efforts to designate Transferee or its affiliates as an "operator" under the Permits, and (iv) Transferee shall use commercially reasonable efforts to obtain a fully executed consent from each Person that has granted a dwelling distance waiver with respect to the Permits, to the extent required by applicable law.

4.     <u>Operation on Permits</u>.   Except for the Transferor's Obligations (as defined below), upon execution of this Permit Agreement, all liabilities, conditions, obligations, responsibilities and other matters pertaining to the Permits shall be the responsibility of Transferee.  It is expressly acknowledged and agreed by the parties that Transferee is desirous of immediately commencing and continuing mining and reclamation operations upon the property covered by the Permits.   In recognition thereof, it is expressly agreed by Transferor that Transferee shall have the right to commence and continue, immediately upon the execution of this Permit Agreement, mining, reclamation and related activities under the terms and conditions of the existing Permits as a designated operator for Transferor upon the property covered by the Permits, with indemnification of Transferor by Transferee during the Interim Period as set forth herein.  Prior to commencing operations on the property covered by the Permits, Transferee shall obtain, and provide to Transferor, copies of all licenses or authorizations required for Transferee to be designated as a designated operator under the Permits until the Transfer Approvals have been obtained from the applicable governmental bodies.  For purposes of this Permit Agreement, "*Transferor's Obligations*" means all liabilities and obligations of Transferor expressly set forth in this Permit Agreement or the Purchase Agreement. The Transferor's Obligations, to the extent not fully completed and satisfied, shall survive the termination of this Permit Agreement.

5.     <u>Right of Entry.</u>   In addition to any and all rights of access granted to Transferee under the Purchase Agreement, Transferor does hereby grant to Transferee a right of entry on, over and across the property covered by the Permits, together with the right of ingress, egress and regress to and from such property (to the extent of Transferor's authority to do so without the resulting breach of the instruments by which Transferor has rights in the property), as required by law or necessary to maintain and comply with the terms of the applicable Assumed Leases and the Permits, exercise its rights and perform its obligations under the Purchase Agreement, this Permit Agreement and the other documents executed pursuant to the Purchase Agreement, and to perform reclamation obligations related to the Permits.  Transferee, to the extent necessary, grants to Transferor, its successors, assigns and contractors, right of entry to the property covered by the Permits, together with the right of ingress, egress and regress to and from such property (to the extent of Transferee's authority to do so without the resulting breach of the instruments by which Transferee has rights in the property):  (a) as may be necessary to segregate and remove the Excluded Assets; (b) as may be necessary for the transfer of the Permits and the release of the Bonds related thereto; (c) to complete any of the Transferor's Obligations; and (d) to review records relating to the Permits and for any other lawful purpose reasonably necessary to exercise its rights under the Purchase Agreement or this Permit Agreement, including correcting, as permitted pursuant to the terms of the Purchase Agreement or this Permit Agreement, any violations of any applicable laws pertaining to the premises subject to the Permits that have not been, and are not being, timely corrected by Transferee, in each case for the foregoing clauses (a) through (d), subject to the terms, conditions, limitations

and restrictions set forth in this Permit Agreement and the Purchase Agreement. The immediately preceding sentence shall survive the term and termination of this Permit Agreement.

6.   <u>Certain Obligations.</u>

(a)   <u>Transferee's Obligations</u>.  Upon the date hereof, except to the extent the liability, performance or other matters constitute the Transferor's Obligations or are matters for which Transferee is entitled to be indemnified by Transferor under the Purchase Agreement, Transferee shall (i) be responsible  and liable for, and shall timely perform, all liabilities and obligations of Transferee expressly set forth in this Permit Agreement or the Purchase Agreement and any and all monitoring, sampling, reporting, maintenance, reclamation and remedial obligations and liabilities under the Permits and for timely compliance with the terms and conditions of the Permits, and (ii) have the duty at its sole cost and expense to timely defend and abate any non-compliance issued on the Permits, whether arising before, on or after the date hereof, to pay all fines and assessments related thereto (excluding any monetary fines and penalties imposed by any governmental body for which Transferor has received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date to the extent relating to periods prior to the Closing Date), to correct all such non-compliances, and to perform all abatement measures required by the applicable governmental bodies.   In the event that either Transferor or Transferee receives written notice of any non-compliance with the Permits or applicable safety or environmental laws, including but not limited to Mine Safety and Health Administration ("***MSHA***") violations or Imminent Danger Orders issued under Section 107(a) of the Federal Mine Safety and Health Act of 1977 (the "***Mine Act***"), a written notice from MSHA that a mine covered by a Permit has a pattern of violations of mandatory health or safety standards of such nature as could have significant and substantial contribution to the cause and effect of mine health or safety hazards under Section 104(e) of the Mine Act, Office of Surface Mining ("***OSM***") citations, or a written notice of Reportable Incidents (as defined in the Mine Act), then it shall give written notice of the non-compliance to the other party promptly, and in any event within 2 business days (or in the case of receipt of a cessation order, immediately), of receipt of such notice.  If Transferee fails to timely defend any non-compliance that it is required to defend pursuant to this Section 6(a) or does not promptly and in good faith take any and all actions necessary to abate such non-compliance, then Transferor shall have the right (but not the obligation), itself or through its contractors, to defend and/or abate said non-compliance and to freely and without unreasonable interference from Transferee enter upon the property covered by the Permits to do all things that Transferor deems necessary to abate any such non-compliance, and Transferee shall reimburse Transferor for all costs and expenses associated with such defense and/or abatement, including the work required to abate any such non-compliance and any and all reasonable attorneys' or other professionals' fees that are incurred by Transferor relating thereto.  Transferor shall provide copies of all inspection sheets received from the KDNR or other applicable governmental

