## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN RE: | Chapter 11 |
| CAMBRIAN HOLDING COMPANY, INC., *et al.*,[1] | Case No. 19-51200 (GRS) |
| Debtors. | (Jointly Administered) |

## AMENDED JOINT DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO THE JOINT PLAN OF ORDERLY LIQUIDATION OF CAMBRIAN HOLDING COMPANY, INC. AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Patricia Burgess (KY Bar No. 85694)
FROST BROWN TODD LLC
250 West Main Street
Suite 2800
Lexington, Kentucky 40507
Telephone:  (859) 231-0000
Facsimile:  (859) 231-0011
pburgess@fbtlaw.com

A.J. Webb (admitted *pro hac vice*)
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Telephone:  (513) 651-6800
Facsimile:  (513) 651-6981
awebb@fbtlaw.com

**Counsel to the Debtors and Debtors-in-Possession**

Geoffrey S. Goodman
(admitted *pro hac vice*)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, Illinois 60654
Telephone:  (312) 832-4500
ggoodman@foley.com

T. Kent Barber, Esq. (KY Bar No. 92456)
BARBER LAW PLLC
2200 Burrus Drive
Lexington, KY 40513
Telephone: (859) 296-4372
kbarber@barberlawky.com

**Counsel for the Official Committee of Unsecured Creditors of Cambrian Holding Company, Inc. *et al.***

---

[1]      The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Cambrian Holding Company, Inc. (8203), Cambrian Coal LLC (3394), Apex Energy, Inc. (3455), C.W. Augering, Inc. (2875), Marshall Resources, Inc. (9735), PLM Holding Company LLC (7427), Bear Branch Coal LLC (0674), Clintwood Elkhorn Mining LLC (6910), Gatliff Coal LLC (5768), Perry County Coal LLC (4382), Ray Coal LLC (0981), Whitaker Coal LLC (8270), Pike-Letcher Land LLC (8952), Premier Elkhorn Coal LLC (8951), Raven Rock Development LLC (1351), Rich Mountain Coal LLC (1974), S.T. & T. Leasing, Inc. (0340), T.C. Leasing, Inc. (7705), and Shelby Resources, LLC (5085).

## DISCLAIMER

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") AND ITS RELATED DOCUMENTS ARE BEING USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE JOINT PLAN OF ORDERLY LIQUIDATION OF CAMBRIAN HOLDING COMPANY, INC. AND ITS AFFILIATED DEBTORS (COLLECTIVELY, THE "DEBTORS"),[2] UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED SEPTEMBER 16, 2020 (AS MAY BE FURTHER AMENDED, THE "PLAN") PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE" AND, TOGETHER WITH THE DEBTORS, THE "PLAN PROPONENTS").

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE CHAPTER 11 CASES AND FINANCIAL INFORMATION. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN OR SUCH STATUTORY PROVISIONS, DOCUMENTS OR FINANCIAL INFORMATION, BUT IS RATHER INTENDED ONLY TO AID AND TO SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN (WHICH IS ATTACHED HERETO AS UNDERLINE A). IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL GOVERN. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS IN VOTING CLASSES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS ATTACHED HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF. THE PLAN PROPONENTS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE SOLICITATION PERIOD PURSUANT TO THIS DISCLOSURE STATEMENT WILL EXPIRE AT 5:00 P.M. (EASTERN TIME) ON ___, 2020 (THE "VOTING DEADLINE").

---

[2]     The Debtors are (with the last four digits of their federal tax identification numbers in parentheses): Cambrian Holding Company, Inc. (8203), Cambrian Coal LLC (3394), Apex Energy, Inc. (3455), C.W. Augering, Inc. (2875), Marshall Resources, Inc. (9735), PLM Holding Company LLC (7427), Bear Branch Coal LLC (0674), Clintwood Elkhorn Mining LLC (6910), Gatliff Coal LLC (5768), Perry County Coal LLC (4382), Ray Coal LLC (0981), Whitaker Coal LLC (8270), Pike-Letcher Land LLC (8952), Premier Elkhorn Coal LLC (8951), Raven Rock Development LLC (1351), Rich Mountain Coal LLC (1974), S.T. & T. Leasing, Inc. (0340), T.C. Leasing, Inc. (7705), and Shelby Resources, LLC (5085).

TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS BY EPIQ BANKRUPTCY SOLUTIONS, LLC ("EPIQ"). ON OR BEFORE THE VOTING DEADLINE. PLEASE SEE SECTION I.B OF THIS DISCLOSURE STATEMENT FOR VOTING INSTRUCTIONS. BALLOTS WILL NOT BE ACCEPTED VIA FACSIMILE OR ELECTRONIC MAIL.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND IT BECOMES EFFECTIVE, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE WHO REJECTED OR WHO ARE DEEMED TO HAVE REJECTED OR ACCEPTED THE PLAN AND THOSE WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR TO REJECT THE PLAN) SHALL BE BOUND BY THE TERMS OF THE PLAN.

# ARTICLE I
# INTRODUCTION

### A.      General

On June 16, 2019 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Each of the Debtors is continuing in possession of its assets as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code, subject to the control and supervision of the Bankruptcy Court.

The Plan Proponents submit this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code in connection with the solicitation of votes on the Plan, a copy of which is attached hereto as Exhibit A.  This Disclosure Statement sets forth certain information regarding the Debtors' pre-petition operations and finances and the Debtors' need to seek chapter 11 protection.  This Disclosure Statement also describes the terms and conditions of the Plan, potential alternatives to the Plan, certain effects of confirmation of the Plan and a description of the distributions proposed to be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that the holders of Claims and Equity Interests entitled to vote must follow for their votes to be counted.

CAPITALIZED TERMS USED AND NOT DEFINED HEREIN SHALL HAVE THE MEANING ASCRIBED TO THEM IN THE PLAN UNLESS THE CONTEXT REQUIRES OTHERWISE.

### B.      Brief Summary of the Plan

The Plan is a plan of liquidation and will be funded by the "Liquidating Trust Assets" consisting of, (a) the Cash held by the Estates after taking into account Distributions made on the Effective Date; (b) all Causes of Action; (c) all Privileged Documents and communications of the Debtors; (d) all other assets of the Debtors or of the Estates existing on the Effective Date after giving effect to all Distributions required to be made as of or prior to the Effective Date, including but not limited to all books, records and files of the Debtors and of the Estates, in all forms, including electronic and hard copy.. The Plan also creates a Liquidating Trust, which will be the mechanism through which Claims will be adjudicated and distributions will be made as set forth in the Plan.

### C.      Voting Instructions and Procedures

#### 1.      Voting Procedures, Ballots and Voting Deadline

With respect to Classes of Claims and Equity Interests that are Impaired under the Plan, each holder of an Allowed Claim or Equity Interest in such a Class will receive this Disclosure Statement, the order approving the Disclosure Statement, the Plan, the notice of the Confirmation Hearing and a Ballot for voting the acceptance or rejection of the Plan (unless deemed to reject the Plan).

Under the Plan, all holders of Claims against the Debtor in Classes 1 and 3 through 6 (the "Voting Classes") are Impaired and entitled to vote on the Plan.  Holders of Claims in Class 2, if

any, are Unimpaired under the Plan and are deemed to have accepted the Plan.  In addition, Holders of Equity Interests in Class 7 are not receiving or retaining any property under the Plan on account of such Equity Interests and, therefore, are conclusively deemed to have rejected the Plan.  Accordingly, holders of Claims in Class 2 and Equity Interests in Class 7 are not entitled to vote on the Plan.  For a description of the Classes of Claims and Equity Interests and their treatment under the Plan, see Article III, "Treatment of Claims and Equity Interests and Summary of Distributions under the Plan."

Only persons who hold Claims or Equity Interests on the Record Date (as defined below) are entitled to receive a copy of this Disclosure Statement.  Only persons who hold Claims in the Voting Classes on the Record Date are entitled to vote on whether to accept the Plan.

Separate pre-addressed return envelopes have been supplied for the Ballots.  Holders of Allowed Claims in the Voting Classes should take care to use the proper pre-addressed envelope to ensure that Ballots are returned to the proper address.  PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.  ALL VOTES TO ACCEPT OR TO REJECT THE PLAN MUST BE CAST BY USING THE BALLOT ENCLOSED WITH THIS DISCLOSURE STATEMENT.  In order for a Ballot to be counted, it must be completed, signed and sent to Epiq **so as to be received by the Voting Deadline (5:00 p.m. Eastern Time on _____, 2020)** at the following address:

> Cambrian Holding Company, Inc., Ballot Processing Center,
> c/o Epiq Corporate Restructuring, LLC at:
>
> (1) P.O. Box 4421, Beaverton, OR 97076-4421, if by first class mail; OR
>
> (2) 10300 SW Allen Blvd., Beaverton, 97005, if by courier service or hand delivery.

If you are a holder of a Claim in a Voting Class and (i) did not receive a Ballot, (ii) received a damaged Ballot, (iii) lost your Ballot, (iv) have any question about balloting procedures, or (v) wish to obtain, at your own expense, (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan or this Disclosure Statement, you may obtain such documents by (1) visiting Cambrian's restructuring website at: https://dm.epiq11.com/cdc; (2) calling (866) 977-0859 (toll-free) or +1 (503) 597-7702 (international), or (3) writing to the following address: Cambrian Holding Company Corporation, Ballot Processing, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005. ONLY PROPERLY COMPLETED AND SIGNED BALLOTS RECEIVED BY EPIQ PRIOR TO THE VOTING DEADLINE WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH VOTING CLASS HAS ACCEPTED THE PLAN. ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED ABSENT THE EXPRESS WRITTEN CONSENT OF THE PLAN PROPONENTS NOR WILL ANY BALLOTS RECEIVED BY FACSIMILE OR ELECTRONIC MAIL BE COUNTED.  The Plan Proponents will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan.

**Your vote on the Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan that each class that is impaired under such plan vote to accept such plan, unless the "cram down" provisions of the Bankruptcy Code are satisfied. See Section IV.D.4, "Cram Down -- Unfair Discrimination and Fair & Equitable Tests".**

### 2.      Voting Record Date

The record date for voting on the Plan is the close of business (Eastern time) on September 17, 2020 (the "Record Date"). Only holders of Claims in the Voting Classes as of the Record Date are entitled to vote to accept or reject the Plan.

### 3.      Incomplete Ballots

Any Ballot received that is not signed or does not indicate either an acceptance or a rejection of the Plan shall be an invalid Ballot and shall not be counted for purposes of determining acceptance or rejection of the Plan.

### 4.      Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Plan Proponents in their sole discretion, whose determination will be final and binding. Unless the Ballot being furnished is timely filed by the Voting Deadline, together with any other documents required by such Ballot, the Plan Proponents may reject such Ballot as invalid and, therefore, decline to use it in connection with seeking confirmation of the Plan by the Bankruptcy Court. In the event of a dispute with respect to a Ballot, any vote to accept or reject the Plan cast with respect to such Ballot will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise. The Plan Proponents reserve the right to reject any and all Ballots not in proper form. The Plan Proponents further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Plan Proponents, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with delivery of a Ballot must be cured within such time as the Plan Proponents (or the Bankruptcy Court) determine. Neither the Plan Proponents nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failing to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.

### 5.      Withdrawal of Ballot

All properly completed, valid Ballots will be irrevocable upon the Voting Deadline. Prior to the Voting Deadline, any holder of a Claim who has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to Epiq so as to be received by Epiq before the Voting Deadline. To be valid, the notice of withdrawal must (a) describe the Claim to which it relates, (b) be signed by the party who signed the Ballot to be revoked, and (c) be received by Epiq by the Voting Deadline. Withdrawal of a Ballot can only be accomplished pursuant to the

foregoing procedure.  Prior to the Voting Deadline, any holder of a Claim who has delivered a valid Ballot may change its vote by delivering to Epiq a properly completed substitute Ballot so as to be received before the Voting Deadline.  In the case where more than one timely, properly completed Ballot for the same Claim(s) is received by the Voting Deadline, only the Ballot that bears the latest date will be counted.  After the Voting Deadline, a vote of the holder of a Claim may only be changed or withdrawn with the authorization of the Bankruptcy Court upon a showing of "cause" pursuant to Bankruptcy Rule 3018(a).

### D.    Confirmation Hearing

**The Bankruptcy Court will hold a hearing on confirmation of the Plan (the "Confirmation Hearing") commencing at _____ Eastern time on _____, 2020, before the Honorable Gregory R. Schaaf, United States Bankruptcy Judge for the Eastern District of Kentucky, 100 East Vine Street, 2nd Floor Courtroom, Lexington, KY 40507.**  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.  At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained for each of the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Any such objections must be filed and served upon the persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline described therein.

### E.    Recommendation of Plan Proponents

The Plan Proponents recommend that holders of Claims entitled to vote on the Plan vote to **ACCEPT** the Plan.

## ARTICLE II:

## BACKGROUND OF THE DEBTORS

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Cases to date, including those leading up to the bankruptcy filings on the Petition Date.  Factual information contained herein has been obtained from court filings in the Chapter 11 Cases, including, the Declaration of J. Mark Campbell in Support of First Day Motions of Debtors and Debtors-in-Possession, dated June 17, 2019 (the "Campbell Declaration") [Docket No. 39]. The Plan Proponents do not represent or warrant that the information contained in this Disclosure Statement is free from inaccuracy.  However, the Plan Proponents have attempted to present the information accurately and fairly and believe the information is substantially accurate.  Copies of all relevant court papers are on file with the Bankruptcy Court.

## A.      Coal Operations

The Debtors' core business was producing and processing metallurgical (or "met") coal and thermal (or "steam") coal for use by utility providers and industrial companies located primarily in the eastern United States and Canada. The Debtors began in 1991 and, over time, acquired various mines and mining-related assets from major coal corporations, including Marshall Resources, Arch Coal, and TECO. The Debtors mined, shipped, and marketed coal from underground and surface mines located in Kentucky and Virginia. As of the Petition Date, the Debtors operated at three primary mining facilities in Kentucky and Virginia: (i) Perry County Coal, located near Hazard, Kentucky; (ii) Premier Elkhorn Coal LLC, located near Dorton, Kentucky; and (iii) Clintwood Elkhorn Mining LLC, located in eastern Kentucky and western Virginia (collectively, the "Cambrian Facilities").

At the Cambrian Facilities, the Debtors used coal preparation plants to wash coal of soil and rock and sort it into graded pieces for shipment to the market. Shipment to the market was accomplished through various loadout and handling facilities located at or near rail lines operated by Class I railroads, whereby coal was loaded onto coal cars and transported by locomotive to the Debtors' customers. Additionally, the Debtors performed loadout by location-to-location trucking and over-the-road trucking, among other means of transportation to the market.

Coal extracted, cleaned, marketed, and shipped at the Cambrian Facilities consisted of metallurgical, industrial, and thermal coals. Metallurgical coal is almost exclusively used to produce high-grade coke, a major component of steelmaking. Thermal coal, as the name implies, is used for power or heat generation. Industrial coal is used in ferrous alloy production, carbon filtration, and steam production for many industrial plants.