body in respect of the Permits or applicable safety or environmental laws to Transferee within five (5) business days of receipt of such sheets.

(b)     <u>Transferor's Obligations.</u>     Transferor shall timely perform the Transferor's Obligations, and shall timely cure any non-compliance arising thereunder or associated therewith.  If Transferor fails to defend any such non-compliance and does not promptly and in good faith take any and all commercially reasonable actions necessary to abate such non-compliance, then Transferee shall have the right (but not the obligation), itself or through its contractors, to defend and/or abate said non-compliance and to freely and without unreasonable interference from Transferor do all things that it deems necessary to abate such non-compliance, and Transferor shall reimburse Transferee for all reasonable costs and expenses associated with such defense and/or abatement, including the work required to abate any such non-compliance and any and all reasonable attorneys' or other professionals' fees that are incurred by Transferee relating thereto.

7.     <u>Replacement Bonds</u>.  Simultaneously with the filing of the Transfer Applications in accordance with the terms of this Permit Agreement, Transferee shall, or shall cause its affiliate to, post all bonds (or other appropriate collateral of a type satisfactory to the appropriate governmental bodies) necessary to obtain the applicable Transfer Approval and cause a full and complete release of the Bonds once the applicable Transfer Approval is obtained.  Transferee is solely responsible for the maintenance of the bonds it posts with respect to the Permits, including the costs and expenses thereof.  The obligations contemplated hereunder shall be on a Permit-by-Permit basis and in no event shall performance be delayed until all Transfer Applications are complete and/or all Permit Application Approvals have been obtained.  Transferee shall take all commercially reasonable steps necessary to ensure that all Bonds (and all deposits, letters of credit or other collateral, if any, posted as security by Transferor or any of its affiliates with respect to the Bonds) and any cash bonds or letters of credit posted by Transferor or its affiliates directly with the applicable governmental body in connection with a Permit shall be refunded in full and/or returned to Transferor and/or its affiliates or Transferee, as provided in the Purchase Agreement, as soon as reasonably practicable after the Transfer Approval is obtained.

8.     <u>Bond Maintenance</u>.  Transferor and its affiliates shall leave in place the bonds of Transferor posted with respect to each of the Permits (collectively, the "***Bonds***") until such Bonds are released by the applicable governmental body following the applicable Transfer Approval and shall cause the security, if any, they have posted for the Bonds to remain in place during the Interim Period; *provided however,* that Transferee shall be solely responsible for all costs associated with the Bonds from and after the Closing Date and Transferee agrees to reimburse Transferor, or upon request from Transferor to pay as and when due directly on behalf of Transferor to the appropriate third party, any amounts payable related to or arising from any Bond during the period from the Closing Date until such Bond is released.  For the avoidance of doubt, Transferee shall be solely responsible for the obligation to replace the applicable Bonds notwithstanding any provision of this Section 8 to the contrary.

9.     <u>Indemnifications.</u>

(a)     <u>Indemnification by Transferee.</u>  Transferee shall indemnify, defend, and save harmless, Transferor, its affiliates and their respective members, managers, officers, directors, stockholders, employees, agents, representatives, successors and assigns from and against any and all liabilities or other obligations in any way arising out of, resulting from or in connection with (i) the Permits; (ii) the performance of the operations of Transferee on the property covered by the Permits; (iii) the use by Transferee of the property covered by the Permits; (iv) the Bonds; or (v) Transferee's obligations under this Permit Agreement or the Purchase Agreement, in each case, other than those liabilities or other obligations solely to the extent arising out of, resulting from or in connection with the Transferor's Obligations.