The Debtors employed a significant number of residents from the Appalachian regions of eastern Kentucky and western Virginia. As of the Petition Date, the Debtors employed approximately 662 employees across the Cambrian Facilities. The total number of the Debtors' employees fluctuated at any given time due to market and other conditions. Generally, the Debtors employed approximately: (i) 261 employees at Perry County Coal; (ii) 82 employees at Premier Elkhorn; (iii) 67 employees at Clintwood Elkhorn; and (iv) 90 employees at Apex. Additionally, the Debtors had employees that provided various administrative and other functions to support the Debtors' mining operations. None of the Debtors' employees were members of a labor union and the Debtors did not have union obligations.

## B.      Corporate Structure

Cambrian Holding Company, Inc. ("Cambrian Holding") is the ultimate parent of the Debtors, except for Shelby Resources, LLC ("Shelby"). Ownership of Cambrian Holding consists of Mark Campbell ("Campbell") with 250 shares (100% ownership). Cambrian Holding, in turn, wholly owns Cambrian Coal LLC ("Cambrian Coal"). Cambrian Coal, in turn, wholly owns Apex Energy, Inc., C.W. Augering, Inc., Marshall Resources, Inc., S.T. & T. Leasing, Inc., T.C. Leasing, Inc., and PLM Holding Company LLC ("PLM"). PLM, in turn, wholly owns Bear Branch Coal LLC, Clintwood Elkhorn Mining LLC, Gatliff Coal LLC, Pike-Letcher Land LLC, Premier Elkhorn Coal LLC, Raven Rock Development LLC, Rich Mountain Coal LLC, and Perry County Coal LLC ("Perry County Coal"). Perry County Coal wholly owns Ray Coal LLC which, in turn,

wholly owns Whitaker Coal LLC. The ownership of Shelby Resources consists of Campbell with 20,625 units (100% ownership). Prior to the Petition Date, James H. Booth ("Booth") and Ted McGinnis ("McGinnis") held ownership interests in Cambrian Holding and Shelby. All of the Debtors are incorporated in Kentucky, with primary administrative offices in Belcher, Corbin, and Lexington, Kentucky.

In addition to the Debtors, for many years, Booth has also controlled numerous other entities that also mined coal in or around eastern Kentucky and western Virginia. These entities are not debtors and include, without limitation, Beech Fork Processing, Inc. ("Beech Fork"), Eagle Coal Company, Inc. ("Eagle"), Pevler Coal Sales Company, Inc. ("Pevler"), Argus Energy Inc., Blazer Coal Corporation, Blazer Coal Development, Inc., Capricorn Coal Company, Inc., Capricorn Coal Shop, Inc., Coalburg Enterprises, Inc., Coal Transport, Inc., Collins Creeks Services, Inc., Cougar Coal Company, Inc., Czar Coal Corporation, Equinox Land Company, Inc., and Southeastern Land, LLC (collectively, the "Non-Debtor Booth Entities").

C.    **Significant Pre-Petition Obligations**

1.    **The ABL Revolver**

On July 10, 2013, Beech Fork, Eagle and Pevler as borrowers (the "Original Borrowers"), and their subsidiaries, including certain of the Non-Debtor Booth Entities as guarantors, entered into that certain ABL Credit and Guaranty Agreement (the "ABL Loan Credit Agreement") for a $10 million asset-based revolving loan (the "ABL Loan"). The Lender, Administrative Agent and Collateral Agent under the ABL Loan Credit Agreement was Deutsche Bank AG New York, ("DB New York"). As consideration for the loan, the Original Borrowers and certain of their subsidiaries agreed to grant DB New York certain liens on their assets.

None of the Debtors were either borrowers or guarantors under the ABL Loan Credit Agreement as of July 2013. In addition, the Debtors did not receive or use any of the proceeds of the ABL Loan.

The Original Borrowers and other Non-Debtor Booth Entities did not perform all of their obligations under the ABL Loan Credit Agreement. As such, between 2013 and September 2015, such entities and DB New York entered into forbearance agreements, including those entered into on September 4, 2014, October 31, 2014, and May 28, 2015.

As of September 20, 2015, the loan balance owed by the Original Borrowers under the ABL Loan was at or about $4,895,702.20. On September 21, 2015, as more fully described in Article II.D below, Debtor Cambrian Coal closed on its acquisition of TECO Coal LLC and its coal operations (the "TECO Acquisition"). On that same day, concurrent with the TECO Acquisition, pursuant to the Fourth Amendment of the ABL Loan Credit Agreement (the "Fourth Amendment"), Cambrian Holding, Cambrian Coal and Shelby were added as "Borrowers" under the ABL Loan Credit Agreement, and every other Debtor – including those acquired that same day in the TECO Acquisition – guaranteed the obligations under the ABL Loan Credit Agreement. The TECO Acquisition provided for, among other things, the assumption by Cambrian Coal of workers' compensation and black lung liabilities (the "WC/BL Liabilities") owed by Clintwood

Elkhorn Mining LLC ("Clintwood Elkhorn"), Perry County Coal and Premier Elkhorn Coal LLC ("Premier Elkhorn").

The Fourth Amendment contained two different loan facilities – the "Revolving Commitment" and the "RH Commitment" – with a combined total commitment of $47.5 million. The "Revolving Commitment" was described as a $10 million "loan" facility to the Debtors. The "Revolving Commitment" included each of the Debtors assuming (or guaranteeing) the entire $4,895,702.20 amount of the ABL Loan previously owed to DB New York by only the Original Borrowers and various other Non-Debtor Booth entities. Each of the Debtors also pledged substantially all of its assets to DB New York to secure the Revolving Commitment.

The RH Commitment was a $37.5 million commitment to the Debtors by Richmond Hill Investment Co., LP ("Richmond Hill") and Essex Equity Joint Investment Vehicle, LLC ("Essex"). Under the RH Commitment, Richmond Hill transferred $37.5 million to One Beacon – a surety – in order to provide cash collateral for the total WC/BL Liabilities owed by Perry County, Premier Elkhorn and Clintwood Elkhorn. Pursuant to the Fourth Amendment, each Debtor guaranteed the entire $37,500,000 that was borrowed from Richmond Hill and Essex pursuant to the RH Commitment.

Both the Revolving Commitment and the RH Commitment under the ABL Loan were allegedly secured by a senior or junior lien, as applicable, on substantially all the assets of the Debtors, other than certain excluded assets, such as collateral accounts, real property not considered material, agreements that prohibit the granting of liens without consent of the counterparty, and other customarily excluded assets. As of the Petition Date, the Debtors alleged that approximately $48 million was still outstanding on the ABL Loan.

## 2.    Term Loan

In addition, on July 10, 2013, the Original Borrowers and their subsidiaries, including certain of the Non-Debtor Booth Entities as guarantors, entered into a Credit and Guaranty Agreement (the "Term Loan Credit Agreement") for a $43.5 million term loan from Deutsche Bank AG, London Branch ("DB London"), as agent for certain lenders (the "Term Loan"). As consideration for the Term Loan, the Original Borrowers and certain of their subsidiaries agreed to grant DB London, for the benefit of the lenders (the "Term Lenders"), certain liens on their assets.

None of the Debtors were either borrowers or guarantors under the Term Loan Credit Agreement as of July 2013. In addition, the Debtors did not receive or use any of the proceeds of the Term Loan.

The Original Borrowers and other Non-Debtor Booth Entities did not perform all of their obligations under the Term Loan Credit Agreement. As such, between 2013 and September 2015, such entities and the Term Lenders entered into five forbearance agreements on September 3, 2014, October 31, 2014, November 12, 2014, December 19, 2014, and May 22, 2015.

As of September 20, 2015, the loan balance owed by the (non-debtor) Original Borrowers under the Term Loan was at or about $31,396,020.74. On September 21, 2015, pursuant to the Sixth Amendment of the Term Loan Credit Agreement, Cambrian Holding, Cambrian Coal and

Shelby were added as "Borrowers" under the Term Loan Credit Agreement, and every other Debtor – including those acquired that same day in the TECO Acquisition – guaranteed the obligations under the Term Loan Credit Agreement. The balance of the Term Loan Credit Agreement also ballooned to $51,745,025.93 as of September 21, 2015 when the Debtors assumed the obligations under that agreement due to various fees, disbursements and alleged borrowings in connection with the TECO Acquisition.

Deutsche Bank Trust Company Americas serves as administrative agent and collateral agent (the "Term Loan Agent") for the Term Loan, and the Term Lenders as of the Petition Date were DB London, Tennenbaum Opportunities Partners V, LP and Tennenbaum Opportunities Fund VI, LLC (the "Prior Term Lenders"). The Term Loan is allegedly secured by a lien on substantially the same assets of the Debtors as those that secure the ABL Loan.

The relative alleged priorities of DB New York as agent under the ABL Loan and the Term Loan Agent on the Debtors' assets was governed by an Amended and Restated Intercreditor Agreement dated as of September 21, 2015.

### 3.    Other Material Debts

As of the Petition Date, the Debtors had various other secured loans to these parties, including purchase money equipment loans owed to Caterpillar Financial Services Corp. and Komatsu and a loan from Community Trust Bank. The Debtors also owe numerous unsecured obligations in amounts that are disclosed in the Debtors' Schedules and Statements of Financial Affairs, including to trade creditors and the unpaid balance of in excess of $20.1 million (including interest and attorneys' fees) that TECO alleges remains unpaid arising from the TECO Acquisition.

### D.    Circumstances Giving Rise to The Chapter 11 Cases

### 1.    The TECO Acquisition and Declining Performance

On September 21, 2015, after many months of discussions, Cambrian Coal entered into a Securities Purchase Agreement with TECO to consummate the TECO Acquisition (the "TECO Purchase Agreement"). The TECO Purchase Agreement provided for, among other things, Cambrian Coal's acquisition of the membership interests of TECO Coal, LLC ("TECO Coal"), n/k/a Debtor PLM Holding Co., LLC.

TECO Coal, in turn, owned either directly or indirectly, Debtors Bear Branch Coal LLC, Clintwood Elkhorn, Gatliff Coal LLC, Perry County Coal, Ray Coal LLC, Whitaker Coal LLC, Pike-Letcher Land LLC, Premier Elkhorn, Raven Rock Development LLC and Rich Mountain Coal LLC (collectively with TECO Coal (the "TECO Acquired Entities")).

As discussed above, the TECO Purchase Agreement provided for the assumption of the WC/BL Liabilities owed by certain of the TECO Acquired Entities. The TECO Purchase Agreement also required Cambrian Coal to pay TECO, under certain specified conditions tied to the future market price of metallurgical coal, up to $60 million over four years. The TECO Acquisition closed on or about September 21, 2015.

As of the closing of the TECO Acquisition, the Debtors had very significant liabilities on their balance sheet. Between the obligations that the Debtors assumed or took on under the Term Loan Credit Agreement and the ABL Loan Credit Agreement, on September 21, 2015, the Debtors became liable for more than $90 million of new funded indebtedness, in addition to the other significant financial obligations assumed as part of the TECO Transaction.

The Debtors' bleak financial status was confirmed by their year-end audit in both 2015 and 2016. As of the year ending December 31, 2015, according to the Debtors' year-end audit, the Debtors on a consolidated basis were insolvent by over $62 million. As of the year ending December 31, 2016, according to the Debtors' year-end audit, the Debtors on a consolidated basis were insolvent by over $88 million. In addition, for the 2015 and 2016 year-end audits, the Debtors' auditor specifically noted "there exists substantial doubt whether the [Debtors] will be able to continue as a going concern."

In addition, The North American coal industry is intensely competitive and over the past several years, market forces in the industry have affected a number of coal companies, many of which have filed for chapter 11. While the metallurgical coal market was favorable over the 24 months preceding the Petition Date, general distress affecting the domestic U.S. thermal coal industry produced a sustained low-price environment. In addition, coal mining requires a high level of capital expenditures to sustain production and to maintain safety requirements.

Although the Debtors previously targeted a total of 4.2 million tons in production in 2018, lack of capital caused actual production to be only 2.8 million tons. This diminished production and sales volume severely limited the Debtors' liquidity and exacerbated production issues in 2019 and prevented the company from implementing planned capital improvements.

## 2.    Efforts to Restructure and the Filing of these Chapter 11 Cases

After the TECO Acquisition, the Debtors undertook various efforts to attempt to return to a positive cash-flow, including: (i) to the extent possible and economically feasible, engaging in optimal downsizing strategies, such as (x) idling or closing certain mining operations and extending the life of service equipment and (y) reducing the Debtors' labor costs, including a limited number of layoffs and wage decreases; (ii) entering into the forbearance agreements with the lenders under the ABL Loan and the Term Lenders, respectively, to allow the Debtors to sell their assets as a going concern, locate replacement or mezzanine financing, raise capital, or engage in another financially-viable transaction; and (iii) retaining Jefferies LLC ("Jefferies") to assist the Debtors with potential capital raising and M&A opportunities.

Between 2015 and the Petition Date, the Debtors idled their operations at the E41 Mine at Perry County Coal and several surface mines and deep mining complexes at both Premier Elkhorn and Clintwood Elkhorn. The idling and closing of these operations resulted in cost savings but, unfortunately, the operations continued to generate losses due to ongoing reclamation and other maintenance costs. The Debtors' idled or closed mining complexes were not profitable and had no reasonable prospect of becoming profitable. These efforts proved insufficient.

Furthermore, on April 26, 2019, the Term Loan Agent obtained a restraining order from the Lawrence Circuit Court in civil action No. 19-CI-00004, *Deutsche Bank Trust Company v.*

*R&J Development, et al*, against non-Debtors Beech Fork Processing, LLC, Eagle Coal Company, LLC and Southeastern Land, LLC, and Debtors Cambrian Coal and Shelby and their respective subsidiaries. The restraining order prohibited these companies from making use of the collateral in which the Term Lenders asserted a first priority lien, effectively prohibiting the Debtors from operating. The restraining order was converted to a temporary injunction by order entered by the Court on May 9, 2019, and the Court permitted the filing of an amended complaint adding the subsidiaries of the original defendants and certain other affiliates to the civil action. On May 24, 2019, the Court granted the Term Loan Agent's motion for a Writ of Possession as to a subset of the collateral, primarily consisting of light duty trucks and other vehicles. Each of the defendants, other than non-Debtors Triple A Resources, Inc. and R & J Development Company, filed a motion to dismiss the Amended Complaint. The Debtor defendants subsequently withdrew their motion.

In early June 2019, with cash at a minimum and no further opportunities to enhance liquidity, Richmond Hill agreed to provide emergency financing to fund professional fees and working capital needs necessary to enable the Debtors to prepare for an orderly chapter 11 filing. Accordingly, in early June 2019, the Company entered into the "Fifth Amendment Loan" to permit the funding of $500,000 which was funded to the Debtors on June 7, 2019.

### E.  Events During the Chapter 11 Cases

#### 1.  Commencement of Chapter 11 Cases

On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date. Upon filing, the Debtors continued in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

#### 2.  Appointment of Official Committee of Unsecured Creditors

On June 26, 2019, the Office of the United States Trustee appointed the Committee, consisting of the following members: TECO Diversified, Inc., Austin Powder Co., Jones Oil Co., Inc./Jones Petroleum Services, LLC, Kentucky River Properties, LLC, Parsley's General Tire, Inc., Whayne Supply Co., Kentucky Coal Employers Self Insurance Guaranty Fund, Robert J. Zik and Pamela Dotson Tester. On July 1, 2019, the Committee selected Foley & Lardner LLP and Barber Law PLLC as its counsel. The Committee thereafter selected B. Riley Financial as its financial advisors.