(b)     <u>Indemnification by Transferor.</u>  Transferor shall indemnify, defend, and save harmless Transferee, its affiliates and their respective members, managers, officers, directors, stockholders, employees, agents, representatives, successors and assigns from and against any and all liabilities or other obligations in any way arising out of, resulting from or in connection with the Transferor's Obligations (other than those liabilities and other obligations solely to the extent arising out of, resulting from or in connection with the obligations of Transferee under this Permit Agreement or the Purchase Agreement).

(c)     <u>Survival.</u>  The indemnification obligations in this Permit Agreement shall survive the term and termination of this Permit Agreement.

10.     <u>Insurance.</u>  At all times during the term of this Permit Agreement, Transferee shall, at its sole cost and expense, provide and maintain insurance covering Transferee's operations and assets and any and all liabilities relating thereto of the type and in the amounts set out in *Exhibit B* attached hereto and incorporated herein by reference and shall comply with the terms and conditions set forth on such exhibit.  Prior to its entry onto the Purchased Real Property, Transferee shall provide Transferor with certificates of insurance that indicate that Transferee has the required insurance.  The insurance limits and coverages specified in the attached *Exhibit B* are minimum requirements and shall not be construed in any way to limit Transferee's liability.  Such insurance shall be maintained with one or more reputable insurance companies that customarily insure risks in the coal industry.  To the extent permitted under the applicable insurance policies, Transferee shall designate Transferor as an additional insured on all such policies and shall provide Transferor with a certificate of insurance or other proof reasonably satisfactory to Transferor as to such insurance coverage.

11.     <u>Accident Notice.</u>  Transferee shall promptly provide written notice to Transferor of any accidents or occurrences resulting in injuries to persons or property in any way arising out of or related to the operations of Transferee, its affiliates or their respective agents, representatives or contractors hereunder.

12.     <u>Termination.</u>  Except to the extent otherwise provided herein, this Permit Agreement, and the obligations of the parties hereunder, shall terminate with respect to each Permit upon the parties obtaining all Transfer Approvals and the release of all Bonds with

respect to such Permit and shall terminate in its entirety upon the parties obtaining all Transfer Approvals and the release of all Bonds with respect to all Permits.

13.    <u>Applicant Violator System</u>.   Transferee hereby represents and warrants to Transferor that neither Transferee nor any of its affiliates is permit blocked on the Applicant Violator System by any governmental body.   Transferor hereby represents and warrants to Transferee that neither Transferor nor any of its affiliates is permit blocked on the Applicant Violator System by any governmental body.

14.    <u>Right to Injunctive Relief</u>.   Transferee acknowledges and agrees that, in the event of a breach or threatened breach of any of Transferee's obligations regarding operations under the Permits or other obligations under this Permit Agreement, Transferor may suffer irreparable harm for which it would have no adequate remedy at law and, accordingly, shall be entitled to an injunction or other equitable relief (including a temporary restraining order or preliminary injunction) against such breach or threatened breach. Transferee waives, to the fullest extent permitted by law, the requirement of the posting of any bond or other security in connection with such injunctive or other equitable relief.   Transferee hereby agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Permit Agreement by Transferee and to specifically enforce the terms and provisions of this Permit Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Transferee under this Permit Agreement all in accordance with the terms of this Section.

15.    <u>Cooperation</u>.   Transferor and Transferee agree to fully cooperate, and to cause their respective affiliates to fully cooperate, with each other in all filings and other actions that may be necessary to obtain the Transfer Approvals, including providing any additional information and the preparation and execution of any additional documents; *provided, however*, Transferor shall not be obligated to incur any liability or pay any money to any third party in connection with such cooperation.

16.    <u>Notice</u>. Except as otherwise specified in this Permit Agreement, all notices, requests, demands and other communications under this Permit Agreement shall be in writing and shall be deemed to have been duly given on the date when personally delivered to the party to whom notice is to be given, on the date of transmission if sent by confirmed e-mail, or on the second day after mailing, if mailed to the party to whom notice is to be given, by nationally recognized overnight delivery service and properly addressed as follows:

TO TRANSFEROR:

c/o Cambrian Coal LLC
P.O. Box 2100
Pikeville, KY 41502
Attn: President
Email: mark.campbell@cambriancoal.com

With a copy (which shall not constitute notice) to:

Frost Brown Todd LLC
Lexington Financial Center
250 W. Main Street, Suite 2800
Lexington, KY  40507-1749
Attn:  Jeffrey L. Hallos
Email: jhallos@fbtlaw.com

TO TRANSFEREE:

[●]

With a copy (which shall not constitute notice) to:

[●]

Any party may change its contact information for the purposes of this Section by giving the other party hereto written notice of the new address in the manner set forth above.