#### 3.  First Day Motions

On the Petition Date, the Debtors filed a number of motions and other pleadings (collectively, the "First Day Motions"), the most significant of which are described below. The First Day Motions were proposed to ensure an orderly transition into Chapter 11. The First Day Motions included:

- a motion to pay prepetition wages and other benefits to the Debtors' employees;

- a motion relating to the continued use of the Debtor's existing cash management system, bank accounts, business forms and investment and deposit guidelines;

- motions relating to case administration;

- a motion to establish procedures for determining adequate assurance for the provision of utility services;

- a motion to pay certain prepetition sales, use and franchise taxes; and

- a motion to pay critical trade vendors.

The Bankruptcy Court entered orders granting each of the First Day Motions, in certain cases after making modifications based on the arguments and rulings in open court.

### 4.    DIP Financing and Use of Cash Collateral

Also on the Petition Date, the Debtors filed a motion (the "DIP Motion") to approve a $15 million debtor-in-possession financing facility (the "DIP Facility") and to use cash collateral. The lenders under the DIP Facility were Richmond Hill and Essex. The Bankruptcy Court entered an interim order approving the DIP Motion on June 19, 2019.

On July 16, 2019, the Committee filed an objection to the DIP Motion, raising various arguments in opposition to the motion. On or about July 22, 2019, Alliance Prime Associates, Inc. ("Alliance"), an affiliate of Continental Heritage Insurance Company ("Continental"), the issuer of the Debtors' surety bonds, acquired the claims of the Term Lenders under the Term Loan Credit Agreement.

On July 25, 2019, after the Debtors, the Committee, Richmond Hill, Essex and Alliance reached an agreement on the terms of the DIP Facility, the Bankruptcy Court entered the Final Order Authorizing (A) Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. § 364, (B) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364 [Docket No. 283] (the "Final DIP Order").

### 5.    Retention of Debtors' Professionals

The Debtors have retained a number of professionals to assist in the administration of this Chapter 11 Cases and related matters. On July 24, 2019, the Bankruptcy Court authorized the Debtors to retain Frost Brown Todd LLC as bankruptcy counsel. On July 17, 2019, the Bankruptcy Court authorized the Debtors to retain Whiteford Taylor & Preston LLP as Special Counsel. Pursuant to an order dated July 29, 2019, the Bankruptcy Court authorized the Debtors to retain FTI Consulting, Inc. as Bankruptcy Consultant and Bertrand M. Troiano as Chief Restructuring Advisor. On July 24, 2019, the Bankruptcy Court entered an order authorizing the Debtors to retain Jefferies as Investment Banker for the Debtors.

### 6.    The Sales Process

On July 12, 2019, the Debtors filed a motion to approve bidding procedures in connection with the proposed sale of substantially all of their assets (the "Bidding Procedures Motion"). The

Debtors – through Jefferies as investment banker – proposed to market the assets for an additional approximately 50 days.  Jefferies had been marketing the Debtors' assets prior to the filing of the Bidding Procedures Motion, as well.

On August 7, 2019, the Bankruptcy Court entered an order granting the Bidding Procedures Motion, as modified to address objections of the Committee, and approving procedures and setting deadlines and hearing dates in connection with the Debtors' efforts to sell all or substantially all of their assets (the "Bidding Procedures Order").  The Bidding Procedures Order set the following dates related to the proposed sale of the Debtors' assets:

| | |
|---|---|
| August 19, 2019: | Deadline to identify any Stalking Horse Bidder |
| September 11, 2019: | Bid Deadline |
| September 18, 2019: | Auction |
| September 24, 2019: | Sale Hearing |

The Debtors never reached an agreement with a "Stalking Horse Bidder" and did not receive a bid for all of their assets that met the requirement of being a "Qualified Bid" prior to the September 18, 2019 auction (the "Auction").  As such, even prior to the Auction, there was a question as to whether any single bidder would acquire each of the Debtors' mining operations, consisting of (a) the Debtors' coal mining operations at Perry County Coal generally referred to as the "Perry County Operations"; (b) the Debtors' mining operations generally referred to as the "Premier Elkhorn Operations"; and (c) the Debtors' mining operations generally referred to as "Clintwood Elkhorn Operations".

The Auction began on September 18, 2019 and concluded on September 20, 2019.  At the inception of the Auction, a joint venture of Richmond Hill, Essex and Alliance (the "JV") indicated that it intended to submit a credit bid for solely the Clintwood Elkhorn Operations – arguably the "best" of the Debtors' assets.  During the Auction, the Debtors and the Committee heavily negotiated with the JV to structure the sales of the Debtors' assets such that the Perry County Operations, the Premier Elkhorn Operations, and the Clintwood Elkhorn Operations would be sold at one time.  This structure was necessary for two primary reasons: (i) the Debtors and the Committee did not want to proceed with a sale whereby the Debtors' "primary" operations (*i.e.*, the Clintwood Elkhorn Operations and, to a lesser degree, the Premier Elkhorn Operations) were sold while the Debtors' less profitable Perry County Operations and its associated liabilities were left with the Debtors' estates; and (ii) the Debtors wanted to ensure that none of the Debtors' mining permits and their associated liabilities would be left with the Estates.  This structure is also consistent with the Debtors' representations to the Bankruptcy Court throughout these Chapter 11 Cases that the Debtors, as fiduciaries of their Estates, would not seek approval of a sale that would leave orphaned permits or leave the Estates administratively insolvent.

At the conclusion of the initial Auction, Pristine Clean Energy, LLC and/or its designee ("Pristine") was selected as the winning bidder for both the Premier Elkhorn Operations and the Perry County Operations, while the JV was selected as the winning bidder for the Clintwood Elkhorn Operations. However, within 48 hours of the initial auction, Pristine backed out of the

transaction for the Perry County Operations and the Debtors were forced to reopen the auction in an effort to salvage a sale of the Perry County Operations. Because the Debtors and the Committee agreed that all the assets and permits would sell or no sales would occur, re-opening the auction to find a buyer for the Perry County Operations was the only choice if the other two sales were to occur. At the reopened auction on September 23, 2020, the only party that expressed a viable interest in the Perry County Operations and its associated liabilities was Perry County Resources, LLC ("PCC") (an affiliate of public company American Resources Corporation ("ARC")), which was excluded from the initial Auction because the Debtors were informed that PCC was "permit blocked" by the Commonwealth of Kentucky Energy and Environment Cabinet (the "Cabinet"). PCC was allowed into the auction for the Perry County Operations after the Cabinet explained to the Debtors that it would be willing to work with PCC if PCC achieved abatement and reclamation of its existing Kentucky permits. PCC was ultimately selected as the successful bidder for the Perry County Operations at the conclusion of the Auction, as there were no other bidders. The Debtors and the Committee required, as a condition for closing, that each of the purchasers obtain bonding for their respective mining permits. The Debtors' existing surety company, Continental Heritage, advised the Debtors prior to the closing of each sale that Continental Heritage would provide bonding for each of the respective purchasers subject to customary underwriting and the purchasers' compliance with their respective Permit Operating Agreement and agreements with Continental.

On September 24, 2019, the Bankruptcy Court conducted a hearing on the proposed Sales (as defined below). The Debtors did not disclose and no other party raised at the Sale Hearing that ARC was permit blocked, and was therefore legally ineligible to receive the Debtors' mining permits absent addressing the existing issues that required abatement and reclamation as noted above. The Debtors, the Committee, the Cabinet and numerous other parties present at the Sale Hearing were aware of ARC's permit blocked status at the September 23, 2019 auction and the September 24, 2019 sale hearing.

The Debtors reviewed ARC's publicly available information including information filed with the Securities and Exchange Commission and were aware that a "going concern" opinion by Malone Bailey, LLC, its auditor, was issued in its fiscal year 2018 10-K filed on April 3, 2019. The Debtors also received additional financial and operational information from ARC to support its ability to proceed with the proposed transaction. The United States Trustee believes that the Debtors failed to adequately review ARC's financial condition before the Debtors designated ARC as a qualified bidder at the September 23, 2019 auction, which the Debtors deny. The United States Trustee also believes that the Debtors failed to adequately disclose ARC's financial condition to the Court at the September 24, 2019 sale hearing, which the Debtors also deny.

On September 25, 2019, the Bankruptcy Court entered an *Order (I) Approving the Sale of Substantially All of the Debtors' Assets Related Thereto Free and Clear of All Non-Assumed Liens Claims, Encumbrances and Interests, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (III) Granting Related Relief* (Docket No. 534) (the "Sale Order"). The Sale Order approved the following three sales of the Debtors' assets (collectively, the "Sales"):

1.    Clintwood Elkhorn Sale. The sale of the Clintwood Elkhorn Operations to the JV, which ultimately organized Clintwood JOD, LLC (the "JOD") to take title to such assets, in

exchange for, among other things, (a) the assumption of numerous liabilities including, without limitation, (i) obligations under the mining permits used in the Clintwood Elkhorn Operations to be transferred to the JOD; (ii) the unpaid post-petition trade payables related to such operations; (iii) accrued payroll and all other employee liabilities related to such operations; and (iv) all cure costs; (b) the payment of $2 million in cash into an "Administrative Priority Claims Escrow Account"; and (c) the payment of $6,583,082 and $475,000 into a 'Professional Fees Escrow Account" and "Wind-Down Escrow Account," respectively.

2.    <u>Premier Elkhorn Sale</u>.  The sale of the Premier Elkhorn Operations to Pristine in exchange for the assumption of numerous liabilities including, without limitation, (a) obligations under the mining permits used in the Premier Elkhorn Operations to be transferred to Pristine; (b) the unpaid post-petition trade payables related to such operations; (c) accrued payroll and all other employee liabilities related to such operations; and (d) all cure costs.

3.    <u>Perry County Sale</u>.  The sale of the Perry County Operations to PCC in exchange for the assumption of numerous liabilities including, without limitation, (a) obligations under the mining permits used in the Perry County Operations to be transferred to PCC; (b) the unpaid post-petition trade payables related to such operations; (c) accrued payroll and all other employee liabilities related to such operations; and (d) all cure costs.

Each of the Sales closed on September 27, 2019.  As part of the Sales, JOD, Premier, and PCC each entered into a "Transition Services Agreement" and a "Permit Operating Agreement" pursuant to which the JOD, Pristine, and PCC each agreed to, among other things, fund certain costs associated with the transition of the Debtors' businesses in connection with the Sales and complete the transfer of the Debtors' mining permits.

The Transition Services Agreement between certain Debtors and PCC terminated October 18, 2019.  The Transition Services Agreement between certain Debtors and Pristine terminated on October 1, 2019.  The Transition Services Agreement between certain Debtors and the JOD expired pursuant to its own terms.

### 7.    Claims Process and Claims Bar Date

On August 1, 2019, the Debtors filed their Schedules, identifying the assets and liabilities of the Estates.  Pursuant to an order of the Bankruptcy Court entered July 23, 2019 (the "Bar Date Order") the Bankruptcy Court fixed the following Bar Dates for the filing of proofs of Claim against the Debtors in the Chapter 11 Cases: (1) September 30, 2019 as the general Bar Date for all General Unsecured Claims, Priority Tax Claims or Priority Claims, except as provided in No. 2 below; (2) December 13, 2019 for any Claim held by a governmental unit; and (3) the Administrative Claims Bar Date of October 18, 2019 for any Administrative Claim arising prior to September 30, 2019.

### 8.    Efforts to Compel Compliance with the Sale Order

#### a.    The JV/JOD

Since the entry of the Sale Order and the conclusion of the TSA period, the Debtors and the Committee have worked with the JV and the JOD to ensure their compliance with their

obligations under the Sale Order.  To date, the JV/JOD have paid a substantial portion of their assumed liabilities under the Sale Order.  To the best of the knowledge of the Debtors and the Committee, the material unpaid assumed liabilities of the JV/JOD under the Sale Order consist of (i) between $600,000 and $800,000 in Meritain claims that are owed by the JOD pending receipt of final claims and a review of eligibility", and (ii) the funding of the final $836,833.33 owed by the JV/JOD into the Administrative Priority Claims Escrow Account, which must occur by September 30, 2020 under the Richmond Hill-Essex Settlement (as discussed below).

The JV and JOD have made material progress in obtaining the transfer of permits from the Debtors' estates.  As of the filing of the Disclosure Statement, Clintwood JOD has advised the Plan Proponents that it has completed the transfer of two Kentucky mining permits, all permits from the Kentucky Division for Air Quality, and all radiation licenses.  In addition, it has twenty six applications for the transfer of mining of permits which are pending with either the Commonwealth of Kentucky or Commonwealth of Virginia, and it has started transfer of the Section 404 permits issued by the U.S. Army Corps of Engineers.

### b.      Pristine and PCC

Pristine and PCC did not immediately pay the liabilities they assumed under the Sale Order.  As such, on October 28, 2019, the Debtors and Committee sent letters to Pristine and PCC demanding payment of such assumed liabilities.  When Pristine and PCC did not do so, the Debtors and Committee filed the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors to Compel American Resources Corporation and Pristine Clean Energy, LLC to Comply with the Sale Order and Other Orders of this Court* (Docket No. 820) (the "Motion to Compel").

After the filing of the Motion to Compel, Pristine and PCC finally engaged in meaningful discussions regarding the payment of assumed liabilities.  On January 17, 2020, Pristine, PCC, the Debtors, and the Committee entered into the *Agreed Order Granting Joint Motion of the Debtors and the Official Committee of Unsecured Creditors to Compel American Resources Corporation and Pristine Clean Energy, LLC to Comply with the Sale Order and Other Orders of this Court* (Docket No. 1019) (the "Assumed Liabilities Agreed Order").

The Assumed Liabilities Agreed Order required Pristine and PCC to pay certain Assumed Liabilities by March 31, 2020.  The Debtors provided PCC with all information requested by Pristine and PCC to reconcile the amounts due and owing.  March 31, 2020 was also the original deadline for Pristine and PCC to file a notice with the Court identifying (i) the assumed liabilities that had been paid, (ii) the amounts paid to holders of assumed liabilities, and (iii) all payment arrangements agreed to holders of assumed liabilities that were not paid in full.  On March 27, 2020, Pristine and PCC each filed a Motion to Extend Deadline for Payment of Approved Administrative Expense Claims.  As the basis for their requests, Pristine and PCC alleged that they needed additional time to comply with the Assumed Liabilities Agreed Order allegedly due to the effects of the COVID-19 virus on their businesses.  After a hearing, the Court entered Orders giving each of Pristine and PCC until April 30, 2020 to comply with the Assumed Liabilities Agreed Order.

                 (1)      *Resolution with Pristine and Status of Permits at the Premier Elkhorn Operations*

On April 9, 2020, Continental separately filed a motion to compel Pristine to comply with its Permit Operating Agreement with Pristine (the "Continental Motion"). The Continental Motion sought, among other things, an order compelling Pristine to (a) file applications to obtain transfers of the mining permits associated with the Premier Elkhorn Operations (the "Premier Mining Permits"), and (b) pay $1,059,345.83 in post-closing bond premiums owed to Continental.