17.    Miscellaneous.

(a)    Succession; Assignment. This Permit Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Transferee may not assign this Permit Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of Transferor, which consent may be withheld in Transferor's sole and absolute discretion.

(b)    Counterparts. This Permit Agreement may be executed in counterparts (including via facsimile and e-mail), each of which shall be deemed an original, but all of which together shall constitute one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto.  The executed Permit Agreement together with any attachments hereto may be photocopied and stored on computer tapes, disks and similar electronic storage media ("***Imaged Document***").  If an Imaged Document is introduced as evidence in any judicial, arbitration, mediation or administrative proceeding, neither party shall object to the admissibility of the Imaged Document on the basis that such was not originated or maintained in documentary form under either the hearsay rule, the best evidence rule, or other rule of evidence.

(c)    Waiver.  The failure of either party to seek redress for violation of or to insist upon a strict performance of any term or condition of this Permit Agreement shall not be considered a waiver, nor shall it deprive that party of the right thereafter to insist upon strict adherence to that or any other term of this Permit Agreement.

(d)    Severability.  If any provision of this Permit Agreement or its application will be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of all other applications of that provision, and of all other provisions and applications hereof, will not in any way be affected or impaired.  If

any court shall determine that any provision of this Permit Agreement is in any way unenforceable, such provision shall be reduced to whatever extent is necessary to make such provision enforceable.

(e)   Headings.  The headings contained in this Permit Agreement are included for purposes of convenience of reference only and shall not affect the construction or interpretation of any of its provisions.

(f)   Entire Agreement.   This Permit Agreement, together with the Purchase Agreement, constitute the entire agreement and understanding of the parties related to the subject matter hereof, and supersede all prior proposals, understandings, agreements, correspondence, arrangements and contemporaneous oral agreements relating to the subject matter of this Permit Agreement.  In the event of a conflict between the provisions of this Permit Agreement and the Purchase Agreement, the provisions of this Permit Agreement shall control.  This Permit Agreement shall not be amended or modified, and no waiver of any provision hereof shall be effective, unless set forth in a written instrument authorized and executed by all the parties hereto.

(g)   Waiver of Right to Trial by Jury.   **EACH OF TRANSFEROR AND TRANSFEREE WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS PERMIT AGREEMENT OR ANY PROVISION HEREOF.**

(h)   Governing Law.  This Permit Agreement will be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, other federal law, where applicable, and, where state law is implicated, the laws of the Commonwealth of Kentucky without regard to or application of conflict of laws principles.

(i)   Submission to Jurisdiction; Consent to Service of Process.  Without limiting any right of Transferor or Transferee to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Permit Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Permit Agreement or any breach or default hereunder, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and Transferor and Transferee hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 16 hereof; *provided, however,* that if any Bankruptcy Case has been closed pursuant to Section 350 of the Bankruptcy Code, Transferor and Transferee agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Fayette Circuit Court and any state appellate court therefrom within the Commonwealth of Kentucky (or, in the event (but only in the event) that such court does not have subject matter jurisdiction over such legal proceeding, in the United States District Court for the Eastern District of Kentucky) and any appellate court from any thereof, for the resolution of any such

claim or dispute.   Transferor and Transferee hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.   Each of Transferor and Transferee agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.   Each of Transferor and Transferee hereby consents to process being served by any other party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 16; provided, however, that such service will not be effective until the actual receipt thereof by the party being served.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned have executed or caused this Permit Agreement to be executed by their respective officers thereunto duly authorized, each with the intent to be legally bound, as of the date first written above.

Transferor:

**[●]**

By: _____
Name: _____
Title: _____

**[●]**

By: _____
Name: _____
Title: _____

Transferee:

**[●]**

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO PERMIT OPERATING AGREEMENT