Continental, Pristine, the Debtors and the Committee resolved both the matters covered by the Continental Motion and Pristine's payment of various assumed liabilities under the Sale Order by an agreed order entered by the Bankruptcy Court on May 5, 2020 (the "Pristine Agreed Order"). The Pristine Agreed Order provided, among other things, for (a) immediate issuance of reclamation bonds for four of the Premier Mining Permits upon the payment of certain amounts, (b) the filing of all transfer applications for the remaining Premier Mining Permits by August 31, 2020, (c) the payment in full by July 31, 2020 (through weekly payments) of unpaid bond premiums Pristine owed to Continental, and (d) weekly payments into escrow of amounts that would be used to pay assumed liabilities under the Sale Order, with payment in full expected by approximately September 2020. As of September 14, 2020, Pristine has not yet made all payments due to Continental under the Pristine Agreed Order.

As of July 31, 2020, Pristine has submitted applications for four (4) of the forty-four (44) mining permits that it acquired from the Debtors. According to the Cabinet, as of August 25 the Applicant/Violator System ("AVS")information database shows Pristine's affiliate Virgie Clean Mining, LLC, with sixteen (16) outstanding NRSP violations from the federal Office of Surface Mining Reclamation and Enforcement and forty (40) outstanding violations for state civil penalties from West Virginia.  These are in addition to the three (3) Kentucky cessation orders, two (2) of which are identified as conditional.  Unresolved listings in AVS may result in Pristine being permit blocked and preventing it from transferring the permits.

                 (2)      *PCC Sanctions, Resolution and Status of Permits at the Perry County Operations*

PCC failed to comply with the Assumed Liabilities Agreed Order under the extended April 30, 2020 deadline.  As a result, on May 11, 2020, the Debtors and the Committee filed a joint motion to find PCC in Contempt of Court and for the issuance of sanctions due to PCC's failure to comply with the Assumed Liabilities Agreed Order and other orders of the Bankruptcy Court (the "Sanctions Motion").  The Kentucky Employers Mutual Insurance Company ("KEMI") joined the Sanctions Motion based on PCC's failure to pay various liabilities owed to KEMI under Bankruptcy Court orders.

On May 22, 2020, the Bankruptcy Court entered an order granting the Sanctions Motion (the "Sanctions Order").  The Sanctions Order (a) required PCC and ARC to pay $1,067,736.10 to satisfy assumed liabilities (including amounts owed to KEMI) by June 1, 2020, (b) imposed sanctions of $2,500/day on PCC and ARC if they did not make that payment by June 1, 2020, and (c) set a hearing date of June 11, 2020 to consider the imposition of additional sanctions.

After the entry of the Sanctions Order, PCC-ARC, the Debtors, the Committee and KEMI reached an agreement on PCC-ARC's payment of various assumed liabilities. That agreement was reflected in an agreed order entered by the Bankruptcy Court on June 9, 2020 (the "PCC Agreed Order"). The PCC Agreed Order provided, among other things, for (a) payment of a total of $200,000 into escrow at the Debtors' estates by June 10, 2020 to satisfy various of PCC-ARC's assumed liabilities (other than amounts owed to KEMI) under the Sale Order, 2020, (b) weekly payment of $5,000 to KEMI until July 13, 2020, (c) the payment of $100,000 on a monthly basis (beginning on July 15, 2020) into escrow at the Debtors, with such amounts to be split between KEMI and various other liabilities assumed by PCC-ARC under the Sale Order, (d) the use of certain equipment proceeds to be received by PCC-ARC, estimated at $300,000, to pay such assumed liabilities as well, and (e) the abeyance of the Sanctions Order so long as PCC-ARC complied with the PCC Agreed Order. PCC has complied with its monthly payments under the PCC Agreed Order through September 15, 2020.

With respect to permits at the Perry County Operations, as part of the sale of such operations to PCC, the Debtors sold a total of 13 mining permits to PCC (collectively, the "PCC Permits"). Prior to the Petition Date, Continental issued 30 bonds related to the PCC Permits with a total bond amount of $9,614,000. On February 20, 2020, the Bankruptcy Court entered its *Order (I) Approving Modification to Sale Order Entered at Docket No. 534 and (II) Granting Related Relief* (Docket No. 1061) (the "Modification Order") whereby three of the PCC Permits were transferred to a different purchaser, Blue Diamond, LLC ("Blue Diamond"), along with 14 associated bonds issued by Continental.

The Debtors and the Committee have been advised that Blue Diamond has filed the requisite permit transfer applications reducing the outstanding PCC Permits to only 10 permits with 16 bonds totaling $6,569,200. The Debtors and the Committee have also been advised that PCC believes it can work with the Cabinet in an attempt to abate outstanding violations and allow PCC to take transfer of the remaining 10 PCC Permits. Despite its obligation to do so, PCC has not taken any steps known to the Plan Proponents to effectuate the transfer of the remaining ten PCC Permits. Indeed, based on discussions with the Cabinet, the Plan Proponents believe that there are significant issues that PCC will have to abate or address in order to be in a position to effectuate the transfer of those permits.

Should PCC not be able to take transfer of such permits, the Debtors and the Committee believe that there is a reasonable possibility that another transferee will be willing to take transfer of such permits, particularly given the relatively modest reclamation obligations involved.

### 9.    The Committee's Adversary Proceedings

On September 20, 2019, only five days before the entry of the Sale Order, the Committee filed two adversary proceedings: Adv. Proc. No. 19-05022 styled *Official Committee of Unsecured Creditors of Cambrian Holding Company, Inc. et al. v. Deutsche Bank AG, New York, Richmond Hill Investment Co., LP, and Essex Equity Joint Investment Vehicle, LLC* (the "ABL Adversary") and Adv. Proc. No. 19-05023 styled *Official Committee of Unsecured Creditors of Unsecured Creditors of Cambrian Holding Company, Inc. et al. v. Alliance Prime Associates, Inc; Deutsche Bank Trust Company Americas; Deutsche Bank NA, London Branch; Tennenbaum Opportunities Partners, V, LP; and Tennenbaum Opportunities Funds VI, LLC* (the "Term Loan Adversary").

### a.    The ABL Adversary and Partial Settlement

The ABL Adversary asserted the following causes of action:

- Count I – Constructively fraudulent transfer claims under § 544(b) of the Bankruptcy Code and KRS 378.020 to avoid DB New York's liens and claims against the Debtors because the Debtors allegedly did not receive "valuable consideration" for assuming the Revolving Commitment in the ABL Loan on or about September 21, 2015.

- Count II – Constructively fraudulent transfer claims under §§ 548(a) and 544(b) of the Bankruptcy Code and KRS 378.020 and 378A.050 to recover approximately $4.487 million in transfers made to DB New York in the event that the Committee prevails under Count I.

- Count III – Constructively fraudulent transfer claims under § 544(b) of the Bankruptcy Code and KRS 378.020 to avoid Richmond Hill and Essex's liens and claims against the Debtors because the Debtors allegedly did not receive "valuable consideration" for the $37.5 million RH Commitment on or about September 21, 2015.

- Count IV – Constructively fraudulent transfer claims under §§ 548(a) and 544(b) of the Bankruptcy Code and KRS 378.020 and 378A.050 to recover up to $25.3 million in transfers made to Richmond Hill and Essex in the event that the Committee prevails under Count III.

- Counts V and VI – Claims under § 544(a) of the Bankruptcy Code to avoid liens against unperfected real property (Count V) and personal property (Count VI) assets of the Debtors.

- Count VII – A claim to require the defendants to disgorge "adequate protection" payments under the Final DIP Order.

The Committee, Richmond Hill and Essex reached a partial settlement of the ABL Adversary, resolving the claims against Richmond Hill and Essex (the "Richmond Hill-Essex Settlement"). Certain key terms of the Richmond Hill-Essex Settlement were as follows: (1) the real estate owned by the JOD at 200 Allison Blvd., Corbin, KY 40701 would be sold and the proceeds thereof split (a) the first $300,000 and 50% of amounts above $300,000 to the Debtors' estates, and (b) the other 50% above $300,000 to Richmond Hill/Essex; (2) Richmond Hill/Essex would fund the final $836,833.33 owed into the Administrative Priority Claims Escrow Account by September 30, 2020; (3) Richmond Hill and Essex waive any administrative claims against the Debtors' estates; (4) Richmond Hill and Essex possess a joint allowed, general unsecured claim against each of the Debtors' estates in the amount of $45,698,362.87 (which is classified as Class 3 under the Plan), provided that except as noted in (5) and (6) below, (a) Richmond Hill/Essex shall not receive any distributions from the Debtors' estates on account of that Allowed Claim, and (b) assigned all rights to any distributions on the Allowed Claim to the holders of allowed general unsecured claims against the Debtors' estates; (5) should the Debtors' estates make distributions totaling more than $4 million in the aggregate to holders of allowed general unsecured

claims against the Debtors' estates (either to an individual estate or group of estates), then Richmond Hill/Essex shall receive 15% of any distributions made to holders of allowed general unsecured claims against the Debtors' estates above $4 million; and (6) in the event the Debtors' estates recover any amounts from DB New York, their successors or assigns, by way of judgment, settlement or otherwise, then Richmond Hill/Essex shall be entitled to receive their *pro rata* share of any distributions made to holders of allowed general unsecured claims against the Debtors' estates from the proceeds of such recovery.

On June 30, 2020, the Debtors and the Committee filed a joint motion to approve the Richmond Hill-Essex Settlement. On July 23, 2020, the Bankruptcy Court entered an order approving that motion (the "Richmond Hill-Essex Settlement Order").

Notwithstanding the entry of the Richmond Hill-Essex Settlement Order, the Committee continues to litigate the remaining claims in the ABL Adversary against DB New York, but the case is currently stayed. The Estates will assign those claims to the Liquidating Trust under the Plan and, unless the matter settles in the interim, the Liquidating Trustee will pursue such claims against DB New York.

### b.    The Term Loan Adversary

The Term Loan Adversary asserts the following causes of action:

- Count I – Constructively fraudulent transfer claims under § 544(b) of the Bankruptcy Code and KRS 378.020 to avoid Alliance and the Term Loan Agent's liens and claims against the Debtors because the Debtors allegedly did not receive "valuable consideration" for assuming the Term Loan on or about September 21, 2015.

- Count II – Constructively fraudulent transfer claims under §§ 548(a) and 544(b) of the Bankruptcy Code and KRS 378.020 and 378A.050 to recover approximately $2.74 million in transfers made to the Term Loan Agent and the Prior Term Lenders in the event that the Committee prevails under Count I.

- Count III – Equitable subordination claims under § 510(c) of the Bankruptcy Code against Alliance and the Term Loan Agent.

- Counts IV and V – Claims under § 544(a) of the Bankruptcy Code to avoid liens against unperfected real property (Count IV) and personal property (Count V) assets of the Debtors.

- Count VI – A claim to require the defendants to disgorge "adequate protection" payments under the Final DIP Order.

The Term Loan Adversary has been stayed for a period of time, but remains pending. The Estates will assign their claims under the Term Loan Adversary to the Liquidating Trust under the Plan and, unless the matter settles in the interim, the Liquidating Trustee will pursue such claims against the defendants.

## ARTICLE III
## OVERVIEW OF THE PLAN

### A.    Introduction

Set forth in this Section is a description of the basic terms of the Plan.  This description is not intended, nor should it be relied upon, as a substitute for a careful review of the actual terms of the Plan, a complete copy of which is attached hereto as Exhibit A.

### B.    Classification of Claims

Section 1122 of the Bankruptcy Code provides that, except for certain claims classified for administrative convenience, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.   The Bankruptcy Code also requires that a plan provide the same treatment for each claim of a particular class unless the holder of a particular claim agrees to a less favorable treatment of its claim.  The Plan Proponents believe that the Plan complies with this standard.  The Plan divides Claims against and Equity Interests in the Debtors into the following Classes:

**Class 1** shall consist of all Other Priority Claims.

**Class 2** shall consist of all Secured Claims.

**Class 3** shall consist of all Richmond Hill-Essex Claims.

**Class 4** shall consist of all Pre-Petition ABL Agent Claims.

**Class 5** shall consist of all Pre-Petition Tern Agent Claims.

**Class 6** shall consist of all General Unsecured Claims.

**Class 7** shall consist of all Equity Interests.

For a description of the treatment of Claims and Equity Interests and a summary of distributions under the Plan, see Section III.C, "Treatment of Claims and Equity Interests and Summary of Distributions under the Plan."

A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest in that Class and has not been paid in full, released or otherwise satisfied prior to the Effective Date.

### C.    Treatment of Claims and Equity Interests and Summary of Distributions Under the Plan

The Confirmation Order shall provide for the transfer of the Debtors' assets to the Liquidating Trust. Pursuant to the terms of the Plan, the Liquidating Trustee will, among other things, calculate and pay all distributions or permitted under the Plan.

## 1.     Administrative Claims

In full satisfaction, and settlement of and in exchange for each Allowed Administrative Claim, except to the extent that any Holder of an Allowed Administrative Claim has received payment prior to the Effective Date, agrees with the Debtors or the Liquidating Trustee, as applicable, to different treatment or as otherwise provided for in the Plan, each Holder of an Allowed Administrative Claim shall receive payment in full, in Cash, on the later of (i) the Effective Date if due on or before that date and unpaid on the Effective Date, (ii) as soon as practicable after the date upon which such Administrative Claim becomes an Allowed Claim, or (iii) such other date as may be agreed upon between the Holder of such Allowed Administrative Claim and the Liquidating Trustee.

Any Holder of an Other Administrative Claim shall, no later than thirty (30) days after the Effective Date, File an application for allowance of such Other Administrative Claim incurred after the Administrative Claim Bar Date. The Holder of an Allowed Other Administrative Claim shall receive payment in full, in Cash, on the later of (i) the Effective Date if due on or before that date and unpaid on the Effective Date, (ii) as soon as practicable after the date upon which such Other Administrative Claim becomes an Allowed Claim, or (iii) such other date as may be agreed upon between the Holder of such Allowed Other Administrative Claim and the Liquidating Trustee.

With respect to Administrative Claims other than Other Administrative Claims, the last day for Filing an objection to any Administrative Claim will be the later of (a) 180 days after the Effective Date, (b) 90 days after the filing of such Administrative Claim, or (c) such other date specified in the Plan or ordered by the Bankruptcy Court.

## 2.     Professional Fee Claims

Any Professional seeking an award by the Bankruptcy Court of an Allowed Professional Fee Claim on account of Professional Fees incurred from the Petition Date through and including the Effective Date (i) shall, no later than thirty (30) days after the Effective Date, File a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through and including the Effective Date, and (ii) shall receive, as soon as reasonably practicable after such Claim is Allowed, in full settlement, and satisfaction of, and in exchange for, such Allowed Professional Fee Claims, Cash in the amount of the Allowed Professional Fee Claims.

The Liquidating Trustee may, without application to or approval by the Bankruptcy Court, retain professionals and pay reasonable professional fees and expenses in connection with services rendered to them after the Effective Date.

## 3.     Priority Tax Claims

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Effective Date or unless otherwise agreed by the Liquidating Trustee and the Holder of an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive its Pro Rata Share of any remaining Liquidating Trust Assets after providing for the payment in full of all Allowed Secured Claims, Allowed Administrative Claims, Allowed Professional Fee Claims and Allowed Other Priority Claims: (i) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; (ii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim.