## **EXHIBIT A**

## **PERMITS**

## EXHIBIT B

## MINIMUM INSURANCE REQUIREMENTS

| Type of Insurance Coverage | Minimum Limits of Liability | Minimum Scope of Coverage |
|---|---|---|
| *Workers' Compensation Insurance* | statutory amount | • as required by applicable law<br>• coverage shall extend to primary state of employment<br>• coverage shall extend to "leased workers"/borrowed servants, to the extent any such persons are used |
| *Employer's Liability Insurance* | $1,000,000 for each accident | • bodily injury by accident or disease, including death, arising out of and in the course of employment<br>• coverage shall extend to "leased workers"/borrowed servants, to the extent any such persons are used |
| *Commercial General Liability Insurance* | $1,000,000 for each occurrence and $2,000,000 aggregate for death, bodily injury, and property damage | • premises/operations<br>• independent contractors and subcontractors<br>• personal and advertising injury<br>• products/completed operations<br>• blanket contractual liability – written and oral<br>• explosion, collapse, subsidence, and underground coverage |
| *Commercial Automobile Liability Insurance* | $1,000,000 for each accident for death, bodily injury, and property damage | • owned vehicles<br>• non-owned vehicles<br>• hired vehicles<br>• leased vehicles |
| *Excess or Umbrella Liability* | $5,000,000 for each occurrence | • the minimum scope of coverage shall be as broad as the underlying insurance policies, and, irrespective of underlying insurance coverage, shall include (a) employer's liability, (b) commercial general liability, including contractual liability, and (c) commercial automobile liability<br>• no "laser exclusions" related to activities during the Interim Period shall be included in the policy (*i.e.*, special exclusions that specifically name certain activities, products, services, or work as not being insured under the policy) |

### Terms and Conditions

1. All insurance required by this Permit Agreement is to be occurrence based.
2. All insurance required by this Permit Agreement shall include endorsements signed by the applicable insurance carrier(s) that name Transferor and its parents, subsidiaries, affiliates, successors, and assigns, and all of their current and former directors, officers, employees, shareholders, members, partners, agents, and representatives, (collectively, the "<u>Additional Insureds</u>," and individually, an "<u>Additional Insured</u>") as additional insured with respect to liability arising out of the activities performed by or on behalf of

EXHIBIT TO PERMIT OPERATING AGREEMENT

Transferee and allow an Additional Insured to be a permissible claimant thereunder; provided, however, such a requirement shall not apply to the workers' compensation insurance required by this Permit Agreement.

3. All insurance required by this Permit Agreement shall be primary and not contributory as to any other insurance and self-insurance that an Additional Insured may have in effect.

4. All insurance required by this Permit Agreement shall (a) waive any rights of subrogation against the Additional Insureds, and (b) have adequate territorial and navigation limits for each applicable state wherein Transferee's operations are located.

5. All insurance required by this Permit Agreement shall (a) be with insurers authorized to conduct insurance business in each state in which insured entities, assets, operations or liabilities are located, (b) be placed with insurers that have a current A.M. Best's rating of no less than A-VII, and (c) include endorsements so as to provide to Transferor no less than thirty (30) calendar days' notice of suspension or termination of coverage or any material change in coverage.

6. All deductibles or self-insured retentions are the sole responsibility of Transferee to pay.

7. Transferee shall not enter onto the Purchased Real Property until all insurance set forth in this Permit Agreement is in place. Transferee shall provide to Transferor certificates of insurance and endorsements signed by an authorized representative of the insurer evidencing that the minimum insurance coverage set forth in this Permit Agreement is in full force and effect, including disclosing any deductibles or self-insured retentions. If policies for which certificates have previously been furnished to Transferor expire during the course of this Permit Agreement, certificates evidencing the renewals of such policies shall immediately be provided to Transferor.

8. Failure on the part of Transferee to maintain the required insurance shall constitute a material breach of this Permit Agreement, which shall give Transferor the right to terminate this Permit Agreement immediately upon notice.

9. All insurance obligations of Transferee are in addition to Transferee's obligations of indemnity and shall not be construed as limiting Transferee's indemnity obligations to the amount of the insurance coverage.

10. The insurance coverage obligations set forth in this Exhibit are minimum coverage requirements only. To the extent Transferee maintains insurance coverage greater than these minimum requirements, such greater insurance coverage shall be applicable to any activities conducted during the Interim Period and to any liabilities and obligations of Transferee under this Permit Agreement. In addition, with respect to those forms of coverage where additional insured status is required by this Permit Agreement, the Additional Insureds shall be entitled to the benefit of the full available limits of liability maintained by Transferee, regardless of the limits of liability set forth in any certificate of insurance issued to the Additional Insureds and regardless of whether such coverage is primary, excess, contingent, or otherwise. By specifying minimum insurance requirements, Transferor does not assert or recommend this insurance as being adequate for any activities conducted during the Interim Period, and Transferee remains solely responsible to inform itself of the types and amounts of insurance coverage that may be appropriate.

11. Transferee shall ensure that all of its contractors performing activities on the property covered by the Permits shall maintain customary insurance in accordance with Transferee's standard contractor insurance requirements. Transferee's insurance will respond to any deficiency in coverage between the minimum insurance coverage set forth in this Permit Agreement and the insurance maintained by Transferee's contractors.