### 4.    Summary of Classification and Treatment of Holders of Allowed Claims and Equity Interests that are Placed in Classes

The following table sets forth a brief summary of the classification and treatment of Claims and Equity Interests and the estimated distributions to the holders of Allowed Claims that are placed in Classes under the Plan. The information set forth in the tables is for convenience of reference only. Each holder of a Claim or Equity Interest should refer to Article V of the Plan, "Treatment of Claims and Equity Interests," for a full understanding of the classification and treatment of Claims and Equity Interests provided under the Plan. The estimates set forth in the table may differ from actual distributions due to, among other things, variations in the amount of Allowed Claims, the existence and resolution of Disputed Claims and certain risk factors potentially impacting recoveries under the Plan, including those described in Article III below. Unless otherwise noted, these estimates are as of June 30, 2020.

| Classification | Impairment/ Voting | Estimated Amount of Claims | Estimated Return | Treatment |
|---|---|---|---|---|
| Class 1 – Other Priority Claims | Impaired/entitled to vote | $0-$1 million | 100%, subject to outcome of litigation brought by the Liquidating Trustee. | Except to the extent that a Holder of an Allowed Class 3 Claim agrees to a less favorable treatment and in exchange for each Class 1 Claim, a Holder of an Allowed Class 1 Claim shall receive its Pro Rata Share of any remaining Liquidating Trust Assets after providing for the payment in full of all Allowed Secured Claims, Allowed Administrative Claims, and Allowed Professional Fee Claims (i) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and (ii) in a manner not less favorable than the most favored nonpriority unsecured claim provided by the Plan. |
| Class 2 – Secured Claims | Unimpaired/deemed to accept/cannot vote | $0 | 100% | To the extent of the Debtors' right, title or interest to the Assets securing such Secured Claims, a Holder of an Allowed Secured Claim shall receive (a) shall be paid the amount of such holder's Allowed Secured Claim in one Cash payment on the later of the Effective Date or the date such Claim becomes an Allowed Claim by Final Order (or as soon as reasonably practicable thereafter) or (b) such holder shall receive such holder's Collateral on the Effective |

| | | | | Date. Any deficiency amount related to a Class 2 Claim shall be treated as a Class 5 Allowed General Unsecured Claim. Alternatively, such Holder shall receive such other less favorable treatment as the Debtors and such Holder agree upon in writing. |
|---|---|---|---|---|
| Class 3 – Richmond Hill-Essex Claims | Impaired/entitled to vote | $45,698,362.87. | 0%-10% | The Richmond-Hill Essex Claims shall receive the treatment given to such claims under the Richmond-Hill Essex Settlement Order. |
| Class 4 – Pre-Petition ABL Agent Claims | Impaired/entitled to vote | $3,349,271.53 | 0%-20%, depending on whether the claim is allowed and, if so, litigation recoveries by the Liquidating Trustee. | The allowance of the Class 4 Claims will be Disputed by the Liquidating Trustee. No distributions shall be made on account of the Pre-Petition ABL Claims unless a Final Order is entered allowing such claims. If the Class 4 Claims are deemed to be Allowed Claims, then such claims shall receive Distributions Pro Rata with holders of Allowed General Unsecured Claims. |
| Class 5 – Pre-Petition Term Agent Claims | Impaired/entitled to vote | $77,881,491.61 | 0%-10%, depending on whether the claim is allowed and, if so, litigation recoveries by the Liquidating Trustee. | The allowance of the Class 5 Claims will be Disputed by the Liquidating Trustee. No distributions shall be made on account of the Pre-Petition Term Agent Claims unless a Final Order is entered allowing such claims. If the Class 5 Claims are deemed to be Allowed Claims, then such claims shall receive Distributions Pro Rata with holders of |

| | | | | Allowed General Unsecured Claims. |
|---|---|---|---|---|
| Class 6 – General Unsecured Claims | Impaired/entitled to vote | $50 million to $100 million | 0%-30%, subject to outcome of litigation brought by the Liquidating Trustee. | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment and in exchange for each Class 6 Claim, a Holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of any remaining Liquidating Trust Assets after providing for the payment in full of all Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims. |
| Class 7 – Equity Interests | Impaired/deemed to reject/cannot vote | 0% | N/A | Class 7 Equity Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect. |

Under the Bankruptcy Code, only holders of Claims in Classes that are Impaired are entitled to vote to accept or reject the Plan. As noted above, the holders of Claims in Classes 1, 3, 4, 5 and 6 are Impaired and entitled to vote to accept or reject the Plan.

Holders of Class 2 Claims are Unimpaired by the Plan. Under § 1126(f) of the Bankruptcy Code, holders of Class 2 Secured Claims are conclusively deemed to have accepted the Plan, and the votes of such holders will not be solicited. Holders of Equity Interests (Class 7) are Impaired but are not entitled to receive or retain any property under the Plan. Accordingly, holders of Equity Interests in Class 7 are deemed to have rejected the Plan and their votes will not be solicited.

### 5.    Reservation of Rights Regarding Claims

Except as otherwise explicitly provided in the Plan, nothing herein shall affect the Debtors' or the Liquidating Trustee's rights and defenses, both legal and equitable, with respect to any Claims or Equity Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

6.      **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code; Withdrawal of the Plan as to one or more Debtors**

The Plan Proponents also reserve the right to withdraw the Plan as to one or more Debtors. If the Plan is withdrawn as to any Debtor (a "Withdrawn Debtor"), and the Plan is subsequently confirmed by the Bankruptcy Court, then (a) the Withdrawn Debtor's Estate shall not be substantively consolidated with the Estates of the Debtors that remain part of the Plan, and (b) the Withdrawn Debtor's Chapter 11 Case will be converted to chapter 7 of the Bankruptcy Code, subject to further approval of the Bankruptcy Court.

D.      **Distribution Provisions**

1.      **Calculation of Amounts to be Distributed**

Each Holder of an Allowed Claim against the Debtors shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtors or the Liquidating Trustee, on behalf of the Debtors or the Liquidating Trust, as applicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII of the Plan. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

2.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

*(a)      Record Date for Distribution*

On the Distribution Record Date, the Claims Register shall be closed and the Debtors or the Liquidating Trustee or any other party responsible for making Distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

*(b)      Delivery of Distributions in General*

(1)      Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall, in the Liquidating Trustee's reasonable discretion, be deemed to have been made by the Liquidating Trustee on the Effective Date, unless the Liquidating Trustee and the applicable Holder of such Claim agree otherwise.

(2)     Special Rules for Distributions to Holders of Disputed
Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by, as applicable, the Debtors or the Liquidating Trustee, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

(3)     Distributions

On and after the Effective Date, the Liquidating Trustee shall make the Distributions required to be made on account of Allowed Claims under the Plan on such date. Any Distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Liquidating Trustee in the Distribution Reserve Account and distributed on the next Distribution Date that occurs after such Claim is Allowed in accordance with the Plan and the Liquidating Trust Agreement.  In accordance with the Plan, no interest shall accrue or be paid on the unpaid amount of any Distribution paid pursuant to the Plan.

(c)     *Minimum; De Minimis Distributions*

Notwithstanding any other provision of the Plan to the contrary (including the treatment of any Claims or Classes), (a) the Liquidating Trustee shall not be required to make Distributions or payments of fractions of dollars, and whenever any Distribution of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down, and (b) the Liquidating Trustee shall have no duty to make a Distribution on account of any Allowed Claim (i) if the aggregate amount of all Distributions authorized to be made on such date is less than $5,000, in which case such Distributions shall be deferred to the next Distribution date, (ii) if the amount to be distributed to that Holder on the particular Distribution date is less than $250.00, unless such Distribution constitutes the final Distribution to such Holder, or (iii) the amount of the final Distribution to any such Holder is less than $250.00, in which case such Distribution shall revert to the Liquidating Trust for distribution on account of other Allowed Claims.

(d)     *Undeliverable Distributions and Unclaimed Property*

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Debtors or the Liquidating Trustee, as applicable, has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without accrual of interest during that time; provided, however, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 120 days from the date the initial Distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidating Trust automatically and without need for a further order by the Bankruptcy Court for Distribution in

29

accordance with the Plan and the Claim of any Holder to such property or interest in property shall be settled, compromised, and forever barred.

### (e) Charitable Contributions

After the final Distributions have been made in accordance with the terms of the Plan and the Liquidating Trust Agreement, if the amount of remaining Cash is less than $10,000, the Liquidating Trustee may donate such amount to one or more charities or philanthropic endeavors as chosen by the Liquidating Trustee, in consultation with the Liquidating Trust Board; provided that such philanthropic endeavors shall be non-profit.

### (f) Manner of Payment Pursuant to the Plan

Cash payments under the Plan shall be in U.S. funds, and shall be made, at the option, and in the sole discretion, of the Debtors or the Liquidating Trustee, as applicable, by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Debtors or the Liquidating Trustee, as applicable. Cash payments to foreign creditors may be made, at the option, and in the sole discretion, of the Debtors or the Liquidating Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan in the form of checks issued by the Liquidating Trustee shall be null and void if not cashed within 120 days of the date of the issuance thereof. Requests for reissuance of any check shall be made directly to the Liquidating Trustee.

### 3. Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Debtors, or the Liquidating Trustee, as applicable, shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

In connection with the Plan and all Distributions hereunder, to the extent applicable, the Debtors and the Liquidating Trustee are authorized to take any and all actions that may be necessary or appropriate to comply with all tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions pursuant to the Plan and Liquidating Trust Agreement shall be subject to any such withholding and reporting requirements. Each Creditor is required to provide the Liquidating Trustee with an executed Form W-9 or similar tax form as a condition precedent to being sent a Distribution. If a Holder of an Allowed Claim does not provide the Liquidating Trustee with an executed Form W-9 or similar form within 90 days of written request, said Creditor shall be deemed to have forfeited their Distribution and the Claim of such Creditor shall be forever barred.

### 4. Claims Paid or Payable to Third Parties

#### (a) *Claims Paid by Third Parties; Recourse to Collateral*

The Debtors or the Liquidating Trustee, as applicable, shall be authorized to reduce in whole or in part a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or, as applicable, the Liquidating Trust, including on account of recourse to collateral held by third parties that secure such Claim. To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment, in whole or in part, from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the Distribution to the Debtor or the Liquidating Trustee, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

#### (b) *Claims Payable by Insurance, Third Parties; Recourse to Collateral*

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable. To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

#### (c) *Applicability of Insurance Policies*

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and consummation of the Plan shall not limit or affect the rights of any third-party beneficiary of any of the Debtor's insurance policies with respect to such policies, and the rights of the Debtors under any such insurance policies shall vest in the Liquidating Trustee as of the Effective Date.

### E. Means for Implementation of the Plan

### 1. Corporate Action

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Liquidating Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, the Debtors, or any other Entity or Person or further Order of the Bankruptcy Court. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed

to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

The authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

### 2.      Dissolution and Boards of the Debtors and Officers

As of the Effective Date: (i) the existing boards of directors and/or boards of managers of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, shareholders, and members and any all remaining officers, managers or directors of each Debtor shall be dismissed without any further action required on the part of any such Debtor, the shareholders or members of such Debtor, or the officers and directors of such Debtor; and (ii) all actions or decisions that would otherwise be made by such directors and/or managers under otherwise applicable law may be taken and made by the Liquidating Trustee. Notwithstanding anything contained in this section, all Claims and Causes of Action against any director or officer of the Debtors, whether current or former, are hereby preserved.

On the Effective Date, all Professionals shall be deemed to have completed their services unless they are expressly retained by the Liquidating Trustee, but they shall be able to file final applications for Professional Fee Claims through the Effective Date as provided for in the Plan.

### 3.      Effectuating Documents; Further Transactions

Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments (including deeds, leases, assignments or other instruments of conveyance), applications for permit transfer or renewal or other regulatory authorizations, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and any Court Order authorizing the sale or other transfer of the Debtors' assets, including, without limitation, the Sale Order, without the need for any further Bankruptcy Court Order, approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 4.      Preservation of Rights of Action

Other than Causes of Action against an Entity that are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order (including, for the avoidance of doubt, any claims or Causes of Action released pursuant to Article XI of the Plan), the Debtors reserve and, as of the Effective Date, assign to the Liquidating Trust, any and all Causes of Action, including without limitation any actions specifically enumerated on Exhibit B to this Disclosure Statement.  On and after the Effective Date, the Liquidating Trustee may pursue such Causes of Action in accordance with the Liquidating Trust Agreement.

Subject in all respects to Article XI of the Plan, the Debtors shall not release any Avoidance Actions, and the Liquidating Trustee shall be authorized and empowered to enforce any such

Avoidance Actions on and after the Effective Date in accordance with the terms of the Plan and the Liquidating Trust Agreement.

No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Liquidating Trustee will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors reserve the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. Except as otherwise provided by the Liquidating Trust Agreement, prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court to the fullest extent permitted by section 1123 of the Bankruptcy Code and all other applicable law.

### 5.    Closing of Debtors' Cases

For the avoidance of doubt, the closing of any case shall not have any effect, in any manner, on the Causes of Action that the Liquidating Trustee may assert in accordance with the Plan and the Liquidating Trust Agreement. The jointly administered case of Cambrian Holding Company, Inc, identified as Case No. 19-51200) (the "Main Case") shall remain open and subject to the provisions of Section 6.5 of the Plan. Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Main Case, when all Assets contributed to the Liquidating Trust in accordance with Section 5.02 of the Plan and the Liquidating Trust Agreement have been liquidated and converted into Cash (other than those assets previously abandoned by the Debtors or abandoned by the Liquidating Trust), and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Plan, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Main Case in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms of Section 5.10 of the Plan.

### 6.    Operations of the Debtors Between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to manage their estates as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

### 7.    Dissolution of the Creditors' Committee

On the Effective Date the Creditors' Committee shall be deemed dissolved and subject to Section 11.04 of the Plan, its members shall be deemed released of their duties, responsibilities

and obligations, provided, however, that the Creditors' Committee shall remain in existence with respect to (a) any Professional Fee Claims; and (b) any appeals of the Confirmation Order or Professional Fee Claims.

<h3 align="center">8.   Destruction of Books and Records</h3>

The Liquidating Trustee has the right to seek authority to destroy or abandon any books and records of the Debtors constituting Liquidating Trust Assets. The Liquidating Trustee, however, shall not destroy or abandon any such books and records without obtaining prior approval of the Bankruptcy Court after notice to creditors of any such request.

<h3 align="center">F.   Substantive Consolidation</h3>

Subject to Section 4.05 of the Plan, the Plan provides for substantive consolidation of the Estates, for purposes of voting, confirmation, and making Distributions to the Holders of Claims under the Plan. Voting on the Plan shall be counted on a consolidated basis. On the Effective Date, and solely for purposes of voting, confirmation and making Distributions to the Holders of Claims under the Plan (a) all guarantees of any Debtor of the payment, performance or collection of another Debtor with respect to Claims against such Debtor shall be eliminated and cancelled; (b) any single obligation of multiple Debtors shall be treated as a single obligation in the consolidated Chapter 11 Cases; and (c) all guarantees or other obligations by a Debtor with respect to Claims against one or more of the other Debtors shall be treated as a single obligation in the consolidated cases. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all General Unsecured Claims based upon guaranties of collection, payment or performance made by a Debtor as to the obligation of another Debtor shall be released and of no further force and effect. Except as set forth in this Section, such substantive consolidation shall not affect (a) the legal and corporate structure of the Debtors, or (b) any obligations under any leases or contracts assumed through the Plan or otherwise after the Petition Date.