EXHIBIT TO PERMIT OPERATING AGREEMENT

## **EXHIBIT B**

**Excluded Liabilities**

All liabilities not identified in <u>Exhibit D</u> to this Agreement as Assumed Liabilities are Excluded Liabilities.

## EXHIBIT C

**Excluded Assets**

Excluded Assets are (a) any and all assets (i) not identified as a Purchased Asset in <u>Exhibit A</u> to this Agreement, or (ii) on which an individual or entity other than Richmond Hill Capital Partners, LP, Essex Equity Joint Investment Vehicle, LLC, or Alliance Prime Associates, Inc. has a Lien that is senior to the Lien(s) of Richmond Hill Capital Partners, LP, Essex Equity Joint Investment Vehicle, LLC, and Alliance Prime Associates, Inc., and (b) any and all oil and gas rights owned or leased by the Sellers or otherwise associated with the Perry County Operations

## EXHIBIT D

**Assumed Liabilities**

1. All liabilities of any kind or character to the extent resulting from or arising out of or in connection with Buyer's or its affiliates' use, operation, possession or ownership of or interest in the Purchased Assets and/or the Perry County Operations, only to the extent such liability first arises following the Closing Date.

2. All cure costs, if any, for each Assumed Purchased Contract as reflected on the cure cost schedule filed with the Bankruptcy Court or as otherwise determined by the Bankruptcy Court, it being agreed that the Buyer will promptly pay all such cure costs on the Closing Date, unless the cure costs are paid in an alternatively-negotiated format or amount as agreed to between the Purchased Contract holder and the Buyer.

3. Subject to the obligation of Buyer to pay all such cure costs, all liabilities of Sellers under the Assumed Purchased Contracts that arise on or after the Closing Date.

4. All liabilities of Sellers (whether arising before, on or after the Closing Date) arising out of or relating to (i) the Transferred Permits, including such liabilities thereunder arising out of or relating to all reclamation and post-mining liabilities of the Perry County Operations or the Purchased Assets, (ii) any mine operation or safety compliance matters related to the condition of the Purchased Assets or the mining areas of the Perry County Operations, (iii) the compliance of the Purchased Assets and the Perry County Operations with environmental laws and regulations, or (iv) any conditions arising from a spill, emission, release or disposal into the environment of, or human exposure to, hazardous materials resulting from the operation of the Perry County Operations or the Purchased Assets, in each case in this subclause (d) excluding any monetary fines and penalties imposed by any governmental body for which Sellers have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date to the extent relating to periods prior to the Closing Date.

5. All accrued and unpaid post-petition trade payables of any Seller relating to the Perry County Operations.

6. All liabilities or other obligations with respect to the WARN Act arising or accruing from, or as a result of, the consummation of the transactions contemplated by this Agreement, the performance or non-performance of the obligations under this Agreement, or the actions of Buyer or its affiliates taken following the Closing Date.

7. All accrued but unpaid liabilities of Sellers with respect to real property taxes assessed with respect to the Purchased Assets for periods prior to calendar year 2019, solely to the extent necessary to transfer the Purchased Assets free and clear of any statutory senior priority lien on such Purchased Assets and all accrued but unpaid liabilities of Sellers with respect to real property taxes assessed with respect to the Purchased Assets for calendar year 2019.

8. All documentary, stamp, transfer, motor vehicle registration, sales, use, value added, excise and other similar non-income taxes and all filing and recording fees (and any penalties and

interest associated with such taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement.

9. All taxes with respect to the Purchased Assets attributable to any tax period or portion thereof that begins after the Closing Date, but for the avoidance of doubt, such amount shall not include any taxes that accrued pre-petition.

10. All wages and other related wage and benefit obligations to employees of the Sellers that have accrued and not been paid prior to the entry of the Sale Order, but for the avoidance of doubt, such amount shall not include any pre-petition payroll taxes.

## **EXHIBIT E**

**Assumed Leases**

The leases listed on the schedule attached to <u>Exhibit F</u>.

[To be completed prior to closing.]

## __EXHIBIT F__

### Assumed Purchased Contracts

The contracts (other than leases) listed on the attached schedule.


[To be completed prior to closing.]