Notwithstanding the substantive consolidation of the Estates for the purposes set forth herein, each Debtor shall pay all U.S. Trustee Fee Claims on all disbursements, including any Distributions or disbursements made as a result of the Plan, until the entry of a final decree in these Chapter 11 Cases, dismissal of these Chapter 11 Cases, closure of these Chapter 11 Cases, or conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

As a result of their analysis, the Plan Proponents have determined that there exists a reasonable basis for a substantive consolidation of the Debtors for purposes of distributions under the Plan, including the foregoing:

- <u>The Substantial Interrelationship among the Debtors</u>

The Plan Proponents believe that there exists substantial interrelationship among the Debtors due to, among other things, the overlap in the officers and directors of the Debtors, the fact that the Debtors' business operations were run as a single integrated enterprise, the lack of any independent board meetings or corporate minutes of the various Debtor entities, the Debtors' integrated accounting and cash management systems, the payment of obligations of one Debtor by another Debtor, the obligation of all Debtors under the ABL Loan Credit Agreement and the Term

34

Loan Credit Agreement.  Moreover, while the Debtors kept records of the "debts" owed between Debtors – which were substantial – those "debts" do not appear to have ever resulted in cash transfers between Debtor entities to resolve or satisfy such debts.

- <u>The Benefits of Substantively Consolidating the Debtors Outweighs any Harm to Creditors of the Debtors</u>

Substantive consolidation of the Debtors will allow the Liquidating Trustee to make distributions to Holders of General Unsecured Claims under the Plan without (a) incurring the expense of negotiating the amount of distributions allocated to each Debtor under the Plan, particularly with respect to litigation settlements, and (b) expending significant sums disentangling the Debtors' complicated internal accounting system and the related intercompany claims and transfers resulting from such systems.  These expenses could substantially diminish, or eliminate, any recoveries for Holders of General Unsecured Claims.

The main remaining assets of the Debtors consist of (a) cash "carved out" as part of a resolution with Richmond Hill in connection with the Sales, and (b) causes of action against third parties.  With respect to (a), there is no natural allocation of that cash between the Debtors, and it could be very costly to litigate which Estates should receive particular amounts.  The same is true of causes of action, as the claims most likely to bring material recoveries for creditors under the Plan (i.e., causes of action against the Debtors' lenders and potentially insiders), span multiple Debtors.  Consolidation avoids the material expense and delay of trying to address those issues.

- <u>The Prejudice Resulting from not Consolidating the Debtors</u>

Absent a consolidation of the Debtors, the Plan Proponents estimate that the expense of negotiating a consensual plan with creditors would increase substantially, as creditors of each individual Debtor would vie for greater shares of the distributions to unsecured creditors in these cases.  In addition, the Debtors estimate that sorting through the separate claims, rights, obligations and causes of action of each individual Debtor would result in substantially higher costs of administering the Plan, thereby reducing the distributions available for the Debtors' creditors.

**G.    Conditions Precedent to Effectiveness of Plan**

**1.    Conditions to Effective Date**

*(a)    Conditions Precedent to Effective Date of the Plan*

The Plan shall not become effective unless and until the Effective Date occurs.  The Effective Date is subject to the following conditions precedent: (i) the Confirmation Order shall become a Final Order; (ii) all documents useful and necessary to effectuating the Plan are executed and delivered to the parties hereto and all conditions to the effectiveness of such documents have been met; and (iii) the Debtors have received all authorizations, consents, approvals, rulings, opinions, and documents that are necessary to implement the Plan.

*(b)    Waiver of Conditions*

The conditions precedent to the Effective Date may be waived, in whole or in part, by the Debtors, with the consent of the Creditors' Committee, at any time, without notice, and without an order from the Bankruptcy Court or any other affirmative action other than proceeding to consummate the Plan.  The failure of the Debtors to exercise any of foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

### 2.        Notice of Occurrence of the Effective Date

The Debtors or Liquidating Trustee shall file a notice of the occurrence of the Effective Date within five (5) Business Days thereafter; provided, however, that failure to timely File such notice shall not affect the occurrence of the Effective Date.

### 3.        Consequences of Non-Occurrence of Effective Date

If the Confirmation Order is vacated prior to the Effective Date, (a) the Plan shall be null and void in all respects; and (b) any settlement of Claims or Equity Interests provided for hereby shall be null and void without further order of the Bankruptcy Court.

### 4.        Substantial Consummation

Substantial Consummation of the Plan shall be deemed to occur on the Effective Date.

### H.        Settlement, Releases, Injunctions and Exculpations

### 1.        Debtors will not receive Discharge

Notwithstanding anything to the contrary in the Plan, the Debtors shall not receive a discharge under the Plan.

### 2.        No Releases by Debtors

Subject to Section 11.03 of the Plan, notwithstanding anything to the contrary in the Plan, the Debtors shall not release (a) any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, derivative claims, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date; or (b) any and all Avoidance Actions against any Person.

### 3.        Exculpation and Limitation of Liability

Notwithstanding anything to the contrary in the Plan, the Debtors, its Professionals retained in the Chapter 11 Cases, its officers or employees, the Committee, individual members of the Committee, and Professionals for the Committee shall not have or incur any liability to any holder of a Claim or Equity Interest for any act, event, or omission in connection with, or arising out of, the Chapter 11 Cases, formulating, negotiating, soliciting, preparing, disseminating, confirming,

or implementing the Plan, consummating the Plan, or the administration of the Plan or the property to be distributed under the Plan, unless it shall be determined in a Final Order to have constituted willful misconduct or gross negligence; provided, however, that for avoidance of doubt, nothing herein shall provide any exculpation or release to James Booth, Ted McGinnis or any other current or former officer, director or employee of the Debtors for conduct occurring prior to the Petition Date.

### 4. Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 11.03 OF THE PLAN (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN SECTION 11.03); OR (3) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, EQUITY INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO EXCULPATED, INCLUDING THE LIQUIDATING TRUST AND THE LIQUIDATING TRUST ASSETS) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF (UNLESS PREVIOUSLY ASSERTED) OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS OR ANY ENTITY SO EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION, AND

NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF OR SUBROGATION PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED, FURTHER, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

## 5.    Setoffs

Except as otherwise provided in the Plan, prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Equity Interest, may set off against any Allowed Claim or Equity Interest on account of any Proof of Claim or other pleading Filed with respect thereto prior to the Confirmation Hearing and the Distributions to be made pursuant to the Plan on account of such Allowed Claim or Equity Interest (before any Distribution is made on account of such Allowed Claim or Equity Interest), any claims, rights, and Causes of Action of any nature that the Debtors' Estates may hold against the Holder of such Allowed Claim or Equity Interest, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), including any rights under section 502(d) of the Bankruptcy Code, provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Equity Interest pursuant to the Plan shall constitute a waiver or release by the Debtors or the Liquidating Trustee, as applicable, of any such claims, rights, and Causes of Action that the Debtors' Estates may possess against such Holder, provided, further, that the Holder of a Claim or Equity Interest may contest such set off by the Debtors or the Liquidating Trustee, as applicable, in the Bankruptcy Court or any other court of competent jurisdiction. In no event shall any Holder of Claims or Equity Interests be entitled to set off any Claim or Equity Interest against any claim, right, or Cause of Action of the Debtors' Estates unless such Holder has timely Filed a Proof of Claim with the Bankruptcy Court preserving such setoff; provided that nothing in the Plan shall prejudice or be deemed to have prejudiced the Debtors' or the Liquidating Trustee's right to assert that any Holder's setoff rights were required to have been asserted by motion or pleading filed with the Bankruptcy Court prior to the Effective Date.

## 6.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in these Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

## I.    The Liquidating Trust

### 1.    Sources of Consideration for Plan Distributions

The Debtors' Cash and the other Liquidating Trust Assets shall be used to fund the Distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims provided in the Plan.

### 2.    The Liquidating Trust

On or prior to the Effective Date, the Debtors, on their own behalf and on their Estates' behalf and on behalf of the Holders of Claims and Equity Interests that are to be satisfied with post-Effective Date Distributions from the Liquidating Trust Assets, will execute the Liquidating Trust Agreement and will take all other steps necessary to establish the Liquidating Trust pursuant to the Liquidating Trust Agreement.  On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors will transfer to the Liquidating Trust all of their rights, title, and interests in all of the Liquidating Trust Assets.

The Liquidating Trust shall be established solely for the purpose of holding and administering the Liquidating Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.  Accordingly, the Liquidating Trustee shall hold the Liquidating Trust Assets pursuant to the terms of the Plan and the Liquidating Trust Agreement by engaging in the following activities: (a) pursuing the Causes of Action retained by the Liquidating Trust; (b) making all required Distributions to the beneficiaries as provided for under the Liquidating Trust Agreement; and (c) taking other actions as may be necessary to effectuate any of the foregoing.  The Liquidating Trust will not hold itself out as an investment company and will not conduct a trade or business.  At no time shall the Liquidating Trust control or operate the business of the Debtors or any assets of the Debtors other than the Liquidating Trust Assets.

### 3.    The Liquidating Trust Board

The Liquidating Trust will be advised by the "Liquidating Trust Board," which shall initially consist of three voting members designated by the Creditors' Committee.

### 4.    Appointment and Termination of the Liquidating Trustee

The Liquidating Trustee shall be Ellen Arvin Kennedy.   The appointment of the Liquidating Trustee shall be approved in the Confirmation Order, and such appointment shall be effective on the Effective Date.

In accordance with the Liquidating Trust Agreement, the Liquidating Trust shall continue for a term terminating on the earlier to occur of (a) all of the Liquidating Trust Assets have been

distributed pursuant to the Plan and the Liquidating Trust Agreement, (b) the Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets or retained Causes of Action are not likely to yield sufficient additional proceeds to justify further pursuit, (c) all Distributions required to be made by the Liquidating Trustee under the Plan and the Liquidating Trust Agreement have been made; provided, however, in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth (5th) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed two (2) years, together with any prior extensions) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust Board may not terminate the Liquidating Trustee for any reason without approval by the Bankruptcy Court. The Liquidating Trust Board may bring a motion on proper notice to the Liquidating Trustee and its counsel for removal of the Liquidating Trustee for, among other reasons: (1) fraud, gross negligence, or willful misconduct in connection with the affairs of the Liquidating Trust, (2) for such physical or mental disability as substantially prevents the Liquidating Trustee from performing the duties of Liquidating Trustee in accordance with the Plan or the Liquidating Trust Agreement, or (3) for cause, which shall include a breach of fiduciary duty or an unresolved conflict of interest.

### 5.      Treatment of Liquidating Trust for Federal Income Tax Purposes; No Successor-in-Interest

The Liquidating Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulation Section 301.7701-4(d) and as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a), with no objective to continue or engage in the conduct of a trade or business. In the event the Liquidating Trust shall fail or cease to qualify as a liquidating trust in accordance with Treasury Regulations Section 301.7701-4(d), the parties to the Liquidating Trust Agreement intend that the Liquidating Trustee take such action as it shall deem appropriate to have the Liquidating Trust classified as a partnership for federal tax purposes under Treasury Regulations Section 301.7701-3 (but not a publicly traded partnership under Code Section 7704), including, if necessary, creating or converting it into a Delaware limited liability partnership or limited liability company.

For all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (1) a transfer by each Debtor of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the beneficiaries in full satisfaction of the beneficiaries' claims against the Debtors and, to the extent Liquidating Trust Assets are allocable to Disputed Claims, to the Distribution Reserve Account (as defined in the Liquidating Trust Agreement), followed by (2) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets in exchange for such beneficiaries interest in the Liquidating Trust Assets. Accordingly, the Liquidating Trust beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for all state, provincial, territorial and local income tax purposes

The Liquidating Trust shall file returns for the Liquidating Trust, except with respect to the Disputed Claims Reserve, as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with this Section of the Plan. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to each holder in accordance with their relative beneficial interests in the Liquidating Trust.

As soon as possible after the Effective Date, the Liquidating Trust shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes.

The Liquidating Trust shall file all income tax returns with respect to any income attributable to the Liquidating Trust Assets and shall pay any federal, state and local income taxes attributable to the Liquidating Trust Assets, based on the items of income, deduction, credit or loss allocable thereto.

The Liquidating Trust may request an expedited determination of Taxes of the Debtors or of the Liquidating Trust, including the Distribution Reserve Account, under Bankruptcy Code section 505(b) for all returns filed for, or on behalf of, the Debtors and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

The Liquidating Trustee shall be responsible for filing all federal, state, local and foreign tax returns for the Debtors and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

## 6.    Responsibilities of Liquidating Trustee

The responsibilities of the Liquidating Trustee, which shall be discharged in accordance with the terms of the Plan and the Liquidating Trust Agreement, shall include, but shall not be limited to, the following:

(a)    Administering, liquidating, and monetizing the Liquidating Trust Assets;

(b)    Objecting to and resolving Claims and Disputed Claims;

(c)    Investigating, pursuing, litigating, settling, or abandoning any Causes of Action which constitute Liquidating Trust Assets, all of which may be done without further approval of the Bankruptcy Court (unless the Liquidating Trustee, in its sole discretion, seeks such approval);

(d)    Making Distributions in accordance with the terms of the Plan and the Liquidating Trust Agreement;

(e)    Preparing and filing post-Effective Date operating reports;

(f)    Filing appropriate tax returns in the exercise of its fiduciary obligations;

(g)    Retaining such professionals as are necessary and appropriate in furtherance of its fiduciary obligations; and

(h)    Taking such actions as are necessary and reasonable to carry out the purposes of the Liquidating Trust.

To the extent necessary or appropriate, the Liquidating Trustee shall be deemed to be a judicial substitute for Causes of Action assigned to the Liquidating Trust, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

### 7.    Costs and Expenses of the Liquidating Trust

To the extent the Liquidating Trust Assets are insufficient to pay the expenses of the Liquidating Trust and the Liquidating Trustee, then such expenses shall be reimbursed from the first dollars out of any proceeds that come into the Liquidating Trust before any Distribution to the beneficiaries of the Liquidating Trust; provided, however, the Liquidating Trust expenses shall be subject to the procedures and review set forth in the Liquidating Trust Agreement.

### 8.    Bonding of Liquidating Trustee

The Liquidating Trustee shall not be obligated to obtain a bond but may do so, in his, her, or its sole discretion, in which case the expense incurred by such bonding shall be paid by the Liquidating Trust.

### 9.    Fiduciary Duties of the Liquidating Trustee

Pursuant to the Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall act in a fiduciary capacity on behalf of the interests of the beneficiaries of the Liquidating Trust.