# EXHIBIT G

## Owned Real Property

| Number | Description | Owner / Lessee | Other Party(ies) |
|---|---|---|---|
| 12029 | Deed | Perry County Coal LLC | Archer, George |
| 12001 | Deed | Perry County Coal LLC | Baker, Myrtle |
| 12002 | Deed | Perry County Coal LLC | Baker, Myrtle |
| 12032 | Deed | Perry County Coal LLC | Baker, Tug |
| 12034 | Deed | Perry County Coal LLC | Baker, Tug |
| 12033 | Deed | Perry County Coal LLC | Belvins, Charles, T. |
| 12004 | Deed | Perry County Coal LLC | Brewer, Lula |
| 12085 | Deed | Perry County Coal LLC | Brown, Betty |
| 13018 | Deed | Perry County Coal LLC | Brown, Clayton |
| 12009 | Deed | Perry County Coal LLC | Browning, Enos |
| 12012 | Deed | Perry County Coal LLC | Burns, Eva Heirs |
| 130.36 | Deed - COAL ONLY | Perry County Coal LLC | Byrley Heirs |
| 12035 | Deed | Perry County Coal LLC | Campbell, Eugene |
| 12036 | Deed | Perry County Coal LLC | Campbell, M.C. |
| 12038A | Deed | Perry County Coal LLC | Campbell, Wallace |
| 12104 | Deed | Perry County Coal LLC | Caudill, Bessie |
| 12111 | Deed | Perry County Coal LLC | Caudill, Chelsie |
| 12090 | Deed | Perry County Coal LLC | Caudill, Ray |
| 13008 | Deed | Perry County Coal LLC | City of Hazard |
| 13004 | Deed | Perry County Coal LLC | Collins, Jack & Charlotte |
| 13014 | Deed | Perry County Coal LLC | Combs, Garrett Heirs |
| 13007 | Deed | Perry County Coal LLC | Combs, John "Buck" |
| 13015 | Deed | Perry County Coal LLC | Combs, Wayne & Virgina (Quentin Combs) |
| 12097 | Deed | Perry County Coal LLC | Cornett, Charlie |
| 12107 | Deed | Perry County Coal LLC | Cornett, Martha Heirs |
| 12044 | Deed | Perry County Coal LLC | Couch, Roy |
| 12043 | Deed | Perry County Coal LLC | Couch, Susie |
| 12092 | Deed | Perry County Coal LLC | Davis, Denver |
| 12108 | Deed | Perry County Coal LLC | Dixon, Lloyd |
| 13038 | Deed | Perry County Coal LLC | Ducar, John heirs |
| 12046 | Deed | Perry County Coal LLC | Engle, Wayne |
| 12096 | Deed | Perry County Coal LLC | Eversole, Buster |
| 12106 | Deed | Perry County Coal LLC | Eversole, Cash |
| 12047 | Deed | Perry County Coal LLC | Eversole, Curman |
| 12049 | Deed | Perry County Coal LLC | Eversole, Harold |
| 12050 | Deed | Perry County Coal LLC | Eversole, Kelly |
| 12048 | Deed | Perry County Coal LLC | Eversole, Mary Belle |
| 13021 | Deed | Perry County Coal LLC | Farler, Catherine & Collins, Judy |
| 12051 | Deed | Perry County Coal LLC | Feltner, Angeline |
| 130.35 | Deed - FEE (75% INT) | Perry County Coal LLC | Fields, Elhannon |
| 12054 | Deed | Perry County Coal LLC | Fields, Fulton |
| 12053 | Deed | Perry County Coal LLC | Fields, Pearl |
| 12055 | Deed | Perry County Coal LLC | Fields, Pearl |
| 12006 | Deed | Perry County Coal LLC | Fugate, Elhanon |
| 13039 | Deed | Perry County Coal LLC | Gayheart, Higgins, et al |
| 12007 | Deed | Perry County Coal LLC | Gross, Mary Rose |
| 12099 | Deed | Perry County Coal LLC | H & S Logging Company |
| 12056 | Deed | Perry County Coal LLC | Hamblin, Curtis |
| 12057A&B | Deed | Perry County Coal LLC | Hayes, Mildred |
| 12057C | Deed | Perry County Coal LLC | Hayes, Mildred (B. Jean Stacy) |
| 13006 | Deed | Perry County Coal LLC | Hazard Independent College |
| 12061 | Deed | Perry County Coal LLC | Joseph, Bernice |
| 12091 | Deed | Perry County Coal LLC | Joseph, Lawrence |
| 12012 | Deed | Perry County Coal LLC | Joseph, Lenville |
| 13042 | Deed | Perry County Coal LLC | Kennedy, Dorsey |
| 13028 | Deed | Perry County Coal LLC | Kennedy, Melvin (Grave) |
| 12008 | Deed | Perry County Coal LLC | Kilburn, Jeffrey |
| 12010 | Deed | Perry County Coal LLC | Kilburn, Jeffrey |
| 12011 | Deed | Perry County Coal LLC | Kilburn, Jeffrey |
| 12109 | Deed | Perry County Coal LLC | Lee, Charles, Jr. |