### 10.    Liability, Indemnification of the Liquidating Trust Protected Parties

The Liquidating Trust Protected Parties shall not be liable for any act or omission of any other Liquidating Trust Protected Parties or the member, designee, agent, or representative of such Liquidating Trust Protected Parties, nor shall such Liquidating Trust Protected Parties be liable for any act or omission taken or not taken in their capacity as Liquidating Trust Parties other than for specific acts or omissions resulting from such Liquidating Trust Protected Parties' willful misconduct, gross negligence or fraud.  The Liquidating Trustee may, in connection with the performance of his, her, or its functions, and in his, her, or its sole and absolute discretion, consult with his, her, or its attorneys, accountants, financial advisors, and agents.  Notwithstanding such authority, the Liquidating Trustee shall not be under any obligation to consult with his, her, or its attorneys, accountants, financial advisors, and agents, and his, her, or its determination not to do so shall not result in the imposition of liability on the Liquidating Trustee or the Liquidating Trust Protected Parties, unless such determination is based on willful misconduct, gross negligence or fraud.  The Liquidating Trust shall indemnify and hold harmless the Liquidating Trust Protected Parties from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses (including, without limitation, reasonable attorney's fees, disbursements, and related

expenses), which such Liquidating Trust Protected Parties may incur or to which such Liquidating Trust Protected Parties may become subject to in connection with any action, suit, proceeding, or investigation brought by or threatened against such Liquidating Trust Protected Parties arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust or the Plan or the discharge of their duties hereunder; provided, however, that such indemnification shall be limited to the Liquidating Trust Assets and provided further that no such indemnification will be made to such Liquidating Trust Protected Parties for actions or omissions as a result of their willful misconduct, gross negligence, or fraud.

### 11.     Full and Final Satisfaction Against Liquidating Trust

On and after the Effective Date, the Liquidating Trust shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Liquidating Trust Agreement.  All payments and all Distributions made by the Liquidating Trustee under the Plan shall be in exchange for all Claims or Equity Interests against the Liquidating Trust.

### J.     Treatment of Executory Contracts and Unexpired Leases

### 1.     Executory Contracts and Unexpired Leases

Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all Executory Contracts and Unexpired Leases to which the Debtor is a party on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtor, (b) previously shall have expired or terminated pursuant to its own terms before the Petition Date; (c) is a Purchased Asset under the Asset Purchase Agreement that was attached as Exhibit A to the Sale Order, or any related agreement including the Permit Operating Agreement attached as Exhibit A-1 to the Sale Order) or (d) is the subject of a pending motion to assume or reject on the Confirmation Date. The Confirmation Order shall not be deemed to reject any insurance policy in which the Debtor is a beneficiary.  No order confirming this Plan or any Amendment thereto is intended to or shall constitute a modification of the terms of the Sale Order.

### 2.     Claims Based on the Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an Order of the Bankruptcy Court, any Proofs of Claim based upon the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed no later than 30 days after the Effective Date.

### K.     Procedures for Resolving Contingent, Unliquidated, and Disputed Claims and Equity Interests

### 1.     Resolution of Disputed Claims

*(a)     Allowance of Claims and Equity Interests*

Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Equity Interest shall become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Equity Interest.

*(b)        Prosecution of Objections to Claims or Equity Interests*

Subject in all respects to the provisions in the Plan, other than with respect to Professional Fee Claims, prior to the Effective Date, the Debtors, and on or after the Effective Date, the Liquidating Trustee shall have the authority to File objections to Claims or Equity Interests, and the exclusive authority to settle, compromise, withdraw, or litigate to judgment objections on behalf of the Debtors' Estates to any and all Claims or Equity Interests, regardless of whether such Claims or Equity Interests are in a Class or otherwise.  For the avoidance of doubt the U.S. Trustee's right to object to Claims, including Professional Fee Claims and Claims asserted under section 503(b)(3) and (b)(4) of the Bankruptcy Code, is reserved.  Any objections to Claims or Equity Interests shall be Filed on or before the Claims Objection Bar Date, as such date may be extended pursuant to the Plan.

Subject to the foregoing sentence, from and after the Effective Date, the Liquidating Trustee (a) may settle or compromise any Disputed Claim in accordance with the Liquidating Trust Agreement and (b) shall succeed to the Debtors' rights with respect to any objections Filed by the Debtors that remain pending as of the Effective Date. From and after the Effective Date, the Liquidating Trustee shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

*(c)        Claims Estimation*

On and after the Effective Date, the Liquidating Trustee, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Liquidating Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to the maximum extent permitted by law as determined by the Bankruptcy Court to estimate any Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan to the contrary, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.

In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of Distributions, and the Debtors or the Liquidating Trustee, as applicable, may elect to pursue additional objections to the ultimate Distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Liquidating Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(d)      *Expungement or Adjustment to Claims Without Objection*

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by, as applicable, the Debtors or the Liquidating Trustee, and any Claim that has been amended may be adjusted thereon by, as applicable, the Debtors or the Liquidating Trustee without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## 2.      **Distribution Reserve Account**

Distributions of Liquidating Trust Assets with respect to Disputed Claims shall be deposited into the Distribution Reserve Account in accordance with the terms of the Plan and the Liquidating Trust Agreement.  The amount deposited shall be determined by the Liquidating Trustee in consultation with the Liquidating Trust Board.  The Liquidating Trustee may, in consultation with the Liquidating Trust Board, invest any Cash that is withheld in the Distribution Reserve Account in accordance the Liquidating Trust Agreement.  Notwithstanding any such investment and the addition to Liquidating Trust Assets of any income earned in respect thereof, in the event such Claim ultimately becomes an Allowed Claim, nothing in the Plan or Liquidating Trust Agreement shall be deemed to entitle the holder of a Disputed Claim to postpetition or post-Effective Date interest on such Claim.

## 3.      **Distributions After Allowance**

On the next Distribution Date after the date when the order or judgment of the Bankruptcy Court allowing all or part of a Disputed Claim becomes a Final Order, the Liquidating Trustee, or such other disbursing agent, will (1) distribute to the holder of such Claim any property in the Distribution Reserve Account that would have been distributed to such beneficiary on the Distribution Dates on which distributions previously were made to beneficiaries if the Claim in issue had been an Allowed Claim (in whole or in part, as applicable) on such earlier Distribution Dates; and (2) distribute any remaining property held in the Distribution Reserve Account on account of any resolved Disputed Claim in accordance with the Plan and the Trust Agreement.

After a Final Order has been entered, or other final resolution has been reached with respect to all Disputed Claims, any remaining property held in the Distribution Reserve Account will be distributed in accordance with the Plan and the Trust Agreement.

### 4.    Disallowance of Claims

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by, as applicable, the Debtors or the Liquidating Trustee (or the Notice and Claims Agent at, as applicable, the Debtors' or the Liquidating Trustee's direction), and any Claim that has been amended may be adjusted thereon by, as applicable, the Debtors or the Liquidating Trustee without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5.    Amendments

After the Bar Date, as applicable, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and any such new or amended Claim Filed shall be deemed Disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court; provided that, even with such Bankruptcy Court authorization, a Claim may be amended by the Holder of such Claim solely to decrease, but not to increase, unless otherwise provided by the Bankruptcy Court, the amount, number or priority.

### 6.    No Interest

Unless otherwise specifically provided for in the Plan, by applicable law, or agreed-to by, as applicable, the Debtors or the Liquidating Trustee, interest shall not accrue or be paid on any Claim, and no Holder of any Claim shall be entitled to interest accruing on and after the Petition Date on account of any Claim. Without limiting the foregoing, interest shall not accrue or be paid on any Claim after the Effective Date to the extent the final Distribution paid on account of such Claim occurs after the Effective Date.  Notwithstanding the foregoing, if Holders of Allowed General Unsecured Claims receive a distribution of 100%, they shall be paid interest from the Petition Date until the date their Allowed General Unsecured Claims are paid in full at the federal judgment interest rate that was in effect on the Petition Date.

### L.    Other Administrative Claims Bar Date

All Other Administrative Claims (other than as set forth in the Plan) must be made by application Filed with the Bankruptcy Court and served on counsel for the Debtors or Liquidating Trustee no later than thirty (30) days after the Effective Date or their Administrative Claims shall be forever barred.  In the event that the Liquidating Trustee objects to an Other Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

With respect to Administrative Claims other than Other Administrative Claims, the last day for Filing an objection to any Administrative Claim will be the later of (a) 180 days after the Effective Date, (b) 90 days after the filing of such Administrative Claim, or (c) such other date specified in the Plan or ordered by the Bankruptcy Court.

### M.    Professional Fee Claims

All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be made by application Filed with the Bankruptcy Court and served on the Debtors, their counsel, the Liquidating Trustee, its counsel, counsel to the Creditors' Committee, the U.S. Trustee, and other necessary parties-in-interest no later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to such applications must be Filed and served on the Debtors, their counsel, Liquidating Trustee, its counsel, counsel to the Creditors' Committee and the requesting Professional or other Entity on or before the date that is thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

The Liquidating Trustee may, without application to or approval by the Bankruptcy Court, retain professionals and pay reasonable professional fees and expenses in connection with services rendered to them after the Effective Date.

### N.  Modifications and Amendments

Subject to the limitations contained in the Plan, the Plan Proponents reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Plan Proponents expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, but only until the Effective Date and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XIII of the Plan.

After the Effective Date, the Liquidating Trustee can modify the Plan only in accordance with section 1127 of the Bankruptcy Code and applicable law.

### O.  Substitution of the Liquidating Trust for the Debtors

On the Effective Date, the Liquidating Trust shall be deemed to be substituted as the party in lieu of the Debtors in all pending matters including but not limited to (i) motions, contested matters and adversary proceeding pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums or administrative proceedings outside of the Bankruptcy Court without the need or requirement for the Liquidating Trustee to file motions or substitutions of parties and counsel.

## ARTICLE IV
## CONFIRMATION OF THE PLAN

### A.    Introduction

The Bankruptcy Code requires a bankruptcy court to determine whether a plan complies with the technical requirements of chapter 11 of the Bankruptcy Code before such plan can be confirmed.  It requires further that a disclosure statement concerning such plan is adequate and includes information concerning all payments made or promised by the plan proponent in connection with the plan.

If the Plan is confirmed, the Plan Proponents expect the Effective Date to occur no more than fifteen (15) days after the Confirmation Date.

To confirm the Plan, the Bankruptcy Court must find that the requirements of the Bankruptcy Code have been met.  Thus, even if the requisite vote is achieved for each of the Classes entitled to vote on the Plan, the Bankruptcy Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan.  Some of these statutory requirements are discussed below.

### B.    Voting

Pursuant to the Bankruptcy Code, only holders of Allowed Claims that are Impaired under the terms and provisions of the Plan and that receive distributions thereunder are entitled to vote for acceptance or rejection of the Plan.  A holder of a Claim or Equity Interest whose legal, equitable, or contractual rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered Impaired.  Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote.

Votes on the Plan will be counted only with respect of Allowed Claims that (i) belong to a Class entitled to vote on the Plan, or (ii) are otherwise permitted by the Bankruptcy Code to vote.

### C.    Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of claims of that class that actually vote.  The Bankruptcy Code defines acceptance of a plan by an impaired class of interests as acceptance by holders of at least two-thirds in dollar amount of interests of that class that actually vote.  Acceptance of a plan need only be solicited from holders of claims or interests whose claims or interests are impaired and not deemed to have rejected the Plan. Except in the context of a "cram down" pursuant to section 1129(b) of the Bankruptcy Code, as a condition to confirmation of a plan the Bankruptcy Code requires that, with certain exceptions, each class of impaired claims or interests accepts the plan.

In the event the requisite vote is not obtained as to a particular Class or Classes of Claims or Equity Interests, the Plan Proponents have the right, assuming that at least one Class of Impaired

48

Claims or Equity Interests has accepted the Plan, to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.   Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more classes of impaired claims or interests if the bankruptcy court finds that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the rejecting class or classes.  This procedure is commonly referred to in bankruptcy parlance as "cram down."  As such, if any Class entitled to vote on the Plan votes to reject the Plan, the Plan Proponents will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

### D.    Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.  Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan satisfies the applicable provisions of the Bankruptcy Code.

- The proponent of the plan has complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been disclosed to the bankruptcy court, and any such payment made before the confirmation of the plan is reasonable, or if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the bankruptcy court as reasonable.

- The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office of such individual must be consistent with the interests of creditors and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtors will employ or retain, and the nature of any compensation for such insider.

- With respect to each class of impaired claims or interests, either each holder of a claim or interest in such class has accepted the plan, or will receive or retain under the plan on account of such claims or interests, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Each class of claims has either accepted the plan or is not impaired under the plan, subject to Section VI.D.4, "Cram Down -- Unfair Discrimination and Fair & Equitable Tests."

49

- Except to the extent that the holder of a claim has agreed to a different treatment of such claim, the plan provides that allowed administrative claims and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the order for relief, of a value, as of the effective date, equal to the allowed amount of such claim.

- If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to receiving the requisite votes in accordance with section 1129(a)(8) of the Bankruptcy Code and the "cram down" of Impaired Classes voting against the Plan or not receiving any distribution under the Plan, the Plan Proponents believe that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Plan Proponents have complied or will have complied with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

## 1.    Best Interests of Holders of Claims and Equity Interests

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each Holder of a Claim in such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

In chapter 7 liquidation cases, unsecured creditors and equity interest holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments until all amounts due to senior classes have been paid fully or payment has been provided for:

- Secured creditors (to the extent of the value of their collateral).
- Priority creditors.
- Unsecured creditors.
- Debt expressly subordinated by its terms or by order of the Bankruptcy Court.
- Equity interest holders.

The Plan is a liquidating plan. Thus, whether by the Liquidating Trust, or a Chapter 7 trustee, the Debtors' Estates' assets will be liquidated. Accordingly, there is no reorganization value to be calculated, or distribution scenarios related thereto. In addition, the activities of the Liquidating Trust and the Liquidating Trustee after the Effective Date are the same ones that would be pursued by a Chapter 7 trustee. However, a Chapter 7 trustee may seek to charge statutory fees of up to 3% of disbursements above $1 million (and higher amounts for disbursements below $1

million).  The Debtors already expect to have in excess of $3 million on hand as of the Effective Date – and may have several million more after the conclusion of all litigation – resulting in a fee to the chapter 7 trustee that could be several hundred thousand dollars.

Additionally, it is likely that a Chapter 7 trustee will retain counsel who would likely be required to spend a significant amount of time and expense becoming familiar with the case – time and expense that would not be required if the Plan is confirmed.  This case has many players and intricacies that can be effectively and efficiently managed by those – including the proposed Liquidating Trustee, Ms. Kennedy – who already have knowledge of these matters.

After careful review of the estimated recoveries in a chapter 11 liquidation scenario and a chapter 7 liquidation scenario, the Plan Proponents have concluded that the recoveries to Holders of Allowed Claims will be maximized by completing the liquidation of any remaining assets of the Debtors under chapter 11 of the Bankruptcy Code and making distributions pursuant to the Plan.  The Debtors believe that the Debtors' Estates have value that would not be fully realized by Holders of Allowed Claims in a chapter 7 liquidation primarily because, among other reasons, (i) additional administrative expenses would be incurred in a chapter 7 liquidation, specifically those of a Chapter 7 trustee charging statutory fees of 3% (or more, for the first $1 million) of disbursements and any costs of counsel to the Chapter 7 trustee to become familiar with the facts and circumstances of these cases, (ii) the additional delay in distributions that would occur if the Debtors' Chapter 11 Cases were converted to cases under chapter 7; and (iii) the additional administrative burdens that are placed on a Chapter 7 Trustee which are not present in a Chapter 11 case.

### 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors unless such liquidation or reorganization is proposed in the Plan.  The Plan is a liquidating plan, satisfying § 1129(a)(11).

### 3. Acceptance

Holders of Allowed Claims in Classes 1 and 3 through 6 are entitled to vote to accept or reject the Plan.  Holders of Allowed Claims in Class 2 are deemed to accept the Plan and cannot vote.  Holders of Equity Interests in Class 7 will receive no distributions under the Plan and therefore are conclusively presumed to have voted to reject the Plan.