| Number | Description | Owner / Lessee | Other Party(ies) |
|---|---|---|---|
| 13029 | Deed | Perry County Coal LLC | Lewis, Hulda |
| 12115 | Deed | Perry County Coal LLC | Locust Grove-WCC |
| 12062 | Deed | Perry County Coal LLC | Lumpkin, James |
| 13002 | Deed | Perry County Coal LLC | Lutz, Faye P. & Wayne R. |
| 13009 | Deed | Perry County Coal LLC | M & T Logging |
| 12093 | Deed | Perry County Coal LLC | Madden, Fred / Frank Bush |
| 12100 | Deed | Perry County Coal LLC | Maggard, Larry (Coots Heirs) |
| 12013 | Deed | Perry County Coal LLC | McDaniel, Edward |
| 12017 | Deed | Perry County Coal LLC | McDaniel, Lute |
| 12018 | Deed | Perry County Coal LLC | McDaniel, Lute |
| 12016 | Deed | Perry County Coal LLC | Melton, Earl |
| 12014 | Deed | Perry County Coal LLC | Melton, Elbert |
| 12015 | Deed | Perry County Coal LLC | Melton, Jerry |
| 12112 | Deed | Perry County Coal LLC | Melton, Jesse Heirs |
| 12019 | Deed | Perry County Coal LLC | Melton, Paul |
| 13011 | Deed | Perry County Coal LLC | Melton, W.P. Heirs |
| 130.31 | Deed - (FEE) | Perry County Coal LLC | Miller, Roy D. & Loveita |
| 13026 | Deed | Perry County Coal LLC | Mitchell, Margarett Estate |
| 12109 | Deed | Perry County Coal LLC | Moore, Rhonda Lee |
| 13022 | Deed | Perry County Coal LLC | Napier, James O. & Yvonne |
| 13005 | Deed | Perry County Coal LLC | Olinger, Andy Tract |
| 12066 | Deed | Perry County Coal LLC | Olinger, Robert L. |
| 13023 | Deed | Perry County Coal LLC | Plowman, Aaron & Linda |
| 13041 | Deed | Perry County Coal LLC | Polly, Jerry |
| 13010 | Deed | Perry County Coal LLC | Ratcliff, Shyla |
| 12068 | Deed | Perry County Coal LLC | Roberts, Hershel |
| 12022 | Deed | Perry County Coal LLC | Roberts, Manda |
| 12110 | Deed | Perry County Coal LLC | Rucker, Rose |
| 13037 | Deed | Perry County Coal LLC | Sexton, John heirs |
| 12067 | Deed | Perry County Coal LLC | Shackleford, Mary E. |
| 13034   (FEE) | Deed - (FEE) | Perry County Coal LLC | Simmons, Beverly |
| 13024 | Deed | Perry County Coal LLC | Smith Heirs |
| 13033   (FEE) | Deed - (FEE) | Perry County Coal LLC | Sparkman, Alpha Estate |
| 13043 | Deed | Perry County Coal LLC | Stacy, Beatty heirs |
| 13019 | Deed | Perry County Coal LLC | Stacy, Danny |
| 13020 | Deed | Perry County Coal LLC | Stacy, Dennis |
| 12023   (FEE) | Deed - (FEE) | Perry County Coal LLC | Stidham, Gain |
| 13025 | Deed | Perry County Coal LLC | Stollings, Chantella |
| 13013 | Deed | Perry County Coal LLC | Timberlands, LLC |
| 12021 | Deed | Perry County Coal LLC | Turner, Lawrence |
| 13001 | Deed | Perry County Coal LLC | Walker, Darrell & Diana |
| 12098 | Deed | Perry County Coal LLC | Wells, Ettie L. |
| 12071 | Deed | Perry County Coal LLC | Whitaker, Caddie |
| 12074 | Deed | Perry County Coal LLC | Whitaker, Edward |
| 120.41 | Deed = (COAL ONLY) | Perry County Coal LLC | Whitaker, Elmer  (Cooley tract) |
| 12094 | Deed | Perry County Coal LLC | Whitaker, Elmer |
| 13027 | Deed | Perry County Coal LLC | Woods, Pleasure Heirs |
| 12083 | Deed | Perry County Coal LLC | Wooton, G.B. |
| 12084 | Deed | Perry County Coal LLC | Wooton, G.B. |
| 12024A  (FEE) | Deed - (FEE) | Perry County Coal LLC | Wooton, George |
| 12024B | Deed - (C,O & G) | Perry County Coal LLC | Wooton, George |
| 13030 | Deed | Perry County Coal LLC | Young, Minerva |