The Plan Proponents will request that the Bankruptcy Court confirm the Plan notwithstanding the deemed rejection of the Plan by Class 7 pursuant to section 1129(b) of the Bankruptcy Code.  The Plan Proponents also will request that the Bankruptcy Court confirm the Plan over the rejection of the Plan by any Class voting on the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 4. Cram Down -- Unfair Discrimination and Fair & Equitable Tests

To obtain nonconsensual confirmation of the Plan, it must be demonstrated that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-

accepting class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  Section 1129(b) of the Bankruptcy Code establishes "cram-down" tests for secured creditors, unsecured creditors, and equity holders, as follows:

*Secured Creditors.*  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be provided in clause (i) or (ii).

*Unsecured Creditors.*  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

*Equity Interests.*  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest, or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

A plan does not "discriminate unfairly" with respect to a nonaccepting class if the value of the cash and/or securities to be distributed to the nonaccepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the nonaccepting class.

The Plan Proponents believe that the Plan is fair and equitable and does not discriminate unfairly with respect to any Class of Claims or Equity Interests that rejects or is deemed to reject the Plan.

## ARTICLE V
## RISK ASSOCIATED WITH THE PLAN

HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.       Parties-in-Interest May Object to the Plan's Classification of Claims

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Plan Proponents believe that the classification of Claims and Interests

under the Plan complies with the requirements set forth in the Bankruptcy Code. However, the Plan Proponents cannot assure you that parties-in-interest and/or the Bankruptcy Court will reach the same conclusion.

**B.      The Plan Proponents may not be able to Secure Confirmation of the Plan**

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusionMoreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of vote

The Bankruptcy Court may confirm the Plan at the Plan Proponents' request if at least one Impaired Class has accepted the Plan (such acceptance being determined without including the vote of an "insider" in such Class), and as to each Impaired Class that has not accepted the Plan, if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired classesThe Plan Proponents believe that the Plan satisfies these requirements.

**C.      The Liquidating Trustee May Object to the Amount or Classification of Your Claim**The Liquidating Trustee, as of the Effective Date, has the right to object to the amount or classification of any ClaimThe estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose Claim is subject to an objection, or may be objected to prior to the Claims Objection Deadline. Any such Holder of a Claim may not receive its specified share of the estimated Distributions described in this Disclosure Statement.

This risk is also present in a chapter 7 case.**The Liquidating Trustee May File a Lawsuit against you**Upon the Effective Date, all Causes of Action vest with the Liquidating Trust to be pursued by the Liquidating Trustee. The Liquidating Trustee may identify and initiate a Cause of Action against you. This risk is also present in a chapter 7 case.

**E.      The Liquidating Trustee may determine that the Liquidating Trust has Insufficient Assets to Prosecute Claims or Causes of Action**

The Liquidating Trust will be funded with the Liquidating Trust Assets. The Liquidating Trustee may determine at any time after the Effective Date that the Liquidating Trust has insufficient assets to identify, initiate or prosecute Causes of Action and may abandon such Causes of Action. Such Causes of Action are anticipate to be the main source of recovery for Creditors.

**F.      The Information in this Disclosure Statement is Based on Estimates, which may turn out to be Incorrect**

The information in this Disclosure Statement is based upon Claims reflected in the Schedules and a preliminary review of the Claims filed as of the date of this Disclosure StatementUpon the completion of a detailed analysis of the proofs of claim, the actual amount of Claims may differ from current estimates. Further, the amounts of Disputed Claims that ultimately are Allowed by the Bankruptcy Court may be significantly more or less than the estimated amounts of such Claims. The actual aggregate amount of Allowed Claims may differ significantly from

the estimates set forth in this Disclosure Statement. Accordingly, the amount of the Distributions that ultimately will be received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed.

### G.    The Debtors are not able to Complete the Transfer of all Mining Permits

As set forth above, the JOD, Pristine and PCC each has not completed the transfer of all mining permits that it has acquired from the Debtors. To the extent that one or more of these purchasers is unable to effectuate the transfer of any permit (including, without limitation, due to PCC and Pristine being "permit blocked"), such permit may remain with the Liquidating Trust after the Effective Date, subject to the rights of, among others, the Cabinet and Continental to be heard on the issue of if and how the Liquidating Trust may hold any permits. While the Plan Proponents believe that there is a reasonable possibility that they could find an alternative assignee of any permit that is not transferred, such a result is not guaranteed. If any permit is not transferred, Continental's surety bonds may be called, causing Continental to likely attempt to assert an Administrative Claim as alleged subrogee of the Administrative Claims of the Cabinet for any funds paid to the Cabinet used to perform post-petition reclamation or reclamation self-performed by Continental. Additionally, the Cabinet will likely assert an Administrative Claim and/or an Other Administrative Claim for any reclamation costs that exceed the amounts paid by Continental (in addition to administrative claims for post-petition civil penalties incurred as a result of violations of Kentucky mining permits held by debtors). While the Plan Proponents would dispute the allowance of any such Administrative Claim asserted by Continental and reserve their rights on any claim asserted by the Cabinet, those issues could be heavily disputed. The lack of any permit transfer could also cause the Plan Proponents to treat one of more Debtors as Withdrawn Debtors under Section 4.05 of the Plan, likely leading to conversion of such Withdrawn Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. The Plan Proponents will file a notice with the Bankruptcy Court if their intention to treat a Debtor as a Withdrawn Debtor no later than ten (10) days before the Confirmation Hearing ("Withdrawn Debtor Notice"). Interested parties, including, without limitation, the Cabinet and Continental, may object to the Withdrawn Debtor Notice, and any such dispute will be heard as part of the Confirmation Hearing.

### ARTICLE VI
### CERTAIN FEDERAL INCOME TAX CONSEQUENCES

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

The following discussion summarizes some of the more significant United States federal income tax consequences of the Plan to certain holders of Allowed Claims and Equity Interests. The analysis contained herein is based upon the Internal Revenue Code of 1986, as amended (the "IRC" or "Tax Code"), the Treasury Regulations promulgated and proposed thereunder (the "Regulations"), judicial decisions, and published administrative rulings and pronouncements of the Internal Revenue Service (the "IRS") as in effect on the date hereof.

Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below. This summary does not address foreign, state, or local income tax, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign companies, nonresident alien individuals, S corporations, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, broker/dealers, and tax-exempt organizations). Accordingly, it should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of an Allowed Claim or Interest.

Due to the complexity of certain aspects of the Plan, some of which are discussed below, the lack of applicable legal precedent and the possibility of changes in the law, the differences in the nature of various Allowed Claims, the differences in the methods of accounting of holders of Allowed Claims or Interests, and the potential for disputes as to legal and factual matters, the federal income tax consequences described herein are subject to significant uncertainties.

THE TAX CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS OR INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW. NO RULING HAS BEEN OR WILL BE APPLIED FOR OR OBTAINED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR WILL BE REQUESTED OR OBTAINED BY THE PLAN PROPONENTS WITH RESPECT THERETO. THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE UPHELD. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN, OR OTHER TAX CONSEQUENCES OF THE PLAN.

### A.       Federal Income Tax Consequences to the Debtors

Debtors are corporations or limited liability companies for U.S. federal income tax purposes, and according to Debtors' accountants, the Plan will have no federal income tax consequences for the Debtors.

### B.       Federal Income Tax Consequences to the Holders of Equity Interests

Under the Plan, the holders of Equity Interests in the Debtors will have the Equity Interests cancelled and will not receive any payment with respect to such cancellation.  Holders of Equity Interests in the Debtors generally will recognize loss in the amount of the holder's adjusted tax basis in its Equity Interest. The character of any recognized loss will depend upon several factors

55

including, but not limited to, the status of the holder, the nature of the Equity Interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period, and the extent to which the holder had previously claimed a deduction for the worthlessness of all or a portion of the Interest. A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered. **HOLDERS OF EQUITY INTERESTS IN THE DEBTORS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF LOSS FOR FEDERAL INCOME TAX PURPOSES.**

Holders of Equity Interests may be allocated income, gain, loss, and deductions recognized by the Debtors as a result of the implementation of the Plan. See, above, "Federal Income Tax Consequences to the Debtors." The tax consequences to a Holder of an Equity Interest from such allocation will vary from Holder to Holder based on the individual circumstances of that Holder. Accordingly, this summary does not further address the U.S. federal income tax consequences applicable to a holder of an Equity Interest who is allocated income, gain, loss, or deductions by the Debtors. **EACH HOLDER OF AN EQUITY INTEREST IN THE DEBTORS SHOULD CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO IT OF THE IMPLEMENTATION OF THE PLAN.**

### C.    Federal Income Tax Consequences to Holders of Allowed Claims

The federal income tax consequences of the Plan to a holder of an Allowed Claim will depend upon several factors, including but not limited to: (i) whether the Holder's Allowed Claim (or a portion thereof) constitutes a payment for principal or interest, (ii) the origin of the Holder's Allowed Claim, (iii) the type of consideration given by the Holder in exchange for the Allowed Claim, (iv) whether the holder is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above), (v) whether the Holder reports income on the accrual or cash basis method, (vi) whether the Holder has taken a bad debt deduction or worthless security deduction with respect to the Allowed Claim, and (vii) whether the holder receives Distributions under the Plan in more than one taxable year. **HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF DISTRIBUTIONS ON ACCOUNT OF THEIR PARTICULAR ALLOWED CLAIMS.** Generally, a Holder of an Allowed Claim will recognize gain or loss equal to the difference between the "amount realized" by such holder and such Holder's adjusted tax basis in the Allowed Claim. The "amount realized" is equal to the fair market value of such Holder's proportionate share of the assets transferred to the Liquidating Trust on the behalf of and for the benefit of such holder (to the extent that such assets are not allocable to any portion of the Allowed Claim representing accrued but unpaid interest (see discussion below)).

If the Liquidating Trust qualifies as a liquidating trust as defined in Treasury Regulation section 301.7701-4(d), the transfer of the Liquidating Trust Assets to the Liquidating Trust by the Debtors will be treated for federal income tax purposes as a transfer of such Liquidating Trust Assets to the Holders of Allowed Claims to the extent they are creditor-beneficiaries, followed by a deemed transfer of such assets by such beneficiaries to the Liquidating Trust. As a result of such

treatment, Holders of Allowed Claims will have to take into account the fair market value of their Pro Rata share, if any, of the Liquidating Trust Assets transferred on their behalf to the Liquidating Trust in determining the amount of gain (or loss) realized and required to be recognized upon consummation of the Plan.  In addition, since a Holder's share of the assets held in the Liquidating Trust may change depending upon the resolution of Disputed Claims, the Holder may be prevented from recognizing any loss in connection with consummation of the Plan until the time that all such Disputed Claims have been resolved.  The Liquidating Trustee will provide the holders of Allowed Claims with valuations of the assets transferred to the Liquidating Trust and such valuations will be used consistently by the Liquidating Trust and such holders for all federal income tax purposes.

The character of any recognized gain or loss (e.g., ordinary income or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Allowed Claim in its hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Allowed Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Allowed Claim.  **HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

In addition, holders of Allowed Claims will be taxed on their allocable shares of the Liquidating Trust's income and gain in each taxable year, whether or not they receive any Distributions from the Liquidating Trust in such taxable year.  **HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE POSSIBILITY OF RECOGNIZING INCOME FOR FEDERAL INCOME TAX PURPOSES WITHOUT THE RECEIPT OF CASH TO PAY THE TAXES ON SUCH INCOME.**

### D.    Allocation of Consideration to Interest

A portion of the consideration received by a Holder in satisfaction of an Allowed Claim pursuant to the Plan may be allocated to the portion of such Allowed Claim (if any) that represents accrued but unpaid interest.  Unless otherwise provided by applicable statute or rule, distributions under the Plan are allocated first to the principal of an Allowed Claim, then to any accrued interest. If any portion of the Distribution were required to be allocated to accrued interest, such portion would be taxable to the Holder as interest income, except to the extent the holder has previously reported such interest as income.

In that event, only the balance of the distribution would be considered received by the Holder in respect of the principal amount of the Allowed Claim.  Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the holder with respect to the Allowed Claim.  If any such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

To the extent that any portion of the distribution is treated as interest, Holders may be required to provide certain tax information in order to avoid the withholding of taxes. **HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS**

CONCERNING THE FEDERAL INCOME TAX TREATMENT OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS.

## ARTICLE VII
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Liquidation Pursuant to Chapter 7 of the Bankruptcy Code

If no Chapter 11 plan can be confirmed or there is a Withdrawn Debtor, some or all of the Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, in which case a trustee will be appointed to liquidate the assets of the Debtors.  It is impossible to predict precisely how the proceeds of a liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code would be distributed to the respective holders of Claims against or Interests in the Debtors.  However, the Plan Proponents believe that liquidation under Chapter 7 would result in, among other things, (i) smaller distributions being made to creditors than those provided for in the Plan because of additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals and (ii) additional expenses and Claims, some of which may be entitled to priority, as discussed more fully in Article IV of this Disclosure Statement.

### B.    Alternative Plan of Liquidation

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan with respect to the Debtors.  Such a plan would necessarily involve the orderly liquidation of the Debtors' assets.  The Plan Proponents have concluded that the Plan represents the best alternative to protect the interests of creditors and other parties-in-interest.

Further, the Plan Proponents believe that the Plan enables the Liquidating Trustee to maximize the value realized from the Debtors' assets and to streamline the process of distributing the proceeds of the Debtors' assets, allowing creditors to realize the highest recoveries under the circumstances.  Accordingly, the Plan Proponents believe that the Creditors of the Debtors will receive greater recoveries through the Plan than in a Chapter 7 liquidation.

## ARTICLE VII
## CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to Holders of Allowed Claims.  Other alternatives would involve delay, uncertainty, and substantial administrative costs.

**THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.**

Dated:  September 16, 2020                **CAMBRIAN HOLDING COMPANY, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION**

*/s/ J. Mark Campbell*
By: J. Mark Campbell
Individual Designated to Perform Duties of Debtors
and Debtors-in-Possession

**OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF CAMBRIAN HOLDING
COMPANY, INC. *ET AL.***

*/s/ Geoffrey S. Goodman*
By: Geoffrey S. Goodman
Counsel to the Official Committee of Unsecured
Creditors of Cambrian Holding Company, Inc., *et
al.*, as authorized signatory

Frost Brown Todd LLC
Patricia Burgess
250 West Main Street
Suite 2800
Lexington, Kentucky 40507

Telephone:  (859) 231-0000
Facsimile:  (859) 231-0011
pburgess@fbtlaw.com

and

A..J. Webb
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Telephone:  (513) 651-6800
Facsimile:  (513) 651-6981
awebb@fbtlaw.com

**Counsel for Debtors and Debtors-in-Possession**

Foley & Lardner LLP
Geoffrey S. Goodman
321 North Clark Street
Suite 2800
Chicago, Illinois
ggoodman@foley.com

and

Barber Law PLLC
T. Kent Barber
2200 Burrus Drive
Lexington, KY 40513
Telephone: (859) 296-4372
kbarber@barberlawky.com

**Counsel for the Official Committee of Unsecured Creditors of Cambrian Holding Company, Inc. *et al.***

4845-6480-7875v2